IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 21-30725 |
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC., | § | Chapter 11 |
| | § | |
| Debtor. [1] | § | |

### DEBTOR'S OBJECTION TO ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S PROOF OF CLAIM

---

**Claim No.:** Stretto Claim No. 403

**Claimant:** Electric Reliability Council of Texas, Inc.

**Date Claim Filed:** June 14, 2021

**Amount of Claim as Filed:** $1,899,152,990.64

**Status of Claim as Filed:** Priority in amount of $1,877,591,506.10; general unsecured in amount of $21,561,484.54

---

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT REACH AN AGREEMENT, YOU MUST FILE A RESPONSE TO THIS OBJECTION AND SEND A COPY OF YOUR RESPONSE TO THE OBJECTING PARTY WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, OR A SHORTER TIME PERIOD AS ORDERED BY THE COURT. IF YOU DO NOT FILE A RESPONSE WITHIN THIS PERIOD, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**A STATUS AND SCHEDULING CONFERENCE HAS BEEN SET ON THIS MATTER ON AUGUST 10, 2021 AT 1:00 P.M. IN COURTROOM 400, 4TH FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK, HOUSTON, TEXAS 77002.**

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Brazos Electric Power Cooperative, Inc. ("Brazos Electric" or the "Debtor") files this Objection to the above-described proof of claim (the "Claim" or the "ERCOT Claim") of Electric Reliability Council of Texas ("ERCOT") for the reasons and grounds set forth below.

## I.     PRELIMINARY STATEMENT

1.     ERCOT seeks to collect an arbitrary and unconscionable rate from the Debtor by ignoring or otherwise failing to follow the properly enacted and operative protocols in place at the relevant time; ERCOT failed to mitigate its damages as required under the contract and applicable law governing the relationship between the Debtor and ERCOT; ERCOT charged excessively and unconscionably high prices for ancillary services; and ERCOT failed in its duty to the Debtor and other market participants to timely and appropriately notify them of the exigencies and anticipated consequences of the storm and to identify and implement measures necessary to allow the market to continue to function properly.  The Debtor therefore requests that this Court disallow, in part, and materially reduce the ERCOT Claim in an amount as determined by this Court.  The Debtor additionally requests that the ERCOT Claim be reclassified as a general unsecured claim in its entirety.

## II.     JURISDICTION, VENUE, AND AUTHORITY

2.     This Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3.     Venue of the Debtor's case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 502, and 503 of the Bankruptcy Code, Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Bankruptcy Local Rules (the "Local Rules").

5.      This Court has constitutional authority to enter final orders with respect to the relief requested herein.  The Debtor further confirms its consent to this Court's entry of final orders or judgments on this Objection if it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

### III.     FACTUAL BACKGROUND

**A.     The Bankruptcy Case**

6.      On March 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On March 15, 2021, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").  *See* Dkt. No. 216. The Committee was reconstituted by the U.S. Trustee on March 24, 2021.  *See* Dkt. No. 285.

8.      Additional information about the Debtor's business and affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date can be found in the *Declaration of Clifton Karnei in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [Dkt. No. 3], which is incorporated herein by reference.

**B.      Background on the Debtor and ERCOT**

      **(1)      The Debtor**

9.      Headquartered in Waco, Texas and founded in 1941, the Debtor is Texas's largest and oldest generation and transmission electric cooperative.  The Debtor is the wholesale power supplier for its 16 member-owner distribution cooperatives (the "Members").  The Debtor's Members' service territory extends across 68 counties from the Texas Panhandle to Houston, ultimately delivering electricity to over 700,000 electric meters and approximately 1.5 million Texans.  The Debtor owns and operates more than 2,713 miles of transmission line and 427 substations and wholesale metered points of delivery and is Texas's seventh largest transmission provider.  The Debtor owns approximately 2,600 MW of generation available to be dispatched by ERCOT, which amounts to approximately 3% of total ERCOT installed generation capacity.

10.      Prior to Winter Storm Uri, the Debtor was a model of financial stability.  By aggregating the distribution needs of its electric cooperative members to obtain best-in-class generation and transmission facilities through low-cost financing, the Debtor maintained an "A+" and "A" issuer credit ratings from Fitch and S&P, respectively, prior to the events leading to the Chapter 11 filing.[2]  During the eight decades prior to the unprecedented and catastrophic energy crisis when a powerful winter storm, which came to be called "Winter Storm Uri," blanketed the entire state of Texas with snow, ice, and sub-freezing temperatures, the Debtor consistently met the generation, transmission, and distribution substation needs of its members and maintained an impeccable financial record, even as Texas's population exploded during this period.

---

[2] *See* S&P Global Ratings, Brazos Electric Power Cooperative Inc., Texas Brazos Sandy Creek Electric Cooperative Inc.; Rural Electric Coop, Jan. 26, 2021; FitchRatings, Fitch Affirms Brazos Electric Power Cooperative, Inc. TX IDR at 'A+' – Outlook Positive, dated June 18, 2020.

11.     The Debtor's Chapter 11 filing was precipitated solely by the exorbitant costs ERCOT and other suppliers charged the Debtor for energy and fuel required to generate electricity during the storm and not by any operational or management issues caused by the Debtor.  To put this into perspective, for the approximate one-week duration of Winter Storm Uri, ERCOT delivered invoices to Debtor in an amount over $2.1 billion due to unprecedented high prices for electric energy and ancillary services.  These invoices equaled almost twice the total annual revenue of the Debtor in recent years.[3]

### (2)     ERCOT

12.     There are three main electric grids in the United States:  (a) the Eastern Interconnection; (b) the Western Interconnection; and (c) the Texas Interconnection.  ERCOT is the independent system operator (the "ISO") solely responsible for managing the Texas Interconnection, which covers 213 of the 254 Texas counties.  Unlike the Eastern Interconnection and the Western Interconnection, the Texas Interconnection, managed by ERCOT, is its own standalone interconnection with extremely limited export and import capability to the Eastern and Western Interconnection.  Texas is the only one of the contiguous 48 states with its own standalone electricity grid.[4]

---

[3] The Debtor's wholesale power, transmission and distribution substation revenues were $1.038 billion and $1.041 billion in 2019, and 2020, respectively.

[4] http://www.ercot.com/news/mediakit/maps



13.     Within this electric grid, ERCOT schedules power for more than 26 million customers on a network that connects more than 46,500 miles of transmission lines and more than 710 generation units with more than 86,000 MW of available generation capacity.[5]

14.     ERCOT is a membership-based 501(c)(4) nonprofit organization governed by its Board of Directors and subject to the oversight of the Public Utility Commission of Texas (the "PUCT") and the Texas Legislature.  It is the ISO of the electric grid within the boundaries of the ERCOT power region, which covers the vast majority of Texas, including 70% of the state's geography and more than 90% of its residents.  As the ISO of the power grid, ERCOT is responsible for "ensur[ing] the reliability and adequacy of the regional electrical network."  TEX. UTIL. CODE § 39.151(a)(2).

---

[5] http://www.ercot.com/content/wcm/lists/219736/ERCOT_Fact_Sheet_2.12.21.pdf

### C. Winter Storm Uri

15.     Winter Storm Uri and the decisions of ERCOT and its overseer, the PUCT, are the only reasons the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The first indication that bad weather was coming toward Texas occurred about a week before ERCOT first ordered firm load shed.[6]

16.     Late in the afternoon on Monday, February 8, 2021, ERCOT issued an emergency Operating Condition Notice ("OCN")[7] report for "an extreme cold weather system approaching Thursday, February 11, 2021."  An OCN is for informational purposes only in order to inform generators of a possible future need for more resources. An OCN does not give ERCOT the authority to *require* more resources to be available due to the possibility of an emergency.

