**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **BRAZOS ELECTRIC POWER** | § | **Case No.:  21-30725 (DRJ)** |
| **COOPERATIVE, INC.,**[1] | § | |
| | § | |
| **Debtor.** | § | |
| _____ | § | |

**OBJECTION OF TRI-COUNTY ELECTRIC COOPERATIVE, INC. TO THE
DEBTOR'S SECOND MOTION FOR ENTRY OF AN ORDER EXTENDING THE
EXCLUSIVITY PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT
ACCEPTANCES THEREOF**

Tri-County Electric Cooperative, Inc. ("Tri-County" or "TCEC"), by and through its

undersigned counsel, hereby files this objection (the "Objection") to the *Debtor's Second Motion*

*For Entry Of An Order Extending The Exclusivity Periods To File A Chapter 11 Plan And Solicit*

*Acceptances Thereof* [Dkt. No. 1258] (the "Second Motion to Extend" or "Motion") filed by

Brazos Electric Power Cooperative, Inc. ("Brazos" or the "Debtor").  In support of this

Objection, Tri-County respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      By the Motion, the Debtor seeks to extend the Exclusivity Period[2] for a second

time, now requesting an extension through March 28, 2022 to file a plan of reorganization, and

May 25, 2022 to solicit votes.  However, neither the Motion nor the Debtor's actions establish

cause for such a lengthy extension.  The Debtor has neither set a target date by which it hopes to

_____

[1]  The Debtor in this chapter 11 case, along with the last four (4) digits of its federal tax identification number, is:
Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the
website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616
Bagby Avenue, Waco, TX 76712.

[2] Capitalized terms undefined herein shall have the meaning ascribed in the Second Motion to Extend.

1

file a proposed plan of reorganization, nor made any tangible progress toward an exit path from this chapter 11 case.[3]  Instead, the Debtor intends to use its exclusive period to "wait and see" what the result of the ERCOT Claim Objection litigation is while keeping only one exit path on the table—a securitization of the ERCOT Claim.

2.      The Debtor's myopic focus on one strategy to raise capital—securitization that would result in a substantial surcharge added for decades to the monthly power bills of the retail and commercial customers of each member cooperative—is a fool's errand.  This path to exit is opposed by the three largest members of the Brazos cooperative that collectively account for nearly two-thirds of Brazos's end consumer and retail customer count and 70 percent of Brazos's load.[4]  Since securitization without the participation of the largest three member-cooperatives is unlikely to raise adequate capital to allow Brazos to exit from bankruptcy, a plan premised on a securitization transaction is simply not feasible.  Further, such a plan is not in the best interests of the member-owners (the ultimate purchasers and consumers of electricity who are Brazos's "most valued assets" and for whom both Brazos and the member-cooperatives exist),[5] and who would shoulder the majority of the cost of securitization.[6]  This path would also put the Debtor

---

[3] *Videotaped Oral Dep. of Clifton Karnei*, November 22, 2021 ("Karnei Deposition") 42:16-21 ("I do not believe the board has established a target" for filing a proposed plan); 48:12-25 (acknowledging "not a lot of work" has been done on what a plan might look like).

[4] As reflected in Exhibit A, the three largest member-cooperatives are Denton County Electric Cooperative, Inc. d/b/a Coserv Electric ("CoServ"), Tri-County, and United Electric Cooperative Services, Inc. d/b/a United Cooperative Services ("United").

[5] Brazos's Mission Statement provides: "At Brazos Electric Cooperative, our mission is to provide valued service to our members and customers by generating, procuring, and transmitting reliable power at the lowest cost. We will provide excellent customer service while practicing the highest degree of integrity. The members, customers, and employees are Brazos Electric Cooperative's most valued assets." *See* www.brazoselectric.com.

[6] The Court has noted several times that the interests of the member-owners must be protected as much as possible.  *See, e.g., Brazos Power Coop. Inc. v. Electric Reliability Council of Texas, Inc.*, Case No. 21-03863-ADV, Mots. to Dismiss and Mots. to Intervene Hr'g Tr. 246:15-20 (Oct. 18, 2021) ("Oct. 18 Tr.") ("And remember, at the end of the [] day, my focus is on those people who pay their electric bills every month, and do not get in my way with respect to that issue.  That – those people mean everything to this process, and we're going to protect those folks to the extent that the law says that we should.").

on a path toward protracted and value-destructive plan confirmation litigation, harming the estate as a whole.

