**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **In re:** § | **Chapter 11** |
| § | |
| **BRAZOS ELECTRIC POWER** § | **Case No.:  21-30725 (DRJ)** |
| **COOPERATIVE, INC.,**[1] § | |
| § | |
| **Debtor.** § | |
| _____ § | |

**PRELIMINARY RESPONSE OF TRI-COUNTY ELECTRIC COOPERATIVE, INC. TO
THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO TRI-COUNTY ELECTRIC COOPERATIVE INC.'S PROOFS OF CLAIM**

Tri-County Electric Cooperative, Inc. ("Tri-County"), by and through its undersigned

counsel, hereby files this preliminary response (the "Response") to the *Objection of the Official*

*Committee of Unsecured Creditors to Tri-County Electric Cooperative Inc.'s Proofs of Claim*

[Dkt. No. 1359] (the "Objection") filed by the Official Committee of Unsecured Creditors (the

"Committee") and Brazos Electric Power Cooperative, Inc.'s ("Brazos" or the "Debtor") joinder

thereto [Dkt. No. 1471] (the "Joinder").[2]  In support of this Response,[3] Tri-County respectfully

represents as follows:

**PRELIMINARY STATEMENT**

1.      Tri-County is the second largest member-cooperative of the Debtor, accounting

for nearly one-fifth of the Debtor's sales of electricity and other services to its sixteen member-

---

[1]  The Debtor in this chapter 11 case, along with the last four (4) digits of its federal tax identification number, is: Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

[2] Capitalized terms undefined herein shall have the meaning ascribed in the Objection.

[3] Tri-County made multiple attempts to extend the deadline to file this Response until after discovery and resolution of the adversary proceeding relating to the ERCOT claim.  The Committee and the Debtor declined that offer.

owners.  Tri-County asserts claims against the Debtor of not less than $640,402,903, as set forth

in its Proof of Claim (defined herein).  The Committee, collaborating with the Debtor's

professionals,[4] has raised various objections to Tri-County's claims in the Objection.  However,

the Committee's Objection fails to rebut the *prima facie* validity of Tri-County's Proof of Claim.

Further, Tri-County can and will establish the validity of its Proof of Claim by a preponderance

of the evidence, including relating to the following claims challenged by the Committee:[5]

- **Disputed Charges:**  The Debtor incurred unprecedented (and disputed) charges from
  ERCOT for energy purchases during Winter Storm Uri (the "<u>Winter Storm</u>") that took
  place in February 2021 (the "<u>Disputed Charges</u>").  The Debtor has asserted that Tri-
  County is required to reimburse the Debtor for the Disputed Charges to the extent that
  the Debtor is unsuccessful in its efforts to reduce or disallow ERCOT's claim against
  the Debtor.  However, as Tri-County sets forth in its Proof of Claim, and which it will
  further show following discovery and a full presentation of evidence, the Disputed
  Charges have not been properly authorized under the Wholesale Power Contract
  between the Debtor and Tri-County.  Further, the Disputed Charges are a result of the
  Debtor's own failures to comply with its contractual and legal duties to Tri-County,
  particularly during the Winter Storm.  To the extent that the Debtor pursues the
  Disputed Charges against Tri-County, Tri-County holds a valid claim against the
  Debtor arising under the Wholesale Power Contract and from the Debtor's failure to

---

[4] *See, e.g.*, *Ninth Monthly Fee Statement of Kramer Levin Naftalis & Franklin LLP, as Counsel to the
Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the
Period From Nov. 1, 2021 Through Nov. 30, 2021* at 55, 68 [Dkt. No. 1426].

The apparent collaboration between the Committee and the Debtor is particularly troubling given the
timing of the Committee's efforts (soon after Tri-County filed its *Objection to the Debtor's Second Motion for Entry
of an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Dkt. No.
1343]), combined with the fact that the Committee only filed an objection to the claims of Tri-County and Denton
Co. Electric Cooperative, d/b/a CoServ Electric ("<u>CoServ</u>") (the two member co-operatives to file objections to the
Debtor's Second Motion to Extend Exclusivity) when fourteen of the sixteen members have filed proofs of claim.
*See* Claim No. 401 (Tri-County Electric Cooperative); Claim No. 411 (Hamilton County Electric Cooperative);
Claim No. 412 (Heart of Texas Electric Cooperative); Claim No. 413 (United Electric Cooperative Services); Claim
No. 414 (Comanche Electric Cooperative); Claim No. 417 (South Plains Electric Cooperative); Claim No. 421
(CoServ Electric); Claim No. 423 (Mid-South Electric Cooperative Association); Claim No. 425 (Navasota Valley
Electric Cooperative); Claim No. 426 (J-A-C Electric Cooperative); Claim No. 427 (Bartlett Electric Cooperative);
Claim No. 428 (Pentex Energy); and Claim No. 429 (Wise Electric Cooperative).

[5] This Response focuses on providing a preliminary response to the primary objections made by the
Committee in its Objection.  In doing so, Tri-County does not waive or abandon any arguments made in its Proof of
Claim, and incorporates by reference those arguments into this Response.  A complete response to the Objection will
require fact discovery.  As such, this Response does not set forth all the facts, circumstances, and legal arguments
relevant to the Proof of Claim or in response to the Objection and this Response does not represent Tri-County's
case in chief.  Tri-County further reiterates the Reservation of Rights it articulated in the Proof of Claim.  Tri-
County reserves its right to supplement this Response in further briefing at a date to be determined by agreement of
the parties and/or by order of the Court.

exercise the requisite skill and care in connection with the performance of its duties and obligations under that agreement.

- **Patronage Account:**  Tri-County holds a valid claim against the Debtor for Tri-County's share of accumulated net margins from the Debtor's operations, which are held in a patronage account as Capital Credits.  Tri-County's claim amount for Capital Credits totals $121,943,839.45 as of the Petition Date, and is expected to increase approximately $16,000,000 to account for excess net margins from the Debtor's 2020 operations and in an amount to be determined for the Debtor's 2021 operations prior to the Petition Date.  Neither the Debtor nor its cooperative members view these amounts as equity and they should not be reclassified, as the Committee contends.

- **Annual Margin Rebate:**  Tri-County holds a valid claim for Annual Margin Rebate in the amount of $5,625,445 owed to Tri-County by the Debtor, as either a lump sum payment or a credit against any charges from the Debtor.

- **Administrative and General Expenses:**  Tri-County holds a valid claim for overcharges for administrative and general expenses, as such expenses have been allocated disproportionately and in a discriminatory fashion that is neither just nor reasonable among the members-cooperatives of the Debtor so that Tri-County and other large member-cooperatives pay far more than appropriate when these expenses are not dependent on the size of the member-cooperatives.

- **Reimbursement for Third-Party Claims:**  Tri-County is entitled to reimbursement from the Debtor for any tort claims or other third-party claims related to the Winter Storm to the extent they relate to the Debtor's conduct and failures during the Winter Storm.

2.      For the reasons stated in Tri-County's Proof of Claim, this Response, and as the evidence will show, the Committee's Objection should be overruled.

## PROCEDURAL BACKGROUND

3.      On March 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      On March 15, 2021, the Office of the United States Trustee appointed the Committee.  *See* Dkt. No. 216.

3

5.     On June 14, 2021, Tri-County filed Claim No. 401 (claim number 114 on the court claims registry), and on June 15, 2021, Tri-County filed Claim No. 409, amending Claim No. 401 (as amended, the "Proof of Claim").

6.     On December 7, 2021, the Committee filed the Objection.  On January 14, 2022, the Debtor filed the Joinder.

7.     The Committee has filed a substantially similar objection to the proof of claim filed by CoServ, the Debtor's largest member-cooperative.  *See* Dkt. No. 1376. The Debtor has also joined in that objection. *See* Dkt. No. 1471.

## FACTUAL BACKGROUND

8.     Brazos is a "G&T Cooperative," meaning that it is a wholesaler that owns assets both to generate and transmit electricity.  Aside from sales of electricity to ERCOT, its customers are the sixteen member-cooperatives who distribute the power purchased from Brazos to their retail member-owners, who consume and ultimately pay for the electricity.  Tri-County is a party to a Wholesale Power Contract with Brazos, which requires Tri-County to purchase all of its power requirements from Brazos through 2045.  Each of the fifteen other member-cooperatives are parties to the same form of Wholesale Power Contract that contains terms and conditions that are substantially similar to the one Brazos entered into with Tri-County.

9.     Tri-County is the second largest of the Debtor's member-cooperatives, accounting for 19% of the Debtor's total electric sales under the Wholesale Power Contracts with its sixteen member-cooperatives.  Tri-County, CoServ, and United Cooperative Services ("United") together account for nearly 70% of the Debtor's total electric sales.  Tri-County serves 121,262 meters as of January 31, 2021.

## **LEGAL STANDARD**

10.     A proof of claim constitutes *prima facie* evidence of the validity and amount of a claim if such proof of claim comports with the Federal Rules of Bankruptcy Procedure (the "Rules").  *See In re Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988); *In re Bates*, 570 B.R. 757, 763 (Bankr. W.D. Tex. 2017) ("Bankruptcy Rule 3001(f) permits a proof of claim that is executed and filed in accordance with [the Rules] to constitute 'prima facie evidence of the validity and amount of the claim.'") (internal citation omitted); *see also* 9 Collier on Bankruptcy ¶ 3001.09[1] (16th ed. 2021).

