**Exhibit C**

*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 21-30725 (DRJ)** |
| **BRAZOS ELECTRIC POWER** | § | |
| **COOPERATIVE, INC.,** | § | **Chapter 11** |
| | § | |
| Debtor.[1] | § | |
| | § | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION OF
## <u>BRAZOS ELECTRIC POWER COOPERATIVE, INC.</u>

**NORTON ROSE FULBRIGHT US LLP**

Jason L. Boland
Julie Goodrich Harrison
Maria Mokrzycka
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone:  (713) 651-5151
jason.boland@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

James A. Copeland
1301 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 408-5471
james.copeland@nortonrosefulbright.com

Paul Trahan
Emily Despres Wolf
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  79701
Telephone:  (512) 474-5201
paul.trahan@nortonrosefulbright.com
emily.wolf@nortonrosefulbright.com

*Counsel for the Debtor and Debtor in Possession*

Dated:  September 20, 2022
         Houston, Texas

**O'MELVENY & MYERS LLP**

Louis R. Strubeck, Jr.
Nick Hendrix
Laura Smith
2501 North Harwood Street, Suite 1700
Dallas, Texas 75201
Telephone:  (972) 360-1925
lstrubeck@omm.com
nhendrix@omm.com
lsmith@omm.com

*Co-Counsel for the Debtor and Debtor in Possession*

---

[1] The Debtor in this chapter 11 case, along with the last four digits of each Debtor's federal tax identification number is 4729.  Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, Texas 76712.

## PRELIMINARY STATEMENT[2]

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF THE DEBTOR'S PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION. THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN.  THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE BASED UPON THE BEST INFORMATION AVAILABLE AS OF THE FILING OF THIS DISCLOSURE STATEMENT.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE DESCRIBED HEREIN OR ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTOR HAS ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented from time to time, the "Plan"); the *Declaration of Clifton Karnei, in Support of the Debtor's Chapter 11 Petitions and First Day Motions* [Dkt. No. 3] (the "First Day Declaration"); or the Debtor's *Motion For Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving The Solicitation and Notice Procedures With Respect to Confirmation of the Debtor's Proposed Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Dkt. No. 2221] (the "Solicitation Motion"), as applicable. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this disclosure statement (as amended, modified, or supplemented, from time to time, the "Disclosure Statement") and the Plan, the Plan will govern.

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND ITS FINANCIAL ADVISORS. THE FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL INFORMATION WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE

131999954

3016(B) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE SECTION VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

---

**RECOMMENDATION BY THE DEBTOR**

THE BOARD OF DIRECTORS OF THE DEBTOR HAS APPROVED THIS DISCLOSURE STATEMENT AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN.  THE DEBTOR BELIEVES THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE, MAXIMIZES VALUE FOR ALL OF THE DEBTOR'S CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTOR'S CREDITORS AND OTHER PARTIES IN INTEREST.

THUS, THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

---

131999954

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 2

I.  INTRODUCTION .................................................................................................. 13

    A.  Purpose of the Disclosure Statement....................................................... 13

    B.  Inquiries.................................................................................................... 13

    C.  Confirmation of Plan ................................................................................ 14

        1.  Requirements ................................................................................ 14

        2.  Confirmation of the Plan .............................................................. 14

        3.  Only Impaired Classes Vote ......................................................... 15

    D.  Voting Procedures and Voting Deadline................................................... 15

    E.  Treatment and Classification of Claims; Impairment .............................. 16

    F.  Releases, Exculpations, and Injunctions .................................................. 20

II. OVERVIEW OF THE DEBTOR'S BUSINESS AND OPERATIONS ............................ 21

    A.  Business Overview.................................................................................... 21

        1.  General Overview ......................................................................... 21

        2.  Generation and Transmission ....................................................... 22

    B.  Corporate Structure .................................................................................. 24

    C.  Management .............................................................................................. 25

    D.  Board of Directors .................................................................................... 26

    E.  Pre-Petition Capital Structure.................................................................. 26

        1.  Rural Utilities Service Obligations and Federal Financing Bank Secured Notes ...... 27

        2.  The Unsecured Revolving Credit Agreement .............................. 28

        3.  The MUFG Letter of Credit Agreement....................................... 29

III. EVENTS LEADING TO THE CHAPTER 11 FILING ............................................... 30

IV. THE CHAPTER 11 CASE .................................................................................... 31

    A.  Commencement of the Chapter 11 Case .................................................. 31

    B.  First and Second Day Relief..................................................................... 31

    C.  Procedural Motions .................................................................................. 32

    D.  Other Substantive Motions ....................................................................... 32

    E.  Retention of Chapter 11 Professionals ..................................................... 33

    F.  Appointment of the Advisory Committee.................................................. 33

    G.  Approval of DIP Facility.......................................................................... 35

    H.  Exclusivity................................................................................................ 36

    I.  Statements and Schedules, and Claims Bar Dates .................................... 36

J.    Compensation Plans.................................................................................37

K.   Pension Benefit Guaranty Corporation ...................................................37

L.   Litigation Matters .....................................................................................38

    1.   ERCOT Adversary Proceeding and Settlement.............................38

    2.   Tenaska Power Claim Settlement ..................................................41

    3.   Member Settlement........................................................................41

    4.   Member Claim Objections.............................................................48

    5.   Gas Providers Adversary Proceeding ...........................................48

    6.   Swap Claim Objections .................................................................49

    7.   The Power Purchase Agreements ..................................................49

    8.   Committee Settlement ...................................................................52

V.   SUMMARY OF PLAN ..................................................................................54

A.   Administrative Expense Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims ...............................................................................55

    1.   Administrative Claims...................................................................55

    2.   DIP Facility Claims.......................................................................56

    3.   Professional Fee Claims ................................................................57

    4.   Priority Tax Claims .......................................................................57

    5.   Payment of Statutory Fees ............................................................57

B.   Classification and Treatment of Claims ...................................................57

    1.   Summary of Classification ............................................................57

    2.   Treatment of Claims .....................................................................58

    3.   No Interests in the Debtor.............................................................63

    4.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy  Code ...................................................................................................63

    5.   Elimination of Vacant Classes......................................................64

    6.   Separate Classification of Other Secured Claims.........................64

    7.   Voting Classes; Presumed Acceptance by Non-Voting Classes ...64

    8.   Subordinated Claims.....................................................................64

C.   Means for Implementation of the Plan .....................................................64

    1.   General Settlement of Claims........................................................64

    2.   Restructuring Transactions; Effectuating Documents ..................65

    3.   Corporate Existence......................................................................65

    4.   Vesting of Assets in the Reorganized Debtor...............................66

    5.   Sources of Plan Funding...............................................................66

131999954

6.   The Member Settlement .................................................................... 69

7.   The ERCOT Settlement ................................................................... 75

8.   SCEA Claims Settlement ................................................................. 80

9.   BSCEC Claims Settlement .............................................................. 80

10.  Tenaska Power Claim Settlement ..................................................... 82

11.  Committee Settlement ..................................................................... 82

12.  Plan Defaults .................................................................................. 84

13.  New Organizational Documents and Senior Management ................... 88

14.  Corporate Action ............................................................................ 90

15.  Employee Obligations ..................................................................... 90

16.  Workers' Compensation Programs .................................................... 91

17.  Ordinary Course Professionals ......................................................... 92

18.  Cancellation of Loans, Securities, and Agreements ........................... 92

19.  Exemption from Certain Taxes and Fees ........................................... 92

20.  Preservation of Causes of Action ..................................................... 93

21.  Insurance Policies and Surety Bonds ................................................ 94

22.  Notice of Effective Date .................................................................. 95

D.   Treatment of Executory Contracts and Unexpired Leases ........................... 95

1.   Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 95

2.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ................ 97

3.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .............. 97

4.   Assumption Dispute Resolution ....................................................... 98

5.   Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases ........................................................................................... 99

6.   Contracts and Leases Entered into After the Petition Date ................... 99

7.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ..... 99

8.   Reservation of Rights ...................................................................... 99

9.   Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ................. 100

E.   Provisions Governing Distributions ......................................................... 100

1.   Distributions Generally .................................................................. 100

2.   Distribution Record Date ................................................................ 100

3.   Timing and Calculation of Amounts to Be Distributed ...................... 100

4.   Rights and Powers of Disbursing Agent ........................................... 101

5.   Delivery of Distributions and Undeliverable or Unclaimed Distributions .............. 102

6.   Satisfaction of Claims .................................................................... 104

131999954

7.      Securities Registration Exemption ........................................................................ 104

8.      Compliance with Tax Requirements ..................................................................... 104

9.      Cancellation of Liens and Surrender of Cancelled Instruments or Securities .......... 105

10.     Allocations .......................................................................................................... 105

11.     No Postpetition or Default Interest on Claims....................................................... 105

12.     Setoffs and Recoupment ...................................................................................... 105

13.     Claims Paid or Payable by Third Parties .............................................................. 106

F.   Procedures for Resolving Contingent, Unliquidated, and Disputed Claims................... 107

1.      Allowance of Claims ............................................................................................ 107

2.      Claims Administration Responsibilities ................................................................ 107

3.      Reservation of Rights to Object to Claims ............................................................ 107

4.      Disputed and Contingent Claims Reserve ............................................................. 108

5.      Estimation of Claims ........................................................................................... 108

6.      Adjustment to Claims Register Without Objection................................................ 108

7.      Time to File Objections to Claims ........................................................................ 109

8.      Disallowance of Claims ....................................................................................... 109

9.      Amendments to Proofs of Claim .......................................................................... 109

10.     Reimbursement or Contribution ........................................................................... 110

11.     No Distributions Pending Allowance .................................................................... 110

12.     Distributions After Allowance .............................................................................. 110

13.     Single Satisfaction of Claims ............................................................................... 110

G.   Settlement, Release, Injunction, and Related Provisions ............................................. 110

1.      Compromise and Settlement of Claims and Controversies .................................... 110

2.      Discharge and Satisfaction of Claims ................................................................... 111

3.      Releases by the Debtor ........................................................................................ 111

4.      Releases by Holders of Claims............................................................................. 113

5.      Exculpation ......................................................................................................... 115

6.      Injunction ............................................................................................................ 115

7.      Waiver of Statutory Limitations on Releases ........................................................ 116

8.      Protection Against Discriminatory Treatment........................................................ 117

9.      Recoupment ......................................................................................................... 117

10.     Subordination Rights ........................................................................................... 117

11.     Release of Liens................................................................................................... 118

H.   Condition Precedent to Consummation of the Plan .................................................... 118

|   | 1. | Conditions Precedent to the Effective Date | 118 |
|---|----|---|---|
|   | 2. | Waiver of Conditions | 119 |
|   | 3. | Effect of Non-Occurrence of Conditions to the Effective Date | 120 |
|   | 4. | Substantial Consummation | 120 |
| I. | | Modifications, Revocation, or Withdrawal of Plan | 120 |
|   | 1. | Modification and Amendments | 120 |
|   | 2. | Effect of Confirmation | 120 |
|   | 3. | Revocation or Withdrawal of the Plan | 121 |
| J. | | Retention of Jurisdiction | 121 |
| K. | | Miscellaneous Provisions | 123 |
|   | 1. | Immediate Binding Effect | 123 |
|   | 2. | Additional Documents | 124 |
|   | 3. | Plan Supplement | 124 |
|   | 4. | Reservation of Rights | 124 |
|   | 5. | Successors and Assigns | 124 |
|   | 6. | Service of Documents | 124 |
|   | 7. | Term of Injunctions or Stays | 125 |
|   | 8. | Entire Agreement | 126 |
|   | 9. | Nonseverability of Plan Provisions | 126 |
|   | 10. | Dissolution of Committee and Bankruptcy Advisory Committee | 126 |
|   | 11. | Votes Solicited in Good Faith | 127 |
|   | 12. | Expedited Tax Determination | 127 |
|   | 13. | No Stay of Confirmation Order | 128 |
|   | 14. | Waiver or Estoppel | 128 |
|   | 15. | Closing of Chapter 11 Case | 128 |
| VI. | | CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING | 128 |
| A. | | The Plan May Not be Accepted | 128 |
| B. | | The Plan May Not be Confirmed | 128 |
| C. | | Parties in Interest May Object to the Plan's Classification of Claims | 129 |
| D. | | Risks Related to Possible Objections to the Plan | 130 |
| E. | | The Debtor May Object to the Amount or Classification of a Claim | 130 |
| F. | | Nonconsensual Confirmation | 130 |
| G. | | Failure to Consummate the Plan and Risk of Non-Occurrence of the Effective Date | 130 |
| H. | | There is Continued Risk Upon Confirmation and Consummation | 130 |

131999954

I.   Plan Releases May Not be Approved ............................................................. 131

J.   Plan Documents are Still Being Negotiated.................................................... 131

K.   Costs of Administering the Estate ................................................................. 131

L.   The Debtor May Not Be Able to Achieve Its Financial Projections............................ 131

M.   The Reorganized Debtor May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case ........................................................ 132

N.   While the Reorganized Debtor Expects to Generate Sufficient Cash to Service All of its Indebtedness, That Cannot be Guaranteed........................................................ 132

O.   Upon Emergence from Bankruptcy, the Composition of the Senior Management Team Will Change ............................................................................................ 132

P.   The Loss of Employees and Key Personnel Could Adversely Affect the Debtor's Operations .......................................................................................... 133

Q.   The Debtor's Operations, Liquidity, and Financial Condition May be Materially Affected by the Effects of Extreme Weather Conditions .................................................... 133

R.   The Debtor's Operations, Liquidity, and Financial Condition Could be Negatively Impacted by Any Development or Event Beyond the Reorganized Debtor's Control that Causes Economic Weakness in the ERCOT Market ......................................................... 133

S.   The Debtor Has No Duty to Update ............................................................... 134

T.   No Representations Outside the Disclosure Statement Are Authorized ...................... 134

U.   No Legal or Tax Advice Is Provided by the Disclosure Statement ............................ 134

V.   No Admission Made...................................................................................... 134

VII.   SOLICITATION AND VOTING PROCEDURES.................................................. 134

A.   General ....................................................................................................... 134

B.   Parties Entitled to Vote on the Plan .............................................................. 135

C.   Classes Impaired and Entitled to Vote on the Plan ........................................ 135

D.   Voting Procedures and Requirements ............................................................ 136

   1.   Ballots...................................................................................................... 136

   2.   Submitting Ballots .................................................................................... 138

   3.   Voting ...................................................................................................... 138

   4.   Notice of Non-Voting Status .................................................................... 138

   5.   Releases, Exculpations, and Injunctions Provisions Under the Plan...................... 139

E.   Acceptance of Plan...................................................................................... 141

F.   Confirmation Without Necessary Acceptances; Cramdown ........................... 142

G.   Classification.............................................................................................. 142

H.   Ballots Not Counted.................................................................................... 143

I.   Elimination of Vacant Classes ..................................................................... 143

131999954

J.     Presumed Acceptance of the Plan ................................................................. 143

VIII.     FEASIBILITY AND BEST INTERESTS OF CREDITORS ................................ 143

A.     Requirements for Confirmation of the Plan. ............................................... 143

B.     Best Interests of Creditors / Liquidation Analysis ..................................... 144

C.     Feasibility .................................................................................................... 145

D.     Valuation ..................................................................................................... 146

IX.     CERTAIN UNITED STATES FEDERAL INCOME  TAX CONSEQUENCES OF THE
PLAN ............................................................................................................................. 146

A.     Introduction ................................................................................................. 146

B.     Tax Status of the Debtor and Reorganized Debtor ..................................... 147

C.     Cancellation of Debt and Reduction of Tax Attributes .............................. 148

D.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims Entitled to
Vote    ........................................................................................................................... 149

    1.     Debt Exchanges Generally ....................................................................... 149

    2.     U.S. Holders of General Unsecured Claims, General Unsecured Convenience   Claims,
Tort Claims, and Tort Convenience Claims (Classes 5, 6, 7, and 8) .................................. 149

    3.     Market Discount ...................................................................................... 150

    4.     Net Investment Income Tax ..................................................................... 151

    5.     Limitation of Use of Capital Losses ........................................................ 151

    6.     Information Reporting and Backup Withholding...................................... 151

X.     RECOMMENDATION ...................................................................................... 152

131999954

**EXHIBITS**

Exhibit A: Plan of Reorganization

Exhibit B: Financial Projections

Exhibit C: Valuation Analysis

Exhibit D: Liquidation Analysis

131999954

# I.    INTRODUCTION

## A.    Purpose of the Disclosure Statement

Brazos Electric Power Cooperative, Inc., as debtor and debtor in possession (the "Debtor" or "Brazos Electric"), submits this Disclosure Statement pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of votes on the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.*, attached hereto as **Exhibit A**.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtor that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan, as required under section 1125 of the Bankruptcy Code.  Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or certifications required pursuant to the Plan.

As described in more detail below, the Debtor faced certain financial challenges prior to March 1, 2021 (the "Petition Date") and commenced this chapter 11 case (the "Chapter 11 Case") to accomplish a successful restructuring of its business through the restructuring transactions contemplated by the Plan.  The Plan is the outcome of extensive negotiations among the Debtor and certain of its key stakeholders and certain other interested parties.  The Debtor believes that the Plan is reflective of these good faith negotiations and will treat Holders of Claims in an economic and fair manner.

This Disclosure Statement includes, among other things, (1) information pertaining to the Debtor's prepetition business operations and financial history; (2) a description of the events leading up to the commencement of this Chapter 11 Case; (3) an overview of the Plan (which overview sets forth certain terms and provisions of the Plan); (4) a description of the effects of confirmation of the Plan; (5) a discussion of certain risk factors associated with the Plan; and (6) a summary of the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote on the Plan in order for their votes to be counted.

## B.    Inquiries

If you have any questions about the packet of materials you have received, please contact Stretto, the Debtor's solicitation and voting agent (the "Voting Agent"), at 855.529.1663 (domestic toll free) or +1 949.771.2210 (International).  Additional copies of this Disclosure Statement, the Plan, and any other publicly filed documents in the Chapter 11 Case are available upon written request to the Voting Agent at the following address:

131999954

| By Regular, Hand Delivery, or Overnight Mail: | By Email: |
|---|---|
| Brazos Electric Power Cooperative, Inc. - Ballot Processing c/o Stretto 410 Exchange, Suite 100 Irvine, California 9260 | brazoselectricinquiries@stretto.com |

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents are also available by downloading the exhibits and documents from the website of the Debtor's Voting Agent at https://cases.stretto.com/Brazos (free of charge) or the Court's website at https://ecf.txsb.uscourts.gov (for a fee).

**C.     Confirmation of Plan**

*1.     Requirements*

The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

*2.     Confirmation of the Plan*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

The Bankruptcy Court has scheduled a hearing to consider final approval of this Disclosure Statement and confirmation of the Plan (the "Combined Hearing") for November 14, 2022 at 9:30 a.m. (prevailing Central Time).  Parties in interest will have the opportunity to object to the final approval of this Disclosure Statement and confirmation of the Plan at the Combined Hearing.

Objections to the final approval of this Disclosure Statement and confirmation of the Plan must be filed no later than October 28, 2022, in accordance with the notice of the Combined Hearing that accompanies the Disclosure Statement Order.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

Notice of the Combined Hearing will be provided to all known creditors or their representatives and other parties in interest.  The Combined Hearing may be adjourned from time to time without further notice except for the announcement of the continuation date made at the Combined Hearing, at any subsequent continued Combined Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Case.

**THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

131999954

### 3.     *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim is impaired under a plan if the applicable holder's legal, equitable, or contractual rights are modified under such plan.  In addition, if the holders of claims in an impaired class do not receive or retain any property under a plan on account of such claims, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 4, 5, 6, 7, 8, and 10 are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims in Classes 1, 2, 3, and 9 are Unimpaired and, therefore, deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 4, 5, 6, 7, 8, and 10.**

### D.     **Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan and make any other elections or certifications required pursuant to the Plan. To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice or complete your Ballot using the online portal maintained by the Voting Agent, in each case indicating your decision to accept or reject the Plan in the boxes provided.

**The Ballot also contains an election for a Holder voting on the Plan, or a Holder abstaining from voting on the Plan, to opt out of the third-party release provisions contained in Article VIII of the Plan, except that Holders of Class 5 General Unsecured Claims or Class 7 Tort Claims that elect on their respective Ballots to receive treatment as Class 6 General Unsecured Convenience Claims or Class 8 Tort Convenience Claims, respectively, shall in each case be deemed to consent to the third-party releases provisions in Article VIII of the Plan referenced above and described herein.  Holders of Claims who are deemed to accept or reject the Plan and, therefore, are not entitled to vote, will receive a Notice of Non-Voting Status and may opt out of the third-party release provisions contained in Article VIII of the Plan by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release provisions.  Each Holder of a Claim that does not timely make the opt-out election on its Ballot or Non-Voting Opt Out Form, as applicable, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.**

**TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN OCTOBER 28, 2022 (THE "<u>VOTING DEADLINE</u>").**

131999954

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class that actually voted on the Plan must vote to accept the Plan.  At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE VOTING AGENT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT AT 855.529.1663 (TOLL-FREE) OR 949.771.2210 (IF CALLING FROM OUTSIDE THE U.S. OR CANADA).  THE VOTING AGENT IS NOT AUTHORIZED TO PROVIDE TAX, LEGAL, OR OTHER FINANCIAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.**

E.      **Treatment and Classification of Claims; Impairment**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Holders of Allowed Claims.  The projected recoveries are based on the best information available to the Debtor as of the date hereof and reflect the Debtor's estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtor makes no representation as to the accuracy of these recovery estimates.  The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims listed below classify Claims for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims, see Section V, "Summary of the Plan," below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Claim Pool Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 1<br>Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course). | Unimpaired Not Entitled to Vote (Deemed to Accept) | <u>Est. Claim Pool Amount</u>: TBD<br><u>Est. Recovery</u>: 100% |
| 2<br>Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the Debtor's or the Reorganized Debtor's, discretion, as applicable:<br>i. payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date, or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course (provided that, for the avoidance of doubt, the Prepetition Revolving Facility Secured Claim shall be paid in full in Cash on the Effective Date);<br>ii. Reinstatement of such Holder's Allowed Other Secured Claim;<br>iii. the Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or<br>iv. such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | Unimpaired Not Entitled to Vote (Deemed to Accept) | <u>Est. Claim Pool Amount</u>: $132,789,396.15<br><u>Est. Recovery</u>: 100% |
| 3<br>RUS Secured Notes Claims | Except to the extent that a Holder of an Allowed RUS Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed RUS Secured Notes Claim, all Allowed RUS Secured Notes Claims shall be Reinstated subject to and in accordance with the Amended and Restated RUS Secured Notes Documents. | Unimpaired Not Entitled to Vote (Deemed to Accept) | <u>Est. Claim Pool Amount</u>: Aggregate principal amount not to exceed $1,815,656,446.54[3] plus all accrued and unpaid interest (including interest accruing after the Petition Date), costs, and other fees, in each case owed under the RUS Secured Notes Documents<br><u>Est. Recovery</u>: N/A |

---

[3] This amount reflects the aggregate asserted claim amount as of the Petition Date, a portion of which has been paid through quarterly amortization payments during the post-petition period.

131999954

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Claim Pool Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 4 ERCOT Claim | Except to the extent that ERCOT agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Allowed ERCOT Claim, ERCOT shall (i) receive (a) on the Effective Date, the Initial ERCOT Cash Payment, and (b) the ERCOT Market Participant Consideration, which ERCOT shall then allocate and distribute to Eligible Market Participants, in full and final satisfaction of the Eligible Market Participants' respective shares of the Brazos Short Pay Claim, through the Market Participant Accelerated Cash Recovery, the Market Participant Convenience Cash Recovery, or the Market Participant Deferred Cash Recovery as set forth in the ERCOT Recovery Appendix. | Impaired Entitled to Vote | Est. Claim Pool Amount: $1,886,595,737.08 Est. Recovery: 76.1% -100% [4] |
| 5 General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment (or otherwise elects and is entitled to receive General Unsecured Convenience Claim treatment on account of its Allowed General Unsecured Claim, or with respect to SCEA and the BSCEC Trustee and the BSCEC Collateral Trustee (on behalf of itself and for the BSCEC Noteholders), as agreed pursuant to the settlements summarized in Article IV.H and Article IV.I of the Plan, respectively), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each such Holder shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, the GUC Cash Recovery, with the Initial GUC Cash Payment to be made on the Effective Date, the Additional GUC Cash Payment to be made on or before the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline) and the Residual GUC Cash Payment, if any, to be made on the date when all General Unsecured Claims have either been Allowed or expunged; provided, that any such Holder of an Allowed General Unsecured Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to reduce the Allowed amount of its Claim to the GUC Convenience Amount and receive the GUC Convenience Recovery. | Impaired Entitled to Vote | Est. Claim Pool Amount: $1,137,025,030.39 Est. Recovery: minimum 89.5% |

---

[4] The estimated recoveries described herein do not account for the value to ERCOT of the Debtor's release of any potential avoidance actions in respect of certain prepetition collateral sweeps made by ERCOT, in the total amount of $350,255,036.39.

18

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Claim Pool Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 6<br>General Unsecured Convenience Claims | Except to the extent that a Holder of an Allowed General Unsecured Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Convenience Claim, each such Holder shall receive the GUC Convenience Recovery on the later of (i) the Effective Date or (ii) the date that such Claim is Allowed.  Class 6 shall consist of all Claims that would otherwise be General Unsecured Claims and are Allowed in the GUC Convenience Amount or less. | Impaired Entitled to Vote | Est. Claim Pool Amount: $1,218,000<br>Est. Recovery: GUC Convenience Recovery |
| 7<br>Tort Claims | Except to the extent that a Holder of an Allowed Tort Claim agrees to less favorable treatment (or otherwise elects to receive Tort Convenience Claim treatment on account of its Allowed Tort Claim), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Claim, each such Holder shall receive the Tort Claim Recovery; provided, that each such Holder of an Allowed Tort Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to be treated as a Tort Convenience Claim and receive the Tort Convenience Recovery in full and final satisfaction of such Allowed Claim. | Impaired Entitled to Vote | Est. Claim Pool Liquidated Amount:[5] $1,683,855<br>Est. Recovery: 100% |
| 8<br>Tort Convenience Claims | Except to the extent that a Holder of an Allowed Tort Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Convenience Claim, each such Holder shall receive the Tort Convenience Recovery on the Effective Date. | Impaired Entitled to Vote | Est. Claim Pool Amount: $0[6]<br>Est. Recovery: Tort Convenience Recovery |

---

[5] Of the 253 Tort Claims that were filed, 42 asserted liquidated amounts totaling $1,683,855.  The remaining Tort Claims did not assert liquidated amounts.

[6] Amount of class to be determined based upon Ballot elections.

131999954

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Claim Pool Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 9<br><br>Member Patronage Capital Claims | Except as otherwise set forth in the Confirmation Order or to the extent that a Holder of an Allowed Member Patronage Capital Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Patronage Capital Claim, each such Allowed Member Patronage Capital Claim shall, subject in all respects to the ECCA and the Bylaws, be Reinstated, retained by such Holder, and retired in accordance with the Bylaws. | Unimpaired Not Entitled to Vote (Deemed to Accept) | Est. Claim Pool Amount: $779,118,594[7]<br>Est. Recovery: N/A |
| 10<br><br>Member Other General Unsecured Claims | Except to the extent that a Holder of an Allowed Member Other General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Other General Unsecured Claim, each such Holder shall receive treatment pursuant to the Member Settlement as set forth in Article IV.F of the Plan. | Impaired Entitled to Vote | Est. Claim Pool Amount: N/A<br>Est. Recovery: N/A |

## F.    Releases, Exculpations, and Injunctions

**THE PLAN INCLUDES AS AN ATTACHMENT THE ELIGIBLE MARKET PARTICIPANT ELECTION NOTICE THAT ERCOT WILL SEND TO ELIGIBLE MARKET PARTICIPANTS.  THE ELIGIBLE MARKET PARTICIPANT ELECTION NOTICE CONTAINS CERTAIN RELEASES BY AND BETWEEN THE ERCOT SETTLEMENT RELEASE PARTIES.  THOSE RELEASES ARE SEPARATE AND APART FROM THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WHICH ARE DESCRIBED BELOW AND WHICH ARE BETWEEN THE RELEASING PARTIES, ON THE ONE HAND, AND CERTAIN RELEASED PARTIES, ON THE OTHER HAND.**

**WITH RESPECT TO THE THIRD PARTY RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN, THE RELEASING PARTIES UNDER THE PLAN INCLUDE THE FOLLOWING: (I) THE HOLDERS OF ALL CLAIMS WHO VOTE TO ACCEPT THIS PLAN (OTHER THAN ERCOT); (II) THE HOLDERS OF CLAIMS WHOSE VOTE IS SOLICITED, OR THAT OTHERWISE RECEIVE NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN THIS PLAN, THAT VOTE TO REJECT OR ABSTAIN FROM VOTING (OTHER THAN ERCOT); (III) THE HOLDERS OF CLAIMS THAT ARE CONCLUSIVELY PRESUMED TO ACCEPT THIS PLAN (OTHER THAN THE RUS SECURED PARTIES); (IV) THE**

---

[7] Estimated Claim Pool Amount is the total Member Patronage Capital as of December 31, 2021.  Member Patronage Capital Claims do not reflect and are subject to substantial reduction from losses described in the Financial Projections attached hereto as **Exhibit B**.

131999954

**HOLDERS OF CLAIMS THAT ARE DEEMED TO REJECT THIS PLAN; (V) THE CONSENTING MEMBERS; (VI) THE DIP AGENT; (VII) THE DIP LENDERS; (VIII) SOLELY IN RESPECT OF CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, OR THE ESTATE, THE RUS SECURED PARTIES; (IX) THE COMMITTEE AND EACH OF ITS MEMBERS; (X) THE BANKRUPTCY ADVISORY COMMITTEE AND EACH OF ITS MEMBERS; (XI) ANY RELEASED PARTY; (XII) WITH RESPECT TO EACH OF THE FOREGOING PERSONS, IN CLAUSES (I) THROUGH (XI), EACH OF THEIR CURRENT AND FORMER AFFILIATES, AND (XVI) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (I) THROUGH (XII), SUCH PERSON'S PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, CURRENT AND FORMER AFFILIATES, CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS (INCLUDING BOTH LIMITED AND GENERAL PARTNERS), MANAGERS, EMPLOYEES, AGENTS, MANAGED ACCOUNTS OR FUNDS, MANAGEMENT COMPANIES, FUND ADVISORS, FINANCIAL ADVISORS, ADVISORY BOARD MEMBERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, AND SUCH PERSON'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES, AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING IN EACH CASE IN THEIR CAPACITY AS SUCH; _PROVIDED_ THAT, EXCEPT AS OTHERWISE SET FORTH HEREIN, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (A) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN, EXCEPT THAT HOLDERS OF CLASS 5 OR CLASS 7 CLAIMS THAT ELECT CONVENIENCE-CLAIM TREATMENT ON THEIR RESPECTIVE BALLOTS AND ARE ENTITLED TO RECEIVE SUCH TREATMENT UNDER THE PLAN SHALL BE DEEMED TO BE A RELEASING PARTY, OR (B) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN; _PROVIDED_, FURTHER, THAT A PARTY'S ELECTION TO OPT OUT OF THE RELEASES IN ARTICLE VIII OF THE PLAN SHALL NOT IN ANY WAY EXCEPT ANY CLAIM FROM OR OTHERWISE COMPROMISE OR ABROGATE THE DEBTOR'S DISCHARGE UNDER SECTION 1141 OF THE BANKRUPTCY CODE. THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN ARTICLE VIII OF THE PLAN ARE INTEGRAL TO THE PLAN AND REORGANIZATION OF THE ESTATE.**

## II.  OVERVIEW OF THE DEBTOR'S BUSINESS AND OPERATIONS

### A.  Business Overview

#### 1.  General Overview

Headquartered in Waco, Texas and founded in 1941, Brazos Electric is Texas's largest and oldest generation and transmission electric cooperative ("G&T Co-Op"). Brazos Electric is a 4,000 megawatt G&T Co-Op and, as of the Petition Date, had over 352 employees in Waco, at Brazos Electric's power plants, and at transmission field offices. Brazos Electric owns more than

2,682 miles of transmission line and 385 substations/delivery points and is Texas's sixth largest transmission provider.  Brazos Electric constructs, owns, and operates many of the transmission lines and substation facilities that move electric power to its sixteen (16) distribution cooperative members' (each a "Member", and collectively, the "Members") distribution systems.

Brazos Electric's mission is to consistently provide reliable and affordable power to its Members who then supply such power to their respective customers.  Affordability is especially important in rural communities, as such communities have a disproportionate number of customers below the poverty level.  As a G&T Co-Op, Brazos Electric's mission also includes being responsive to the needs of its Members.  Brazos Electric operates as a wholesale provider of power to its Members, who then supply that power to their Texas residential and business member-consumers.

Brazos Electric serves its Members through substantially identical and inter-dependent "all-requirements" wholesale power contracts (the "All Requirements Contracts"), pursuant to which Brazos Electric is obligated to supply each of its Members with 100% of their requirements for electricity, transmission, and substation services needed for the Members to supply their respective member retail consumers (approximately 700,000 retail meters, and each meter may serve multiple consumers.  The All Requirements Contracts expire in December 2045.[8]  Brazos Electric's revenues are derived primarily from the sale, transportation, and substation distribution of electric energy to its Members through the All Requirements Contracts.  The end retail member-consumers of power provided by Brazos Electric through its Members are predominately residential (accounting for approximately 58% of all revenues), which, historically, has contributed to the stability of Brazos Electric's overall revenue base.  Brazos Electric's wholesale power and transmission and distribution substation revenues were $1.042 billion, $1.038 billion, and $1.041 billion in 2018, 2019, and 2020, respectively.

Brazos Electric's Board of Directors establishes the rates charged for power and distribution services provided by Brazos Electric to its Members, and the transmission rates charged by Brazos Electric are established and regulated by the Public Utility Commission of Texas ("PUCT").

## 2. Generation and Transmission[9]

All of Brazos Electric's owned generation facilities are natural gas-fired, and Brazos Electric previously had long-term power purchase agreements ("PPAs") for coal-fired generation from the Sandy Creek Generating Station, renewable energy from a solar-generation facility, and a short-term PPA for renewable energy from a hydroelectric facility, as well as other bilateral purchases of various terms from other wholesale market energy suppliers.  Brazos Electric is heavily dependent on natural gas for generating power and power prices in ERCOT are highly

---

[8] As part of Brazos Electric's settlement with its Consenting Members, the All Requirements Contracts will be amended (as amended, the "Amended ARCs").  The Amended ARCs will, among other things, extend the termination date from 2045 to 2060, with such Amended ARCs anticipated to become effective as of March 1, 2023.

[9] The Plan sets forth provisions related to the post-Effective Date sale of the Reorganized Debtor's generation assets and application of the Generation Sale Proceeds.

131999954

dependent on the price and availability of natural gas (only approximately 41% of Brazos Electric's natural gas-fired plants have the ability to burn oil as a backup fuel source). Brazos Electric has gas transportation agreements with major Texas intrastate pipelines and purchases its natural gas through industry standardized National American Energy Standard Board ("NAESB") master contracts. Brazos Electric also owns natural gas pipelines between its generation plants and these major Texas intrastate pipelines.

Brazos Electric sources electricity through a combination of purchased power, owned generation, and forward-energy purchases from a number of different counterparties. Brazos Electric's energy mix in recent years has predominantly been purchased power, followed by Brazos Electric's owned natural-gas-fired generation, coal-fired generation, dual fuel, and renewables. Currently, Brazos Electric's three gas-fired plants provide approximately 2,075 megawatts of power.

The Jack County Plant is a 1,210-megawatt, natural gas-fired, combined-cycle power plant located near Jacksboro, Texas. The Jack County Plant consists of four natural gas-fired combustion turbine generators, four heat recovery steam generators, two steam turbine generators, and other assorted equipment. Brazos Electric began providing power from the first phase of the Jack County Plant to cooperative members in 2005. The plant was expanded with a second phase that was completed in 2011. The Jack County Plant is Brazos Electric's newest gas-fired plant.

The Randle W. Miller County Plant is a 596-megawatt, gas-fired, dual-fueled facility consisting of three steam generators and two gas turbines, located in Palo Pinto County, Texas. Four of the units at this plant have backup fuel oil supply that can fuel generation.

The Johnson County Plant is a 269-megawatt, gas-fired, combined-cycle plant located in Cleburne, Texas. The plant entered commercial operation in 1997, and Brazos Electric purchased the power through a long-term PPA. However, the plant was severely damaged in 2005, and was later acquired by Brazos Electric. In 2006, the plant was repaired and restarted. This plant has backup fuel oil supply that can fuel generation.

Brazos Electric is also party to a number of PPAs as well as forward-energy contracts and heat-rate call options (which give Brazos Electric the right to call electricity above a specified market heat rate) for physical settlement. Brazos Electric's contracted power purchases account for more than 1900 megawatts of its total electric capacity. Brazos Electric's mix of owned generation and contracted resources has helped it lower electric rates to members, limit operational risks through diversification of supply, and provide a hedge against potentially higher prices in the ERCOT market under normal circumstances.

As of the Petition Date, Brazos Electric owned and operated 2,682 miles of transmission lines and over 490 transformation substations. Transmission service is provided under rates regulated by the PUCT. Brazos Electric's approved Transmission Cost of Service is recovered from approximately 26 million Texas end-use consumers. Brazos Electric's PUCT-approved Transmission Cost of Service (or TCOS) provided revenues totaling more than $134 million in 2020.

### B.       Corporate Structure

Brazos Electric is a Texas non-profit electric cooperative corporation.

Brazos Sandy Creek Electric Cooperative, Inc. ("BSCEC"), a Texas non-profit electric cooperative corporation, is a wholly owned subsidiary of Brazos Electric, and was formed to acquire an undivided 25% tenant-in-common ownership interest in the Sandy Creek Generating Station, an approximate 940-megawatt, coal-fired generation facility located near Riesel, Texas. BSCEC is not a debtor in this Chapter 11 Case.[10]

Brazos Fuel Company, Inc., a Texas consuming assets corporation, is a wholly owned subsidiary of Brazos Electric, and was formed for the purpose of the procurement of natural gas for the benefit of Brazos Electric.  As of the commencement of this Chapter 11 Case, Brazos Fuel was no longer an operating entity, and Brazos Fuel is not a debtor in this Chapter 11 Case.

As referenced above, Brazos Electric generates and procures, through short-term and long-term PPAs, power and energy to sell at wholesale to its Members.  Brazos's sixteen Members are (a) Bartlett Electric Cooperative, (b) Comanche Electric Cooperative, (c) Denton County Electric Cooperative, Inc. d/b/a CoServ Electric, (d) Fort Belknap Electric Cooperative, (e) Hamilton County Electric Cooperative, (f) Heart of Texas Electric Cooperative, (g) HILCO Electric Cooperative, (h) J-A-C Electric Cooperative, (i) Mid-South Electric Cooperative Association, (j) Navarro County Electric Cooperative, (k) Navasota Valley Electric Cooperative, (l) PenTex Energy, (m) South Plains Electric Cooperative, (n) Tri-County Electric Cooperative, (o) United Cooperative Services, and (p) Wise Electric Cooperative.

The economic and practical realities of member-ownership in a non-profit Texas electric cooperative are unique and different than holding an equity interest in a for-profit company, in part, because an electric cooperative is owned by the members it serves.  Brazos Electric does not earn "profits," rather, any revenue received over and above its operating expenses is called "margin," a portion of which is allocated to the members as "Patronage Capital."  Patronage Capital is allocated to the Members annually based upon their individual power purchases during that year.  Each Member has a patronage capital account.  While the Members' patronage accounts are retired over time and benefit from a liquidation preference, the majority of Brazos Electric patronage is re-invested in Brazos Electric to maintain financial stability and fund capital projects. Although the size of the Members' respective ownership interests varies, each Member has the same voting power (each Member has only one vote, and each of the 16 directors on the Brazos Electric board of directors has but one vote).

As of December 31, 2021, the estimated patronage capital allocations per Member were as follows:

---

[10] BSCEC filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on March 18, 2022.  BSCEC's chapter 7 case is being administered under Case No. 22-30682 in the Bankruptcy Court for the Southern District of Texas, Houston Division.

| Co-Op Member | Patronage Allocation | Patronage Amount |
|---|---|---|
| Bartlett Electric Cooperative | 1.5% | $11,444,149 |
| Comanche Electric Cooperative | 2.0% | $15,355,210 |
| Denton County Electric Cooperative, Inc. d/b/a CoServ Electric | 30.8% | $245,650,376 |
| Fort Belknap Electric Cooperative | 1.1% | $7,976,896 |
| Hamilton County Electric Cooperative | 1.8% | $13,750,667 |
| Heart of Texas Electric Cooperative | 3.2% | $24,710,532 |
| HILCO Electric Cooperative | 4.0% | $31,035,778 |
| J-A-C Electric Cooperative | 0.9% | $6,725,758 |
| Mid-South Electric Cooperative Association | 4.5% | $35,919,205 |
| Navarro County Electric Cooperative | 3.5% | $26,874,444 |
| Navasota Valley Electric Cooperative | 3.2% | $24,232,279 |
| PenTex Energy | 3.6% | $26,960,734 |
| South Plains Electric Cooperative | 3.4% | $25,123,997 |
| Tri-County Electric Cooperative | 17.6% | $137,987,728 |
| United Cooperative Services | 14.6% | $112,322,379 |
| Wise Electric Cooperative | 4.3% | $33,048,463 |

As set forth in Article III.B.9 of the Plan, and as part of the consideration under the Consenting Member Settlement as set forth in Article IV.F. of the Plan, all Class 9 Member Patronage Capital Claims against the Debtor shall be Reinstated, allowing Members to retain material value, potentially subject to certain offsets. Member Patronage Capital Claims do not reflect and are subject to substantial reduction from losses described in the Financial Projections attached hereto as **Exhibit C**.

## C.    Management

The Debtor's management team has been composed of highly capable and experienced professionals. The Debtor's core management team currently consists of the following individuals:

| Name | Position |
|---|---|
| Clifton Karnei | Executive Vice President and General Manager |
| Khaki Bordovsky | Vice President of Services |
| Johnny York | Vice President of Transmission |
| Joshua Clevenger | Vice President of Power Supply |
| Travis Thrall | Vice President of Generation |
| Shari Heino | Chief Risk and Compliance Officer |

On the Effective Date, the Debtor's management team shall remain in their respective roles and capacities as officers and senior management of the Reorganized Debtor, however, as set forth in Article IV.M of the Plan and Section IV.L.1 herein, certain members of the Reorganized Debtor's senior management team shall cease to be employees of the Debtor.

D.    **Board of Directors**

The Debtor's Board of Directors consists of the following directors:

| Name | Position | Co-Op Member |
|---|---|---|
| Audie Morris | Secretary – Treasurer | Wise Electric Cooperative, Inc. |
| Bill Allen | | HILCO Electric Cooperative, Inc. |
| Bill Ragsdale | Chairman – Power Supply Committee | Denton County Electric Cooperative, Inc. d/b/a CoServ Electric |
| Billy Jones | Chairman – Operating, Budget, Rates and Tariff Committee | Navarro County Electric Cooperative, Inc. |
| Brandon Young | | Heart of Texas Electric Cooperative, Inc. |
| Cody Lasater | | Hamilton County Electric Cooperative Assn. |
| Darryl Schriver | | Tri-County Electric Cooperative, Inc. |
| Dennis McWhorter | President Chairman – Executive Committee | Mid-South Electric Cooperative Association |
| Elaine Martin | | J-A-C Electric Cooperative, Inc. |
| Glenn Jones | | South Plains Electric Cooperative, Inc. |
| Henry Bradford | | Bartlett Electric Cooperative, Inc. |
| Kenneth Alexander | | PenTex Energy |
| Larry Bays | Vice President | United Cooperative Services, Inc. |
| Monty Carlisle | Chairman – Finance and Audit Committee | Comanche Electric Cooperative Assn. |
| Rick Ickert | Chairman – Transmission and Distribution Planning – Operations Committee | Fort Belknap Electric Cooperative, Inc. |
| Steve Jones | | Navasota Valley Electric Cooperative, Inc. |

E.    **Pre-Petition Capital Structure**

As of the Petition Date, the principal amount of the Debtor's funded debt obligations totaled approximately $2.04 billion (excluding interest, obligations under various hedging arrangements, letters of credit, and other charges), as summarized on a consolidated basis below:

| Debt Obligations | Maturity | Principal Amount (000) |
|---|---|---|
| Federal Financing Bank (FFB) Secured Notes | | |
| *Various rates from 0.912% to 5.291%* | Various dates through December 2045 | $1,809,613 |
| *Less Current Cash Cushion and RUS Cushion of Credit* | | ($245,004) |
| **Total Secured Debt** | | **$1,564,609** |
| Unsecured Revolving Credit Agreement | | |

26

| | | |
|---|---|---|
| *Revolving Facility* | September 2023 | $479,975[11] |
| **Total Unsecured Financed Debt** | | **$479,975** |
| ***Total Debt Obligations (in thousands)*** | | **$2,044,584** |

### 1.    *Rural Utilities Service Obligations and Federal Financing Bank Secured Notes*

The Debtor's long-term secured indebtedness (approximately $1.81 billion) is financed through the Federal Financing Bank ("FFB"), a government corporation that provides financings at favorable, below-market rates, which indebtedness is guaranteed by the Rural Utilities Service ("RUS"), a Rural Development agency of the United States Department of Agriculture ("USDA"). The notes issued to the Debtor by the FFB (the "FFB Secured Notes"), as well as related reimbursement notes to RUS (should RUS pay FFB under its guarantee of the FFB Secured Notes), are secured by that certain Indenture of Deed of Trust, Security Agreement, and Financing Statement dated as of June 1, 2010 (as amended, restated, modified, and supplemented from time to time, the "Trust Indenture") by and between the Debtor, as grantor, and Regions Bank, as Trustee (the "Indenture Trustee"). FFB has, from time to time, made various loans to the Debtor to fund capital projects. The terms and conditions governing the FFB loans are set forth in the FFB Secured Notes and in a loan contract with RUS. Most recently, in November 2020, the Debtor entered into that certain Sixth Supplemental Indenture with the Indenture Trustee for the purpose of securing an additional loan from FFB in a principal amount of up to $128,990,000 (the "AU8 FFB Note"), and terms and conditions governing the AU8 FFB Note are set forth in that certain Fifth Amended and Restated Loan Contract, dated as of December 15, 2020 (as amended, restated, modified, and supplemented from time to time, the "RUS Loan Contract") between the Debtor and the United States of America, acting through the Administrator of RUS. The AU8 FBB Note will be used to reimburse the Debtor for certain already expended capital expenditures, primarily for upgrades to transmission systems, but, as of the Petition Date, there were no borrowings under the AU8 FFB Note. The AU8 FFB Note and the rest of the FFB Secured Notes (and related RUS reimbursement Notes) are secured under the Trust Indenture by liens on substantially all of the Debtor's assets, including the All Requirements Contracts.

As of the Petition Date, there was approximately $1.81 billion in principal amount outstanding under the FFB Secured Notes.

The Debtor participates in the "Cushion of Credit" program offered by RUS pursuant to 7 C.F.R. § 1785.68 for direct and guaranteed RUS or FFB loans and obligations. Under the Cushion of Credit program, RUS established and maintains an interest-bearing account (the "CoC Account")[12] with the United States Treasury for the Debtor. The CoC Account is administered by RUS and funded on a voluntary basis by the Debtor, with amounts RUS receives from the Debtor that *exceed* the required payments under the applicable financing documents. The CoC Account,

---

[11] Pursuant to the Final DIP Order, approximately $123,892,136.96 (the "Setoff Amount") held in the accounts of various Holding Lenders (as defined in the Final DIP Order) are subject to such Holding Lender's setoff rights. Thus, the Setoff Amount is a secured claim pursuant to section 506(a)(1) of the Bankruptcy Code and the Final DIP Order, and that secured claim inures to the benefit of the Revolving Lenders pro rata.

[12] The CoC Account currently bears interest at a rate of 4 percent per annum.

once funded, is fully restricted for application to debt service for the FFB Secured Notes.  Although the Debtor has some ability to direct which FFB/RUS obligations the funds are applied to, the deposited funds cannot be applied for any other purpose.

As of the Petition Date, the Debtor's CoC Account contained approximately $245.04 million, which amount was sufficient to pay the Debtor's debt service on its current FFB/RUS secured debt for the next 18 months.[13]  Through this Chapter 11 Case, the Debtor has made amortization payments to the RUS from the CoC account.  As of the filing of the Disclosure Statement, the CoC Account contains approximately $99.451 million.

## 2.    *The Unsecured Revolving Credit Agreement*

The Debtor maintains a long-term (maturing in 2023) unsecured line of credit under that certain Second Amended and Restated Credit Agreement, dated as of September 28, 2018 (as amended, restated, modified, and supplemented from time to time, the "Revolving Credit Agreement," and together with all other documentation executed in connection with any of the foregoing, the "Prepetition Revolving Credit Documents"), by and among Wilmington Trust, National Association, as successor to Bank of America N.A., as Administrative Agent (including its permitted successors and assigns, "Agent"), and certain lenders party thereto (collectively, the "Revolving Lenders").[14]  The Revolving Credit Agreement provides the Debtor with a $500 million revolving line of credit (the "Revolving Facility"), which bears an interest rate of 1.11% (as of February 26, 2021).  As part of the Revolving Facility, the Revolving Credit Agreement provides the Debtor's letter of credit and swing-line-loan facilities.  Historically, the Debtor has used the liquidity available under the Revolving Credit Agreement to fund the Debtor's working capital needs, contribute to the financing of various other capital projects pending long-term financings, and for various collateral postings required in the ERCOT wholesale market, including various bilateral counterparties.

As of the Petition Date, the Debtor had fully drawn the Revolving Facility in order to access additional liquidity in the wake of Winter Storm Uri.  As of the Petition Date, there was approximately $479.98 million in principal amount outstanding under the Revolving Facility (excluding issued but undrawn letters of credit, which use the remaining approximately $20 million in commitments under the Revolving Facility; the Debtor is required to reimburse amounts drawn on such letters of credit, which become obligations under the Revolving Facility).

Also as of the Petition Date, the Debtor maintained a balance of approximately $123,892,136 in its deposit accounts, investment accounts, or other investments with certain Prepetition Revolving Lenders (as defined in the Final DIP Order, the "Holding Lenders").  As a result, the Holding Lenders asserted certain alleged setoff rights in respect of those funds under

---

[13] Due to rule changes implemented during the Trump administration, effective December 20, 2018, future deposits into the CoC Account have been prohibited.

[14] As of the Petition Date, the Debtor believes that the Lenders included Bank of America, N.A.; CoBank; ACB; National Rural Utilities Cooperative Finance Corporation; Wells Fargo Bank, National Association; Comerica Bank; MUFG Bank, Ltd.; Regions Bank; and Truist Bank f/k/a Branch Banking and Trust Company.  The Debtor understands that certain of these claims have since been transferred to other third parties during the course of this Chapter 11 Case.

the Prepetition Revolving Credit Documents.  After further negotiation with the Debtor, the Holding Lenders agreed to allow the Debtor to use the applicable funds in exchange for, among other things, a secured claim in the amount of $123,892,136 (the "Setoff Amount") pursuant to, and as set forth in, the Final DIP Order.  The Setoff Amount attributable to amounts held by each Holding Lender is set forth in the table below:

| Prepetition Revolving Lender as of the Petition Date | Principal Amount of Prepetition Revolving Credit Agreement Obligations as of the Petition Date | Amount on Deposit and/or Invested With as of the Petition Date, if applicable | Setoff Amount and Section 506(a) Secured Claim as of the Petition Date |
|---|---|---|---|
| Bank of America, N.A. | $130,000,000 | $23,117,978.93 | $23,117,978.93 |
| CoBank, ACB | $55,000,000 | -0- | -0- |
| Wells Fargo Bank, National Association | $65,000,000 | $134,557.27 | $134,557.27 |
| MUFG, Ltd.[15] | $65,000,000 | -0- | -0- |
| National Rural Utilities Cooperative Finance Corporation | $85,000,000 | $192,556,112.39 | $85,000,000 |
| Comerica Bank | $30,000,000 | -0- | -0- |
| Regions Bank | $40,000,000 | $5,140,332.80 | $5,140,332.80 |
| Truist (f/k/a Branch Banking & Trust Company) | $30,000,000 | $10,499,267.96 | $10,499,267.96 |
| Total: | $500,000,000.00 | $231,448,249.35 | $123,892,136.96 |

Each of the Revolving Lenders, whether or not it is a Holding Lender, benefits from the secured claim of each Holding Lender in the Setoff Amount by virtue of Section 2.13 of the Revolving Credit Agreement, which generally requires that each Revolving Lender (including the Holding Lenders) share any payment received by it on account of the obligations under the Revolving Facility in excess of its ratable share pursuant to the mechanics provided for therein.

### 3.    The MUFG Letter of Credit Agreement

The Debtor is party to that certain Continuing Letter of Credit Agreement (For Standby Letters of Credit) dated as of June 18, 2019 (as amended, restated, modified, and supplemented from time to time, the "MUFG L/C Agreement") with MUFG Bank, Ltd. ("MUFG").  The MUFG L/C Agreement provides for MUFG to issue, in its sole discretion from time to time, irrevocable letters of credit in favor of counter-parties or obligees of the Debtor in connection with its business.  As of the Petition Date, there was $99.2 million in letters of credit issued under the MUFG L/C

---

[15] Pursuant to the Final DIP Order, the Debtor did not seek authority to utilize, pledge, or otherwise transfer the approximate $6.5 million held by MUFG Bank relating to certain letters of credit issued by MUFG Bank (the "MUFG Account"), and the MUFG Account is excluded from the DIP Collateral; *provided, however*, that any proceeds of the MUFG Account that revert to the Debtor would constitute DIP Collateral with the DIP Liens on such DIP Collateral, for the avoidance of doubt, junior and subject to Permitted Prior Liens.

131999954

Agreement.  The Debtor is required to reimburse MUFG for amounts drawn on any letters of credit issued under the MUFG L/C Agreement, and approximately $6.5 million is held in the MUFG Account that secures the Debtor's letter of credit obligations to MUFG.

### III.     EVENTS LEADING TO THE CHAPTER 11 FILING

Prior to Winter Storm Uri, Brazos Electric was a model of financial stability for 80 years. By aggregating the distribution needs of its Members to obtain generation and transmission facilities through low-cost financing, Brazos Electric maintained an "A+" and "A" issuer credit ratings from Fitch and S&P, respectively.  A product of the Rural Electrification Act of 1936, which provided federal loans for the installation of electrical generation, transmission, and distribution systems to serve isolated rural areas of the United States, the funding was channeled through electric cooperatives such as Brazos Electric and its Members.  For eight decades, Brazos Electric consistently met the power supply, transmission, and distribution substation needs of its Members and maintained an impeccable financial record as Texas has seen its population explode during this period.

As the month of February 2021 began, the notion that a financially stable cooperative such as Brazos Electric would end the month preparing for bankruptcy was unfathomable.  Yet that changed as a direct result of the catastrophic failures and regulatory market intervention that accompanied the winter storm that blanketed the state of Texas on or about February 13, 2021 and maintained its grip of historically sub-freezing temperatures for days.  Electric generation equipment and natural gas pipeline equipment froze, causing the available generation of power within ERCOT to dramatically decline.

ERCOT's CEO Bill Magness stated that the ERCOT electric grid "was seconds and minutes (away from a total system failure)."  After almost losing power across the entire grid early the morning of February 15, 2021, ERCOT ordered rotating outages across Texas to reduce demand to match available generation.  In the wake of this crisis, ERCOT set the price for wholesale electricity at the maximum price of $9,000 per megawatt hour (or MWh) (which, days before Winter Storm Uri, was priced at approximately $20 per MWh) for more than four straight days.  In addition, ERCOT also imposed increases in ancillary fees to more than $25,000 per MWh. The consequences of these prices were devastating to Brazos Electric and its Members.

Brazos Electric was presented with invoices by ERCOT for the Winter Storm Uri event, which, when combined, amounted to over $2.1 billion, payment of which ERCOT required within a few days.  Brazos Electric responded to this demand for payment with a force majeure event letter, and informed ERCOT that it was abating payment pending resolution of the force majeure event.  Additionally, Brazos Electric disputed the invoices charged by ERCOT.

Within days following Winter Storm Uri, the Debtor retained Berkley Research Group ("BRG") to assist in the analysis of its general liquidity needs and Norton Rose Fulbright US LLP ("NRF") to explore potential options to restructure its existing debt in or outside of chapter 11. The results of the Debtor's advisors' analysis led the Debtor to determine that it would be necessary to seek chapter 11 relief in order to preserve its status as a market participant in the ERCOT market, manage liquidity, and prevent potentially devastating effects on Brazos Electric, its Members, and the Members' retail customers.

131999954

## IV.   THE CHAPTER 11 CASE[16]

### A.   Commencement of the Chapter 11 Case

On the Petition Date, the Debtor filed a voluntary petition for relief under the Bankruptcy Code.  The Debtor has continued in its possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On March 15, 2021, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee. [Dkt. No. 216].  The Committee was reconstituted by the U.S. Trustee on March 24, 2021. [Dkt. No. 285].  The members of the Committee include: (1) MUFG Bank, Ltd.; (2) Pension Benefit Guaranty Corporation; (3) Stefano Russolillo; and (4) Leslie Hixson.

No request has been made for the appointment of a trustee or examiner in the Chapter 11 Case.

### B.   First and Second Day Relief

On the Petition Date, the Debtor filed a number of "first day" motions designed to ease the Debtor's transition into chapter 11, maximize the value of the Debtor's assets, and minimize the effects of the commencement of the Chapter 11 Case.  Some of these motions were granted on a final basis following the first day hearing on March 3, 2021.  Others were granted first on an interim basis on March 3, 2021, and then on a final basis following the second day hearing held March 17, 2021.  The Bankruptcy Court entered various orders authorizing the Debtor to, among other things:

- Maintain its corporate credit card program and authorize its banks to release funds to allow the Debtor to make ordinary course day ahead market and spot market gas purchases [Dkt. No. 27];

- Obtain use of cash collateral [Dkt. No. 109];

- Continue the use of the Debtor's cash management system, bank accounts, and business forms [Dkt. No. 108];

- Pay certain prepetition claims of vendors and other trade claimants [Dkt. No. 104];

- Continue paying employee wages and benefits and maintaining programs and policies related to employee benefits [Dkt. No. 102]; and

---

[16] Capitalized terms that are used in this Section but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the relevant motions or orders, as applicable.

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing services [Dkt. No. 103].

## C.      Procedural Motions

The Debtor has filed various motions regarding procedural issues that are common to Chapter 11 cases of similar size and complexity as this Chapter 11 Case.  The Bankruptcy Court granted substantially all of the relief request in such motions and entered various orders authorizing the Debtor to, among other things:

- Continue performing under and enter into new hedging and trading arrangements [Dkt. No. 400];

- Pay certain prepetition taxes and assessments [Dkt. No. 469];

- Continue insurance and surety bond programs [Dkt. No. 740];

- Establish procedures for interim compensation and reimbursement of expenses for professionals [Dkt. No. 658];

- Employ professionals utilized by the Debtor in the ordinary course of business [Dkt. No. 508];

- Pursue condemnation proceeds or settlements and establish procedures related thereto [Dkt. No. 741]; and

- Sell or transfer de minimis assets and establish procedures related thereto [Dkt. No. Dkt. No. 875].

## D.      Other Substantive Motions

The Debtor has also filed motions regarding substantive issues unique to this Chapter 11 Case at various times throughout the case.  The Bankruptcy Court has entered various orders authorizing the Debtor to, among other things:

- Allow Members to use prepetition credits for Postpetition invoices [Dkt. No. 324];

- Pay prepetition claims under Power Purchase Agreement with BSCEC [Dkt. No. 235];

- Pay prepetition transmission claims [ Dkt. No. 335];

- Enter into various agreements to settle issues with the Debtor, BSCEC, and the BSCEC Noteholders [Dkt. No. 634];

- Enter into a contract extension amendment relating to a certain Power Purchase Agreement with the United States of America [Dkt. No. 946];

131999954

- Enter into agreement to mutually terminate the System Water Availability Agreement with Brazos River Authority [Dkt. No. 1325]; and

- Mutually terminate the Comerica Card Agreement and enter into the JPMC Commercial Card Agreement [Dkt. No. 1630].

## E.    Retention of Chapter 11 Professionals

The Debtor has filed several applications and obtained authority to retain various professionals to assist the Debtor in carrying out its duties under the Bankruptcy Code during the Chapter 11 Case.  The Bankruptcy Court has entered orders authorizing the retention of the following professionals: (a) Norton Rose Fulbright US LLP, as bankruptcy counsel; (b) O'Melveny & Myers LLP, as bankruptcy co-counsel; (c) Berkley Research Group LLC, as financial advisor; (d) Stretto, as claims and noticing agent; (e) Collet & Associates LLC, as investment banker; (f) Eversheds Sutherland (US) LLP, as special conflicts and regulatory counsel; (g) Foley & Lardner LLP, as special conflicts counsel; (h) McKool Smith P.C. as special conflicts counsel; (i) J.P. Morgan Securities LLC, as investment banker and "phase 1" structuring advisor; and (j) Ted B. Lyon & Associates, the Gallagher Law Firm, West & Associations LLP, Butch Boyd Law Firm, and Boyd Smith Law Firm, as contingency counsel.

## F.    Appointment of the Advisory Committee

On March 15, 2021, the Debtor filed its *Application for Entry of an Order Authorizing the Debtor to Retain and Employ the Brazos Electric Power Cooperative, Inc. Bankruptcy Advisory Committee* [Dkt. No. 413] (the "Advisory Committee Motion").  The Court approved the formation of the Advisory Committee on May 13, 2021.  [Dkt. No. 569].  The Advisory Committee consists of three members:

- ***Hon. Russell Nelms.***  Judge Nelms received a B.A. with high honors from Texas Tech University in 1975, and a Juris Doctor with high honors from Texas Tech University School of Law in 1978. After serving in the United States Army Judge Advocate General's Corps from 1978 to 1984, Judge Nelms practiced bankruptcy law until he was appointed a bankruptcy judge for the Northern District of Texas, Fort Worth Division, where he served from 2004 to 2018.  He was also an adjunct professor of law from 2012 to 2014 at SMU's Dedman School of Law.  Since serving as a bankruptcy judge, Judge Nelms has served as an independent director and chapter 11 plan trustee, among other positions.

- ***Michael Greene***. Greene is a distinguished graduate of the University of Texas at Arlington with a BS degree in mechanical engineering and serves on the UTA President's Advisory Council and the UTA Engineering Advisory Council.  Mr. Greene has broad experience in regulated and competitive electric markets and natural gas pipeline operations having served as Vice President of TXU Marketing, Executive Vice President of TXU Fuel Company and TXU Mining Company, President of TXU Transmission, President of TXU Pipeline, President of Oncor Electric and Gas Delivery, Chairman and CEO of Luminant Generation and as Vice Chairman of Energy Future Holdings, formerly TXU.  He served as chairman of

33

the Electric Reliability Council of Texas Technical Advisory Committee (1988 and 1989) and was chairman of the ERCOT Board for six terms (1997, 1998, 2002, 2003, 2004, and 2005) during the start-up of ERCOT's competitive wholesale market and later its competitive retail market. Mr. Greene has served on the North American Electric Reliability Council Engineering Committee, the NERC Board, and was the initial chairman of the NERC Stakeholders Committee, now known as the Members Representatives Committee. Mr. Greene has also served as chairman of the Electric Power Research Institute Research Advisory Committee, chairman of the EPRI Power Delivery Reliability Initiative, and an executive committee member of the EPRI board.

- *Dary Stone.* Mr. Stone attended Tulane University and Baylor University for undergraduate studies. He has a Juris Doctorate (JD) from Baylor University. Mr. Stone is the Chief Executive Officer of Hicks Holdings, LLC (Dallas-based private equity firm of the Tom Hicks' family), and President and Chief Executive Officer of R.D. Stone Interests. He is active in the real estate and financial services industry, currently serving as Director of Cousins Properties, Inc. (NYSE: CUZ), Tolleson Wealth Management and Tolleson Private Bank, Perry Homes Advisory Board, and AIMCO (NYSE: AIV). Mr. Stone formerly served as a Director of Parkway Properties (NYSE: PKY), Hunt Companies, Inc., Drilling Tools International, Lone Star Bank, and as Chairman of the Banking Commission of Texas. Mr. Stone founded and built a commercial development company in Texas, Faison-Stone, Inc., which was acquired by Atlanta-based Cousins Properties. He formerly served as President of Cousins Properties in Atlanta, President of Cousins Stone, and Vice Chairman of the company upon his return to Texas. He has served as Counsel to former Texas Gov. Bill Clements; Director of the Texas Office of State-Federal Relations in Washington, D.C.; and as Campaign Manager for the re-election of Gov. Clements. He also served as a Presidential Appointee to the regional board of the Resolution Trust Corporation. Recently, he served as Special Advisor to Mayor Mike Rawlings of Dallas on the development of the Trinity Corridor and Harold Simmons Park surrounding Downtown Dallas. He is a past member and past Chairman of the Board of Regents of Baylor University, where he lead the Capital Campaign effort for the new McLane Stadium. Previously, he served as a Director of Baylor Medical Center Foundation, the Texas Economic Development Foundation, Cistercian Preparatory School, the Real Estate Roundtable (Washington, D.C.), and the Real Estate Council (of Dallas). He is a former member of the Governor's Strategic Planning Committee, the Texas Commission on Judicial Efficiency, the North Texas Regional Transportation Task Force, and the Urban Land Institute.

On December 13, 2021, certain Members requested a meeting with the Advisory Committee for the Advisory Committee to consider whether Brazos should engage an investment banker to explore the potential sale of Brazos's generation, transmission and/or distribution assets.

On December 23, 2021, in response to certain Members' request and out of concerns that such issue was overly broad and would result in a default under the Final DIP Order if Brazos were to take such action, pursuant to the Board's directive, Brazos designated the following issue for

consideration by the Advisory Committee: "Whether Brazos should issue a request for proposal with respect to the potential retention of an investment banker to conduct a market valuation testing of some or all of Brazos's assets, which market testing may include obtaining non-binding indications of interest or the like; provided, however, that any such market valuation testing shall not include or otherwise involve any commitment or substantive negotiation by Brazos."  The Advisory Committee ultimately considered the following designated issue (the "Designated Issue"):  "Should Brazos engage an investment banker to explore the potential sale of Brazos's generation, transmission, and/or distribution assets (the "Assets")?"

On January 21, 2022, Brazos, CoServ, Tri-County, United, the Committee, and the RUS provided position papers to the Advisory Committee in connection with the Designated Issue.  The Advisory Committee held an in-person meeting in Dallas on January 28, 2022, to consider the Designated Issue.  Following that in-person meeting, the Advisory Board presented its recommendation to the Brazos Board at the next regularly scheduled Board meeting held in February.  Ultimately, the Advisory Committee recommended to the Brazos Board that it would not be in Brazos's best interests to hire an investment banker and market the assets at that time.

Following the Advisory Committee's consideration of the Designated Issue and as part of the plan formulation process, the Debtor later formed the Generation Oversight Committee to consider the possible sale of all of the Debtor's generation assets following the Effective Date of the Debtor's Plan.  In this respect, in August 2022, the Debtor solicited proposals from five (5) investment bankers, and on September 9, 2022, the Generation Oversight Committee recommended—and the Brazos Board approved—the retention of Moelis & Company to serve as the Debtor's investment banker in connection with this generation sales process.  As part of the Consenting Member Settlement described herein and in the Plan, the Generation Assets will be sold pursuant to the terms of Article IV.L.3 of the Plan.

## G.    Approval of DIP Facility

On May 11, 2021, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Authorizing the Debtor to Use Cash Collateral, (C) Granting Liens and Providing Claims for Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Revolving Lenders and RUS Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Dkt. No. 553] (the "DIP Motion").  Pursuant to the DIP Motion, the Debtor sought entry of an order authorizing the Debtor to, among other things, obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority debtor-in-possession revolving credit facility, on the terms set forth in that certain Superpriority Secured Debtor-in-Possession Credit Agreement (as amended, restated, extended, supplemented, or otherwise modified in writing from time to time, the "DIP Credit Agreement") and use of cash collateral.

On May 19, 2021, the Court approved the DIP Motion on an interim basis [Dkt. No. 636] (the "Interim DIP Order").  On May 21, 2021, the DIP Credit Agreement was entered into by and among the Debtor, as borrower, the DIP Lenders (as defined in the DIP Credit Agreement), and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent.  The DIP Credit Agreement provided for a new money revolving credit facility in the aggregate principal amount of up to $350 million (the "DIP Facility"), with up to $200 million available through a sub-facility

131999954

in the form of standby letters of credit, and of which $150,000,000 was available immediately upon entry of the Interim DIP Order.  On June 11, 2021, the Bankruptcy Court entered an order approving the DIP Motion on a final basis [Dkt. No. 755] (the "Final DIP Order").  The DIP Obligations under the DIP Facility and as defined in the Final DIP Order constituted superiority administrative expenses and were secured by senior liens on unencumbered property, liens junior to certain other liens, and liens priming or *pari passu* or junior with certain prepetition collateral.

On May 12, 2022, the Debtor entered into the first amendment to the DIP Credit Agreement to exercise the Facility Extension Option in order to extend the Scheduled Maturity Date (each as defined in the DIP Credit Agreement), extending the initial Scheduled Maturity Date of May 21, 2022 by 180 days to November 17, 2022.

## H.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "Exclusive Plan Period").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Plan Period, the "Exclusive Periods").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Debtor's Exclusive Periods have been extended by the Court on multiple occasions, most recently on August 17, 2022, pursuant to which the Court extended the Exclusive Plan Period to September 1, 2022 and the Exclusive Solicitation Period to October 31, 2022.

## I.    Statements and Schedules, and Claims Bar Dates

On March 31, 2021, the Debtor filed its Schedules and Statements, detailing known claims against the Debtor.  To date, 745 proofs of Claim had been filed against the Debtor, asserting in the aggregate approximately $8,099,689,176.09 in liquidated claims.  The Debtor has begun to review and analyze the filed Claims, including filing numerous objections to Claims, and will reconcile objections to the filed Claims as appropriate.

On May 5, 2021, the Bankruptcy Court entered its *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Dkt. No. 515] (the "Bar Date Order"), approving (i) June 15, 2021 as the deadline for all creditors or other parties in interest to file proofs of Claim; (ii) August 5, 2021 as the deadline for all tort claimants that assert a Tort Claim that arose (or is deemed to have arisen) before the Petition Date to file proofs of Claim, and (iii) September 3, 2021 as the deadline for all governmental units to file proofs of Claim (each, a "Bar Date").

The Debtor provided notice of the Bar Dates and published notice of the Bar Dates in the following publications:

- Bartlett Tribune-Progress
- The Comanche Chief
- Denton Record-Chronicle
- Olney Enterprise
- Hamilton Herald-News
- The McGregor Mirror
- Hillsboro Reporter
- Clay County Leader
- Navasota Examiner

- Corsicana Daily Sun
- Franklin Advocate
- Robertson County News
- Gainesville Daily Register
- Lubbock Avalanche Journal
- Azle News
- Cleburne Times-Review
- Wise County Messenger

- Austin American-Statesman
- Dallas Morning News
- Waco Tribune-Herald
- Houston Chronicle
- Fort Worth Star Telegram
- New York Times
- Wall Street Journal – Texas Edition

Further, the Debtor may reject additional executory contracts or unexpired leases pursuant to the Plan. Any counterparty to an executory contract or unexpired lease that is rejected must file and serve a proof of Claim on the Debtor by no later than the applicable bar date governed by the Plan, the Bar Date Order, or the Court order governing such rejection.

**J.      Compensation Plans**

On May 13, 2021, the Debtor filed its *Motion for Entry of an Order (I) Authorizing and Approving the Debtor's (A) Key Employee Incentive Plan, and (B) Key Employee Retention Plan; (II) Authorizing Payments under Prepetition Long Term Incentive Plans; and (III) Granting Related Relief* [Dkt. No. 570] (the "Compensation Plans Motion"). Pursuant to the Compensation Plans Motion, the Debtor sought entry of an order authorizing and approving the Debtor's proposed key employee incentive plan ("KEIP") and key employee retention plan ("KERP") and authorizing payments under the Debtor's prepetition long term incentive plans ("LTIPs," and together with the KEIP and KERP, the "Compensation Plans"). On June 11, 2021, the Court entered an order approving the Compensation Plans Motion [Dkt. No. 756] (the "Compensation Plans Order"). Pursuant to the Compensation Plans Order, the Debtor was authorized to provide incentive and retention awards to certain key employees in order to retain and incentivize the employees necessary to maximize the value of the Debtor's business during its restructuring, and to provide payments under the Debtor's existing LTIPs.

The Plan contemplates a management severance plan (the "Management Severance Plan"), initially approved by the Debtor's Board, but to be implemented with respect to Reorganized Debtor on the Effective Date of the Plan, the terms of which are materially consistent with industry standards, and substantially in the form to be included in the Plan Supplement.

The Plan also contemplates an employee retention and severance program (the "Generation Employee Retention Plan") for employees involved in the management, maintenance, and operation of the Generation Assets and power-supply and related services, initially approved by the Debtor's Board, but to be implemented with respect to Reorganized Debtor on the Effective Date, the terms of which are materially consistent with industry standards, and substantially in the form to be included in the Plan Supplement.

**K.      Pension Benefit Guaranty Corporation**

The Debtor is the contributing sponsor of The Brazos Electric Power Cooperative Inc. Pension Plan (the "Pension Plan"), a single-employer defined benefit pension plan. The Pension

Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §§ 1301-1461 (2018) ("ERISA"). The Pension Plan covers an estimated 389 of the Debtor's current, former, and retired employees and is underfunded by an estimated $40.8 million.

The Pension Benefit Guaranty Corporation ("PBGC") is the federal government agency created under Title IV of ERISA to administer the federal pension insurance program and enforce compliance with the provisions of Title IV of ERISA. PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

On June 11, 2021, PBGC filed proofs of claims against the Debtor for the following statutory liabilities: (1) the unfunded benefit liabilities of the Pension Plan, 29 U.S.C. § 1362(a) (the "Unfunded Benefit Liabilities"); (2) due and unpaid minimum funding contributions owed to the Pension Plan, 26 U.S.C. §§ 412, 430 and 29 U.S.C. §§ 1082, 1083 (the "Minimum Funding Obligations"); and (3) the flat-rate, variable-rate, and termination premiums owed to PBGC, 29 U.S.C. §§ 1306(a)(7), 1307 (collectively, "Premiums" and together with Minimum Funding Obligations and Unfunded Benefit Liabilities, the "PBGC Claims"). PBGC asserts that the Debtor and all members of its controlled group (as defined in 29 U.S.C. § 1301(a)(14)) are jointly and severally liable with respect to the PBGC Claims. PBGC's claims for the Pension Plan's Unfunded Benefit Liabilities and termination premiums are contingent upon the termination of the Pension Plan.

On the Effective Date, the Reorganized Debtor will assume and sponsor the Pension Plan in accordance with and subject to the terms of the Pension Plan (as such terms may be amended from time to time) and applicable non-bankruptcy law. The Pension Plan is and shall remain subject to such applicable requirements under ERISA and the Internal Revenue Code of 1986, as amended. On the Effective Date, PBGC shall be deemed to have withdrawn the PBGC Claims if all Pension Plan obligations owed as of the Effective Date have been paid timely – *i.e.*, variable-rate and flat-rate premiums owed to PBGC and Minimum Funding Obligations owed to the Pension Plan.

Nothing in the Debtor's bankruptcy proceedings, the Plan, the Confirmation Order, the Bankruptcy Code (and § 1141 thereof), or any other document filed in the Debtor's bankruptcy case shall in any way be construed to discharge, release, limit, or relieve the Debtor or any other party, in any capacity, from any liability or responsibility with respect to the Pension Plan or any other defined benefit pension plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, the Confirmation Order, Bankruptcy Code, or any other document filed in the Debtor's bankruptcy case.

## L.   Litigation Matters

### 1.   *ERCOT Adversary Proceeding and Settlement*

The Proof of Claim filed by ERCOT in the net amount of approximately $1.9 billion (the "ERCOT Claim") is the largest unsecured priority claim asserted in this Chapter 11 Case. On August 18, 2021, the Debtor filed an objection to the ERCOT Claim under Bankruptcy Code sections 502, 503, 544, and 548 (the "ERCOT Claim Objection") by filing an adversary complaint,

arguing, among other things, that the ERCOT Claim must be (a) reduced to the extent that it was calculated using a rate that ERCOT fixed at $9,000/MWh and (b) reclassified, in its entirety, as a general unsecured, non-priority claim.  ERCOT has disputed these contentions.

The parties' respective positions as to the amount and classification of the ERCOT Claim, the impact of the PUCT Orders, and the propriety of ERCOT's actions that preceded the filing of the Debtor's Chapter 11 Case are heavily disputed by the parties, and all such issues were briefed extensively in the ERCOT Adversary Proceeding.  *See, e.g.*, Adv. Dkt. Nos. 1, 21, 24, 41, 42, 44, 45, 137, 173, 191, 192, 243, 279, 281, 285, 306, 308, 321, 324, 325, 327, 328, 339, 340, 349, and 377.  All such pleadings are available from the website of the Debtor's Voting Agent at https://cases.stretto.com/Brazos (free of charge) or the Court's website at https://ecf.txsb.uscourts.gov (for a fee).

The trial on the ERCOT Claim Objection began on February 22, 2022 and continued until March 3, 2022, during which time the Court heard testimony from several ERCOT and Brazos witnesses including: (a) William Magness, former CEO of ERCOT; (b) DeAnn Walker, former chairperson for the PUCT during Storm Uri; (c) Dwayne Rickerson, ERCOT's Vice President of Grid Planning and Operations during Storm Uri; (d) Arthur D'Andrea, former commissioner for the PUCT during Storm Uri; (e) Dave Maggio, ERCOT's Director of Market Design and Analytics; (f) Josh Clevenger, Vice President of Power Supply for Brazos Electric; (g) Clifton Karnei, Executive Vice President and General Manager for Brazos Electric; (h) Frank Graves, Calpine's expert on power market economics and economic design; and (i) Kenan Ogelman, ERCOT's Vice President of Commercial Operations.

On March 3, 2022, at the suggestion of the Court, the parties agreed to suspend and stay the trial of the ERCOT Claim Objection and mediate the ERCOT Claim Objection before United States Bankruptcy Judge Marvin Isgur.  After extensive negotiations spanning several months, the Debtor and ERCOT reached a settlement that is embodied in the Plan and consented to an indefinite stay of the ERCOT Claim litigation.  Under the settlement, the Debtor will make two Effective Date payments to ERCOT: first, a $599.7 million payment, which ERCOT will use to replenish its CRR Reserve Account and pay down Subchapter M securitization, and second, a $553.8 million payment to fund an initial distribution to Market Participants that elect to receive either the "convenience" or "accelerated" cash recovery.  The Debtor will also make certain installment payments (of up to $13.8 million per year over 12 years) and contribute a portion of the Generation Sale Proceeds (approximately $116.6 million) to fund payments—through ERCOT—to the applicable Market Participants.  ERCOT will pay the applicable Market Participants in accordance with the Market Participant Settlement Procedures and ERCOT Recovery Appendix, described in the Plan.  The ERCOT Settlement includes a mutual release and related Chapter 11 Plan injunctions, precluding ERCOT from collecting default uplift for prepetition amounts owed by the Debtor.

The ERCOT Settlement also includes material non-economic provisions requested by ERCOT including that the Reorganized Debtor no longer be a financial Counter-Party to ERCOT after certain milestone dates and that there be certain post-Effective Date changes in the Debtor's senior management team and its general counsel.  The changes to senior management include:

131999954

(a)     Clifton Karnei (the Debtor's Vice President & General Manager) shall exit his existing roles and cease his employment with, or otherwise retire from, the Reorganized Debtor on or before the earlier of (i) March 31, 2023 or (ii) the date that is 30 days after the Generation Sale Closing Date ("Karnei Resignation Date"). On the Karnei Resignation Date, Mr. Karnei's employment by the Reorganized Debtor and his position as an officer of the Reorganized Debtor shall cease and end for all purposes; provided, however, that, if the Generation Sale Closing Date has not occurred on or before March 31, 2023, the Reorganized Debtor may, in its sole discretion, retain Mr. Karnei as a consultant pursuant to a commercially reasonable consulting agreement through the date that is 30 days after the Generation Sale Closing Date.  Other than as expressly permitted above, from and after the Karnei Resignation Date: Mr. Karnei: (i) shall not be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor including while acting as a consultant to the Reorganized Debtor; and (ii) shall completely disassociate himself, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest, either now or hereafter. The foregoing prohibitions include, but are not limited to, Mr. Karnei being further retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

(b)     Josh Clevenger (the Debtor's Vice President of Power Supply) and Travis "Dean" Thrall (the Debtor's Vice President of Generation) shall exit their existing roles and cease their employment with, or otherwise retire from, the Reorganized Debtor on or before the date that is 30 days after the Generation Sale Closing Date ("Clevenger/Thrall Resignation Date"). On the Clevenger/Thrall Resignation Date, Mr. Clevenger's and Mr. Thrall's employment by the Reorganized Debtor and their positions as officers of the Reorganized Debtor shall cease and end for all purposes. From and after the Clevenger/Thrall Resignation Date: (i) neither Mr. Clevenger nor Mr. Thrall shall be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor; and (b) Mr. Clevenger and Mr. Thrall shall both completely disassociate themselves, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest, either now or hereafter.  The foregoing prohibitions include, but are not limited to, either Mr. Clevenger or Mr. Thrall being retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

(c)     Philip Segrest (the Debtor's General Counsel) shall exit his existing role as General Counsel of the Reorganized Debtor on the date that is 30 days after the Effective Date ("Segrest Resignation Date").  Effective as of the Segrest Resignation Date and thereafter, neither Mr. Segrest nor any other lawyer at Segrest & Segrest PC shall hold the title of "General Counsel" (or any equivalent title) or be employed by the Reorganized Debtor in any in-house legal capacity; provided, however, that the Reorganized Debtor may, in its sole discretion, obtain any legal services from Mr. Segrest and Segrest & Segrest PC at any time before, on, and after the Effective Date.

(d)     In addition to the above, no employee of the Debtor currently or formerly in its power supply or generation functions may become a Principal of the Debtor or the Reorganized Debtor.

To the extent that there are any other anticipated changes in the Reorganized Debtor's directors and officers, the Debtor shall, pursuant to section 1129(a)(5) of the Bankruptcy Code, identify such changes (including any new directors and officers) in the Plan Supplement.

For purposes of compromising the ERCOT Claim and the other disputes between the Debtor and ERCOT, the Debtor has accepted these and other non-economic terms requested by ERCOT.  However, the Debtor and ERCOT disagree as to whether Mr. Clevenger and Mr. Thrall are "Principals" of the Debtor pursuant to Protocol § 16.1.2 such that Protocol §§ 16.2.1(3) or 16.8.1(2) would apply if they are later employed as a Principal of a QSE or CRR Account Holder.

On September 12, 2022, South Texas Electric Cooperative ("STEC") filed an objection to the Debtor's motion to conditionally approve its Disclosure Statement, in part, because STEC has objections to the settlement that was reached between the Debtor and ERCOT, among others, after months of mediation.  STEC's objection is available from the website of the Debtor's Voting Agent at   https://cases.stretto.com/Brazos   (free   of   charge)   or   the   Court's   website   at https://ecf.txsb.uscourts.gov (for a fee), and is located at Dkt. No. 2245.

### 2.     *Tenaska Power Claim Settlement*

The Plan incorporates a settlement with Tenaska Power Services, Co. regarding the treatment of all Claims of Tenaska Power under the Plan.  The Tenaska Power Claim Settlement includes the following material terms and conditions:

As of the Effective Date, the Tenaska Power Claim shall be deemed an Allowed Administrative Claim in the aggregate amount of $84,090,140.38, and, notwithstanding anything to the contrary in Article II.A of the Plan, Tenaska Power shall be paid an amount in Cash equal to 93.6 Cents of such Allowed Claim (*i.e.*, $78,708,371.40) on the Effective Date in full and final satisfaction of such Allowed Claim.

On the Effective Date, each Proof of Claim Filed by or on behalf of any of Tenaska Power shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court.

### 3.     *Member Settlement*

The Plan incorporates a settlement with the Members regarding any Proofs of Claims filed by the Members as well as other rights against the Debtor, and outstanding amounts owed by the Members under the All Requirements Contracts, including the TAA Balance (the "Member Settlement").[17]  The Member Settlement includes the following material terms, conditions, and Restructuring Transactions:

---

[17] The Members have collectively Filed Proofs of Claim totaling $1,184,550,694.13 in liquidated claims, plus certain other asserted unliquidated claims.  Pursuant to the Member Settlement, on the Effective Date, each Proof of Claim

131999954

- <u>Reorganized Debtor as a Transmission & Distribution Electric Cooperative</u>.  After the Effective Date (but no later than the Generation Sale Outside Date), in accordance with the Plan and through the Restructuring Transactions, the Reorganized Debtor shall sell its Generation Assets in one or more asset sales.  On the Amended ARC Effective Date, and subject to the Power Supply Exceptions, the Reorganized Debtor shall terminate its involvement in all power-supply activities and transition from a "wholesale generation and transmission electric cooperative" to a "wholesale transmission and distribution electric cooperative" organized and existing as a nonprofit electric cooperative corporation under the ECCA.

  As of the Effective Date and thereafter, the Reorganized Debtor shall be prohibited from purchasing or building new electric-generation facilities and purchasing an interest in any electric-generation facility, and, as of the Amended ARC Effective Date, the Reorganized Debtor shall also be prohibited from (i) procuring power supply for any Consenting Members, (ii) selling electric power and energy to the Members or any other Entities, and (iii) registering with ERCOT as a QSE, LSE, or CRR Account Holder; <u>provided</u>, <u>however</u>, that, in each case, the Reorganized Debtor may, subject to the Amended ARCs, engage in activities directly related to the Power Supply Exceptions through a Third-Party QSE.  Notwithstanding the foregoing sentence, the Debtor and the Consenting Members are discussing potential amendments to the Member Settlement as it relates to the Reorganized Debtor's use of a Third-Party QSE so as to potentially align the applicable provisions with the Generation QSE Termination Date in connection with the ERCOT Settlement.  Notwithstanding the foregoing, the Reorganized Debtor's status as a QSE, LSE, and CRR Account Holder shall terminate as set forth in Article IV.G.7 of the Plan.

- <u>Assumption of All Requirements Contracts and Entry Into the Amended ARCs</u>.  On the Effective Date, the Reorganized Debtor shall assume the All Requirements Contracts (including any All Requirements Contracts with any Defaulting Members) and execute the Amended ARCs.  On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, and the Consenting Members shall enter into the Amended ARCs, the term of which will commence on the Amended ARC Effective Date.

  As of the Amended ARC Effective Date, but subject to the Power Supply Exceptions, the Reorganized Debtor shall provide to the Consenting Members only wholesale transmission within the ERCOT market, wholesale distribution, and other related services, and the Consenting Members shall no longer be obligated to obtain power supply services from the Reorganized Debtor and shall be forever released from all such obligations under the existing All Requirements Contracts; <u>provided</u>, <u>however</u>, that the Consenting Members shall remain obligated for any Transition Charges relating to any Generation Assets not sold by the Amended ARC Effective Date and

---

Filed by or on behalf of any of the Consenting Members shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court.

131999954

relating to the Retained Agreements, in each case, in accordance with the provisions of the Amended ARCs.

o  *Defaulting Members*.  Notwithstanding anything to the contrary in the Plan, pursuant to the Member Settlement, the Reorganized Debtor shall not enter into an Amended ARC with any Defaulting Member, and such Defaulting Member shall be deemed to be in breach of, but remain subject to all of its obligations under (including an obligation to pay its TAA Balance and its allocated share of Transition Charges), its All Requirements Contract, as assumed pursuant to the Plan.  Such Defaulting Member's unpaid TAA Balance shall be deemed to be a Cause of Action retained by the Reorganized Debtor pursuant to the Retained Causes of Action Schedule and shall not be released by any provision in the Plan.

A Defaulting Member shall be obligated to, among other things, pay any amounts associated with any loan, financing, or indebtedness incurred by the Debtor or the Reorganized Debtor, as applicable, to bridge such Defaulting Member's TAA Balance and any reasonable, documented fees and expenses (including, without limitation, any fees and expenses related to enforcement) incurred by the Reorganized Debtor or other applicable third party in connection with the collection of such Defaulting Member's TAA Balance and any other outstanding obligations.

o  *Expulsion of Defaulting Members*.  A Defaulting Member's failure to timely pay, or cause to be paid, its TAA Balance on the Effective Date shall be deemed to be a violation or a refusal to comply with a rule or regulation of the Board, the Debtor, or the Reorganized Debtor, as applicable.  The approval of the Plan by two-thirds (2/3) of the members of the Board shall be deemed to be the affirmative vote by two-thirds (2/3) of the members of the Board to expel a Defaulting Member from the Debtor or the Reorganized Debtor, as applicable, pursuant to section 1.6 of the Bylaws effective upon the date that is 30 days after such Defaulting Member's failure to timely pay its TAA Balance on the Effective Date in accordance with the Plan; provided, however, that, notwithstanding the foregoing, nothing in the Plan shall prohibit the Reorganized Debtor's Board from reinstating such Defaulting Member as a member of the Reorganized Debtor upon a two-thirds (2/3) vote of the members of the Reorganized Debtor's Board.  Any such Defaulting Member's then-existing Patronage Capital shall be retired in the ordinary course and in accordance with the applicable provisions of the Bylaws, the Plan, and the Confirmation Order.  Following the expulsion of the Defaulting Member, the Defaulting Member shall no longer accrue and be allocated additional Patronage Capital.  The expulsion of the Defaulting Member shall not affect the Defaulting Member's rights and obligations (including an obligation to pay its TAA Balance and its allocated share of Transition Charges) under its All Requirements Contract, as assumed pursuant to the Plan, and the Member shall continue to deemed to be in breach of its All Requirements Contract, as assumed pursuant to the Plan.

• <u>Transition to Member-Directed Power Supply</u>.  Before, on, or after the Effective Date, the Consenting Members and the Debtor or the Reorganized Debtor, as applicable, shall cooperate to negotiate and otherwise facilitate such Consenting Members' transition to

alternative sources of power supply, and each Consenting Member may interact directly with ACES and other potential counterparties in connection with such Consenting Member's power supply.  Beginning on the Effective Date, or as soon thereafter as is reasonably practicable, at a Consenting Member's reasonable written request, the Reorganized Debtor shall use commercially reasonable efforts to amend its agreements with ACES, as necessary, to accomplish the foregoing, and will use commercially reasonable efforts to support any such Consenting Member's membership in ACES and such Consenting Member may negotiate, execute, and enter into its own power supply arrangements and agreements with counterparties; provided, however, that the foregoing is subject in all respects to the terms of the All Requirements Contracts until the Amended ARC Effective Date; provided, further, however, that no power supply related agreements entered into by a Consenting Member shall be effective or otherwise permit transactions to occur before the Amended ARC Effective Date.

- Generation Sale.  Before the Effective Date, the Debtor's Board authorized the Debtor to conduct the Generation Sale and, pursuant to the Plan, before, on and immediately after the Effective Date, the Debtor and the Reorganized Debtor, as applicable, shall continue such efforts, conduct a marketing process, and promptly consummate the Generation Sale.  In the event that the Debtor enters into an engagement agreement with an investment banker for the Generation Sale before the Effective Date, such engagement agreement shall be assumed by the Reorganized Debtor on the Effective Date pursuant to Article V of the Plan.

  The final tranche or transaction of the Generation Sale must close, and all Generation Assets must have been sold, transferred, or otherwise abandoned (with any such abandonment to be subject to Bankruptcy Court approval), on or before the Generation Sale Outside Date, which may be extended solely by the unanimous consent of (i) the Consenting Members and (ii) the Generation Oversight Committee; provided, however, that the Consenting Members and the Generation Oversight Committee must provide ERCOT, the Committee, and the GUC Notice Parties with written notice of any such extension at least 30 days before the Generation Sale Outside Date then in effect, and such notice shall contain reasonable detail setting forth the need for the extension and a good faith estimate of the anticipated length of the extension.

  Notwithstanding any order of the Bankruptcy Court extending the Generation Sale Outside Date, if the Generation Sale Outside Date is extended, on or before the Generation QSE Termination Date, the Reorganized Debtor shall retain a Third-Party QSE to schedule the Reorganized Debtor's generation for the Generation Assets. Failure to retain such Third-Party QSE on or before the Generation QSE Termination Date shall result in ERCOT having the absolute right to prohibit the Reorganized Debtor from selling generation into the ERCOT wholesale market until such time as the Reorganized Debtor has retained a Third-Party QSE.

  For the avoidance of doubt, the sale or other disposition or abandonment of any Generation Assets shall be conducted in accordance with the applicable provisions of the Amended and Restated RUS Secured Notes Documents.

o *Generation Oversight Committee.* The Generation Oversight Committee shall make recommendations to the Board regarding the Generation Sale, but shall not have the authority to approve any transaction or otherwise bind the Board, the Debtor, or the Reorganized Debtor. The Generation Oversight Committee may, subject to the consent and approval of the Reorganized Debtor's Board (such consent and approval not to be unreasonably withheld), retain professionals and other staff to, among other things, oversee and make recommendations to the Board in respect of the Generation Sale.

The Reorganized Debtor shall provide the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with reasonable access to nonprivileged documents and information concerning the status of the Generation Sale, including by providing copies of any written reports created by the Generation Oversight Committee (with appropriate redactions for privileged information) promptly after such reports are delivered to the Board or the Reorganized Debtor, as applicable. Any such documents and information provided to the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, or the GUC Notice Parties, as applicable, shall be subject to the terms of the Protective Order and be treated by ERCOT as Protected Information (as defined in the Protocols) and by any other parties as confidential. At the reasonable written request of the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, the GUC Notice Parties, or their respective attorneys and advisors, the Reorganized Debtor shall provide a reasonably detailed update, which may be written or by telephonic or video conference, on the status of the Generation Sale. For the avoidance of doubt, any documents or information belonging to the Members shall be treated as highly confidential and no document or information shall be shared with any Entity (including any principal of such Entity) that is a competitor of the Reorganized Debtor or a potential purchaser of any T&D Assets.

o *Generation Employee Retention Plan*. The Generation Employee Retention Plan shall be implemented by the Reorganized Debtor on the Effective Date without any further action by the Reorganized Debtor's Board or the Bankruptcy Court.

- Substations. Upon the occurrence of the effective date under the Amended ARCs, and in accordance with the terms thereof, a Consenting Member shall have the ability by providing written notice to the Reorganized Debtor, but not the obligation, to construct, own, and maintain new substations in such Consenting Member's service area.

- The Ratepayer Hardship Fund. The Debtor's mission historically has been to provide valued service to the Members and through them, their respective Ratepayers, by generating, procuring, and transmitting reliable power at the lowest cost. Although the Reorganized Debtor, in accordance with the Plan, will soon exit the power-supply and power-generation businesses, the Reorganized Debtor remains committed to reducing the financial impact of Winter Storm Uri and this Chapter 11 Case on the applicable Members' Ratepayers, while continuing to provide reliable electricity transmission and distributions service after the Effective Date and the consummation of the Generation Sale. To continue those efforts, the Debtor or the Reorganized Debtor, as applicable,

shall establish and fund the Ratepayer Hardship Fund to help mitigate Winter Storm Uri's impact on Ratepayer electric bills.

o   *The Establishment of the Ratepayer Hardship Fund.*  Before, on, or promptly after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall take all necessary steps to establish the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents.  The Ratepayer Hardship Fund shall not be a source of distributions to Holders of Claims under the Plan or otherwise against the Debtor or the Reorganized Debtor.  The Ratepayer Hardship Fund shall be established for the purposes described in the Plan and, as applicable, the Plan Supplement, and any other purposes more fully described in the Ratepayer Hardship Fund Documents.  The Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall, in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents:

  i.   make Hardship Distributions to Qualified Hardship Recipients;

  ii.  hold, manage, invest, and administer the Hardship Fund Contribution and all other funds and other assets received by the Ratepayer Hardship Fund for the benefit of the beneficiaries of the Ratepayer Hardship Fund;

  iii. hold and maintain required reserves for the Ratepayer Hardship Fund in accordance with the Ratepayer Hardship Fund Documents; and

  iv.  pay all applicable Hardship Fund Expenses.

On the Effective Date, the Reorganized Debtor shall fund the Ratepayer Hardship Fund with the Hardship Fund Contribution and neither the Debtor, the Reorganized Debtor, the Consenting Members, nor any other party shall be obligated to make any other or further contribution to the Ratepayer Hardship Fund.  The Hardship Fund Contribution shall vest in the Ratepayer Hardship Fund free and clear of all Liens, Claims, interests, encumbrances, and liabilities of any kind, and shall be subject to and governed by the applicable provisions of the Plan and the Ratepayer Hardship Fund Documents.

o   *Appointment and Role of the Hardship Fund Administrator, the Hardship Fund Trustee, and the Hardship Fund Oversight Committee.*  Upon the entry of the Confirmation Order, the Debtor shall be authorized to engage and retain Solix, Inc., on and subject to the terms set forth in the Plan Supplement, to serve as the initial Hardship Fund Administrator.  In furtherance of and consistent with the purposes of the Ratepayer Hardship Fund and the Plan, the Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall have the power and authority to perform their respective functions on behalf of the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship

131999954

Fund Documents.  In all circumstances, the Hardship Fund Administrator and the Hardship Fund Trustee shall be independent and disinterested and shall act in the best interests of the beneficiaries of the Ratepayer Hardship Fund, in furtherance of the purposes of the Ratepayer Hardship Fund, and in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents.  All determinations regarding the eligibility of any person or entity for any service, payment, or other relief or accommodation from the Ratepayer Hardship Fund will be made pursuant to the Ratepayer Hardship Fund Documents.

o    The affairs of the Ratepayer Hardship Fund shall be managed by the Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, under the direction of the Hardship Fund Oversight Committee.

o    *Monitoring and Reporting Obligations*.  The Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall, among other things and subject to the Ratepayer Hardship Fund Documents, (i) monitor the use of funds received by Ratepayer Hardship Fund and (ii) prepare and deliver to the Reorganized Debtor, the Consenting Members, and the PUCT quarterly reports on the disbursements and other Hardship Distributions from the Ratepayer Hardship Fund, the use and management of the Hardship Fund Contribution, and compliance with the Ratepayer Hardship Fund Documents.  A copy of any such quarterly reports shall be Filed with the Bankruptcy Court.  In addition, the Hardship Fund Administrator shall use commercially reasonable efforts to provide the Reorganized Debtor, the Consenting Members, and the PUCT with reasonable access to nonprivileged documents and information concerning the administration of the Ratepayer Hardship Fund and any Hardship Distributions made to Qualified Hardship Recipients.

o    *Residual Cash in Ratepayer Hardship Fund*.  To the extent any portion of the Hardship Fund Contribution (including any proceeds thereof) remains in the Ratepayer Hardship Fund as of the 10th anniversary of the Effective Date, such remaining Cash shall be deemed to have irrevocably re-vested in, and the Hardship Fund Administrator shall promptly transfer such property to, the Reorganized Debtor for distribution to the Members (other than Defaulting Members and Members that did not have a TAA Balance) to be used by such Members in a manner materially consistent with the Ratepayer Hardship Fund purposes and the written recommendations of the Hardship Fund Oversight Committee (a copy of which shall be given to each Member) made in accordance with the Ratepayer Hardship Fund Documents.[18]

---

[18] The likelihood or unlikelihood of any Residual Cash in Ratepayer Hardship Fund at the end of ten (10) years—and the corresponding amounts of any such Residual Funds—is not possible to predict given the voluntary nature of the program.  Nonetheless, for the avoidance of doubt as stated herein, any re-vesting of Residual Cash in the Reorganized Debtor for distribution to the Members (other than Defaulting Members and Members that did not have a TAA Balance) after ten (10) years must be used by such Members in a manner materially consistent with the Ratepayer

- <u>Releases; Proofs of Claim; CoServ/Tri-County Litigation</u>.  The Consenting Members shall be (i) Released Parties hereunder and shall receive the releases set forth in Article VIII.C of the Plan and (ii) Releasing Parties hereunder and shall grant the releases set forth in Article VIII.D of the Plan.  On the Effective Date, each Proof of Claim Filed by or on behalf of any of the Consenting Members shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court, and except as otherwise set forth herein, all Claims and Causes of Action between the Debtor and the Estate, on the one hand, and the Consenting Members, on the other hand, shall be deemed to be fully and finally resolved, waived, discharged and released.

  On the Effective Date or promptly thereafter, CoServ, Tri-County, the Reorganized Debtor, and the Committee shall take reasonable steps to facilitate the dismissal with prejudice, of the CoServ/Tri-County Claim Litigation, and the CoServ/Tri-County Claim Litigation shall be deemed fully resolved; <u>provided</u>, <u>however</u>, that the CoServ/Tri-County Claim Litigation shall not be withdrawn or dismissed as to any Defaulting Member.

- <u>Consenting Member Recourse</u>.  The Consenting Members shall have all rights available under applicable law to enforce the terms of the Plan, the Confirmation Order, and any other applicable Plan Document, and nothing in the Plan shall be construed to limit or compromise any such rights.

### 4.    *Member Claim Objections*

On December 7, 2021, the Committee filed an objection to the Proof of Claim filed by Tri-County Electric Cooperative (the "<u>Tri-County Objection</u>").  The Committee also objected to the Proof of Claim filed by Denton County Electric Cooperative, Inc. d/b/a CoServ Electric on December 10, 2021 (the "<u>CoServ Objection</u>" and together with the Tri-County Objection, the "<u>Member Claim Objections</u>").  The Debtor filed a joinder to the Member Claim Objections on January 14, 2022.  The Court entered a scheduling order regarding the Member Claim Objections on March 11, 2022 (with a trial scheduled for July 2022), which dates were later adjourned by agreement of the Debtor, the Committee, Tri-County, and CoServ subsequent to the filing of summary judgment motions and related memoranda of law in support thereof by the Debtor and the Committee.  A status conference on the Member Claim Objections is currently set for September 26, 2022.  The Member Claim Objections will be resolved in the Consensual Member Settlement, as set forth in the Plan.

### 5.    *Gas Providers Adversary Proceeding*

On November 22, 2021, the Debtor filed an adversary complaint against various gas claimants who have asserted claims arising out of sales of natural gas to the Debtor in February

---

Hardship Fund purposes and the written recommendations of the Hardship Fund Oversight Committee made in accordance with the Ratepayer Hardship Fund Documents.

2021 during Winter Storm Uri.[19]   The Debtor objected to the Gas Claims, which total approximately $180 million, on the basis that they are based on "exorbitant and excessive prices," and requested that the Court "materially reduce the Gas Claims to a fair and reasonable amount."

On January 7, 2022, several of the Gas Defendants filed motions to dismiss the Debtor's adversary proceeding.  On May 11, 2022, the Court granted the motions to dismiss, but gave the Debtor the opportunity to replead on all five counts.  The Debtor filed an Amended Complaint on June 1, 2022, and several of the Gas Defendants re-urged their motions to dismiss the adversary proceeding on June 27, 2022.  The Court held a hearing on the motions to dismiss on August 3, 2022 and granted in part and denied in part the motions to dismiss.

### 6.    *Swap Claim Objections*

On June 7, 2022, the Debtor filed four Claim objections, seeking to reduce approximately $133 million of Proofs of Claims filed on account of interest rate swap terminations to $85.7 million.  The objected-to Claims were filed by Wells Fargo, MUFG Bank, Morgan Stanley and J. Aron (collectively, the "Swap Claims" and the objections thereto, the "Swap Claim Objections").  Specifically, the Debtor sought to reduce J. Aron's $51.2 million filed Claim to $36.2 million; reduce Morgan Stanley's $29.4 million filed Claim to $17.7 million; reduce MUFG's $23.1 million filed Claim to $9.1 million; and reduce Wells Fargo's $29.3 million filed Claim to $22.7 million.

On August 24, 2022,  the Debtor filed amended objections to the Swap Claims.  On August 29, 2022, the Court held a status conference to consider a scheduling order for the Swap Claim Objections.  The Court ordered that any responses to the Swap Claim Objections must be filed on or before September 30, 2022.  The Court scheduled an additional status conference on the Swap Claim Objections and any responses thereto for October 12, 2022.

### 7.    *The Power Purchase Agreements*

On March 16, 2022, the Debtor filed a motion to reject its PPAs for the purchase of electricity from the coal-fired Sandy Creek Energy Station generation facility [Dkt. No. 1622] (the "Rejection Motion").  In the Rejection Motion, the Debtor sought entry of an order allowing it to reject (a) the PPA with BSCEC (the "BSCEC PPA") and (b) the PPA with Sandy Creek Energy Associates, LP (the "SCEA PPA"), *nunc pro tunc* to March 16, 2022.  The Debtor entered into stipulations providing for the consensual rejection of the PPAs *nunc pro tunc* to March 16, 2022.  *See* Dkt. Nos. 1691, 1692, 1700.

On May 19, 2022, Sandy Creek Energy Associates, LP ("SCEA") filed a motion for relief from the automatic stay to allow SCEA to commence and proceed with an arbitration proceeding

---

[19] The defendants in the gas providers adversary proceeding include 507 Capital LLC; 507 Summit LLC; Cetus Capital VI, L.P.; Chase Lincoln First Commercial Corporation; Citigroup Financial Products Inc.; CrossingBridge Low Duration High Yield Fund; Destinations Global Fixed Income Opportunities Fund; Destinations Low Duration Fixed Income Fund; Koch Energy Services LLC; Leaffilter North Holdings, Inc.; NJR Energy Services Co.; OFM II, LP; OU 2 LLC; RiverPark Short Term High Yield; RiverPark Strategic Income Fund; Total Gas & Power North America, Inc.; and Two Seas Global (Master) Fund LP (collectively, the "Gas Defendants").

to resolve the determination of damages sustained by SCEA resulting from the Debtor's breach of the SCEA PPA due to the Debtor's rejection. *See* Dkt. No. 1802. After holding a hearing on June 15, 2022, the Court denied SCEA's motion. *See* Dkt. No. 1895. SCEA filed a notice of appeal of the Court's denial on June 27, 2022. *See* Dkt. No. 1922. On July 1, 2022, the Debtor, the Committee, and SCEA jointly certified the appeal to the United States Court of Appeals for the Fifth Circuit. *See* Dkt. No. 1944.

On June 13, 2022, the Debtor objected to SCEA's proofs of claim related to the SCEA PPA, alleging that the rejection damages stemming from the Debtor's rejection of the SCEA PPA were materially below the approximate $640 million to $770 million asserted by SCEA. *See* Dkt. No. 1886.

Since the filing of the objections to SCEA's proofs of claim, the Debtor and SCEA participated in a mediation with Judge Isgur, which ultimately resulted in a settlement of all issues by and between the Debtor and SCEA (the "SCEA Claims Settlement"). The SCEA Claims Settlement includes the following material terms and conditions:

- As of the Effective Date, the SCEA Allowed Administrative Claim shall be deemed Allowed in full and shall be paid in full in Cash in accordance with Article IIA of the Plan.

- As of the Effective Date, the SCEA Allowed GUC Claim shall be a Class 5 General Unsecured Claim and deemed Allowed, unless the Bankruptcy Court determines that it must be separately classified, in which case the SCEA Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5A Claim with the same treatment as provided for in Article IV.H of the Plan. The SCEA Allowed GUC Claim shall receive treatment as an Allowed Class 5 General Unsecured Claim; provided, however, that SCEA shall receive the following payments on account of the SCEA Allowed GUC Claim:  (i) on the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the aggregate amount of $105,440,252.88 in Cash with respect to the first $124,047,356.33 tranche of the SCEA Allowed GUC Claim, which payment shall be in full and final satisfaction of such portion of the SCEA Allowed GUC Claim, and (ii) the second $130,000,000 tranche of the SCEA Allowed GUC Claim shall be paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the SCEA Allowed GUC Claim is classified as a Class 5 or Class 5A General Unsecured Claim (*i.e.*, the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the GUC Cash Recovery in the amount of the GUC Distribution Percentage with respect to the $130,000,000 tranche of the SCEA Allowed GUC Claim in full and final satisfaction thereof). To the extent the recoveries received by Holders of Allowed Class 5 General Unsecured Claims increase consistent with the terms of the Committee Settlement and the Plan, the recovery to SCEA on account of the $130,000,000 tranche of the SCEA Allowed GUC Claim shall increase commensurately. There shall be no interest, charge, or accrual of any kind payable in respect of the SCEA Allowed GUC Claim other than solely in respect of the second tranche of the SCEA Allowed GUC Claim as set forth in Article VI.L.1.a of the Plan, if any.

- On the Effective Date, except to the extent of the Allowed SCEA Claims in Article IV.H of the Plan, each Proof of Claim Filed by or on behalf of any of SCEA shall be deemed withdrawn and expunged and the Debtor's objection to the SCEA Claims, all related filings by the Debtor and SCEA in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

On June 25, 2022, the Debtor objected to the Proof of Claims filed by Janet Northrup, in her capacity as Chapter 7 Trustee (the "BSCEC Trustee") for the estate of BSCEC related to the BSCEC PPA.  *See* Dkt. No. 1917.  The following day, on June 26, 2022, the Debtor also objected to the proofs of claim asserted by Computershare Trust Company, N.A. ("BSCEC Collateral Trustee"), as assignee of Wells Fargo Bank, N.A., the Collateral Trustee for the BSCEC Secured Parties with respect to the BSCEC Secured Notes issued by BSCEC.  *See* Dkt. No. 1920.  The Debtor asserted that the BSCEC Collateral Trustee claims are duplicative of the claims filed by the BSCEC Trustee and therefore should be disallowed in their entirety.

The Debtor, the BSCEC Trustee, and the BSCEC Collateral Trustee participated in a mediation with Judge Isgur, which ultimately resulted in a settlement of all issues by and between the Debtor, BSCEC, and the BSCEC Collateral Trustee (the "BSCEC Claims Settlement").  The BSCEC Claims Settlement includes the following material terms and conditions:

- Pursuant to the BSCEC Claims Settlement, the BSCEC Allowed GUC Claim shall receive the agreed treatment pursuant to the Plan and the Confirmation Order in accordance with the terms and conditions of the BSCEC Claims Settlement Agreement, which terms and conditions are incorporated into the Plan as if fully set forth herein. The BSCEC Allowed GUC Claim shall be classified as a Class 5 General Unsecured Claim, unless the Bankruptcy Court determines that it must be separately classified, in which case the BSCEC Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5B Claim with the same treatment pursuant to the Plan and the Confirmation Order as provided for in the BSCEC Claims Settlement Agreement and paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the BSCEC Allowed GUC Claim is classified as a Class 5 or Class 5B General Unsecured Claim (*i.e.*, the Debtor or the Reorganized Debtor, as applicable, shall pay the GUC Cash Recovery in the amount of the GUC Distribution Percentage on account of the BSCEC Allowed GUC Claim).  There shall be no interest, charge, or accrual of any kind payable in respect of the BSCEC Allowed GUC Claim other than as set forth in Article IV.L.1.a of the Plan, if any.

- On the Effective Date, except in respect of and to the extent of the BSCEC Allowed GUC Claim in the BSCEC Claims Settlement Agreement and Article IV.I of the Plan, each Proof of Claim Filed by or on behalf of any of the BSCEC Trustee or the BSCEC Collateral Trustee, on behalf of itself or the BSCEC Noteholders, shall be deemed withdrawn and expunged and the Debtor's objections to the applicable BSCEC Claims, all related filings by the Debtor, the BSCEC Trustee, or the BSCEC Collateral Trustee in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

- Notwithstanding anything in the Plan or the Confirmation Order, the BSCEC Claims Settlement Agreement provides for releases to be granted and received by parties (which includes third-party beneficiaries for all purposes in this paragraph and the next paragraph) as set forth therein, and the releases thereunder shall exclusively govern the terms and conditions of the releases (including the timing of such releases) and the scope of any stay, injunction, and exculpation in the Plan between such parties; provided, however, that a party may affirmatively elect to opt into the broader releases, stays, injunction and exculpations as provided for in the Plan as to itself.  There shall be no retained Causes of Action in respect of any releasee referenced in Section 5 of the BSCEC Claims Settlement Agreement.

- Notwithstanding anything in the Plan Documents, Article IV.I of the Plan does not impair or limit the BSCEC Claims Settlement Agreement, which shall remain in full force and effect and shall control in the event of an inconsistency with the Plan Documents.  Article IV.I of the Plan and any other provision of the Plan may not be amended or modified to adversely affect any rights of the parties under the BSCEC Claims Settlement Agreement without the prior written consent of the affected party, which consent may not be unreasonably withheld.

### 8. *Committee Settlement*

In conjunction with the mediation of the ERCOT Claim Objection that led to the ERCOT Settlement, the Debtor and the Committee engaged in numerous mediation sessions with Judge Isgur regarding the treatment of General Unsecured Claims under the Plan and ultimately reached a settlement regarding such treatment and other terms and conditions set forth in the Plan and Confirmation Order (the "Committee Settlement").  The Committee Settlement includes the following material terms and conditions:

- Minimum Recovery.  Each Holder of an Allowed General Unsecured Claim will be paid by the Reorganized Debtor through the GUC Cash Recovery an aggregate amount in Cash that is sufficient to yield a recovery of no less than 89.5 Cents on account of such Holder's Allowed General Unsecured Claim (without interest, charge, or accrual of any kind, other than pursuant to Article IV.L.1.a of the Plan), including the BSCEC Allowed GUC Claim and the second tranche of the SCEA Allowed GUC Claim (i.e., the remaining $130,000,000), unless any such Holder agrees to less favorable treatment (including, as to the BSCEC Allowed GUC Claim, pursuant to the BSCEC Claims Settlement Agreement, if any, and as to the SCEA Allowed GUC Claim pursuant to the SCEA Claims Settlement).  Holders of Allowed General Unsecured Claims will be the sole beneficiaries of any reduction in the amount of the Debtor's Estimated GUC Pool (i.e., if the amount of Allowed General Unsecured Claims falls below the August 2022 Estimated GUC Pool, including on account of any reduction in the BSCEC Claims as set forth in the BSCEC Claims Settlement Agreement, each Holder of an Allowed General Unsecured Claim will receive a proportionate increase in its recovery under the Plan), unless any such Holder agrees to less favorable treatment.  The GUC Distribution Percentage shall not be increased on account of the portion of any Claim held by MUFG that is secured by the MUFG Account, any General Unsecured Claim

that is reclassified as a Secured Claim or Administrative Claim or Other Priority Claim, any Cure Claims, Claims for obligations assumed by the Reorganized Debtor under the Plan, any Claims to the extent paid (in full or in part) during the Chapter 11 Case pursuant to a Bankruptcy Court order, and Claims that are expressly deemed withdrawn, expunged, or otherwise disallowed as of the Effective Date under the Plan. For the avoidance of doubt, no portion of the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payments, shall be reduced to fund the GUC Cash Recovery and, similarly, no portion of the GUC Cash Recovery shall be reduced to fund the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Payment.

- <u>Tort Claims Treatment</u>.  Holders of Class 7 Tort Claims will receive the treatment set forth in Article III.B.7 of the Plan.  To the extent that any Holder of an Allowed Class 7 Tort Claim is entitled to receive payment on account of such Allowed Claim under the applicable General Liability Insurance Policy, the Reorganized Debtor shall pay the amount of the deductible, if any, required under the applicable General Liability Insurance Policies.  As set forth in Articles III.B.7 and III.B.8 of the Plan, each Holder of an Allowed Tort Claim shall have the option to elect Tort Convenience Claim treatment and receive the Tort Convenience Recovery in accordance with the Plan. Each Holder of an Allowed Tort Claim that affirmatively elects on its Ballot to receive the Tort Convenience Recovery as a Class 8 Tort Convenience Claim shall be deemed to be a Releasing Party under the Plan and to have granted a full release and waiver in respect of the Debtor, the Reorganized Debtor, each of the Members, and each of the foregoing party's respective Representatives on account of such Holder's Claim.

- <u>Waiver of Certain Preference Claims</u>.  On the Effective Date, the Debtor, on behalf of itself and its Estate, and all of its successors or assigns, and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall release and be deemed to have waived the right to pursue any and all Claims and Causes of Action under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable nonbankruptcy law (including, without limitation, any such Claims and Causes of Action against Holders of Allowed General Unsecured Claims, Allowed General Unsecured Convenience Claims, Allowed Tort Claims, and Allowed Tort Convenience Claims).

- <u>Committee Consent, Consultation, and Reporting Rights</u>.  The following Plan Documents (or applicable provisions thereof) shall be in form and substance reasonably satisfactory to the Committee, <u>provided</u> that any such consent shall not be unreasonably withheld:  (i) the Plan; (ii) the provisions of the Confirmation Order that implement the terms of the Committee Settlement; and (iii) any amendment, modification, or supplement to the foregoing that is materially adverse to the Committee or Holders of Allowed Claims in Classes 5 through 8.  The Debtor or the Reorganized Debtor, as applicable, shall consult the Committee in respect of the following:  (i) the Debtor's selection of the Effective Date, (ii) the form of the Exit Facility Credit Agreement, and

(iii) whether to include in the Plan Supplement any other document or agreement that the Debtor determines may be necessary or advisable to effectuate the Restructuring Transactions or that are otherwise contemplated by the Plan, but solely to the extent that such document or agreement affects the treatment of Allowed Claims in Classes 5 through 8.  The Committee and the Prepetition Revolving Agent shall also receive any reporting provided pursuant to the Exit Facility Credit Agreement until final distributions are made on all General Unsecured Claims, which reporting shall be subject to the Protective Order and be treated as confidential.

- Plan Support.  The Committee will recommend that all creditors, including, without limitation, the Holders of Claims under the Prepetition Revolving Loan Documents and Holders of Tort Claims, support the Committee Settlement and vote to accept the Plan (including by providing a letter or other insert to be included in the Disclosure Statement and solicitation materials).   The Committee will not change its recommendation, and will not, directly or indirectly, oppose, join in opposition, or otherwise assist with any objection or other challenge to the Plan or to Confirmation unless the Bankruptcy Court finds that the Disclosure Statement contained material omissions or misstatements sufficient to require a re-solicitation of the Plan.   In addition, neither the Committee, its members, nor its professionals will share any "work product," analysis, or other confidential information with any other party that does not support the Committee Settlement or the Plan; provided, however, that the Committee and its professionals will not be prohibited or otherwise prevented from requesting that information already known to the Committee and its professionals be included in the Disclosure Statement to the extent that the Committee or its professionals reasonably believe that the inclusion of such information is necessary to ensure that the Disclosure Statement provides "adequate information" as defined in section 1125 of the Bankruptcy Code.

## V.    SUMMARY OF PLAN

The Debtor believes that the Plan provides the best and most prompt possible recovery to Holders of Claims.  The Debtor believes that (a) through the Plan, Holders of Allowed Claims will obtain a recovery from the Estate equal to or greater than the recovery that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against a debtor.  Confirmation of a plan makes the plan binding upon the debtor and any creditor of the debtor, whether or not such creditor (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the

plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims against the Debtor who are entitled to vote to accept or reject the Plan.

**SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN, EXHIBITS TO THE PLAN, AND THE PLAN SUPPLEMENT. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS AND THE PLAN SUPPLEMENT) WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE LATTER SHALL GOVERN.**

A.    **Administrative Expense Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify (i) Administrative Claims, including Section 503(b)(9) Claims, DIP Facility Claims, and Professional Fee Claims, and (ii) Priority Tax Claims.

1.    *Administrative Claims*

Except with respect to Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon thereafter as is reasonably practicable; provided, however, that, if an Allowed Administrative Claim arises from liabilities incurred by the

Debtor's Estate in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims or DIP Facility Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, however, that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims (other than Section 503(b)(9) Claims) arising in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

The Plan provides additional provisions regarding the settlement of and objections to Administrative Claims and the establishment and funding of the Administrative and Priority Claims Reserve.

### 2. *DIP Facility Claims*

Pursuant to the Plan, all DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the then-outstanding DIP Obligations (as defined in the DIP Order).  Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to different treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder of an Allowed DIP Facility Claim shall receive on the Effective Date, at each such Holder's election in its sole discretion, either (i) its Pro Rata share of a participation in the Exit Facility, in accordance with and subject to the Exit Facility Documents (which shall be in form and substance acceptable to each such Holder of an Allowed DIP Facility Claim, in its sole discretion), or (ii) payment in full in Cash.

In addition, the DIP Facility and the DIP Documents shall be deemed cancelled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtor and the Reorganized Debtor arising out of or related to the DIP Facility shall automatically terminate, all obligations of the Debtor arising out of or related to the DIP Facility Claims shall be automatically discharged and released and all collateral subject to such Liens shall be automatically released, and all guarantees arising out of or related to the DIP Facility Claims shall be automatically discharged and released.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Documents shall survive to the extent necessary to preserve any rights of the DIP Agent (i) as against any money or property distributable to the Holders of Allowed DIP Facility Claims, including any priority in respect of payment and (ii) to appear and be heard in the Chapter 11 Case or in any proceeding relating to the Debtor in the Bankruptcy Court or any other court to enforce the respective obligations owed to the DIP Agent under the Plan.

131999954

### 3.     *Professional Fee Claims*

The Plan includes provisions governing the filing of final requests for allowance and payment of Professional Fee Claims, which must be Filed with the Bankruptcy Court no later than the first Business Day that is 45 days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  The Plan also provides that  any objections to Professional Fee Claims shall be Filed and served no later than 35 days after the filing of final requests for allowance and payment of Professional Fee Claims.  Except as otherwise provided in the Plan, Professionals may be paid in accordance with the Interim Compensation Order and any other applicable orders of the Bankruptcy Court.

The Plan additionally includes provisions governing each Professional's good faith estimate of its unpaid Professional Fee Claim and other unpaid fees and expenses, the Debtor's establishment and funding of the Professional Fee Escrow, and the payment of certain post-Effective Date fees and expenses.

### 4.     *Priority Tax Claims*

Pursuant to the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, agree (whether before or after the Effective Date) to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.     *Payment of Statutory Fees*

Pursuant to the Plan, all  fees due and payable pursuant to 28 U.S.C. § 1930(a) before the Effective Date shall be paid by the Debtor in full in Cash on the Effective Date. All monthly reports due before the Effective Date shall be Filed by the Debtor on the Effective Date. On and after the Effective Date, the Reorganized Debtor shall pay any and all such fees in full in Cash when due and payable, and shall File with the Bankruptcy Court the final monthly report (for the month in which the Effective Date occurs) and quarterly reports in a form reasonably acceptable to the U.S. Trustee until the case is converted, dismissed, or closed, whichever occurs first. The U.S. Trustee shall not be required to File any Administrative Claim in the Chapter 11 Case and shall not be treated as providing any release under the Plan in connection therewith.

## B.     Classification and Treatment of Claims

### 1.     *Summary of Classification*

All Claims, except for Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim qualifies within the description of such other Classes.  A Claim also is classified in a particular Class for the purpose

of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. All of the potential Classes for the Debtor are set forth in the Plan.

The classification of Claims against the Debtor pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote *Deemed to Accept* |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote *Deemed to Accept* |
| 3 | RUS Secured Notes Claims | Unimpaired | Not Entitled to Vote *Deemed to Accept* |
| 4 | ERCOT Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Convenience Claims | Impaired | Entitled to Vote |
| 7 | Tort Claims | Impaired | Entitled to Vote |
| 8 | Tort Convenience Claims | Impaired | Entitled to Vote |
| 9 | Member Patronage Capital Claims | Unimpaired | Not Entitled to Vote *Deemed to Accept* |
| 10 | Member Other General Unsecured Claims | Impaired | Entitled to Vote |

**2.    *Treatment of Claims***

To the extent a Class contains Allowed Claims, the treatment provided to each Class for distribution purposes is specified below:

(i)    Class 1 – Other Priority Claims

*Classification*: Class 1 consists of all Other Priority Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

*Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to

58

section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Allowed Other Priority Claim are not entitled to vote to accept or reject the Plan.

(ii) <u>Class 2 – Other Secured Claims</u>

*Classification*: Class 2 consists of all Other Secured Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the Debtor's or the Reorganized Debtor's, discretion, as applicable:

(1) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course (provided that, for the avoidance of doubt, the Prepetition Revolving Facility Secured Claim shall be paid in full in Cash on the Effective Date);

(2) Reinstatement of such Holder's Allowed Other Secured Claim;

(3) the Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(4) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

*Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

(iii) <u>Class 3 – RUS Secured Notes Claims</u>

*Classification*:   Class 3 consists of all RUS Secured Notes Claims against the Debtor.

*Allowance*:  The RUS Secured Notes Claims shall be Allowed against the Debtor in the aggregate principal amount of $1,815,656,446.54[20]  plus all accrued and unpaid interest (including interest accruing after the Petition Date), costs, and other fees, in each case owed under the RUS Secured Notes Documents, from the Petition Date through the Effective Date.

---

[20] This amount reflects the aggregate asserted claim amount as of the Petition Date, a portion of which has been paid through quarterly amortization payments during the post-petition period.

*Treatment*:  Except to the extent that a Holder of an Allowed RUS Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed RUS Secured Notes Claim, all Allowed RUS Secured Notes Claims shall be Reinstated subject to and in accordance with the Amended and Restated RUS Secured Notes Documents.

*Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of an Allowed RUS Secured Notes Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed RUS Secured Notes Claims are not entitled to vote to accept or reject the Plan.

(iv)  <u>Class 4 – ERCOT Claim</u>

*Classification*:  Class 4 consists of the ERCOT Claim against the Debtor.

*Allowance*:  On the Effective Date, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the ERCOT Claim shall be Allowed in the aggregate amount of $1,886,595,737.08.

*Treatment*:  Except to the extent that ERCOT agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Allowed ERCOT Claim, ERCOT shall (i) receive (a) on the Effective Date, the Initial ERCOT Cash Payment, and (b) the ERCOT Market Participant Consideration, which ERCOT shall then allocate and distribute to Eligible Market Participants, in full and final satisfaction of the Eligible Market Participants' respective shares of the Brazos Short Pay Claim, through the Market Participant Accelerated Cash Recovery, the Market Participant Convenience Cash Recovery, or the Market Participant Deferred Cash Recovery as set forth in the ERCOT Recovery Appendix.

*Voting*:  Class 4 is Impaired under the Plan.  ERCOT is entitled to vote to accept or reject the Plan.

(v)  <u>Class 5 – General Unsecured Claims</u>

*Classification*:   Class 5 consists of all General Unsecured Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment (or otherwise elects and is entitled to receive General Unsecured Convenience Claim treatment on account of its Allowed General Unsecured Claim, or with respect to SCEA and the BSCEC Trustee and the BSCEC Collateral Trustee (on behalf of itself and for the BSCEC Noteholders), as agreed pursuant to the settlements summarized in Article IV.H and Article IV.I of the Plan, respectively), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each such Holder shall receive, up to the full amount of such Holder's

Allowed General Unsecured Claim, the GUC Cash Recovery, with the Initial GUC Cash Payment to be made on the Effective Date, the Additional GUC Cash Payment to be made on or before the Generation Sale Closing Date (or within ten days thereafter, but in any case, such payment must be paid on or before the Interim Distribution Deadline) and the Residual GUC Cash Payment, if any, to be made on the date when all General Unsecured Claims have either been Allowed or expunged; provided, that any such Holder of an Allowed General Unsecured Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to reduce the Allowed amount of its Claim to the GUC Convenience Amount and receive the GUC Convenience Recovery; provided, further that **any Holder that (i) votes to accept the Plan and (ii) affirmatively elects on its Ballot to receive treatment as a General Unsecured Convenience Claim shall be deemed to be a Releasing Party hereunder** in exchange for receiving the GUC Convenience Recovery.

*Voting*:  Class 5 is Impaired under the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(vi)    Class 6 – General Unsecured Convenience Claims

*Classification*:  Class 6 consists of all General Unsecured Convenience Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Convenience Claim, each such Holder shall receive the GUC Convenience Recovery on the later of (i) the Effective Date or (ii) the date that such Claim is Allowed.  Class 6 shall consist of all Claims that would otherwise be General Unsecured Claims and are Allowed in the GUC Convenience Amount or less.  **Any Holder of an Allowed Class 5 General Unsecured Claim that (i) votes to accept the Plan and (ii) affirmatively elects on its Class 5 Ballot to receive treatment as a General Unsecured Convenience Claim shall be deemed to be a Releasing Party hereunder** in exchange for receiving the GUC Convenience Recovery.

*Voting*:  Class 6 is Impaired under the Plan.  Each Holder of a General Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

(vii)    Class 7 – Tort Claims

*Classification*:  Class 7 consists of all Tort Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Tort Claim agrees to less favorable treatment (or otherwise elects to receive Tort Convenience Claim treatment on account of its Allowed Tort Claim), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Claim, each such Holder shall receive the Tort Claim Recovery;

131999954

<u>provided</u>, that each such Holder of an Allowed Tort Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to be treated as a Tort Convenience Claim and receive the Tort Convenience Recovery in full and final satisfaction of such Allowed Claim; <u>provided</u>, <u>further</u> that **any Holder that (i) votes to accept the Plan and (ii) affirmatively elects on its Ballot to receive treatment as a Tort Convenience Claim shall be deemed to be a Releasing Party hereunder and to have consented to and granted a full release and waiver of any claims and causes of action against the Members on account of such Holder's Allowed Tort Claim** in exchange for receiving the Tort Convenience Recovery.

*Voting*:  Class 7 is Impaired under the Plan.  Each Holder of a Tort Claim is entitled to vote to accept or reject the Plan.

(viii)    <u>Class 8 – Tort Convenience Claims</u>

*Classification*:  Class 8 consists of all Tort Convenience Claims against the Debtor.

*Allowance*:  On the Effective Date, each Tort Convenience Claim shall be deemed to be Allowed in the lower of (i) the asserted aggregate liquidated amount of such Tort Convenience Claim and (ii) the Tort Convenience Amount.

*Treatment*:  Except to the extent that a Holder of an Allowed Tort Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Convenience Claim, each such Holder shall receive the Tort Convenience Recovery on the Effective Date.  **Any Holder of a Allowed Class 7 Tort Claim that (i) votes to accept the Plan and (ii) affirmatively elects on its Class 7 Ballot to receive treatment as a Tort Convenience Claim shall be deemed to be a Releasing Party hereunder and to have consented to and granted a full release and waiver of any claims and causes of action against the Members on account of such Holder's Claim** in exchange for receiving the Tort Convenience Recovery.

*Voting*:  Class 8 is Impaired under the Plan.  Each Holder of a Tort Convenience Claim is entitled to vote to accept or reject the Plan.

(ix)    <u>Class 9 – Member Patronage Capital Claims</u>

*Classification*:  Class 9 consists of all Member Patronage Capital Claims against the Debtor.

*Treatment*:  Except as otherwise set forth in the Confirmation Order or to the extent that a Holder of an Allowed Member Patronage Capital Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Patronage Capital Claim, each such Allowed Member Patronage Capital Claim shall, subject in all respects to the ECCA and the Bylaws, be Reinstated, retained by such Holder, and retired in accordance with the Bylaws.

*Voting*:  Class 9 is Unimpaired under the Plan.  Each Holder of an Allowed Member Patronage Capital Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Member Patronage Capital Claims are not entitled to vote to accept or reject the Plan.

(x)   Class 10 – Member Other General Unsecured Claims

*Classification*:  Class 10 consists of all Member Other General Unsecured Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Member Other General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Other General Unsecured Claim, each such Holder shall receive treatment pursuant to the Member Settlement as set forth in Article IV.F.

*Voting*:  Class 10 is Impaired under the Plan.  Each Holder of a Member Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

3.    *No Interests in the Debtor*[21]

Pursuant to the ECCA, there are no Interests in the Debtor for purposes of the Plan.  Rather, each of the Members has a statutory membership interest in the Debtor, which is represented by each Member's Member Certificate.  As set forth in Article IV.C of the Plan, except as otherwise set forth in the Plan or the Confirmation Order, the Members shall retain their Membership Certificates and continue to be members of the Reorganized Debtor under the ECCA, the Bylaws, and applicable law.  Accordingly, there are no Interests in the Debtor subject to classification under sections 1122 and 1123 of the Bankruptcy Code.

4.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtor shall seek

---

[21] The Committee believes that the Members' statutory cooperative membership in the Debtor under Texas law should be separately classified under the Plan.  The Debtor believes that a statutory cooperative membership is not an "Interest" subject to classification under sections 1122 and 1123 of the Bankruptcy Code; accordingly, the Plan does not classify the Members' statutory cooperative membership.  In the event that the Bankruptcy Court determines that such cooperative memberships constitute "Interests" that must be classified under the Bankruptcy Code, or such memberships are otherwise placed by agreement into a separate Class under the Plan, such memberships shall be Unimpaired under the Plan, and will be retained by the Members, who will continue to be members of the Reorganized Debtor under the ECCA, the Bylaws, and applicable law.  In such case, the Members would be deemed to accept the Plan on account of their respective memberships and would not be entitled to vote to accept or reject the Plan on account of such statutory cooperative memberships.

Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

### 5.      Elimination of Vacant Classes

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.      Separate Classification of Other Secured Claims

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under the Plan.

### 7.      Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

### 8.      Subordinated Claims

Except as may be the result of the settlement, the allowance, classification, and treatment of all Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor and the Reorganized Debtor reserve the right to reclassify any Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## C.      Means for Implementation of the Plan

### 1.      General Settlement of Claims

In consideration for the classification, distributions, releases, exculpations, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Causes of Action, controversies, and disputes resolved pursuant to the Plan. The Plan shall be deemed a motion by the Debtor to approve such compromises and settlements (including, without limitation, the Plan Settlements not already approved by the Bankruptcy Court) pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order, subject to the occurrence of the Effective Date, shall constitute the Bankruptcy Court's approval of such compromises and settlements (including, without limitation, the Plan Settlements not already approved by the Bankruptcy Court) under Bankruptcy Rule 9019 and section 1123 of the

Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtor, its Estate, and Holders of Claims, and are fair, equitable, and within the range of reasonableness.  Subject to Article VI of the Plan and the occurrence of the Effective Date, the treatment provided in the Plan and the distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final and indefeasible and shall not be subject to challenge, avoidance, turnover, or recovery by any other Person or Entity.

### 2.        *Restructuring Transactions; Effectuating Documents*

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may take any and all actions as may be necessary or appropriate in the Debtor's or the Reorganized Debtor's reasonable discretion to effectuate the Restructuring and the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of any New Organizational Documents, including any appropriate agreements or other documents of restructuring, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the filing of the New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, continuance, or dissolution pursuant to applicable law; (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iv) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution and delivery of the Exit Facility Documents, the RUS Contingency Exit Note, the Amended and Restated RUS Secured Notes Documents (including any agreement or document in connection with the funding of the AU8 FFB Note); (vi) the execution and delivery of the applicable Participating Member Securitization Documents; (vii) the execution and delivery of the Ratepayer Hardship Fund Documents; (viii) the consummation of the Generation Sale and execution and delivery of any documents and agreements in connection therewith; and (ix) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan (collectively, the "Restructuring Transactions"); provided, however, that the foregoing shall not be deemed to abrogate or replace the Board's authority or the consent or consultation rights granted to the Consenting Members under the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1142, 1145, and 1146 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, and no further approvals, authorization, or consents, except those expressly required pursuant to the Plan or the Confirmation Order shall be required.

### 3.        *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any

131999954

agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, the Debtor shall exist as the Reorganized Debtor and as a separate nonprofit corporation or other form of entity, as the case may be, with all the powers of a corporation or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other nonbankruptcy law).

Except as otherwise set forth in Article IV.E.2 of the Plan in respect of Defaulting Members, on and as of the Effective Date, the Members shall retain their Membership Certificates and continue to be members of the Reorganized Debtor in accordance with the terms of the ECCA, the Bylaws, and applicable law.

### 4.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Estate, all the Debtor's Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Retained Causes of Action Schedule), all Executory Contracts and Unexpired Leases assumed, but not assigned, by the Debtor, and any property acquired by the Debtor, including interests held by the Debtor in non-Debtor subsidiaries and Affiliates, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, interests, encumbrances, and liabilities of any kind unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or Bankruptcy Rules, subject to the Debtor's continued performance under the Plan. For the avoidance of doubt, the Reorganized Debtor shall be bound by all applicable provisions of the Protocols except as set forth in the Plan.

### 5.    *Sources of Plan Funding*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtor and the Reorganized Debtor, as applicable, shall fund distributions under the Plan with, as applicable, (i) the TAA Proceeds; (ii) the proceeds and loans available under the Exit Facility and the RUS Exit Financing; (iii) Cash on hand; (iv) Generation Sale Proceeds net of any transaction expenses in accordance with the provisions of Article IV.E.4 of the Plan and subject to the terms and conditions of the Amended and Restated RUS Secured Notes Documents; and (v) any other assets, sources of funding, or other consideration available to the Debtor or the Reorganized Debtor, as applicable. For the avoidance of doubt, funding for distributions under the Plan does not include any Claim that has been Reinstated pursuant to the Plan, and, upon a Member's deposit of its TAA Balance with the TAA Escrow Agent in accordance with the Plan, such Member shall not be obligated to provide Plan funding.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date agreement (including any New Organizational Documents), shall have the right and authority without further approval or order of the Bankruptcy Court to raise additional capital and obtain additional funding and financing in accordance with, and subject to, applicable law.

(i) <u>Payment of TAA Balances and Participating Member Securitization Reimbursements</u>

Each Member shall pay, or cause to be paid, its TAA Balance in full in Cash by depositing funds in an amount equal to such Member's TAA Balance with the TAA Escrow Agent no later than on the Effective Date.  A funds-flow memorandum shall be attached to the TAA Escrow Agreement and agreed to by the Debtor and the applicable Members at least five days before the Effective Date, which memorandum shall, to the extent practicable, provide that funds on deposit in respect of a Member's TAA Balance will be delivered directly to ERCOT and certain other Holders of Allowed Claims.  The TAA Escrow Agent's delivery of the applicable funds in accordance with the TAA Escrow Agreement and the funds-flow memorandum shall be deemed to be in full and final satisfaction of such Member's TAA Balance.

Each applicable Member shall pay, or cause to be paid, its respective Participating Member Securitization Reimbursements, if any, in full in Cash by depositing funds in an amount equal to such Member's Participating Member Securitization Reimbursements with the TAA Escrow Agent no later than on the Effective Date.  The TAA Escrow Agent's delivery of the applicable funds to the Debtor or the Reorganized Debtor, as applicable, in accordance with the TAA Escrow Agreement and the funds-flow memorandum shall be deemed to be in full and final satisfaction of such Member's Participating Member Securitization Reimbursements.

The funds on deposit with the TAA Escrow Agent shall not constitute property of the Debtor, its Estate, or the Reorganized Debtor unless and until such funds are delivered to the Debtor or the Reorganized Debtor, as applicable in accordance with the TAA Escrow Agreement and the funds-flow memorandum.

(ii) <u>Participating Member Securitization</u>

A Member may, in its sole discretion, elect to participate in the Participating Member Securitization, proceeds of which shall be used to fund, in full or in part, each Participating Member's TAA Balances and Participating Member Securitization Reimbursements.  On or before the Effective Date, each of the Participating Members shall cause the Participating Member Financing Order to be adopted by its board of directors and be binding and irrevocable on the Participating Members in accordance with its terms immediately upon the issuance of the Participating Member Securitized Bonds under the Participating Member Securitization Documents executed in connection with the Plan.  On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, and the Participating Members shall consummate the Participating Member Securitization and cause the Participating Member Securitized Bonds to be issued by the Participating Member Securitization LLC in one or more tranches or series and pursuant to and secured by a trust agreement.

Upon the entry of the Confirmation Order, the Debtor and the Reorganized Debtor, as applicable, shall be authorized to execute and perform under any applicable Participating Member Securitization Documents, including the Participating Member Master Servicing Agreement.[22]

(iii)  <u>Generation Sale Proceeds and Generation Debt Paydown</u>

On the Effective Date, the Cushion of Credit shall be applied to reduce the outstanding balance of and partially retire the RUS Secured Notes (including any accrued interest and, if any, prepayment penalty) related to debt obligations that were used to fund generation-related capital expenditures and are secured by a Lien on the Generation Assets, among other property, in favor of the RUS Secured Parties (such indebtedness after application of the Cushion of Credit, the "<u>Generation Debt</u>"). In accordance with the Amended and Restated RUS Secured Notes Documents, the Generation Sale Proceeds shall be used to first pay the remaining balance of the Generation Debt until the Generation Debt is paid in full (such paydown, the "<u>Generation Debt Paydown</u>"). Any and all Generation Sale Proceeds net of the Generation Debt Paydown and transaction fees and expenses related to the Generation Sale (including the RUS Secured Parties' reasonable, documented professional fees and expenses) shall be used to fund, within ten days of the Generation Sale Closing Date, the then-unpaid portion of the Interim Distribution Obligations, and any Generation Sale Proceeds remaining thereafter, if any, shall then be used by the Reorganized Debtor to pay down the RUS Contingency Exit Note. The Generation Sale Proceeds remaining after the RUS Contingency Exit Note is paid in full, if any, shall vest in and be retained by the Reorganized Debtor to be used, in the Reorganized Debtor's discretion, for any other general or corporate purposes; <u>provided</u>, <u>however</u>, that the use of any Generation Sale Proceeds remaining after satisfying the then-unpaid portion of the applicable Interim Distribution Obligations shall be subject to the RUS Secured Parties' prior written consent as set forth in the Amended and Restated RUS Secured Notes Documents unless otherwise approved by the RUS Secured Parties.

For the avoidance of doubt, unless otherwise agreed by the RUS Secured Parties and the Reorganized Debtor before the sale of a Generation Asset, the RUS Secured Parties' Lien in such Generation Assets shall continue in the proceeds thereof to the same extent and priority that the RUS Secured Parties had before such Generation Asset was sold. Notwithstanding the foregoing, the Reorganized Debtor's payments in respect of the Additional Market Participant Cash Payment and the Deferred GUC Obligations shall be free of any Lien of the RUS Secured Parties.

(iv)  <u>The Exit Facility and RUS Exit Financing</u>

The Reorganized Debtor shall be authorized to execute and otherwise enter into the Exit Facility and the RUS Exit Financing. The Exit Facility and the RUS Exit Financing will be made available to the Reorganized Debtor, pursuant to and subject to the terms and conditions set forth

---

[22] In its Disclosure Statement objection, STEC asserts that all securitization proceeds must be devoted to the market shortfall and that ERCOT lacks the authority to settle the Brazos Short Pay Claim. ERCOT has represented that the ERCOT Settlement is consistent with the Protocols and it has the authority to settle the Brazos Short Pay Claim. Brazos disagrees with STEC, and asserts that the various settlements contained in the Plan are the result of extensive settlements following several months of mediation with the Honorable Judge Marvin Isgur.

in the Exit Facility Documents and the Amended and Restated RUS Secured Notes Documents, respectively.

Confirmation shall be deemed approval of the incurrence of the Exit Facility and the RUS Exit Financing (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtor shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the indebtedness and other obligations under the Exit Facility, the RUS Exit Financing, and related guarantees, including the Exit Facility Documents and the Amended and Restated RUS Secured Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtor may deem to be necessary to consummate the Exit Facility and the RUS Exit Financing.

6.      *The Member Settlement*

The treatment under the Plan of the Members' Claims (including any Proofs of Claim filed by any of the Members) and other rights against the Debtor (including, without limitation, relating to the Members' payment of their respective TAA Balances and the treatment of the Allowed Member Other General Unsecured Claims, the Allowed Member Patronage Capital Claims, and the Members' All Requirements Contracts), together with the other terms and conditions set forth in the Plan and in the Confirmation Order (including the releases set forth in the Plan and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes by and among the Debtor and the Estate, on the one hand, and the Members, on the other hand.  The Member Settlement shall incorporate and include the following terms, conditions, and Restructuring Transactions:

(i)      Reorganized Debtor as a Transmission & Distribution Electric Cooperative

After the Effective Date (but no later than the Generation Sale Outside Date), in accordance with the Plan and through the Restructuring Transactions, the Reorganized Debtor shall sell its Generation Assets in one or more asset sales.  On the Amended ARC Effective Date, and subject to the Power Supply Exceptions, the Reorganized Debtor shall terminate its involvement in all power-supply activities and transition from a "wholesale generation and transmission electric cooperative" to a "wholesale transmission and distribution electric cooperative" organized and existing as a nonprofit electric cooperative corporation under the ECCA.

As of the Effective Date and thereafter, the Reorganized Debtor shall be prohibited from purchasing or building new electric-generation facilities and purchasing an interest in any electric-generation facility, and, as of the Amended ARC Effective Date, the Reorganized Debtor shall also be prohibited from (i) procuring power supply for any Consenting Members, (ii) selling electric power and energy to the Members or any other Entities, and (iii) registering with ERCOT as a QSE, LSE, or CRR Account Holder; provided, however, that, in each case, the Reorganized Debtor may, subject to the Amended ARCs, engage in activities directly related to the Power Supply Exceptions through a Third-Party QSE.  Notwithstanding the foregoing sentence, the

Debtor and the Consenting Members are discussing potential amendments to the Member Settlement as it relates to the Reorganized Debtor's use of a Third-Party QSE so as to potentially align the applicable provisions with the Generation QSE Termination Date in connection with the ERCOT Settlement.  Notwithstanding the foregoing, the Reorganized Debtor's status as a QSE, LSE, and CRR Account Holder shall terminate as set forth in Article IV.G.7 of the Plan.

    (ii)    <u>Assumption of All Requirements Contracts and Entry Into the Amended ARCs</u>

On the Effective Date, the Reorganized Debtor shall assume the All Requirements Contracts (including any All Requirements Contracts with any Defaulting Members) and execute the Amended ARCs.  On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, and the Consenting Members shall enter into the Amended ARCs, the term of which will commence on the Amended ARC Effective Date.

As of the Amended ARC Effective Date, but subject to the Power Supply Exceptions, the Reorganized Debtor shall provide to the Consenting Members only wholesale transmission within the ERCOT market, wholesale distribution, and other related services, and the Consenting Members shall no longer be obligated to obtain power supply services from the Reorganized Debtor and shall be forever released from all such obligations under the existing All Requirements Contracts; <u>provided</u>, <u>however</u>, that the Consenting Members shall remain obligated for any Transition Charges relating to any Generation Assets not sold by the Amended ARC Effective Date and relating to the Retained Agreements, in each case, in accordance with the provisions of the Amended ARCs.

    *1.*    *Defaulting Members*

Notwithstanding anything to the contrary in the Plan, pursuant to the Member Settlement, the Reorganized Debtor shall not enter into an Amended ARC with any Defaulting Member, and such Defaulting Member shall be deemed to be in breach of, but remain subject to all of its obligations under (including an obligation to pay its TAA Balance and its allocated share of Transition Charges), its All Requirements Contract, as assumed pursuant to the Plan.  Such Defaulting Member's unpaid TAA Balance shall be deemed to be a Cause of Action retained by the Reorganized Debtor pursuant to the Retained Causes of Action Schedule and shall not be released by any provision in the Plan.

A Defaulting Member shall be obligated to, among other things, pay any amounts associated with any loan, financing, or indebtedness incurred by the Debtor or the Reorganized Debtor, as applicable, to bridge such Defaulting Member's TAA Balance and any reasonable, documented fees and expenses (including, without limitation, any fees and expenses related to enforcement) incurred by the Reorganized Debtor or other applicable third party in connection with the collection of such Defaulting Member's TAA Balance and any other outstanding obligations.

    *2.*    *Expulsion of Defaulting Members*

A Defaulting Member's failure to timely pay, or cause to be paid, its TAA Balance on the Effective Date shall be deemed to be a violation or a refusal to comply with a rule or regulation of the Board, the Debtor, or the Reorganized Debtor, as applicable.  The approval of the Plan by two-

thirds (2/3) of the members of the Board shall be deemed to be the affirmative vote by two-thirds (2/3) of the members of the Board to expel a Defaulting Member from the Debtor or the Reorganized Debtor, as applicable, pursuant to section 1.6 of the Bylaws effective upon the date that is 30 days after such Defaulting Member's failure to timely pay its TAA Balance on the Effective Date in accordance with the Plan; provided, however, that, notwithstanding the foregoing, nothing in the Plan shall prohibit the Reorganized Debtor's Board from reinstating such Defaulting Member as a member of the Reorganized Debtor upon a two-thirds (2/3) vote of the members of the Reorganized Debtor's Board.  Any such Defaulting Member's then-existing Patronage Capital shall be retired in the ordinary course and in accordance with the applicable provisions of the Bylaws, the Plan, and the Confirmation Order.  Following the expulsion of the Defaulting Member, the Defaulting Member shall no longer accrue and be allocated additional Patronage Capital.  The expulsion of the Defaulting Member shall not affect the Defaulting Member's rights and obligations (including an obligation to pay its TAA Balance and its allocated share of Transition Charges) under its All Requirements Contract, as assumed pursuant to the Plan, and the Member shall continue to deemed to be in breach of its All Requirements Contract, as assumed pursuant to the Plan.

     (iii)    <u>Transition to Member-Directed Power Supply</u>

Before, on, or after the Effective Date, the Consenting Members and the Debtor or the Reorganized Debtor, as applicable, shall cooperate to negotiate and otherwise facilitate such Consenting Members' transition to alternative sources of power supply, and each Consenting Member may interact directly with ACES and other potential counterparties in connection with such Consenting Member's power supply.  Beginning on the Effective Date, or as soon thereafter as is reasonably practicable, at a Consenting Member's reasonable written request, the Reorganized Debtor shall use commercially reasonable efforts to amend its agreements with ACES, as necessary, to accomplish the foregoing, and will use commercially reasonable efforts to support any such Consenting Member's membership in ACES and such Consenting Member may negotiate, execute, and enter into its own power supply arrangements and agreements with counterparties; provided, however, that the foregoing is subject in all respects to the terms of the All Requirements Contracts until the Amended ARC Effective Date; provided, further, however, that no power supply related agreements entered into by a Consenting Member shall be effective or otherwise permit transactions to occur before the Amended ARC Effective Date.

     (iv)    <u>Generation Sale</u>

Before the Effective Date, the Debtor's Board authorized the Debtor to conduct the Generation Sale and, pursuant to the Plan, before, on and immediately after the Effective Date, the Debtor and the Reorganized Debtor, as applicable, shall continue such efforts, conduct a marketing process, and promptly consummate the Generation Sale.  In the event that the Debtor enters into an engagement agreement with an investment banker for the Generation Sale before the Effective Date, such engagement agreement shall be assumed by the Reorganized Debtor on the Effective Date pursuant to Article V of the Plan.

The final tranche or transaction of the Generation Sale must close, and all Generation Assets must have been sold, transferred, or otherwise abandoned (with any such abandonment to be subject to Bankruptcy Court approval), on or before the Generation Sale Outside Date, which

may be extended solely by the unanimous consent of (i) the Consenting Members and (ii) the Generation Oversight Committee; provided, however, that the Consenting Members and the Generation Oversight Committee must provide ERCOT, the Committee, and the GUC Notice Parties with written notice of any such extension at least 30 days before the Generation Sale Outside Date then in effect, and such notice shall contain reasonable detail setting forth the need for the extension and a good faith estimate of the anticipated length of the extension.

Notwithstanding any order of the Bankruptcy Court extending the Generation Sale Outside Date, if the Generation Sale Outside Date is extended, on or before the Generation QSE Termination Date, the Reorganized Debtor shall retain a Third-Party QSE to schedule the Reorganized Debtor's generation for the Generation Assets.  Failure to retain such Third-Party QSE on or before the Generation QSE Termination Date shall result in ERCOT having the absolute right to prohibit the Reorganized Debtor from selling generation into the ERCOT wholesale market until such time as the Reorganized Debtor has retained a Third-Party QSE.

For the avoidance of doubt, the sale or other disposition or abandonment of any Generation Assets shall be conducted in accordance with the applicable provisions of the Amended and Restated RUS Secured Notes Documents.

3.    *Generation Oversight Committee*

The Generation Oversight Committee shall make recommendations to the Board regarding the Generation Sale, but shall not have the authority to approve any transaction or otherwise bind the Board, the Debtor, or the Reorganized Debtor.  The Generation Oversight Committee may, subject to the consent and approval of the Reorganized Debtor's Board (such consent and approval not to be unreasonably withheld), retain professionals and other staff to, among other things, oversee and make recommendations to the Board in respect of the Generation Sale.

The Reorganized Debtor shall provide the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with reasonable access to nonprivileged documents and information concerning the status of the Generation Sale, including by providing copies of any written reports created by the Generation Oversight Committee (with appropriate redactions for privileged information) promptly after such reports are delivered to the Board or the Reorganized Debtor, as applicable.  Any such documents and information provided to the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, or the GUC Notice Parties, as applicable, shall be subject to the terms of the Protective Order and be treated by ERCOT as Protected Information (as defined in the Protocols) and by any other parties as confidential.  At the reasonable written request of the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, the GUC Notice Parties, or their respective attorneys and advisors, the Reorganized Debtor shall provide a reasonably detailed update, which may be written or by telephonic or video conference, on the status of the Generation Sale.  For the avoidance of doubt, any documents or information belonging to the Members shall be treated as highly confidential and no document or information shall be shared with any Entity (including any principal of such Entity) that is a competitor of the Reorganized Debtor or a potential purchaser of any T&D Assets.

4.    *Generation Employee Retention Plan*

The Generation Employee Retention Plan shall be implemented by the Reorganized Debtor on the Effective Date without any further action by the Reorganized Debtor's Board or the Bankruptcy Court.

   (v)   <u>Substations</u>

Upon the occurrence of the effective date under the Amended ARCs, and in accordance with the terms thereof, a Consenting Member shall have the ability by providing written notice to the Reorganized Debtor, but not the obligation, to construct, own, and maintain new substations in such Consenting Member's service area.

   (vi)   <u>The Ratepayer Hardship Fund</u>

The Debtor's mission historically has been to provide valued service to the Members and through them, their respective Ratepayers, by generating, procuring, and transmitting reliable power at the lowest cost. Although the Reorganized Debtor, in accordance with the Plan, will soon exit the power-supply and power-generation businesses, the Reorganized Debtor remains committed to reducing the financial impact of Winter Storm Uri and this Chapter 11 Case on the applicable Members' Ratepayers, while continuing to provide reliable electricity transmission and distributions service after the Effective Date and the consummation of the Generation Sale. To continue those efforts, the Debtor or the Reorganized Debtor, as applicable, shall establish and fund the Ratepayer Hardship Fund to help mitigate Winter Storm Uri's impact on Ratepayer electric bills.

   *1.*   *The Establishment of the Ratepayer Hardship Fund*

Before, on, or promptly after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall take all necessary steps to establish the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents. The Ratepayer Hardship Fund shall not be a source of distributions to Holders of Claims under the Plan or otherwise against the Debtor or the Reorganized Debtor. The Ratepayer Hardship Fund shall be established for the purposes described in the Plan and, as applicable, the Plan Supplement, and any other purposes more fully described in the Ratepayer Hardship Fund Documents. The Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall, in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents:

   i.   make Hardship Distributions to Qualified Hardship Recipients;

   ii.   hold, manage, invest, and administer the Hardship Fund Contribution and all other funds and other assets received by the Ratepayer Hardship Fund for the benefit of the beneficiaries of the Ratepayer Hardship Fund;

   iii.   hold and maintain required reserves for the Ratepayer Hardship Fund in accordance with the Ratepayer Hardship Fund Documents; and

   iv.   pay all applicable Hardship Fund Expenses.

On the Effective Date, the Reorganized Debtor shall fund the Ratepayer Hardship Fund with the Hardship Fund Contribution and neither the Debtor, the Reorganized Debtor, the Consenting Members, nor any other party shall be obligated to make any other or further contribution to the Ratepayer Hardship Fund. The Hardship Fund Contribution shall vest in the Ratepayer Hardship Fund free and clear of all Liens, Claims, interests, encumbrances, and liabilities of any kind, and shall be subject to and governed by the applicable provisions of the Plan and the Ratepayer Hardship Fund Documents.

2.    *Appointment and Role of the Hardship Fund Administrator, the Hardship Fund Trustee, and the Hardship Fund Oversight Committee*

Upon the entry of the Confirmation Order, the Debtor shall be authorized to engage and retain Solix, Inc., on and subject to the terms set forth in the Plan Supplement, to serve as the initial Hardship Fund Administrator. In furtherance of and consistent with the purposes of the Ratepayer Hardship Fund and the Plan, the Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall have the power and authority to perform their respective functions on behalf of the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents. In all circumstances, the Hardship Fund Administrator and the Hardship Fund Trustee shall be independent and disinterested and shall act in the best interests of the beneficiaries of the Ratepayer Hardship Fund, in furtherance of the purposes of the Ratepayer Hardship Fund, and in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents. All determinations regarding the eligibility of any person or entity for any service, payment, or other relief or accommodation from the Ratepayer Hardship Fund will be made pursuant to the Ratepayer Hardship Fund Documents.

The affairs of the Ratepayer Hardship Fund shall be managed by the Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, under the direction of the Hardship Fund Oversight Committee.

3.    *Monitoring and Reporting Obligations*

The Hardship Fund Administrator and the Hardship Fund Trustee, as applicable, shall, among other things and subject to the Ratepayer Hardship Fund Documents, (i) monitor the use of funds received by Ratepayer Hardship Fund and (ii) prepare and deliver to the Reorganized Debtor, the Consenting Members, and the PUCT quarterly reports on the disbursements and other Hardship Distributions from the Ratepayer Hardship Fund, the use and management of the Hardship Fund Contribution, and compliance with the Ratepayer Hardship Fund Documents. A copy of any such quarterly reports shall be Filed with the Bankruptcy Court. In addition, the Hardship Fund Administrator shall use commercially reasonable efforts to provide the Reorganized Debtor, the Consenting Members, and the PUCT with reasonable access to nonprivileged documents and information concerning the administration of the Ratepayer Hardship Fund and any Hardship Distributions made to Qualified Hardship Recipients.

4.    *Residual Cash in Ratepayer Hardship Fund*

To the extent any portion of the Hardship Fund Contribution (including any proceeds thereof) remains in the Ratepayer Hardship Fund as of the 10th anniversary of the Effective Date,

such remaining Cash shall be deemed to have irrevocably re-vested in, and the Hardship Fund Administrator shall promptly transfer such property to, the Reorganized Debtor for distribution to the Members (other than Defaulting Members and Members that did not have a TAA Balance) to be used by such Members in a manner materially consistent with the Ratepayer Hardship Fund purposes and the written recommendations of the Hardship Fund Oversight Committee (a copy of which shall be given to each Member) made in accordance with the Ratepayer Hardship Fund Documents.

(vii)    Releases; Proofs of Claim; CoServ/Tri-County Claim Litigation

The Consenting Members shall be (i) Released Parties under the Plan and shall receive the releases set forth in Article VIII.C and (ii) Releasing Parties under the Plan and shall grant the releases set forth in Article VIII.D.  On the Effective Date, each Proof of Claim Filed by or on behalf of any of the Consenting Members shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court, and, except as otherwise set forth herein, all Claims and Causes of Action between the Debtor and the Estate, on the one hand, and the Consenting Members, on the other hand, shall be deemed to be fully and finally resolved, waived, discharged, and released.

On the Effective Date or promptly thereafter, CoServ, Tri-County, the Reorganized Debtor, and the Committee shall take reasonable steps to facilitate the dismissal with prejudice, of the CoServ/Tri-County Claim Litigation, and the CoServ/Tri-County Claim Litigation shall be deemed fully resolved; provided, however, that the CoServ/Tri-County Claim Litigation shall not be withdrawn or dismissed as to any Defaulting Member.

(viii)    Consenting Member Recourse

The Consenting Members shall have all rights available under applicable law to enforce the terms of the Plan, the Confirmation Order, and any other applicable Plan Document, and nothing in the Plan shall be construed to limit or compromise any such rights.

*7.    The ERCOT Settlement*

The treatment of the ERCOT Claim under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth in the Plan and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the ERCOT Adversary Proceeding, the ERCOT Claim Appeals, and all Claims, Causes of Action, controversies, and disputes related thereto.  The ERCOT Settlement includes the following material terms, conditions, and Restructuring Transactions:

(i)    Eligible Market Participant Election Notice

ERCOT shall send the Eligible Market Participant Election Notice to the Eligible Market Participants.

(ii)    ERCOT's Payments to Eligible Market Participants; Releases; Binding Effect

131999954

The Eligible Market Participant Election Notice sets forth the Market Participant Settlement Procedures. The Market Participant Settlement Procedures provide, among other things, that all Eligible Market Participants will be bound by the release and injunction provisions as set forth therein unless any such Eligible Market Participant opts out in accordance with the Market Participant Settlement Procedures. The Market Participant Settlement Procedures further provide that any Eligible Market Participants that do not elect to receive the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash Recovery will receive the Market Participant Deferred Cash Recovery. Pursuant to the Market Participant Settlement Procedures, ERCOT will pay the ERCOT Market Participant Consideration received under Article III.B.4 of the Plan to Eligible Market Participants in accordance with the ERCOT Recovery Appendix. The Market Participant Settlement Procedures provide that any payment obligation of ERCOT to Eligible Market Participants on account of the Brazos Short Pay Claim shall be governed solely by the Plan and the ERCOT Recovery Appendix, and that ERCOT's payment of the ERCOT Market Participant Consideration to Eligible Market Participants pursuant to the Market Participant Settlement Procedures constitutes the full and final satisfaction of the amount each are owed by ERCOT on account of their allocable portion of the Brazos Short Pay Claim.

**Except as otherwise set forth in the Confirmation Order or the Market Participant Settlement Procedures, effective immediately upon the occurrence of the Effective Date, each of the ERCOT Settlement Release Parties shall be deemed to release, remise and forever discharge each other ERCOT Settlement Release Party of and from any and all debts, losses, demands, actions, Claims, Causes of Action, suits, accounts, covenants, contracts, agreements, claims, counterclaims, controversies, disputes, obligations, judgments, rights, damages, costs, losses, expenses, liens, or liabilities of any and every nature or description whatsoever, both at law or in equity, whether asserted or unasserted, express or implied, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, which arose at any time before the Effective Date, arising out of or directly related to the ERCOT Adversary Proceeding, the ERCOT Claim, the Brazos Short Pay Claim (including ERCOT's efforts to collect the Brazos Short Pay Claim), or the Debtor's purchase or procurement of any electricity or ancillary services from ERCOT during Winter Storm Uri.**

**Upon the occurrence of the Effective Date, except as otherwise set forth in the Market Participant Settlement Procedures, or to the extent that the Bankruptcy Court orders otherwise, the Eligible Market Participants and their respective affiliates (for purposes of this paragraph, the term "affiliate" shall have the meaning ascribed in the Protocols) and Representatives shall be forever barred and enjoined from taking any action against ERCOT or its property or to otherwise interfere with the implementation of the Plan or the ERCOT Settlement in respect of any Claim or Cause of Action in any way related to the ERCOT Claim (including the Brazos Short Pay Claim), or the specific transactions underlying or that otherwise gave rise to the ERCOT Claim or any portion thereof (including the Brazos Short Pay Claim); _provided_, _however_, that nothing herein releases or waives the Debtor's, the Reorganized Debtor's, or ERCOT's obligations under the ERCOT Settlement. Notwithstanding anything contained in Article IV.G of the Plan to the contrary, Eligible Market Participants may cooperate with the efforts of their QSE Customers that are not ERCOT Settlement Release Parties before the PUCT, a court, or other Governmental Unit, at the request of such QSE Customer and to the extent that such cooperation is required by the terms of the contract between the Eligible Market Participant and the QSE Customer.**

For the avoidance of doubt, (i) no party is releasing any right or interest in any Unaffected Proceeding pursuant to Article IV.G of the Plan or the Market Participant Settlement Procedures; (ii) if all transactions in the ERCOT wholesale market during Winter Storm Uri are resettled or repriced (*i.e.*, a market-wide repricing) by either ERCOT decision, an act of the Texas Legislature, or an order issued by the PUCT or any other Governmental Unit or court with authority (including as a result of invalidation or vacatur of the PUCT orders entered on February 15, and 16, 2021 or ERCOT's implementation of those orders during any time period) neither the Debtor nor the Reorganized Debtor nor any Member shall be required to pay, or entitled to receive payment in connection with, any invoices (including Default Uplift Invoices) related to such ERCOT market-wide wholesale market resettlement or repricing; (iii) the Debtor or the Reorganized Debtor, as applicable, shall be required to pay the ERCOT Unaffected Invoices as set forth below; (iv) neither the Debtor nor the Members are releasing any rights or Claims against each other related to the All Requirements Contract, the TAA, or the TAA Balance pursuant to Article IV.G.2 of the Plan; and (v) nothing in the ERCOT Settlement, Article IV.G  of the Plan, or the Market Participant Settlement Procedures shall in any way except any Claim from or otherwise compromise or abrogate the Debtor's discharge under section 1141 of the Bankruptcy Code or the applicable provisions of Article VIII of the Plan.

On the Effective Date, each Proof of Claim Filed by or on behalf of any Eligible Market Participants shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court solely to the extent that such Claim relates to the Brazos Short Pay Claim or any related Default Uplift; provided, however, that any timely Filed Proofs of Claim or applications for payment in respect of Bilateral Power Claims or Bilateral Gas Claims held by any Eligible Market Participants shall remain subject to any rights and defenses held by the Debtor, the Estate, the Reorganized Debtor, and the Holders of such Claims and shall, if Allowed, receive the treatment applicable to such Claims under the Plan.

### (iii)    No Default Uplift

The Debtor's and Reorganized Debtor's timely payment of the Initial ERCOT Cash Payment and the ERCOT Market Participant Consideration to ERCOT and ERCOT's subsequent payments of such Cash to Eligible Market Participants, as set forth in the ERCOT Recovery Appendix, shall constitute a payment plan designed to enable ERCOT to pay the Eligible Market Participants all amounts such Eligible Market Participants are owed by ERCOT on account of the Brazos Short Pay Claim.  If the Debtor or Reorganized Debtor fails to comply with this payment plan, ERCOT (i) shall not collect unpaid amounts through the Default Uplift process described in Protocols §§ 9.19.1 and 9.19.2 in connection with or arising from the Brazos Short Pay Claim and (ii) may only seek relief from the Bankruptcy Court as provided in the Plan.  For the avoidance of doubt, the foregoing does not apply to any Default Uplift process arising from a default by a Market Participant other than Brazos.

### (iv)    ERCOT Prepetition Transfers

As partial consideration to ERCOT in exchange for the settlement and compromises set forth in the ERCOT Settlement (including the compromise and settlement of the ERCOT Claim), as of the Effective Date, all claims and Causes of Action related to the ERCOT Prepetition

Transfers are waived and released by the Debtor and the Estate, and ERCOT shall retain the ERCOT Prepetition Transfers.

(v)    Dismissal of Proceedings

On the Effective Date, ERCOT and the Reorganized Debtor (and, to the extent required under any applicable rules, the Member Intervenors, the Defendant Intervenors, and the Committee) shall file one or more joint stipulations, motions, or other appropriate filings with, as applicable, the Bankruptcy Court, the U.S. District Court for the Southern District of Texas, or the U.S. Court of Appeals for the Fifth Circuit to dismiss with prejudice the ERCOT Adversary Proceeding and dismiss the ERCOT Claim Appeals.  ERCOT and the Reorganized Debtor acknowledge and agree that the *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss and for Abstention* [Adv. Dkt. No. 137], the *Order Denying Electric Reliability Council of Texas, Inc.'s Emergency Motion to Dismiss* [Adv. Dkt. No. 243], and the *Order on Motions for Summary Judgment* [Adv. Dkt. No. 377] are each subject to an ongoing and pending appeal, each of which will be fully resolved by the ERCOT Settlement agreement; thus, no court of final appellate jurisdiction has reviewed or considered whether the Bankruptcy Court made any factual or legal errors in its respective rulings.

(vi)    Certain Remaining Obligations

On the Effective Date (or in the ordinary course if any of the following amounts are not due and owing as of the Effective Date), the Debtor or the Reorganized Debtor, as applicable, shall pay in full the ERCOT Unaffected Invoices.

To secure the payment obligations of the Debtor and the Reorganized Debtor, as applicable, in respect of an ERCOT Unaffected Invoice, ERCOT may hold the ERCOT Unaffected Invoice Collateral, which ERCOT may apply to satisfy the Debtor's or the Reorganized Debtor's obligations to ERCOT under any ERCOT Unaffected Invoice in the event that the Debtor or the Reorganized Debtor fails to timely pay such invoice as required by the Plan.  In the event that ERCOT uses any portion of the ERCOT Unaffected Invoice Collateral to satisfy payment obligations arising from an ERCOT Unaffected Invoice, ERCOT may request that the Reorganized Debtor replenish the ERCOT Unaffected Invoice Collateral.  After the Reorganized Debtor's potential liability for any ERCOT Unaffected Invoice has ended, ERCOT shall return to the Reorganized Debtor any then-unused ERCOT Unaffected Collateral.

(vii)    Reorganized Debtor's Market Participant Status

The treatment provided under Article III.B.4 of the Plan in respect of the Allowed ERCOT Claim, constitutes the full, final, and prompt satisfaction, settlement, release, and discharge of the ERCOT Claim, including under sections 39.159, 39.160, and 41.151(b) of PURA.  Subject to the Reorganized Debtor's performance of its obligations under the Plan and the Confirmation Order, (i) the Reorganized Debtor shall be deemed to be in compliance with the applicable requirements of, and no action shall be taken against the Reorganized Debtor in respect of the Brazos Short Pay Claim under, sections 39.159, 39.160, and 41.151 of PURA as they relate to any obligations arising from or related to the ERCOT Claim, (ii) ERCOT shall be deemed to have taken all steps necessary to pursue collection in full, (iii) ERCOT shall not report to the PUCT that the Reorganized Debtor

is in default under sections 39.159 or 39.160 of PURA or otherwise, in connection with any obligations arising from or related to the ERCOT Claim, and (iv) except as otherwise provided in the Plan in respect of ERCOT, no Entity shall pursue collection of the ERCOT Claim from the Reorganized Debtor or any other Entity under sections 39.159 or 39.160 of PURA or otherwise.

On and after the Effective Date, subject to the Reorganized Debtor's continued compliance with the Brazos SFA (as applicable) and any other applicable SFA, (i) the Brazos SFA shall be deemed to be in full force and effect and binding on the Reorganized Debtor, and any alleged breach or default occurring before the Petition Date shall be deemed to be cured as of the Effective Date; (ii) the Reorganized Debtor shall remain a LSE pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor shall terminate its status as a LSE; (iii) the Reorganized Debtor shall remain a QSE pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor may no longer schedule load and may remain as a QSE solely to schedule generation for the Generation Assets through the Generation QSE Termination Date; (iv) the Reorganized Debtor shall remain a CRR Account Holder pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor may remain as a CRR Account Holder solely to fully liquidate or transfer its PCRRs and CRRs (each as defined in Protocols § 2.1) pursuant to a written "liquidation plan" submitted to ERCOT, and the Reorganized Debtor shall terminate its status as a CRR Account Holder for all purposes within 30 days after such PCRRs and CRRs are fully liquidated or transferred; and (v) the Reorganized Debtor shall remain a Transmission Service Provider and a Distribution Service Provider, and perform any other Market Participant functions reasonably necessary under the Amended ARCs (other than serving as a QSE, LSE, or CRR Account Holder) pursuant to the Brazos SFA or any other applicable SFA.  If the Reorganized Debtor or ERCOT determines that it would be necessary or advisable for the Reorganized Debtor or its Affiliates to execute a new SFA or other agreement under the Protocols in connection with the Plan and the Restructuring Transactions, ERCOT and the Reorganized Debtor shall, subject to the Protocols, cooperate to negotiate any such SFA or other agreement in good faith.

Notwithstanding anything to the contrary herein, subject to the Reorganized Debtor's compliance with the Protocols, nothing in the Plan shall be deemed to limit or in any way hinder the Reorganized Debtor's engagement of or arrangements with a Third-Party QSE in connection with the Power Supply Exceptions, if any, on the Reorganized Debtor's behalf.

(viii)    <u>Changes in Management</u>

As part of the ERCOT Settlement, and at ERCOT's request, the Board and the Debtor have agreed to, and the Reorganized Debtor shall implement, the management changes set forth in Article IV.M.2 of the Plan.

(ix)    <u>No Consents Required</u>

ERCOT represents and warrants that it has full power and authority to enter into the ERCOT Settlement as set forth in the Plan and otherwise perform all of its obligations under the ERCOT Settlement, the Plan, and the Confirmation Order, and that no other or further authority, approval, or consent of or from the PUCT or any other Entity is required for ERCOT to enter into the ERCOT Settlement.

131999954

### 8.     SCEA Claims Settlement

The treatment of the SCEA Claims (including the SCEA Allowed GUC Claim and the SCEA Allowed Administrative Claim) under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth in the Plan and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and SCEA, on the other hand.  The SCEA Claims Settlement includes the following material terms and conditions:

As of the Effective Date, the SCEA Allowed Administrative Claim shall be deemed Allowed in full and shall be paid in full in Cash in accordance with Article IIA of the Plan.

As of the Effective Date, the SCEA Allowed GUC Claim shall be a Class 5 General Unsecured Claim and deemed Allowed, unless the Bankruptcy Court determines that it must be separately classified, in which case the SCEA Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5A Claim with the same treatment as provided for in this Article IV.H.  The SCEA Allowed GUC Claim shall receive treatment as an Allowed Class 5 General Unsecured Claim; provided, however, that SCEA shall receive the following payments on account of the SCEA Allowed GUC Claim:   (i) on the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the aggregate amount of $105,440,252.88 in Cash with respect to the first $124,047,356.33 tranche of the SCEA Allowed GUC Claim, which payment shall be in full and final satisfaction of such portion of the SCEA Allowed GUC Claim, and (ii) the second $130,000,000 tranche of the SCEA Allowed GUC Claim shall be paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the SCEA Allowed GUC Claim is classified as a Class 5 or Class 5A General Unsecured Claim (i.e., the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the GUC Cash Recovery in the amount of the GUC Distribution Percentage with respect to the $130,000,000 tranche of the SCEA Allowed GUC Claim in full and final satisfaction thereof).  To the extent the recoveries received by Holders of Allowed Class 5 General Unsecured Claims increase consistent with the terms of the Committee Settlement and the Plan, the recovery to SCEA on account of the $130,000,000 tranche of the SCEA Allowed GUC Claim shall increase commensurately.  There shall be no interest, charge, or accrual of any kind payable in respect of the SCEA Allowed GUC Claim other than solely in respect of the second tranche of the SCEA Allowed GUC Claim as set forth in Article IV.L.1.a of the Plan, if any.

On the Effective Date, except to the extent of the Allowed SCEA Claims in this Article IV.H of the Plan, each Proof of Claim Filed by or on behalf of any of SCEA shall be deemed withdrawn and expunged and the Debtor's objection to the SCEA Claims, all related filings by the Debtor and SCEA in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

### 9.     BSCEC Claims Settlement

The treatment of the BSCEC Claims (including the BSCEC Allowed GUC Claim) under the Plan and the BSCEC Claims Settlement, together with the other terms and conditions set forth

in the Plan and the Confirmation Order, reflects the compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and each of the BSCEC Trustee and the BSCEC Collateral Trustee, on behalf of itself and the BSCEC Noteholders, on the other hand.  The BSCEC Claims Settlement includes the following material terms and conditions:

Pursuant to the BSCEC Claims Settlement, the BSCEC Allowed GUC Claim shall receive the agreed treatment pursuant to the Plan and the Confirmation Order in accordance with the terms and conditions of the BSCEC Claims Settlement Agreement, which terms and conditions are incorporated into the Plan as if fully set forth herein.  The BSCEC Allowed GUC Claim shall be classified as a Class 5 General Unsecured Claim, unless the Bankruptcy Court determines that it must be separately classified, in which case the BSCEC Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5B Claim with the same treatment pursuant to the Plan and the Confirmation Order as provided for in the BSCEC Claims Settlement Agreement and paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the BSCEC Allowed GUC Claim is classified as a Class 5 or Class 5B General Unsecured Claim (*i.e.*, the Debtor or the Reorganized Debtor, as applicable, shall pay the GUC Cash Recovery in the amount of the GUC Distribution Percentage on account of the BSCEC Allowed GUC Claim).  There shall be no interest, charge, or accrual of any kind payable in respect of the BSCEC Allowed GUC Claim other than as set forth in Article IV.L.1.a of the Plan, if any.

On the Effective Date, except in respect of and to the extent of the BSCEC Allowed GUC Claim in the BSCEC Claims Settlement Agreement and Article IV.I of the Plan, each Proof of Claim Filed by or on behalf of any of the BSCEC Trustee or the BSCEC Collateral Trustee, on behalf of itself or the BSCEC Noteholders, shall be deemed withdrawn and expunged and the Debtor's objections to the applicable BSCEC Claims, all related filings by the Debtor, the BSCEC Trustee, or the BSCEC Collateral Trustee in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything in the Plan or the Confirmation Order, the BSCEC Claims Settlement Agreement provides for releases to be granted and received by parties (which includes third-party beneficiaries for all purposes in this paragraph and the next paragraph) as set forth therein, and the releases thereunder shall exclusively govern the terms and conditions of the releases (including the timing of such releases) and the scope of any stay, injunction, and exculpation in the Plan between such parties; provided, however, that a party may affirmatively elect to opt into the broader releases, stays, injunction and exculpations as provided for in the Plan as to itself.  There shall be no retained Causes of Action in respect of any releasee referenced in Section 5 of the BSCEC Claims Settlement Agreement.

Notwithstanding anything in the Plan Documents, Article IV.I of the Plan does not impair or limit the BSCEC Claims Settlement Agreement, which shall remain in full force and effect and shall control in the event of an inconsistency with the Plan Documents.  Article IV.I of the Plan and any other provision of the Plan may not be amended or modified to adversely affect any rights of the parties under the BSCEC Claims Settlement Agreement without the prior written consent of the affected party, which consent may not be unreasonably withheld.

131999954

### 10. *Tenaska Power Claim Settlement*

The treatment of the Tenaska Power Claim under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth in the Plan and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and Tenaska Power, on the other hand.  The Tenaska Power Claim Settlement includes the following material terms and conditions:

As of the Effective Date, the Tenaska Power Claim shall be deemed an Allowed Administrative Claim in the aggregate amount of $84,090,140.38, and, notwithstanding anything to the contrary in Article II.A of the Plan, Tenaska Power shall be paid an amount in Cash equal to 93.6 Cents of such Allowed Claim (*i.e.*, $78,708,371.40) on the Effective Date in full and final satisfaction of such Allowed Claim.

On the Effective Date, each Proof of Claim Filed by or on behalf of any of Tenaska Power shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court.

### 11. *Committee Settlement*

The treatment of General Unsecured Claims under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth in the Plan and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Committee.  The Committee Settlement includes the following material terms and conditions:

(i) <u>Minimum Recovery</u>

Each Holder of an Allowed General Unsecured Claim will be paid by the Reorganized Debtor through the GUC Cash Recovery an aggregate amount in Cash that is sufficient to yield a recovery of no less than 89.5 Cents on account of such Holder's Allowed General Unsecured Claim (without interest, charge, or accrual of any kind, other than pursuant to Article IV.L.1.a of the Plan), including the BSCEC Allowed GUC Claim and the second tranche of the SCEA Allowed GUC Claim (i.e., the remaining $130,000,000), unless any such Holder agrees to less favorable treatment (including, as to the BSCEC Allowed GUC Claim, pursuant to the BSCEC Claims Settlement Agreement, if any, and as to the SCEA Allowed GUC Claim pursuant to the SCEA Claims Settlement).  Holders of Allowed General Unsecured Claims will be the sole beneficiaries of any reduction in the amount of the Debtor's Estimated GUC Pool (i.e., if the amount of Allowed General Unsecured Claims falls below the August 2022 Estimated GUC Pool, including on account of any reduction in the BSCEC Claims as set forth in the BSCEC Claims Settlement Agreement, each Holder of an Allowed General Unsecured Claim will receive a proportionate increase in its recovery under the Plan), unless any such Holder agrees to less favorable treatment. The GUC Distribution Percentage shall not be increased on account of the portion of any Claim held by MUFG that is secured by the MUFG Account, any General Unsecured Claim that is

82

reclassified as a Secured Claim or Administrative Claim or Other Priority Claim, any Cure Claims, Claims for obligations assumed by the Reorganized Debtor under the Plan, any Claims to the extent paid (in full or in part) during the Chapter 11 Case pursuant to a Bankruptcy Court order, and Claims that are expressly deemed withdrawn, expunged, or otherwise disallowed as of the Effective Date under the Plan.  For the avoidance of doubt, no portion of the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payments, shall be reduced to fund the GUC Cash Recovery and, similarly, no portion of the GUC Cash Recovery shall be reduced to fund the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payment.

(ii)     <u>Tort Claims Treatment</u>

Holders of Class 7 Tort Claims will receive the treatment set forth in Article III.B.7 of the Plan.  To the extent that any such Holder of an Allowed Class 7 Tort Claim is entitled to receive payment on account of such Allowed Claim under the applicable General Liability Insurance Policies, the Reorganized Debtor shall pay the amount of the deductible, if any, required under the applicable General Liability Insurance Policies.  As set forth in Articles III.B.7 and III.B.8 of the Plan, each Holder of an Allowed Tort Claim shall have the option to elect Tort Convenience Claim treatment and receive the Tort Convenience Recovery in accordance with the Plan.  Each Holder of an Allowed Tort Claim that affirmatively elects on its Ballot to receive the Tort Convenience Recovery as a Class 8 Tort Convenience Claim shall be deemed to be a Releasing Party under the Plan and to have granted a full release and waiver in respect of the Debtor, the Reorganized Debtor, each of the Members, and each of the foregoing party's respective Representatives on account of such Holder's Claim.

(iii)    <u>Waiver of Certain Preference Claims</u>

On the Effective Date, the Debtor, on behalf of itself and its Estate, and all of its successors or assigns, and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall release and be deemed to have waived the right to pursue any and all Claims and Causes of Action under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable nonbankruptcy law (including, without limitation, any such Claims and Causes of Action against Holders of Allowed General Unsecured Claims, Allowed General Unsecured Convenience Claims, Allowed Tort Claims, and Allowed Tort Convenience Claims).

(iv)    <u>Committee Consent, Consultation, and Reporting Rights</u>

The following Plan Documents (or applicable provisions thereof) shall be in form and substance reasonably satisfactory to the Committee, <u>provided</u> that any such consent shall not be unreasonably withheld:  (i) the Plan; (ii) the provisions of the Confirmation Order that implement the terms of the Committee Settlement; and (iii) any amendment, modification, or supplement to the foregoing that is materially adverse to the Committee or Holders of Allowed Claims in Classes 5 through 8.  The Debtor or the Reorganized Debtor, as applicable, shall consult the Committee in respect of the following:  (i) the Debtor's selection of the Effective Date, (ii) the form of the Exit

Facility Credit Agreement, and (iii) whether to include in the Plan Supplement any other document or agreement that the Debtor determines may be necessary or advisable to effectuate the Restructuring Transactions or that are otherwise contemplated by the Plan, but solely to the extent that such document or agreement affects the treatment of Allowed Claims in Classes 5 through 8. The Committee and the Prepetition Revolving Agent shall also receive any reporting provided pursuant to the Exit Facility Credit Agreement until final distributions are made on all General Unsecured Claims, which reporting shall be subject to the Protective Order and be treated as confidential.

     (v)    <u>Plan Support</u>

The Committee will recommend that all creditors, including, without limitation, the Holders of Claims under the Prepetition Revolving Loan Documents and Holders of Tort Claims, support the Committee Settlement and vote to accept the Plan (including by providing a letter or other insert to be included in the Disclosure Statement and solicitation materials). The Committee will not change its recommendation, and will not, directly or indirectly, oppose, join in opposition, or otherwise assist with any objection or other challenge to the Plan or to Confirmation unless the Bankruptcy Court finds that the Disclosure Statement contained material omissions or misstatements sufficient to require a re-solicitation of the Plan. In addition, neither the Committee, its members, nor its professionals will share any "work product," analysis, or other confidential information with any other party that does not support the Committee Settlement or the Plan; <u>provided</u>, <u>however</u>, that the Committee and its professionals will not be prohibited or otherwise prevented from requesting that information already known to the Committee and its professionals be included in the Disclosure Statement to the extent that the Committee or its professionals reasonably believe that the inclusion of such information is necessary to ensure that the Disclosure Statement provides "adequate information" as defined in section 1125 of the Bankruptcy Code.

     *12.*    ***Plan Defaults***

     (i)    <u>Reorganized Debtor Defaults</u>

The Reorganized Debtor's failure to timely pay any portion of the ERCOT Market Participant Consideration to ERCOT or the Deferred GUC Obligations to the applicable Holders shall constitute a "Plan Default." If the Reorganized Debtor determines that it will be unable to timely pay any portion of the ERCOT Market Participant Consideration or the Deferred GUC Obligations on or before the date that any such Plan payment is due, the Reorganized Debtor shall, no later than seven (7) days before any such Plan payment is due, File a notice (and serve a copy of such notice on the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties) with the Bankruptcy Court (i) stating that the Reorganized Debtor's Board, in its sole discretion, has authorized the Reorganized Debtor to, as applicable, promptly sell a portion of its T&D Assets or obtain other financing and, in either case, (ii) confirming (a) that such sale transaction or financing is reasonably likely to result in net-sale proceeds or financing proceeds sufficient to enable the Reorganized Debtor to cure the applicable Plan Default and (b) the anticipated timing of any such transaction (any such notice, a "<u>Plan Default Cure Notice</u>"). After Filing a Plan Default Cure Notice, the Reorganized Debtor shall use commercially reasonable efforts to promptly market and sell the applicable T&D Assets or otherwise obtain such financing, as the case may be.

After the Reorganized Debtor Files a Plan Default Cure Notice, the Reorganized Debtor shall provide the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with reasonable access to nonprivileged documents and information concerning the status of any proposed sale of T&D Assets or efforts to obtain other financing. Any such documents and information provided to the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, or the GUC Notice Parties, as applicable, shall remain subject to the Protective Order and be treated by ERCOT as Protected Information and by any other parties as confidential. For the avoidance of doubt, any documents or information belonging to the Members shall be treated as highly confidential and no document or information shall be shared with any Entity (including any principal of such Entity) that is a competitor of the Reorganized Debtor or a potential purchaser of any T&D Assets.

a.   <em>Post-Effective Date and Default Interest</em>

The unpaid portion of the Interim Distribution Obligations shall bear interest at a rate of 6.0% *per annum* from and including the Effective Date through the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date; <u>provided</u>, <u>however</u>, that, if such Interim Distribution Obligations are paid in full on or before the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, any accrued interest shall be deemed to have been irrevocably waived and forgiven. If the Interim Distribution Obligations are not paid in full on or before the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, any accrued interest shall become immediately due and payable as of the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, subject to subsection (b) below. If a Plan Default occurs in respect of the Interim Distribution Obligations, the unpaid portion of such Interim Distribution Obligations shall bear interest payable on demand, subject to subsection (b) below, at a rate of 8% *per annum* from and after the date of such Plan Default until the defaulted portion of such Interim Distribution Obligations are paid in full.

If a Plan Default occurs in respect of an Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment, the amount of such defaulted Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment, as applicable, shall bear interest payable on demand, subject to subsection (b) below, at a rate of 8% *per annum* from and after the date of such Plan Default until the defaulted portion of such Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment, as applicable, is paid in full; <u>provided</u>, <u>however</u>, that if such defaulted Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment is paid in full within 30 days of the occurrence of the applicable Plan Default, any accrued interest shall be deemed to have been irrevocably waived and forgiven.

b.   <em>Stay of Enforcement Actions and Standstill Periods</em>

(i)  ERCOT, the Committee, the GUC Notice Parties, and Holders of General Unsecured Claims are entitled, and the Reorganized Debtor shall not dispute that they are entitled, to exercise any remedies available under applicable law following the occurrence of a Plan Default, subject to the provisions of this subsection (b), including, obtaining an order of the Bankruptcy

85

Court in accordance with the procedures of this subsection (b) that finds that a Plan Default has occurred and is continuing.

(ii)     With respect to a Plan Default on account of any of the Additional Market Participant Cash Payment, the Deferred GUC Obligations, the *first* installment of the Installment Market Participant Cash Payments, and the *first* Market Participant Deferred Cash Recovery payment, if the Reorganized Debtor has delivered a Plan Default Cure Notice then (x) all Entities and all Holders of General Unsecured Claims (other than ERCOT, the Committee, and the GUC Notice Parties) shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the 12 months following such Plan Default, and (y) each of ERCOT, the Committee, and the GUC Notice Parties shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the first 90 days following such Plan Default other than filing a motion with the Bankruptcy Court seeking entry of an order, upon notice and a hearing, that a Plan Default has occurred and enforcing the terms of the Plan and Confirmation Order and authorizing the exercise of any remedies (including specific performance) available under applicable law (an "Enforcement Motion") and taking any action or exercising any remedy permitted by law after entry of an order by the Bankruptcy Court granting such Enforcement Motion; provided, however, that, no hearing on any such Enforcement Motion shall be scheduled to occur before the 90th day following the occurrence of the applicable Plan Default described in this paragraph; provided, further, however, that such 12-month prohibition in (x) above shall terminate and all other Holders of General Unsecured Claims and other Entities with standing shall be entitled to file an Enforcement Motion if the Reorganized Debtor has not, on or before the 90th day following the occurrence of the applicable Plan Default, paid interest accrued in accordance with subsection (a) above from the Effective Date to the date of the Plan Default at the rate of 6% *per annum* and interest accrued from the date of the Plan Default to the date of payment at 8% *per annum*.

(iii)    With respect to a Plan Default on account of any *subsequent* Installment Market Participant Cash Payment or *subsequent* Market Participant Deferred Cash Recovery payment, if the Reorganized Debtor has delivered a Plan Default Cure Notice, then ERCOT and all other Entities shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the 60 days following such Plan Default except that, after such Plan Default, ERCOT may File an Enforcement Motion with the Bankruptcy Court; provided, however, that no hearing on any such Enforcement Motion shall be scheduled to occur before the 30th day following the occurrence of the applicable Plan Default described in this paragraph.

(iv)    Notwithstanding anything to the contrary in Article IV.L. of the Plan and for the avoidance of doubt, no Entity may enforce any remedy against the Reorganized Debtor or its property in respect of a Plan Default without first obtaining an order from the Bankruptcy Court that a Plan Default has occurred and is continuing.  Nothing herein shall prohibit the Reorganized Debtor from disputing that a Plan Default has occurred or is continuing, the amount of any such Plan Default, or the calculation of any interest owed on account of any such Plan Default.

c.      *T&D Asset Proceeds and Pro Rata Sharing*

In the event that the proceeds of the sale of T&D Assets or other financing obtained pursuant to Article IV.L of the Plan are insufficient to pay the unpaid portion of the Additional Market Participant Cash Payment and the Deferred GUC Obligations, such proceeds shall be applied to the payment of the Additional Market Participant Cash Payment and the Deferred GUC Obligations pro rata, without preference or priority as to timing or amount.[23]  The foregoing does not obviate the obligation to pay all ERCOT Market Participant Consideration and the Deferred GUC Obligations in full.  The Reorganized Debtor shall be prohibited from distributing the proceeds of any sale of T&D Assets to any Entity (other than the RUS Secured Parties or any other Entity with a valid Lien on such T&D Assets) before the Reorganized Debtor has made all distributions required under the Plan to Holders of Allowed General Unsecured Claims and to ERCOT; provided, however, that, following the (a) payment in full to all Holders of General Unsecured Claims and (b) payment in full of the Additional Market Participant Cash Payment and Installment Market Participant Cash Payments, the Reorganized Debtor shall not be prohibited from distributing the proceeds of a T&D Asset sale to any other Entity if, and only if ERCOT consents to such distribution(s) in writing  (which consent shall not be unreasonably withheld). Notwithstanding the preceding sentence, the Debtor and ERCOT continue to negotiate language around any potential future T&D Asset sales outside of a Plan Default scenario, which asset sales could occur in the ordinary course of the Reorganized Debtor's business.  Any future agreed upon language will be reflected in an amended Plan. Notwithstanding the foregoing sentence, the Debtor and the Consenting Members are discussing potential amendments to the Member Settlement as it relates to the Reorganized Debtor's use of a Third-Party QSE so as to potentially align the applicable provisions with the Generation QSE Termination Date in connection with the ERCOT Settlement.

d.      *No Default Uplift*

In no event shall any amount be assessed to or collected from Market Participants through the Default Uplift process described in Protocols §§ 9.19.1 and 9.19.2 in connection with any Plan Default.

(ii)    Creditor Defaults

An act or omission by a Holder of a Claim in contravention of the provisions of the Plan shall be an event of default under the Plan.  Upon an event of default, the Reorganized Debtor may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtor in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may: (i) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (ii) enforce the Plan by order of specific performance;

---

[23] For example, in the event of a Plan Default, any one Holder of an Allowed General Unsecured Claim shall not receive any different treatment over any other Holder of an Allowed General Unsecured Claim—*i.e.*, any distributions following a Plan Default to Holders of Allowed General Unsecured Claims shall be made to such Holders on a *pro rata* and *pari passu* basis.

(iii) award judgment against such defaulting creditor in favor of the Reorganized Debtor in an amount, including interest, to compensate the Reorganized Debtor for the damages caused by such default; and (iv) make such other order as may be equitable that does not materially alter the terms of the Plan.

Nothing in the preceding paragraph (i) authorizes the Reorganized Debtor to appear, sign and/or accept the documents required under the Plan on behalf of the United States or any of its agencies, (ii) permits a remedy against the United States or its agencies that would be unavailable under applicable law, (iii) require the RUS Secured Parties to perform any obligation not contained in the Amended and Restated RUS Secured Documents, RUS Contingency Exit Note, or the AU8 FFB Note, or (iv) permits the Reorganized Debtor to collect attorney's fees in contravention of the Anti-Deficiency Act, 31 U.S.C. §§ 1341 *et seq*.

Nothing herein shall prohibit the applicable creditor from disputing that a Plan Default has occurred or is continuing.

### 13.   *New Organizational Documents and Senior Management*

(i)   New Organizational Documents

From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the New Organizational Documents, if any, and the Reorganized Debtor (subject to any approvals required under the Bylaws) shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  The Bylaws shall contain such provisions as are necessary to satisfy the provisions and ensure the implementation of the Plan, subject to further amendment and revision thereof after the Effective Date as permitted by applicable law.  Under the Debtor's existing organizational documents and, as applicable, the New Organizational Documents, the Debtor has no power to issue certificates of stock, its principal purpose being to generate (through the Generation Sale Closing Date), procure (through March 1, 2023), and transmit wholesale electricity at the lowest cost to the Members and, under applicable law, the Debtor shall operate as a nonprofit cooperative pursuant to the ECCA. Accordingly, the requirement of section 1123(a)(6) of the Bankruptcy Code does not apply to the Debtor or the Plan.

(ii)   Senior Management

On the Effective Date, the current officers of the Debtor shall remain in their respective roles and capacities as officers of the Reorganized Debtor, except that:

(a)   Clifton Karnei (the Debtor's Vice President & General Manager) shall exit his existing roles and cease his employment with, or otherwise retire from, the Reorganized Debtor on or before the earlier of (i) March 31, 2023 or (ii) the date that is 30 days after the Generation Sale Closing Date ("Karnei Resignation Date").  On the Karnei Resignation Date, Mr. Karnei's employment by the Reorganized Debtor and his position as an officer of the Reorganized Debtor shall cease and end for all purposes; provided, however, that, if the Generation Sale Closing Date has not occurred on or before March 31, 2023, the Reorganized Debtor may, in its sole discretion, retain Mr. Karnei as a consultant pursuant to a commercially reasonable consulting agreement through the date that is 30 days after

the Generation Sale Closing Date.  Other than as expressly permitted above, from and after the Karnei Resignation Date: Mr. Karnei: (i) shall not be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor including while acting as a consultant to the Reorganized Debtor; and (ii) shall completely disassociate himself, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest, either now or hereafter.  The foregoing prohibitions include, but are not limited to, Mr. Karnei being further retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

(b)      Josh Clevenger (the Debtor's Vice President of Power Supply) and Travis "Dean" Thrall (the Debtor's Vice President of Generation) shall exit their existing roles and cease their employment with, or otherwise retire from, the Reorganized Debtor on or before the date that is 30 days after the Generation Sale Closing Date ("Clevenger/Thrall Resignation Date"). On the Clevenger/Thrall Resignation Date, Mr. Clevenger's and Mr. Thrall's employment by the Reorganized Debtor and their positions as officers of the Reorganized Debtor shall cease and end for all purposes.   From and after the Clevenger/Thrall Resignation Date: (i) neither Mr. Clevenger nor Mr. Thrall shall be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor; and (ii) Mr. Clevenger and Mr. Thrall shall both completely disassociate themselves, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest, either now or hereafter.  The foregoing prohibitions include, but are not limited to, either Mr. Clevenger or Mr. Thrall being retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

(c)      Philip Segrest (the Debtor's General Counsel) shall exit his existing role as General Counsel of the Reorganized Debtor on the date that is 30 days after the Effective Date ("Segrest Resignation Date").  Effective as of the Segrest Resignation Date and thereafter, neither Mr. Segrest nor any other lawyer at Segrest & Segrest PC shall hold the title of "General Counsel" (or any equivalent title) or be employed by the Reorganized Debtor in any in-house legal capacity; provided, however, that the Reorganized Debtor may, in its sole discretion, obtain any legal services from Mr. Segrest and Segrest & Segrest PC at any time before, on, and after the Effective Date.

In addition to the above, no employee of the Debtor currently or formerly in its power supply or generation functions may become a Principal of the Debtor or the Reorganized Debtor. To the extent that there are any other anticipated changes in the Reorganized Debtor's directors and officers, the Debtor shall, pursuant to section 1129(a)(5) of the Bankruptcy Code, identify such changes (including any new directors and officers) in the Plan Supplement.

(iii)     Management Severance Plan

The Management Severance Plan shall be implemented by the Reorganized Debtor on the Effective Date without any further action by the Reorganized Debtor's Board or the Bankruptcy Court.

### 14.    Corporate Action

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects and, to the extent taken before the Effective Date, ratified in all respects without any requirement for further action by Holders of Claims, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including, as applicable (i) the selection and appointment of the directors and officers for the Reorganized Debtor; (ii) the implementation of the Restructuring Transactions; and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtor, and any corporate action required by the Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Members, directors, or officers of the Debtor or the Reorganized Debtor.  On or before the Effective Date, as applicable, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Reorganized Debtor, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.N of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

### 15.    Employee Obligations

Except as (i) otherwise provided in the Plan; (ii) identified on the Rejected Contracts Schedule; (iii) was rejected by the Debtor pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Effective Date, the Reorganized Debtor shall honor the Debtor's Employee Obligations and, to the extent not already satisfied, the Debtor's Employee Obligations shall become obligations of the Reorganized Debtor in accordance with their terms.  To the extent the Employee Obligations are Executory Contracts and (i) such Executory Contracts are not identified on the Rejected Contracts Schedule, (ii) were not previously rejected pursuant to sections 365 or 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the Effective Date, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided that the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-reference written contracts, agreements, policies, programs and plans.  Notwithstanding anything else set forth in this paragraph, the cure provisions of Article V of the Plan shall apply to any Employee Obligation arising from an Executory Contract assumed in accordance with the provisions of Article V of the Plan.

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtor shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the bonus, retention, or severance programs approved by the Bankruptcy Court in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein, if any, in accordance with the terms thereof.

On the Effective Date, the Reorganized Debtor shall continue and assume the Pension Plan in accordance with and subject to the terms of the Pension Plan and applicable law, including, to

the extent applicable, the timely payment of any (i) unfunded benefit liabilities of the Pension Plan under 29 U.S.C. § 1362(a); (ii) due and unpaid minimum funding contributions owed to the Pension Plan under 26 U.S.C. §§ 412 and 430, and 29 U.S.C. §§ 1082 and 1083; and (iii) flat-rate, variable-rate, and termination premiums owed to the PBGC under 29 U.S.C. §§ 1306(a)(7) and 1307.  The Pension Plan is and shall remain subject to such applicable requirements under Title IV of ERISA and the Internal Revenue Code of 1986, as amended.

On the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall provide to the PBGC a Pension Plan account statement or other document evidencing that the above minimum funding obligations, if any, have been timely paid, and if all Pension Plan obligations owed as of the Effective Date have been paid timely—*i.e.*, variable-rate and flat-rate premiums owed to PBGC and minimum funding obligations owed to the Pension Plan, then all Proofs of Claim filed by the PBGC with respect to the Pension Plan shall be deemed withdrawn automatically on the Effective Date and without any further notice to or action, order, or approval of the Bankruptcy Court.  No provision of the Disclosure Statement, Plan, Confirmation Order, section 1141 of the Bankruptcy Code, or any other document filed in the Debtor's Chapter 11 Case shall be construed to discharge, release, or relieve the Reorganized Debtor, its successors, individuals, or any "parties in interest" (as defined in 29 U.S.C. § 1002(14)) from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plan or from claims of the PBGC with respect to the Pension Plan.  The PBGC and the Pension Plan will not be enjoined or precluded from enforcing such liability with respect to the Pension Plan as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, section 1141 of the Bankruptcy Code, or any other document filed in the Debtor's Chapter 11 Case.

Notwithstanding anything to the contrary in the Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtor shall continue to honor all retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), if any, as and to the extent required by the agreements giving rise to such obligations.

### 16.    *Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtor shall continue to honor its obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtor operates or the Debtor previously operated and (ii) the Debtor's (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation; (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation; and (c) workers' compensation insurance policies and programs.  All Proofs of Claim filed by the Debtor's current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for in the Plan; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's claims, defenses, Causes of Action, or other rights under applicable law with respect to any such contracts, agreements, policies, programs, and plans.

17.    *Ordinary Course Professionals*

Any Ordinary Course Professional is authorized to set off any undisputed Claim for prepetition fees and expenses against any amount held on retainer for such Ordinary Course Professional.

18.    *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan, on the Effective Date:  (i) the obligations of the Debtor under the Prepetition Revolving Loan Documents and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor or giving rise to any Claim shall be cancelled or extinguished and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against the Debtor shall be released and discharged; underlined provided that notwithstanding the releases set forth in Article VIII of the Plan, Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions or other applicable treatment under the Plan as provided in the Plan; underlined provided, underlined further, that nothing in this section shall effectuate a cancellation of any Indemnification Obligation.  For the avoidance of doubt, the Reorganized Debtor shall retain the interests in any other Entity in which the Debtor or the Reorganized Debtor has an interest as of the Effective Date, and, except as otherwise set forth in the Plan, the Membership Certificates shall not be cancelled.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Article IV.R of the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

Nothing in Article IV.R of the Plan shall cancel or otherwise operate upon any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor held by the RUS Secured Parties.

19.    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments, or documents; (ii) the creation of any Lien, mortgage, deed of trust or other security interest; (iii) any transfers, directly or

indirectly, of property (including the Generation Assets) pursuant to the Plan or Plan Documents; (iv) any assumption, assignment, or sale by the Debtor of its interests in Unexpired Leases of nonresidential real property or Executory Contracts pursuant to section 365(a) of the Bankruptcy Code; (v) the grant of collateral, if any, under the Exit Facility Documents and the RUS Exit Financing; and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, or the Restructuring Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 20. *Preservation of Causes of Action*

Except as otherwise set forth in the Plan and on the Retained Causes of Action Schedule, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtor's Causes of Action, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **The Debtor and the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action that have not been released by the Plan or are on the Retained Causes of Action Schedule.**

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor, as applicable, shall not pursue any and all available Causes of Action against it.  Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtor and the Reorganized Debtor, as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtor reserves and shall retain such Causes of Action of the Debtor notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

**Notwithstanding anything to the contrary contained in Article IV.T of the Plan, on the Effective Date, all Avoidance Actions that are not specifically identified in the Retained Causes of Action Schedule shall be released by the Debtor.**

### 21. *Insurance Policies and Surety Bonds*

(i)   Director and Officer Liability Insurance

On the Effective Date, the Reorganized Debtor shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtor's and its Affiliates' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or before the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of each of the D&O Liability Insurance Policies.

After the Effective Date, neither the Debtor nor the Reorganized Debtor shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on the Effective Date with respect to conduct occurring before the Effective Date, and all officers, directors, managers, and employees of the Debtor and its Affiliates who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date; provided that nothing in this paragraph shall preclude a reduction in the amount of available policy proceeds under the D&O Liability Insurance Policies through payment of claims under any D&O Liability Insurance Policies to or on behalf of the Debtor or the Reorganized Debtor.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan and no Proof of Claim need be Filed with respect thereto.

(ii)   Assumption of Insurance Policies

On the Effective Date, each Insurance Policy shall be assumed by the Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was identified on the Rejected Contracts Schedule, (ii) was rejected by the Debtor pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending on the date of the Effective Date.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of such Insurance Policies.

(iii)   Insurance Neutrality

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) the rights or obligations of any Insurer or (ii) any rights or obligations of the Debtor or the Reorganized Debtor arising out of or under any Insurance Policy.   The Insurers, the Debtor, and

Reorganized Debtor, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable to the Debtor, as existed before the Effective Date.  Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.  Nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

(iv)     Surety Bonds

On the Effective Date, (i) all of the Debtor's obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtor; (ii) surety bonds and related indemnification and collateral agreements entered into by the Debtor will be vested and performed by the Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order; and (iii) the Reorganized Debtor shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business.  Nothing in the Plan or Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of the Debtor or any surety bond provider with respect to any unexpired surety bond agreement or related indemnification or collateral agreement.

### *22.    Notice of Effective Date*

On the Effective Date, the Debtor shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## D.    Treatment of Executory Contracts and Unexpired Leases

### *1.    Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Contracts Schedule; (ii) have been previously rejected, assumed, or assumed and assigned by a Final Order; (iii) previously expired or terminated pursuant to their own terms; (iv) are the subject of a motion that is pending on the Effective Date; or (v) have an ordered or requested effective date of rejection that is after the Effective Date; provided that nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan, document, or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; provided, further, that the Debtor reserves the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assignments, and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan and the Assumed and Rejected Contracts Schedules pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, the Confirmation Order, or in the Assumed and Rejected Contracts Schedules, assumptions, assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be deemed to be effective as of the Effective Date.  The Debtor is authorized to abandon any of the Debtor's personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease).  Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtor, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

The Debtor reserves the right to alter, amend, modify, or supplement the Assumed and Rejected Contract Schedules, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including the Effective Date.  As such, the Assumed and Rejected Contract Schedules are not final, and are subject to ongoing review.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  The Consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which the Debtor or Reorganized Debtor, as applicable, is a party.

The provisions of the Plan relating to the Member Settlement set forth in Article IV.F of the Plan shall control to the extent that any provision of Article V of the Plan relating to the All Requirements Contracts and the Amended ARCs is inconsistent with the provisions of Article IV.F of the Plan.

## 2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of 30 days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be deemed disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or any property of the foregoing, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Except as otherwise set forth in the Plan, Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 of the Plan, and such Claims may be objected to in accordance with the Plan.

## 3. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtor or the Reorganized Debtor, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event any Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan are not listed in the Assumed Contracts Schedule, the Cure Claim for such Executory Contracts and Unexpired Leases shall be deemed to be zero dollars ($0.00). On and after the Effective Date, the Reorganized Debtor may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Contracts Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtor or the Reorganized Debtor, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor, as applicable, of such Cure Claim.

**Any party that fails to timely object to the assumption or assumption and assignment of its Executory Contract or Unexpired Lease (including the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Contracts Schedule, shall be (i) deemed to have consented to the assumption or assumption and assignment of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the**

**Assumed Contracts Schedule (including a cure amount of $0.00) and from asserting any Claim against the Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim as set forth in the Assumed Contracts Schedule, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor or the Reorganized Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

### 4.      *Assumption Dispute Resolution*

Any counterparty to any Executory Contract and Unexpired Lease shall have the time prescribed by the Disclosure Statement Order, or other applicable order of the Bankruptcy Court, to object to the proposed assumption, assumption and assignment, or related Cure Claim listed on the Assumed Contracts Schedule or other applicable cure notice. In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, assignment, or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "<u>Assumption Dispute</u>") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtor may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before the resolution of such Assumption Dispute; <u>provided</u> that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtor, the Debtor may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

If the Debtor is unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim before the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "<u>Adjourned Cure Dispute</u>").

5.      *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or the Reorganized Debtor, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtor pursuant to rejected Executory Contracts or Unexpired Leases.

6.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, and not assigned to a non-Debtor Entity, will be performed by the Debtor or the Reorganized Debtor in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

7.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.      *Reservation of Rights*

Neither the inclusion nor exclusion of any Executory Contract or Unexpired Lease on the Debtor's Schedules, the Assumed and Rejected Contracts Schedules, nor anything contained in the Plan or the Confirmation Order, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. The Debtor and the Reorganized Debtor each reserves all rights with respect to any Causes of Action or other rights, claims, and defenses in respect of any Executory Contract or Unexpired Lease.

### 9. *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## E.   Provisions Governing Distributions

### 1. *Distributions Generally*

Except as otherwise provided in the Plan, the Debtor or the Reorganized Debtor, as applicable, in its capacity as Disbursing Agent shall make all distributions under the Plan to the Holders of Allowed Claims in accordance with the terms of the Plan.  Such distributions shall be made to Holders of Allowed Claims on behalf of the Debtor.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 2. *Distribution Record Date*

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 3. *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are Disputed, shall receive the amount of the distributions that the Plan provides for the applicable Holders of Allowed Claims in each applicable Class as set forth in the Plan beginning on the Effective Date, and such initial and subsequent distributions shall be made in the manner provided in the Plan; provided, however, that Allowed Administrative Claims and Allowed Priority Tax Claims shall be paid in accordance with Article II of the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or other charges or accruals of any kind on any such Claims or the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

If any distribution is made after the Effective Date in respect of any Interim Distribution Obligation (other than a regularly scheduled payment to ERCOT due on a date before the Generation Sale Closing Date or, if the Generation Sale Closing Date has not occurred, due before the Interim Distribution Deadline), the Reorganized Debtor shall contemporaneously make a like payment (equivalent on a pro rata basis) on all other Interim Distribution Obligations so that all Interim Distribution Obligations are paid *pari passu*.

### 4. Rights and Powers of Disbursing Agent

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, Holders of Claims against the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising solely out of the willful misconduct, gross negligence, malpractice, actual fraud, criminal conduct, or *ultra vires* acts of such Disbursing Agent as determined by a Final Order of a court of competent jurisdiction. No Holder of a Claim or other party in interest shall have or pursue any Claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising solely out of the willful misconduct, gross negligence, actual fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent as determined by a Final Order of a court of competent jurisdiction. Except as otherwise agreed by the Reorganized Debtor, the Disbursing Agent shall be empowered to, in its capacity as Disbursing Agent and at its sole expense, (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions in the Plan.

The Reorganized Debtor shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtor) with the amounts of Claims and the identities and addresses of Holders of Claims as of the Distribution Record Date, in each case, as set forth in the Debtor's books and records.

### (i) Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtor's books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute Securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date.

(ii)     Expenses Incurred On or After the Effective Date

To the extent the Disbursing Agent is an Entity other than the Reorganized Debtor, except as otherwise agreed in writing by the Reorganized Debtor, any compensation, reimbursements, fees, expenses, and other amounts (including any professionals' fees and expenses) incurred by such Disbursing Agent on or after the Effective Date (including any taxes) shall be the sole responsibility of such Disbursing Agent.

**5.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions***

(i)     Delivery of Distributions

a.     *Delivery of Distributions in General*

Except as otherwise provided in the Plan, distributions to Holders of an Allowed Claim shall be made as follows:  (i) at the address set forth in the Debtor's books and records (unless such Holder listed a different address on the Proof of Claim, if any, Filed in respect of such Allowed Claim); (ii) at the address set forth in any written notice of address changes actually received by the Reorganized Debtor after the Effective Date; or (iii) to any counsel that has appeared in the Chapter 11 Case on the Holder's behalf.  Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Disbursing Agent shall not incur any liability whatsoever on account of any distributions under the Plan except solely to the extent of its willful misconduct, gross negligence, actual fraud, malpractice, criminal conduct or *ultra vires* acts as determined by a Final Order of a court of competent jurisdiction.

b.     *Delivery of Distributions on Account of the Allowed ERCOT Claim*

ERCOT shall be deemed to be the sole Holder of the Allowed ERCOT Claim and shall receive all distributions in respect of the Allowed ERCOT Claim under the Plan.

c.     *Delivery of Distributions on Account of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims*

The Reorganized Debtor (or other applicable Disbursing Agent designated by the Reorganized Debtor), in its capacity as the Disbursing Agent under the Plan, shall make all distributions to Holders of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims in Cash.  Distributions to Holders of Allowed General Unsecured Claims shall be made as follows:  the Initial GUC Cash Payment shall be made to Holders of Allowed General Unsecured Claims on the Effective Date, the Additional GUC Cash Payment shall be made to Holders of Allowed General Unsecured Claims on the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline), and the Residual GUC Cash Payment, if any, shall be made on the date when all General Unsecured Claims have either been Allowed or expunged.

   d.    *Distributions on Account of Allowed Tort Claims*

As of the Effective Date, Holders of Allowed Tort Claims will be permitted to pursue such Allowed Claims to final judgment or settlement and attempt to recover any liquidated final judgment or settlement on account of such Allowed Claims solely from the Available Coverage and in no event will the Debtor, its Estate, or the Reorganized Debtor be liable to such Holder in any way whatsoever with respect to such Holder's Claim except that, to the extent that a Holder of an Allowed Tort Claim is entitled to payment under the applicable General Liability Insurance Policies, the Reorganized Debtor shall pay the amount of the deductible, if any, required thereunder.

   e.    *Delivery of Distributions on Account of Allowed Tort Convenience Claims*

The Reorganized Debtor (or other applicable Disbursing Agent designated by the Reorganized Debtor), in its capacity as the Disbursing Agent under the Plan, shall make all distributions to Holders of Allowed Tort Convenience Claims.

   (ii)    <u>Minimum Distribution</u>

Holders of Allowed Claims entitled to distributions of $100 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Reorganized Debtor or its property.

   (iii)    <u>Distributions after Effective Date</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

   (iv)    <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon thereafter as is reasonably practicable without interest or other charge or accrual of any kind; <u>provided</u> that nothing herein shall require the Disbursing Agent to attempt to locate Holders of undeliverable distributions; <u>provided</u>, <u>further</u>, that any such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. Subject to the last sentence of this paragraph (solely with respect to General Unsecured Claims), after such date, all unclaimed property or interests in property shall automatically revert to and shall be property of the Reorganized Debtor without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred. Any unclaimed property or interests in property with respect to General Unsecured Claims shall be returned to the applicable Disbursing Agent for

inclusion in the Residual GUC Cash Payment, if any, or, if Allowed General Unsecured Claims are paid in full, the Reorganized Debtor.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Disbursing Agent of an intent to accept a particular distribution and has not actually accepted such distribution within 180 days; (iii) responded to the Disbursing Agent's request for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

### 6.      Satisfaction of Claims

Any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 7.      Securities Registration Exemption

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the offering, issuance, and distribution of any Securities under the Plan, whether on the Effective Date or any other date of distribution thereafter, pursuant to the terms of the Plan or the Confirmation Order, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (i) the Securities Act and all rules and regulations promulgated thereunder and (ii) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities. Except as otherwise set forth in the Plan, pursuant to section 1145 of the Bankruptcy Code, any issuance of Securities contemplated by the Plan will be freely transferable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments; and (c) any other applicable regulatory approval.

### 8.      Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Taxing Authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Disbursing Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Disbursing Agent make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Reorganized Debtor, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its property.

### 9.     *Cancellation of Liens and Surrender of Cancelled Instruments or Securities*

Except to the extent otherwise provided in the Plan, upon the payment or other satisfaction of an Allowed Secured Claim (including an Allowed Other Secured Claim), the Holder of such Allowed Secured Claim shall deliver to the Debtor or Reorganized Debtor, as applicable, any collateral or other property of the Debtor or the Reorganized Debtor held by such Holder, and any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Secured Claim that may be required in order to terminate any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents.

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article VI.I of the Plan, except to the extent otherwise provided in the Plan.

### 10.     *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed in the Plan.

### 11.     *No Postpetition or Default Interest on Claims*

Except to the extent set forth in Article IV.L of the Plan, or as otherwise required by an order of the Bankruptcy Court or applicable bankruptcy law, neither postpetition nor default interest shall accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest of any kind accruing on or after the Petition Date on any such Claim.

### 12.     *Setoffs and Recoupment*

Except as otherwise expressly provided in the Plan, the Reorganized Debtor may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Reorganized Debtor may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claim they may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless (i) the Reorganized Debtor has consented and (ii) such

Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable nonbankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

### 13.    *Claims Paid or Payable by Third Parties*

(i)    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be deemed disallowed or otherwise satisfied and shall be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any party.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Disbursing Agent on account of such Claim, such Holder shall, within two weeks thereof, repay or return any distribution held by or transferred to the Holder to the applicable Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(ii)    Claims Payable by Insurers

Distributions under the Plan to each holder of an Allowed Insured Claim against the Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; except, that there shall be deducted from any distribution under the Plan on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such Holder in respect of such Allowed Insured Claim.  To the extent that one or more of the Debtor's Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Debtor or the Reorganized Debtor, as applicable, shall provide 21 days' advance written notice to the Holder of such Claim before any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(iii)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions under the Plan to Holders of Allowed Claims and/or payments by Insurers of Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a

106

waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers, under any Insurance Policies nor shall anything contained in the Plan constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

## F.   Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.   Allowance of Claims

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses (including the applicable Causes of Action retained pursuant to the Plan) that the Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order.  All settled Claims approved before the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties and parties in interest.  The Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

### 2.   Claims Administration Responsibilities

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the authority to (i) File, withdraw, or litigate to judgment objections to Claims; (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court shall, with respect to all Claims, vest in the Reorganized Debtor, provided that the Reorganized Debtor shall consult with the Committee with respect to the settlement or compromise of any Disputed General Unsecured Claim above $1,000,000 and the Reorganized Debtor shall consult with the Committee on a quarterly basis after the Effective Date on the claims-reconciliation process of Class 5 General Unsecured Claims; provided, further, that, if after the initial Claims Objection Deadline, the Debtor has not objected to other Filed (but not yet Allowed) General Unsecured Claims above $1,000,000 and has not informed the Committee that it intends to object to such Claims by the subsequent Claims Objection Deadline, the Committee shall, subject to advance notice and consultation with the Reorganized Debtor, have the right to file or litigate to judgment objections to such General Unsecured Claims above $1,000,000 and the Reorganized Debtor shall provide reasonable assistance in such litigation.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately before the Effective Date with respect to any Disputed Claim.

### 3.   Reservation of Rights to Object to Claims

The failure of the Debtor or the Reorganized Debtor, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion

thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtor or the Reorganized Debtor, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or nonbankruptcy forum.

### 4.       *Disputed and Contingent Claims Reserve*

On or after the Effective Date, the Reorganized Debtor may establish any other reserves, in its sole discretion, for Claims that are contingent, unliquidated, or have not yet been Allowed, in an amount or amounts as reasonably determined by the Reorganized Debtor, consistent with the Proof of Claim Filed by the applicable Holder.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. § 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Debtor or the Reorganized Debtor, as applicable, shall be required to comply with the relevant rules.

### 5.       *Estimation of Claims*

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and may be used as evidence in any supplemental proceedings, and the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 7 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 6.       *Adjustment to Claims Register Without Objection*

Any duplicate Claim, any Claim (Filed or scheduled) that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtor upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.     *Time to File Objections to Claims*

Any objections to a Claim shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.  For the avoidance of doubt, the Committee may object to a General Unsecured Claim to the extent set forth in Article VII.B of the Plan.

### 8.     *Disallowance of Claims*

Subject to the waivers and releases of Causes of Action contemplated in Articles IV.K.3 and T of the Plan, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor, as applicable.

All Proofs of Claim Filed on account of an Indemnification Obligation or Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation or Employee Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided in the Plan or otherwise agreed by the Debtor or the Reorganized Debtor, as applicable, any and all Claims, or any portion thereof, shall be deemed disallowed and any related Proofs of Claim, if any, shall be expunged as of the Effective Date without any further notice, action, order, or approval of the Bankruptcy Court to the extent that (i) such Claim has been disallowed by Final Order, settlement, or other agreement; (ii) the related Proofs of Claim were Filed after the applicable Claims Bar Date; (iii) such Claim is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely Filed; or (iv) such Claim is not listed on the Schedules and as to which no Proof of Claim has been timely Filed, and, in each case, Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the applicable Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

### 9.     *Amendments to Proofs of Claim*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.  Nothing in

this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

### 10. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

### 11. No Distributions Pending Allowance

Except as otherwise set forth in the Plan, no payment or distribution provided under the Plan shall be made on account of the Disputed portion of any Claim unless and until such Disputed portion of such Claim becomes an Allowed Claim.  Any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed.

### 12. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  Except as otherwise set forth in the Plan, as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing a Disputed Claim becomes a Final Order, the distributions (if any) to which such Holder is entitled under the Plan as of the Effective Date or thereafter, without any interest, dividends, or other charges or accruals of any kind other than as set forth in Article IV.L.1.a of the Plan, shall be paid to the Holder of such Allowed Claim on account of such Allowed Claim.

### 13. Single Satisfaction of Claims

In no case shall the aggregate value of all property received or retained under the Plan or otherwise on account of any Allowed Claim exceed 100 Cents of such Allowed Claim.

## G. Settlement, Release, Injunction, and Related Provisions

### 1. Compromise and Settlement of Claims and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good faith compromise and settlement in full and final satisfaction, discharge, and release of all Claims and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.

131999954

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and is fair, equitable, and reasonable.   The compromises, settlements, and releases described in the Plan (including the Plan Settlements) shall be deemed nonseverable from each other and from all other terms of the Plan.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and the Estate and Causes of Action against other Entities.

## 2.    *Discharge and Satisfaction of Claims*

Pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt, right, or is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has voted to accept or reject the Plan.   Any default or "*event of default*" by the Debtor or its Affiliates with respect to any Claim that existed immediately before or on account of the Filing of the Chapter 11 Case shall be deemed cured (and no longer continuing) as of the Effective Date.   The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.

## 3.    *Releases by the Debtor*

**Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and each of the RUS Secured Parties is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally and forever released and discharged by the Debtor, the Reorganized Debtor, and the Estate, including any successors to the Debtor or the Estate's representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all other Entities who may**

purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Cause of Action against the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the Debtor's capital structure, management, assets or operation thereof, including any draws under or any Claims or Causes of Action related to the Prepetition Revolving Loan Documents), the assertion or enforcement of rights and remedies against the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Plan, the business or contractual relationship between the Debtor and any Released Party or RUS Secured Parties, the Debtor's in- or out-of-court restructuring efforts, the Debtor's purchase or procurement of products and services from ERCOT or any other Entity during Winter Storm Uri, any Avoidance Actions (including any Avoidance Actions in respect of the ERCOT Prepetition Transfers), intercompany transactions between or among the Debtor and its Affiliates, the Chapter 11 Case, the Plan Settlements, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility or the Exit Facility Documents, the RUS Exit Financing or the Amended and Restated RUS Secured Notes Documents, the Participating Member Securitization or the Participating Member Securitization Documents, the Amended ARCs, or this Plan (including, for the avoidance of doubt, the Plan Supplement and the Plan Documents), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Transactions, the Plan, the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility or the Exit Facility Documents, the RUS Exit Financing or the Amended and Restated RUS Secured Notes Documents, the Participating Member Securitization or the Participating Member Securitization Documents, the Amended ARCs, the Chapter 11 Case, the Filing of the Chapter 11 Case, the Plan Settlements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of securities of any kind pursuant to or in connection with this Plan, or the distribution of property of any kind under or in connection with this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained in the Plan to the contrary, the foregoing release does not release (i) any obligations of any party under this Plan or any document, instrument, or agreement executed to implement this Plan; (ii) the rights of Holders of Allowed Claims to receive distributions under this Plan; or (iii) any retained Causes of Action set forth in the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each

of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (iv) a good-faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (v) in the best interest of the Debtor and the Estate and all Holders of Claims; (vi) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (vii) a bar to the Debtor, the Reorganized Debtor, the Estate, or any other Entity asserting any Claim or Cause of Action released pursuant to the Debtor Release.

> ### 4. *Releases by Holders of Claims*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the Debtor's capital structure, management, assets, or operation thereof, including any draws under or any Claims or Causes of Action related to the Prepetition Revolving Loan Documents), the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Plan (including the ERCOT Claim), the business or contractual relationship between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, the Debtor's purchase or procurement of products and services from ERCOT or any other Entity during Winter Storm Uri, any Avoidance Actions (including any Avoidance Actions in respect of the ERCOT Prepetition Transfers), intercompany transactions between or among the Debtor and its Affiliates, the Chapter 11 Case, the Plan Settlements, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility, the Participating Member Securitization Documents, the Amended ARCs, or this Plan (including, for the avoidance of doubt, the Plan Supplement and the Plan Documents), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility, the Participating Member Securitization, the Amended ARCs, or the Confirmation Order, the Chapter 11 Case, the Filing of the Chapter 11 Case, the Plan Settlements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of securities of any kind pursuant to or in connection with this Plan, or the distribution of property of any kind under or in connection with this Plan or any other related agreement, or upon any other

131999954

act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained in the Plan to the contrary, the foregoing release does not release (i) any Claim or Cause of Action against a non-Debtor Market Participant in respect of the Unaffected Proceedings; (ii) any Claims related to any act or omission that is determined in a final order to have constituted willful misconduct, gross negligence, or actual fraud, solely to the extent as determined by a final order of a court of competent jurisdiction; (iii) any obligations of any party under this Plan or any document, instrument, or agreement executed to implement this Plan; (iv) the rights of Holders of Allowed Claims to receive distributions under this Plan; (v) the rights of any current employee of the Debtor under any applicable employment agreement or plan; or (vi) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party releases, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (iv) a good-faith settlement and compromise of the Claims or Causes of Action released by the third party releases; (v) in the best interest of the Debtor and the Estate and all Holders of Claims; (vi) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (vii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third party releases.

THE ABOVE RELEASES ARE SEPARATE AND APART FROM THE RELEASES SET FORTH IN THE ELIGIBLE MARKET PARTICIPANT ELECTION NOTICE THAT ERCOT WILL SEND TO ELIGIBLE MARKET PARTICIPANTS. THE ELIGIBLE MARKET PARTICIPANT ELECTION NOTICE CONTAINS CERTAIN SEPARATE RELEASES SET FORTH IN ARTICLE IV.G.2 OF THE PLAN BY AND BETWEEN THE ERCOT SETTLEMENT RELEASE PARTIES, WHICH INCLUDE (I) THE DEBTOR AND THE REORGANIZED DEBTOR, (II) ERCOT, (III) THE COMMITTEE, (IV) THE MEMBERS, (V) THE ELECTING MARKET PARTICIPANTS, (VI) THE ELIGIBLE MARKET PARTICIPANTS RECEIVING ONLY THE MARKET PARTICIPANT DEFERRED CASH RECOVERY AND THAT DID NOT OPT OUT OF THE RELEASES SET FORTH IN THE MARKET SETTLEMENT PROCEDURES IN ACCORDANCE THEREWITH, (VII) ANY QSE CUSTOMER THAT DOES NOT OPT OUT OF THE RELEASES SET FORTH IN THE MARKET PARTICIPANT SETTLEMENT PROCEDURES IN ACCORDANCE THEREWITH, AND (VIII) EACH OF THE REPRESENTATIVES OF THE FOREGOING PARTIES; PROVIDED, HOWEVER, THAT (A) AN ELECTING MARKET PARTICIPANT SHALL NOT BE AN ERCOT SETTLEMENT RELEASE PARTY IN RESPECT OF ONLY THE PORTION OF ITS ALLOCABLE SHARE OF THE BRAZOS SHORT PAY CLAIM FOR WHICH IT ELECTS, AT THE DIRECTION OR OTHERWISE ON BEHALF OF A QSE

CUSTOMER, TO (1) RECEIVE THE MARKET PARTICIPANT DEFERRED CASH RECOVERY AND (2) OPT OUT OF THE RELEASE SET FORTH IN THE MARKET PARTICIPANT SETTLEMENT PROCEDURES IN ACCORDANCE THEREWITH; AND (B) AN ELIGIBLE MARKET PARTICIPANT THAT IS AN AFFILIATE OF ANOTHER ELIGIBLE MARKET PARTICIPANT SHALL NOT BE AN ERCOT SETTLEMENT RELEASE PARTY SOLELY BY OPERATION OF CLAUSE (VIII) OF THIS DEFINITION.

### 5. *Exculpation*

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, including, without limitation, the formulation, preparation, dissemination, negotiation, or Filing of the Plan and any related prepetition transactions (including any draws under or Claims or Causes of Action related to the Prepetition Revolving Loan Documents), the Disclosure Statement, the DIP Facility, the Exit Facility, the RUS Exit Financing, the Participating Member Securitization, the Amended ARCs, the Plan Settlements, the Plan Supplement and the Plan Documents, or any transaction related to the Restructuring, any contract, instrument, release or other agreement or document created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Actions, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of securities pursuant to or in connection with this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date to the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the exculpations set forth in Article VIII.E of the Plan.

### 6. *Injunction*

Upon entry of the Confirmation Order, all Holders of Claims and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, Representatives, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim that is extinguished, discharged, or released in connection with this Plan. Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Causes of

**Action that have been released, discharged, or are subject to exculpation pursuant to Article VIII of the Plan or otherwise under the Plan or Confirmation Order, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, the Exculpated Parties, and/or the Released Parties:**

    ii.    **commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action;**

    iii.    **enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Causes of Action;**

    iv.    **creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action;**

    v.    **asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and**

    vi.    **commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action released, settled, or enjoined in connection with this Plan or the Confirmation Order.**

**Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order or under any other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order. The injunction in this Plan shall extend to any successors and assigns of the Debtor and the Reorganized Debtor and their respective property and interests in property.**

    *7.*    *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that the Releasing Party does not know of or suspect to exist in its favor, which if known by it may have

materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses, Claims, or Causes of Action. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party, including the provisions of California Civil Code section 1542. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### 8. *Protection Against Discriminatory Treatment*

**Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, and applicable law, all Governmental Units and any other Entity subject to section 525 of the Bankruptcy Code under applicable law shall be prohibited from discriminating against the Debtor and the Reorganized Debtor or denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to (including, for the avoidance of doubt, the Reorganized Debtor's or its Affiliates' registration as a Transmission Service Provider or a Distribution Service Provider), conditioning such a grant to, discriminating with respect to such a grant against, denying, or restricting employment to, terminating the employment of, or discriminating with respect to employment against, the Debtor or the Reorganized Debtor, or another Entity with whom the Debtor or the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.**

### 9. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 10. *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

131999954

### 11.    *Release of Liens*

Except (i) with respect to the Liens, if any, securing (a) the Exit Facility; (b) the Amended and Restated RUS Secured Notes Documents; and (c) to the extent elected by the Debtor with respect to an Allowed Secured Claim in accordance with Article III.B.2 of the Plan, or (ii) as otherwise provided in the Plan or the Confirmation Order or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Reorganized Debtor to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor or the Reorganized Debtor.

## H.    Condition Precedent to Consummation of the Plan

### 1.    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (before or in conjunction with the occurrence of the Effective Date) or waived pursuant to Article IX.B of the Plan):

    i.    the Plan and the Plan Documents shall be in form and substance reasonably satisfactory to the Debtor;

    ii.    the final version of the Plan Supplement (including all schedules, exhibits, and other document contained therein) shall have been Filed and all documents contained therein shall be consistent in all material respects with the Plan and otherwise in form and substance reasonably satisfactory to the Debtor;

    iii.    the Plan, the Confirmation Order, and the applicable Plan Documents, shall be in form and substance reasonably satisfactory to the Consenting Members as set forth in Article I.H of the Plan, and each of the Consenting Members and the Debtor shall have executed the Amended ARCs;

    iv.    the Plan and the provisions of the Confirmation Order that implement the ERCOT Settlement shall be in form and substance reasonably satisfactory to ERCOT;

    v.    the Plan and the provisions of the Confirmation Order that implement the Committee Settlement shall be in form and substance reasonably satisfactory to the Committee as set forth in Article IV.K.4 of the Plan;

    vi.    the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance satisfactory to the Debtor, and the Confirmation Order shall approve the Disclosure Statement on a final basis and the Confirmation of the Plan (including the Member Settlement, the ERCOT Settlement, the SCEA Claims

Settlement, the Committee Settlement, any other Plan Settlements not already approved by the Bankruptcy Court, the Tenaska Power Claim Settlement, the Participating Member Securitization, the Plan Supplement, and the releases, exculpation, and other provisions in Article VIII of the Plan) and such Confirmation Order shall not have been stayed, modified, or vacated;

vii.    the Exit Facility Documents, the Amended and Restated RUS Secured Notes Documents, the applicable Participating Member Securitization Documents, and other applicable Plan Documents shall have been executed by the parties thereto and shall be effective in accordance with their respective terms (except for any conditions that will be satisfied in conjunction with, or are otherwise related to, the occurrence of the Effective Date);

viii.    each Member shall have deposited an amount equal to its TAA Balance, if any, with the TAA Escrow Agent in accordance with Article IV.E.1 of the Plan;

ix.    the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

x.    the Debtor or the TAA Escrow Agent, as applicable, shall have funded the Administrative and Priority Claims Reserve;

xi.    the ERCOT Escrow Account shall have been established and funded in accordance with the Plan;

xii.    the United States shall have funded the AU8 FFB Note in full; and

xiii.    the Professional Fee Escrow shall have been established and funded in accordance with the Plan.

### 2.    *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article IX.A of the Plan may be waived only if waived in writing by the Debtor and, as applicable, (i) solely in respect of the condition precedent in Article IX.A.3 of the Plan, the Debtor and the applicable Consenting Members; (ii) solely in respect of the condition precedent in Article IX.A.4 of the Plan, the Debtor and ERCOT; (iii) solely in respect of the conditions precedent in Articles IX.A.5 and IX.A.7 of the Plan, the Debtor and the Committee; and (iv) solely in respect of the condition precedent in Article IX.A.8 of the Plan, the Debtor, the RUS Secured Parties, and the Members; provided, however, that a Member shall not have the right to withhold or otherwise condition its consent to the waiver of Article IX.A.8 of the Plan in respect of its own TAA Balance; and (iv) in respect of the conditions precedent in Articles IX.A.2 and IX.A.7 of the Plan, and solely to the extent of the Amended ARCs, the Exit Facility Documents, and the RUS Exit Financing, the Debtor and the RUS Secured Parties.  For the avoidance of doubt, the Committee, the Members, ERCOT and the RUS Secured Parties shall not unreasonably withhold their respective consent to the waiver of the applicable conditions precedent in Article IX.A of the Plan.

### 3. *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the Plan Supplement, or any other Plan Document shall (i) constitute a waiver or release of any Claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders of Claims, or any other Entity in any respect.

### 4. *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## I.   Modifications, Revocation, or Withdrawal of Plan

### 1. *Modification and Amendments*

Subject to ERCOT's, the Consenting Members' and the Committee's rights set forth in the Plan, respectively, the Debtor reserves the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to any applicable restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Subject to ERCOT's, the Consenting Members', and the Committee's rights set forth in the Plan, the Debtor has the right to amend the treatment of any Class under the Plan as permitted by the Bankruptcy Code and Bankruptcy Rules.  For the avoidance of doubt, the Debtor is prohibited from seeking amendments or modifications that would directly or indirectly cause any particular Holder of an Allowed General Unsecured Claim to receive more than any other Holder of an Allowed General Unsecured Claim on more favorable terms.

### 2. *Effect of Confirmation*

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if stated as findings of fact.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the

Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. *Revocation or Withdrawal of the Plan*

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the Member Settlement, the ERCOT Settlement, the SCEA Claims Settlement, the Committee Settlement, or the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims; (b) prejudice in any manner the rights of the Debtor or any other Entity, including the Holders of Claims; (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity; or (d) be used by the Debtor or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## J.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of, or related to, the Chapter 11 Case, the Plan, the Confirmation Order, or the Restructuring to the fullest extent permitted under applicable law, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims; provided that the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtor or the Reorganized Debtor, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Debtor or the Reorganized Debtor, as applicable, amending, modifying, or supplementing, after the Confirmation Date, the schedule of Executory Contracts

and Unexpired Leases to be assumed or rejected pursuant to Article V of the Plan; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any motions or applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all settlements (including the Plan Settlements), contracts, instruments, releases, indentures, and other agreements or documents created in connection with or otherwise relating to the Plan or any of the Plan Documents;

9.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan or the Confirmation Order (including with respect to the Plan Settlements);

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, the Plan Documents, or the Confirmation Order, including, without limitation, any order to enforce sections 525, 1123, 1141, or 1142 of the Bankruptcy Code and the provisions for discharge, satisfaction, release, and injunctive relief with respect to Claims provided for or otherwise addressed under the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI of the Plan;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Plan Documents, the Confirmation Order, or the Plan Supplement;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein (including, without limitation, the Restructuring Transactions);consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

19.      hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release or exculpation provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.      enforce all orders entered by the Bankruptcy Court;

22.      hear any other matter not inconsistent with the Bankruptcy Code;

23.      enter an order concluding or closing the Chapter 11 Case; and

24.      enforce the compromise, settlement, injunction, release, and exculpation provisions set forth in Article VIII of the Plan or the Confirmation Order.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement or other Plan Documents that have a jurisdictional, forum selection, or dispute resolution clause that requires actions to be brought in a court other than the Bankruptcy Court and any disputes concerning documents contained in the Plan Supplement or any Plan Document that contain such clauses shall be governed in accordance with the provisions of such documents.

## K.      Miscellaneous Provisions

### 1.      Immediate Binding Effect

Subject to Article IX.A of the Plan and the applicable provisions of the Bankruptcy Code, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, any and all Holders of Claims (irrespective of

whether such Holders of Claims have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements (including the Plan Settlements), compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### 2. *Additional Documents*

On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3. *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address below or by downloading such exhibits and documents from the Debtor's restructuring website at https://cases.stretto.com/Brazos or the Bankruptcy Court's website at www.txs.uscourts.gov.

### 4. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor with respect to the Holders of Claims before the Effective Date.

### 5. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, Representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 6. *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtor or Reorganized Debtor shall be served on:

131999954

**Debtor & Reorganized Debtor**

Brazos Electric Power Cooperative, Inc.
7616 Bagby Avenue
Waco, Texas 76712
Attn.: Clifton Karnei; Johnny York
ckarnei@brazoselectric.com
jyork@brazoselectric.com

- and -

Segrest & Segrest P.C.
28015 US-84
McGregor, Texas 76657
Attn.: Philip R. Segrest; JaNelle Cobb
philip.segrest@segrestfirm.com
janelle.cobb@segrestfirm.com

      with copies to:

**Counsel to Debtor & Reorganized Debtor**

Norton Rose Fulbright US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Attn: Jason L. Boland; Julie Goodrich Harrison; Maria Mokrzycka
jason.boland@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York  10019
Attn: James A. Copeland
james.copeland@nortonrosefulbright.com

- and -

O'Melveny & Myers LLP
2501 North Harwood Street, Suite 1700
Dallas, Texas 75201
Attn: Louis R. Strubeck; Laura Smith; Nick Hendrix
lstrubeck@omm.com
lsmith@omm.com
nhendrix@omm.com

### 7.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or

stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8. *Entire Agreement*

The Plan, Plan Supplement, and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 9. *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided that, at the request of the Debtor or the Reorganized Debtor, as applicable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, further, that any such alteration or interpretation shall be satisfactory to the Debtor in all respects.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtor or the Reorganized Debtor (as applicable) and, to the extent set forth in the Plan, any affected Plan Settlement party, ERCOT, the Consenting Members, or the Committee; and (iii) nonseverable and mutually dependent.

### 10. *Dissolution of Committee and Bankruptcy Advisory Committee*

On the Effective Date, the Committee and the Bankruptcy Advisory Committee shall be deemed to have automatically dissolved; provided that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) prosecuting fee applications, and any relief related thereto, for compensation by the Committee's Professionals; (ii) in connection with any pending litigation or contested matter, including appeals, to which the Committee is a party; (iii) in connection with any appeals of the Confirmation Order to which the Committee is a party; and (iv) in connection with the Committee's post-Effective Date rights and actions as set forth in the Plan; provided, however, that, on and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall not be liable for or otherwise required to pay any fees or expenses incurred by the Committee or its professionals except for the necessary fees or expenses incurred with respect to the matters identified in clauses (i) through (iv) above; provided, that any reasonable and necessary fees or expenses incurred in clauses (ii) through (iv) above are subject to the Committee Post-Effective Date Budget; provided, however, that, notwithstanding anything to the contrary herein, if a Plan Default has occurred and is continuing with respect to the Deferred GUC Obligations, reasonable and necessary fees and expenses incurred by the Committee or its professionals with respect to such Plan Default shall not be subject to the Committee Post-Effective Date Budget, but to the

126

extent that the Reorganized Debtor disputes any such fees and expenses (including with respect to the reasonableness or necessity thereof), the Reorganized Debtor shall pay the undisputed portion of such fees and expenses and, if the parties are unable to consensually resolve any such dispute, the Bankruptcy Court shall retain jurisdiction to determine such disputed fees and expenses. Unless otherwise provided in the Plan, fees and expenses incurred pursuant to this Article XII.J of the Plan shall be paid in the ordinary course by the Reorganized Debtor.  On and after the Effective Date, the Committee's professionals shall include (i) one counsel and (ii) one financial advisor (other than with respect to final fee applications).  The Committee's professionals shall at all times use reasonable best efforts to use minimal staffing and efficient resources in connection with any such matters the Committee survives for post-Effective Date work (*i.e.*, items (i) through (iv) above and any applicable Plan Default) until the Committee's final dissolution.  The Committee will dissolve automatically upon the earlier of (i) the entry of an order by the Bankruptcy Court closing the Chapter 11 Case and (ii) the completion of the Committee's post-Effective Date work.

Upon the dissolution of the Committee and the Bankruptcy Advisory Committee, the members of such committees and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Case and shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

Notwithstanding the dissolution of the Committee and the Bankruptcy Advisory Committee and release of their respective members from further duties and responsibilities, all such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or any Bankruptcy Court-appointed mediator, which shall remain in full force and effect according to their terms.

### 11.     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its Representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under or in connection with the Plan and any previous plan, if any, and, therefore, neither any of such parties or individuals nor the Reorganized Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under or in connection with the Plan and any previous plan.

### 12.     *Expedited Tax Determination*

The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtor for all taxable periods through the Effective Date.

### 13.     No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

### 14.     Waiver or Estoppel

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement or the Debtor's or Reorganized Debtor's right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Claims and Noticing Agent before the Confirmation Date.

### 15.     Closing of Chapter 11 Case

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## VI.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    The Plan May Not be Accepted

The Debtor can make no assurances that the requisite acceptances to the Plan will be received, and the Debtor may need to obtain acceptances to an alternative plan of reorganization for the Debtor, or otherwise, that may not have the support of the Holders, and/or may be required to liquidate the Estate under chapter 7 or chapter 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Plan.

### B.    The Plan May Not be Confirmed

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for

confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization, plan of liquidation, or chapter 7 liquidation.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtor has retained the exclusive right to propose the Plan upon filing its petition.  If the Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

## C.    Parties in Interest May Object to the Plan's Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class.  The Debtor believes that all Claims have been appropriately classified in the Plan.

To the extent that the Court finds that a different classification is required for the Plan to be confirmed, the Debtor would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim.  The Debtor believes that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

**D.      Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Court will not sustain such an objection.

**E.      The Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**F.      Nonconsensual Confirmation**

In the event that any Impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased fees and expenses relating to such contested Confirmation.

**G.      Failure to Consummate the Plan and Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date or consummation of the Plan. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims would remain unchanged.

**H.      There is Continued Risk Upon Confirmation and Consummation**

Even if the Plan is confirmed and consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of its assets due to the Chapter 11 Case, and increasing expenses.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtor's stated goals.

Furthermore, even if the Debtor's debts are reduced and/or discharged through the Plan, the Debtor may need to raise additional funds through public or private debt or equity financing

or other various means to fund the Debtor's business after the completion of the proceedings related to the Chapter 11 Case.  Adequate funds may not be available when needed or may not be available on favorable terms.

## I.        Plan Releases May Not be Approved

There can be no assurance that the third-party release, exculpation, and injunction provisions, as provided in Article VIII of the Plan, will be granted.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

## J.        Plan Documents are Still Being Negotiated

Certain Plan Documents, including documents that are a part of the Plan Supplement, are being negotiated between the Debtor and non-Debtor parties.  It is a condition precedent to the Consummation of the Plan that the Plan, the Confirmation Order, and the applicable Plan Documents, shall be in form and substance reasonably satisfactory to the Consenting Members as set forth in Article I.H of the Plan.  It is additionally a condition precedent to Consummation of the Plan that the Plan and provisions of the Confirmation Order that implement the ERCOT Settlement be in form and substance reasonably satisfactory to ERCOT.  It is a further condition precedent to Consummation of the Plan that the Plan and the provisions of the Confirmation Order that implement the Committee Settlement be in form and substance reasonably satisfactory to the Committee as set forth in Article IV.K.4 of the Plan.  If the conditions precedent have not been satisfied (before or in conjunction with the occurrence of the Effective Date) or waived pursuant to Article IX.B of the Plan, the Plan may not be Consummated.

## K.        Costs of Administering the Estate

Liquidation of the Estate's assets and the disbursement of the proceeds of such liquidation, to the extent such liquidation occurs, would require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and may affect creditor recoveries.

## L.        The Debtor May Not Be Able to Achieve Its Financial Projections

The Financial Projections attached hereto as **Exhibit B** represent the Debtor's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor's operations.  While the Debtor believes that the Financial Projections attached hereto as **Exhibit B** are reasonable, there can be no assurance that they will be realized.  If the Debtor does not achieve its projected financial results, (a) the recoveries by Holders of General Unsecured Claims may be negatively affected, (b) the Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtor may be unable to service its debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

**M.**     **The Reorganized Debtor May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case**

In the future, the Reorganized Debtor may become party to litigation.  Any claims against the Debtor, whether meritorious or not, could be time-consuming, result in costly litigation, damage the Debtor's reputation, require significant amounts of management time, and divert significant resources.  If any of these legal proceedings were to be determined adversely to the Debtor, or the Debtor were to enter into a settlement arrangement, the Debtor could be exposed to monetary damages or limits on the Debtor's ability to operate its business, which could have an adverse effect on the Debtor's business, financial condition, and results of operations.  It is not possible to predict the potential litigation that the Reorganized Debtor may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtor's business and financial stability, however, could be material.

**N.**     **While the Reorganized Debtor Expects to Generate Sufficient Cash to Service All of its Indebtedness, That Cannot be Guaranteed**

The Reorganized Debtor's ability to make scheduled payments on, or refinance its debt obligations, depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtor's control.  While not anticipated, the Reorganized Debtor may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtor to pay the principal, premium, if any, and interest and/or fees on its indebtedness, including, without limitation, anticipated borrowings under the Exit Facility upon emergence.

Timely payment of the Deferred Obligations will depend on the availability of sufficient Generation Sale Proceeds, together with Cash on hand and other potential sources of liquidity.  A successful Generation Sale cannot be guaranteed.  While the Debtor believes a sufficiently robust market for the Debtor's generation fleet will exist, there can be no guarantee that will be the case. If the Debtor's expectations are not correct and the original sources prove insufficient to satisfy defaulted Deferred Obligations, ultimately the Reorganized Debtor may have to explore a sale of additional assets, obtain alternative financing, or otherwise seek additional relief from the Bankruptcy Court.

**O.**     **Upon Emergence from Bankruptcy, the Composition of the Senior Management Team Will Change**

The composition of the Debtor's senior management team is expected to change following the Chapter 11 Case, as described above.  Any new officers or managers may have different backgrounds, experiences, and perspectives from those individuals who currently serve on the management team and, thus, may have different views on the issues that will determine the future of the Debtor's business.  As a result, future strategy and plans may differ materially from those of the past.

**P.      The Loss of Employees and Key Personnel Could Adversely Affect the Debtor's Operations**

The Debtor's operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtor's Chapter 11 Case has created distractions and uncertainty for key management personnel and employees. As a result, the Debtor has experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel in the energy industry can be significant, the Debtor may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtor's ability to operate its business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or plant levels could have a material adverse effect on the Debtor's ability to meet customer and counterparty expectations, thereby adversely affecting the Debtor's business and the results of operations.

**Q.      The Debtor's Operations, Liquidity, and Financial Condition May be Materially Affected by the Effects of Extreme Weather Conditions**

The Debtor's operations, liquidity, and financial condition may be materially affected by weather conditions and may fluctuate substantially on a seasonal basis as the weather changes.  In addition, the Debtor could be subject to the effects of extreme weather.  Extreme weather conditions could stress the Debtor's generation (to the extent occurring before the Generation Sale Closing Date or Generation Sale Outside Date, as applicable), transmission, and distribution system, resulting in outages, increased maintenance, and capital expenditures.  Extreme weather events, including sustained cold or hot temperatures, hurricanes, storms, or other natural disasters, could be destructive and result in casualty losses that are not ultimately offset by insurance proceeds or in increased capital expenditures or costs, including supply chain costs.

Prior to the Generation Sale Closing Date or Generation Sale Outside Date, as applicable, an extreme weather event might affect the availability of generation and transmission capacity, limiting the Debtor's ability to source or deliver electricity where it is needed.

**R.      The Debtor's Operations, Liquidity, and Financial Condition Could be Negatively Impacted by Any Development or Event Beyond the Reorganized Debtor's Control that Causes Economic Weakness in the ERCOT Market**

The Debtor currently derives substantially all of its revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market.  Such a reduction could have a material negative impact on the Debtor's operations, liquidity, and financial condition prior to the Generation Sale Closing Date or Generation Sale Outside Date, as applicable.

**S.     The Debtor Has No Duty to Update**

The statements contained in the Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**T.     No Representations Outside the Disclosure Statement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

**U.     No Legal or Tax Advice Is Provided by the Disclosure Statement**

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim.

The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**V.     No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims.

## VII.     SOLICITATION AND VOTING PROCEDURES

**A.     General**

The following is a brief summary of the Plan confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with

applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all Holders of Claims in an impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtor believes that the Plan satisfies section 1129 of the Bankruptcy Code.

**B.**     **Parties Entitled to Vote on the Plan**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**C.**     **Classes Impaired and Entitled to Vote on the Plan**

The following Classes are Impaired under the Plan and entitled to vote on the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 3 | RUS Secured Notes Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 4 | ERCOT Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Convenience Claims | Impaired | Entitled to Vote |
| 7 | Tort Claims | Impaired | Entitled to Vote |
| 8 | Tort Convenience Claims | Impaired | Entitled to Vote |
| 9 | Member Patronage Capital Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 10 | Member Other General Unsecured Claims | Impaired | Entitled to Vote |

In general, if a claim is Unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim to have accepted the plan, and thus, the holders of claims in such Unimpaired classes are not entitled to vote on the plan.  Because Classes 1, 2, 3, and 9 are

Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote and the votes of such Holders of Claims in Classes 1, 2, 3, and 9 shall not be solicited.

**D.    Voting Procedures and Requirements**

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (1) the procedures for voting your Claim or with respect to the packet of materials that you have received or (2) the amount of your Claim, please contact the Debtor's Voting Agent at 855.529.1663 (domestic toll free) or +1 949.771.2210 (International). If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from the Debtor's Case Information Website located at https://cases.stretto.com/Brazos or by requesting a copy from the Voting Agent, which can be reached at 855.529.1663 (domestic toll free) or +1 949.771.2210 (International) or by email at brazoselectricinquiries@stretto.com.

*1.      Ballots*

The record date for purposes of determining which Holders of Claims are entitled to receive solicitation packages and, where applicable, vote on the Plan shall be **September 13, 2022** (the "Voting Record Date"). Accordingly, only Holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (a) only the Ballot sent to you with this Disclosure Statement or (b) the online electronic ballot portal. If you are a Holder of a Claim in Classes 4, 5, 6, 7, 8, or 10 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Voting Agent at 855.529.1663 (domestic toll free) or +1 949.771.2210 (International) or by email at brazoselectricinquiries@stretto.com.

Item 3 on the Class 6 and 10 Ballots and Item 4 on the Class 5 and 7 Ballots titled "Optional Release Opt-Out" contains an election. Checking the "opt out" box in Item 3 on the Class 6 and 10 Ballots and Item 4 on the Class 5 and 7 Ballots shall constitute an election to not grant the third-party releases contained in Article VIII of the Plan. You will be deemed to have granted the third-party releases contained in Article VIII of the Plan unless you (a) elect to opt out of the releases contained in the Plan by checking the "opt out" box on your Ballot, except that Holders of Class 5 General Unsecured Claims or Class 7 Tort Claims that elect on their respective Ballots to receive treatment as Class 6 General Unsecured Convenience Claims or Class 8 Tort Convenience Claims, respectively, shall in each case be deemed to be a Releasing Party or (b) timely object to the releases contained in the Plan and such objection is resolved in your favor by a Final Order entered by the Bankruptcy Court.

If you are a Holder of Claim in Class 5 General Unsecured Claims, you will receive a Class 5 Ballot. Item 3 on the Class 5 Ballot titled "Optional General Unsecured Convenience Claim

Election" contains an election.  Checking the "opt in" box in Item 3 on the Class 5 Ballot shall constitute an election to reduce the amount of your General Unsecured Claim to the General Unsecured Convenience Claim Amount and be treated as a Holder of Class 6 General Unsecured Convenience Claims under the Plan.  In making this election, you acknowledge that treatment as a Holder of Class 6 General Unsecured Convenience Claims is in lieu of any treatment you may have received as a Holder of Class 5 General Unsecured Claim.  In making this election, you will be deemed to have consented to the releases in Article VIII.D of the Plan.

If you are a Holder of Claim in Class 7 Tort Claims, you will receive a Class 7 Ballot.  Item 3 on the Class 7 Ballot titled "Optional Tort Convenience Claim Election" contains an election.  Checking the "opt in" box in Item 3 shall constitute an election to receive the Tort Convenience Recovery (a cash payment in the lower of (i) the asserted aggregate liquidated amount of your Allowed Tort Claim or (ii) $5,000) and be treated as a Holder of Class 8 Tort Convenience Claims under the Plan.  In making this election, you acknowledge that treatment as a Holder of Class 8 Tort Convenience Claims is in lieu of any treatment you may have received as a Holder of Class 7 Tort Claim.  In making this election, you will be deemed to have consented to the third party releases in Article VIII.D of the Plan and the member release in Article III.B of the Plan (which releases include, among others, a release of the Debtor, affiliates of the Debtor, and the Members).  In order to receive the Tort Convenience Recovery, you must vote to accept the Plan (otherwise, you will receive the treatment as a Class 7 Tort Claim).  Even if you asserted a Tort Claim for less than $5,000, you must make the election to receive the Tort Convenience Recovery (provided you vote to accept the Plan).

If you do not elect the "Tort Convenience Claim Election" then you shall remain in Class 7 Tort Claims and retain the right to litigate your Tort Claim in a court of competent jurisdiction.  In not making the Tort Convenience Claim Election, you acknowledge that if you, as a Holder of a Class 7 Tort Claim, obtain a judgment (or a settlement) against the Debtor, you shall receive the right, subject in all respects to the terms and conditions of the applicable General Liability Insurance Policies, as your sole source of recovery, to recover up to the full amount of your Allowed Tort Claim from available insurance coverage or the proceeds of the applicable General Liability Insurance Policies to the extent sufficient coverage remains as may be determined pursuant to the terms and conditions thereof.  The Reorganized Debtor will pay any applicable deductibles under the applicable General Liability Insurance Policies.

The Debtor has General Liability Insurance Policies with Federated Rural Electric Insurance Exchange, Lexington Insurance Company, and Everest Reinsurance Company.  The General Liability Insurance Policies have deductibles of $5,000 per occurrence, an initial policy limit of $2 million supplemented by an initial umbrella policy covering claims up to $30 million, a first excess umbrella policy covering claims between $30 to $45 million and a second excess umbrella policy covering claims between $45 to $50 million.  The insurers have been notified by the Debtor about the filing of the Tort Claims, and the insurers have not yet taken a position regarding coverage.  Holders of Class 7 Tort Claims may review the underlying insurance policies upon request to the Debtor and signing the protective order entered in the main chapter 11 case.

### 2.    *Submitting Ballots*

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, and submit your Ballot in accordance with the instructions set forth in your Ballot and the Solicitation Order.

Except as otherwise ordered by the Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtor (in its sole discretion).  No Ballot should be sent to the Debtor, its agents (other than the Voting Agent), any administrative agent (unless specifically instructed to do so), or the Debtor's financial or legal advisors, and if so sent, the Ballot will not be counted.  If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

### 3.    *Voting*

If the Debtor has served an objection or request for estimation as to a Claim at least ten calendar days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and manner as set forth in such objection or in the Solicitation Order or as otherwise agreed by the Debtor.

### 4.    *Notice of Non-Voting Status*

Holders of Claims not entitled to vote to accept or reject the Plan will receive a Notice of Non-Voting Status, which will provide such Holder with information regarding (a) how to obtain copies of this Disclosure Statement, the Plan, and other documents, (b) the Combined Hearing, (c) the deadline to object to final approval of the Disclosure Statement and the confirmation of the Plan (the "Plan Objection Deadline"), and (d) the releases, exculpations, and injunctions provided for in Article VIII of the Plan.  The Notice of Non-Voting Status will also include a Non-Voting Opt Out Form that allows Holders of Claims who are deemed to accept or reject the Plan to opt out of the third-party release provisions contained in Article VIII of the Plan by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's third-party release provisions.  Market Participants who are not Holders of Claims against the Debtor will not receive a Notice of Non-Voting Status.

The Debtor shall mail or cause to be mailed by first-class mail to Holders of Claims in Classes 1, 2, 3, and 9 a copy of the Notice of Non-Voting Status.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from the Debtor's Case Information Website located at https://cases.stretto.com/Brazos or by requesting a copy from the Voting Agent, which can be reached at 855.529.1663 (domestic toll free) or +1 949.771.2210 (International) or by email at brazoselectricinquiries@stretto.com.

If you are a Holder of a Claim in Class 1, 2, 3, or 9 and elect to opt out of the third-party release provisions contained in Article VIII of the Plan, please complete and submit the Non-Voting Opt Out Form by the Voting Deadline.  If you are a Holder of a Claim in Class 1, 2, 3, or 9 and did not receive a Notice of Non-Voting Status and/or Non-Voting Opt Out Form, if your Notice of Non-Voting Status and/or Non-Voting Opt Out Form is damaged or lost, or if you have any questions concerning the election procedures, please contact the Voting Agent at 855.529.1663

(domestic toll free) or +1 949.771.2210 (International) or by email at brazoselectricinquiries@stretto.com.

5.      *Releases, Exculpations, and Injunctions Provisions Under the Plan*

THE PLAN CONTAINS CERTAIN RELEASES, EXCULPATIONS, AND INJUNCTIONS (AS DESCRIBED MORE FULLY IN ARTICLE VIII OF THE PLAN), INCLUDING RELEASES BETWEEN THE DEBTOR, ON THE ONE HAND, AND CERTAIN RELEASING PARTIES ON THE OTHER HAND.  THE RELEASING PARTIES UNDER THE PLAN INCLUDE THE FOLLOWING: (I) THE HOLDERS OF ALL CLAIMS WHO VOTE TO ACCEPT THIS PLAN (OTHER THAN ERCOT); (II) THE HOLDERS OF CLAIMS WHOSE VOTE IS SOLICITED, OR THAT OTHERWISE RECEIVE NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN THIS PLAN, THAT VOTE TO REJECT OR ABSTAIN FROM VOTING (OTHER THAN ERCOT); (III) THE HOLDERS OF CLAIMS THAT ARE CONCLUSIVELY PRESUMED TO ACCEPT THIS PLAN (OTHER THAN THE RUS SECURED PARTIES); (IV) THE HOLDERS OF CLAIMS THAT ARE DEEMED TO REJECT THIS PLAN; (V) THE CONSENTING MEMBERS; (VI) THE DIP AGENT; (VII) THE DIP LENDERS; (VIII) SOLELY IN RESPECT OF CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, OR THE ESTATE, THE RUS SECURED PARTIES; (IX) THE COMMITTEE AND EACH OF ITS MEMBERS; (X) THE BANKRUPTCY ADVISORY COMMITTEE AND EACH OF ITS MEMBERS; (XI) ANY RELEASED PARTY; (XII) WITH RESPECT TO EACH OF THE FOREGOING PERSONS, IN CLAUSES (I) THROUGH (XI), EACH OF THEIR CURRENT AND FORMER AFFILIATES, AND (XVI) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (I) THROUGH (XII), SUCH PERSON'S PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, CURRENT AND FORMER AFFILIATES, CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS (INCLUDING BOTH LIMITED AND GENERAL PARTNERS), MANAGERS, EMPLOYEES, AGENTS, MANAGED ACCOUNTS OR FUNDS, MANAGEMENT COMPANIES, FUND ADVISORS, FINANCIAL ADVISORS, ADVISORY BOARD MEMBERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, AND SUCH PERSON'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES, AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING IN EACH CASE IN THEIR CAPACITY AS SUCH; <u>PROVIDED</u> THAT, EXCEPT AS OTHERWISE SET FORTH HEREIN, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (A) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN, EXCEPT THAT HOLDERS OF CLASS 5 OR CLASS 7 CLAIMS THAT ELECT CONVENIENCE-CLAIM TREATMENT ON THEIR RESPECTIVE BALLOTS AND ARE ENTITLED TO RECEIVE SUCH TREATMENT UNDER THE PLAN SHALL BE DEEMED TO BE A RELEASING PARTY, OR (B) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN; <u>PROVIDED</u>, FURTHER, THAT A PARTY'S ELECTION TO OPT OUT OF THE RELEASES IN ARTICLE VIII

139

OF THE PLAN SHALL NOT IN ANY WAY EXCEPT ANY CLAIM FROM OR OTHERWISE COMPROMISE OR ABROGATE THE DEBTOR'S DISCHARGE UNDER SECTION 1141 OF THE BANKRUPTCY CODE.

THE RELEASED PARTIES UNDER THE PLAN MEAN, EACH OF AND COLLECTIVELY, (I) THE DEBTOR AND THE REORGANIZED DEBTOR; (II) THE CONSENTING MEMBERS; (III) THE DIP AGENT; (IV) THE DIP LENDERS; (V) THE COMMITTEE AND EACH OF ITS MEMBERS; (VI) THE BANKRUPTCY ADVISORY COMMITTEE AND EACH OF ITS MEMBERS; (VII) ANY RELEASING PARTY (OTHER THAN THE RUS SECURED PARTIES); (VIII) WITH RESPECT TO EACH OF THE FOREGOING PERSONS, IN CLAUSES (I) THROUGH (VII), EACH OF THEIR CURRENT AND FORMER AFFILIATES; AND (IX) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (I) THROUGH (VIII), SUCH PERSON'S PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, CURRENT AND FORMER AFFILIATES, CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS (INCLUDING BOTH GENERAL AND LIMITED PARTNERS), MANAGERS, EMPLOYEES, AGENTS, MANAGED ACCOUNTS OR FUNDS, MANAGEMENT COMPANIES, FUND ADVISORS, FINANCIAL ADVISORS, ADVISORY BOARD MEMBERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, AND SUCH PERSON'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING, IN EACH CASE IN THEIR CAPACITY AS SUCH; PROVIDED THAT AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (A) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN, EXCEPT THAT HOLDERS OF CLASS 5 OR CLASS 7 CLAIMS THAT ELECT CONVENIENCE-CLAIM TREATMENT ON THEIR RESPECTIVE BALLOTS AND ARE ENTITLED TO RECEIVE SUCH TREATMENT UNDER THE PLAN SHALL BE DEEMED TO BE A RELEASED PARTY, OR (B) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN; PROVIDED, FURTHER, THAT A PARTY'S ELECTION TO OPT OUT OF THE RELEASES IN ARTICLE VIII OF THE PLAN SHALL NOT IN ANY WAY EXCEPT ANY CLAIM FROM OR OTHERWISE COMPROMISE OR ABROGATE THE DEBTOR'S DISCHARGE UNDER SECTION 1141 OF THE BANKRUPTCY CODE.

THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN ARTICLE VIII OF THE PLAN ARE INTEGRAL TO THE PLAN AND THE REORGANIZATION OF THE DEBTOR'S BUSINESS.

ITEM 3 ON THE CLASS 6 AND 10 BALLOTS AND ITEM 4 ON THE CLASS 5 AND 7 BALLOTS TITLED "OPTIONAL RELEASE OPT-OUT" CONTAINS AN ELECTION. CHECKING THE "OPT OUT" BOX IN ITEM ITEM 3 ON THE CLASS 6 AND 10 BALLOTS AND ITEM 4 ON THE CLASS 5 AND 7 BALLOTS SHALL CONSTITUTE AN ELECTION TO NOT GRANT THE THIRD-PARTY RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN, EXCEPT TO THE EXTENT THAT A

**HOLDER OF A CLASS 5 GENERAL UNSECURED CLAIM OR CLASS 7 TORT CLAIM MAKES AN ELECTION TO BE TREATED AS A CLASS 6 GENERAL UNSECURED CONVENIENCE CLAIM OR CLASS 8 TORT CONVENIENCE CLAIM, RESPECTIVELY. YOU WILL BE DEEMED TO HAVE GRANTED THE THIRD-PARTY RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN UNLESS YOU (A) ELECT TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN BY CHECKING THE "OPT OUT" BOX ON YOUR BALLOT, EXCEPT THAT HOLDERS OF CLASS 5 GENERAL UNSECURED CLAIMS OR CLASS 7 TORT CLAIMS THAT ELECT ON THEIR RESPECTIVE BALLOTS TO RECEIVE TREATMENT AS CLASS 6 GENERAL UNSECURED CONVENIENCE CLAIMS OR CLASS 8 TORT CONVENIENCE CLAIMS, RESPECTIVELY, SHALL IN EACH CASE BE DEEMED TO BE A RELEASING PARTY OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN THE PLAN AND SUCH OBJECTION IS RESOLVED IN YOUR FAVOR BY A FINAL ORDER ENTERED BY THE BANKRUPTCY COURT.**

**IF YOU ARE A HOLDER OF A CLAIM DEEMED TO ACCEPT OR REJECT THE PLAN, AND THEREFORE, NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU WILL RECEIVE A NOTICE OF NON-VOTING STATUS AND MAY ELECT TO OPT OUT OF BEING A RELEASING PARTY BY TIMELY COMPLETING AND SUBMITTING A NON-VOTING OPT OUT FORM. IF YOU DO NOT TIMELY SUBMIT THE NON-VOTING OPT OUT FORM, YOU WILL BE DEEMED TO HAVE GRANTED SUCH THIRD-PARTY RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN.**

## E.    Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of Impaired claims votes to accept the plan, except under certain circumstances. *See* "Confirmation Without Necessary Acceptances; Cramdown" below. A class of claims that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of such claim or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim entitles the holder of such claim.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim in such class. *See* "Best Interests of Creditors" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set

forth in section 1129(b) of the Bankruptcy Code discussed below.  *See* "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable," with respect to each nonaccepting impaired class of claims.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims.  The Debtor believes that, under the Plan, all Impaired Classes of Claims are treated in a manner that is consistent with the treatment of other Classes of Claims that are similarly situated, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class.  Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors and unsecured creditors, as follows:

(1) Secured Creditors. Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

(2) Unsecured Creditors. Either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims that are junior to the claims of the dissenting class will not receive any property under the plan.

As discussed above, the Debtor believes that the distributions provided under the Plan satisfy the "fair and equitable" standard, where required.

## G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding Administrative Claims) against a debtor into separate classes

based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. The Debtor believes that the Plan classifies all Claims in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims created under the Plan. Accordingly, the classification of Claims in the Plan complies with section 1122 of the Bankruptcy Code.

## H.  Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile or other electronic means (other than the E-Ballot Portal); (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtor's schedules as contingent, unliquidated or disputed for which the applicable Claims Bar Date has passed and no Proof of Claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order and the solicitation procedures); (vi) it was sent to the Debtor, the Debtor's agents/representatives (other than the Voting Agent), an administrative agent (except as otherwise permitted by the Disclosure Statement Order), or the Debtor's financial or legal advisors instead of the Voting Agent; (vii) it lacks an original signature, with the understanding that the voting party's electronic signature through e-ballot will be deemed an original signature; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

## I.  Elimination of Vacant Classes

Any Class of Claims that does not have a Holder of an Allowed Claim as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## J.  Presumed Acceptance of the Plan

To the extent that Claims of any Class are Reinstated, each Holder of a Claim in such Class is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

## VIII.   FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.  Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims. At the Combined Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (1) the

143

Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

## B.  Best Interests of Creditors / Liquidation Analysis

Section 1112(c) of the Bankruptcy Code provides that a non-profit entity, such as the Debtor, cannot have its chapter 11 case converted into a chapter 7 case involuntarily.[24]  A liquidation under chapter 7 of the Bankruptcy Code is—unlike in the context of for-profit debtors—a path that can be chosen only by the non-profit debtor.  Although the Chapter 11 Case cannot be involuntarily converted to a chapter 7 liquidation, the Debtor is providing a liquidation analysis, prepared by the Debtor with the assistance of its advisors (the "Liquidation Analysis"), attached hereto as **Exhibit D**.  The Debtor's submission of the Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.  The Debtor reserves all rights to oppose the applicability of the Best Interests Test in the Chapter 11 Case.

As noted above, even if a plan is accepted by the holders of each class of claims, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test").

To calculate the probable distribution to holders of each impaired class of claims if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims in such impaired class.

The Liquidation Analysis considers whether holders of Impaired Claims will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  Seven Classes of Impaired Claims, Classes 4, 5, 6, 7, 8, and 10 are Impaired under the Plan.

---

[24] 11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

To calculate the probable distribution to holders of each Impaired Class of Claims and interests if the Debtor was liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Debtor was in a case under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtor's assets by a chapter 7 trustee. The amount of liquidation value available to unsecured creditors would be reduced by the Claims of any secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in the Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and any Claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors.

As reflected in the Liquidation Analysis, the Debtor believes that liquidation of the Debtor's business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtor believes that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). To determine whether the Plan meets this feasibility requirement, the Debtor has analyzed its ability to meet its respective obligations under the Plan. As part of this analysis, the Debtor has prepared financial projections for the Reorganized Debtor (the "Financial Projections"). Creditors and other interested parties should review Section VI of this Disclosure Statement entitled "Certain Risk Factors to be Considered Prior to Voting" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Financial Projections are attached hereto as **Exhibit B** and incorporated herein by reference. Based upon the Financial Projections, the Debtor believes the Plan will meet the feasibility requirements of the Bankruptcy Code.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan

131999954

Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

**D.     Valuation**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtor determined that it was necessary to estimate the post-Confirmation going concern value of the Debtor.  Accordingly, the Debtor, with the assistance of its advisors, produced the valuation analysis that is set forth in **Exhibit C** attached hereto and incorporated herein by reference (the "Valuation Analysis").  As set forth in the Valuation Analysis, the Debtor's going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Debtor's enterprise under chapter 7 of the Bankruptcy Code.  Accordingly, the Valuation Analysis further supports the Debtor's conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.     Introduction**

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtor or Reorganized Debtor, as applicable, and certain holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.   Due to the lack of definitive judicial and administrative authority in certain areas, substantial uncertainty may exist with respect to some of the tax consequences described below.   The Debtor has not requested, and does not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS, any other taxing authority or the courts.   No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, corporations, persons who hold Claims or who will hold consideration received under the Plan as part of a straddle, hedge, conversion transaction, or

other integrated investment, persons using a mark-to-market method of tax accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).   This summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.   This summary does not address the U.S. federal income tax consequences to holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan.

This summary also does not discuss potential tax consequences to Non-U.S. Holders (defined below).  For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code).   For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.   Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.   ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## B.    Tax Status of the Debtor and Reorganized Debtor

The Debtor is a generation and transmission electric cooperative that uses the calendar year as its taxable year.   The Debtor has historically met the requirements for tax exemption described in section 501(c)(12) of the Tax Code.  Under this provision, a rural electric cooperative is generally exempt from federal income tax, other than with respect to its unrelated business taxable income, but only if 85 percent or more of its income consists of amounts collected from members for the sole purpose of meeting losses and expenses.  Amounts received from Members pursuant

to the ARCs generally have enabled the Debtor to meet this 85% test and to qualify for this tax exemption.

No assurance can be given that the Debtor or Reorganized Debtor, as applicable, will meet the requirements of section 501(c)(12) for every taxable year. For example, the Generation Sale may result in substantial proceeds and gross income being realized by the Debtor from one or more non-members. The Generation Sale accordingly could result in the Debtor or Reorganized Debtor, as applicable, failing to meet the 85% test of section 501(c)(12) for the taxable year that includes the Generation Sale Closing Date (and/or perhaps for other taxable years, depending upon the terms and conditions of the Generation Sale).

If a tax-exempt cooperative fails to meet the 85% test in a given taxable year, the cooperative will be treated as a taxable cooperative. A taxable cooperative that is primarily engaged in furnishing electric energy to persons in rural areas is not subject to the provisions of Subchapter T of the Tax Code; rather, such a taxable rural electric cooperative (a "taxable REC") is generally subject to the federal income tax law as it existed immediately prior to the enactment of the Revenue Act of 1962. Such law largely consists of court cases and IRS administrative pronouncements.

A taxable REC generally determines the source of its income as either patronage or non-patronage and may reduce its taxable income by any qualifying patronage dividends allocated to its members/patrons. Thus, a taxable REC may exclude patronage dividends from income if the dividends are allocated to patrons from patronage income in proportion to patronage. Patronage income generally is considered to refer to the net earnings of the organization from business done with or for its patrons.

## C.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, the Debtor will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, however, the Debtor will not be required to include any amount of CODI in gross income if the Debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a result of such exclusion, the Debtor must reduce its tax attributes by the amount of CODI excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses and NOL carryovers; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Debtor will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtor may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will

generally have no other U.S. federal income tax impact.

**D.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims Entitled to Vote**

*1.     Debt Exchanges Generally*

The following discussion assumes that the transactions currently contemplated by the Plan occur.   Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Plan.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of the Debtor for United States federal income tax purposes.   Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.   These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.     There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Holders should consult their own tax advisors regarding the status of their claims as securities.

If an Allowed Claim qualifies as a "security" of the Debtor and is exchanged pursuant to the Plan for a "security" of the Reorganized Debtor, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization.   Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss.   Such Holder's tax basis in the "security" of the Reorganized Debtor received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor.   Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for the security received should include the holding period for the Claim exchanged therefor.

*2.     U.S. Holders of General Unsecured Claims, General Unsecured Convenience Claims, Tort Claims, and Tort Convenience Claims (Classes 5, 6, 7, and 8)*

A U.S. Holder of a General Unsecured Claim, General Unsecured Convenience Claim, Tort Claim, or Tort Convenience Claim (collectively, the "General Unsecured or Tort Claims") will receive, as applicable, its Pro Rata share of the GUC Cash Recovery, the GUC Convenience Recovery, the Tort Claim Recovery, or the lower of (i) the asserted aggregate amount of its Tort Convenience Claim and (ii) the Tort Convenience Amount.   The General Unsecured or Tort Claims are not expected to constitute securities for U.S. federal income tax purposes.

If an Allowed Class does not qualify as a "security" of the Debtor or is exchanged pursuant to the Plan for a debt instrument of the Reorganized Debtor that does not constitute a "security," then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, each U.S. Holder of a General Unsecured or Tort Claim should recognize gain or loss equal to the difference between (1) the issue price of the relevant debt instrument received and (2) such Holder's adjusted basis, if any, in such General Unsecured or Tort Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the General Unsecured or Tort Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its General Unsecured or Tort Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its General Unsecured or Tort Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the debt instrument received should equal its issue price as of the date such property is distributed to the Holder. A Holder's holding period for the debt instrument received should begin on the day following the date it receives such property.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the relevant debt instrument issued to a Holder is traded on an "established securities market" at any time during the 31- day period ending 15 days after the Effective Date. In general, a debt instrument will be treated as traded on an established securities market if (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument, or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for the debt instrument.

### 3.    *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder

(unless the U.S. Holder elected to include market discount in income as it accrued). Generally, if a Claim that was acquired with market discount is exchanged in a tax-free transaction for other property, any market discount that accrued on such Claim as of the time of the exchange but that was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of such accrued but unrecognized market discount. U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 4.    *Net Investment Income Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 5.    *Limitation of Use of Capital Losses*

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 6.    *Information Reporting and Backup Withholding*

The Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtor will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## X.    RECOMMENDATION

The Debtor believes that Confirmation of the Plan is in the best interests of all stakeholders. **Accordingly, the Debtor urgers all eligible Holders of Impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.**

Dated: September 20, 2022

BRAZOS ELECTRIC POWER COOPERATIVE, INC.

By: */s/ Clifton Karnei*
Name:    Clifton Karnei
Title:    Executive Vice President and General Manager of Brazos Electric Power Cooperative, Inc.

131999954

**EXHIBIT A**

**<u>Chapter 11 Plan</u>**

**[filed on the docket]**

**EXHIBIT B**

**FINANCIAL PROJECTIONS**

The Debtor[1] believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by a liquidation of the Debtor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtor analyzed its ability to satisfy its post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

The Debtor does not, as a matter of course, publish its business plans or strategies, projections or anticipated financial position. Accordingly, the Debtor does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or the following financial projections (the "Financial Projections") to Holders of Claims or other parties in interest going forward or otherwise make such information public.

In connection with the Disclosure Statement, the Debtor's management team ("Management"), with the assistance of the Debtor's legal and financial advisors, prepared the Financial Projections for the years 2023 through 2027 based on several assumptions made by Management with respect to the future performance of the Reorganized Debtor's operations.

The Debtor, with the assistance of its legal and financial advisors, has prepared the Financial Projections based on information available to it, including financial data that likely will be incorporated into future regulatory rate filings and input from its Members regarding future transmission and distribution ("T&D") system capital projects. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

ALTHOUGH THE DEBTOR HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTOR'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (as may be amended, modified, or supplemented, the "Plan") and the *Disclosure Statement for Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (as may be amended, modified, or supplemented, the "Disclosure Statement"), as applicable.

1

based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtor believes that its plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtor cannot be sure that such plans, intentions and expectations will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements are attributable to the Debtor or Persons or Entities acting on its behalf and are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only to information available as of the date on which they are made. Except as required by law, the Debtor expressly disclaims any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtor's control. Although the Debtor believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) uncertainties related to allowed rates of return achieved through future PUCT regulatory filings; (b) uncertainty regarding the achievability of the Debtor's plan for completion of existing and future T&D system capital projects; (c) changes in the availability and cost of capital; and (d) risks inherent in providing power supply to Members and operating generation facilities in the period prior to the Debtor's exit from power supply and the Debtor's disposition of the Generation Assets. Additional information regarding these uncertainties is described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors or to the extent to which any such factors or combination may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtor's future performance.

**Overview**

The Financial Projections present pro forma revenues, expenses and cash flows on an annual basis for the calendar years from 2023 to 2027 and pro forma current asset, net plant, debt and other liability balances as of the end of each year for the calendar years from 2023 to 2027. The Reorganized Debtor's opening balance sheet upon the Effective Date, which is reflected in the 2023 to 2027 outlook, also is based on projections of financial statement results and balances, as well as of Plan implementation activity, from July 31, 2022 to December 31, 2022.

**Assumptions**

**A.   Overview**

Upon the Effective Date of the Plan, the Reorganized Debtor will be a G&T Cooperative and is projected to sell the Generation Assets pursuant to the Plan within 12 months of the Effective Date. In accordance with the Amended ARCs, the Reorganized Debtor will cease its power supply function effective March 1, 2023, the Amended ARC Effective Date, irrespective of whether the Generation Assets have been sold as of that date. After the Amended ARC Effective Date and the Generation Sale Closing Date, or the Generation Sale Outside Date, as applicable, the Reorganized Debtor will be a T&D Cooperative that will continue to provide T&D services to the Members and will be a Transmission Service Provider ("TSP") in the PUCT's Transmission Cost of Service ("TCOS") system for regulating rates earned by TSPs. The Reorganized Debtor will continue to bill the Members for T&D services and will reduce costs, for the benefit of Members, through the Reorganized Debtor's net margins by executing transmission capital projects that will earn a PUCT-approved TCOS rate of return. The Reorganized Debtor also will execute distribution capital projects to facilitate the Members' growth.

**B.   Plan Consummation**

The assumed Effective Date reflected in the Financial Projections is December 30, 2022.

**C.   Accounting Policies**

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtor's historical financial statements. The Debtor was advised by its auditor that fresh start accounting cannot be applied to the Reorganized Debtor's opening balance sheet.

**D.   Revenues**

Revenues consist of billings from the Reorganized Debtor to the Members for generation/power supply and T&D services. Members are billed for generation/power supply services through March 1, 2023. From 2023 to 2027, the Members are billed a peak demand allocation of the Reorganized Debtor's share of peak demand on the entire PUCT-regulated transmission system,

the cost of which is applied to peak demand on a postage stamp rate basis, in accordance with the WPSDS Tariff. The Members also are billed for distribution services in accordance with a revenue requirement calculation under the WPSDS Tariff, the key inputs into which are the Distribution rate base, the Reorganized Debtor's TCOS rate of return, and the previous year's operating expenses.

### E.    Operating Expenses

Operating expenses can be functionalized between generation/power supply and T&D services. Generation/power supply operating expenses include the cost of the Members' load; generation plant fuel, labor, maintenance and contracted services, and bilateral hedge costs, net of revenues earned by selling resource power to ERCOT. Transmission operating expenses include the full cost of the Reorganized Debtor's allocation of the PUCT's TCOS, net of the Reorganized Debtor's PUCT-approved total TCOS to be recovered, as well as other expenses. The Financial Projections anticipate that a new TCOS rate case will be filed with the PUCT and will go effective in 2023. The projections reflect that the new TCOS rate of return is effective January 1, 2023. The primary input into the new TCOS rate case is the Reorganized Debtor's annual debt service on the RUS Secured Notes. Distribution operating expenses include labor, maintenance and contracted services.

### F.    General and Administrative Expenses

General and administrative expenses consist of general labor, professional and other contracted services at the corporate level. Projected general and administrative expenses are based on the Debtor's current development and operational plans.

### G.    Member Rebates

The Member rebate program provides Members with a method to mitigate the burden of the Reorganized Debtor's billings through the issuance of rebates equal to the excess of EBITDA above debt service and a coverage cushion on an annual basis.

### H.    Depreciation and Amortization

Depreciation and amortization is comprised of depreciation of utility plant assets and other corporate assets.

### I.    Interest expense

Interest expense includes interest incurred on the RUS Secured Notes and on projected new RUS secured borrowings (referred to collectively hereinafter as the "RUS Secured Notes") and on the RUS Contingency Exit Note. The RUS Secured Notes related to Generation Assets will be fully paid upon the Generation Sale Closing Date. The RUS Contingency Exit Note is anticipated to be a direct Treasury rate loan from the RUS with a term of 20 years and a mortgage payment structure.

### J.    Assets

Assets generally include operating cash, accounts receivable from the Members, billing-related accruals, materials and supplies, investments in associated organizations, utility plant in service, construction in process and other accruals.

### K.    Current Liabilities

Current liabilities are comprised of unused Member rebates. The Debtor anticipates it will have access to the Exit Facility post-Effective Date for working capital purposes but does not anticipate that it will carry a balance on this facility in the normal course after ceasing power supply services. The Debtor also expects to have credit terms with vendors post-Effective Date but anticipates a significant decrease of accounts payable after ceasing power supply services. Given the liquidity projected to be available and the significant decrease in working capital needs once power supply services are ceased, the Reorganized Debtor projects no accounts payable balance.

### L.    RUS Secured Notes

The RUS Secured Notes are extended by the RUS under the Debtor's existing RUS Indenture and the RUS is, and is anticipated to be going forward, the only lender under the RUS Indenture. The RUS Secured Notes extended under the RUS Indenture are secured by substantially all of the tangible and intangible property of the Debtor and are used to finance capital expenditures.

### M.    RUS Contingency Exit Note

The Debtor anticipates that the RUS will extend a direct Treasury rate operating loan, to be drawn upon the Generation Sale Closing Date or the Interim Distribution Deadline, as applicable, to fund the Additional Market Participant Cash Payment and the Additional GUC Cash Payment. This note will be secured under the same RUS Indenture as that of the RUS Secured Notes. The Debtor anticipates that the draw necessary for implementation of the Plan will be in the amount of approximately $178 million.

### N.    Installment Market Participant Cash Payments Obligation

The Installment Market Participant Cash Payments are explained more fully in the Plan. These payments, which are over 12 years and total $166 million, will be recorded on the balance sheet at this amount.

### O.    Other Non-Current Liabilities

Other non-current liabilities include accruals for pension, post-retirement health benefits and other miscellaneous items.

### P.    Equities and Margins

Equities and margins includes the Members' patronage capital accounts, described more fully in Section II.B of the Disclosure Statement, and by extension a substantial portion of the Ratepayers' patronage capital in the Members. Equities and margins absorbs the cumulative financial impact of all Winter Storm Uri costs, Claims, and Plan Settlements, except to the extent that the TAA Balances are securitized or otherwise paid by the Members and by extension the Members' Ratepayers. The impact to Ratepayers of both the securitization and/or other form of financing by the Members, a financed cost recovery, and the majority of the losses absorbed by the Debtor or Reorganized Debtor, as applicable, will be spread over approximately 30 years to alleviate the immediate impact of these costs on the Members and Ratepayers. The Reorganized Debtor will not seek to recover through billings the losses to equities and margins; as such, the Financial Projections include no revenues for such a recovery. The Hardship Fund of $140 million is reflected as a loss to equities and margins, but will inure to the benefit of certain Ratepayers who qualify for such relief.

The Cumulative Net Loss to equities and margins shown in the table below is a combination of cash and non-cash losses related to PPA rejection damages, interest rate swap termination, a partial Member receivable write-off related to the ERCOT Settlement, a subsidiary investment write-off, and asset disposition losses, partially offset by post-petition operating margins and projected operating margins.

| ($ in millions) | Debtor Equities and Margins | | Cumulative Debtor Net Loss |
|---|---|---|---|
| As of Petition Date | $ | 947 | $ | - |
| As of December 31, 2021 | | 929 | | 18 |
| As of December 31, 2022 (Projected) | | 213 | | 735 |
| As of December 31, 2023 (Projected) | | 165 | | 782 |
| | | | | |
| Cumulative Debtor Net Loss (Projected) | $ | 782 | | |
| TAA Balances borne by Ratepayers (Off Balance Sheet) | | 2,085 | | |
| Total Loss Impact on Debtor/Ratepayers | $ | 2,867 | | |

### Q.    Capital Expenditures

Capital expenditures include transmission interconnection and line building capital projects, as well as the Member extension capital projects, which incorporate high-voltage transmission and low-voltage distribution infrastructure related to distribution substations. This projection of capital expenditures is based on the Debtor's 5-year budget for these projects, which incorporates input from the Members, adjusted for recent historical trends.

### R.   RUS Secured Note Borrowings

The RUS Secured Notes borrowings are used to finance capital expenditures and are projected to be approved and drawn in the year following the capital expenditure spend. This cadence is consistent with the Debtor's historical activity.

### S.   Proceeds/Borrowings/Payments Under Plan

This line item incorporates all cash transactions expected to occur on or about the Generation Sale Closing Date or the Interim Distribution Deadline, as applicable, in 2023. These cash flows include receipt of sale proceeds from the Generation Sale, the paydown of the RUS Secured Notes related to the Generation Assets, the draw on the RUS Contingency Exit Note, payment of the Additional Market Participant Cash Payment and the Additional GUC Cash Payment, and other items related to ceasing power supply services.

| ($ in millions) | Financial Projections | | | | |
|---|---|---|---|---|---|
| | CY 2023 | CY 2024 | CY 2025 | CY 2026 | CY 2027 |
| **INCOME STATEMENT** | | | | | |
| Total revenue | $ 606 | $ 308 | $ 315 | $ 320 | $ 326 |
| Operating expenses | 451 | 151 | 151 | 158 | 160 |
| General and administrative expenses | 15 | 15 | 15 | 15 | 15 |
| Member rebates | 17 | 18 | 26 | 18 | 21 |
| EBITDA | 123 | 124 | 122 | 128 | 130 |
| Depreciation and amortization | 64 | 56 | 60 | 60 | 63 |
| Interest expense | 38 | 36 | 37 | 39 | 38 |
| Net margins | $ 22 | $ 32 | $ 26 | $ 29 | $ 29 |

| ($ in millions) | Financial Projections | | | | |
|---|---|---|---|---|---|
| | YE 2023 | YE 2024 | YE 2025 | YE 2026 | YE 2027 |
| **BALANCE SHEET** | | | | | |
| ASSETS | | | | | |
| Cash | $ 115 | $ 53 | $ 182 | $ 94 | $ 136 |
| Other current assets | 129 | 129 | 130 | 131 | 131 |
| Total current assets | 245 | 183 | 312 | 224 | 267 |
| Net utility plant | 1,428 | 1,517 | 1,492 | 1,559 | 1,594 |
| Other non-current assets | 72 | 72 | 72 | 72 | 72 |
| Total assets | $ 1,745 | $ 1,771 | $ 1,876 | $ 1,855 | $ 1,933 |
| EQUITIES AND LIABILITIES | | | | | |
| Accounts payable | $ - | $ - | $ - | $ - | $ - |
| Exit facility | - | - | - | - | - |
| Other current liabilities | 17 | 18 | 26 | 18 | 21 |
| Total current liabilities | 17 | 18 | 26 | 18 | 21 |
| RUS Secured Notes | 1,205 | 1,219 | 1,310 | 1,288 | 1,356 |
| RUS Contingency Exit Note | 172 | 165 | 159 | 152 | 145 |
| Total long-term debt | 1,376 | 1,385 | 1,468 | 1,439 | 1,500 |
| Installment MP Cash Payments obligation | 152 | 138 | 125 | 111 | 97 |
| Other non-current liabilities | 34 | 34 | 34 | 34 | 34 |
| Total liabilities | 1,579 | 1,574 | 1,652 | 1,602 | 1,651 |
| Equities and margins | 165 | 197 | 223 | 253 | 282 |
| Total equities and liabilities | $ 1,745 | $ 1,771 | $ 1,876 | $ 1,855 | $ 1,933 |

| ($ in millions) | Financial Projections | | | | |
|---|---|---|---|---|---|
| | CY 2023 | CY 2024 | CY 2025 | CY 2026 | CY 2027 |
| **CASH FLOWS** | | | | | |
| EBITDA | $ 123 | $ 124 | $ 122 | $ 128 | $ 130 |
| (+/-) Δ in net working capital | 87 | 1 | 8 | (8) | 2 |
| (-) Capital expenditures | (71) | (145) | (35) | (127) | (98) |
| (-) Installment MP Cash Payments | (14) | (14) | (14) | (14) | (14) |
| Unlevered free cash flow | 125 | (34) | 81 | (20) | 20 |
| (-) Cash interest | (38) | (36) | (37) | (39) | (38) |
| Levered free cash flow | $ 88 | $ (70) | $ 45 | $ (59) | $ (18) |
| Beginning cash balance | $ 73 | $ 115 | $ 53 | $ 182 | $ 94 |
| (+/-) Levered free cash flow | 88 | (70) | 45 | (59) | (18) |
| (+) RUS Secured Note borrowings | 65 | 71 | 145 | 35 | 127 |
| (-) Payments on long-term debt | (61) | (63) | (61) | (64) | (66) |
| (+/-) Proceeds/borrowings/(payments) under Plan | (50) | - | - | - | - |
| Ending cash balance | $ 115 | $ 53 | $ 182 | $ 94 | $ 136 |

**EXHIBIT C**

**VALUATION ANALYSIS**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY ASSETS OF THE DEBTOR OR SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTOR OR ANY OF ITS AFFILIATES.

THE VALUATION ANALYSIS DOES NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS OR ANY OTHER PERSON AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN. COLLET HAS NOT BEEN REQUESTED TO, AND DOES NOT EXPRESS ANY VIEW AS TO, THE POTENTIAL TRADING VALUE OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN ON ISSUANCE OR AT ANY OTHER TIME.

**A.   Collet's Estimated Valuation**

Solely for the purposes of the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (as may be amended, modified, or supplemented, the "Plan") and the *Disclosure Statement for Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (as may be amended, modified, or supplemented, the "Disclosure Statement"), Collet & Associates, LLC ("Collet"), as investment banker to Brazos Electric Power Cooperative, Inc. (the "Debtor"), has estimated a range of total utility plant fair market values ("Utility Asset FMV") for Reorganized Brazos Electric Power Cooperative, Inc. ("Reorganized Brazos Electric") on a going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by the Debtor's management and financial advisors, including the financial projections attached to the Disclosure Statement as Exhibit C (collectively the "Projections"), and information that is publicly available or was provided by other sources. The Valuation Analysis assumes that the Effective Date will occur on or about December 14, 2022. The valuation estimates set forth herein represent valuation analyses of Reorganized Brazos Electric based on the application of customary valuation techniques to the extent deemed appropriate by Collet.

Based on the Projections and solely for the purposes of the Plan and Disclosure Statement, Collet estimates that the potential range of Utility Asset FMV for Reorganized Brazos Electric is approximately **$3.01 to $3.33 billion**. The Utility Asset FMV is the sum of the individual asset class values for fixed assets of Reorganized Brazos Electric comprised of electric transmission, electric distribution, electric power generation, utility general plant facilities, and general fixed assets including the corporate headquarters using the valuation techniques appropriate to the asset

1

class as determined by Collet.

For purposes of the Valuation Analysis, Collet assumed that, between the date of filing of the Disclosure Statement and the assumed effective date of the Plan (the "Effective Date"), no material changes will occur that would affect the Projections or Valuation Analysis. Collet's Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

## B.    Valuation Methodology

Collet has estimated the Utility Asset FMV of Reorganized Brazos Electric by primarily relying on three generally accepted valuation methodologies: (i) the Discounted Cash Flow ("DCF") Analysis, (ii) the Precedent Transaction Analysis, and (iii) the Comparable Public Company Analysis. Collet weighted its Valuation Analysis more heavily to the Precedent Transaction Analysis and DCF Analysis methodologies, but considered at a lesser weighting, the Comparable Public Company Analysis, as this methodology has less relevance for purposes of assessing the Utility Asset FMV as Reorganized Brazos Electric will not be publicly traded, among other factors.

(i)    The DCF Analysis:

The DCF Analysis methodology is a forward-looking valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the weighted average cost of capital (the "Discount Rate") of the business or applicable to the asset class. The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business or asset class. The Discount Rate for Reorganized Brazos Electric reflects the Public Utility Commission of Texas's ("PUCT") jurisdictional cost of capital used for ratemaking purposes. The Utility Asset FMV is determined by calculating the present value of the unlevered free cash flows for the years from 2023 to 2032 ("Projection Period") based on the Projections plus an estimate for the value of the assets beyond the Projection Period, known as the terminal value. The terminal value is derived using the annuity value of the normalized unlevered free cash flow in the final year of the Projection Period, discounted back to the assumed Effective Date. An alternative terminal value is derived assuming a sale of the assets following the final year of the Projection Period, discounted back to the assumed Effective Date.

(ii)    The Precedent Transaction Analysis:

The Precedent Transaction Analysis methodology estimates value by examining comparable precedent merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial metrics. These transaction multiples are calculated based on the purchase price paid

to acquire asset groups that are comparable to Reorganized Brazos Electric. The Precedent Transaction Analysis methodology also reflects aspects of value other than the intrinsic value of a company or asset class, and the transactions analyzed for this asset class invariably will have occurred over an extended historical period reflecting different operating and financial environments. While Collet considered precedent transactions since 2000, Collet believes that the transactions identified since 2015 have more relevance when assessing the Utility Asset FMV of Reorganized Brazos Electric, and consideration of precedent transactions prior to 2015 are required due to the lack of sufficient recent and comparable observations, among other factors.

(iii)    The Comparable Public Company Analysis:

The Comparable Public Company Analysis methodology estimates the value of a company or asset base that could be operated as a company relative to other publicly traded companies with similar asset composition, business and financial characteristics. Collet first selected a set of publicly traded companies that it believes exhibit similar business and financial characteristics to Reorganized Brazos Electric operating in the transmission and distribution electric utility business. Criteria for the selected reference group included, among other relevant characteristics, similarity in operations, business risks, growth prospects, regulatory status, revenue base, margins, market presence, size and scale of operations. The selected reference group may not be comparable to Reorganized Brazos Electric in all aspects, and may differ materially in certain specific respects.

In deriving enterprise value ranges under the Comparable Public Company Analysis methodology, Collet used earnings before interest, taxes, depreciation and amortization ("EBITDA") as its primary valuation metric. In addition, Collet utilized enterprise valuation metrics to net utility plant and asset book values as a secondary valuation methodology. Collet then applied a range of multiples to the Debtor's FY2022E EBITDA and June 30, 2022 asset values.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY COLLET ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTOR AVAILABLE TO COLLET AS OF SEPTEMBER 1, 2022. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR AFFECT COLLET'S CONCLUSIONS, COLLET DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO. SUBSEQUENT DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, IN RELATION TO COVID-19, MAY AFFECT THE PROJECTIONS AND OTHER INFORMATION THAT COLLET UTILIZED IN THE VALUATION ANALYSIS. COLLET ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE VALUATION ANALYSIS BASED ON CIRCUMSTANCES OR EVENTS AFTER THE DATE HEREOF.

COLLET DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT COLLET USED IN THE VALUATION ANALYSIS, AND NO

INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTOR OR REORGANIZED BRAZOS ELECTRIC WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN, DISCLOSURE STATEMENT, AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF THE ASSETS OR ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTOR, COLLET, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET VALUES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Management of the Debtor and its financial advisor advised Collet that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtor's best estimates and judgments as to the future operating and financial performance of Reorganized Brazos Electric. The Valuation Analysis assumes that the actual performance of Reorganized Brazos Electric corresponds to the Projections in all material respects. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Utility Asset FMV therein.

In preparing the Valuation Analysis, Collet: (a) reviewed certain historical financial information of the Debtor for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtor, including the Projections and anticipated rate recovery mechanism; (c) discussed the Debtor's operations and future prospects with the Debtor's senior management team and third-party advisors; (d) reviewed certain publicly available financial data

for, and considered the market value of, public companies that Collet deemed generally relevant in analyzing the value of Reorganized Brazos Electric; (e) reviewed certain publicly available financial data for transactions involving asset bases or companies similar in certain respects to Reorganized Brazos Electric; (f) considered certain economic and industry information that Collet deemed generally relevant to Reorganized Brazos Electric, including but not limited to regulatory returns allowed on similarly situated electric utility assets; and (g) conducted such other studies, analyses, inquiries, and investigations as Collet deemed appropriate. Collet assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtor's management and other parties as well as publicly available information.

Collet did not estimate the value of any tax attributes, nor did it estimate the impact of any cancellation of indebtedness income on Reorganized Brazos Electric's projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on Reorganized Brazos's projections could materially impact Collet's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY COLLET. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY COLLET IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

COLLET IS ACTING AS INVESTMENT BANKER TO THE DEBTOR, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

**EXHIBIT D**

**LIQUIDATION ANALYSIS**

Brazos Electric Power Cooperative, Inc. ("Brazos Electric" or the "Debtor"), with the assistance of its legal and financial advisors, has prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (as amended, supplemented, or modified from time to time, the "Plan") and related disclosure statement (as amended, supplemented, or modified from time to time, the "Disclosure Statement"), pursuant to chapter 11 title 11 of the United States Code (the "Bankruptcy Code").[1]

The Liquidation Analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. Under this test, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each holder of an impaired Claim against the Debtor either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code, the Debtor, with the assistance of its advisors, has prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

This Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims pursuant to a hypothetical liquidation under Chapter 7 of the Bankruptcy Code upon disposition of the Debtor's assets as an alternative to the Plan. Accordingly, the estimated range of asset values discussed herein may be different than amounts referred to in the Plan. The determination of the hypothetical proceeds from the liquidation of assets is inherently a highly uncertain process involving the extensive use of estimates and assumptions, which, although considered reasonable by the Debtor and the Debtor's advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the Debtor's control.

The Liquidation Analysis does not consider the discounting over time of creditor recoveries, which would likely result in lower recoveries to holders of Claims than the estimated recoveries presented in the Liquidation Analysis.

In preparing the Liquidation Analysis, the Debtor estimated Allowed Claims based upon a review of Claims listed on the Debtor's financial statements and filed proofs of claim to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or Plan, as applicable.

for Claims not currently asserted in the Chapter 11 case, but which could be asserted and allowed in a Chapter 7 liquidation, including Chapter 7 trustee (the "Trustee") fees and related professional expenses. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtor's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

---

**THE DEBTOR MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS.**

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.  THE DEBTOR RESERVES THE RIGHT TO SUPPLEMENT, AMEND, OR MODIFY THE LIQUIDATION ANALYSIS, INCLUDING BY CHANGING THE ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN. YOU SHOULD CONSULT YOUR OWN ADVISORS REGARDING THE INFORMATION CONTAINED HEREIN.**

---

### Overview and Liquidation Process

The Liquidation Analysis is required to be included in the Disclosure Statement for the purpose of evaluating whether the Plan satisfies the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code.  Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim must either:

- accept the plan; or

- receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis assumes that the hypothetical liquidation begins on or about October 31, 2022 (the "Liquidation Date") and was developed from the Debtor's projected balance sheet as of that date. The Liquidation Analysis also relies on the balance sheets and certain customer information  for the Members generally as of June 30, 2022, or March 31, 2022, adjusted as appropriate to estimate projected balances as of the Liquidation Date.

The Liquidation Analysis assumes the orderly liquidation by the Trustee of substantially all of the Debtor's assets over a 9-12-month period beginning on or about the Liquidation Date, the concurrent Member liquidations, and wind-down of the Chapter 7 estate (the "Estate").

2

Chapter 7 liquidation adjustments include post-conversion net operating cash flow, Trustee fees, other administrative costs including professional fees, and employee related costs.

The Debtor's liquidation would be conducted in a Chapter 7 environment with the Trustee managing the Estate to maximize recovery in an expedited process. The major components of the hypothetical liquidation would be as follows:

- Collect from the Members receivable balances that are due to the Debtor, or that become due to the Debtor upon the Debtor's liquidation, arising from (a) costs and expenses incurred during Winter Storm Uri calculated pursuant to the WPSDS Tariff and the TRRM Protocols and invoiced to the Members (the "TAA Claims"), (b) ordinary course accounts receivable ("Accounts Receivable") projected as of the Liquidation Date, and (c) all other costs and expenses of the Debtor (the "Other Member Claims"), to the extent that each Member is able to pay unsecured claims following their respective hypothetical liquidations;

- Sell or otherwise monetize the fixed assets owned by the Debtor to one or multiple buyers, which may include (a) sales of logical asset groups, (b) sales of facilities with associated assets, (c) sales on a going-concern basis (where possible), or (d) other sales of assets on a piecemeal basis;

- Realize value for cash and other current assets;

- Determine the amount of net proceeds generated by the Estate during the period from conversion to Chapter 7;

- Reconcile each Class of Claims asserted to determine the amount of Allowed Claims per Class;

- Estimate Claims not currently asserted in the Chapter 11 case, but which would be asserted and allowed in a Chapter 7 liquidation; and

- Distribute net cash proceeds generated from the sale of the Estate's assets in accordance with the absolute priority rule.

The gross amount of cash available from a liquidation would be the sum of proceeds from the collection of receivable balances from the Members, disposition of the Debtor's assets, and cash held by the Debtor at the time of the commencement of the Chapter 7 case. This amount would be adjusted by the following:

- Cash flow, net of interest expense on related debt, from the T&D Assets after conversion to Chapter 7 and through the asset sales, assumed to be a period of 9-12 months;

3

- Operating revenues net of related costs and maintenance costs have been assumed for Generation Assets after conversion to Chapter 7 and through the asset sales, assumed to be a period of 3 months during the shoulder period (following the Liquidation Date) for generation dispatch;

- Interest to be paid on Generation Debt in the 3 months prior to closing of a sale(s) of the Generation Assets;

- Transaction fees on asset sales;

- Costs related to the retention of certain of the Debtor's personnel during the monetization period; and

- Trustee fees and other administrative costs of 4.0% of gross proceeds.

A.     **Estimated Proceeds from Members – TAA Claims, Accounts Receivable, and Other Member Claims**

The Trustee would pursue its claims against each Member, consisting of TAA Claims, Accounts Receivable, and Other Member Claims. These claims, the absence of the Hardship Fund contemplated in the Plan, the absence of the other reductions and settlements embodied in the Plan, the liquidation of the Brazos cooperative structure and loss of its associated benefits to the Members, and the potential that the Trustee would pursue the Members for the Other Member Claims, are assumed to lead to the liquidation of each Member with an unpaid TAA Balance. It is assumed that for those same reasons, the Members would be unwilling or unable to securitize the unmitigated TAA Claims, and would instead seek protection under the Bankruptcy Code.[2] Each Member liquidation is assumed to be conducted on a standalone basis, commencing on or about the Liquidation Date. Given the unique structure of the Debtor and relationship between it and its Members, a liquidation of each Member represents the best estimate of the Trustee's ability to collect, and the Members' ability to pay, the TAA Claims, Accounts Receivable, and Other Member Claims in the absence of the negotiated Plan.

Net proceeds from the utility fixed assets of each Member are estimated using two methods, weighted equally: (i) the estimated range of the fair value from sale of residential customers, discounted in a hypothetical liquidation by 10%; and (ii) the estimated range of fair value based on a multiple of the Net Utility Plant to book value for each Member, discounted in a hypothetical liquidation by 5%. Estimated proceeds from the sale of non-utility assets other than broadband assets are assumed to be at net book value (i.e., a multiple of 1.25x book value with a liquidation discount of 20%); net proceeds from broadband assets are discounted by 50% of book value. Estimated recoveries of current assets from each Member are assumed to equal book value.

---

[2] Additionally, neither the Debtor nor any other third-party entity has the ability to compel a Member to securitize any amount, and the Members would be unable to securitize the non-TAA Claim amounts.

4

Transaction and Trustee fees incurred by each Member are assumed to be 3.0% and 1.5%, respectively.

The TAA Claims, Accounts Receivable, and Other Member Claims would receive their pro-rata share of the general unsecured claims distributions for each Member in its hypothetical liquidation, to the extent each Member is able to pay such claims.

## B.      Fixed Asset Sale Proceeds

The Liquidation Analysis assumes that the Trustee sells or otherwise monetizes the Debtor's Generation Assets, T&D Assets, and other fixed assets to one or multiple buyers during a 3-month period for the Generation Assets and 9-12-month period for the T&D Assets and other fixed assets. Fuel, materials, and supplies are assumed to be included in the sale of their associated facilities. Estimated fair values by asset class were prepared assuming a base (low) and high case, producing a range of estimated recoveries. The low case utilized the base case values in the Valuation Analysis prepared by Collet & Associates, LLP, attached to the Disclosure Statement as Exhibit D (the "Valuation Analysis"). As compared to the base case, the high case utilizes the high case values in the Valuation Analysis for the Generation Assets and Distribution Assets, and assumes a potential premium of approximately 40% to the base case value in the Valuation Analysis for the Debtor's electric transmission assets (the "Transmission Assets"). This premium accounts for the potential of an over-valued bid on the Debtor's Transmission Assets by a strategic buyer in order to present the highest possible estimate of the value of the Transmission Assets in a liquidation scenario.

Discounts were applied to the range of estimated fair values of 20% for Generation Assets and the Debtor's wholesale distribution assets (the "Distribution Assets"), and 10% for the Transmission Assets in a Chapter 7 liquidation. Other fixed assets (primarily the headquarters facility in Waco, TX) are assumed to be realized at 60% of book value.  The Debtor and its advisors believe that the estimated range of liquidation values from fixed asset sales must consider, among other factors, the following:

- In a liquidation, the ability and timeframe for potential buyers to conduct due diligence would be impacted. Major diligence tasks likely would include completion of environmental assessments, assignment of interconnection and other legal agreements, and real estate and engineering issues for buyers intending to separate the Transmission Assets and Distribution Assets;

- Any required regulatory approvals likely would take months and could be contested;

- The potential for termination as a market participant and a lack of credit availability from counterparties and/or ERCOT may result in a relatively short period for a sale process for the Generation Assets;

5

- Due to the integrated nature of the T&D Assets, both at the Debtor level and with the ERCOT grid, any separation will be time consuming and costly, imposing additional risk on the buyer(s);

- Potential buyers not already in the Texas market may be restricted from acquiring the T&D Assets, limiting the pool of potential buyers; and

- Employee and staffing concerns for a new buyer to run transmission lines and substations.

## C.     Cash and Equivalents

Projected cash and equivalents are as of the Liquidation Date. The Liquidation Analysis assumes 100% recovery of these balances. The Liquidation Analysis also assumes the release of the entire amount of the Cushion of Credit account.

## D.     Summary of Estimated Liquidation Adjustments

Post-Conversion Cash Flow: Based on estimated cash flow, net of interest, generated from the T&D Assets during the 9-12 month period prior to the sale completion, as well as operating cash flows, maintenance costs, and interest paid on debt related to Generation Assets prior to sale.

Trustee and Other Administrative Costs: The Liquidation Analysis assumes costs will be 4.0% of gross liquidation proceeds.

Transaction fees: Assumed to be 3.0% of gross asset sale proceeds, before Trustee costs.

Employee costs: Employee related costs through the closing of the asset sales, including retention, severance, vacation, and sick pay.

## E.     Distribution of Net Proceeds to Claimants.

Any available net proceeds would be allocated to Holders of Claims in accordance with section 726 of the Bankruptcy Code:

- Secured Claims includes Claims related to the RUS Secured Notes and Other Secured Claims (i.e., pre-petition revolver setoff);

- Administrative Priority Claims includes estimated Claims for post-petition accounts payable, Professional Fee Claims, Claims arising under section 503(b)(9) of the Bankruptcy Code, and certain employee related Claims entitled to priority;

- General Unsecured Claims includes Claims arising from the unsecured portion of the Prepetition Revolving Loan Documents, interest rate swaps, letters of credit, Pension Plan Claims and other employee related Claims, the unsecured portion of the ERCOT Claim, the SCEA Claim, the BSCEC Claims, the Tort Claims and various other General Unsecured Claims; and

- The Liquidation Analysis assumes that there is no recovery for any Member's Claim with respect to Patronage Capital.

### 1.    The ERCOT Claim

- The Liquidation Analysis assumes no settlement or re-litigation of the ERCOT Claim, consisting of $258 million in 503(b)(9) Claims and a $1,628 million general unsecured Claim. Projected ERCOT receivables as of the Liquidation Date, estimated at $44 million, are assumed to be set off by ERCOT, reducing the general unsecured portion of the ERCOT Claim to $1,584 million.  There is a risk to the Estate that ERCOT would litigate the priority of the full amount of the ERCOT Claim.

### 2.    General Unsecured Claims other than the ERCOT Claim

- Sandy Creek related Claims are estimated at a range of $425 million to $625 million, assuming no plan-related settlements;

- Rejection damages for other contracts were not included and would further reduce recoveries;

- General Unsecured Claims for the Prepetition Revolving Loan Documents, letters of credit, swaps, and other trade Claims are as estimated in the Plan;

- Pension and post-retirement health care plan Claims are included at the asserted amounts due to plan terminations;

- The high recovery case assumes total general unsecured Claims are reduced by $50 million resulting from objections to Claims by the Trustee; and

- No settlement is reached in relation to any Claims filed by the Members. Should these Claims be litigated, any additional costs could further reduce recoveries.

**CONCLUSION**

Based on this Liquidation Analysis versus the implied reorganization value under the Plan, the Plan satisfies the requirements of 1129(a)(7) of the bankruptcy code. Upon application of the

above assumptions and estimates, the estimated recoveries are summarized in the table on the following page.

Estimated distributable value ranges from approximately $3.9 billion to $4.7 billion. Secured and Administrative Claims are paid in full under each case. General Unsecured Claims recoveries are estimated to be 50.4% in the low case, 65.8% at the midpoint, and 82.6% in the high case.

**Liquidation Analysis Summary**

| $ in millions | Projected Book Value 10/31/22 | | Low | | Midpoint | | High |
|---|---|---|---|---|---|---|---|
| TAA Claims | $ 2,507.0 | $ | 909.8 | $ | 960.7 | $ | 1,011.6 |
| Asserted Member Offsets | - | | - | | - | | - |
| Accounts Receivable from Members | 139.3 | | 58.7 | | 62.2 | | 65.7 |
| Other Member Claims | 831.5 | | 407.9 | | 414.0 | | 420.2 |
| RUS Cushion of Credit | 99.5 | | 99.5 | | 99.5 | | 99.5 |
| Cash on Hand | 99.0 | | 99.0 | | 99.0 | | 99.0 |
| Prepaid Expenses and Other | 5.0 | | - | | - | | - |
| Fuel and Materials | 91.2 | | - | | - | | - |
| Fixed Assets | 2,090.4 | | 2,486.8 | | 2,808.4 | | 3,129.9 |
| Post-Conversion Cash Flows from T&D, Gen O&M | | | 45.0 | | 52.5 | | 60.0 |
| Trustee and Other Administrative Costs | | | (164.3) | | (179.9) | | (195.4) |
| Total Distributable Value | | $ | 3,942.5 | $ | 4,316.5 | $ | 4,690.5 |
| Secured Claims | | | | | | | |
| RUS Secured Notes | | | (1,643.0) | | (1,643.0) | | (1,643.0) |
| BofA Prepetition Revolver Setoff | | | (123.9) | | (123.9) | | (123.9) |
| Total Secured Claims | | $ | (1,766.9) | $ | (1,766.9) | $ | (1,766.9) |
| Administrative Priority Claims | | | | | | | |
| 503(b)(9): ERCOT | | | (258.3) | | (258.3) | | (258.3) |
| 503(b)(9): Power and Gas | | | (344.3) | | (344.3) | | (344.3) |
| Post-Petition Accounts Payable | (65.0) | | (65.0) | | (65.0) | | (65.0) |
| Other | | | (11.9) | | (11.9) | | (11.9) |
| Total Administrative Priority Claims | | $ | (679.5) | $ | (679.5) | $ | (679.5) |
| Total Secured & Administrative Priority Claims | | $ | (2,446.3) | $ | (2,446.3) | $ | (2,446.3) |
| Secured & Administrative Priority Claims Recovery | | | 100% | | 100% | | 100% |
| Funds Available for Unsecured Claims | | $ | 1,496.1 | $ | 1,870.1 | $ | 2,244.1 |
| Unsecured Claims | | | | | | | |
| Sandy Creek Related Claims | | $ | (625.0) | $ | (525.0) | $ | (425.0) |
| Other Contract Rejection Damages | | | TBD | | TBD | | TBD |
| Unsecured Portion of Prepetition Revolving Loan | | | (356.6) | | (356.6) | | (356.6) |
| Interest Rate Swaps | | | (246.9) | | (246.9) | | (246.9) |
| Letters of Credit | | | (20.0) | | (20.0) | | (20.0) |
| Pension and Post-Retirement Health Care Plans | | | (62.9) | | (62.9) | | (62.9) |
| Other Claims | | | (50.8) | | (50.8) | | (50.8) |
| Employee Related | | | (21.6) | | (21.6) | | (21.6) |
| ERCOT | | | (1,584.3) | | (1,584.3) | | (1,584.3) |
| Potential Claims Reduction | | | - | | 25.0 | | 50.0 |
| Total Unsecured Claims | | $ | (2,968.3) | $ | (2,843.3) | $ | (2,718.3) |
| Shortfall/Surplus | | $ | (1,472.1) | $ | (973.1) | $ | (474.1) |
| Unsecured Claims Recovery | | | 50.4% | | 65.8% | | 82.6% |