17.     The next day, on Tuesday, February 9, 2021, the National Weather Service issued a state of Texas Weather Briefing warning of dangerously cold winter weather, including freezing rain.[8]

18.     On Wednesday, February 10, 2021, ERCOT issued an "Advisory" for the "predicted extreme cold weather event for the ERCOT region."[9]  On this same date, the PUCT's Emergency Management Coordinator sent an email to several market participants warning that "this Arctic Air Mass is expected to make it all the way down to the [Rio Grande] Valley!"[10]

---

[6] "Firm load shed" refers to rolling outages which may be necessary when generation is insufficient to meet demand.

[7] An Operating Condition Notice is the first of three levels of communication issued by ERCOT in anticipation of a possible emergency condition.  Protocol 2.1; Protocol 6.5.9.3.1.

[8] Attachment to Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (Response by Public Utility Commission of Texas to Texas Public Information Act Request, Bates labeled PUCT 0000354, hereinafter referenced by "PUCT [Bates label #]).

[9] An Advisory is the second of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.3.2. Advisory *available at* http://www.ercot.com/services/comm/mkt_notices/notices/2021/02 (issued at 17:09:45 on Feb. 10, 2021).

[10] Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (PUCT 0000352).

19.     On Thursday, February 11, 2021, ERCOT issued a "Watch" for a cold weather event.[11]

20.     On Friday, February 12, 2021, Texas Governor Greg Abbott, pursuant to Section 418.014 of the Texas Government Code, declared a state of disaster due to the expected winter weather.

21.     On Sunday, February 14, 2021, President Biden declared that an emergency existed in the State of Texas and ordered that federal assistance be provided.

22.     But it was not until the early hours of Monday, February 15, 2021, that ERCOT declared an Energy Emergency Alert ("EEA") "Level 1," urging consumers to conserve power. Within an hour, however, ERCOT elevated to an Emergency Alert "Level 2," and only 13 minutes later, at 1:25 a.m., ERCOT elevated to an Emergency Alert "Level 3."  Level 3 is the highest level of emergency in ERCOT, under which ERCOT "[a]s a last resort, instruct[s] transmission companies to reduce demand on the electric system; typically in the form of controlled outages."[12] With the grid stressed to within minutes of a catastrophic failure, ERCOT ordered transmission operators to implement deep cuts in load in the form of rotating outages to reduce the strain and avoid a complete system collapse.  The EEA Level 3 remained in effect until Friday, February 19, 2021, leaving over 4.1 million homes and businesses without power, some for more than four consecutive days.[13]

23.     According to a list provided by ERCOT to the PUCT, at least 312 generating units at 219 power plants lost capacity for varying durations between Sunday, February 14, and Friday,

---

[11] A Watch is the third of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.4.

[12] http://www.ercot.com/content/wcm/lists/230330/2021_EEA_Overview_Final.pdf.

[13] ERCOT News Release dated February 19, 2021 *available at* http://www.ercot.com/news/releases/show/225962.

February 19, 2021.[14]  At around 5:30 a.m. on Monday, February 15, 2021, one of the two units of the South Texas Project, a nuclear-power plant, tripped off-line, causing a frequency drop in the transmission grid.  The highest amount of unavailable generating capacity during Winter Storm Uri—totaling 51,173 MW of generating capacity off-line—occurred at approximately 8:00 a.m. on Tuesday, February 16, 2021.[15]  ERCOT reported that approximately 48.6% of generation was forced out at this highest point due to the impacts of the extreme weather conditions.[16]

### D.      The Standard Form Market Participant Agreement

24.      The Debtor and ERCOT are parties to a Standard Form Market Participant Agreement (the "SFA").  The SFA imposes various duties and obligations on both the Debtor and ERCOT.  Specifically, both the Debtor and ERCOT agreed to discharge their respective duties and responsibilities under the ERCOT protocols.  The ERCOT protocols are defined as:

> [T]he document adopted by ERCOT . . . as amended from time to time, that contains the scheduling, operating, planning, reliability, and Settlement . . . policies, rules, guidelines, procedures, standards, and criteria of ERCOT.  For the purposes of determining responsibilities and rights at a given time, the ERCOT protocols, as amended in accordance with the change procedure(s) described in the ERCOT protocols, in effect at the time of the performance or non-performance of an action, shall govern with respect to that action.[17]

25.      The relationship between the Debtor and ERCOT is governed by the SFA, related agreements, and the ERCOT protocols (which includes provisions that govern the prices ERCOT collects in the settlement process).  If the provisions of the protocols are to be modified, there are

---

[14] http://www.ercot.com/content/wcm/lists/226521/ERCOT_Letter_Re_Feb_2021_Generator_Outages.pdf

[15] February 2021 Extreme Cold Weather Event: Preliminary Report on Causes of Generator Outages and Derates, April 6, 2021.  PUC Project No. 51878, Item 20. http://interchange.puc.state.tx.us/search/documents/?controlNumber=51878&itemNumber=20.

[16] http://www.ercot.com/content/wcm/key_documents_lists/225373/2.2_REVISED_ERCOT_Presentation.pdf.

[17] Protocols 1.1

specific procedures that must be followed to effect any changes as prescribed in the ERCOT protocols and incorporated by reference into the SFA.

**E.       The ERCOT Claim**

26.       ERCOT filed the ERCOT Claim on June 14, 2021.  The ERCOT Claim alleges that the Debtor is liable to ERCOT in the amount of $1,899,152,990.64, with approximately $1,877,591,506.10 of that amount subject to administrative expense priority status.  The ERCOT Claim further alleges that the Debtor is liable for these amounts because, "[p]rior to the Petition Date, Brazos was in default of its obligations under the Brazos SFA and the ERCOT Protocols."

27.       In its *Statement of Electric Reliability Council of Texas to Debtor's Motion for Entry of an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Dkt. No. 896], ERCOT asserts that the ERCOT Claim "must be promptly cured in connection with the assumption of the executory contracts between ERCOT and the Debtor in order for the Debtor to continue participating in the ERCOT market."  As of the date of the filing of this Objection, the Debtor has not made a determination whether to assume or reject the SFA or any other agreements between the Debtor and ERCOT, and the Debtor asserts that the ERCOT Claim does not reflect the true cure costs due to ERCOT, if the Debtor does assume the SFA.  Nothing contained herein or any actions taken pursuant to the relief requested in this Objection is intended or should be construed as a request by or authorization for the Debtor to assume or reject the SFA or any other prepetition agreements between the Debtor and ERCOT pursuant to section 365 of the Bankruptcy Code, and the Debtor reserves all rights with respect to the assumption or rejection of the SFA.  Indeed, the ultimate amount of the allowed ERCOT Claim will have to be considered as part of any broader assumption analysis.

## IV.   RELIEF REQUESTED

28.    By this Objection, the Debtor seeks to disallow, in part, and materially reduce ERCOT's Claim in an amount as determined by the Court.  The Debtor additionally seeks to reclassify the ERCOT Claim in its entirety as a general unsecured claim.

## V.   OBJECTION

29.    Section 502 of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Once there is an objection to a proof of claim, the Bankruptcy Code mandates a determination of the amount of the claim absent certain exceptions that are inapplicable here.  *See* 11 U.S.C. § 502(b).

30.    Based on the information contained in the ERCOT Claim, other publicly available information reviewed by the Debtor to date, and subject to the reservation of rights below, the Debtor objects to ERCOT's Claim as set forth below.

**A.    ERCOT's Charges to the Debtor Based on a $9,000/MWh Energy Price Contradict the Terms of the SFA and the ERCOT Protocols.**

31.    The SFA and the ERCOT protocols incorporated therein set out detailed mechanisms to calculate the amount of money that the Debtor is contractually obligated to pay to ERCOT.  The invoices ERCOT sent and attached to the ERCOT Claim do not conform to the terms of the SFA and protocols.  The Debtor is not contractually obligated to pay any amount over the price that was agreed to in the SFA and as set by the protocols.  ERCOT has no right to claim an amount that the Debtor never agreed to pay and thus does not owe.