3.      The Debtor's requested extension of its exclusive period is being used to "run the clock" on other viable exit strategies, and force the Debtor's preferred securitization transaction on its members.  To date it appears that the Debtor has done nothing other than "think" about alternative capital sources including, most importantly, the sale of some or all of Debtor's significant transmission, distribution, and generation assets.  It is unacceptable for the Debtor to pursue the path of securitization, which burdens the member-owners with billions of dollars of the Debtor's obligations, unless Brazos also concurrently analyzes with the same commitment and vigor other potential options which are much less onerous for the retail and commercial rate payers.

4.      As this Court noted in connection with the Debtor's first request to extend exclusivity, a long exclusive period leaves little opportunity to evaluate if the Debtor's proposed path is working.[7]  Instead, while stakeholders may have additional information regarding the size and priority of the claims pool at the end of the Exclusivity Period, they will be no closer to figuring out how to fund a plan that does not unduly burden the ultimate stakeholders here—the consumers who pay for the electricity.  Having chosen to focus on only the securitization path to exit, the Debtor should not be given the unfettered right to take all other exit options "off the table" for 152 days.  Instead, a shorter extension of 30 days is appropriate, during which time the Debtor must *genuinely* engage with its members on exploring all exit options.

---

[7] *Mot. To Extend Exclusivity Period for Filing Chapter 11 Plan and Disclosure Statement Hr'g Tr*. 22:14-23:25 (July 26, 2021).

## BACKGROUND

### A.  Procedural Background

5.      The Debtor filed its chapter 11 petition on March 1, 2021 (the "Petition Date").

Dkt. No. 1.  On June 28, 2021, the day before the Debtor's initial period of exclusivity was set to

expire, the Debtor asked the Court to extend the Exclusivity Period by 120 days (the "First

Motion to Extend").  Dkt. No. 816.  An ad hoc group of member-owner distribution cooperatives

(the "Ad Hoc Group") filed a statement that responded to certain statements regarding

securitization and Senate Bill 1580 that were contained in the First Motion to Extend and in the

objection of the Official Committee of Unsecured Creditors [Dkt. No. 907]. Dkt. No. 926.  Tri-

County did not formally oppose the First Motion to Extend, but filed a joinder to the Ad Hoc

Group's statement and made an additional statement.  In its statement, Tri-County clearly set

forth its views that the proposal to pay creditors through a securitization scheme pursuant to SB

1580 was not in the best interest of consumers and, rather, would "burden[] the ultimate

consumers with a crushing debt of $2.5 billion to remedy a problem not of their own making."

Dkt. No. 927.  CoServ and United also filed joinders to the Ad Hoc Group's statement and

statements of their own.  Dkt. Nos. 928, 929.

6.      This Court granted the relief sought by the First Motion to Extend, extending the

Filing Exclusivity Period through October 27, 2021, and the Solicitation Exclusivity Period

through December 28, 2021.  Dkt. No. 961.

7.      On the day that the Debtor's second window of exclusivity was set to expire, the

Debtor filed the Second Motion to Extend, which is subject to this Objection.  In the Second

Motion to Extend, the Debtor asks the Court to extend the Filing Exclusivity Period through

March 28, 2022 (more than a year past the Petition Date), and Solicitation Exclusivity Period

through May 25, 2022, without prejudice to seek further extensions.  Second Motion to Extend ¶1.

### B.  Key Factual Background

8.      Brazos is a "G&T Cooperative" meaning that it owns assets to both generate and transmit electricity.  Its only customers are the 16 member-cooperatives who distribute the power supplied by Brazos to their member-owners, who consume and ultimately pay for the electricity. Tri-County is a party to a Wholesale Power Contract ("WPC") with Brazos that requires Tri-County to purchase all of its power requirements from Brazos.  The 15 other member-cooperatives are parties to the same form of WPC with Brazos.  As a consequence of the WPC, Brazos's member-cooperatives are obligated to acquire all required power from Brazos.