11.     To rebut the *prima facie* validity of a claim, "the evidence the objecting party produces must be 'at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'"  *In re 804 Cong., L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015) (quoting *In re Rally Partners, L.P.*, 306 B.R. 165, 168 (Bankr. E.D. Tex. 2003)); *see also Lundell v. Anchor Constr. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1040–41 (9th Cir. 2000); *In re Bates*, 570 B.R. at 763; *In re Patton*, 388 B.R. 629, 633 (Bankr. E.D. Pa. 2008) (a "[d]ebtor as the objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim").  If, and only if, an objecting party offers sufficient evidence to overcome the *prima facie* presumption of validity of a claim does the burden shift to the claimant to prove the validity of the claim by a preponderance of the evidence.  *In re Fid. Holding*, 837 F.2d at 698; *In re 804 Cong.*, 529 B.R. at 219.

12.     The Committee has not carried its burden to rebut the *prima facie* validity of Tri-County's claim.  The Committee has misconstrued facts, provided the Court with incomplete

recitations of the underlying documents, and misapplied law in asserting that Tri-County's claims are invalid.  Because the Committee has not presented evidence sufficient to overcome the *prima facie* presumption of the validity of Tri-County's claim, the burden has not shifted to Tri-County to prove the validity of its claim by a preponderance of evidence.  To the extent that the Committee has met its initial burden, Tri-County has shown and will further prove following discovery and an evidentiary hearing, well beyond a preponderance of the evidence, that Tri-County is entitled to each claim it has set forth in the Proof of Claim.

13.     Furthermore, Tri-County submits that the Objection should have been brought as an adversary proceeding.[6]  Tri-County respectfully requests that the litigation relating to the Objection be treated as an adversary proceeding, as has occurred with litigation surrounding the ERCOT claim and the gas suppliers' claims.

## **RESPONSE**

### A.     **Tri-County Holds a Valid Claim Arising from the Wholesale Power Contract and Texas Law.**

14.     Misinterpreting Texas law and the contractual arrangement between Tri-County and the Debtor, the Committee seemingly believes that the Debtor's sole obligation under the Wholesale Power Contract is to provide power to Tri-County, and that Tri-County must blindly pay any and all extraordinary costs without regard to any failures by the Debtor that caused or exacerbated those charges.  To the contrary, the Debtor owes to Tri-County specific contractual

---

[6]The Rules define the procedural mechanics for lodging a proper objection to a filed claim.  *See* Fed. R. Bankr. P. 3007; *see also* 11 U.S.C. § 502(a) (allowing a party in interest to object to a proof of claim).  Rule 3007(b) states that an objecting party "**shall _not_** include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim."  Fed. R. Bankr. P. 3007(b) (emphasis added); *see also In re Donson*, 434 B.R. 471, 474 (Bankr. S.D. Tex. 2010).

The Committee's Objection ignores this maxim, and therefore the Objection must be overruled.  The Objection attempts to subordinate Tri-County's patronage account to all other debt.  In doing so, the Objection attempts to improperly lodge a "demand for relief of a kind specified in rule 7001 in an objection to the allowance" of the Tri-County's claim.  Fed. R. Bankr. P. 3007(b); *see also* Fed. R. Bankr. P. 7001(7) (providing that an action to subordinate any allowed claim shall be an adversary proceeding).

obligations and common law duties, duties that the Debtor breached in the time leading up to and during the Winter Storm, and which caused significant damages to Tri-County.  As a result, the Disputed Charges cannot be passed through to Tri-County, in whole or in part.

### 1.  The Debtor has a Duty of Care and Skill in its Performance of the Wholesale Power Contract.

15.     As has been repeatedly reiterated by the Supreme Court of Texas,[7] "[a]ccompanying every contract is a common law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract."  *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947); *see also Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718–19 (Tex. 2014); *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Coulson v. Lake LBJ Mun. Util. Dist.*, 734 S.W.2d 649, 651–52 (Tex. 1987).

16.     Under the Wholesale Power Contract, the Debtor has an express duty to provide Tri-County with all of its requirements for power.  *See* Wholesale Power Contract § 2 (providing that Brazos shall sell and deliver "all electric power and energy which Member [Tri-County] shall require for the operation of the Member's system").  Implicit in that express obligation is the requirement to—in fact—have power to supply by means of generation and hedging.  Based on the express and implied terms of the all-requirements Wholesale Power Contract, and all agreements integrated thereunder, the Debtor had a "duty to perform with care, skill, reasonable expedience, and faithfulness" in its performance with respect to maintaining and operating its

---

[7] The Wholesale Power Contract does not explicitly dictate the law of the governing state, but this Court should apply Texas law as the parties are Texas entities, the place of performance was Texas, and thus Texas has the "most significant relationship" to the claims.  *See Stevenson v. Ford Motor Co.*, 608 S.W.3d 109, 124 (Tex. App.—Dallas 2020, no pet.).

generation assets, executing financial and power hedges to mitigate the impact of the volatile Texas electricity market, and in meeting its obligation to supply the electric requirements of its sixteen member-cooperatives.[8]  *See Scharrenbeck*, 204 S.W. 2d at 510.

17.     The application of the implied duty of care and skill is illustrated by the opinion in *Turnbow v. Life Partners, Inc.*, in which Life Partners, Inc. ("LPI") had entered into an agency agreement to assist investors in acquiring interests in life insurance policies insuring persons who were still living.  3:11-CV-1030-M, 2012 WL 4473080 at *2 (N.D. Tex. Sept. 28, 2012).  The validity of the investing strategy turned on how long the insured would survive after the policy was purchased; and therefore, reliable and accurate life expectancy information was essential to performance of the agency agreement.  *Id.* at *1.  A group of plaintiff investors sued LPI, asserting that it had breached the agency agreement by using unreliable and inaccurate life expectancy information which understated the insureds' life expectancies.  Even though the express contractual duties in *Turnbow* were broadly stated, the district court denied a motion to dismiss, finding that there was a common law duty to perform the contract with care and skill, which included the unwritten duty to utilize accurate information, and that the plaintiff investors sufficiently pleaded facts to support a breach of contract claim.  *Id.* at *7.

---

[8] Furthermore, to the extent the Texas Uniform Commercial Code applies, a matter the Committee acknowledges is "currently in litigation," Objection ¶ 61, the Debtor had a duty to use "best efforts" in its performance of the Wholesale Power Contract under Texas Business and Commerce Code § 2.306, which provides:

> A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Tex. Bus. & Comm. Code § 2.306.  Here, the Wholesale Power Contract is an all-requirements contract, and the demand by Tri-County for power was indisputably in good faith.  As a result, Brazos was required to use its "best efforts" to supply electricity to Tri-County, and it manifestly failed to do so for the reasons stated *infra*. *Aquila Sw. Pipeline, Inc. v. Harmony Expl., Inc.*, 48 S.W.3d 225, 234 (Tex. App.—San Antonio 2001, pet. denied) (in the context of an exclusive dealings contract, finding that purchaser/processor failed to meet its best efforts duty to promote repurchase of natural gas).

18.     The Committee—which is not a party to the Wholesale Power Contract—argues broadly that the Debtor has no obligation "to sell any power to ERCOT or to maintain its generator plants."  Objection ¶ 4.  Unable to dispute the applicability of the *Scharrenbeck* line of cases, the Committee cites a handful of cases standing for the unremarkable proposition that the duty to perform a contract with care and skill applies only to a party's duties under the contract, and that any implied duties must be consistent with the express terms of the contract.  *See* Objection ¶ 57–58.  The Committee also argues that, although the Wholesale Power Contract unequivocally requires the Debtor to supply power to Tri-County, it does not require the Debtor to supply power to Tri-County "*at a specified cost* or otherwise on the most cost-efficient basis."[9] *See* Objection ¶ 55 (emphasis in original).[10]  Thus, completely ignoring that the Debtor had a duty to perform its existing contractual obligations to supply energy and power to Tri-County with a standard of care and skill under the *Scharrenbeck* precedent, the Committee incorrectly asserts that a duty of care and skill would exist only if the Wholesale Power Contract also included an additional obligation to supply such power at a specified cost, or on a cost-efficient basis.

19.     Rather than help its position, the Committee's cases stand for the proposition that an implied contractual duty to perform must rest on the duties expressly provided in the parties' contract and the presumed intention of the parties based on the terms of the contract as a whole. *See* Objection ¶¶ 57–58 (citing *Danciger Oil & Refin. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex.

---

[9] Ironically, the Debtor's Mission Statement expressly states that Brazos's "mission is to provide valued service to our members and customers by generating, procuring, and transmitting reliable power **at the lowest cost**." Brazos Electric, http://www.brazoselectric.com/web/extranet.aspx?bo=b6portal.wo&fn=HomePage (last visited Jan. 26, 2022) (emphasis added).

[10] The Wholesale Power Contract does, however, require that the rates charged to Tri-County must be approved by the Debtor's board of directors, and that any changes thereto must be approved by the Rural Utility Service and assessed after 30-days' notice to Tri-County.  *See infra* ¶ 50.   There is no evidence that the Tri-County Board or RUS approved the rates during the Winter Storm.