32.    Under the SFA, both the Debtor and ERCOT agreed to "comply with, and be bound by, all ERCOT protocols."  SFA at §§ 5 and 6.  The protocols establish a comprehensive (indeed voluminous) set of rules that govern the ERCOT market and how market participants, including

ERCOT, interact with each other.  The protocols contain the Settlement[18] "policies, rules, guidelines, procedures, standards, and criteria of ERCOT."  SFA at Addendum § A.  And the "ERCOT Protocols, *as amended in accordance with the change procedure(s) described in the ERCOT Protocols*, in effect at the time of the performance or non performance of an action, shall govern with respect to that action."  SFA at Addendum § A (emphasis added).

33.     The ERCOT Claim for approximately $1.9 billion was based on an exorbitant and unconscionable $9,000/MWh price set by the PUCT in a February 15, 2021 order (the "PUCT Order")[19] in a process that ignored the procedures for price setting that the Debtor and ERCOT were required to follow in the SFA and as set forth in the protocols.  Because ERCOT failed to follow the agreed-upon procedure to alter the method of establishing the price of energy in the ERCOT market, the amount ERCOT charged the Debtor for energy and ancillary services during Winter Storm Uri is way beyond any amount the Debtor contractually agreed to pay ERCOT.

34.     Winter Storm Uri brought bitterly cold temperatures to much of Texas.  The loss of power across ERCOT was due to weather, equipment failures, excessive fuel prices, and lack of available fuel, not because generators were waiting on the sidelines to see if energy prices would rise.[20]  Yet, on February 15, 2021, during a six-minute discussion taken up on an hour's notice,[21] the then-presiding commissioners of the PUCT adopted an order that impermissibly changed ERCOT's rules for calculating energy prices, raising the cost of electricity by tens of billions of

---

[18] Settlement is the process used to resolve financial obligations between a Market Participant and ERCOT.  Protocol 2.1.

[19] An audio recording of the February 15, 2021 Open Meeting Audio is available at http://www.adminmonitor.com/tx/puct/open_meeting/20210215/.  The written order was posted on the PUCT website the next day.  *See* http://www.puc.texas.gov/51617WinterERCOTOrder.pdf.

[20] *See* ERCOT Presentation to Senate Business and Commerce Committee House Joint Committee on State Affairs and Energy Resources, *Review of February 2021 Extreme Cold Weather Event* at 15-16 (Feb. 25, 2021), *available at*: http://www.ercot.com/content/wcm/lists/226521/Texas_Legislature_Hearings_2-25-2021.pdf.

[21] The recorded hearing is available at http://www.adminmonitor.com/tx/puct/open_meeting/20210215/.

dollars over a four-day span, which had the direct result of exponentially and unexpectedly increasing the price of energy for the Debtor, thereby forcing the Debtor into Chapter 11. Tellingly, all three PUCT commissioners who undertook this action have since resigned.

35.     ERCOT implemented the PUCT Order by issuing a market notice[22] stating that it would implement the "pricing outcomes directed by the order by making an administrative adjustment to the . . . Real-Time Reliability Deployment Price Adder process during all intervals in which ERCOT has directed firm Load shed."[23]

36.     ERCOT's decision to use the mechanism of an "administrative adjustment" to implement the $9,000/MWh price in the PUCT Order reflected ERCOT's conclusion that the conventional ERCOT pricing mechanisms set forth the ERCOT protocols and incorporated into the SFA had to be manually overridden.  The pricing mechanism contained in the protocols generally yields a market price for energy established by generators who submit bids to supply the energy.  The PUCT Order setting a price of $9,000/MWh, and ERCOT's implementation of the PUCT Order, supplanted the market price set by generators and substituted the market price with an artificial price set by the PUCT.  The PUCT's action was based on the premise that if firm load shed was occurring, then the "correct" price must be $9,000/MWh—a position that directly contradicted the ERCOT protocols in effect at the time.  As discussed below, ERCOT (as overseen by the PUCT) had previously considered changing the protocols to make load shed a factor in increasing the real time price of energy up to $9,000/MWh but ultimately rejected that proposed change.[24]

---

[22] A Market Notice is a notice required by the ERCOT protocols regarding market-relevant information communicated through ERCOT publicly-subscribed electronic distribution channels. Protocols 2.1.

[23] http://www.ercot.com/services/comm/mkt_notices/archives/5196

[24] The legislative history of the proposed rule change is available at http://www.ercot.com/mktrules/issues/NPRR626#keydocs. The initial proposal lists "Firm Load Shed" as a factor to accounted for in pricing signals available at http://www.ercot.com/content/mktrules/issues/nprr/626-

37.     The protocols governing the pricing of wholesale energy in ERCOT include a "scarcity pricing" mechanism that is designed to allow prices to increase up to a maximum allowable rate of up to $9,000/MWh during periods of energy shortages.   ERCOT wholesale energy prices generally trade in the $20-$25/MWh range. The average price during 2020 for the ERCOT day ahead market was $22/MWh.[25]  During extremely rare periods in which "scarcity pricing" is occurring, prices may clear as high as $9,000/MWh (a market offer cap under the ERCOT protocols, not a market peg for energy pricing, as the PUCT implemented it during Winter Storm Uri).

38.     The specific mechanism or algorithm contained in the protocols to which the Debtor and ERCOT agreed to be bound is found in Protocol 6.5.7.3.1, *Determination of Real-Time On-Line Reliability Deployment Price Adder*, which sets forth a robust set of shortage-related factors that impact scarcity pricing.

39.     Rolling outages, also known as "firm load shed," are sometimes necessary when there is insufficient generation to meet demand.  But, according to the protocols in effect during Winter Storm Uri, firm load shed *does not trigger* maximum scarcity pricing under ERCOT's rules.  *See* Protocol 6.5.7.3.1.  The omission of firm load shed as a factor in scarcity pricing is by design.  ERCOT considered *and rejected* a proposal to include firm load shed in proposed 2014 amendments to section 6.5.7.3.1 of the protocols.  Thus, the rules that governed the Debtor's

---

650/626/keydocs/626NPRR-01%20ORDC%20Price%20Reversal%20Mitigation%20Enhancements%2005161.doc. Subsequent to an ERCOT Technical Advisory Committee meeting, the first comment strikes out "Firm Load Shed" with the "intent of capturing the compromise voted upon by the Technical Advisory Committee" available at http://www.ercot.com/content/mktrules/issues/nprr/626-650/626/keydocs/626NPRR-03_Luminant_Energy_Comments_060514.doc.

[25] U.S. Energy Information Administration, *Wholesale U.S. electricity prices were generally lower and less volatile in 2020 than 2019* (Jan. 8, 2021), available at: https://www.eia.gov/todayinenergy/detail.php?id=46396#.

settlement prices with ERCOT going into Winter Storm Uri expressly *did not include firm load shed* as factor in scarcity pricing.[26]

40.     Despite this express action by ERCOT to adopt protocols *excluding* firm load shed as a trigger for the $9,000/MWh price, ERCOT's overseer, the PUCT, unilaterally and without any input from market participants other than ERCOT, changed the way pricing of energy was to be calculated during Winter Storm Uri and artificially raised the price to $9,000/MWh with little more than the stroke of a pen.  At 5:20 p.m. on February 15, 2021, the PUCT convened a telephonic Open Meeting where it discussed issuing an order to alter ERCOT's price of energy.  After a brief discussion, the commissioners agreed to adopt the PUCT Order, which had not yet been disseminated to the market, and urged ERCOT to make it immediately effective.[27]  The PUCT Order was made publicly available on the PUCT's website the next day.[28]  The PUCT Order notes that electricity prices during the storm were clearing "as low as approximately $1,200" and concludes that this "outcome is inconsistent with the fundamental design of the ERCOT market."[29] The PUCT Order supposes that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."[30]  The PUCT thus pegged the price of energy through the period of the storm at the ERCOT "system-

---

[26] ERCOT ultimately did change its protocols to include firm load shed as a consideration in the Real Time Reliability Deployment Price Adder, but not until *three months after* Winter Storm Uri.  *See* NPRR 1081 (approved on June 28, 2021 and effective July 1, 2021).    A record of this NPRR is available here: http://www.ercot.com/mktrules/issues/NPRR1081#summary.