9.      Improperly relying on terms in the WPC, Brazos asserts that the member-cooperatives are required to reimburse Brazos for costs incurred by Brazos during the winter storm, including the ERCOT Claim.  Brazos asserts that Tri-County is required to reimburse it for the outrageous sum of $579.4 million for winter storm costs.  For Tri-County, such a payment represents approximately three-times Tri-County's annual power costs for an entire year.  Tri-County disputes any obligation to pay this amount,[8] and it is unclear how Tri-County could afford to pay it if required to do so.  Brazos has deferred any collection of this sum from Tri-County and the other member-cooperatives based on what Brazos calls a Temporary Affordability Allowance ("TAA").

---

[8] Tri-County and the other member cooperatives are not liable for Brazos's debts, including those arising out of the winter storm. See section 2 of Brazos's Bylaws and section 161.060 of the Tex. Utilities Code. Additionally, as reflected in Tri-County's proof of claim (*see* proof of claim 114-1 filed by Tri-County), Tri-County disputes its responsibility for these charges under the WPC.  Tri-County asserts that these huge charges are the result of Brazos's own failure to use care and skill to prepare for and properly operate during the winter storm so as to protect the member cooperatives from the resulting extreme price fluctuations.  Consequently, Tri-County asserts that Brazos is not entitled to reimbursement for winter storm charges arising from Brazos's own failure to properly perform under the WPC.

10.     Tri-County serves approximately 116,000 meters.[9]  The enormous TAA charge amounts to an estimated charge of approximately $5,000 per meter.  Through securitization, that sum would ultimately constitute a surcharge on each member's electric bill for decades.  For the economically weaker segments of Tri-County's customers—including the elderly, low-income families, and those living on fixed incomes—this surcharge is incredibly onerous.  However, securitization is not the Debtor's only option.

11.     These increased electric bills of the member-owners will have an adverse impact on the competitiveness of Tri-County as a distribution cooperative by potentially raising the rates it must charge to customers to levels potentially in excess of the prevailing rates in the Texas power market.  Eventually, these uncompetitive prices will result in increased competition and place Tri-County's survival as a public power cooperative in danger.

12.     Brazos owns valuable hard assets, in particular its transmission and distribution assets, which could be sold to generate substantial cash to fund a plan thereby substantially reducing the burden placed on the member-owners to fund a plan.  So far, Brazos' Board and management have refused to take any tangible steps to appropriately analyze this option, and appear poised to rush toward securitization without considering other options that better protect the member-owners.[10]

## LEGAL STANDARD

13.     Section 1121 of the Bankruptcy Code provides that a debtor has the exclusive right to file a plan within the first 120 days after the order for relief and, if a plan is filed within

---

[9] *See* Exhibit A.

[10] *See*, *e.g.*, Karnei Deposition 30:20-31:2 (the Board has decided not to pursue a sale of distribution assets at this time); 31:16-32:24 (Mr. Karnei confirming that "there is no task force to consider the sale of transmission and distribution assets because those are not assets that the board is actively considering selling"); 43:14-25 (the Board has determined not to evaluate selling transmission and distribution assets at this time, and has not hired an investment banker).

that time frame, the debtor is given 180 days in which to obtain acceptance of the plan.  11

U.S.C. § 1121(b), (c).  A debtor bears the burden to demonstrate "cause" to extend those periods.

11 U.S.C. § 1121(d)(1); *see also In re Mirant Corp.*, No. 4-04-CV-476-A, 2004 WL 2250986, at

*2 (N.D. Tex. Sept. 30, 2004).  After the statutory exclusivity period expires, any party in interest

may file a plan.  11 U.S.C. § 1121(c).

       14.    Courts consider a number of factors, sometimes referred to as the *Adelphia*

factors, when considering whether to extend exclusivity:

> (1) the size and complexity of the case;
> (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
> (3) the existence of good faith progress toward reorganization;
> (4) the fact that the debtor is paying its bills as they become due;
> (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan;
> (6) whether the debtor has made progress in negotiations with its creditors;
> (7) the amount of time which has elapsed in the case;
> (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
> (9) whether an unresolved contingency exists.

*In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D.

Tex. Feb. 25, 2014) (citing *In re GMG Capital Partners III, L.P.,* 503 B.R. 596, 2014 WL 260552

(Bankr. S.D.N.Y. 2014)); *see also In re Adelphia Commc'n Corp.*, 352 B.R. 578, 586-87 (Bankr.