1941); *Bank One, Tex., N.A. v. Maco Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).  However, none of the cases cited by the Committee suggest that the implied duty of skill and care does not apply to the Debtor's express obligations under the Wholesale Power Contract.  *Danciger* involves an implied covenant for the reasonable development of mineral properties, and does not address the implied duty of care and skill.  *See* 154 S.W. 2d at 632.  Likewise, *Bank One* concerns a bailment agreement.  *See* 967 S.W. 2d at 419.  While the *Bank One* opinion discusses generally Texas law on implied covenants, like *Danciger*, it does not address the *Scharrenbeck* implied duty of care and skill.  *See id.*

20.     Furthermore, while the Committee contends that *City of Austin* is "nearly identical" to the situation presented here and that this Court similarly should not find that Brazos had an implied duty under the Wholesale Power Contract to perform with care and skill, the case is factually distinguishable.  *See City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773 (Tex. App.—Dallas 1992, writ denied).  There, the city of Austin was a participant in a joint venture to construct a nuclear power plant.  *Id.* at 778–79.  The parties' agreement placed ultimate control over the project in an independent management committee composed of members from each of the joint venture participants.  *Id.* at 784.  Further, one of the participants, Houston Lighting & Power ("HL&P"), agreed to serve as a project manager.  *Id.*  However, HL&P was never an independent contractor, it did not agree to be responsible for the results obtained from the project, and its duties were limited to providing material information about the project to the other participants.  *Id.* at 784–85.  Consequently, because the independent management committee (and not HL&P) expressly retained ultimate control and responsibility for the project under the parties' agreement, the court found that *Scharrenbeck* could not be

relied upon to impose an implied duty of care and skill on HL&P to make it responsible for the entire project where the agreement provided to the contrary. *Id.* at 785–86.

21.    Here, by contrast, although the member-cooperatives hold a seat on the Debtor's board,[11] the Debtor alone (and not Tri-County or the other individual member-cooperatives) was and is responsible for performing the Debtor's obligations under the Wholesale Power Contract. Further, unlike the *City of Austin* case, Tri-County is not asking the Court to impose a duty of care and skill on the Debtor to perform obligations that the agreement expressly provides are the responsibility of another party.  Rather, because the Wholesale Power Contract expressly requires the Debtor (and not another party) to supply power to Tri-County, the Debtor had a duty to perform its own obligation with care and skill, and the rationale applied by the court in the *City of Austin* case is inapposite.[12]

22.    Here, the duty of care and skill attaches to each obligation that the Debtor agreed to perform under the Wholesale Power Contract, *Jones v. Star Houston, Inc.*, 45 S.W.3d 350, 355 (Tex. App.—Houston [1st Dist.] 2001, no pet.), at least including those identified below.

- **Setting Rates:**  A rate or tariff properly established in accordance with section 5 of the Wholesale Power Contract is the only contractual mechanism by which the Debtor can charge Tri-County for its costs.  More specifically, section 5 of the Wholesale Power Contract provides that the rate set by the Debtor should be "only

---

[11] The Committee suggests throughout the Objection that Tri-County's representation on the Brazos Board of Directors renders various parts of Tri-County's Proof of Claim meritless.  *See*, *e.g.*, Objection ¶¶ 5, 22, 23, 38, 45, 62, 66, 78.  This is misleading.  Each of the sixteen member-cooperatives is entitled to one representative on the Board of Directors, and each Board member is entitled to one vote.  Therefore, despite holding 17.6% of the patronage capital in Brazos as of December 31, 2020, Tri-County only has a 1/16 representation on the Board of Directors.  *See Declaration of Clifton Karnei in Support of Chapter 11 Petition and Emergency First Day Motions* ¶ 21 [Dkt. No. 3] ("Karnei Declaration").  Furthermore, Tri-County, CoServ, and United together hold approximately 63% of the patronage capital, and the remaining thirteen member-cooperatives each have much smaller patronage capital holdings.  *Id.*  These differences in customer load and patronage capital can lead to a situation in the board room in which the smaller member-cooperatives have significant voting power to silence the will of Tri-County and the other large member-cooperatives.  In short, the Committee vastly overstates Tri-County's limited influence on the Brazos Board of Directors.

[12] The Committee also relies on *City of Austin* for an argument that a duty of care and skill would exist only if the parties intended to include it, which Tri-County does not even dispute.  *See City of Austin*, 844 S.W.2d at 773.

sufficient" to cover costs incurred by the Debtor for, *inter alia*, "maintenance of the generating plant[s] . . . and related facilities," as well as "the cost of any power and energy purchased." Wholesale Power Contract § 5.[13] The Debtor has agreed to set "only sufficient" rates, which are dependent on *its own* actions with respect to operating its generation resources and purchasing power. Moreover, the Wholesale Power Contract expressly contemplates that the rates charged to Tri-County will be mitigated by "revenues of [Brazos] from ***all other sources***," which includes the sale of power to ERCOT. *Id.* (emphasis added). Therefore, the Debtor has a duty of care and skill with respect to setting rates under section 5 of the Wholesale Power Contract.

- **Hedging:** As incorporated under the Wholesale Power Agreement, as of December 21, 2019, Brazos implemented the Tiered Resource Rate Methodology ("TRRM").[14] The goal of the TRRM is to facilitate cost allocation associated with member-cooperative's generation supply and hedging, and to provide Members with some limited ability to procure member specific resources through Brazos rather than relying on system average hedging products. Under the TRRM, there are four components governing the rights and responsibilities of the parties, and the services and charges to which each is entitled:

  Load Resources: *Market purchases for serving load and load related costs.* Load expenses are allocated to the Members based on wholesale energy delivered to each Member. *See* Protocols for Application of the TRRM ("TRRM Protocols"), dated Dec. 21, 2019, § III.A; Wholesale Power Supply and Delivery Service Rate ("WPSDS Tariff"), dated Dec. 21, 2019, at 1–3.

  Tier 1 Requirements: *Brazos-owned generation, purchase power resources with contract terms greater than one year in place as of the adoption of the TRRM, and Supplemental Transactions, as defined below.* All Members (including "Opt-Outs," as defined below) participate in Tier 1 Resources. The net benefits and expenses of Tier 1 Resources' market sales are allocated to the Members based on

---

[13] Section 5 of the Wholesale Power Contract provides:

The Board of Directors of the Seller . . . shall review such rate so that it shall produce revenues which shall be sufficient, ***but only sufficient***, with the revenues of the Seller from all other sources, ***to meet the cost of the operation and maintenance*** (including without limitation, replacements, insurance, taxes and administrative and general overhead expenses) ***of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchased for resale hereunder by the Seller,*** the cost of transmission service, make payments on account of principal of and interest on all indebtedness of the Seller, ***and to provide for the establishment and maintenance of reasonable reserves***."

Wholesale Power Contract § 5 (emphasis added).

[14] As stated in the Proof of Claim, Tri-County disputes whether Brazos properly adopted the TRRM and asserts all claims, offsets and credits against the Debtor arising from the inaccurate and improper billing of Tri-County pursuant to the TRRM billing system, as well as for any charges by the Debtor to Tri-County pursuant to the Wholesale Power Contract which were not in accord with the terms of the agreement or tariffs properly approved by the Debtor's board of directors. Tri-County has paid every power bill under protest since the TRRM was adopted in December 2019.

summer peak demands, or "4CP." The Tier 1 Requirements allocation factors are computed as 80% of the 2014-2018 base period average 4CP allocation, plus 20% of the latest year 4CP allocation. *See* TRRM Protocols, § III.B; WPSDS Tariff at 3–5.

Tier 2 Requirements:  *Purchase power resources not in Tier 1, and other resources acquired to provide a market hedge for Members with limited or no Member Directed Resources ("MDRs").*  Members may exercise an annual option to participate in all, or a portion, of Tier 2 Requirements.  Members who decline to participate are "Opt-Outs."  The Tier 2 "Opt-In" Members are allocated the net benefits and expenses of Tier 2 Requirements resources based on their recent year metered 4CP demand, plus 7% resources, plus 2% system losses, minus their allocation of Tier 1 Requirements capacity, minus MDRs.  The monthly Tier 2 Requirements allocation factor is the Member monthly Tier 2 capacity need, divided by the Brazos total monthly Tier 2 Requirements capacity need.  During the Winter Storm, Tri-County (along with CoServ and United) were "Opt-Out" Members.  *See* TRRM Protocols, § III.C; WPSDS Tariff at 5–6.

MDRs:  *MDRs are resources Brazos acquires at the direction of Members participating in the MDR program.*  The benefit and expense of all MDRs are directed to the Member.  Seven of the Members participate in long-term contracts with the Lapetus solar facility, which are an MDR.  Otherwise, MDRs are bilateral transactions entered into by the Opt-Outs.  *See* TRRM Protocols, § III.D; WPSDS Tariff at 6.

Although Tri-County opted out of Tier 2 Requirements for January 2021 through December 2021, Tri-County still shared in the benefits and expenses of the Tier 1 Requirements.  Those benefits include Brazos-owned generation and purchase power resources.  As such, the TRRM Protocols expressly and implicitly support that Brazos had a duty to reasonably hedge its owned generation assets and power purchases against the volatility of the ERCOT spot market.  Furthermore, Tier 1 Requirements include "Supplemental Transactions," the definition of which explicitly refers to short-term energy purchases that are (a) Tier 1 Requirements and (b) to be made "to mitigate the exposure of Customer Load to the Real-Time Market."  TRRM Protocols, Attachment A ("Supplemental Transactions").[15]  Therefore, this definition provides further

---

[15] "Supplemental Transactions" under the TRRM Protocols

support that the Debtor has a duty to use care and skill to hedge its power purchases against the volatility of the ERCOT market.

23.     The existence of the Debtor's duties of care and skill is also supported by the circumstances of the ERCOT market surrounding the Wholesale Power Contract, as well as the purposes of the agreements that are incorporated into the Wholesale Power Contract.  Under the very case law cited by the Committee, "covenants will be implied in fact when necessary to give effect to the actual intention of the parties as reflected by the contract or conveyance *as construed in its entirety in the light of the circumstances under which it was made and the purposes sought to be accomplished thereby*."  *Danciger*, 154 S.W.2d at 635 (emphasis added). The Debtor and Tri-County executed the Wholesale Power Contract on October 1, 1987—a decade before the deregulation of the Texas electricity market.  After the ERCOT market for the most part became what it is today, the parties:  (1) amended the Wholesale Power Contract to extend its term by twenty years and to eliminate a cap on the amount of electricity that Brazos was required to supply to Tri-County; (2) incorporated the WPSDS Tariff and TRRM Protocols into the Wholesale Power Contract as rate schedules under section 5; and (3) entered into the MDR Agreement.