[27] Open Meeting Audio *available at* http://www.adminmonitor.com/tx/puct/open_meeting/20210215/.

[28] http://www.puc.texas.gov/51617WinterERCOTOrder.pdf.

[29] *Id.* at 1.

[30] *Id.* The PUCT re-adopted the rule in substantial similar form, again without any notice or comment, the next day. App. B.

wide offer cap" of \$9,000/MWh,[31] ignoring the fact that in 2014, ERCOT considered and expressly *rejected* firm load shed as a factor in scarcity pricing.

41.    The PUCT's actions were purportedly taken with the intent to incentivize generation to come online,[32] but generation was not available at any price. Texas was in the middle of a humanitarian crisis, and if generation had been available, it would have been deployed. It simply was not available, and no order of the PUCT could make it so. The PUCT and ERCOT's actions in raising the energy price to \$9,000/MWh violated the fundamental principles on which the ERCOT market is based. The theory behind scarcity pricing is to create an incentive for generators to come online who would otherwise be sitting idle because of high marginal costs of production. But generators were not idly sitting by waiting for higher prices during Winter Storm Uri. The generators that were off-line were frozen or lacked access to the fuel necessary to operate their units.

42.    The unexpected price change ordered by the PUCT and implemented by ERCOT had dramatic effects on the ERCOT market. The estimated total cost of electricity during the storm exceeded \$50 billion, more than six times the cost of all electricity in ERCOT in 2020.[33] This resulted in payment defaults to ERCOT of over \$2.9 billion from parties including competitive

---

[31] The system-wide offer cap is supposed to operate as a cap limiting the amount that generators can offer for energy to no more than \$9,000/MWh. Instead, the PUCT treated this price as a peg rather than a cap, thus guaranteeing that all generators would be paid \$9,000/MWh regardless of what they bid into the market. TEX. ADMIN. CODE §25.505 (titled "Reporting Requirements and the Scarcity Pricing Mechanism in the Electric Reliability Council of Texas Power Region") *available at* https://www.puc.texas.gov/agency/rulesnlaws/subrules/electric/25.505/25.505ei.aspx.

[32] The argument that raising the energy price to the cap was necessary to incentivize generation lacks merit because the initial PUCT order, adopted on February 15, 2021, applied retroactively to the time when firm load shed began. A price increase that applies *retroactively* cannot be justified as an incentive to bring additional generation on-line. On February 16, 2021, the PUCT adopted a new order eliminating the retroactive component of the February 15th order.

[33]    Report    by    former    PUC    Commissioners    *available    at* http://interchange.puc.texas.gov/Documents/52268_10_1140902.PDF.

retailers and electric cooperatives, including, notably, the Debtor.  Fitch Ratings has since placed all ERCOT retail and wholesale electric utilities on negative ratings watch status.[34]

43.     Another puzzling aspect of ERCOT's decision to follow the PUCT Order, is that if ERCOT and the PUCT thought that certain generating units were sitting idle and they wanted to bring all available generation on-line, the protocols contain a provision giving ERCOT complete authority to order generators to commence producing energy during a period of emergency.  The process is known as the Reliability Unit Commitment or "RUC" procedure, as established in Section 5 of the ERCOT protocols.  The RUC procedure is generally used to ensure system reliability through sufficient resource capacity.  Rather than using the narrower tool of the RUC process to bring generators on line, the PUCT used the blunt hammer of artificially raising the price to the highest amount possible, even though that price hike was not permitted by law and would not cause off-line generators to generate at any price.  As discussed herein, ERCOT improperly decided to implement that pricing and maintained that pricing for more than four days. Testifying in front of the Texas Legislature a few weeks after the storm, one PUCT commissioner seemed to have second thoughts about pegging the price of energy at $9,000/MWh rather than using the RUC procedure: "if you had told me Monday morning you have four more days of this, I would have said "Suspend market rules, we're RUCing everybody"  . . . And that's what I wish would have done in retrospect . . ."[35]

---

[34] Fitch Places Texas Public Power Utilities and Electric Cooperatives on Rating Watch Negative, Fitch Ratings (Feb. 24, 2021), *available at*  https://www.fitchratings.com/research/us-public-finance/fitch-places-texas-public-power-utilities-electric-cooperatives-on-rating-watch-negative-24-02-2021.

[35] Testimony of The Hon. Arthur D'Andrea before the Senate Jurisprudence Committee at 4:52:37 (Mar. 11, 2021) available at  https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15446.  The ERCOT  protocols allow ERCOT to suspend the market rules "at its sole discretion"  and to act "in accordance with the Texas Emergency Management Plan." ERCOT Protocols 25.1(2) and 25.2(1)(b).

44.     Several entities have filed lawsuits or direct appeals challenging ERCOT's pricing.[36]  These cases have cast serious doubt on the legality of the PUCT Order and the resulting $9,000/MWh price.  One of the entities challenging the PUCT Order is Luminant Energy Company ("Luminant").  Luminant filed a direct appeal of the PUCT Order in the Texas Court of Appeals for the Third Judicial District.[37]  Luminant's parent company, Vistra Corp, commissioned a study conducted by London Economics International LLC ("LEI") to determine what market-clearing prices would have been during February 15-19, 2021 in the absence of the PUCT Order and assuming the ERCOT protocols had been allowed to operate without interference.  LEI examined ERCOT's own data and found that between 10:15 p.m. on Monday, February 15, 2021 and 9:00 a.m. on Friday, February 19, 2021 the energy prices would have averaged $2,404/MWh if not for the PUCT's interference.[38]  This market outcome would mean **$6,578/MWh, or a 73% *lower*,** real time energy prices than the prices ERCOT charged the Debtor.

45.     The Debtor fundamentally disagrees with ERCOT's methodology in calculating the charges to the Debtor set forth in the ERCOT Claim.  ERCOT seems to believe that the PUCT Order establishes the price that the Debtor is to be charged.  However, the SFA and the ERCOT protocols establish the price that ERCOT is allowed to charge the Debtor for energy and ancillary

---

[36] *See*, *e.g.*, D-1-GN-21-001772, *Exelon Generation Co v. PUCT* (53rd District Court, Travis County; partially nonsuited without prejudice); D-1-GN-21-002099, *Exelon Generation v. Peter Lake* (261st District Court, Travis County; abated); Luminant Energy Company LLC has filed three direct appeals against the Public Utility Commission of Texas in the Texas Third Court of Appeals, Case Nos. 03-21-00139-CV, 03-21-00108-CV, and 03-21-00098-CV. Numerous parties have been granted intervenor status in these cases, including Exelon Generation Company LLC; Calpine Corporation; TexGen Power, LLC; DGSP2 LLC; and Distributed Generation Solutions LLC.  The Debtor contends that, with respect to the ERCOT Claim asserted against the Debtor, this forum is the most appropriate venue for resolution of the ERCOT Claim.  Therefore, this Court must determine whether ERCOT impermissibly deviated from the SFA and the ERCOT protocols in effect during Winter Storm Uri as a necessary part of determining the Debtor's ultimate liability for the ERCOT Claim.

[37] *Luminant Energy Company LLC v Public Utility Commission of Texas*, No. 03-21-00098-CV (Tex. App.—Austin, *pending*).

[38] Analysis of ERCOT market prices during February 2021 winter storm event at 5, *available at* https://interchange.puc.texas.gov/Documents/51617_10_1131376.PDF.

services during the winter storm.  The pricing methodology in the protocols can be changed, but both the SFA and the protocols require that a specific change process be followed.  ERCOT ignored the process in the SFA and the protocols and simply arbitrarily applied the PUCT Order that pegged the price for energy at the system-wide offer cap of $9,000/MWh.  The Debtor objects to the ERCOT Claim and respectfully requests that the pricing methodology and change process contained in the SFA and the protocols in effect at the time be followed and used by this Court in determining the Debtor's liability for the ERCOT Claim.