S.D.N.Y. 2006) (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997))

(explaining that while the elements that constitute "cause" are not defined in the Bankruptcy

Code, courts have developed a list of nine enumerated factors to inform the inquiry).

       15.    Although a court has discretion to award an extension, the mere existence of one

or more of the *Adelphia* factors is not sufficient to justify an extension.  *See In re Mid-State*

*Raceway, Inc.*, 323 B.R. 63, 67-68 (Bankr. N.D.N.Y. 2005) (citation omitted) ("[T]he court is mindful that whether or not to grant an extension of exclusivity pursuant to Code § 1121(d) is a matter of discretion based on all the facts and circumstances").  In *Adelphia*, the court explained, "the test is better expressed as determining whether terminating exclusivity would ***move the case forward materially***, to a degree that wouldn't otherwise be the case."  *See Adelphia*, 352 B.R. at 590 (emphasis added) (citations omitted); *see also In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) (holding that "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution.").  This amounts to "a practical call that can override a mere toting up of the factors." *Adelphia*, 352 B.R. at 590; *In re Borders Grp., Inc.*, 460 B.R. 818, 827 (Bankr. S.D.N.Y. 2011) (citing practical considerations as determinative in considering whether to extend or terminate exclusivity).  Of course, "practical considerations or other considerations in the interest of justice, could override, in certain cases, the results after analysis of the nine factors" that courts typically consider in determining whether to extend or terminate exclusivity.  *Adelphia*, 352 B.R. at 590.

16.     Further, courts have cautioned that extensions of exclusivity should "be granted neither routinely nor cavalierly."  *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y 1987); *see also Borders*, 460 B.R. at 822 ("A court's decision to extend a debtor's exclusive period is a serious matter").  "The debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts."  *Mirant*, 2004 WL 2250986, at *2.  Indeed, a court "should not routinely grant an extension."  *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987).

17.     This caution is in line with the purpose of section 1121, which is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d  363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988); *see also Mirant*, 2004 WL 2250986, at *2 (noting that one of the fundamental purposes of Bankruptcy Code section 1121 is "to limit the delay that makes creditors the hostages of Chapter 11 debtors").  The legislative history shows the concern that "unlimited exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to force unfair concessions." *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988) (*quoting* House Report, 1978 U.S.C.C.A.A.N. at 6191) (emphasis omitted); *In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.") (quoting S. Re. No. 95-989, 95th Cong. 2d Sess. 118 (1978)).

## ANALYSIS

18.     The Debtor has not shown the requisite "cause" to extend exclusivity for 152 days as requested in the Second Motion to Extend.  This case has already been pending for more than eight months.  That time period should have provided ample opportunity for the Debtor to assess exit options and at least begin to negotiate a plan of reorganization with its constituents.  Instead, the Debtor finds itself exactly where it was at the expiration of its first period of exclusivity: having done "not a lot of work" on a plan and having demonstrated minimal progress toward reorganization, no reasonable prospects and no target date for filing a viable plan, and no significant progress in negotiations with creditors and stakeholders.[11]  As described herein, there

---

[11] *Millennium*, 2014 WL 792115, at *6 (factors 2, 3, 5, 6, 7); *see also* Karnei Dep. 42:16-21; 48:12-25.

are options available to Brazos other than the securitization scheme that has been the sole focus

of the Debtor.  If the Debtor is unwilling to explore these options, the Court should give other

stakeholders and parties-in-interest an opportunity to file a plan and bring about a productive

resolution to this case, rather than letting another five months pass on the current path.  11 U.S.C.

§ 1121(b), (c).

### I.      The Debtor Has Not Made Good Faith Progress Toward Reorganization or Demonstrated Reasonable Prospects for Filing a Viable Plan During the Requested Extension Period.

19.     This is the Debtor's second request for an extension of its Exclusivity Period.

The Debtor has had ample opportunity to begin negotiations with creditors and other

stakeholders regarding the terms of a chapter 11 plan, but has chosen not to do so.  While the

Debtor cites to the efforts it has undertaken to date in the Second Motion to Extend,[12] none of

those efforts involve negotiating and progressing toward reorganization.  Indeed, no substantive

plan discussions have been initiated as of the filing of the Second Motion to Extend.[13]

20.     The Debtor has not appropriately used the lengthy period of exclusivity to which

it has already been entitled, and does not appear to have any intention of meaningfully exploring

any exit paths other than securitization during the 152-day period requested in the Second

Motion to Extend.  Instead, the Debtor intends to use its proposed exclusivity extension to (1)

conclude the litigation over the ERCOT Claim Objection and (2) concurrently explore

securitization structures for whatever size of ERCOT Claim this Court ultimately determines.