24.     The Wholesale Power Contract was originally drafted to take into account the vertically integrated electric market that existed prior to the implementation of the ERCOT

---

[S]hall mean short-term trades that are not [generation resources] to the TRRM Protocols and are not part of the TIER 2 BEPC Resources.  *Examples of Supplemental Transactions include purchases made for delivery for the next hour or hours, day or days, week or weeks, or month or months as directed by Brazos Electric staff to mitigate the exposure of Customer Load to the Real-Time Market*, *when such load is not adequately hedged by TIER I Resources, TIER 2 BEPC Resources or MDR.*  Supplemental Transactions will not be used to hedge Real-Time Market exposure for Member loads included in a Member's Standard Offer Replacement Resource plan indicating Customer Load exposure to the Real-Time Market.

TRRM Protocols, Attachment A ("Supplemental Transactions") (emphasis added).

market.  There was no central "clearinghouse" or market for the purchase and supply of electric power.  Rather, wholesalers of electric power, such as Brazos, sold power generated through their owned facilities to retail suppliers, including to Tri-County.  That is exactly what the Wholesale Power Contract contemplated—that Brazos would generate power from its owned generating facilities for direct sale to Tri-County.  *See* Wholesale Power Contract §§ 2–3, 5.  Since starting to participate in the ERCOT market, however, Brazos no longer sells its power directly to Tri-County.  Instead, Brazos sells its generated power to ERCOT, and in turn, purchases power from ERCOT that it then resells under the Wholesale Power Contract to Tri-County.  As a result, the terms and conditions of the Wholesale Power Contract—with the extension and currently applicable rate schedule—must be construed in light of this new market framework, in which ERCOT acts as a clearinghouse to match resources to load.

25.     Moreover, the Committee's attempt to exclude from the Debtor's duty any issue of affordability ignores the economic realities underlying the contract.  The Wholesale Power Contract is a requirements contract that makes Tri-County completely dependent upon the Debtor for its power supply.  Further, as a cooperative, Tri-County can pay the Debtor for power supplied under the Wholesale Power Contract only through charges to Tri-County's own member-owners in their monthly electric bills.  There are practical limits as to what Tri-County can reasonably charge its member-owners for the electricity it acquires and distributes from the Debtor.

26.     The Committee also asserts that the Wholesale Power Contract imposes no obligation on Brazos to sell power to ERCOT or any party other than Tri-County.  Objection ¶ 24.  However, the sale of power to ERCOT must be viewed as an essential part of Brazos's obligation to generate and sell power to Tri-County as required under the Wholesale Power

15

Contract, specifically in the context of the new market structure that exists today.  Given that the sale and purchase of power through ERCOT is an unavoidable requirement of any transaction between Brazos and Tri-County, it is unclear how the Committee envisions the Wholesale Power Contract might be read without imposing an obligation on Brazos to sell power to ERCOT. Furthermore, evidence will show that the Debtor's generation resources alone cannot meet the member-cooperatives' load requirements at several points throughout the year, and the Debtor has frequently transacted with ERCOT and third parties to fulfill its power supply requirements. Again, the Committee's interpretation of the Wholesale Power Contract blatantly ignores the realities of the ERCOT market as well as the Debtor's relationships with its member-cooperatives and ERCOT.

27.    Stated differently, the entire purpose of the Wholesale Power Contract was for the Debtor to generate the power to be supplied to Tri-County and the other members-cooperatives at its own generation facilities so that they could avoid the violent price fluctuations associated with acquiring power from the ERCOT market.[16]  Indeed, there would be no reason for Tri-County and the other member co-ops to pay for the "operation and maintenance … of the [Debtor's] generating plant, transmission system and related facilities" under section 5(b) of the Wholesale Power Contract if the Debtor was required only to purchase power on the ERCOT market (at any price) and transmit it to Tri-County and the other member-cooperatives, as the Committee incorrectly suggests.

---

[16] In theory, in any event, such as temperatures causing market volatility, the Debtor should have been selling power equal to approximately one-half of the load requirements of the member-cooperatives into the market at the extreme prevailing market prices ($9,000 per MWh during the Winter Storm), thereby offsetting the cost to buy the member-cooperatives' load requirements at the same extreme market prices.  Any analysis of Brazos' performance during the Winter Storm must take into account that the underlying economic rationale for Brazos owning and operating the generation assets which was to protect the member-cooperatives from extreme market volatility such as that which occurred during the Winter Storm.

28.     Instead, reading the Wholesale Power Contract as a whole, which references the Debtor's power generation facilities throughout the agreement and incorporates the Debtor's agreements and tariffs with ERCOT, and the MDR Agreement, demonstrates that the Debtor and Tri-County intended that under the current ERCOT market structure, the Debtor would make its generation plant and facilities available to ERCOT for economic dispatch, *i.e.*, to generate the power to be purchased by ERCOT, and would purchase power from ERCOT to supply to Tri-County for the latter to meet its electric load requirements.  The compensation that the Debtor receives from ERCOT for the Debtor's generation is intended to offset all member-cooperatives' costs for electric load requirements.

## 2. *The Debtor Breached Its Duty of Care and Skill in Its Performance of the Wholesale Power Contract.*

### a. The Debtor Breached Its Duty of Care and Skill in its Failure to Reasonably Maintain Generation Resources.

29.     The Committee argues that Tri-County's Proof of Claim "fails to allege any act or omission by Brazos that could have rendered it responsible for generation failures during Winter Storm Uri."  Objection ¶ 5.  Tri-County is confident that evidence in support of its claims will establish that the Debtor—in many ways—breached its duty of care and skill with respect to maintaining its generation resources ahead of and during the Winter Storm.[17]  Indeed, the Debtor's failures in this respect includes, without limitation (and as shall be further developed in discovery):  (1) failure to manage natural gas curtailment during winter of 2020–2021; (2) failure to implement and follow reasonable winterization procedures; and (3) failure with respect to running fuel oil operations.

---

[17] Tri-County has served discovery requests in connection with its claim objection.  The Committee objected to the timing of the requests on the spurious ground that there is no "contested matter," and instead suggested that discovery would be more appropriate following the entry of a scheduling order in this case.

- **Failure to Manage Natural Gas Curtailment**:  The Debtor's wholly-owned generation assets are primarily fueled by natural gas.[18]  Despite known risks that it would be facing issues with the transportation and/or supply of natural gas to its plants, the Debtor did not have any firm natural gas supply contracts or transportation contracts, had minimal access to natural gas storage facilities, and failed to execute short-term transportation/supply agreements ahead of the Winter Storm.

- **Failure to Implement and Follow Reasonable Winterization Procedures**:  The Debtor also failed to take reasonable steps to adequately prepare for freezing temperatures at its plants.  Specifically, evidence will show that the Debtor failed to properly winterize its facilities, failed to procure sufficient consumables for its plants to run, start, and restart in winter conditions, and failed to otherwise implement and follow reasonable winterization procedures.  Notably, Karnei was on the ERCOT board in 2011 when the recommendations after the 2011 winter weather were focused on the need for power plant owners to winterize their facilities.

- **Fuel Oil Failures**:  As mentioned above, several of the units at the Debtor's generating facilities have dual-fuel capability.  Namely, the units at the Miller facility and the Johnson County facility normally operate on natural gas, but can operate on fuel oil as a back-up fuel supply.  However, the Debtor was not adequately prepared to transition to and operate these plants on fuel oil.

30.     The Debtor's failures resulted in its own bankruptcy and severe loss to its member-cooperatives; its resources operated at significantly reduced levels throughout the Winter Storm when measured against comparable units in the ERCOT market.  The evidence following discovery will show that the Debtor breached its duty of care and skill with respect to maintaining its generation resources.

### b.  The Debtor Breached Its Duty of Care and Skill in Its Failure to Reasonably Execute Financial and Power Hedges.

31.     Similarly, the evidence will show that even with twice-daily updates on worsening market conditions with respect to the ERCOT spot market and gas prices, the Debtor failed to secure reasonable short-term energy transactions, despite ample notice and opportunity to do so.

---

[18] The Debtor's units at the Miller and Johnson County plants are also able to run on fuel oil.  The Debtor's failures with respect to running on fuel oil—which ultimately became necessary due to Debtor's failure to manage natural gas curtailment—is discussed below.  The Debtor's Jack County plant cannot run on fuel oil.

32.    As stated by ERCOT:

Energy is bought and sold in ERCOT in three ways:  (1) the bilateral market; (2) the ERCOT Day-Ahead Market; and (3) the ERCOT Real-Time Market.  The Day-Ahead Market is an ERCOT-managed market where sellers offer to supply, and buyers offer to buy electricity.  ERCOT determines a clearing price for the sale of generation in the Day-Ahead Market.  Supply that is not cleared in the Day-Ahead Market is scheduled for the Real-Time Market, which facilitates the real-time purchase and sale of electrical energy.  Because electricity prices in the Day-Ahead and Real-Time Markets can be volatile, ERCOT market participants may choose to enter long-term bilateral contracts for energy to hedge against price spikes. Participants may also go to the ERCOT Day-Ahead and Real-Time Markets to satisfy excess load demands, a strategy that is vulnerable to price volatility.[19]

33.    Despite this well-known volatility, Brazos's market strategy through the Winter Storm (and past winters) was to lean more heavily on the ERCOT market than on bilateral transactions to procure power to serve its obligations to its sixteen member-cooperatives under the Wholesale Power Contracts.  Indeed, pursuant to Board Policy 319, which delegated broad discretion to the Debtor's management, the Debtor left approximately 35% of its forecasted supply requirements unhedged—exposed to the volatility of the ERCOT market.