46.     The Texas legislature has recently weighed in how the amounts owed to ERCOT are to be calculated.  The legislature passed two bills in the regular legislative session that concluded in 2021: HB 4492 and SB 1580, both of which are informative on how to calculate the amount the Debtor owes to ERCOT.[39]  These bills impose certain penalties on market participants who do not pay their ERCOT bills in full.[40]  The bills contain nearly identical language requiring the Debtor and other market participants with unpaid balances to pay in full "the amount owed the independent organization [ERCOT], *calculated solely according to the protocols of the independent organization in effect during the period of emergency promulgated subject to the approval of the commission* . . . ."  PURA § 41.151(b)(1) (emphasis added).  Following this legislative directive, the amount the Debtor owes to ERCOT should be calculated "according to the protocols" in effect during the winter storm, not according to the PUCT Orders passed without any market input at all.

---

[39] These bills were signed into law on June 16, 2021 (HB 4492) and June 18, 2021 (SB 1580) and became effective immediately upon signing.

[40] The Debtor reserves all rights to challenge the application of HB 4492 and SB 1580 to the Debtor and any actions by ERCOT or the PUCT taken pursuant to HB 4492 or SB 1580 to exclude the Debtor as a market participant.

47.     The cornerstone of a properly functioning market is transparency and trust that the market rules, especially the rules governing price, will be honored.  In particular, the rules (or in this case, the protocols), should be honored during a natural disaster when market participants' primary focus is on the mitigation of human suffering and preservation of life.  Yet, it was in the middle of Winter Storm Uri when ERCOT's governing agency, the PUCT, unilaterally changed the price of energy in the ERCOT market with virtually no notice, no opportunity to be heard, and in contravention of the established protocols agreed upon between the Debtor and ERCOT.  The Debtor objects to this price change which occurred in violation of the SFA (and related protocols), various Texas statutes, and the course of dealing on which the Debtor had come to rely.

48.     ERCOT's decision to follow the PUCT Order, rather than complying with the terms of the SFA and the ERCOT protocols, constituted prior material breaches by ERCOT that excuse the Debtor's performance under the SFA, including its liability for the amounts asserted in the ERCOT Claim.  If ERCOT simply had complied with the SFA and operated pursuant to the protocols without artificially interfering with the price of energy, according to LEI, the prevailing energy price would have averaged around $2,404/MWh, not $9,000/MWh.  This would reduce the amount of the ERCOT Claim substantially.

**B.     ERCOT Failed to Mitigate Its Claim.**

49.     ERCOT further made no effort to mitigate the ERCOT Claim for approximately $1.9 billion.  Section 8(D) of the SFA requires ERCOT to mitigate damages.  Rather than attempt any mitigation, however, ERCOT simply passed the entirety of its excessive charges to the Debtor.

50.     As described above, ERCOT is not entitled to receive $9,000/MWh for any settlement period during Winter Storm Uri.  However, even if ERCOT properly charged $9,000/MWh for a period of time, it could and should have reduced the price at any time during

the storm and should certainly have ceased charging the Debtor that amount once ERCOT ceased shedding firm load. Doing the latter would have reduced the real time energy price for the last 33 hours of Winter Storm Uri and would have mitigated ERCOT's claim by a substantial amount.

51.     The PUCT Order administratively set the real time price of energy at $9,000/MWh and directed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." ERCOT responded to the PUCT Order by forcing wholesale prices to $9,000/MWh. Over the next two days, firm load shed continued and the $9,000 price remained in effect. However, by midnight on Thursday, February 18, 2021, ERCOT had ceased all load shed. Even assuming that the PUCT Order was valid, by the terms of the PUCT Order, once firm load shed had ceased, the $9,000 price should have also stopped. Although firm load shed ceased as of midnight on Thursday, ERCOT left the $9,000 price in place *for an additional 33 hours*—from midnight on Thursday, February 18, until 9:00 a.m. on Friday, February 19, 2021. This action burdened the market with an astonishing **$16 billion** in unnecessary electricity costs.

52.     ERCOT's failure to remove the artificial energy price after load shed ceased caught the attention of the ERCOT Independent Market Monitor ("IMM")[41] who pointed out: "ERCOT recalled the last of the firm load shed instructions at [11:55 p.m.] on February 17, 2021. Therefore, in order to comply with the PUCT Order, the pricing intervention that raised prices to the value of lost load (VOLL) should have ended immediately at that time. Regrettably, ERCOT failed to do so . . . . This decision resulted in over-priced energy in ERCOT's real-time market by $16 billion."[42]

---

[41] The IMM is a statutorily mandated "independent organization" whose mission is to detect and prevent market manipulation strategies and recommend measures to enhance the efficiency of the wholesale electric market. TEX. UTIL. CODE § 39.1515. According to regulations adopted by the PUCT, the role of the IMM is to "offer independent analysis to the commission to assist in making judgments in the public interest." TEX. ADMIN. CODE § 16(a).

[42] IMM Letter to PUCT Chairman Arthur C. D'Andrea at 1 (Mar. 11, 2021) *available at* https://interchange.puc.texas.gov/Documents/51812_149_1115720.PDF.

53.     ERCOT ran up at least $47 billion in charges to load serving entities for the five days of Winter Storm Uri.  According to the IMM, more than $16 billion of that amount was unnecessary and could have been mitigated had ERCOT simply removed the artificial $9,000/MWh price once load shed ceased.[43]

54.     Despite being made aware of the pricing error relating to the last 33 hours of the storm by the numerous market participants, ERCOT refused to take any action to review the price charged to the Debtor after load shed ceased.  ERCOT refused to take action despite the undisputed authority in the protocols allowing ERCOT to reprice the real time market.  Protocols 6.3(4).  In fact, the protocols authorize the ERCOT Board to direct a resettlement of real time prices "at any time, to address unusual circumstances."  Protocols 9.5.6(1).  Having failed to correct the problem in real time, the $16 billion could have been mitigated had the ERCOT Board repriced the power as allowed under the protocols and quantified by the IMM.

55.     Although the ERCOT Board possesses the power under the protocols to reprice "at any time" as discussed above, it is undisputed that ERCOT staff had clear authority to reprice the $9,000/MWh charges within 30 days of the relevant operating days when the charges were assessed.  Protocols 6.3(6).  Opinion No. KP-0363 of the Attorney General of Texas issued on March 17, 2021 confirmed that ERCOT had the legal authority to change and correct its excessive prices.[44]  It failed to do so.

56.     ERCOT's conduct unnecessarily and unreasonably exacerbated the amounts ERCOT charged the Debtor during the storm.  Had ERCOT merely followed the PUCT Order  and applied the $9,000/MWh price only during times when firm load shed was in place, or had ERCOT

---

[43] *Id.*

[44] Tex. Att'y Gen. Op. No. KP-0363 at 6 (Mar. 17, 2021) *available at* https://www.texasattorneygeneral.gov/sites/default/files/opinion-files/opinion/2021/kp-0363.pdf.

exercised its undisputed right to reprice the real time market at any time, the amount of the ERCOT Claim asserted against the Debtor would have been reduced by hundreds of millions of dollars.

**C.      The Debtor Was Not in Default Prior to Petition Date.**

57.      ERCOT erroneously claims that "Prior to the Petition Date, [the Debtor] was in default of its obligations" under the SFA and the ERCOT protocols.

58.      The Debtor properly provided a Notice of Force Majeure Event to ERCOT on February 25, 2021.  ERCOT has not acknowledged or addressed the notice in any manner.

59.      Section 8 of the SFA, entitled "Default," provides that "[i]f, due to a Force Majeure Event, a Party is in breach with respect to any obligation hereunder, such breach shall not result in a Default by that Party."