---

[12] *See* Second Motion to Extend ¶¶ 41-44.
[13] Karnei Dep. 42:16-21; 48:12-25.

Conspicuously absent from the Debtor's agenda is any meaningful intent to explore other alternatives.

21.     The Debtor has represented that litigating the ERCOT Claim Objection "remains the Debtor's priority."[14]  Indeed, the Debtor's EVP and General Manger testified that he does not know if the Debtor will be able to propose a plan of reorganization prior to this Court issuing its decision in the ERCOT Claim Objection litigation.[15]  While Tri-County recognizes that the litigation surrounding the ERCOT Claim Objection is an important focus of the Debtor, the existence of "complex litigation, the outcome of which is crucial to any plan formulation" *does not justify* extending the exclusivity period unless the debtor also proves "that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization within a reasonable time." *Jourdanton*, 84 B.R. at 451, 454.  Further, ERCOT's $1.9 billion claim is not the only substantial claim that needs to be resolved, nor is it the only key issue in this proceeding that will impact whether the debtor or another party in interest could present a viable plan of reorganization.  The ERCOT Claim Objection cannot be the basis to stall larger efforts in this proceeding for another five months.

**II.     There is No Reasonable Prospect that the Debtor Will File a Viable Plan.**

22.     Despite some of the Debtor's sweeping and conclusory comments in the Second Motion to Extend that it is "exploring all potential paths to maximize value to the Debtor's estate,"[16] in fact, the Debtor's only focus appears to be on hiring an investment banker to explore securitization.  Indeed, Brazos spent months conducting an extensive process to select an

---

[14] See Second Motion to Extend ¶ 15.
[15] Karnei Dep. 95:23-96:3.
[16] Second Motion to Extend ¶¶ 15, 43(e).

investment banker to advise it regarding the potential for a successful securitization and is expected to file an application to retain J.P. Morgan Securities, LLP in that role.[17]  However, the Debtor has made no concerted effort to hire an investment banker or other similar professionals to explore any other alternatives.[18]

23.     To date, the Debtor has been focused solely on a securitization scenario as the vehicle for Brazos to emerge from bankruptcy without changing its business model or downsizing its operations.  While the Debtor created a "Generation Task Force" with the ostensible purpose of considering the sale of the Debtor's generation assets, its EVP and General Manager is of the opinion that a sale process for the generation assets should not be commenced until after the ERCOT Claim Objection litigation reaches a conclusion.[19]  The Debtor's Board has also determined *not* to evaluate the sale of the transmission or distribution assets "at this time."[20] Thus, the Debtor has elected *not* to retain an investment banker to prepare for a potential sale process or even evaluate the desirability of that path to exit, despite the fact that its EVP and General Manager believes a properly run sale process would take four to six months.[21]  So while the Debtor is quick to claim that "all options" have been and remain under consideration since the Petition Date, the practical reality is that only one option will be left if the Debtor is granted another 152 days of exclusivity.  Indeed, Tri-County believes that this is precisely the reason why Brazos is requesting such a long exclusivity period—to leave its members and other constituents with no plan alternative other than a securitization financing of the ERCOT Claim.  The

---

[17] Karnei Dep. 39:19-41:6, 75:20-77:7; *see also* Second Motion to Extend ¶ 43(e) (noting that the Debtor solicited proposals from investment bankers, "each of whom has extensive experience in ratepayer-backed securitization bond offerings").

[18] Karnei Dep. 43:14-25.

[19] Karnei Dep. 62:14-18.

[20] Karnei Dep. 30:20-31:2; 31:16-32:24; 43:14-25.

[21] Karnei Dep. 43:14-25; 65:14-19.

unfortunate losers from the Debtor's refusal properly to explore other plan alternatives are the consumers of electricity who will pay for the securitization as a part of their monthly electric bills for many years to come.