34.    Weeks ahead of the Winter Storm, the Debtor received twice-daily reports from the Alliance for Cooperative Energy Services Power Marketing, LLC ("ACES"), the Debtor's contractor and agent with respect to energy trades, which included 13-day forecasts of the Debtor's supply requirement, net capacity, and energy positions.  In the first days of February 2021, ACES's reports disclosed weather forecasts indicating that there would be freezing or near freezing temperatures for longer than a week, and that the Debtor's energy portfolio would be short in capacity and energy.  Notably, these reports also included risk mitigation profiles of hedging opportunities that ACES presented to Brazos.

---

[19] Electric Reliability Council Of Texas, Inc. And Defendant-Intervenors' Response In Opposition To Debtor's Motion For Judgment On The Pleadings And For Entry Of An Order Striking Certain Expert Opinions ¶¶ 9–10, *Brazos Electric Power Cooperative, Inc. v. ERCOT*, Adv. Proc. No. 21-03863 (DRJ) (Bankr. S.D. Tex. Jan. 7, 2022), Dkt. No. 294.

35.     The evidence will show that the reports' forecasts for supply requirements, weather, and risk profile worsened with every morning and afternoon read.  As early as a week before the Winter Storm, ACES projected that the Debtor's energy portfolio would be at least **_1,200 MW short_** for each day during the period February 12 through 14, 2021.

36.     The evidence will show that the Debtor knew that its net supply position worsened, _i.e._, increased, each day until the Winter Storm, and yet, Brazos still did not hedge through the bilateral transactions that ACES noted were available.  The evidence will show that in the days before the Winter Storm, Brazos was aware of possible rotating outages, natural gas curtailment to its generating plants, and with forecasts of energy prices rapidly approaching scarcity levels of $9,000/MWh, and still did not hedge or buy bilateral transactions that ACES had available.  By February 12, 2021, Brazos and market participants throughout the state knew that natural gas had traded in Oklahoma at $400/MMBtu, which roughly translates to energy prices of $6,000/MWh, and yet, Brazos still did not hedge or buy bilateral transactions that ACES had available.  The evidence will show that Brazos for years was aware that the prices of energy could reach the system firm-wide offer cap of $9,000/MWh, even without PUCT orders so dictating, and yet, Brazos still did not hedge or buy bilateral transactions that ACES had available.  Finally, the evidence will show that the Debtor's priority was to continue to participate in the day-ahead market rather than use its collateral to purchase hedges and bilateral transactions.  Had those hedges and bilateral transactions been procured, the Debtor would have been in compliance with the TRRM Protocols (Tier 1 Supplemental Transactions).

37.     Despite every opportunity to do so, and despite every indication of the risks of transacting in the ERCOT spot market during the Winter Storm, the Debtor failed to secure any hedges or bilateral market transactions, even though such products were readily available in the

market at less than ERCOT scarcity prices.  This failed risk mitigation strategy, coupled with the unavailability of Brazos's generation resources caused by breaches of its duty to exercise skill and care in their maintenance and operation, resulted in Brazos transacting in the ERCOT day-ahead and real-time markets in an attempt to cover significant energy shortages—all while incurring staggering costs as energy traded at scarcity prices.  Specifically, Brazos's participation in the ERCOT market from February 9–20, 2021, make up $1.98B of the $2.23B that ERCOT claims the Debtor owes for the February 9–28, 2021 time period.[20]

38.     The Debtor's breaches of its duty of care and skill to perform under the Wholesale Power Contract have caused these outrageous sums, and Tri-County cannot be held liable for any amounts incurred as a result of those breaches.

### 3.     The "Act of God" Doctrine Does Not Excuse Debtor's Nonperformance.

39.     The Committee contends that section 10 of the Wholesale Power Contract "exculpates" Brazos from responsibility to perform under the agreement because "an Act of God or other cause beyond Brazos's control" excuses Brazos's failure to sell power.  Objection ¶ 54.[21] The Committee states that Brazos's "obligation to supply electricity is subject to the availability of power and facilities" and then summarily concludes that "[t]he unavailability of certain services and facilities during Winter Storm Uri was therefore not a breach of the Wholesale Power Contract."  *Id.*

---

[20] ERCOT's Am. Proof of Claim [Claim 115] (Nov. 4, 2021).

[21] Section 10 of the Wholesale Power Contract states:

The Seller [Brazos] shall use reasonable diligence to provide a constant and uninterrupted supply of electric power and energy hereunder.  If the supply of electric power and energy shall fail or be interrupted, or become defective through act of God or of the public enemy, or because of accident, labor troubles, or any other cause beyond the control of [Brazos], [Brazos] shall not be liable therefor or for damages caused thereby.

Wholesale Power Contract § 10.

40.     The Committee completely ignores the fact that section 10 applies specifically to the provision of "a constant and uninterrupted supply of electric power and energy."  Wholesale Power Contract § 10.  The constant and uninterrupted supply of electric power and energy, however, is not the focus of Tri-County's Proof of Claim.  Tri-County has asserted that Brazos' failures have led Brazos to incur an oversized bill that could have been avoided if Brazos had used ordinary skill and care to run its plants and purchase energy from ERCOT.  Thus, even any colorable exculpatory provision in section 10 of the Wholesale Power Contract does not apply to Tri-County's claims.

41.     Even if an exculpatory provision in section 10 of the Wholesale Power Contract applied to Tri-County's Proof of Claim, the Debtor cannot avail itself of the exculpation as the Committee fails to show why section 10 excuses Brazos's nonperformance (*i.e.*, how the Winter Storm qualifies as an "act of God"), and simply ignores the language of the Wholesale Power Contract providing that Brazos is excused for an "act of God" ***only if*** the cause of failure to provide electric power was "beyond the control of the Seller."  Wholesale Power Contract § 10.

42.     Here, Brazos made conscious decisions to not hedge and thus did not prepare adequately for the cold weather, causing its failure during the Winter Storm.  It was certainly within Brazos's control to prepare for such a cold weather event, particularly given the repeated warnings and all the market information it was provided from ERCOT and its own advisor ACES prior to and during the Winter Storm.

43.     Under Texas law, "[a]n occurrence is caused by an act of God if it is caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care."  *Vien v. Del Buono*, No. 10-09-00318-CV, 2010 WL 5117248, at *5 (Tex. App.—Waco Dec. 15, 2010, pet. denied) (quoting

*Dillard v. Tex. Elec. Cooperative*, 157 S.W.3d 429, 432 n.5 (Tex. 2005)).  "What is meant by allusion to the absence of human intervention is not the absence of all human involvement but the absence of human negligence proximately causing the injury."  *McWilliams v. Masterson*, 112 S.W.3d 314, 321 (Tex. App.—Amarillo 2003, pet. denied).  The party invoking the "Act of God" doctrine bears the burden of proof and "for one to be insulated from liability, it must be shown that 1) the loss was due directly and exclusively to an act of nature and without human intervention; and 2) *no amount of foresight or care* which could have been reasonably required of the defendant could have prevented the injury."  *Id.* at 320 (emphasis added).

44.     When a party invokes the "Act of God" doctrine due to an act of nature, "the act of nature must be unusual or unprecedented."  *Id.*  While "it need not be the sole, greatest, or harshest violent act ever experienced" the event must "be so unusual that it *could not have been reasonably expected or provided against*."  *Id.* (emphasis added).  Any human negligence or improper care will defeat the defense.  *E.g. Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557, 560 (Tex. App.—Texarkana 1992, writ denied) ("Act of God" doctrine not applicable to a lightning strike causing damage when property owners should have known that a lightning protection system was improperly installed).

45.     The "Act of God" exception in the Wholesale Power Contract does not apply here for two principal reasons:  (1) the Winter Storm was not "unprecedented" as it was both "reasonably expected" and the negative effects of it could have been "provided against"; and (2) the exercise of reasonable skill and care would have allowed Brazos to perform despite the Winter Storm.

46.     The Winter Storm, while severe, was predicted well in advance, which allowed the chance for Brazos to have better prepared for the resulting scarcity of power.  Further, Texas

courts have declined to apply the "Act of God" exception when winter storms occur during winter months. *Compare Tex. & P. Ry. Co. v. Coggin & Dunaway*, 99 S.W. 1052, 1053 (Tex. Civ. App. 1906, no writ) ("Cold weather in the month of December in this latitude is not that act of God which would excuse a carrier from the performance of its contract"), *with McWilliams*, 112 S.W.3d at 321 (finding a causal connection between the highly unusual time of the winter storm *in late spring* and the wrongful death suffered due to the erratic behavior of the cattle, the court observed, "had the [cattle] had their winter coat, they could have better fared the storm").

47.     Brazos could have exercised proper skill and care to better perform during the storm.  The fact that Brazos had underlying issues exacerbated by the Winter Storm does *not* allow the invocation of the "Act of God" defense, because those circumstances were within the control of Brazos.  As discussed *supra*, the evidence will show that Brazos was aware of the risks relating to cold weather events in general and of Winter Storm Uri in particular, and despite that knowledge, Brazos failed to take reasonable steps to hedge against the high energy prices with its own generation or with amply available financial hedges.  As such, the Winter Storm was not such an "unpredictable" and "unforeseeable" event that "directly and exclusively" caused Brazos to be unable to satisfy its obligations under the Wholesale Power Contract.  *See McWilliams*, 112 S.W.3d at 320.  The Winter Storm simply pushed Brazos over the edge and highlighted its failed power supply and risk management strategies.