60.      Because ERCOT has not addressed the Debtor's Notice of Force Majeure Event, the SFA's terms govern and the Debtor was not in default prior to the Petition Date as claimed by ERCOT.  Accordingly, to the extent that the ERCOT Claim asserts any amounts resulting from the Debtor's alleged default under the SFA and the ERCOT protocols, those amounts should be disallowed in their entirety.

**D.      ERCOT Seeks to Collect Unconscionably High Rates from the Debtor.**

61.      If the SFA and related protocols truly allow ERCOT to implement whatever prices for whatever duration ERCOT decides or the PUCT directs, irrespective of the arbitrariness, effectiveness, rationale, legal justification, or impact (in this case catastrophic) on the rate paying customers, then such provisions of the agreement are procedurally and substantively unconscionable.  When confronted with this unconscionable pricing, the Debtor was faced with the impossible decision of either going along or objecting and putting its members' customers' property in jeopardy and lives in danger.  The Debtor erred on the side of mitigating the

humanitarian crisis to avoid the devastating effects that otherwise would have occurred. These unconscionable rates cannot be recovered through the ERCOT Claim.

**E.      ERCOT Charged Unreasonably High Prices for Ancillary Services.**

62.      In addition to purchasing energy in the ERCOT market during Winter Storm Uri, the Debtor also purchased capacity products known as "ancillary services" from ERCOT.  ERCOT procures and then charges load serving entities like the Debtor for certain ancillary services that allow ERCOT to maintain capacity reserves, both online and offline, to keep the grid in balance. One example of an ancillary service is Responsive Reserve Service.  On a daily basis in the Day Ahead Market, ERCOT selects and pays various market participants, representing several types of generation and load, to provide this service.  The primary method by which generators provide this service is by being online, but below maximum output, so that they can almost immediately increase or decrease generation output in order to mitigate the effects of a disturbance on the grid. Large loads, such as industrial operations, can provide this service by being available to drop their load automatically in the event of a frequency disturbance on the grid or when instructed by ERCOT.

63.      During Winter Storm Uri, prices for certain day-ahead ancillary services reached more than $20,000/MWh, an amount that far exceeds the system-wide offer cap price of $9,000/MWh.  ERCOT charged the Debtor these prices for certain pricing intervals during the storm. As noted by the Independent Market Monitor,[45] the ancillary service charges are excessive and should be capped at the system-wide offer cap of $9,000/MWh.  The IMM recognized that

---

[45]      *Letter to Commissioners,* Docket No. 51812, pp. 1-2 (March 1, 2021), https://interchange.puc.texas.gov/Documents/51812_34_1113309.PDF

reserves are procured to reduce the probability of losing load, and as such, the cost of reserves should not exceed the $9,000/MWh price that ERCOT charged for electricity.

64.     ERCOT's action in charging the Debtor prices for ancillary service that far exceed the system-wide offer cap for energy is unreasonable and violates the principles of ERCOT's market design.  ERCOT's ancillary service charges should be reduced to a level no greater than the system-wide offer cap of $9,000/MWh.

**F.      ERCOT Failed to Carry Out its Duty to Ensure the Reliability and Adequacy of the Regional Electrical Network.**

65.     ERCOT operates under the statutory duty to ensure the reliability and adequacy of the electric grid.  TEX. UTIL. CODE § 39.151(a)(2).  The ERCOT protocols underscore that one of the key functions of ERCOT is to "[e]nsure the reliability and adequacy of the ERCOT Transmission Grid."  Protocols 1.2(1)(b).  In the SFA, the Debtor and ERCOT agreed to discharge their duties under the ERCOT protocols.  One of ERCOT's duties is to ensure the reliability and adequacy of the electric grid, which included a duty to closely monitor and timely inform market participants of the anticipated storm and to plan for, manage, and minimize its financial impact.

66.     ERCOT knew that potentially dangerous weather was coming this year at least one week (on February 8, 2021) before it declared an emergency (on February 15, 2021).  ERCOT was slow to act, waiting until February 13, 2021 to deploy responsive reserves and until February 14, 2021 to issue a conservation alert and media appeal.[46]  ERCOT's inaction caused dramatic hardship across the state of Texas and the assignment of enormous costs to the Debtor.  Indeed, ERCOT's performance was so poor that its Chief Executive Officer reported that rapid frequency

---

[46] ERCOT News Release dated February 14, 2021 "Grid operator requests energy conservation for system reliability" *available at* http://www.ercot.com/news/releases/show/225151; ERCOT's February 2021 Extreme Weather Event public information and timeline *available at* http://www.ercot.com/news/february2021.

drops placed the entire grid only 4 minutes and 37 seconds away from a total collapse that could have led to an ERCOT-wide outages for weeks or possibly months.[47]

67.     As devastating as Winter Storm Uri was, it was not the first time severe winter weather in Texas caused rolling outages.  ERCOT has been aware for more than 30 years that cold Texas weather can have a severe impact on the electric grid resulting in dramatic hardship, excessively high wholesale prices, and rolling outages.  With full knowledge of this fact, ERCOT accepted and attempted to carry out its statutory and contractual duty to "ensure the adequacy and reliability of the electric grid," which includes the financial integrity of the grid.  It failed in spectacular fashion.  Based on past experience of rolling outages due to severe winter weather, what happened to market participants during Winter Storm Uri was entirely preventable had ERCOT instituted various tools it had at its disposal.  ERCOT should have, but did not, take reasonable care in estimating and planning for the amount of power that would be required for Winter Storm Uri and the corresponding financial impact it would have on the market participants.

68.     ERCOT's failure to protect the market during Winter Storm is a material breach of the SFA.  But rather than accept responsibility for its ineffectiveness and failure, ERCOT has simply demanded that load serving entities like the Debtor pay the full economic cost of ERCOT's own shortcomings.

---

[47]  Transcript and recording of ERCOT Press Conference on February 18, 2021 *available at:* https://www.rev.com/transcript-editor/shared/bwpa-1U9FfxRGdAEuXxUGXzJWhtTVX_d7kAt-Had6vHMUnz85GHL4kfQhx2GtGJXNAHjEk8Sm7siE2K_xPjBpxfw_XM?loadFrom=PastedDeeplink&ts=0.22 at 41:12.

**G.     The ERCOT Claim Must be Reclassified as a General Unsecured Claim.**

69.     ERCOT designated substantially all of the ERCOT Claim (*i.e.*, $1.87 billion of the approximate $1.9 billion asserted) as a priority claim pursuant to Bankruptcy Code section 503(b)(9).  Section 503(b)(9) provides that:

> After notice and a hearing, there shall be allowed administrative expenses, . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9).

70.     To establish a priority claim under section 503(b)(9), ERCOT must show that (a) it **sold goods** to the Debtor, (b) the **value of such goods** was (c) received by the Debtor within the 20-day period immediately before the Petition Date, and (d) such goods were sold to the Debtor in **the ordinary course of the Debtor's business**.  Courts in this District and others narrowly construe section 503(b) to better ensure that the debtor maximizes value for the benefit of all creditors.  Consequently, "[a] party claiming priority must fit clearly within the [ ] statute in order to be granted" priority status.[48]  Once again, ERCOT bears the burden of demonstrating that the ERCOT Claim, in whole or in part, qualifies as a section 503(b)(9) administrative expense.  While a claim for services does not qualify for priority treatment under section 503(b)(9), if a sale includes both goods and services, only the portion relating to the delivery of goods can give rise to a section 503(b)(9) priority claim.