24.     As Tri-County and other member-cooperatives have highlighted before,[22] securitization is simply not feasible under the circumstances, including because:

- The Debtor admits that securitization is voluntary,[23] and it is not supported by the three largest member-cooperatives, including Tri-County;[24]

- Although the Debtor believes that only $200 million must be raised for a securitization to be viable, that leaves unanswered whether sufficient amounts could be raised through securitization to allow Brazos to exit from bankruptcy without pursuing litigation against the three largest member-cooperatives;[25]

- Securitization would lead to unacceptable increases of monthly bills for end-users for years to come; and

- The economic impact of securitization would render Tri-County and similarly situated member-cooperatives non-competitive in the Texas power market, and potentially push those member-cooperatives into bankruptcy themselves.[26]

---

[22] *See* Dkt. No. 927; *see also* Dkt. Nos. 926, 928, 929.

[23] Karnei Dep. 97:11-100:4.

[24] Attached as Exhibit A is a table reflecting the number of retail consumers by meter count served by each member cooperative as of year-end 2018 and 2020. As the chart reflects, the three largest member-cooperatives, CoServ (37.2%), Tri-County (16.7%) and United (12.9%), account for approximately two-thirds of the meters served by Brazos. Because these three cooperatives also serve many business and industrial accounts with higher power consumption, they collectively account for approximately 70 percent of the load served by Brazos. Exhibit A also reflects that approximately 82 percent of the growth in meters served by the Brazos system between year-end 2018 and year-end 2020 is attributable to those three largest member-cooperatives.

Moreover, because the three largest member-cooperatives service the vast majority of meters and load served by Brazos, the burden to pay for securitization will fall mostly heavily on these three member-cooperatives and their member-owners. Consequently, the ability of Brazos successfully to consummate a securitization transaction to raise sufficient funds to allow it to emerge from bankruptcy will likely require the participation of the three largest member-cooperatives.

[25] Karnei Deposition 97:11-99:2.

[26] If Brazos seeks to enforce payment of the entire TAA in an amount beyond the member-cooperative's ability to pay, that becomes a potential outcome. In such a bankruptcy case, it is possible that the member-cooperative would reject the WPC with Brazos and require Brazos to accept a long-term payment of the claim over a period of years through a plan of reorganization.

25.      Despite the obvious merit (indeed absolute necessity) of exploring the options cited above, Brazos appears to have taken no tangible steps to take advantage of these opportunities.  Instead, Debtor's management appears determined to follow a path to securitization, thereby burdening the member-owners with billions of dollars in obligations, all without fully exploring other less onerous options.  As a result, the Debtor is setting itself on a path toward value destructive plan litigation that cannot be avoided if its members are forced by a lengthy exclusivity extension to sit on the sideline while more viable exit options are timed out.

**III.      There Are Other Better Options Than Securitization.**

26.      Whether securitization or some other alternative will ultimately be the best option for Brazos is, of course, not an issue for today.  But what the Debtor should not be permitted to do is to use its exclusive period to practically eliminate any other alternative.  As noted above, Brazos has categorically ruled out even analyzing a sale of its transmission and distribution assets, and deferred the consideration of a sale process for its generation assets until after the ERCOT Claim Objection litigation has concluded, by which time it will be too late.  If Brazos were truly using its exclusive period to explore "all options," it would pursue a possible sale option concurrently with a potential securitization financing.  Instead, the Brazos management team seems intent upon preserving its existing structure and avoiding any downsizing that asset sales would entail, whether or not that is in the best interests of the member-owners.

**A.  Other Options to Protect Member-Owners.**

27.      Potential other options that would achieve the goal of protecting member-owners who ultimately pay for power provided by Brazos include:

- **Sale of the Transmission Assets:** The quality and location of Brazos's transmission assets—including 2,714 miles of transmission lines and 490

transformation substations—are "highly desirable" to potential purchasers.[27] The Board has been informed of the value of these assets.[28]  Brazos's Executive Vice President and General Manager is aware of multiple potentially interested buyers of these assets, but has not actively sought to solicit bids from those buyers.[29]  In the current environment, there is good reason to expect that the transmission assets could generate a robust bidding process and be sold for a premium substantially in excess of the amount owed to Rural Utilities Service ("RUS").[30] Such a transaction would reduce or perhaps even eliminate the need for a securitization transaction.