### 4.  *The Debtor Breached Express Terms of the Wholesale Power Contract.*

48.     Tri-County further holds a valid claim arising from the Wholesale Power Contract on account of the Debtor's express breaches of the contract.

49.     *First*, Tri-County asserts damages against the Debtor for its failure to settle Tri-County's Tier 2 requirements properly at the day-ahead price, as set forth in a letter from Tri-

County to the Debtor tendered on August 17, 2020 (the "August 17 Letter").  Per the TRRM

Protocols, because Tri-County opted not to procure any Tier 2 MDRs during February and March

2021, Tri-County was entitled to specify how its unhedged load would be scheduled.  *See* TRRM

Protocols § XI.2.  The August 17 Letter specifically directed the Debtor to settle Tri-County's

Tier 2 Requirements at the ERCOT day-ahead price, per Tri-County's 2021 Tier 2 MDR

Replacement Plan.  *See* August 17 Letter at 2 ("No hedge or supply actions for non-summer

months.  Brazos to settle non-summer [Tri-County] Tier 2 requirements on the Day Ahead

market.").  Additionally, Tri-County is confident that evidence obtained through discovery will

show that Brazos agreed to implement Tri-County's 2021 Tier 2 MDR Replacement Plan as

attached to the August 17 Letter.  Despite agreeing to Tri-County's direction to schedule

unhedged load in the day-ahead market, evidence will show that Brazos began purchasing power

in the real-time market on February 16 or 17, 2021, and continued transacting in the real-time

market without authorization until March 10, 2021.  Therefore, Brazos breached the express

terms of the Wholesale Power Contract, and Tri-County cannot be held responsible for difference

between the requirements settled at the prevailing ERCOT real-time hourly price, and the

ERCOT day-ahead hourly price for that time period.[22]

50.     *Second*, Tri-County has serious doubts that the TRRM-generated invoices, as

discussed above, comply with the terms of the applicable tariffs of the Wholesale Power

Contract.  Brazos has declined Tri-County's numerous requests to conduct an audit of the

---

[22] Tri-County explained in its Proof of Claim that the Debtor sent Tri-County certain letters that included demands to provide a performance assurance for products it did not acquire on Tri-County's behalf or with Tri-County's authorization.  In objecting to this assertion, the Objection merely reiterates, almost as an afterthought, the specious explanation for the discriminatory demand letters previously given by the Debtor.  To date, the Debtor still has not provided any evidence justifying its demands in accordance with § XI.2 of the TRRM Protocols.  The Committee also provides no evidence that the demands were made consistent with the TRRM Protocols and instead baldly asserts that Brazos had the discretion to send such demands.  Accordingly, Tri-County reserves its right to argue following discovery that the Debtor's demands for performance assurance were an unjust and discriminatory application of the TRRM rate and constituted a breach of the Wholesale Power Agreement.

Debtor's billing system and/or to receive and review the backup information relate to the calculation of the TRRM invoices to substantiate the TRRM invoices. Therefore, Tri-County reserves its right to argue that the application of the TRRM rate constituted a breach of the Wholesale Power Agreement following discovery.

51.     *Third*, the very assessment of the "Temporary Affordability Adjustment" constitutes a breach of contract. Tri-County's gross bill from the Debtor for the billing period ending February 20, 2021, was $588.2 million. From this sum, the Debtor deducted a Temporary Affordability Adjustment ("TAA") for the Disputed Charges of $563.8 million, which it contends in the invoice "is not a credit or forgiveness of any charges due," but rather "a temporary suspension."[23] The TAA appears to consist of unjustifiably excessive charges for electricity and ancillary services purchased by the Debtor from ERCOT during the Winter Storm. However, as the Committee itself recognizes, changes to the rates charged to Tri-County must be: (1) communicated to Tri-County in writing 30 days before assessment;[24] (2) approved by the Brazos Board of Directors;[25] and (3) approved by the Rural Utility Service ("RUS").[26] Wholesale Power Contract § 5(a), (b); Objection ¶¶ 22, 62. Here, the TAA itself was not assessed as a rate in accordance with the Wholesale Power Contract. Tri-County received no written notice of a rate

---

[23] *See* Invoice for Electric Service from January 21 to February 20, from Brazos Electric Power Cooperative, Inc., to Tri-County Electric Cooperative, Inc., dated March 10, 2021, attached as **Exhibit 1**.

[24] Wholesale Power Contract ¶ 5(b) ("The Seller shall cause a notice in writing to be given to the Member and other members of the Seller and the Administrator which shall set out all the proposed revisions of the rate with the effective date thereof, which shall be not less than thirty (30) nor more than forty-five (45) days after the date of the notice, and shall set forth the basis upon which the rate is proposed to be adjusted and established.").

[25] *Id.* ("The Board of Directors of the Seller at such intervals as it shall deem appropriate, but in any event no less frequently than once in each calendar year, shall review the rate for electric power and energy furnished hereunder and under similar agreements with other Members . . . .").

[26] *Id.* ("The Member agrees that the rate from time to time established by the Board of Directors of the Seller shall be deemed to be substituted for the rate herein provided . . .; provided, however, that no such revision shall be effective unless approved in writing by the Administrator [of the Rural Electrification Administration].").

The Rural Electrification Administration was abolished and replaced by the RUS in 1994. *See* National Archives, Records of the Rural Electrification Administration [REA] ¶ 221.1, *available at* https://www.archives.gov/research/guide-fed-records/groups/221.html#221.1 (last visited Jan. 8, 2022).

change, if the TAA even can be characterized as such.  Most importantly, the conversion of the

Tri-County charges into the TAA was not approved by the Brazos Board of Directors, nor by the

RUS.  In summary, Brazos cannot alter the rates charged to Tri-County on a whim, nor can it

otherwise recover costs from Tri-County except through a properly approved rate and any

attempt to do, and any attempt to do so constitutes a breach of the Wholesale Power Contract.

### 5. *The Committee's Interpretation of the Wholesale Power Contract is Not Commercially Reasonable.*

52.     Finally, the Committee's interpretation of the Wholesale Power Contract is

commercially unreasonable and ignores a long line of Texas Supreme Court precedent.

53.     The Texas Supreme Court consistently recognizes a "requirement that the

agreement be construed in a utilitarian manner, *consistent with the business activity sought to be*

*served, avoiding an unreasonable, inequitable, and oppressive construction* of the

agreement."  *In re Houston Bluebonnet, L.L.C.*, 16-34850, 2021 WL 4562255, at *6 (Bankr. S.D.

Tex. Oct. 5, 2021) (Isgur, J.) (emphasis added) (internal quotations omitted) (citing *Frost Nat'l*

*Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)); *Reilly v. Rangers Mgmt.,*

*Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) ("A court should construe contracts from a utilitarian

standpoint bearing in mind the particular business activity sought to be served and need not

embrace strained rules of interpretation which would avoid ambiguity at all costs.").  Texas

courts "will avoid when possible and proper a construction which is unreasonable, inequitable,

and oppressive."  *Reilly*, 727 S.W.2d at 530.

54.     In this case, and as noted above, the Committee's interpretation of the Wholesale

Power Contract is unreasonable, inequitable, and oppressive.  The Committee's proposition that

Tri-County would enter into an all-requirements contract without any obligation on Brazos to

provide power on a most efficient cost basis is absurd.  *See In re Houston Bluebonnet, L.L.C.*,

2021 WL 4562255, at *10 (rejecting defendants' proffered contract interpretation where the "practical implications [bore] out the absurdity" of their construction).  The Committee's construction of the Wholesale Power Contract requires Tri-County to purchase power at manifestly inefficient and unreasonable prices.  This interpretation is unreasonable, inequitable, and oppressive under Texas law.  *See Frost Nat'l Bank*, 165 S.W.3d at 312; *see Reilly*, 727 S.W.2d at 530.  Accordingly, a reasonable and utilitarian construction of the Wholesale Power Contract would not pass through the Disputed Charges to Tri-County, in whole or in part.

      **B.**     **Tri-County Holds a Valid Claim for Its Share of Accumulated Net Margins from the Debtor's Operations Held in the Patronage Account.**

     55.     In the course of its operations, the Debtor generates funds from payments it receives from the member-cooperatives in excess of the Debtor's costs and expenses for providing services to those member-cooperatives.  Pursuant to the Bylaws of Brazos Electric Power Cooperative, Inc. (the "Bylaws"), the Debtor is obligated to allocate a share of such excess amounts to a capital account held for each member-cooperative (the "Capital Credits").  *See* Bylaws § 8.2; *see also* Tex. Util. Code § 161.059(a).  The stated purpose for providing a rebate to the member-cooperatives in the form of Capital Credits is to "assure that [Brazos] will operate on a non-profit basis."  Bylaws § 8.2.

     56.     Tri-County holds a claim for Capital Credits owed by the Debtor totaling approximately $121,943,839.45 as of the Petition Date.  Tri-County also holds a claim for excess net margins from the Debtor's 2020 operations, which Tri-County believes have not yet been allocated to Tri-County as Capital Credits, of approximately $16,000,000 (the "2020 Net Margins") and in an amount to be determined for the Debtor's 2021 operations prior to the Petition Date (the "2021 Net Margins" and together with the 2020 Net Margins and the Capital Credits, the "Patronage Claim").