71.     ERCOT, despite asserting a $1.87 billion administrative claim, did not submit any evidence or documentation that would satisfy the requirements for a section 503(b)(9) claim.  Indeed, the Debtor submits that, under the circumstances of this case, ERCOT cannot satisfy its

---

[48] *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 240 (Bankr. N.D. Tex. 2009) (citing *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 669 (2006)).

burden.  As an initial matter, ERCOT is not the kind of creditor that section 503(b)(9) is designed to protect.  ERCOT admits that it "acts only as a clearinghouse through which funds are exchanged **between buyers and sellers** in the ERCOT market,"[49] and explains in broad terms certain aspects of its role as ISO and the economic reality of the arrangement embodied in the Protocols and the other ERCOT Agreements.  *See* ERCOT Claim Addendum ¶ B.3 (emphasis added).  ERCOT is not a real buyer or seller; instead, through the SFA and similar agreements, it provides critical <u>services</u> for market participants throughout Texas by matching supply with demand and otherwise managing the electrical grid.

72.     Even assuming that ERCOT is a "real" seller of electricity and the right party to assert a section 503(b)(9) claim for those transactions, the priority status of the ERCOT Claim nevertheless fails.  Under the circumstances here, and according to the statute's plain terms, section 503(b)(9) does not apply to any portion of the ERCOT Claim.  For the reasons set forth below, any claim that ERCOT may have against the Debtor falls outside the scope of Bankruptcy Code section 503(b)(9) and, therefore, must be classified in its entirety as a general unsecured claim.

---

[49] ERCOT repeated this admission in its *Statement of Electric Reliability Council of Texas to Debtor's Motion for Entry of an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Dkt. No. 896], stating:

> In connection with its operation of the wholesale electricity market, ERCOT has a statutory obligation to "ensure that electricity production and delivery are accurately accounted for **among the generators and wholesale buyers and sellers**" in the ERCOT footprint. TEX. UTIL. CODE § 39.151(a)(4).  ERCOT fulfills that obligation by accepting payments from buyers of electricity, with ERCOT retaining a sufficient amount to cover costs. *Id.* at § 39.151(e). ERCOT essentially serves as the clearinghouse for market transactions **between electricity buyers and sellers**, ensuring that electricity production, scheduling, and downstream delivery are ultimately timely and accurately accounted for and provided. ERCOT Protocols at § 1.2(1)(d).

(emphasis added).

a.   **Ancillary Services and Electricity are not "goods" for purposes of section 503(b)(9).**

73.    ERCOT's asserted priority claim includes charges for electricity and for "ancillary services" that the Debtor purchased in the ERCOT market in connection with Winter Storm Uri, neither of which is eligible for administrative expense treatment under Bankruptcy Code section 503(b)(9).  The ERCOT invoices attached to the ERCOT Claim include only aggregate amounts and do not provide sufficient detail for the Debtor to determine how much of the ERCOT Claim relates to purchased energy or ancillary services.  Nevertheless, "ancillary service," by its name, is a service, not a good, and plainly falls beyond section 503(b)(9)'s clear scope and, therefore, any such charges should be classified as a general unsecured claim.[50]

74.    Electricity, similarly, is *not* a "good" for purposes of section 503(b)(9).[51]  The Bankruptcy Code does not define the term "goods."  Courts have used a variety of analytical frameworks to review section 503(b)(9) claims and typically look to, among other things, the definition of "goods" in Article 2 of the Uniform Commercial Code ("UCC") for guidance.  Although both federal and state courts are split as to whether electricity falls within the UCC's definition,[52] this Court should find that electricity is not a "good" but a service; and, therefore, the ERCOT Claim is not entitled to priority status.  While several decisions in various other jurisdictions have concluded that electricity is a good, even those courts have recognized that other courts—including the Bankruptcy Court for the Northern District of Texas in *Pilgrim's Pride*—have disagreed.  The Debtor contends that *Pilgrim's Pride* and similar decisions in courts around

---

[50] ERCOT defines "ancillary service" as "[a] *service* necessary to support the transmission of energy to Loads while maintaining reliable operation of the Transmission Service Provider's (TSP's) transmission system using Good Utility Practice."  *See* ERCOT Glossary (available at http://www.ercot.com/glossary/a) (emphasis added); Protocols 2.1.

[51] *See Pilgrim's Pride*, 421 B.R. at 239-40 (finding that electricity is not a "good" and that a utility's claim did not "clearly fit within the requirements of section 503(b)(9)").

[52] Neither the Fifth Circuit nor any other Circuit has addressed the question.

the country have taken the better reasoned view, one that is informed by the legal and practical realities concerning the generation, transmission, and distribution of electric power.  The Debtor submits that it did not receive **any** goods from ERCOT in the 20-day period before the Petition Date and, as a result, ERCOT is not entitled to an administrative priority claim under section 503(b)(9).

75.    Accordingly, the entirety of the ERCOT Claim should be classified as a general unsecured claim.

### b.    Charges related to Winter Storm Uri were not incurred in the ordinary course of the Debtor's business.

76.    ERCOT's Claim further fails to qualify for 503(b)(9) administrative priority status because the electricity and ancillary services were not sold to the Debtor "in the ordinary course of such [D]ebtor's business."  Although "ordinary course" is not defined in the Bankruptcy Code or the legislative history for section 503(b)(9), in determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (*i.e.*, "the way businesses operate within a given industry") and the "vertical" dimension test (*i.e.*, whether the transaction is consistent with the reasonable "expectations of creditors").[53]  "The horizontal dimension test focuses on whether other businesses in the same industry engage in the same type of transaction on a regular basis.  The vertical dimension test focuses on the expectations of creditors of the estate."[54]  The primary focus is on the Debtor's pre-petition business practices and conduct.

77.    Under the horizontal test, ERCOT cannot establish that other G&T Co-Ops, or other generation and transmission providers in Texas, regularly engage in the purchase or sale of

---

[53] *See Denton Cty. Elec. Coop., Inc. v. Eldorado Ranch, Ltd. (In re Denton Cty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr. N.D. Tex. 2002) (collecting cases).

[54] *In re Willow Bend Ventures, LLC*, Case No. 17-11178, 2019 WL 2252498, at *11 (Bankr. E.D. La. May 24, 2019).

electricity through the ERCOT market at the system-wide offer cap of $9,000/MWh, outside of the unprecedented Winter Storm Uri event.  Rather, the average price of electricity in any given year in the ERCOT market is $20-25/MWh, far from the PUCT artificially imposed (outside the ERCOT protocols) $9,000/MWh price instituted during Winter Storm Uri.  As stated above, the estimated total cost of electricity during Winter Storm Uri exceeded $50 billion, more than six times what market participants spent on electricity in all of 2020.  Such extraordinary costs cannot be said to be in the ordinary course of the Debtor's business.[55]

78.     Additionally, the ordinary course of the Debtor's business in transacting in the ERCOT market is set forth in the SFA and protocols, as they existed prior to Winter Storm Uri.  ERCOT's material breach of the SFA and actions outside of the protocols—including its charges to the Debtor based on the $9,000/MWh energy price and its unreasonably high charges for ancillary services, both as discussed above—are clearly not usual and ordinary business practices between ERCOT and the Debtor.  Rather, the interference of the PUCT in issuing the PUCT Order, and ERCOT's decision to follow the PUCT Order, fundamentally changed the nature of the Debtor's transactions within the ERCOT market, such that any amounts incurred by the Debtor were not incurred in the ordinary course of the Debtor's business.  As stated above, the RUC procedures in the protocols already provided ERCOT with authority and mechanisms to order all available generation to produce during a period of emergency, but that ordinary procedure was side-stepped during Winter Storm Uri, and extraordinary measures were instead put in place.  *See also*, *infra* ¶ 35-36.

---

[55] *See In re Waterfront Cos.*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985) ("Some transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary."); *see also In re Roth American, Inc.*, 975 F.2d 949, 954 (3d Cir. 1992) (concluding that a transaction that is "fundamentally different" from previous transactions of similar type is outside the ordinary course of business).

79.     Further, at the time the Debtor received the bulk of the electricity that forms the basis of the ERCOT Claim, ERCOT had declared an EEA Level 3—something that, prior to Winter Storm Uri, had happened only three times in ERCOT's history.  Winter Storm Uri brought with it a humanitarian crisis throughout the state of Texas, as shown by President Biden's declaration of a state of emergency in Texas, after receiving a request from Governor Greg Abbott.