- **Sale of Distribution Assets (Substations)**: In addition, Brazos owns approximately 385 distribution substations that are located within each member-cooperative's service area.[31]  These substations transform the high voltage transported through the transmission lines into lower voltage for distribution by the member-cooperatives to its customers throughout the distribution cooperative's service area.[32]  Tri-County and some of the other member-cooperatives are interested in purchasing the substations that they use to service their customers.[33]  Such a sale would likely generate a substantial fund of money over and above the funds derived by selling the transmission assets.

- **Sale of the Generation Assets**: Another option that would lessen the burden on the member-owners, while still allowing Brazos to reorganize, is the sale of Brazos's generation assets (three power plants located near Cleburne, Palo Pinto and Jacksboro).  Tri-County believes that the generation assets could likely be sold for a sufficient sum to pay the debt owed to RUS.  This type of transaction could also result in substantial savings to Tri-County and other member-cooperatives that would offset and minimize (1) the costs to fund a plan for Brazos, and (2) any net increase in monthly power bills to Tri-County's member-owners as a result of a plan.

28.    Under the asset sale scenarios, the member-owners are burdened as little as possible and Brazos can still reorganize, albeit through adopting a different business model then exists today.

---

[27] Karnei Dep. 59:10-19; *see also* Karnei Deposition Ex. 3, Collet & Associates, *Valuation Report and Collateral Position for Utility Plant Assets*, May 16, 2021 ("Collet Report") at 27.

[28] Karnei Dep. 60:10-20.

[29] Karnei Dep. 61:5-21; 70:16-20.

[30] The transmission assets secure a debt by Brazos to the RUS.

[31] Collet Report at 36.

[32] *Id.*

[33] Karnei Deposition 177:17-178:2.

**B. Brazos Version 2.0.**

29.     If a substantial portion of Brazos's assets are sold, Brazos can be restructured into a smaller operating entity, with a smaller staff, and serve member-cooperatives with a "paper portfolio."[34] If transmission, distribution, and generation assets are sold to pay claims against the Brazos estate, Brazos or a successor can be constituted as a "Paper G & T." A Paper G & T is an organization that provides power supply and transmission services to the member-cooperatives, who are distribution cooperatives that distribute the power to their member-owners as the consumers of the electricity.  A Paper G & T does not own either generating or transmission assets.  Instead, the Paper G & T acquires these services from third parties, provides these services to the member-cooperatives, and then is reimbursed by the member-cooperatives for these services.  The Paper G & T may also provide back-office, billing and administrative services for its member-cooperatives to meet their specific needs.

30.     A similar entity may be constituted if either the transmission or generation assets is retained.  If the cooperative retains generation assets, but owns no transmission assets, it becomes a "Paper G."  Conversely, if the cooperative owns transmission assets, but owns no generation assets, it is a "Paper T."  Likewise, a Paper G or a Paper T may provide back-office, billing and administrative services to the member-cooperatives as required by their specific needs.

31.     This is important as many of the smaller cooperatives are dependent upon Brazos to purchase their power on the market and to provide back-office, billing and administrative services to the member-cooperatives.  A reconfigured Brazos, whether as a Paper G & T, Paper T, or a Paper G, can continue to provide these services to the member-cooperatives, although likely

---

[34] Karnei Dep. 41:18-22; 115:2-19.

with a much smaller staff and organization.  Consequently, under any of these scenarios, the small member-cooperatives will be provided with the same support which they now receive from Brazos, although through a smaller organization.

32.    While the Court is not now being asked to opine on which alternative is best for Brazos, it should not permit a lengthy exclusivity extension to be used as a cudgel by the Debtor to practically eliminate these alternatives.

### IV.    The Likely End Result of the Securitization Path is a Confrontation Between The Debtor and the Largest Cooperatives Who Decline to Participate in Securitization.

33.    The three largest member-cooperatives have unequivocally informed the Debtor that they oppose the securitization of whatever ERCOT Claim is ultimately allowed.  To cover the shortfall between the amounts recovered through securitization and the amount due to ERCOT and other claimants, the Debtor would likely pursue litigation against the member-cooperatives who declined to participate in the securitization.[35]  Depending on the ultimate size of the ERCOT Claim, such sums might send Tri-County and the other large members into bankruptcy proceedings of their own.  As this Court has noted, Brazos should not seek confirmation of a plan that forces any of its members into their own bankruptcies.[36]  However, there is no good reason for this confrontation to ever occur as there are other options available to Brazos to avoid this scenario and allow for the confirmation of a consensual plan.