57.     The Committee argues that Tri-County's Patronage Claim constitutes an equity interest subordinate to unsecured claims.[27]  This argument is misguided.  On the contrary, the Capital Credits are more akin to a rebate of customer overpayments made to Brazos in excess of the amount required to provide power to Brazos's customers.  Such rebate is paid specifically so that no profits will accrue as equity, given that Brazos is a non-profit entity without shareholders.  Brazos's sixteen members contribute to Brazos capital and is returned capital on a rotational basis (typically 20–30 years rotation following accounting principle of FIFO or LIFO).  Instead of attempting to generate a profit, Brazos's rate charged for electricity under the Wholesale Power Contract is limited to recovering its costs on a system-wide basis, and to maintaining reasonable reserves consistent with applicable regulatory and financial requirements.  If there is any excess of revenues over expenses, or "margins," Brazos is obligated by Texas law, its Bylaws, and the Internal Revenue Code to return the excess to its members as patronage capital.  In contrast, a for-profit, investor-owned utility ("IOU") is a provider of retail electric service and exists expressly to generate profit for its shareholders.  An IOU generates and buys electric power, transmits that power, often in intrastate commerce, and sells the power to its wholesale and retail customers.  Any profits earned by an IOU are distributed to and enjoyed by its shareholders, who may or may not purchase electricity from the IOU.

---

[27] The Committee argues that even if Tri-County's Patronage Claim is classified as a claim that it must be subordinated to other debt claims under section 8.3 of the Bylaws.  The Committee's argument is incorrect.  Section 8.3 of the Bylaws states that "[i]n the event of dissolution, liquidation, or other cessation of existence of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding Capital Credits shall be retired."  Bylaws § 8.3.  Notably, any subordination provided for here only applies in the "event of dissolution, liquidation, or other cessation of existence." 11 U.S.C. 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); *see also In re Gen. Homes Corp.*, 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991).  Therefore, such subordination is only applicable in the context of a dissolution, liquidation, or other cessation of existence of Brazos, and it does not subordinate Tri-County's Patronage Claim in other contexts, such as the ordinary course of business or a plan of reorganization.  In fact, Brazos has previously retired Capital Credits annually since 2017 without paying all of its outstanding indebtedness.  *See Statement of Financial Affairs for Brazos Electric Power Cooperative, Inc. Case No. 21-30725* at 67 [Dkt. No. 352].

58.     Brazos and its member-cooperatives together view the Capital Credits as a rebate that helps keep costs low for their rate payers, and neither Brazos nor its member-cooperatives regards the Capital Credits as equity.  Indeed, the Debtor previously represented:

> The economic and practical realities of a member-ownership in a non-profit Texas electric cooperative are unique and different than holding an equity interest in a for-profit company, in part because an electric cooperative is owned by the members it serves, unlike for-profit companies.  Brazos Electric does not earn "profits."  Rather, any revenue received over and above its operating expenses is called "margin," a portion of which is allocated to the members as "patronage capital."

Karnei Declaration ¶ 20.  This is also why the Debtor amended its Schedule F, which lists creditors with unsecured claims, to also list the Capital Credits as an unsecured claim.  *See Schedules of Assets and Liabilities for Brazos Electric Power Cooperative, Inc. Case No. 21-30725 at 25 [Dkt. No. 648].*  Moreover, Brazos even alerted its member-cooperatives that Brazos had scheduled "patronage capital claims through year 2019" but that members should file proofs of claims for patronage capital claims for 2020.[28]  The Debtor additionally provided cooperative members with projected patronage capital allocations for 2020 to assist the cooperative members with substantiating the "patronage capital claims" in their proofs of claims.  *Id.*

59.     When dealing with a non-profit debtor, concepts such as equity must be interpreted differently from a case with a debtor owned by profit-seeking equity holders.  *See In re Corcoran Hosp. Dist.*, 233 B.R. 449, 458 (Bankr. E.D. Cal. 1999) (noting there are no holders of equity when the debtor is a non-profit); *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1314 (7th Cir. 1995) ("[T]he rules of Chapter 11 bankruptcy, primarily designed as they are for profit seeking enterprises, are less than straightforward to apply here.").  An equity interest is defined by the right to share profits, control corporate decision making and ownership in the

---

[28] Email on behalf of Khaki Bordovksy from C. Denton to Member-Cooperatives, dated June 2, 2021, excluding attachments, attached as **Exhibit 2**.

corporate asset upon dissolution.[29]  *See In re Wabash*, 72 F.3d  at 1318.  Brazos was organized

under the Texas Electric Cooperative Act and is operated as a non-profit cooperative not as a

means for generating profits for equity-holders, as would be the case with a profit-seeking

enterprise, but so that the Debtor's member-cooperatives can provide power to their customers at

rates that are not inflated by a need to generate profit or return to equity holders or shareholders.

Recognizing this distinction, the Court offered its own view at the March 30, 2021 hearing:  "I

look at this case a lot like I would a municipality.  It serves a . . . public need.  It's -- it doesn't

exist to make a profit.  It -- it exists to provide a service.  And I don't ever want to lose sight of

that."[30]

60.    Tri-County does not share in the profits of the Debtor.  Essential to an equity

interest is the right to profits.  However, "in a co-operative association the concept of profit is

inappropriate, because profit, in its recognized economic sense, is the wage of the entrepreneur,

and in a co-operative there is no entrepreneur."  Emmanuel S. Tyson, Annotation, *Co-operative*

*Associations:  Rights in Equity Credits or Patronage Dividends*, 50 A.L.R.3d 435, 2a (1995).

Pursuant to Texas law and the Bylaws of the cooperative, Tri-County receives no profits and has

no current ownership rights in the Debtor's assets.  *See* Bylaws § 8.1; Tex. Util. Code §

161.059(a) ("An electric cooperative shall operate without profit to its members.").  Since Tri-

County does not share in the profits of the Debtor it cannot be considered an equity holder.  *In re*

---

[29]A mere right to corporate assets upon dissolution does not amount to an equity interest.  A right to corporate assets is not essential to an equity interest, however, a "share of profits."  *In re Wabash*, 72 F.3d  at 1318.  Moreover, the Committee relies on cases that present different substantive issues and involve agricultural cooperatives. *S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*, 252 B.R. 373, 377 (E.D. Tex. 2000) (involving an agricultural cooperative that sold chemicals and fertilizers to its patrons, who then resold those products in for-profit feed stores); *see generally In re E. Maine Elec. Co-op., Inc.*, 125 B.R. 329, 339 (Bankr. D. Me. 1991) (relying heavily on precedent based on agricultural cooperatives).  Agricultural cooperatives help their members secure production and supplies at a low cost that are later sold to consumers for a profit.  This is distinguishable from utility cooperatives and the facts of this case because the Debtor and Tri-County are both non-profits who bring electrical power to large parts of rural Texas at a low cost.

[30] Am. Hr'g Tr., Mar. 30, 2021, 19:6–10.

*General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 736 (N.D. Cal. 1998) ("Since they do not participate in profits, '[the debtor's] Members are not owners in any usual sense of the term.'") (quoting *In re Wabash*, 72 F.3d at 1313).

61.     To be clear, the net margins and Capital Credits do not constitute profits of Brazos.  The excess net margins underlying the Capital Credits derive from payments the member-cooperatives themselves originally made to Brazos on account of the power and services Brazos provides to the member-cooperatives.  The Capital Credits are a reimbursement of the member-cooperatives' own funds, to the extent that the member-cooperatives' payments exceeded the funding Brazos needed to provide such services.  Such reimbursement is a primary feature of the cooperative non-profit structure.  Rather than the excess net margins accruing as profits for the benefit of profit-seeking equity holders, and being transferred from the pockets of customers to the equity holders, excess net margins are returned on a rotational basis to customers as Capital Credits as a means of keeping ultimate customer costs low.[31]

62.     Moreover, Tri-County's claim to the Capital Credits, and more broadly Tri-County's general interest in the Debtor, does not exhibit other necessary features of an equity interest, such as control over the Debtor's corporate decision making.  The Debtor's one-member, one-vote system is antithetical to the type of control equity holders typically receive on account of funding provided as an equity interest.  The Debtor's Bylaws, Texas law, and the Internal Revenue Code provide that each of the sixteen member-cooperatives has one vote as part of the Debtor's scheme of corporate governance.  Bylaws § 2.5.  This "democratic voting"

---

[31] *See In re Wabash*, 72 F.3d at 1313–14 ("The primary benefit to the members of an electric cooperative accrues to them in their role as customers with access to electric power at favorable rates. . . . [R]atepayers pay only the cost to produce the electricity they purchase. Cooperatives are arguably able to offer lower rates, primarily because they are so constituted that profit or return to equity is not part of their cost to produce and they can borrow money at low interest rates.").

structure is one of the requirements of the Internal Revenue Code which must be satisfied to maintain the cooperative's tax-exempt status under section 501(c)(12). *See* 26 U.S.C. § 501(c)(12). Tri-County holds 17.6% of the Capital Credits, and pays for approximately 19% of Brazos's plant costs, but only holds a 6.25% voting interest. Proof of Claim ¶ 62. This system differs drastically from the typical equity structure in which stock is "the premium investors are willing to pay for a controlling interest in a business corporation." *In re Wabash Valley*, 72 F.3d at 1318.

63.     Tri-County's entitlement to the Patronage Claim constitutes a valid claim. The Patronage Claim is not an equity interest because it bears little resemblance to the interest shareholders typically receive on account of their capital contributions. The Capital Credits are reimbursements back to the customer for its proportional share of margins realized by Brazos based on the amount of business conducted between Brazos and the customer. Capital Credits are for the benefit of the rate payer, not a profit seeking entity. Also, Tri-County does not receive voting rights proportionate to its Capital Credits, a premium that equity holders expect to receive. Therefore, Tri-County's Patronage Claim should not be classified as an equity interest and should not be subordinated to the unsecured claims.