80.     Following the storm, Governor Abbott declared the "correction of any billing errors by [ERCOT], including any inaccurate excessive charges and any issues regarding ancillary services prices" as an emergency item for the 87th Legislative Session.[56]  Lt. Governor Dan Patrick said in a statement: "I am glad Governor Abbott has made correcting ERCOT's two pricing errors an emergency item for this session.  Yesterday [March 8] I called on the [PUCT] and ERCOT to correct the errors identified by the [IMM] and today 28 Texas senators from both parties made the same request."[57]  ERCOT reported that it "set a new winter peak demand record [on February 14, 2021], reaching 69,150 MW between 6 and 7 p.m.[, which was] more than 3,200 MW higher than the previous winter peak."[58]  And, as stated above, the Debtor properly provided a notice of Force Majeure Event to ERCOT, further establishing the highly unusual nature of the events giving rise to the ERCOT Claim.

81.     ERCOT also cannot establish ordinary course under the vertical test.  There is no question that Winter Storm Uri, and the resulting electricity costs that form the basis of the ERCOT

---

[56] Message from the Governor of Texas to the Senate and House of Representatives of the Eighty-Seventh Texas Legislature, dated March 9, 2021, *available at* https://gov.texas.gov/uploads/files/press/EMERG_MESSAGE_legislative_matter_repricing_electricity_FINAL_03-09-21.pdf.

[57] Statement of the Lieutenant Governor of Texas, Dan Patrick dated March 9, 2021, *available at* https://www.ltgov.texas.gov/2021/03/09/lt-gov-dan-patrick-applauds-gov-abbott-naming-ercot-billing-error-correction-an-emergency-item/.

[58] ERCOT (@ERCOT_ISO), TWITTER (Feb. 14, 2021, 8:37 p.m.), https://twitter.com/ERCOT_ISO/status/1361142665140711427 (the Tweet has since been deleted but is still publicly available at the above URL if copy-pasted into the address bar).

Claim, exceeded creditors' "expectations of what transactions the debtor in possession is likely to enter into the ordinary course of its business," due to the crippling costs incurred.

82.     Further, the UCC defines a "buyer in the ordinary course of business," stating that: "[a] person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  Tex. Bus. & Com. Code § 1.201(b)(9).  As stated above, the sale of electricity that forms the basis of the ERCOT Claim was not sold to the Debtor in accordance with the "usual or customary practices" in the ERCOT market, but under extraordinary, unprecedented circumstances.

> ### c.     The ERCOT Claim far exceeds the "value" received by the Debtor.

83.     Lastly, ERCOT cannot establish that the *value* of the goods sold are in line with the amounts asserted in the ERCOT Claim.  Under section 503(b)(9), ERCOT could only be entitled to administrative expense treatment (assuming all other requirements of the statute are fulfilled) to the extent of "the value of any goods received" by the Debtor during the 20-day period.  The term "value" appears throughout the Bankruptcy Code and is ascribed different meanings for different purposes, but "value" as used in section 503(b)(9) is undefined.  As a result, it is within the Court's discretion to determine the value of goods the Debtor received (if any) during the prepetition period.  Although many courts have recognized a presumption that the invoice or contract price is a suitable measure of value under section 503(b)(9), that price is not dispositive.  A party can rebut the presumption through an evidentiary showing that, under the facts and circumstances, the invoice or contract price does not reflect the actual value received by the Debtor and its estate. The *Pilgrim's Pride* court suggested that, under section 503(b)(9), a proper measure of value for a market-traded commodity would be "the price at which it could be purchased during the relevant

period on the commodity market."[59]  That view, however, assumes a healthy, demand-driven marketplace.

84.    Here, as discussed above, there was no properly functioning market for electric power during Winter Storm Uri.  Both the market regulator (*i.e.*, the PUCT) and the market maker (*i.e.*, ERCOT) took unprecedented and ill-conceived actions that caused market participants to incur approximately $50 billion in charges for wholesale power in ***one week***, an amount close to what they would ordinarily incur over ***four years***.  Winter Storm Uri, of course, did cause extreme low temperatures, which drove demand and a corresponding increase in power prices, fuel-supply costs, and ancillary-service charges.  According to one source, the ERCOT market should have seen prices ranging from $758/MWh to $5,168/MWh, resulting in an average price of $2,404/MWh (or, approximately ***$6,578/MWh less*** than the pricing that the PUCT and ERCOT forced market participants to accept).[60]

85.    The PUCT and ERCOT did not agree with then-existing market signals and instead chose to intercede, dictating prices to market participants, dramatically inflating storm-related costs, and, in the aftermath of it all, refusing to exercise its rights to correct obvious (and egregious) errors.  The PUCT and ERCOT, by implementing and keeping in place the system-wide offer cap of $9,000/MWh, effectively suspended the competitive market and arbitrarily (if unintentionally) sorted market participants into "winners" and "losers."  ERCOT's asserted $1.87 billion priority claim then does not reflect real market outcomes.

86.    The "value" of the electricity and ancillary services is not reflected in the invoices, which simply shows the price ERCOT decided to charge.  The better evidence of value is what the

---

[59] 421 B.R. at 243-44.

[60]    *See* LEI Report at 19, available at https://interchange.puc.texas.gov/Documents/51617_10_1131376.PDF.

Debtor actually agreed to pay under the SFA.  At the very least, if the Court determines that section 503(b)(9) applies here, ERCOT's administrative expense claim should be reduced, by, at least, the difference between the power price that the PUCT and ERCOT determined participants should pay and the price that participants likely would have paid if the market had been allowed to work.

## VI.    RESERVATION OF RIGHTS AND RIGHT TO AMEND

87.    This Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtor to object to any claim on any ground whatsoever.  The Debtor expressly reserves all further substantive or procedural objections to the ERCOT Claim and any other claim.  The Debtor further reserves its right to amend or supplement the Objection as additional information is discovered.

88.    Nothing contained herein or any actions take pursuant to such relief is intended or should be construed as: (i) an admission as to the validity of any prepetition claim against the Debtor; (ii) a waiver of the Debtor's right to dispute any prepetition claim on any grounds; (iii) a promise or requirement to pay any prepetition claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by the Objection; (v) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (iv) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.

## VII.    PRAYER

For the foregoing reasons, the Debtor respectfully requests that this Court disallow, in part, and reduce the Claim, and allow the Claim only in a substantially reduced amount, to be determined by the Court, and for such other and further relief as may be just and proper.

Dated:  July 25, 2021
      Houston, Texas

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ Lino Mendiola*
Lino Mendiola (SBT 00791248)
Michael Boldt (SBT 24064918)
One American Center
600 Congress Ave., Suite 2000
Austin, TX 78701
Telephone: (512) 721-2700
Facsimile: (512) 721-2656
Email: linomendiola@eversheds-sutherland.us
Email: michaelboldt@eversheds-sutherland.us

*Special Counsel for the Debtor and Debtor in Possession*

**O'MELVENY & MYERS LLP**
Louis R. Strubeck, Jr. (SBT 19425600)
Nick Hendrix (SBT 24087708)
2501 North Harwood Street
Dallas, Texas 75201
lstrubeck@omm.com
nhendrix@omm.com
(972) 360-1925

*Proposed Co-Counsel for the Debtor and Debtor in Possession*

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Jason L. Boland*
Jason L. Boland (SBT 24040542)
Julie G. Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1301 McKinney Street, Suite 5100
Houston, TX 77010
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246
Email: jason.boland@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

Paul Trahan  (SBT 24003075)
98 San Jacinto Boulevard, Suite 1100
Austin, TX  78701
Telephone: (512) 536 5288
Facsimile: (512) 536 4598
Email: paul.trahan@nortonrosefulbright.com

*Counsel for the Debtor and Debtor in Possession*