---

[35] Karnei Dep.  98:7-99:16.

[36] *See*, *e.g.*, Oct. 18 Tr. 246:15-20; *see also Emer. Mot. Hr'g (via Zoom)* Am. Tr. 43:10-44:20 (Mar. 30, 2021) (Stating that the Court is "keenly aware of the death spiral effect" for co-op members, and is "worried about it" after being informed that there is a "limit . . . to how much [] charges can be passed through to [the Debtor's] member co-cops and ultimately to its customers.").

## CONCLUSION

34.     Brazos and the 16 member cooperatives exist to serve the member-owners who consume the electricity.  Securitization pushes potentially billions of dollars of debt down onto the shoulders of these member-owners, many of whom are elderly, on fixed-incomes, or otherwise unable to withstand significant increases to their monthly power bills.  Brazos should not pursue a path that burdens these consumers without first thoroughly analyzing, and leaving itself in a position to pursue, all reasonable alternatives, including asset sales.  Brazos, however, seeks a lengthy extension of exclusivity so that it can practically rule out those very alternatives. A more limited extension of 30 days would allow Brazos to do what its largest members have been asking for months – genuinely pursue and leave open these other alternatives.

35.     For the reasons above, this Court should deny the relief sought by the Second Motion to Extend.

*[Remainder of the page left intentionally blank.]*

Dated:  November 24, 2021     Respectfully submitted,


*/s/ Sarah Link Schultz*
Sarah Link Schultz
Texas Bar No. 24033047
Laura P. Warrick
Texas Bar No. 24079546
AKIN GUMP STRAUSS HAUER & FELD, LLP
2300 N. Field Street, Suite 1800
Dallas, Texas 75201-2481
(214) 969-4367 Telephone
(214) 969-4343 Facsimile
sschultz@akingump.com
lwarrick@akingump.com

Abid Qureshi (*pro hac vice* motion pending)
New York Bar No. 2684637
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
aqureshi@akingump.com

and

J. Robert Forshey
Texas Bar No. 07264200
Jeff P. Prostok
Texas Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, Texas 76102
(817) 877-8855 Telephone
(817) 877-4151 Facsimile
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

**ATTORNEYS FOR TRI-COUNTY
ELECTRIC COOPERATIVE, INC**

## **CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2021 a true and correct copy of the foregoing document was served via email on all interested parties that have consented to such service.

*/s/ Sarah Link Schultz*
Sarah Link Schultz

**Exhibit "A"**

Average Number of Retail Consumers (Meter Count)

| | 12/31/2018[37] | 12/31/2020[38] | Change |
|---|---|---|---|
| Bartlett Electric | 12,081 | 12,385 | 304 |
| Comanche Electric | 17,220 | 17,087 | (133) |
| CoServ Electric | 236,992 | 258,637 | 21,645 |
| Fort Belknap Electric | 6,135 | 6,047 | (88) |
| Hamilton County Electric | 18,253 | 18,511 | 258 |
| Heart of Texas Electric | 21,899 | 22,077 | (188) |
| HILCO Electric | 28,284 | 29,829 | 1,545 |
| J-A-C Electric | 5,913 | 5,890 | (23) |
| Mid-South Synergy | 31,266 | 33,705 | 2,439 |
| Navarro County Electric | 16,608 | 17,500 | 892 |
| Navasota Valley Electric | 19,674 | 19,929 | 255 |
| PenTex Electric | 16,421 | 16,653 | 232 |
| South Plains Electric (est) | 8,085 | 8,100 | 15 |
| Tri-County Electric | 111,896 | 116,228 | 4,332 |
| United Cooperative Services | 86,356 | 90,000 | 3,644 |
| Wise Electric | 22,790 | 23,337 | 547 |
| | 659,873 | 695,915 | 36,042 |

---

[37] Brazos Electric Cooperative, Inc. 2018 Audit Report

[38] Texas Electric Cooperatives, Member Directory, available at: https://texas-ec.org/about/member-directory/