**C.     Tri-County Holds a Valid Claim for Annual Margin Rebate for Payment Either in a Lump Sum or as a Credit Against Charges from the Debtor.**

64.     The WPSDS Tariff includes an annual true-up mechanism (the "Annual Margin Rebate Adjustment" or "AMR") which provides an annual refund to member-cooperatives for any revenues collected pursuant to the WPSDS Tariff in excess of the margins that the Board of Directors has deemed reasonably necessary to the Debtor's financial objectives. WPSDS Tariff at 10. The AMR amounts are refunded in addition to the Capital Credits and are not allocated to members' patronage accounts. Instead, member-cooperatives may use the AMR amounts as a

33

credit to offset subsequent charges by the Debtor under the Wholesale Power Contract.  Tri-County holds a claim for 2020 AMR amounts that have not yet been allocated by the Debtor in the amount of $5,625,445, which may be applied as a credit against charges Tri-County receives from the Debtor pursuant to the Wholesale Power Contract.

65.     With little elaboration, the Committee asserts that:  (1) no member-cooperative has a current entitlement to AMR, (2) payment of AMR is discretionary, and (3) AMR amounts can be carried forward by the Debtor to offset deficiencies in future years.  The Committee is incorrect on each point.

66.     The WPSDS Tariff provides calculation for the Debtor's total AMR, to be made by April 1 of each year, that takes into consideration the Board of Directors' financial objectives each year.  WPSDS Tariff at 9–10.  Under the terms of the WPSDS Tariff, the total AMR is then to be allocated on a weighted basis to the Debtor's wholesale customers.  WPSDS Tariff at 10.  The Finance and Audit Committee of the Brazos Board of Directors received the calculation of Annual Margin Rebate for 2020 in a memorandum from the CEO and CFO of Brazos on February 9, 2020.[32]  The calculation of total AMR for 2020 was calculated by Brazos, as required by the WPSDS Tariff, and thus Brazos now is obligated to allocate that 2020 AMR to each member-cooperative, and such obligation gives rise to a current entitlement to AMR.  Moreover, the regular annual payment of AMR each year for several years, since at least 2016, has caused Tri-County to rely on the expected rebate of AMR to be paid to Tri-County each year.

67.     Contrary to the Committee's assertion, the WPSDS Tariff does not state that payment of the AMR is discretionary.  Rather, the WPSDS Tariff is better read to state that the Board of Directors has discretion with respect to how to rebate each customer's allocated share

---

[32] Memorandum from Khaki Bordovsky and Clifton Karnei to the Finance and Audit Committee re Review Projected Patronage Capital and Annual Margin Rebate, dated February 9, 2021, attached as **Exhibit 3**.

of AMR, whether as a "separate adjustment to the power bills in future periods" or "a lump sum payment" equal to the net present value of such future adjustments.  WPSDS Tariff at 10.[33] Notably, the adjustment is to be made to future *power bills*—not to future AMR entitlements, as the Committee asserts.  Although the WPSDS Tariff does provide for a margin deficiency to be carried forward and offset against future positive AMR amounts, the WPSDS Tariff does not include any provision for AMR payments to offset future AMR deficiencies, as the Committee claims.  *See id*.  Thus, as Tri-County asserted in its Proof of Claim, Tri-County holds a claim for AMR amounts for 2020 in the amount of $5,625,445, which may be applied as a credit against charges Tri-County receives from the Debtor pursuant to the Wholesale Power Contract.

68.     The Committee also mystifyingly asserts that Tri-County somehow is not in good standing with the Debtor, and as a result, Tri-County's claim to the AMR is not current.  Given how the Committee carefully notes earlier in the Objection that, with respect to the TAA, "Brazos has not sought to affirmatively collect these amounts yet as it is continuing to dispute the ERCOT claim," and in light of the Debtor's own statements with respect to the TAA, it is unclear to Tri-County what the Committee means by saying that Tri-County is not "current on all accounts."  Objection at ¶¶ 26, 73.  The Committee's assertion is particularly preposterous given that Brazos has provided no accounting for the alleged amount of Tri-County's TAA, despite repeated requests for supporting material.  Moreover, neither the Board of Directors of Brazos

---

[33] The WPSDS Tariff provides, in relevant part:

The wholesale customer's allocated share of any Annual Margin Rebate shall, at the sole discretion of the Board of Directors of Brazos Electric, be rebated to the wholesale customers as either (i) a separate adjustment to the power bills in future periods as approved by such Board of Directors or (ii) a lump sum payment to the wholesale customer equal to the net present value of (i) above, at an appropriate discount rate for such payment as determined by the Board of Directors.

WPSDS Tariff at 10.

nor the RUS has approved the TAA as a rate under section 5 of the Wholesale Power Contract, and proper notice of a rate change has not been provided.

      **D.**     **Tri-County Holds a Valid Claim for Overcharges for Administrative and General Expenses.**

     69.    The Committee's brief argument that Tri-County is not entitled to a return of administrative and general expenses (the "A&G Costs") disregards how costs are allocated disproportionately among members. The Debtor's Bylaws provide that each of the sixteen member-cooperatives has one vote as a part of the Debtor's scheme of corporate governance. The three largest member-cooperatives, however, are allocated a disproportionately large portion of the A&G Costs.

     70.    Historically, the Debtor has allocated costs based on an approximate percentage of the load that each member-cooperative contributes to the Debtor's total system load. While this may be logical in relation to reimbursing the Debtor for power purchased from third parties, or for the cost of generating power to sell into the ERCOT market, this allocation is not appropriate as to the Debtor's A&G Costs.

     71.    The Debtor's A&G Costs should be allocated equally among the member-cooperatives, with 1/16 or 6.25% of such costs being allocated to each member. None of the items that fall under A&G Costs are influenced directly by the load size of the member-cooperatives; thus, the allocation of these expenses should not be divided based on load size but should be divided evenly among the member-cooperatives. For example, the A&G Costs include fixed costs for the Debtor's office, the salaries and benefits for the Debtor's staff, and per diems and benefits paid to members of the Board of Directors. Such amounts are independent of load size and should not be allocated as though they are incurred in proportion to a member's load.

72.     As result of the Debtor's wrongful allocation of A&G Costs, Tri-County has been overcharged by millions of dollars for costs that should have been borne equally by all members. For example, if such expenses are allocated equally among the sixteen member-cooperatives, then Tri-County is allocated only 6.25 cents out of each dollar spent for A&G Costs.  However, if such expenses are allocated based on the members' Capital Credits or the percentage of the Debtor's total load, respectively, Tri-County's share is 17.6 or 19.0 cents per dollar, which is basically triple Tri-County's share based on a pro rata application.

73.     The overcharges to Tri-County are substantial.  The Debtor's total A&G Costs for the five-year period ended in 2019 were $93.7 million.  For example, allocating these costs based upon the members' Capital Credits, approximately $16.9 million is allocated to Tri-County.  If allocated equally among the member-cooperatives, the amount allocated to Tri-County is substantially reduced by $11.0 million to $5.9 million.  Therefore, Tri-County is entitled to reimbursement and recoupment of excess charges for A&G Costs from the Debtor in such amount.

**E.     Tri-County Is Entitled to Reimbursement from the Debtor for Any Tort Claims or Other Third Party Claims Related to the Winter Storm.**

74.     The Committee argues that Tri-County is not entitled to indemnification and contribution claims against Brazos if Tri-County is held liable for any tort claims as a result of the Winter Storm.  Objection ¶ 79.  In support, the Committee quotes the Tariff for Electric Service ("Tariff"), attached as Exhibit 4 to the Objection, which provides in the first paragraph:

> It is the policy of Brazos Electric that it is not an insurer of any loss that a consumer may suffer by reason of a system failure, and does not guarantee electric service against fluctuations or interruptions.  Brazos Electric will not be liable for any damages, whether direct or consequential, including, without limitation, loss of profits, loss of revenue, or loss of production capacity, occasioned by fluctuations or interruptions ***unless it be shown that Brazos Electric has not made reasonable provisions to supply electric service***.  In the event of a failure to make such reasonable provision of service, whether as a result of negligence or otherwise,

Brazos Electric's liability shall be limited to the cost of necessary repairs of physical damages proximately caused by the service failure.

Tariff at 1 (emphasis added).

75.     Tri-County contends that the quoted provision does not restrict Tri-County from recovering on any appropriate indemnification or contribution claim.  Further, as noted above, Brazos did not make "reasonable provisions to supply electric service" during the Winter Storm, so any claims by Tri-County would fall into that express contractual carve-out.

## **CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, Tri-County respectfully requests that the Court overrule the Objection and allow in full the claims set forth in Tri-County's Proof of Claim.  Tri-County further requests any other relief that the Court finds to be just and proper.

*[Remainder of the page left intentionally blank.]*

Dated:  January 31, 2022

Respectfully submitted,

*/s/ Sarah Link Schultz*
Sarah Link Schultz
Texas Bar No. 24033047
Laura P. Warrick
Texas Bar No. 24079546
AKIN GUMP STRAUSS HAUER & FELD, LLP
2300 N. Field Street, Suite 1800
Dallas, Texas 75201-2481
(214) 969-4367 Telephone
(214) 969-4343 Facsimile
sschultz@akingump.com
lwarrick@akingump.com

Abid Qureshi (admitted *pro hac vice*)
New York Bar No. 2684637
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
aqureshi@akingump.com

and

J. Robert Forshey
Texas Bar No. 07264200
Jeff P. Prostok
Texas Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, Texas 76102
(817) 877-8855 Telephone
(817) 877-4151 Facsimile
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com

**ATTORNEYS FOR TRI-COUNTY**
**ELECTRIC COOPERATIVE, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 31, 2022, a true and correct copy of the foregoing document was served via email on all interested parties that have consented to such service.

<u>*/s/ Sarah Link Schultz*         </u>
Sarah Link Schultz