**<u>Exhibit A</u>**

Amended Chapter 11 Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC., | § | Chapter 11 |
| | § | |
| Debtor.[1] | § | |

**AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**OF BRAZOS ELECTRIC POWER COOPERATIVE, INC.**

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland
Julie Goodrich Harrison
Maria Mokrzycka
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone:  (713) 651-5151
Email:   jason.boland@nortonrosefulbright.com
        julie.harrison@nortonrosefulbright.com
        maria.mokrzycka@nortonrosefulbright.com

James A. Copeland
1301 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 408-5471
Email:   james.copeland@nortonrosefulbright.com

Paul Trahan
Emily Despres Wolf
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  79701
Telephone:  (512) 474-5201
Email:   paul.trahan@nortonrosefulbright.com
        emily.wolf@nortonrosefulbright.com

*Counsel for the Debtor and Debtor in Possession*

Dated:   October 27, 2022

**O'MELVENY & MYERS LLP**
Louis R. Strubeck, Jr.
Nick Hendrix
Laura Smith
2501 North Harwood Street, Suite 1700
Dallas, Texas 75201
Telephone:  (972) 360-1925
Email:   lstrubeck@omm.com
        nhendrix@omm.com
        lsmith@omm.com

*Co-Counsel for the Debtor and Debtor in Possession*

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729).   Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, Texas 76712.

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........1
   A. Defined Terms ........1
   B. Rules of Interpretation ........32
   C. Computation of Time ........32
   D. Governing Law ........33
   E. Reference to Monetary Figures ........33
   F. Reference to the Debtor or the Reorganized Debtor ........33
   G. Controlling Document ........33
   H. Consenting Member Consent and Consultation Rights ........33

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS ........34
   A. Administrative Claims ........34
   B. DIP Facility Claims ........35
   C. Professional Fee Claims ........35
   D. Priority Tax Claims ........37
   E. Payment of Statutory Fees ........37

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS ........37
   A. Summary of Classification ........37
   B. Treatment of Claims ........38
   C. No Interests in the Debtor ........42
   D. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........42
   E. Elimination of Vacant Classes ........43
   F. Separate Classification of Other Secured Claims ........43
   G. Voting Classes; Presumed Acceptance by Non-Voting Classes ........43
   H. Subordinated Claims ........43

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........43
   A. General Settlement of Claims ........43
   B. Restructuring Transactions; Effectuating Documents ........44
   C. Corporate Existence ........44
   D. Vesting of Assets in the Reorganized Debtor ........45
   E. Sources of Plan Funding ........45
   F. The Member Settlement ........47
   G. The ERCOT Settlement ........52
   H. SCEA Claims Settlement ........58
   I. BSCEC Claims Settlement ........59
   J. Tenaska Power Claim Settlement ........60
   K. Committee Settlement ........60
   L. Plan Defaults ........62
   M. New Organizational Documents and Senior Management ........65
   N. Corporate Action ........66
   O. Employee Obligations ........67
   P. Workers' Compensation Programs ........68
   Q. Ordinary Course Professionals ........68
   R. Cancellation of Loans, Securities, and Agreements ........68
   S. Exemption from Certain Taxes and Fees ........69
   T. Preservation of Causes of Action ........69
   U. Insurance Policies and Surety Bonds ........70
   V. Notice of Effective Date ........71

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........71
   A. Assumption and Rejection of Executory Contracts and Unexpired Leases ........71

     B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases....................................72
     C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................................73
     D.      Assumption Dispute Resolution....................................................................................................73
     E.      Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases ............74
     F.      Contracts and Leases Entered into After the Petition Date ............................................................74
     G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.........................74
     H.      Reservation of Rights...................................................................................................................75
     I.      Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)........................................75

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................................................75
     A.      Distributions Generally.................................................................................................................75
     B.      Distribution Record Date ..............................................................................................................75
     C.      Timing and Calculation of Amounts to Be Distributed..................................................................75
     D.      Rights and Powers of Disbursing Agent .......................................................................................76
     E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions......................................77
     F.      Satisfaction of Claims ..................................................................................................................78
     G.      Securities Registration Exemption ...............................................................................................78
     H.      Compliance with Tax Requirements .............................................................................................79
     I.      Cancellation of Liens and Surrender of Cancelled Instruments or Securities ...............................79
     J.      Allocations ..................................................................................................................................79
     K.      No Postpetition or Default Interest on Claims ..............................................................................80
     L.      Setoffs and Recoupment ..............................................................................................................80
     M.      Claims Paid or Payable by Third Parties.......................................................................................80

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED
          CLAIMS .......................................................................................................................................81
     A.      Allowance of Claims....................................................................................................................81
     B.      Claims Administration Responsibilities ........................................................................................81
     C.      Reservation of Rights to Object to Claims ....................................................................................82
     D.      Disputed and Contingent Claims Reserve .....................................................................................82
     E.      Estimation of Claims....................................................................................................................82
     F.      Adjustment to Claims Register Without Objection........................................................................83
     G.      Time to File Objections to Claims ................................................................................................83
     H.      Disallowance of Claims ...............................................................................................................83
     I.      Amendments to Proofs of Claim...................................................................................................83
     J.      Reimbursement or Contribution....................................................................................................84
     K.      No Distributions Pending Allowance.............................................................................................84
     L.      Distributions After Allowance ......................................................................................................84
     M.      Single Satisfaction of Claims .......................................................................................................84

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............................84
     A.      Compromise and Settlement of Claims and Controversies.............................................................84
     B.      Discharge and Satisfaction of Claims ...........................................................................................85
     C.      Releases by the Debtor .................................................................................................................85
     D.      Releases by Holders of Claims .....................................................................................................86
     E.      Exculpation .................................................................................................................................87
     F.      Injunction ...................................................................................................................................88
     G.      Waiver of Statutory Limitations on Releases.................................................................................89
     H.      Protection Against Discriminatory Treatment................................................................................89
     I.      Recoupment ................................................................................................................................90
     J.      Subordination Rights....................................................................................................................90
     K.      Release of Liens ..........................................................................................................................90

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...................................90
     A.      Conditions Precedent to the Effective Date ...................................................................................90
     B.      Waiver of Conditions...................................................................................................................91

    C.      Effect of Non-Occurrence of Conditions to the Effective Date .........................................92
    D.     Substantial Consummation .........................................................................................92

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .......................92
    A.     Modification and Amendments ..................................................................................92
    B.     Effect of Confirmation ..............................................................................................92
    C.      Revocation or Withdrawal of the Plan .......................................................................93

ARTICLE XI. RETENTION OF JURISDICTION ...............................................................................93

ARTICLE XII. MISCELLANEOUS PROVISIONS ..............................................................................95
    A.     Immediate Binding Effect ..........................................................................................95
    B.     Additional Documents ...............................................................................................95
    C.      Plan Supplement ........................................................................................................96
    D.     Reservation of Rights.................................................................................................96
    E.     Successors and Assigns ..............................................................................................96
    F.     Service of Documents ................................................................................................96
    G.     Term of Injunctions or Stays .....................................................................................97
    H.     Entire Agreement .......................................................................................................97
    I.      Nonseverability of Plan Provisions ...........................................................................97
    J.      Dissolution of Committee and Bankruptcy Advisory Committee...............................98
    K.     Votes Solicited in Good Faith ...................................................................................98
    L.     Expedited Tax Determination ....................................................................................99
    M.    No Stay of Confirmation Order ..................................................................................99
    N.     Waiver or Estoppel.....................................................................................................99
    O.     Closing of Chapter 11 Case .......................................................................................99

**EXHIBITS**

BSCEC Claims Settlement Agreement………...……………………………………………    Exhibit A

Eligible Market Participant Election Notice...…………………………………………………    Exhibit B

Eligible Market Participants...…………………………………………………………………    Exhibit C

Retained Agreements………....………………………………………………………………    Exhibit D

TAA Balances……………....……………………………………………………………….    Exhibit E

## INTRODUCTION

Brazos Electric Power Cooperative, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), proposes this *Amended Chapter 11 Plan of Reorganization* pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I below. Capitalized terms not defined herein shall have the meanings provided in the Bankruptcy Code. Holders of Claims may refer to the Disclosure Statement for a discussion of the Debtor's history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE URGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE X OF THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN BEFORE ITS CONSUMMATION.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

The following terms shall have the meanings set forth below.

1.    "ACES" means Alliance for Cooperative Energy Services Power Marketing LLC, a Delaware limited liability company, and its applicable Affiliates.

2.    "Accelerated Recovery Allocation Factor" means (x) *divided by* (y), expressed as a percentage, where (x) is the portion of the Brazos Short Pay Claim for which Electing Market Participants have elected to receive the Market Participant Convenience Cash Recovery or the Market Participant Accelerated Cash Recovery, and (y) is $1,286,886,127.86 (*i.e.*, the Brazos Short Pay Claim minus the Initial ERCOT Cash Payment).

3.    "Additional GUC Cash Payment" means one or more Cash payments from the Reorganized Debtor on or before the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline) in an aggregate amount equal to (i) 40.0% of the GUC Distribution Percentage *multiplied by* the Estimated GUC Pool as of that date (after deducting the first tranche of the SCEA Allowed GUC Claim) *plus* (ii) any amounts necessary, at such time, to true-up the Initial GUC Cash Payment to 60.0% of the increased GUC Distribution Percentage in respect of Holders' Allowed General Unsecured Claims.

4.    "Additional Market Participant Cash Payment" means one or more Cash payments from, or on behalf of, the Reorganized Debtor to ERCOT on or before the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be made on or before the Interim Distribution Deadline) in an aggregate amount equal to $116,600,000, which aggregate amount shall be allocated as set forth in the ERCOT Recovery Appendix to fund, as applicable, the Market Participant Accelerated Cash Recovery and the Market Participant Deferred Cash Recovery. The Reorganized Debtor shall deposit an amount equal to the Additional Market Participant Cash Payment *multiplied by* the Deferred Recovery Allocation Factor into the ERCOT Escrow Account contemporaneously with the Reorganized Debtor's payment to ERCOT in an amount equal to the Additional Market Participant Cash Payment *multiplied by* the Accelerated Recovery Allocation Factor.

5.        "Ad Hoc Member Group" means the ad hoc group of certain Members, in its capacity as such, represented by Vinson & Elkins LLP.  The members of the Ad Hoc Member Group are: (i) Bartlett Electric Cooperative, Inc.; (ii) Comanche County Electric Cooperative Association; (iii) Cooke County Electric Cooperative, Inc., d/b/a PenTex Energy; (iv) Hamilton County Electric Cooperative Association; (v) Heart of Texas Electric Cooperative, Inc.; (vi) J-A-C Electric Cooperative, Inc.; (vii) Navasota Valley Electric Cooperative, Inc.; and (viii) Wise Electric Cooperative, Inc.

6.        "Administrative and Priority Claims Reserve" means a reserve to be funded by the Debtor or the Reorganized Debtor, as applicable, with Cash in the aggregate amount sufficient to pay Allowed Administrative Claims pursuant to Article II.A, Allowed Priority Tax Claims pursuant to Article II.D, and Allowed Other Priority Claims pursuant to Article III.B.1.

7.        "Administrative Claim" means a Claim against the Debtor (other than DIP Facility Claims) for costs and expenses of administration of the Debtor's Estate pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the Petition Date; (ii) Allowed Professional Fee Claims; (iii) Statutory Fees; and (iv) Section 503(b)(9) Claims.  For the avoidance of doubt, the RUS Roll-Up Loans shall not be Administrative Claims under the Plan.

8.        "Administrative Claims Bar Date" means the deadline for Filing requests for payment of Administrative Claims (other than Section 503(b)(9) Claims), which (i) with respect to such Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

9.        "Administrative Claims Objection Deadline" means the deadline for objecting to an Administrative Claim (including Section 503(b)(9) Claims), which shall be on the date that is the later of (i) 180 days after the Effective Date or (ii) such later date as may be set by the Bankruptcy Court upon a motion by the Reorganized Debtor; provided that, if the Reorganized Debtor Files such motion before the expiration of the then-effective Administrative Claims Objection Deadline, such Administrative Claims Objection Deadline shall be tolled pending entry of a further order by the Bankruptcy Court.

10.        "Adv. Dkt. No." means, as applicable, the docket number associated with the applicable Filing in the ERCOT Adversary Proceeding or the Gas Supplier Adversary Proceeding.

11.        "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply as if such Entity were a Debtor.

12.        "Allowed" means, with respect to any Claim, except as otherwise provided herein, such Claim (or any portion thereof) that:  (i) is a Claim in a liquidated amount as to which no objection has been Filed before the applicable claims-objection deadline and that is (a) evidenced by a Proof of Claim, as applicable, timely Filed by the applicable Claims Bar Date or (b) that is not required to be evidenced by a Filed Proof of Claim, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (ii) is a Claim that is scheduled by the Debtor as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or different amount; (iii) has been expressly Allowed under the Plan (including any agreement entered into in connection herewith), any stipulation that is approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; or (iv) is compromised, settled, or otherwise resolved by the Debtor or the Reorganized Debtor, as applicable, and the Holder of such Claim in accordance with the Plan; provided that with respect to a Claim described in clauses above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the

Allowance thereof has been Filed or interposed within the applicable period set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules, or otherwise set by the Bankruptcy Court, or an objection is so Filed or interposed and the Claim has been Allowed by a Final Order; provided, further, that, except as otherwise expressly provided herein, the amount of any Allowed Claim shall be determined in accordance with the Bankruptcy Code, including (as applicable) sections 502, 503, and 506 of the Bankruptcy Code, and shall not exceed the limitations under or maximum amounts permitted thereby.  Notwithstanding anything to the contrary herein, (i) as set forth in Article VII.H, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be Allowed; (ii) Allowed Tort Claims shall be settled or adjudicated outside of the Bankruptcy Court in accordance with the applicable General Liability Insurance Policies and the Plan, subject to the Debtor's or Reorganized Debtor's, as applicable, ability to object as provided in Article VII; and (iii) the Debtor and the Reorganized Debtor, as the case may be, shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.  A Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowance," and "Allowing" shall have correlative meanings.

13.    "All Requirements Contracts" means those certain prepetition contracts (including any prepetition amendments, modifications, or supplements thereto) between the Debtor and each Member whereby the Debtor, as seller, sells and delivers to each Member, as purchaser, all wholesale electric power and energy, and wholesale transmission and wholesale distribution service, that each Member requires for the operation of such Member's electric-distribution system, as such contracts existed before any amendment or restatement provided for under the Plan.

14.    "Amended and Restated RUS Secured Notes Documents" means the amended and restated RUS Indenture, amended and restated RUS Loan Contract, and all related notes, agreements, and documents between the Reorganized Debtor and the applicable RUS Secured Parties in connection with the Reinstated RUS Secured Notes, which, as applicable, shall be consistent with the applicable Exit Financing Term Sheets and shall be in form and substance satisfactory to the Debtor and the RUS Secured Parties.

15.    "Amended ARC Effective Date" means the occurrence of the effective date under the Amended ARCs, which shall be March 1, 2023.

16.    "Amended ARCs" means, collectively, the Amended and Restated Wholesale Transmission and Distribution Services Contract by and between the Reorganized Debtor and a Consenting Member, including all exhibits thereto, the form and substance of which shall be satisfactory to the Debtor, the RUS Secured Parties, and the Consenting Members.  The form of the Amended ARCs shall be filed in the Plan Supplement.

17.    "Assumed and Rejected Contracts Schedules" means the Assumed Contracts Schedule and the Rejected Contracts Schedule, each as may be amended, modified, or supplemented by the Debtor or the Reorganized Debtor, as applicable, from time to time.

18.    "Assumed Contracts Schedule" means the schedule of Executory Contracts and Unexpired Leases, filed as part of the Plan Supplement, that will be assumed or assumed and assigned by the Debtor or the Reorganized Debtor pursuant to the Plan, which schedule shall include Cure Claim amounts (if any) with respect such Executory Contracts and Unexpired Leases, as such schedule may be amended, modified, or supplemented by the Debtor from time to time; provided that the Assumed Contracts Schedule does not need to include Executory Contracts and/or Unexpired Leases that have been assumed pursuant to an order of the Bankruptcy Court entered before the Effective Date.

19.    "Assumption Dispute" shall have the meaning set forth in Article V.D.

20.     "August 2022 Estimated GUC Pool" means $1,076,340,070.08 of General Unsecured Claims.  The August 2022 Estimated GUC Pool (i) includes the BSCEC Allowed GUC Claim (for purposes of the August 2022 Estimated GUC Pool, however, the BSCEC Allowed GUC Claim shall be $165,000,000), the SCEA Allowed GUC Claim, and other General Unsecured Claims but (ii) excludes the portion of any Claim held by MUFG that is secured by the MUFG Account and (iii) is subject to further revision, as necessary, to exclude any General Unsecured Claim that is reclassified as a Secured Claim or Administrative Claim or Other Priority Claim, any Cure Claims, Claims for obligations assumed by the Reorganized Debtor under the Plan, any Claims to the extent paid (in full or in part) during the Chapter 11 Case pursuant to a Bankruptcy Court order, and Claims that are expressly deemed withdrawn, expunged, or otherwise disallowed as of the Effective Date under the Plan.

21.     "AU8 FFB Note" means that certain unfunded note dated as of December 15, 2020, issued by the Debtor and payable to the order of FFB in the face principal amount of $128,990,000 and guaranteed by the United States, as amended, modified, or supplemented from time to time.  The AU8 FFB Note is secured by the RUS Indenture, the terms of which are governed by the RUS Loan Contract.  As of the Petition Date, the Debtor had completed certain capital projects that were designated for reimbursement pursuant to the AU8 FFB Note and the proceeds thereof.  The RUS Secured Parties shall, subject to the Amended and Restated RUS Secured Notes Documents, fund the AU8 FFB Note in the aggregate amount of $128,990,000 on or before the Effective Date.

22.     "Available Coverage" means, with respect to a Holder of an Allowed Tort Claim, any available coverage or proceeds under the applicable General Liability Insurance Policies, as may be determined pursuant to the terms and conditions thereof, in respect of a liquidated final judgment or settlement on account of such Holder's Allowed Tort Claim.

23.     "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable nonbankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

24.     "Ballot" means the form(s) distributed to Holders of Claims entitled to vote on the Plan to indicate their acceptance or rejection of the Plan, and, as applicable, to make elections with respect to treatment under Article III and the releases under Article VIII.

25.     "Bankruptcy Advisory Committee" means the Brazos Electric Power Cooperative, Inc. Bankruptcy Advisory Committee formed pursuant to the *Order Authorizing the Debtor to Retain and Employ the Brazos Electric Power Cooperative, Inc. Bankruptcy Advisory Committee* at Dkt. No. 569.

26.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Case.

27.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

28.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of the Judicial Code and any local rules, orders, or procedures of the Bankruptcy Court, as amended from time to time, and as applicable to the Chapter 11 Case.

29.     "Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date*

*and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* at Dkt. No. 515.

30.    "Bilateral Gas Claim" means any Claim against the Debtor arising under a bilateral agreement with the Debtor for the purchase and sale of natural gas.

31.    "Bilateral Power Claim" means any Claim against the Debtor arising under a bilateral agreement with the Debtor (including, without limitation, any applicable ISDA master agreement or EEI master agreement with the Debtor) for the purchase and sale of electricity or ancillary services, or options for the purchase and sale of electricity.

32.    "Board" means, as applicable, the board of directors for the Debtor or the Reorganized Debtor.

33.    "Brazos" means, as applicable, Brazos Electric Power Cooperative, Inc., the Debtor in this Chapter 11 Case and the Reorganized Debtor under the Plan.

34.    "Brazos Sandy Creek" means Brazos Sandy Creek Electric Cooperative, Inc., a Texas nonprofit electric cooperative corporation, and a debtor in a case under chapter 7 of the Bankruptcy Code pending in the Bankruptcy Court under the caption *In re Brazos Sandy Creek Electric Cooperative, Inc.*, Case No. 22-30682 (DRJ).

35.    "Brazos SFA" means that certain Standard Form Market Participant Agreement dated as of April 1, 2015 between Brazos and ERCOT, as amended, modified, or supplemented from time to time.

36.    "Brazos Short Pay Claim" means $1,886,595,737.08, which is the total amount arising from or related to all Settlement Statements or Resettlement Statements issued by ERCOT to the Debtor for operation days before the Petition Date and that had not been paid by the Debtor in full to ERCOT as of the Petition Date.

37.    "BSCEC Allowed GUC Claim" means an Allowed General Unsecured Claim held by the BSCEC Estate and the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders) in the aggregate amount of $165,000,000, which is subject to the downward adjustment, if any, described in the BSCEC Claims Settlement Agreement and as summarized in Article IV.I.

38.    "BSCEC Claims" means, collectively, all Claims of Brazos Sandy Creek against the Debtor and all Claims of the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders) against the Debtor, including the Claims set forth in the Proofs of Claim numbered 758, 761, 772, 773 on the Claims and Noticing Agent's Claim Register and numbered 127 and 147 on the Claim Register filed by the BSCEC Trustee or the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders) in the Chapter 11 Case.

39.    "BSCEC Claims Settlement" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor and the Estate and each of the BSCEC Trustee and the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders), as set forth in the BSCEC Claims Settlement Agreement, the *Joint Emergency Motion for Authorization and Approval of Settlement Between (I) Brazos Electric and (II) Chapter 7 Trustee and Collateral Trustee* at Dkt. No. 2156, and the Bankruptcy Court's order approving such motion at Dkt. No. 2276, and as summarized in Article IV.I.

40.     "BSCEC Collateral Trustee" means Computershare Trust Company, N.A. (together with its successors and assigns, any co-trustees in such capacity, and each of their respective agents, members, managers, officers, directors, and employees), as collateral trustee for the BSCEC Noteholders.

41.     "BSCEC Noteholders", means, each of and collectively, the holders of the 6.54% Series 2009A Senior Secured Notes due June 30, 2024 issued by Brazos Sandy Creek.

42.     "BSCEC Claims Settlement Agreement" means that certain Settlement Agreement dated as of August 24, 2022 (as amended, modified, or supplemented pursuant to its terms) by and among Brazos, the BSCEC Trustee, and the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders), and the Bankruptcy Court's order approving the Settlement Agreement at Dkt. No. 2276, a copy of which is attached hereto as **Exhibit A**.

43.     "BSCEC Trustee" means Janet S. Northrup, solely in her capacity as the chapter 7 trustee for the bankruptcy estate of Brazos Sandy Creek.

44.     "Business Day" means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

45.     "Bylaws" means the Bylaws of Brazos, as revised and effective as of April 30, 2020 and as subsequently revised, amended, restated, or modified from time to time.

46.     "Cash" means legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

47.     "Cause of Action" or "Causes of Action" means any action, claim, proceeding, cause of action, Avoidance Actions, controversy, demand, right, action, Lien, indemnity, interest, guarantee, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory.  For the avoidance of doubt, "Cause of Action" includes, without limitation, (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity; (iii) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims; (iv) any Claim pursuant to section 362 of the Bankruptcy Code; and (v) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

48.     "Cents" means, with respect to distributions on any Claim, the cents-on-the-dollar, *e.g.*, payment of 89.5% of a Claim is expressed herein as 89.5 Cents.

49.     "Chapter 11 Case" means the chapter 11 bankruptcy case of the Debtor pending in the Bankruptcy Court under the caption *In re Brazos Electric Power Cooperative, Inc.*, Case No. 21-30725 (DRJ).

50.     "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

51.     "Claims and Noticing Agent" means Stretto (trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries) employed in the Chapter 11 Case pursuant to the *Order Authorizing the Retention and Appointment of Stretto as Claims, Noticing, and Solicitation Agent* at Dkt. No. 35.

52. "Claims Bar Date" means the applicable deadline by which Proofs of Claim or applications for payment, as applicable, must be Filed, as established by (i) the Bar Date Order, (ii) the Plan, (iii) the Confirmation Order, or (iv) a Final Order of the Bankruptcy Court.

53. "Claims Objection Deadline" means the deadline for objecting to a Claim (other than an Administrative Claim), which shall be on the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be set by the Bankruptcy Court upon a motion by the Reorganized Debtor; provided that, if the Reorganized Debtor Files such motion before the expiration of the then-effective Claims Objection Deadline, such Claims Objection Deadline shall be tolled pending entry of a further order by the Bankruptcy Court; provided, further, that the Reorganized Debtor shall consult with the Committee before filing a motion to extend the Claims Objection Deadline.

54. "Claims Register" means the official register of Claims maintained by the Claims and Noticing Agent or the clerk of the Bankruptcy Court, as applicable.

55. "Class" means a category of Holders of Claims as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

56. "Clevenger/Thrall Resignation Date" shall have the meaning set forth in Article IV.M.2.

57. "Committee" means the official committee of unsecured creditors, appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

58. "Committee Post-Effective Date Budget" means Cash in the maximum aggregate amount of $150,000.

59. "Committee Settlement" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor, the Estate, and the Committee as set forth in the Plan and as summarized in Article IV.K.

60. "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

61. "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

62. "Confirmation Hearing" means, collectively, one or more hearings held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to the Bankruptcy Code.

63. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement on a final basis.

64. "Consenting Members" means each of the Members except for any Defaulting Member.

65. "Consummation" means the occurrence of the Effective Date.

66. "CoServ" means Denton County Electric Cooperative, Inc. d/b/a CoServ Electric, a Member.

67. "CoServ/Tri-County Claim Litigation" means, collectively, the objections Filed by the Committee, and joined by the Debtor as set forth in the *Debtor's Joinder to the Official Committee of Unsecured Creditors' Objections to the Proofs of Claims Filed by Tri-County Electric Cooperative, Inc.*

*and Denton County Electric Cooperative, Inc.* [Dkt. No. 1471], to the Proofs of Claim Filed by CoServ and Tri-County and the related contested matters.

68.    "CRR" shall have the meaning set forth in Protocols § 2.1.

69.    "CRR Account Holder" shall have the meaning set forth in Protocols § 2.1.

70.    "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty), including an amount of $0.00, based on the Debtor's defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

71.    "Cushion of Credit" means the Cushion of Credit program offered by RUS pursuant to 7 C.F.R. Part 1785 Subpart B for direct and guaranteed RUS or FFB loans and obligations, including the Cushion of Credit Account.

72.    "Cushion of Credit Account" means that certain Cushion of Credit account (and the funds on deposit therein) established and maintained with the United States Treasury, and administered by RUS for the benefit of the Debtor, which account is fully restricted for application to debt service for the RUS Secured Notes in accordance with 7 U.S.C. § 940c and 7 C.F.R. Part 1785 Subpart B and not available for the Debtor or the Reorganized Debtor to setoff or recoup.

73.    "D&O Liability Insurance Policies" means all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to the Debtor for certain liabilities of the Debtor and/or its current or former directors, managers, and officers, and all agreements, documents, or instruments related thereto.

74.    "Defaulting Member" means a Member that fails to pay its TAA Balance to the Debtor or the Reorganized Debtor (as applicable), or to deposit an amount equal to its TAA Balance with the TAA Escrow Agent, on or before the Effective Date in accordance with the Plan.

75.    "Defaulting Member Power Supply Charge" shall have the meaning set forth in Article IV.G.7.

76.    "Default Uplift" means the process set forth in Protocols §§ 9.19.1 and 9.19.2 by which ERCOT issues Default Uplift Invoices to Market Participants to collect any short-paid amounts resulting from a Market Participant's default.

77.    "Default Uplift Invoice" shall have the meaning set forth in Protocols § 9.19.1.

78.    "Defendant Intervenors" means the following defendant-intervenors in the ERCOT Adversary Proceeding: (i) Calpine Corporation, on behalf of itself and each of its Affiliates, including, but not limited to, Calpine Energy Services, L.P., Calpine Energy Solutions, LLC, and Cavallo Energy Texas, LLC; (ii) NRG Energy, Inc., on behalf of itself and each of its Affiliates, including, but not limited to, Direct Energy LP, NRG Cedar Bayou Development Company, LLC, NRG South Texas LP, NRG Texas Power LLC, NRG Power Marketing LLC, and Cirro Group, Inc.; (iii) NextEra Energy Marketing, LLC; (iv) ENGIE Energy Marketing NA, Inc., on behalf of itself and each of its Affiliates, including, but not limited to, Anson Solar Center LLC, Live Oak Wind Project LLC, Engie Long Draw Solar LLC, Las Lomas Wind Project LLC, Jumbo Hill Wind Project, LLC, Prairie Hill Wind Project, LLC, Solaire Holman 1 LLC, Seymour Hills Wind Project LLC and Engie Resources LLC; (v) Tenaska Power Services Co.; (vi) Golden Spread Electric Cooperative, Inc.; and (vii) South Texas Electric Cooperative, Inc.

79.     "<u>Deferred GUC Obligations</u>" means any payment due from the Reorganized Debtor in connection with (i) the Additional GUC Cash Payment and (ii) any payment made after the Effective Date with respect to any General Unsecured Claim under this Plan or any settlement Allowing a General Unsecured Claim, other than the Initial GUC Cash Payment and the Residual GUC Cash Payment (if any).

80.     "<u>Deferred Recovery Allocation Factor</u>" means one (1) *minus* the Accelerated Recovery Allocation Factor, expressed as a percentage.

81.     "<u>DIP Agent</u>" means JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent under the DIP Credit Agreement, and any successor thereto.

82.     "<u>DIP Credit Agreement</u>" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of May 21, 2021, by and among Brazos, as borrower, the DIP Lenders, and the DIP Agent, and as approved by the DIP Order, and as amended, modified, or supplemented from time to time in accordance with its terms.

83.     "<u>DIP Documents</u>" shall have the meaning set forth in the DIP Order.

84.     "<u>DIP Facility</u>" means the postpetition financing facility provided pursuant to the DIP Credit Agreement and the DIP Order, consisting of a $350,000,000 new money revolving credit facility.

85.     "<u>DIP Facility Claim</u>" means any Claim in respect of any DIP Obligations (as defined in the DIP Order) owed by the Debtor under the DIP Order.  For the avoidance of doubt, the RUS Roll-Up Loans shall not be DIP Facility Claims under the Plan.

86.     "<u>DIP Lenders</u>" means the lenders that are, from time to time, party to the DIP Credit Agreement.

87.     "<u>DIP Order</u>" means, collectively, the Interim DIP Order and the Final DIP Order.

88.     "<u>Disbursing Agent</u>" means, as applicable, (i) the Debtor or the Reorganized Debtor, (ii) the TAA Escrow Agent, or (iii) any Entity selected by the foregoing to make or to facilitate the applicable distributions in its capacity as a Disbursing Agent under and in accordance with the Plan.

89.     "<u>Disclosure Statement</u>" means the *Disclosure Statement for Plan of Reorganization of Brazos Electric Power Cooperative, Inc.*, dated as of September 20, 2022 (as amended, modified, or supplemented from time to time in accordance with its terms), including all exhibits and schedules thereto and references therein that relate to the Plan that are prepared and distributed in accordance with applicable law.

90.     "<u>Disclosure Statement Order</u>" means that certain *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation, Voting, and Tabulation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* entered by the Bankruptcy Court on September 13, 2022 approving, on a conditional basis, the Disclosure Statement as having adequate information under section 1125 of the Bankruptcy Code at Dkt. No. 2271.

91.     "<u>Disputed</u>" means, as to a Claim, any Claim or any portion of a Claim: (i) that is not Allowed; (ii) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (iii) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with nonbankruptcy law; (iv) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; or (v) with respect to which a party in interest has Filed

a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

92.     "Distribution Record Date" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be 5:00 p.m. prevailing Central Time on the Effective Date.

93.     "Distribution Service Provider" or "DSP" shall have the meaning set forth in Protocols § 2.1.

94.     "Dkt. No." means the docket number associated with the applicable Filing in the Chapter 11 Case.

95.     "ECCA" means the Electric Cooperative Corporation Act, codified in the Texas Utilities Code at title 4, subtitle A of chapter 161 *et seq.*

96.     "Effective Date" means the date selected by the Debtor, in consultation with the Consenting Members as set forth in Article I.H, on which the Debtor or the Reorganized Debtor, as applicable, shall make or initiate all payments that the Debtor or the Reorganized Debtor, as applicable, is required to make on the Effective Date under the Plan; *provided* that on such date (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date have been satisfied or waived in accordance with Article IX of the Plan.

97.     "Electing Market Participants" means, collectively, the Eligible Market Participants that elect (in accordance with the Market Participant Settlement Procedures) to receive a recovery on all or a portion of their respective share of the Brazos Short Pay Claim in exchange for their allocable share of the ERCOT Market Participant Consideration paid pursuant to the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash Recovery.

98.     "Eligible Market Participant Election Notice" means the notice substantially in the form attached hereto as **Exhibit B** and sent by ERCOT via electronic communications to the designated recipients for Eligible Market Participants and posted on the ERCOT website.

99.     "Eligible Market Participants" means the Market Participants identified by ERCOT on **Exhibit C** attached hereto as parties that are owed by ERCOT some portion of the Brazos Short Pay Claim.

100.    "Employee Obligations" means any contracts, agreements, policies, programs, and plans (as amended or restated from time to time) applicable to employees or directors for regular compensation (including wages, salary, commissions, and incentives), bonus programs approved by the Bankruptcy Court, expense reimbursements, vacation and sick leave benefits, employee and retiree health care, vision, and dental benefits, employee and retiree life insurance benefits, disability insurance benefits, accidental death and dismemberment insurance benefits, qualified retirement programs, employee relocation programs, employee and director vehicle use policies, commuter benefits, adoption assistance benefits, employee, director, and retiree discount programs, and other employee welfare plan benefits, in each case existing with the Debtor and in effect immediately before the Effective Date.  The term "Employee Obligations" does not include any contracts, agreements, arrangements, letters, policies, programs, or plans (as amended or restated from time to time) for deferred compensation, non-qualified retirement benefits, severance, or other employment termination benefits.

101.    "Enforcement Motion" shall have the meaning set forth in Article IV.L.

102.    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

103.    "ERCOT" means Electric Reliability Council of Texas, Inc.

104.    "ERCOT Adversary Proceeding" means the adversary proceeding filed in the Chapter 11 Case, pending in the Bankruptcy Court, and captioned *Brazos Electric Power Cooperative, Inc. et al. v. Electric Reliability Council of Texas, Inc., et al. (In re Brazos Electric Power Cooperative, Inc.)*, Adv. Case. No. 21-03863 (DRJ).

105.    "ERCOT Claim" means all Claims of ERCOT against the Debtor arising before the Petition Date, including, without limitation, the Claims set forth in the amended Proof of Claim no. 743 filed on the Claims Register and subject to the ERCOT Adversary Proceeding.

106.    "ERCOT Claim Appeals" means any timely filed appeals taken or pending as of the Effective Date in connection with the ERCOT Adversary Proceeding, including, without limitation, that certain appeal proceeding captioned *Electric Reliability Council of Texas, Incorporated et al. v. Brazos Electric Power Cooperative, Incorporated et al. (In re Brazos Electric Power Cooperative, Inc.)*, Case No. 22-20056, pending in the United States Court of Appeals for the Fifth Circuit, and all related proceedings.

107.    "ERCOT Escrow Account" means an interest-bearing escrow account with a banking institution, with a minimum rating of A- with S&P or Fitch or A3 with Moody's, selected by ERCOT and the Debtor, and subject to mutually acceptable escrow-account requirements, established no later than ten Business Days before the Effective Date to prefund or defease, in full or in part, only the payment obligations set forth in the ERCOT Recovery Appendix in respect of the Market Participant Deferred Cash Recovery.  This escrow account shall be initially funded by the Debtor or the Reorganized Debtor, as applicable, on the Effective Date in an aggregate amount equal to the Initial Market Participant Cash Payment *multiplied by* the Deferred Recovery Allocation Factor.  The Reorganized Debtor will subsequently deposit into the ERCOT Escrow Account (i) amounts equal to the Installment Market Participant Cash Payments *multiplied by* the Deferred Recovery Allocation Factor and (ii) an amount equal to the Additional Market Participant Cash Payment *multiplied by* the Deferred Recovery Allocation Factor.

108.    "ERCOT Market Participant Consideration" means the following payments from the Debtor or the Reorganized Debtor, as applicable, to ERCOT: (i) the Initial Market Participant Cash Payment, the Additional Market Participant Cash Payment, and the Installment Market Participant Cash Payments, all of which shall be allocated as set forth in the ERCOT Recovery Appendix to fund, as applicable, the Market Participant Convenience Cash Recovery, the Market Participant Accelerated Cash Recovery, and the Market Participant Deferred Cash Recovery; and (ii) any additional Cash paid from the ERCOT Escrow Account on behalf of the Reorganized Debtor to ERCOT or paid by the Reorganized Debtor to ERCOT, if insufficient funds are in the ERCOT Escrow Account in connection with Market Participant Deferred Cash Recovery; provided, however, that ERCOT's respective payment obligations to Eligible Market Participants are limited and conditioned upon its receipt of the associated payments from the Debtor or the Reorganized Debtor.

109.    "ERCOT Prepetition Transfers" means, collectively, transfers in the aggregate amount of $350,255,036.39 in Cash that ERCOT received (either through Cash payments by the Debtor or collateral sweeps by ERCOT) in respect of amounts owed to ERCOT by the Debtor before the Petition Date.

110.    "ERCOT Recovery Appendix" means that certain document setting forth, among other things, (i) ERCOT's allocation of part of the Brazos Short Pay Claim among the Eligible Market Participants, and (ii) the allocation of the ERCOT Market Participant Consideration and any related flow of funds, made in accordance with the Market Participant Settlement Procedures, among the Eligible Market Participants based on whether such parties are receiving the Market Participant Deferred Cash Recovery (including the fixed payment schedule prepared by the Debtor for the Market Participant Deferred

Cash Recovery), the Market Participant Accelerated Cash Recovery, and the Market Participant Convenience Cash Recovery. The ERCOT Recovery Appendix will be attached as an exhibit to the Confirmation Order.

111. "<u>ERCOT Settlement</u>" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor, the Committee, and ERCOT, as set forth in <u>Article IV.G</u> of the Plan.

112. "<u>ERCOT Settlement Release Parties</u>" and "<u>ERCOT Settlement Release Party</u>" means, each of and collectively, (i) the Debtor and the Reorganized Debtor, (ii) ERCOT, (iii) the Committee, (iv) the Members, (v) the Electing Market Participants, (vi) the Eligible Market Participants receiving only the Market Participant Deferred Cash Recovery and that did not opt out of the release set forth in the Market Participant Settlement Procedures in accordance therewith, (vii) any QSE Customer that instructs an Eligible Market Participant to elect (a) the Market Participant Accelerated Cash Recovery for the portion of the Brazos Short Pay Claim applicable to such QSE Customer or (b) the Market Participant Deferred Cash Recovery, for the portion of the Brazos Short Pay Claim applicable to such QSE Customer, and does not opt out of the release set forth in the Market Participant Settlement Procedures and, in each case, in accordance therewith, and (viii) each of the Representatives of the foregoing parties; <u>provided</u>, <u>however</u>, that (a) an Electing Market Participant shall not be an ERCOT Settlement Release Party in respect of only the portion of its allocable share of the Brazos Short Pay Claim for which it elects, at the direction or otherwise on behalf of a QSE Customer, to (1) receive the Market Participant Deferred Cash Recovery and (2) opt out of the release set forth in the Market Participant Settlement Procedures in accordance therewith; and (b) an Eligible Market Participant that is an affiliate (for the purposes of this definition, the term "affiliate" shall have the meaning ascribed to it in the Protocols) of another Eligible Market Participant shall not be an ERCOT Settlement Release Party solely by operation of clause (viii) of this definition.

113. "<u>ERCOT Unaffected Invoice</u>" means (i) Default Uplift Invoice 20220527_0037722902000 and Default Uplift Invoice 20220527_0037722905000, and (ii) any Invoice (including, without limitation, an ADR Invoice, miscellaneous invoice, any securitization default charge invoice under Protocols § 26, Default Invoice, Settlement Statement, or Resettlement Statement) that has been or is later issued by ERCOT after the Petition Date and sent to the Debtor or the Reorganized Debtor, as applicable, to assess overpayments or underpayments allocated as a result of a claim that is approved through the alternative-dispute-resolution process identified in Protocols § 20 or as a result of a final, non-appealable order of the PUCT issued on appeal of an ERCOT decision pursuant to Protocols § 20.9(4), or as a result of a final non-appealable judgment of a court or as a result of a settlement of litigation that relates to the Debtor's prepetition wholesale market activities, which includes the invoices issued by ERCOT in connection with resolution of Alternative Dispute Resolution No. 2021-TPS-05. For the avoidance of doubt, there are no ERCOT Unaffected Invoices in the Brazos Short Pay Claim.

114. "<u>ERCOT Unaffected Invoice Collateral</u>" means collateral to be provided to ERCOT, subject to <u>Article IV.G</u>, in the maximum aggregate amount of $5,000,000, which collateral may be provided by the Debtor or the Reorganized Debtor, as applicable, in its sole discretion, in the form of Cash, a letter of credit, a holdback by ERCOT of any positive recovery to the Debtor or the Reorganized Debtor (as applicable) arising from ERCOT's alternative-dispute-resolution process, or other financial assurance reasonably acceptable to ERCOT. The ERCOT Unaffected Invoice Collateral shall be returned to the Reorganized Debtor when potential liability for any ERCOT Unaffected Invoice has ended.

115. "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461, as amended, and the rules and regulations promulgated thereunder.

116.    "Estate" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

117.    "Estimated GUC Pool" means on any date the lesser of (i) the August 2022 Estimated GUC Pool and (ii) the total amount of Allowed General Unsecured Claims *plus* the Filed or estimated amount by the Reorganized Debtor's professionals, in consultation with the Committee's professionals, of any remaining General Unsecured Claims that have not been Allowed.

118.    "Exculpated Parties" means, collectively, and in each case in its capacity as such: (i) the Debtor; (ii) the Committee and its members; and (iii) the Bankruptcy Advisory Committee and its members; provided, however, that neither the TAA Escrow Agent nor any Disbursing Agent (other than the Reorganized Debtor) shall be Exculpated Parties.

119.    "Executory Contract" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including (except as otherwise set forth herein) any modifications, amendments, addenda, or supplements thereto or restatements thereof.

120.    "Exit Facility" means the conversion of the DIP Facility into a new exit working capital facility issued pursuant to the Exit Facility Documents, which shall be consistent with the applicable Exit Financing Term Sheets.

121.    "Exit Facility Agent" means the administrative agent with respect to the Exit Facility Credit Agreement in its capacity as such, including any successors thereto.

122.    "Exit Facility Credit Agreement" means the credit agreement to be entered into in connection with the Exit Facility, which shall be consistent with the applicable Exit Financing Term Sheets.

123.    "Exit Facility Documents" means the Exit Facility Credit Agreement and such other financing documents to be entered into in connection with the Exit Facility, each of which shall be consistent with the applicable Exit Financing Term Sheets and in form and substance satisfactory to the Debtor and the Exit Facility Agent.  The Debtor shall consult with the RUS Secured Parties concerning the form and substance of the Exit Facility Documents.

124.    "Exit Facility Lenders" means the lenders that are, from time to time, party to the Exit Facility Credit Agreement.

125.    "Exit Financing Term Sheets" means those certain term sheets that shall be included in the Plan Supplement that set forth the principal terms of the Exit Facility and the RUS Contingency Exit Note.

126.    "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

127.    "FFB" means the Federal Financing Bank.

128.    "File," "Filed," or "Filing" means file, filed, or filing in the Chapter 11 Case (including the ERCOT Adversary Proceeding, the Gas Supplier Adversary Proceeding, the ERCOT Claim Appeals, and any other adversary proceeding in the Chapter 11 Case) with the Bankruptcy Court or other applicable court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent or the clerk of the Bankruptcy Court.

129.    "Final DIP Order" means the *Final Order (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Authorizing the Debtor to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to*

*the Prepetition Revolving Lenders and RUS Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* at Dkt. No. 755, as amended, modified, or supplemented from time to time.

130. "<u>Final Order</u>" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u> that the possibility that a request for relief under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable nonbankruptcy law, may be Filed relating to such order shall not prevent such order from being a Final Order.

131. "<u>Gas Supplier Adversary Proceeding</u>" means the adversary proceeding filed in the Chapter 11 Case, pending in the Bankruptcy Court, and captioned *Brazos Electric Power Cooperative, Inc. et al. v. 507 Capital LLC et al. (In re Brazos Electric Power Cooperative, Inc.)*, Adv. Case. No. 21-04407 (DRJ).

132. "<u>General Claims Bar Date</u>" means June 15, 2021, as set forth in the Bar Date Order.

133. "<u>General Liability Insurance Policies</u>" means any and all general-liability Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtor as an insured upon which any claim could have been, has been, or may be made with respect to Tort Claims, including all rights and proceeds in connection therewith.

134. "<u>General Unsecured Claim</u>" means, except to the extent otherwise set forth in the Plan, any Claim against the Debtor that has not otherwise been paid in full, other than an Administrative Claim (including, without limitation, a Professional Fee Claim), a Priority Tax Claim, a DIP Facility Claim, an Other Secured Claim, an Other Priority Claim, an RUS Secured Notes Claim, the ERCOT Claim, a General Unsecured Convenience Claim, a Tort Claim, a Tort Convenience Claim, a Member Other General Unsecured Claim, and a Member Patronage Capital Claim.

135. "<u>General Unsecured Convenience Claim</u>" means any Claim that would otherwise be a General Unsecured Claim that is (i) Allowed in the GUC Convenience Amount or less, or (ii) Allowed in an amount in excess of the GUC Convenience Amount for which the Holder of such Claim votes to accept the Plan and irrevocably elects on its Ballot to reduce the amount of such Claim to the GUC Convenience Amount and be deemed to be a Releasing Party hereunder in exchange for receiving treatment as an Allowed Class 6 General Unsecured Convenience Claim.  A Claim may not be subdivided into multiple Claims of the GUC Convenience Amount or less for purposes of receiving treatment as a General Unsecured Convenience Claim and, if any portion of a Claim has been transferred, such Claim will be aggregated to determine whether such Claim amount is equal to or less than the GUC Convenience Amount.

136. "<u>Generation Assets</u>" means, as applicable, the Debtor's or the Reorganized Debtor's electric-generation facilities known as the Jack County Plant, the Randle W. Miller Plant, the Johnson County Plant, and assets related to the foregoing; <u>provided</u>, <u>however</u>, that, subject to, and consistent with, the provisions of the Member Settlement set forth in <u>Article IV.F</u>, the Generation Assets do not include the Retained Agreements or T&D Resources.

137. "<u>Generation Debt</u>" shall have the meaning set forth in <u>Article IV.E.3</u>.

138. "<u>Generation Debt Paydown</u>" shall have the meaning set forth in <u>Article IV.E.3</u>.  For the avoidance of doubt, no Generation Sale Proceeds shall be used to fund either the Additional Market Participant Cash Payment or the Deferred GUC Obligations until after the Generation Debt Paydown.

139.    "Generation Employee Retention Plan" means the employee retention and severance program for employees of the Debtor or Reorganized Debtor, as applicable, involved in the management, maintenance, and operation of the Generation Assets and power-supply and related services, initially approved by the Debtor's Board, to be implemented with respect to Reorganized Debtor on the Effective Date, the terms of which are materially consistent with industry standards and substantially in the form to be included in the Plan Supplement.

140.    "Generation Oversight Committee" means the oversight committee established by the Debtor's Board on June 14, 2022 to oversee the Generation Sale in accordance with Article IV.F.4, which comprises the following initial members:  Kerry Kelton (Mid-South Electric Cooperative Association), Donnie Clary (CoServ), Alan Lesley (Comanche County Electric Cooperative Association), Rayce Cantwell (Wise Electric Cooperative, Inc.), and Brandon Young (Heart of Texas Electric Cooperative, Inc.).

141.    "Generation QSE Termination Date" means the date that is the earlier of (i) 30 days following the Generation Sale Closing Date and (ii) the first anniversary of the Effective Date.

142.    "Generation Sale" means the sale of all of the Generation Assets free of any Liens pursuant to section 1123 of the Bankruptcy Code, which Generation Assets may be sold in one or more tranches or transactions pursuant to Article IV.F.4.  For the avoidance of doubt, unless otherwise agreed by the RUS Secured Parties and the Reorganized Debtor before the sale of a Generation Asset, the RUS Secured Parties' Lien in such Generation Assets shall continue in the proceeds thereof to the same extent and priority that the RUS Secured Parties had before such Generation Asset was sold.  Notwithstanding the foregoing, the Reorganized Debtor's payments in respect of the Additional Market Participant Cash Payment and the Deferred GUC Obligations shall be free of any Lien of the RUS Secured Parties.

143.    "Generation Sale Closing Date" means the date on which the Generation Sale of all Generation Assets is consummated, or, if the Generation Assets are sold in tranches, the date on which the final tranche of the Generation Sale is consummated (which date shall be calculated without reference to any post-consummation purchase-price adjustments).

144.    "Generation Sale Outside Date" means the date that is the one-year anniversary of the occurrence of the Effective Date, which may be extended solely by the unanimous consent of (i) the Consenting Members and (ii) the Generation Oversight Committee, subject to and in accordance with Article IV.F.4.

145.    "Generation Sale Proceeds" means the Cash proceeds of the Generation Sale net of any transaction fees and expenses (including any payments due under the Generation Employee Retention Plan).

146.    "Governmental Claims Bar Date" means September 3, 2021, as set forth in the Bar Date Order.

147.    "Governmental Unit" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

148.    "GUC Cash Recovery" means, with respect to a Holder of an Allowed General Unsecured Claim (subject to such Holder's right to elect to receive treatment as an Allowed General Unsecured Convenience Claim and, in the case of SCEA and the BSCEC Trustee and the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders), subject to such parties' respective agreement to accept different treatment as set forth in Article IV.H and in the BSCEC Claims Settlement Agreement, respectively, if any), such Holder's right to receive a Pro Rata share of the following Cash payments, to be paid by, or on behalf of, the Reorganized Debtor on the following dates:  (i) on the Effective Date, the Initial GUC Cash Payment; (ii) on or before the Generation Sale Closing Date (or within ten days thereafter,

but, in any case, such payment must be paid on or before the Interim Distribution Deadline), the Additional GUC Cash Payment; and (iii) on the date when all General Unsecured Claims have either been Allowed or expunged (or as soon thereafter as is reasonably practicable), the Residual GUC Cash Payment, if any.

149.     "GUC Convenience Amount" means the aggregate amount of $19,000 per Holder.

150.     "GUC Convenience Recovery" means, with respect to a Holder of an Allowed General Unsecured Convenience Claim, such Holder's right to receive an aggregate amount of Cash sufficient to yield a recovery of 95 Cents on account of such Holder's Allowed General Unsecured Convenience Claim.

151.     "GUC Distribution Percentage" means, at any date on and after the Effective Date, the greater of (i) 89.5 Cents and (ii) the percentage equal to the quotient of (a) 89.5% *multiplied by* August 2022 Estimated GUC Pool (after deducting the first tranche of the SCEA Allowed GUC Claim) *divided by* (b) the Estimated GUC Pool on such date (after deducting the first tranche of the SCEA Allowed GUC Claim).

152.     "GUC Notice Parties" means each of (i) the Prepetition Revolving Agent (for itself and on behalf of the Prepetition Revolving Lenders), (ii) SCEA, (iii) the BSCEC Trustee, and (iv) the BSCEC Collateral Trustee (for itself and on behalf of the BSCEC Noteholders).

153.     "GUC Recovery Consideration" means (i) the Initial GUC Cash Payment, (ii) the Additional GUC Cash Payment, and (iii) the Residual GUC Cash Payment, if any, each of which shall be allocated to fund the GUC Cash Recovery.

154.     "Hardship Distribution" means a payment, distribution, or reimbursement of a Ratepayer electric-bill credit to a Member, or other relief or accommodation from or by the Ratepayer Hardship Fund to a Qualified Hardship Recipient in accordance with the Ratepayer Hardship Fund Documents.

155.     "Hardship Fund Administrator" means Solix, Inc., and any successor or replacement administrator selected and appointed by the Hardship Fund Oversight Board in accordance with the Ratepayer Hardship Fund Documents.

156.     "Hardship Fund Contribution" means the aggregate amount of $140,000,000 in Cash to be paid by the Debtor or the Reorganized Debtor, as applicable, to the Ratepayer Hardship Fund on or before the Effective Date.

157.     "Hardship Fund Custodian" means the custodian of the Ratepayer Hardship Fund, and any successor or replacement custodian, selected and appointed to, among other things, invest and manage the Hardship Fund Contribution and make disbursements on behalf the Ratepayer Hardship Fund in accordance with the Ratepayer Hardship Fund Documents.

158.     "Hardship Fund Expenses" means any and all costs, expenses (including professional fees and expenses), fees, taxes, disbursements, debts, or obligations incurred from the operation and administration of the Ratepayer Hardship Fund, including, but not limited to, the costs and expenses incurred by the Hardship Fund Administrator and the Hardship Fund Custodian.  For the avoidance of doubt, except for the payment of the Hardship Fund Contribution to the Ratepayer Hardship Fund on or before the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any obligation, responsibility, or liability of any kind in respect of the Ratepayer Hardship Fund, including, without limitation, any obligation, responsibility, or liability to make any Hardship Distributions or otherwise carry out any Ratepayer Hardship Fund purposes.

159.     "Hardship Fund Oversight Board" means an oversight board established before, on, or after the Effective Date in accordance with the Ratepayer Hardship Fund Documents comprising seven or more

members, each nominated by the Consenting Members that have a TAA Balance and approved by the Debtor's or the Reorganized Debtor's Board, as applicable, to oversee the administration of the Ratepayer Hardship Fund by the Hardship Fund Administrator and the Hardship Fund Custodian in accordance with the Ratepayer Hardship Fund Documents.

160.     "Holder" means an Entity holding a Claim solely in its capacity as such.

161.     "Impaired" means, when used in reference to a Claim, a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

162.     "Indemnification Obligations" means any obligation of the Debtor to indemnify current and former directors, officers, members, managers, agents, or employees of the Debtor who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any such capacities, or for or on behalf of the Debtor, whether pursuant to agreement, the Debtor's articles or certificates of incorporation, corporate charters, bylaws, or similar corporate or organizational documents, or other applicable contract or law in effect as of the Effective Date.

163.     "Initial ERCOT Cash Payment" means a Cash payment to be made by, or on behalf of, the Debtor or the Reorganized Debtor, as applicable, to ERCOT on the Effective Date in an aggregate amount of $599,709,609.22.

164.     "Initial GUC Cash Payment" means a Cash payment to be made by, or on behalf of, the Debtor or the Reorganized Debtor, as applicable, on the Effective Date to Holders of Allowed General Unsecured Claims as set forth in the Plan in an aggregate amount equal the *sum* of (i) $105,440,252.88 (*i.e.*, a recovery of 85 Cents on the first tranche of the SCEA Allowed GUC Claim to be paid solely to SCEA as set forth in Article IV.H) and (ii) an amount of Cash equal to 60% of the GUC Distribution Percentage *multiplied by* the Estimated GUC Pool as of that date (after deducting the first tranche of the SCEA Allowed GUC Claim), to be allocated and distributed by the Debtor or the Reorganized Debtor, as applicable, to Holders of other Allowed General Unsecured Claims in accordance with the GUC Cash Recovery.

165.     "Initial Market Participant Cash Payment" means a Cash payment to be made by, or on behalf of, the Debtor or the Reorganized Debtor, as applicable, to ERCOT on the Effective Date in an aggregate amount of $553,819,121.69, which aggregate amount shall be allocated and distributed by ERCOT in accordance with the ERCOT Recovery Appendix to fund, as applicable, the Market Participant Convenience Cash Recovery, the Market Participant Accelerated Cash Recovery, and the Market Participant Deferred Cash Recovery.  As set forth in the ERCOT Recovery Appendix, an amount equal to the Initial Market Participant Cash Payment *multiplied by* the Accelerated Recovery Allocation Factor shall be used by ERCOT to first make any payments owing on the Effective Date to Electing Market Participants who have elected to receive the Market Participant Convenience Cash Recovery, and second, to make any payments owed on the Effective Date to Electing Market Participants who have elected to receive the Market Participant Accelerated Cash Recovery.  The Reorganized Debtor shall deposit an amount equal to the Initial Market Participant Cash Payment *multiplied by* the Deferred Recovery Allocation Factor into the ERCOT Escrow Account contemporaneously with the Reorganized Debtor's payment to ERCOT of Cash in an amount equal to the Initial Market Participant Cash Payment *multiplied by* the Accelerated Recovery Allocation Factor.

166.     "Installment Market Participant Cash Payments" means 12 Cash installment payments to be made by, or on behalf of, the Reorganized Debtor to ERCOT in an aggregate annual amount of $13,833,333.33, which aggregate amount shall be allocated as set forth in the ERCOT Recovery Appendix to fund, as applicable, the Market Participant Accelerated Cash Recovery and the Market Participant Deferred Cash Recovery, and shall begin on the Interim Distribution Deadline and continue on each anniversary of the Effective Date through the 12th anniversary of the Effective Date.  The Reorganized

Debtor shall deposit an amount equal to $13,833,333.33 *multiplied by* the Deferred Recovery Allocation Factor into the ERCOT Escrow Account contemporaneously with the Reorganized Debtor's payment to ERCOT in an amount equal to $13,833,333.33 *multiplied by* the Accelerated Recovery Allocation Factor.

167.    "Insurance Policies" means any and all insurance policies issued or providing coverage at any time to the Debtor or any of its predecessors and all agreements, documents, letters of indemnity, or instruments relating thereto, including, but not limited to, the D&O Liability Insurance Policies, the General Liability Insurance Policies, and/or any agreements with third-party administrators.

168.    "Insured Claim" means any Claim against the Debtor for which the Debtor is entitled to coverage, indemnification, reimbursement, contribution, or other payment under the applicable Insurance Policies.

169.    "Insurer" means any company or other Entity that issued or entered into any of the Insurance Policies, any third-party administrator of or for any of the Insurance Policies, and any respective predecessors, successors and/or Affiliates of the foregoing.

170.    "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the applicable Entity and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the applicable Entity.

171.    "Interim Compensation Order" means the *Amended Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* at Dk. No. 568, as amended, modified, or supplemented from time to time.

172.    "Interim DIP Order" means that certain *Interim Order (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Authorizing the Debtor to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Revolving Lenders and RUS Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* at Dkt. No. 636, as amended, modified, or supplemented from time to time.

173.    "Interim Distribution Deadline" means the date that is the one-year anniversary of the occurrence of the Effective Date.

174.    "Interim Distribution Obligations" means any payment due from the Reorganized Debtor in connection with (i) the Additional Market Participant Cash Payment and (ii) the Deferred GUC Obligations.

175.    "Invoice" shall have the meaning set forth in Protocols § 2.1.

176.    "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001, as amended from time to time.

177.    "Karnei Resignation Date" shall have the meaning set forth in Article IV.M.2.

178.    "Lapetus 1 PPA" means that certain solar power sales contract for 25 MW, dated as of February 1, 2019, by and between Brazos and CoServ, as buyer, and Lapetus Energy Project, LLC, acting by and through Duke Energy Renewables Solar, LLC, as seller, as amended from time to time.  The Lapetus 1 PPA shall be assumed by the Debtor and assigned to CoServ pursuant to Article V and the Confirmation Order.

179.   "Lapetus 2 PPA" means that certain solar power sales contract for 42.5 MW, dated as of February 1, 2019, by and between Brazos, as buyer, and Lapetus Energy Project, LLC, acting by and through Duke Energy Renewables Solar, LLC, as seller, as amended from time to time.

180.   "Lapetus 3 PPA" means that certain solar power sales contract for 26.5 MW, dated as of February 1, 2019, by and between Brazos, as buyer, and Lapetus Energy Project, LLC, acting by and through Duke Energy Renewables Solar, LLC, as seller, as amended from time to time.  The Lapetus 3 PPA shall be assumed by the Debtor and assigned to CoServ pursuant to Article V and the Confirmation Order.

181.   "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

182.   "Load Serving Entity" or "LSE" shall have the meaning set forth in Protocols § 2.1.

183.   "Management Severance Plan" means the management severance plan, initially approved by the Debtor's Board, to be implemented with respect to Reorganized Debtor on the Effective Date, the terms of which are materially consistent with industry standards and substantially in the form to be included in the Plan Supplement.

184.   "Market Participant" shall have the meaning set forth in Protocols § 2.1.

185.   "Market Participant Accelerated Cash Recovery" means, with respect to an Electing Market Participant, its pro rata share of the Cash payments from ERCOT to the Electing Market Participants, to be paid solely out of the ERCOT Market Participant Consideration, on the following dates in accordance with the ERCOT Recovery Appendix: (i) on the Effective Date, the Initial Market Participant Cash Payment; (ii) on or before the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline), the Additional Market Participant Cash Payment; and (iii) annually for 12 years beginning on the Interim Distribution Deadline, the Installment Market Participant Cash Payments.

186.   "Market Participant Convenience Cash Recovery" means, with respect to an Electing Market Participant, the right to receive a one-time Cash payment from ERCOT, to be paid out of the Market Participant Accelerated Cash Recovery, on the Effective Date in an amount equal to 63% of the lesser of (i) such Electing Market Participant's share of the Brazos Short Pay Claim and (ii) $10,000.  Any Eligible Market Participant holding a share of the Brazos Short Pay Claim that exceeds $10,000 shall have the right, pursuant to the Market Participant Settlement Procedures, to irrevocably elect to reduce such share of the Brazos Short Pay Claim to $10,000 and receive the Market Participant Convenience Cash Recovery in full and final satisfaction of thereof.

187.   "Market Participant Deferred Cash Recovery" means, with respect to an Eligible Market Participant (subject to such Entity's right to elect to receive the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash Recovery), its pro rata share of 30 annual Cash payments to be paid by ERCOT solely out of the ERCOT Market Participant Consideration in accordance with the fixed-payment schedule (created by the Debtor) set forth in the ERCOT Recovery Appendix until such Eligible Market Participant's share of the Brazos Short Pay Claim is nominally satisfied in full without interest or accrual of any kind.

188.   "Market Participant Settlement Procedures" means the procedures set forth in the Eligible Market Participant Election Notice for Eligible Market Participants (i) to elect to receive payment(s) from ERCOT, in full and final satisfaction of the amount owed by ERCOT on account of the Brazos Short Pay Claim, pursuant to the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash Recovery instead of the Market Participant Deferred Cash Recovery default treatment; (ii) to opt out of the releases set forth in Article IV.G if such Eligible Market Participant did not elect to receive the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash

Recovery; and (iii) which provides that any Eligible Market Participant that is not an Electing Market Participant will receive payments from ERCOT under the Market Participant Deferred Cash Recovery option.

189.     "Member Certificate" means, as to each Member, the certificate described in and issued by the Debtor pursuant to the section 161.066 of the ECCA and the Bylaws, which evidences such Member's membership in the Debtor.

190.     "Member Intervenors" means the following plaintiff-intervenors in the ERCOT Adversary Proceeding: (i) Mid-South Electric Cooperative Association; (ii) CoServ; (iii) United Electric Cooperative Services, Inc., d/b/a United Cooperative Services; (iv) Tri-County; and (v) the Ad Hoc Member Group.

191.     "Member Other General Unsecured Claim" means any Claim held by a Member against the Debtor, including all Claims asserted in such Member's Proof(s) of Claim other than a Member Patronage Capital Claim or an Administrative Claim, if any.

192.     "Member Patronage Capital Claim" means any Claim for any amount owed or otherwise payable to a Member based upon its Patronage Capital as calculated, determined, and provided for in the Bylaws.

193.     "Members" means, each of and collectively, the members, from time to time, of the Debtor or the Reorganized Debtor.

194.     "Member Settlement" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor and the Estate and each of the Members, as set forth in the Plan and the Amended ARCs and as summarized in Article IV.F.

195.     "Monitor" shall have the meaning set forth in Article IV.G.7.

196.     "MUFG" means MUFG Bank, Ltd.

197.     "MUFG Account" shall have the meaning set forth in the Final DIP Order.

198.     "MUFG L/C Agreement" means that certain Continuing Letter of Credit Agreement (For Standby Letters of Credit) dated as of June 18, 2019, between the Debtor and MUFG, as amended, modified, or supplemented from time to time.

199.     "New Organizational Documents" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of the Reorganized Debtor, if any, in form and substance satisfactory to the Debtor's Board and filed in the Plan Supplement.

200.     "Non-Participating Member" means a Member that has a TAA Balance and is not a Participating Member.

201.     "Other Priority Claim" means any Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code other than Administrative Claims and Priority Tax Claims.

202.     "Other Secured Claim" means any Secured Claim against the Debtor (including the Prepetition Revolving Facility Secured Claim, any Secured Tax Claim, and the portion of any Claim held by MUFG that is secured by the MUFG Account) other than the DIP Facility Claims and the RUS Secured Notes Claims, unless otherwise classified in Article III.B, if any.

203.     "<u>Participating Member</u>" means a Member that has a TAA Balance and elects to participate in the Participating Member Securitization by adopting the Participating Member Financing Order in accordance with <u>Article IV.E.2</u> and applicable law.

204.     "<u>Participating Member Financing Order</u>" means the financing order adopted by the board of directors of each of the Participating Members in accordance with the requirements of SB 1580 and in connection with the Participating Member Securitization as set forth in <u>Article IV.E.2</u>.

205.     "<u>Participating Member Master Servicing Agreement</u>" means that certain Securitized Property Master Servicing Agreement by and between the Participating Member Securitization LLC, as issuer, and the Debtor or the Reorganized Debtor (as applicable), as master servicer, in respect of the Participating Member Securitization, a form of which will be filed in the Plan Supplement and shall be in form and substance satisfactory to the Debtor and the Participating Members.

206.     "<u>Participating Member Securitization</u>" means the Brazos-sponsored, combined securitization financing under and in accordance with SB 1580 authorized by the Participating Member Financing Order, for which the Reorganized Debtor will serve as the initial master servicer, the proceeds of which shall be used to pay "extraordinary costs and expenses" and other "qualifying costs" (each term as defined in SB 1580) in accordance with SB 1580, the Plan, the Confirmation Order, the Participating Member Financing Order, and the Participating Member Securitization Documents.

207.     "<u>Participating Member Securitization Documents</u>" means the documents and agreements to be entered into or otherwise executed in connection with the Participating Member Securitization (including the applicable trust agreement and the Participating Member Master Servicing Agreement), certain forms of which may be filed in the Plan Supplement, and all of which shall be in form and substance satisfactory to the Debtor and the Participating Members.

208.     "<u>Participating Member Securitization LLC</u>" means a newly formed special purpose entity, which shall be organized as a limited liability company under the laws of Delaware, created for the benefit of the Participating Members to issue the Participating Member Securitized Bonds and purchase the Participating Members' securitized property.

209.     "<u>Participating Member Securitization Proceeds</u>" means the proceeds of the Participating Member Securitized Bonds.

210.     "<u>Participating Member Securitization Reimbursements</u>" means any amount due and owing from a Member to the Debtor, if any, on account of, among other things, (i) reimbursement for funds advanced or otherwise paid by the Debtor on behalf of being a Member (either in "Phase 1" or "Phase 2" of the Participating Member Securitization process) or (ii) transaction fees and associated costs related to the Participating Member Securitization.

211.     "<u>Participating Member Securitized Bonds</u>" means the bonds or notes issued in respect of the Participating Member Securitization pursuant to the Participating Member Securitization Documents.

212.     "<u>Patronage Capital</u>" means any Claim or other right of the Members described in sections 8.2, 8.3 of the Bylaws in respect of the revenues of Brazos described in section 161.059(d) of the ECCA.

213.     "<u>PBGC</u>" means Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and agency created under Title IV of ERISA.

214.     "<u>PCRR</u>" shall have the meaning set forth in Protocols § 2.1.

215.    "Pension Plan" means the Brazos Electric Power Cooperative, Inc. Pension Plan, as amended from time to time.

216.    "Permitted Investments" means: (i) marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury by statute; (ii) marketable debt securities, rated Aaa by Moody's and/ or AAA by S&P, issued by U.S. Government-sponsored enterprises, U.S. Federal agencies, U.S. Federal financing banks, and international institutions whose capital stock has been subscribed for by the United States; (iii) money market mutual funds that hold at least 99.5% of assets in Cash, U.S. Government securities, and/or repurchase agreements that are collateralized solely by U.S. Government securities or Cash and are registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, and operated in accordance with Rule 2a-7 and that at the time of such investment are rated Aaa by Moody's and/or AAAm by S&P; and (iv) any other investments in securities or assets permitted under the escrow agreement for the ERCOT Escrow Account.

217.    "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

218.    "Petition Date" means March 1, 2021.

219.    "Plan" means this *Amended Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (including the Plan Supplement, any exhibits or schedules to the Plan Supplement, and any further exhibits, schedules, or supplements referenced by and incorporated into the Plan), each as may be amended, modified, or supplemented from time to time, subject to the applicable provisions set forth in Article X.

220.    "Plan Default" shall have the meaning set forth in Article IV.L.1.

221.    "Plan Default Cure Notice" shall have the meaning set forth in Article IV.L.1.

222.    "Plan Documents" means (i) the Plan, (ii) the Confirmation Order, (iii) the Disclosure Statement, (iv) the Disclosure Statement Order, (v) the Plan Supplement and the documents filed therewith, and (vi) any other documents or agreements executed, delivered, assumed, or performed to implement or supplement the Plan, in each case, as may be amended, modified, or supplemented from time to time.

223.    "Plan Settlements" means the Member Settlement, the ERCOT Settlement, the Tenaska Power Claim Settlement, the SCEA Claims Settlement, the BSCEC Claims Settlement, and the Committee Settlement.

224.    "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance materially consistent with this Plan and otherwise satisfactory to the Debtor, as may be amended, modified, or supplemented from time to time, including, as applicable, (i) the Assumed and Rejected Contracts Schedules; (ii) the Retained Causes of Action Schedule; (iii) the identity of the members of the Reorganized Debtor's Board and senior management for the Reorganized Debtor; (iv) the terms of the Management Severance Plan (including the eligible managers thereunder); (v) the terms of the Generation Employee Retention Plan (including the eligible employees thereunder); (vi) the identity of the Hardship Fund Administrator and certain other documents and information in respect of the Ratepayer Hardship Fund; (vii) the form of the Participating Member Master Servicing Agreement and any other Participating Member Securitization Document to which the Debtor is a party; (viii) the form of the Amended ARCs; (ix) the form(s) of the TAA Escrow Agreement; (x) the Exit Financing Term Sheets; and (xi) any other document or agreement necessary to effectuate the Restructuring Transactions or that are otherwise contemplated by this Plan.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (i) through (xi), as applicable.  The Debtor shall file the Plan Supplement at least four days before the deadline to vote to accept or reject the Plan.  The Debtor shall have the right to amend the documents and agreements contained

in, and exhibits to, the Plan Supplement through the Effective Date or otherwise pursuant to their respective terms.

225.    "Power Supply Exceptions" means, each of and collectively, and subject to the Member Settlement set forth in Article IV.F and the ERCOT Settlement in Article IV.G, (i) the treatment of any Defaulting Members under the Plan; (ii) the Retained Agreements, including the administration thereof and the retention of the benefits thereunder in accordance with the Amended ARCs; (iii) the T&D Resources, including the operation thereof; and (iv) the Generation Assets through the Generation Sale Closing Date, including the operation thereof.

226.    "Prepetition Revolving Agent" means Wilmington Trust, N.A., as Administrative Agent under the Prepetition Revolving Credit Agreement, and any of its successors or assigns.

227.    "Prepetition Revolving Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of September 28, 2018 (as may be amended, modified, or amended and restated from time to time in accordance with its terms) among the Debtor, Bank of America, N.A., as Administrative Agent, Swing Line Lender, and L/C Issuer, and the Prepetition Revolving Lenders.

228.    "Prepetition Revolving Facility Secured Claim" means, each of and collectively, the Secured Claims held by the Holding Lenders (as defined in the Final DIP Order) in the aggregate amount of $123,892,136.96 under the Prepetition Revolving Credit Agreement as set forth in the Final DIP Order, which Secured Claims inure to the benefit of the Prepetition Revolving Lenders pro rata in accordance with the term of the Prepetition Revolving Credit Agreement.

229.    "Prepetition Revolving Lenders" means the lenders, from time to time, party to the Prepetition Revolving Credit Agreement.

230.    "Prepetition Revolving Loan Documents" means the Prepetition Revolving Credit Agreement together with all other Loan Documents (as defined in the Prepetition Revolving Credit Agreement).

231.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

232.    "Professional" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

233.    "Professional Fee Claim" means any Claim for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through the Effective Date.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then any such reduced or denied amount shall no longer constitute a Professional Fee Claim.

234.    "Professional Fee Claims Estimate" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.E.2.

235.    "Professional Fee Reserve" means a reserve account established and funded pursuant to Article II.E.3.

236.   "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable, unless otherwise indicated.

237.   "Proof of Claim" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

238.   "Protective Order" means that certain *Confidentiality Agreement and Stipulated Protective Order* at Dkt. No. 521, as amended or modified from time to time.

239.   "Protocols" means the ERCOT Nodal Protocols as of the Effective Date.

240.   "PUCT" means Public Utility Commission of Texas.

241.   "PURA" means the Public Utility Regulatory Act codified at title II of the Texas Utilities Code.

242.   "QSE Customer" means any customer, counterparty, or assignee of a QSE (i) with a contractual or other interest in such QSE's allocable portion of the Brazos Short Pay Claim or (ii) that has a claim for payment from such QSE that is contractually impacted by the timing and amount of payments by ERCOT to such QSE of such allocable portion of the Brazos Short Pay Claim.  For the purposes of this definition, a QSE or CRR Account Holder is not a QSE Customer.

243.   "Qualified Hardship Recipient" means (i) a Member's Ratepayer who becomes an eligible recipient of funds or other relief available from the Ratepayer Hardship Fund in accordance with the Ratepayer Hardship Fund Documents and the qualification criteria set forth therein, and (ii) a Member who is reimbursed for the cost of issuing electric-bill credits to its respective Ratepayers that are Qualified Hardship Recipients.

244.   "Qualified Scheduling Entity" or "QSE" shall have the meaning set forth in Protocols § 2.1.

245.   "Ratepayers" means, collectively, all Entities, including all residential and commercial and industrial retail electric-service customers, that are physically connected to the Members' electric-distribution systems and physically located in the Members' service areas and receive retail electricity service and other services therefrom as a member of the applicable Member distribution cooperative.

246.   "Ratepayer Hardship Fund" means a trust established in accordance with Internal Revenue Code section 501(c)(4) and pursuant to Article IV.F.6 and the Ratepayer Hardship Fund Documents. Additional information concerning the Ratepayer Hardship Fund will be filed in the Plan Supplement.

247.   "Ratepayer Hardship Fund Documents" means the trust agreement and any other the documents governing the Ratepayer Hardship Fund created pursuant to Article IV.F.6, including any documents that the Hardship Fund Administrator or the Hardship Fund Custodian, as applicable, determines to be necessary to carry out the purposes of the Ratepayer Hardship Fund.

248.   "Reinstate", "Reinstated", or "Reinstatement" means, with respect to Claims, the treatment provided for in section 1124 of the Bankruptcy Code.

249.   "Reinstated RUS Secured Notes" means those certain Outstanding Notes (as Reinstated by and defined in the applicable Amended and Restated RUS Secured Notes Documents) and all amendments, supplements, extensions, and replacements to, of, or for such notes.

250.   "Rejected Contracts Schedule" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtor under the Plan, as set forth in the Plan Supplement and as may be amended, modified, or supplemented from time to time.

251.   "Released Parties" or "Released Party" means, each of and collectively, (i) the Debtor and the Reorganized Debtor; (ii) the Consenting Members; (iii) the DIP Agent and the DIP Lenders; (iv) the Exit Facility Agent and the Exit Facility Lenders (including any lead arrangers, bookrunners, or similar parties in respect of the Exit Facility); (v) the Committee and each of its members; (vi) the Bankruptcy Advisory Committee and each of its members; (vii) any Releasing Party (other than the RUS Secured Parties); (viii) with respect to each of the foregoing Persons, in clauses (i) through (vii), each of their current and former Affiliates; and (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), such Person's predecessors, successors, assigns, subsidiaries, current and former Affiliates, current and former officers and directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, managed accounts or funds, management companies, fund advisors, financial advisors, advisory board members, attorneys, accountants, investment bankers, consultants, Representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees and any and all other persons or entities that may purport to assert any Cause of Action derivatively, by or through the foregoing, in each case in their capacity as such; provided that an Entity shall not be a Released Party if it: (a) elects to opt out of the releases contained in Article VIII of the Plan, except that Holders of Class 5 or Class 7 Claims that elect convenience-claim treatment on their respective Ballots and are entitled to receive such treatment under the Plan shall be deemed to be a Released Party, or (b) timely objects to the releases contained in Article VIII of the Plan; provided, further, that a party's election to opt out of the releases in Article VIII of the Plan shall not in any way except any Claim from or otherwise compromise or abrogate the Debtor's discharge under section 1141 of the Bankruptcy Code.

252.   "Releasing Parties" or "Releasing Party" means, collectively, (i) the Holders of all Claims who vote to accept this Plan (other than ERCOT); (ii) the Holders of Claims whose vote is solicited, or that otherwise receive notice of the opportunity to opt out of granting the releases set forth in this Plan, that vote to reject or abstain from voting (other than ERCOT); (iii) the Holders of Claims that are conclusively presumed to accept this Plan (other than the RUS Secured Parties); (iv) the Holders of Claims that are deemed to reject this Plan; (v) the Consenting Members; (vi) the DIP Agent and the DIP Lenders; (vii) the Exit Facility Agent and the Exit Facility Lenders (including any lead arrangers, bookrunners, or similar parties in respect of the Exit Facility); (viii) solely in respect of Claims and Causes of Action against the Debtor, the Reorganized Debtor, or the Estate, the RUS Secured Parties; (ix) the Committee and each of its members; (x) the Bankruptcy Advisory Committee and each of its members; (xi) any Released Party; (xii) with respect to each of the foregoing Persons, in clauses (i) through (xi), each of their current and former Affiliates, and (xvi) with respect to each of the foregoing Persons in clauses (i) through (xii), such Person's predecessors, successors, assigns, subsidiaries, current and former Affiliates, current and former officers and directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both limited and general partners), managers, employees, agents, managed accounts or funds, management companies, fund advisors, financial advisors, advisory board members, attorneys, accountants, investment bankers, consultants, Representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, and any and all other persons or entities that may purport to assert any Cause of Action derivatively, by or through the foregoing in each case in their capacity as such; provided that, except as otherwise set forth herein, an Entity shall not be a Releasing Party if it: (a) elects to opt out of the releases contained in Article VIII of the Plan, except that Holders of Class 5 or Class 7 Claims that elect convenience-claim treatment on their respective Ballots and are entitled to receive such treatment under the Plan shall be deemed to be a Releasing Party, or (b) timely objects to the releases contained in Article VIII of the Plan; provided, further, that a party's election to opt out of the

releases in Article VIII of the Plan shall not in any way except any Claim from or otherwise compromise or abrogate the Debtor's discharge under section 1141 of the Bankruptcy Code.

253.     "Reorganized Debtor" means the Debtor, as reorganized pursuant to the Plan, or any successors thereto, on or after the Effective Date.

254.     "Reporting Period" shall have the meaning set forth in Article IV.G.7.

255.     "Representatives" means, with respect to any Entity, (i) such Entity's current and former Affiliates and (ii) such Entity's and such Entity's current and former Affiliates' directors, managers, general managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, and the respective heirs, executors, estates, servants, and nominees of the foregoing.

256.     "Resettlement Statement" shall have the meaning ascribed to such term in Protocols § 9.

257.     "Residual GUC Cash Payment" means the payment to be made on the date when all General Unsecured Claims have either been Allowed or expunged, which payment shall be in the aggregate amount, if any, required to be distributed to Holders of Allowed General Unsecured Claims (other than the first tranche of the SCEA Allowed GUC Claim) such that the recoveries of such Holders total the GUC Distribution Percentage.

258.     "Restructuring" means the restructuring of the existing debt, other obligations, and operations of the Debtor on the terms and conditions set forth in the Plan, Plan Supplement, and any other Plan Documents.

259.     "Restructuring Transactions" shall have the meaning set forth in Article IV.B.

260.     "Retained Agreements" means the power purchase agreements and related or ancillary agreements identified on **Exhibit D** hereto.

261.     "Retained Causes of Action Schedule" means a schedule of retained Causes of Action filed in connection with the Plan Supplement.  For the avoidance of doubt, the Retained Causes of Action Schedule shall not include any Cause of Action that has been settled, released, or exculpated by entry of a Final Order of the Bankruptcy Court, or is settled, released, or exculpated under the Plan on the Effective Date.

262.     "RUS" means Rural Utilities Service, an agency of the United States Department of Agriculture.

263.     "RUS Contingency Exit Note" means one or more committed loans or notes up to the aggregate amount of $178,035,000 to be made available to the Reorganized Debtor, if necessary in the Reorganized Debtor's sole discretion, to fund distributions under the Plan pursuant to and subject to the terms and conditions of the Amended and Restated RUS Secured Notes Documents.  The material terms of the RUS Contingency Exit Note shall be consistent with the applicable Exit Financing Term Sheets and satisfactory to the Debtor and RUS.

264.    "RUS Exit Financing" means the AU8 FFB Note and the RUS Contingency Exit Note, and the loans and proceeds available under the foregoing in accordance with the Amended and Restated RUS Secured Notes Documents, which shall be consistent with the applicable Exit Financing Term Sheets.

265.    "RUS Indenture" means that certain Indenture of Deed of Trust, Security Agreement, and Financing Statement, dated as of June 1, 2010 (as it has been or may amended, supplemented, or amended and restated from time to time in accordance with its terms) by the Debtor, as grantor, and the RUS Trustee, as grantee.

266.    "RUS Loan Contract" means that certain Fifth Amended and Restated Loan Contract, dated as of December 15, 2020, between the Debtor and the United States of America, acting through the Administrator of RUS, as may be amended, modified, supplemented, or amended and restated from time to time.

267.    "RUS Roll-Up Loans" shall have the meaning set forth in the DIP Order; provided, however, that, notwithstanding anything in the DIP Order to the contrary, the RUS Roll-Up Loans shall be deemed to have "rolled back" down and shall receive treatment as Allowed RUS Secured Notes Claims pursuant to Article III.B.3.

268.    "RUS Secured Notes" means those certain Outstanding Notes (as defined in the RUS Loan Contract) either payable to the order of FFB (the payment of which is guaranteed by the United States of America, acting by and through the Administrator of RUS) or payable to the order of the United States of America evidencing reimbursement obligations of the Debtor to the United States of America with respect to its guarantee of the payment of certain notes payable to the order of FFB, and all amendments, supplements, extensions, and replacements to, of, or for such notes.

269.    "RUS Secured Notes Claim" means any Claim of the RUS Secured Parties (or any of them) against the Debtor, acting by and through the administrator of the RUS, arising from, under or in connection with the RUS Secured Notes or the RUS Secured Notes Documents (including the RUS Roll-Up Loans) and all accrued but unpaid interest, costs, fees, and indemnities.

270.    "RUS Secured Notes Documents" means the RUS Indenture, the RUS Secured Notes, the RUS Loan Contract, and all related agreements and documents executed by the Debtor in connection with the RUS Secured Notes.

271.    "RUS Secured Parties" means the RUS Trustee and any other parties to the RUS Secured Notes Documents from time to time (including RUS and FFB).

272.    "RUS Trustee" means Regions Bank, as Trustee under the RUS Indenture, and any successor thereto.

273.    "SCEA" means Sandy Creek Energy Associates, L.P.

274.    "SCEA Claims" means, collectively, all Claims of SCEA against the Debtor including, without limitation, the SCEA Allowed Administrative Claim, the SCEA Allowed GUC Claim, and the Claims set forth in the Proofs of Claim filed by SCEA in the Chapter 11 Case (including Proof of Claim nos. 433 and 788 on the Claims and Noticing Agent's Claim Register and Proof of Claim nos. 127 and 147 filed on the Claim Register) and subject to the *Debtor's Objection to Sandy Creek Energy Associates, L.P.'s Proof of Claim Nos. 127 and 147* at Dkt. No. 1886.

275.    "SCEA Allowed Administrative Claim" means an Allowed Administrative Claim of SCEA against the Debtor in the aggregate amount of $8,559,747.12.

276. "SCEA Allowed GUC Claim" means an Allowed General Unsecured Claim of SCEA against the Debtor in the aggregate amount of $254,047,356.33, divided into two tranches for purposes of receiving distributions under the Plan as set forth in Article IV.H.

277. "SCEA Claims Settlement" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, including, without limitation, the dispute concerning the SCEA Claims, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor, the Estate and SCEA, as set forth in and incorporated into the Plan, and as summarized in Article IV.H.

278. "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed on March 31, 2021 at Dkt. Nos. 353 and 352, respectively, as such schedules or statement have been or may be further amended or supplemented, from time to time, in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1009 or order of the Bankruptcy Court.

279. "SEC" means the United States Securities and Exchange Commission.

280. "Section 503(b)(9) Claim" means any Claim entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code as determined by a Final Order of the Bankruptcy Court.

281. "Secured" means when referring to a Claim: (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtor, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

282. "Secured Tax Claim" means any Secured Claim against the Debtor that, absent such Claim's secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

283. "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended, together with the rules and regulations promulgated thereunder.

284. "Security" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

285. "Segrest Resignation Date" shall have the meaning set forth in Article IV.M.2.

286. "Senate Bill 1580" or "SB 1580" means that certain Senate Bill enacted by the Texas 87th Legislature (2021) relating to, among other things, (i) the use of securitization by electric cooperatives to address certain Winter Storm Uri weather-related extraordinary costs and expenses as codified at PURA § 41.151 *et seq.* and (ii) requirements that Market Participants pay or make provision for the payment of amounts owed to ERCOT, as codified at PURA § 39.160.

287. "Settlement Invoice" shall have the meaning set forth in Protocols § 2.1.

288. "Settlement Statement" shall have the meaning ascribed to such term in Protocols § 2.1.

289. "SFA" means the Standard Form Market Participant Agreement described in Protocols § 22, as may be amended, modified, or supplemented from time to time.

290. "Shell Power Transaction Confirmation" means that certain 10 MW transaction confirmation (Trade No. 1115235) dated March 11, 2021 between the Debtor, as purchaser, and Shell Energy North America (US), L.P., as seller, related to the Nebraska Furniture Mart, Cinemark, and

potentially other large commercial customers of CoServ, which transaction was executed under that certain Master Power Purchase and Sale Agreement, effective March 11, 2021, by and between the Debtor, one the one hand, and Shell Energy North America (US), L.P., on the other hand, as may be amended, modified, supplemented, or otherwise extended from time to time.  The Shell Power Transaction Confirmation shall be assumed by the Debtor and assigned to CoServ pursuant to <u>Article V</u> and the Confirmation Order.

291.    "<u>Short Pay</u>" means, with respect to a Market Participant, an unpaid amount from a Settlement Invoice, as set forth in Protocols § 9.19.  The term "short-paid" shall have the correlative meaning.

292.    "<u>Statutory Fees</u>" means all fees for which the Debtor or the Reorganized Debtor, as applicable, is obligated pursuant to 28 U.S.C. § 1930(a)(6), together with interest, if any, pursuant to 31 U.S.C. § 3717.

293.    "<u>SWPA PPA</u>" means that certain hydro power sales contract for 36 MW, dated as of July 18, 2003, by and between Brazos, as buyer, and the United States of America, acting by and through the Southwestern Power Administration within the Department of Energy, as seller, as amended from time to time.

294.    "<u>T&D Assets</u>" means, collectively, the Debtor's or Reorganized Debtor's, as applicable, wholesale electric transmission and wholesale distribution assets.

295.    "<u>T&D Resources</u>" means any power-supply resource to the extent that such power-supply resource is constructed, acquired, leased, operated or entered into solely for the Reorganized Debtor to provide reliable wholesale transmission service or wholesale distribution service, the costs of which power-supply resources associated with the provision of reliable (i) wholesale transmission service must be recoverable as a transmission cost of service under applicable market rules and requirements and (ii) wholesale distribution service must be located at or near a delivery point and be consented to by (in its sole discretion as to the use and location of such power supply resource) and recoverable from the applicable Member or other Entity taking wholesale distribution service at such delivery point in the wholesale distribution rates applicable to providing such service to such Member or Entity.  For the purposes of this definition, factors that may affect the "reliability" of the Reorganized Debtor's provision of wholesale transmission service or wholesale distribution service include, but are not limited to, power flows, power factor, voltage control, reactive power, short-circuit current, and frequency stability; <u>provided</u> that power-supply resources (x) shall not include simple-cycle gas fired turbines or combined-cycle gas fired turbines, and (y) shall not individually exceed 5 MW (aggregating for this purpose all such power-supply resources at a single delivery point) and shall not collectively exceed 250 MW across the Reorganized Debtor's wholesale transmission or distribution service area, but such amount at a single delivery point or collectively across the Reorganized Debtor's wholesale transmission or distribution service area may be increased with the consent of ERCOT, the PUCT or such other regulatory body with jurisdiction over the service being provided.

296.    "<u>TAA</u>" means the amount(s) calculated and determined by the Debtor pursuant to the WPSDS Tariff and the TRRM Protocols and invoiced to the applicable Members for costs and expenses incurred during Winter Storm Uri, the collection of which was temporarily deferred until the Bankruptcy Court's adjudication or the consensual resolution of the validity, amount and priority of the ERCOT Claim.

297.    "<u>TAA Balance</u>" means, with respect to each Member, certain unpaid amounts as set forth on **<u>Exhibit E</u>**.

298.    "TAA Escrow Agent" means the escrow agent pursuant to the TAA Escrow Agreement, which escrow agent shall be selected by the Debtor and the Consenting Members no later than five Business Days before the Confirmation Date.

299.    "TAA Escrow Agreement" means, collectively, one or more escrow agreements entered into by the Debtor and the applicable Members under which such Members shall deposit with the TAA Escrow Agent amounts sufficient to satisfy in full such Member's TAA Balance and, to the extent applicable, the Participating Member Securitization Reimbursements, which the TAA Escrow Agent will hold in segregated, Member-specific escrow accounts.  The form(s) of the TAA Escrow Agreement shall be filed in the Plan Supplement and shall be in form and substance satisfactory to the Debtor and the Consenting Members.

300.    "TAA Proceeds" means the amounts deposited by the Members with the TAA Escrow Agent on or before the Effective Date in respect of the Members' respective TAA Balances, which funds shall be used for the sole purpose of funding distributions under this Plan.

301.    "Tax" means: (i) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value-added, transfer, franchise, profits, license, property, environmental or other tax, assessment, or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local, or foreign Taxing Authority; or (ii) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined, or unitary group or being a party to any agreement or arrangement whereby liability for payment of any such amount is determined by reference to the liability of any other Entity.

302.    "Taxing Authority" means any Governmental Unit or other governmental authority exercising any authority to impose, regulate, levy, assess, or administer the imposition of any tax.

303.    "Tenaska Power" means Tenaska Power Services, Co.

304.    "Tenaska Power Claim" means all Claims of Tenaska Power against the Debtor, including the Claims set forth in the amended Proof of Claim no. 98-2 filed by Tenaska Power on the Claims Register.

305.    "Tenaska Power Claim Settlement" means the compromises, settlements, and resolutions of all Claims, Causes of Action, controversies, and disputes, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, between the Debtor and the Estate and Tenaska Power, as set forth in the Plan and as summarized in Article IV.J.

306.    "Third-Party QSE" means a third-party, non-affiliate Qualified Scheduling Entity (for the purposes of this definition, the term "affiliate" shall have the meaning ascribed to it in the Protocols) that is authorized by ERCOT under the Protocols to participate in the ERCOT wholesale market in such capacity.

307.    "Tort Claim" means any direct or indirect Claim in tort against the Debtor for property damage or personal injury (including for physical, mental, emotional, and economic injuries) resulting from, related to, or in respect of Winter Storm Uri other than a Tort Convenience Claim.

308.    "Tort Claims Bar Date" means August 5, 2021, as set forth in the Bar Date Order.

309.    "Tort Claim Recovery" means, with respect to a Holder of an Allowed Tort Claim, such Holder's right, subject in all respects to the terms and conditions of the applicable General Liability Insurance Policies, to recover up to the full amount of such Holder's Allowed Tort Claim from the Available Coverage.  To the extent that a Holder of an Allowed Class 7 Tort Claim is determined in accordance with

the terms of the applicable General Liability Insurance Policies to be entitled to receive a distribution under the Available Coverage, the Reorganized Debtor shall pay the applicable deductible, if any, in respect of such Allowed Class 7 Tort Claim.

310.    "Tort Convenience Claim" means any Claim that would otherwise be a Tort Claim for which the Holder of such Claim (i) votes to accept the Plan and (ii) irrevocably elects on its Ballot to be treated as a Tort Convenience Claim and receive the Tort Convenience Recovery.  As set forth in Article III.B, any such electing Holder shall be deemed to be a Releasing Party and to have consented to and granted a release of all claims and causes of action against the Members on account of such Tort Claim in exchange for receiving treatment as an Allowed Class 8 Tort Convenience Claim.  A Claim may not be subdivided into multiple Claims for purposes of receiving treatment as a Tort Convenience Claim and, if any portion of a Claim has been transferred, such Claim will be aggregated to determine whether such Claim amount is equal to or less than the Tort Convenience Amount.

311.    "Tort Convenience Amount" means the maximum aggregate amount of $5,000 per Holder.

312.    "Tort Convenience Recovery" means, with respect to a Holder of an Allowed Tort Convenience Claim, a Cash payment on the Effective Date in the lower of (i) the asserted aggregate liquidated amount of the applicable Allowed Claim and (ii) the Tort Convenience Amount.

313.    "Transition Charges" shall have the meaning set forth in the Amended ARCs.

314.    "Transmission Service Provider" or "TSP" shall have the meaning set forth in Protocols § 2.1.

315.    "Tri-County" means Tri-County Electric Cooperative, Inc., a Member.

316.    "TRRM Protocols" means the Protocols for Application of Tiered Resource Rate Methodology Under Wholesale Power Supply and Delivery Service Rate approved by the Brazos Board by resolution dated July 30, 2019 and effective as of December 21, 2019, as may be amended, modified, or supplemented from time to time.

317.    "U.S. Trustee" means the United States Trustee for the Southern District of Texas (Region 7).

318.    "Unaffected Proceeding" means (i) *Luminant v. PUC*, Case No. 03-21-00098-CV (Tex. Ct. App.—Austin 2021); (ii) *Just Energy Group Inc. v. Electric Reliability Council of Texas, Inc. (In re Just Energy Group Inc.)*, Adv. Proc. No. 21-30823 (Bankr. S.D. Tex. 2021); (iii) *Phillips as Trustee of the Entrust Liquidating Trust v. Electric Reliability Council of Texas, Inc. (In re Entrust Energy, Inc.)*, Adv. Proc. No. 22-03018 (Bankr. S.D. Tex. 2022); and (iv) any other lawsuit, appeal, settlement dispute, resettlement request, or contested case filed and pending, or that may be filed, in any court, with ERCOT, or with the PUCT to the extent it is not directly related to the ERCOT Claim, the ERCOT Settlement, or the Brazos Short Pay Claim; provided, however, that the outcome of any Unaffected Proceeding shall not affect the ERCOT Claim, the ERCOT Settlement, the Brazos Short Pay Claim, the Plan (including the distributions hereunder), or the Confirmation Order.

319.    "Unexpired Lease" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, including (except as otherwise set forth herein) any modifications, amendments, addenda, or supplements thereto, or restatements thereof.

320.    "Unimpaired" means, with respect to a Claim, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

321.    "<u>Winter Storm Uri</u>" means the major winter and ice storm that had widespread impacts across the United States, including Texas, in the period beginning 12:00 a.m. (Central Time), February 12, 2021, and ending at 11:59 p.m. (Central Time), February 20, 2021.

322.    "<u>WPSDS Tariff</u>" or "<u>Rate WPSDS</u>" means that certain Wholesale Power Supply and Delivery Service Rate (Rate WPSDS) under the All Requirements Contracts approved by the Brazos Board by resolution dated July 30, 2019, and effective as of December 21, 2019, as amended, modified, or supplemented from time to time.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or the Confirmation Order; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) subject to the provisions of any contract, certificate of incorporation, limited liability company agreement, bylaw, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (viii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (ix) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xi) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Case; (xii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (xiii) any immaterial effectuating provisions may be interpreted by the Debtor, or after the Effective Date, the Reorganized Debtor, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xiv) any reference to an Entity as a Holder of a Claim includes that Entity's successors and assigns; and (xv) except as otherwise provided, any action to be taken on the Effective Date may be taken on the Effective Date or as soon thereafter as is reasonably practicable.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied or preempted by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

F.    *Reference to the Debtor or the Reorganized Debtor*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

H.    *Consenting Member Consent and Consultation Rights*

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Plan and the Confirmation Order, and any amendment, modification, or supplement to the Plan or the Confirmation Order, shall be in form and substance reasonably satisfactory to the Consenting Members, underlined provided that any such consents shall not be unreasonably withheld; (ii) any other Plan Document to which a Consenting Member is a party, and any amendments, modifications, or supplements thereto, shall be in form and substance reasonably satisfactory to the applicable Consenting Member, underlined provided that any such consent shall not be unreasonably withheld; and (iii) the Debtor or the Reorganized Debtor, as applicable, shall consult the Consenting Members in respect of the following:  (a) the selection of the Effective Date; (b) the form of the Exit Financing Documents, the Amended and Restated RUS Secured Notes Documents, the RUS Contingency Exit Note, and any Ratepayer Hardship Fund Documents filed with the Plan Supplement; and (c) whether to include in the Plan Supplement any other document or agreement that the Debtor determines may be necessary or advisable to effectuate the Restructuring Transactions or that are otherwise contemplated by this Plan.  Notwithstanding anything to the contrary herein, a Defaulting Member shall not have any consent or consultation rights in respect of the Plan (including the Restructuring and Restructuring Transactions contemplated herein), the Plan Documents, or the Confirmation Order.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS,
## PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, (i) Administrative Claims, including Section 503(b)(9) Claims, DIP Facility Claims, and Professional Fee Claims, and (ii) Priority Tax Claims have not been classified and, therefore, are excluded from the classification of Claims set forth in Article III.

A.    *Administrative Claims*

Except with respect to Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of a Final Order of the Bankruptcy Court Allowing such Claim, or as soon thereafter as is reasonably practicable; provided, however, that, if an Allowed Administrative Claim arises from liabilities incurred by the Debtor's Estate in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in this Article II.A, and except with respect to Administrative Claims that are Section 503(b)(9) Claims, Professional Fee Claims, or DIP Facility Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, however, that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims (other than Section 503(b)(9) Claims) arising in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

The Reorganized Debtor may settle Administrative Claims in the ordinary course of business without further notice and without further approval or an order of the Bankruptcy Court. The Debtor or the Reorganized Debtor, as applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court or agreement in writing of the applicable parties. Unless the Debtor or the Reorganized Debtor (or other party with standing) objects to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor objects to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount. On or before the Effective Date, the Debtor shall establish and fund the Administrative and Priority Claims Reserve in an amount sufficient to pay all Disputed Administrative Claims and Disputed Priority Claims in full based on the asserted amount of the underlying Claims, which Administrative Claims, if Allowed, shall be paid in accordance with the Plan. Any funds remaining in the Administrative and Priority Claims Reserve after all Allowed Administrative Claims and Allowed Priority Claims are paid in full in accordance with the Plan shall revert to the Reorganized Debtor.

**Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor, the Reorganized Debtor, any trust or other Entity created under or in connection with the Plan, or their**

**respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date.**

B.      *DIP Facility Claims*

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the then-outstanding DIP Obligations (as defined in the DIP Order), including (i) the principal amount outstanding under the DIP Facility on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, expenses, and indemnification obligations payable under the DIP Documents, including, the reasonable and documented fees and expenses of the attorneys of the DIP Agent and the DIP Lenders to the extent provided in the DIP Documents.

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to different treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Holder of an Allowed DIP Facility Claim shall receive on the Effective Date, at each Holder's election in its sole discretion, either (i) its Pro Rata share of a participation in the Exit Facility, in accordance with and subject to the Exit Facility Documents (which shall be in form and substance satisfactory to each such Holder of an Allowed DIP Facility Claim, in its sole discretion), or (ii) payment in full in Cash.  Subject to and in accordance with the DIP Credit Agreement and the DIP Orders, all reasonable and documented unpaid fees and expenses of the attorneys of the DIP Agent and the DIP Lenders shall be paid in Cash on or before the Effective Date.  Contemporaneously with the foregoing treatment, the DIP Facility and the DIP Documents shall be deemed canceled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtor and the Reorganized Debtor arising out of or related to the DIP Facility shall automatically terminate, all obligations of the Debtor arising out of or related to the DIP Facility Claims shall be automatically discharged and released and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent, the DIP Lenders, or the Bankruptcy Court and all guarantees arising out of or related to the DIP Facility Claims shall be automatically discharged and released, in each case without further action by the DIP Agent, the DIP Lenders, or the Bankruptcy Court.  The DIP Agent and the Bankruptcy Court shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Reorganized Debtor; <u>provided</u> that any provisions of the DIP Documents governing the DIP Facility that by their terms survive the payoff and termination of such facility shall survive in accordance with the terms of such DIP Documents.  Notwithstanding anything to the contrary in this paragraph, the DIP Documents shall survive to the extent necessary to preserve any rights of the DIP Agent (i) as against any money or property distributable to the Holders of Allowed DIP Facility Claims, including any priority in respect of payment and (ii) to appear and be heard in the Chapter 11 Case or in any proceeding relating to the Debtor in the Bankruptcy Court or any other court to enforce the respective obligations owed to the DIP Agent under the Plan.

After the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its respective agents shall be relieved of all further duties and responsibilities related to the DIP Documents upon the occurrence of the Effective Date, except with respect to such other rights and obligations of the DIP Agent (if any) that, pursuant to the express terms of the DIP Documents, survive the termination of the DIP Documents.

C.      *Professional Fee Claims*

1.      <u>Final Professional Fee Applications</u>

All final requests for allowance and payment of Professional Fee Claims (which shall include an estimate of any fees and expenses for compiling and Filing such Professional's final request for payment)

must be Filed with the Bankruptcy Court no later than the first Business Day that is 45 days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Any objections to Professional Fee Claims shall be Filed and served no later than 35 days after the filing of final requests for allowance and payment of Professional Fee Claims.  At or before any hearing in respect of a Professional's final fee application, such Professional shall disclose the actual amount of any fees and expenses incurred for compiling and Filing its final fee application.

Except as otherwise provided in the Plan, Professionals may be paid in accordance with the Interim Compensation Order and any other applicable orders of the Bankruptcy Court.

For the avoidance of doubt, notwithstanding anything in the Plan or the Confirmation Order to the contrary, Professionals shall not be entitled to reimbursement for fees and expenses in connection with any objection to its fees, without a further order of the Bankruptcy Court.

2.      Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtor's Estate before and as of the Effective Date (including an estimate of any fees and expenses for compiling and Filing such Professional's final request for payment) and shall deliver such reasonable, good-faith estimate to the Debtor no later than 10 Business Days before the Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtor shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

3.      Professional Fee Reserve

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor shall establish and fund the Professional Fee Reserve with Cash based on its evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or interests of any kind shall encumber the Professional Fee Reserve in any way.  The Professional Fee Reserve (including funds held in the Professional Fee Reserve) (i) shall not be and shall not be deemed property of the Debtor or the Reorganized Debtor and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided that funds remaining in the Professional Fee Reserve after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtor.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtor's obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Reserve.

If the amount of funds in the Professional Fee Reserve is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the applicable Professional by the Reorganized Debtor without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtor shall be authorized to, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses incurred after the Effective Date that may be related to implementation of the Plan, Consummation, or the Restructuring Transactions (including,

without limitation, the retention of an investment banker in respect of the Generation Sale) incurred on or after the Effective Date by the Debtor's professionals and to the extent set forth in the Plan and applicable Plan Documents. Upon the Effective Date, the Reorganized Debtor may employ any professional (including any Professional employed by the Debtor during the Chapter 11 Case) in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, agree (whether before or after the Effective Date) to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.     *Payment of Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) before the Effective Date shall be paid by the Debtor in full in Cash on the Effective Date. All monthly reports due before the Effective Date shall be Filed by the Debtor on the Effective Date. On and after the Effective Date, the Reorganized Debtor shall pay any and all such fees in full in Cash when due and payable, and shall File with the Bankruptcy Court the final monthly report (for the month in which the Effective Date occurs) and quarterly reports in a form reasonably acceptable to the U.S. Trustee until the case is converted, dismissed, or closed, whichever occurs first. The U.S. Trustee shall not be required to File any Administrative Claim in the Chapter 11 Case and shall not be treated as providing any release under the Plan in connection therewith.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS

A.     *Summary of Classification*

All Claims, except for Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim is classified in a particular Class only to the extent that such Claim qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. All of the potential Classes for the Debtor are set forth herein.

The classification of Claims against the Debtor pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 3 | RUS Secured Notes Claims | Unimpaired | Not Entitled to Vote<br>*Deemed to Accept* |
| 4 | ERCOT Claim | Impaired | Entitled to Vote |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Convenience Claims | Impaired | Entitled to Vote |
| 7 | Tort Claims | Impaired | Entitled to Vote |
| 8 | Tort Convenience Claims | Impaired | Entitled to Vote |
| 9 | Member Patronage Capital Claims | Unimpaired | Not Entitled to Vote *Deemed to Accept* |
| 10 | Member Other General Unsecured Claims | Impaired | Entitled to Vote |

B.    *Treatment of Claims*

1.    <u>Class 1 – Other Priority Claims</u>

a.    *Classification*: Class 1 consists of all Other Priority Claims against the Debtor.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date (or, if payment is not then due, payment shall be paid in accordance with its terms in the ordinary course).

c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Secured Claims</u>

a.    *Classification*: Class 2 consists of all Other Secured Claims against the Debtor.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the Debtor's or the Reorganized Debtor's discretion, as applicable:

(i)    payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date, or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course (<u>provided</u> that, for the avoidance of doubt, the Prepetition Revolving Facility Secured Claim shall be paid in full in Cash on the Effective Date);

(ii)        Reinstatement of such Holder's Allowed Other Secured Claim;

(iii)      the Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iv)      such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – RUS Secured Notes Claims</u>

a.    *Classification*: Class 3 consists of all RUS Secured Notes Claims against the Debtor.

b.    *Allowance*: The RUS Secured Notes Claims shall be Allowed against the Debtor in the aggregate principal amount of $1,815,656,446.54[2] plus all accrued and unpaid interest (including interest accruing after the Petition Date), costs, and other fees, in each case owed under the RUS Secured Notes Documents, from the Petition Date through the Effective Date.

c.    *Treatment*: Except to the extent that a Holder of an Allowed RUS Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed RUS Secured Notes Claim, all Allowed RUS Secured Notes Claims shall be Reinstated subject to and in accordance with the Amended and Restated RUS Secured Notes Documents.

d.    *Voting*: Class 3 is Unimpaired under the Plan. Each Holder of an Allowed RUS Secured Notes Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed RUS Secured Notes Claims are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – ERCOT Claim</u>

a.    *Classification*: Class 4 consists of the ERCOT Claim against the Debtor.

b.    *Allowance*: On the Effective Date, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the ERCOT Claim shall be Allowed in the aggregate amount of $1,886,595,737.08.

c.    *Treatment*: Except to the extent that ERCOT agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Allowed ERCOT Claim, ERCOT shall receive (i) on the Effective Date, the Initial ERCOT Cash Payment, and (ii) the ERCOT Market Participant Consideration, which ERCOT shall then allocate and distribute to Eligible Market Participants, in full and final satisfaction of the Eligible Market

---

[2] This amount reflects the aggregate asserted Claim amount as of the Petition Date, a portion of which has been paid through quarterly amortization payments during the postpetition period.

Participants' respective shares of the Brazos Short Pay Claim, through the Market Participant Accelerated Cash Recovery, the Market Participant Convenience Cash Recovery, or the Market Participant Deferred Cash Recovery as set forth in the ERCOT Recovery Appendix.

d.    *Voting*: Class 4 is Impaired under the Plan.  ERCOT is entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

a.    *Classification*:   Class 5 consists of all General Unsecured Claims against the Debtor.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment (or otherwise elects and is entitled to receive General Unsecured Convenience Claim treatment on account of its Allowed General Unsecured Claim, or with respect to SCEA and the BSCEC Trustee and the BSCEC Collateral Trustee (on behalf of itself and for the BSCEC Noteholders), as agreed pursuant to the settlements summarized in Article IV.H and Article IV.I, respectively), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each such Holder shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, the GUC Cash Recovery, with the Initial GUC Cash Payment to be made on the Effective Date, the Additional GUC Cash Payment to be made on or before the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline) and the Residual GUC Cash Payment, if any, to be made on the date when all General Unsecured Claims have either been Allowed or expunged; provided, that any such Holder of an Allowed General Unsecured Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to reduce the Allowed amount of its Claim to the GUC Convenience Amount and receive the GUC Convenience Recovery; provided, further that **any Holder that (i) votes to accept the Plan and (ii) affirmatively elects on its Ballot to receive treatment as a General Unsecured Convenience Claim shall be deemed to be a Releasing Party hereunder** in exchange for receiving the GUC Convenience Recovery.

c.    *Voting*: Class 5 is Impaired under the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

6.    Class 6 – General Unsecured Convenience Claims

a.    *Classification*:   Class 6 consists of all General Unsecured Convenience Claims against the Debtor.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Convenience Claim, each such Holder shall receive the GUC Convenience Recovery on the later of (i) the Effective Date or (ii) the date that such Claim is Allowed.  Class 6 shall consist of all Claims that would otherwise be Class 5 General Unsecured Claims and are Allowed in the GUC

Convenience Amount or less. **Any Holder of an Allowed Class 5 General Unsecured Claim that (i) votes to accept the Plan and (ii) affirmatively elects on its Class 5 Ballot to receive treatment as a General Unsecured Convenience Claim shall be deemed to be a Releasing Party hereunder** in exchange for receiving the GUC Convenience Recovery.

    c.    *Voting*: Class 6 is Impaired under the Plan. Each Holder of a General Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Tort Claims</u>

    a.    *Classification*: Class 7 consists of all Tort Claims against the Debtor.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Tort Claim agrees to less favorable treatment (or otherwise elects and is entitled to receive Tort Convenience Claim treatment on account of its Allowed Tort Claim), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Claim, each such Holder shall receive the Tort Claim Recovery; <u>provided</u>, that each such Holder of an Allowed Tort Claim that votes to accept the Plan shall have the option to irrevocably elect on its Ballot to be treated as a Tort Convenience Claim and receive the Tort Convenience Recovery in full and final satisfaction of such Allowed Tort Claim; <u>provided</u>, <u>further</u> that **any Holder that (i) votes to accept the Plan and (ii) affirmatively elects on its Ballot to receive treatment as a Tort Convenience Claim shall be deemed to be a Releasing Party hereunder and to have consented to and granted a full release and waiver of any claims and causes of action against the Members on account of such Holder's Allowed Tort Claim** in exchange for receiving the Tort Convenience Recovery.

    c.    *Voting*: Class 7 is Impaired under the Plan. Each Holder of a Tort Claim is entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Tort Convenience Claims</u>

    a.    *Classification*: Class 8 consists of all Tort Convenience Claims against the Debtor.

    b.    *Allowance*: On the Effective Date, each Tort Convenience Claim shall be deemed to be Allowed in the lower of (i) the asserted aggregate liquidated amount of such Tort Convenience Claim and (ii) the Tort Convenience Amount.

    c.    *Treatment*: Except to the extent that a Holder of an Allowed Tort Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Tort Convenience Claim, each such Holder shall receive the Tort Convenience Recovery on the Effective Date. **Any Holder of a Allowed Class 7 Tort Claim that (i) votes to accept the Plan and (ii) affirmatively elects on its Class 7 Ballot to receive treatment as a Tort Convenience Claim shall be deemed to be a Releasing Party hereunder and to have consented to and granted a full release and waiver of any claims and causes of action against the Members on account of such Holder's Claim** in exchange for receiving the Tort Convenience Recovery.

      d.     *Voting*:  Class 8 is Impaired under the Plan.  Each Holder of a Tort Convenience Claim is entitled to vote to accept or reject the Plan.

9.     <u>Class 9 – Member Patronage Capital Claims</u>

      a.     *Classification*:  Class 9 consists of all Member Patronage Capital Claims against the Debtor.

      b.     *Treatment*:  Except as otherwise set forth in the Confirmation Order or to the extent that a Holder of an Allowed Member Patronage Capital Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Patronage Capital Claim, each such Allowed Member Patronage Capital Claim shall, subject in all respects to the ECCA and the Bylaws, be Reinstated, retained by such Holder, and retired in accordance with the Bylaws.

      c.     *Voting*:  Class 9 is Unimpaired under the Plan.  Each Holder of an Allowed Member Patronage Capital Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Member Patronage Capital Claims are not entitled to vote to accept or reject the Plan.

10.     <u>Class 10 – Member Other General Unsecured Claims</u>

      a.     *Classification*:  Class 10 consists of all Member Other General Unsecured Claims against the Debtor.

      b.     *Treatment*:  Except to the extent that a Holder of an Allowed Member Other General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Member Other General Unsecured Claim, each such Holder shall receive treatment pursuant to the Member Settlement as set forth in <u>Article IV.F</u>.

      c.     *Voting*:  Class 10 is Impaired under the Plan.  Each Holder of a Member Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

C.     *No Interests in the Debtor*

     Pursuant to the ECCA, there are no Interests in the Debtor for purposes of the Plan.  Rather, each of the Members has a statutory membership interest in the Debtor, which is represented by each Member's Member Certificate.  As set forth in <u>Article IV.C</u>, except as otherwise set forth in the Plan or the Confirmation Order, the Members shall retain their Membership Certificates and continue to be members of the Reorganized Debtor under the ECCA, the Bylaws, and applicable law.  Accordingly, there are no Interests in the Debtor subject to classification under sections 1122 and 1123 of the Bankruptcy Code.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

     Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

E.      *Elimination of Vacant Classes*

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Separate Classification of Other Secured Claims*

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

H.      *Subordinated Claims*

Except as may be the result of the settlement, allowance, classification, and treatment of all Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor and the Reorganized Debtor reserve the right to reclassify any Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims*

In consideration for the classification, distributions, releases, exculpations, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Causes of Action, controversies, and disputes resolved pursuant to the Plan.  The Plan shall be deemed a motion by the Debtor to approve such compromises and settlements (including, without limitation, the Plan Settlements not already approved by the Bankruptcy Court) pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order, subject to the occurrence of the Effective Date, shall constitute the Bankruptcy Court's approval of such compromises and settlements (including, without limitation, the Plan Settlements not already approved by the Bankruptcy Court) under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtor, its Estate, and Holders of Claims, and are fair, equitable, and within the range of reasonableness.  Subject to <u>Article VI</u> and the occurrence of the Effective Date, the treatment provided herein and the distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final and indefeasible and shall not be subject to challenge, avoidance, turnover, or recovery by any other Person or Entity.

B.      *Restructuring Transactions; Effectuating Documents*

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may take any and all actions as may be necessary or appropriate in the Debtor's or the Reorganized Debtor's reasonable discretion to effectuate the Restructuring and the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of any New Organizational Documents, including any appropriate agreements or other documents of restructuring, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the filing of the New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, continuance, or dissolution pursuant to applicable law; (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iv) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution and delivery of the Exit Facility Documents, the RUS Contingency Exit Note, the Amended and Restated RUS Secured Notes Documents (including any agreement or document in connection with the funding of the AU8 FFB Note); (vi) the execution and delivery of the applicable Participating Member Securitization Documents; (vii) the execution and delivery of the Ratepayer Hardship Fund Documents; (viii) the consummation of the Generation Sale and execution and delivery of any documents and agreements in connection therewith; (ix) the execution, delivery, and entry into the TAA Escrow Agreement; and (x) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan (collectively, the "Restructuring Transactions"); provided, however, that the foregoing shall not be deemed to abrogate or replace the Board's authority or the consent or consultation rights granted to the Consenting Members under the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1142, 1145, and 1146 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, and, to the extent such actions were taken before the Confirmation Date, such actions are ratified in all respects, and, in each case, no further approvals, authorization, or consents, except those expressly required pursuant to the Plan or the Confirmation Order, shall be required.

C.      *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, the Debtor shall exist as the Reorganized Debtor and as a separate nonprofit corporation or other form of entity, as the case may be, with all the powers of a corporation or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other nonbankruptcy law).

Except as otherwise set forth in Article IV.E.2 of the Plan in respect of Defaulting Members, on and as of the Effective Date, the Members shall retain their Membership Certificates and continue to be

members of the Reorganized Debtor in accordance with the terms of the ECCA, the Bylaws, and applicable law.

D.   *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Estate, all the Debtor's Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Retained Causes of Action Schedule), all Executory Contracts and Unexpired Leases assumed, but not assigned, by the Debtor, and any property acquired by the Debtor, including interests held by the Debtor in non-Debtor subsidiaries and Affiliates, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, interests, encumbrances, and liabilities of any kind unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, the Reorganized Debtor shall be bound by all applicable provisions of the Protocols except as set forth in the Plan.

E.   *Sources of Plan Funding*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtor and the Reorganized Debtor, as applicable, shall fund distributions under the Plan with, as applicable, (i) the TAA Proceeds; (ii) the proceeds and loans available under the Exit Facility and the RUS Exit Financing; (iii) Cash on hand; (iv) Generation Sale Proceeds net of any transaction expenses in accordance with the provisions of Article IV.E.4 and subject to the terms and conditions of the Amended and Restated RUS Secured Notes Documents; and (v) any other assets, sources of funding, or other consideration available to the Debtor or the Reorganized Debtor.  For the avoidance of doubt, funding for distributions under the Plan does not include any Claim that has been Reinstated pursuant to the Plan, and, upon a Member's deposit of its TAA Balance with the TAA Escrow Agent in accordance with the Plan, such Member shall not be obligated to provide Plan funding.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date agreement (including any New Organizational Documents), shall have the right and authority without further approval or order of the Bankruptcy Court to raise additional capital and obtain additional funding and financing in accordance with, and subject to, applicable law.

1.   Payment of TAA Balances and Participating Member Securitization Reimbursements

Upon entry of the Confirmation Order, the Debtor shall be authorized to execute, enter into, and perform under the TAA Escrow Agreement.  Each Member shall pay, or cause to be paid, its TAA Balance in full in Cash by depositing funds in an amount equal to such Member's TAA Balance with the TAA Escrow Agent no later than on the Effective Date.  A funds-flow memorandum shall be attached to the TAA Escrow Agreement and agreed to by the Debtor and the applicable Members at least five days before the Effective Date, which memorandum shall, to the extent practicable, provide that funds on deposit in respect of a Member's TAA Balance will be delivered directly to ERCOT and certain other Holders of Allowed Claims.  The TAA Escrow Agent's delivery of the applicable funds in accordance with the TAA Escrow Agreement and the funds-flow memorandum shall be deemed to be in full and final satisfaction of such Member's TAA Balance.

Each applicable Member shall pay, or cause to be paid, its respective Participating Member Securitization Reimbursements, if any, in full in Cash by depositing funds in an amount equal to such Member's Participating Member Securitization Reimbursements with the TAA Escrow Agent no later than

on the Effective Date. The TAA Escrow Agent's delivery of the applicable funds to the Debtor or the Reorganized Debtor, as applicable, in accordance with the TAA Escrow Agreement and the funds-flow memorandum shall be deemed to be in full and final satisfaction of such Member's Participating Member Securitization Reimbursements.

The funds on deposit with the TAA Escrow Agent shall not constitute property of the Debtor, its Estate, or the Reorganized Debtor unless and until such funds are delivered to the Debtor or the Reorganized Debtor, as applicable, in accordance with the TAA Escrow Agreement and the funds-flow memorandum.

2.      Participating Member Securitization

A Member may, in its sole discretion, elect to participate in the Participating Member Securitization, proceeds of which shall be used to fund, in full or in part, each Participating Member's TAA Balance and Participating Member Securitization Reimbursements. On or before the Effective Date, each of the Participating Members shall cause the Participating Member Financing Order to be adopted by its board of directors and be binding and irrevocable on the Participating Members in accordance with its terms immediately upon the issuance of the Participating Member Securitized Bonds under the Participating Member Securitization Documents executed in connection with the Plan. On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, and the Participating Members shall consummate the Participating Member Securitization and cause the Participating Member Securitized Bonds to be issued by the Participating Member Securitization LLC in one or more tranches or series and pursuant to and secured by a trust agreement.

Upon the entry of the Confirmation Order, the Debtor and the Reorganized Debtor, as applicable, shall be authorized to execute and perform under any applicable Participating Member Securitization Documents, including the Participating Member Master Servicing Agreement.

3.      Generation Sale Proceeds and Generation Debt Paydown

On the Effective Date, the Cushion of Credit shall be applied to reduce the outstanding balance of and partially retire the RUS Secured Notes (including any accrued interest and, if any, prepayment penalty) related to debt obligations that were used to fund generation-related capital expenditures and are secured by a Lien on the Generation Assets, among other property, in favor of the RUS Secured Parties (such indebtedness after application of the Cushion of Credit, the "Generation Debt"). In accordance with the Amended and Restated RUS Secured Notes Documents, the Generation Sale Proceeds shall be used to first pay the remaining balance of the Generation Debt until the Generation Debt is paid in full (such paydown, the "Generation Debt Paydown"). Any and all Generation Sale Proceeds remaining after the Generation Debt Paydown and the payment of transaction fees and expenses related to the Generation Sale (including the RUS Secured Parties' reasonable, documented professional fees and expenses) shall be used to fund, within ten days of the Generation Sale Closing Date, the then-unpaid portion of the applicable Interim Distribution Obligations, and the Generation Sale Proceeds, if any, remaining after the payment of any such obligations shall then be used by the Reorganized Debtor to pay down the RUS Contingency Exit Note. The Generation Sale Proceeds remaining after the RUS Contingency Exit Note is paid in full, if any, shall vest in and be retained by the Reorganized Debtor to be used, in its discretion, for any other general or corporate purposes; provided, however, that the use of any Generation Sale Proceeds remaining after satisfying the then-unpaid portion of the applicable Interim Distribution Obligations shall be subject to the RUS Secured Parties' prior written consent as set forth in the Amended and Restated RUS Secured Notes Documents unless otherwise approved by the RUS Secured Parties.

For the avoidance of doubt, unless otherwise agreed by the RUS Secured Parties and the Reorganized Debtor before the sale of a Generation Asset, the RUS Secured Parties' Lien in such Generation Assets shall continue in the proceeds thereof to the same extent and priority that the RUS

Secured Parties had before such Generation Asset was sold; provided, however, that the Reorganized Debtor's payments in respect of the Additional Market Participant Cash Payment and the Deferred GUC Obligations shall be free of any Lien of the RUS Secured Parties.

    4.    The Exit Facility and RUS Exit Financing

The Reorganized Debtor shall be authorized to execute and otherwise enter into the Exit Facility and the RUS Exit Financing. The Exit Facility and the RUS Exit Financing will be made available to the Reorganized Debtor, pursuant to and subject to the terms and conditions set forth in the Exit Facility Documents and the Amended and Restated RUS Secured Notes Documents, respectively.

Confirmation shall be deemed approval of the incurrence of the Exit Facility and the RUS Exit Financing (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtor shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the indebtedness and other obligations under the Exit Facility, the RUS Exit Financing, and related guarantees, including the Exit Facility Documents and the Amended and Restated RUS Secured Notes Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtor may deem to be necessary to consummate the Exit Facility and the RUS Exit Financing.

F.    *The Member Settlement*

The treatment under the Plan of the Members' Claims (including any Proofs of Claim filed by any of the Members) and other rights against the Debtor (including, without limitation, relating to the Members' payment of their respective TAA Balances and the treatment of the Allowed Member Other General Unsecured Claims, the Allowed Member Patronage Capital Claims, and the Members' All Requirements Contracts), together with the other terms and conditions set forth in the Plan and in the Confirmation Order (including the releases set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes by and among the Debtor and the Estate, on the one hand, and the Members, on the other hand. The Member Settlement shall incorporate and include the following terms, conditions, and Restructuring Transactions:

    1.    Reorganized Debtor as a Transmission & Distribution Electric Cooperative

After the Effective Date (but no later than the Generation Sale Outside Date), in accordance with the Plan and through the Restructuring Transactions, the Reorganized Debtor shall sell its Generation Assets in one or more asset sales. On the Amended ARC Effective Date, and subject to the Power Supply Exceptions, the Reorganized Debtor shall terminate its involvement in all power-supply activities and transition from a "wholesale generation and transmission electric cooperative" to a "wholesale transmission and distribution electric cooperative" organized and existing as a nonprofit electric cooperative corporation under the ECCA.

As of the Effective Date and thereafter, the Reorganized Debtor shall be prohibited from purchasing or building new electric-generation facilities and purchasing an interest in any electric-generation facility, and, as of the Amended ARC Effective Date, the Restructuring Transactions, the Reorganized Debtor shall also be prohibited from (i) procuring power supply for any Consenting Members, subject to the requirements in Article IV.G.7; (ii) selling electric power and energy to the Members or any other Entities, and (iii) registering with ERCOT as a QSE, LSE, or CRR Account Holder; provided, however, that, in each case, the Reorganized Debtor may, subject to the terms and conditions of the Amended ARCs (but solely to the extent not inconsistent

with the Plan), engage in activities directly related to the Power Supply Exceptions through a Third-Party QSE; provided, further, however, that, in accordance with Article IV.G.7, the Reorganized Debtor may remain a QSE only until the Amended ARC Effective Date, at which time the Reorganized Debtor shall no longer schedule load and may remain as a QSE solely to schedule generation for the Generation Assets through the Generation QSE Termination Date.  Notwithstanding the foregoing, the Reorganized Debtor's status as a QSE, LSE, and CRR Account Holder shall terminate as set forth in Article IV.G.7.

2.    Assumption of All Requirements Contracts and Entry Into the Amended ARCs

On or before the Effective Date, the Reorganized Debtor shall assume the All Requirements Contracts (including any All Requirements Contracts with any Defaulting Members), and the Debtor or the Reorganized Debtor, as applicable, and the Consenting Members shall execute and enter into the Amended ARCs, the term of which will commence on the Amended ARC Effective Date.

As of the Amended ARC Effective Date, but subject to the Power Supply Exceptions, the Reorganized Debtor shall provide to the Consenting Members only wholesale transmission within the ERCOT market, wholesale distribution, and other related services, and the Consenting Members shall no longer be obligated to obtain power-supply services from the Reorganized Debtor and shall be forever released from all such obligations under the existing All Requirements Contracts; provided, however, that the Consenting Members shall remain obligated for any Transition Charges relating to any Generation Assets not sold by the Amended ARC Effective Date and relating to the Retained Agreements, in each case, in accordance with the provisions of the Amended ARCs.

a.    *Defaulting Members*

Notwithstanding anything to the contrary in the Plan, pursuant to the Member Settlement, the Reorganized Debtor shall not enter into an Amended ARC with any Defaulting Member, and such Defaulting Member shall be deemed to be in breach of, but remain subject to all of its obligations under (including an obligation to pay its TAA Balance and its allocated share of Transition Charges), its All Requirements Contract, as assumed pursuant to the Plan; provided, however, that, on or after the Amended ARC Effective Date, any Defaulting Member's continued treatment as a Power Supply Exception will be subject to Article IV.G.7 herein unless and until such Defaulting Member has cured its defaults, satisfied all outstanding obligations to the Reorganized Debtor, and entered into the Amended ARC with the Reorganized Debtor.  Such Defaulting Member's unpaid TAA Balance shall be deemed to be a Cause of Action retained by the Reorganized Debtor pursuant to the Retained Causes of Action Schedule and shall not be released by any provision in the Plan.

A Defaulting Member shall be obligated to, among other things, pay any amounts associated with (i) any loan, financing, or indebtedness incurred by the Debtor or the Reorganized Debtor, as applicable, to bridge such Defaulting Member's TAA Balance and any reasonable, documented fees and expenses (including, without limitation, any fees and expenses related to enforcement) incurred by the Reorganized Debtor or other applicable third party in connection with the collection of such Defaulting Member's TAA Balance and any other outstanding obligations and (ii) the Monitor, including, without limitation, the costs of the appointment of the Monitor, any fees and expenses related to any reports compiled by the Monitor, and any amounts payable to the Ratepayer Hardship Fund pursuant to Article IV.G.7, including the Defaulting Member Power Supply Charge.  For the avoidance of doubt, a Defaulting Member shall not be a Released Party hereunder.

b.    *Expulsion of Defaulting Members*

A Defaulting Member's failure to timely pay, or cause to be paid, its TAA Balance on the Effective Date shall be deemed to be a violation or a refusal to comply with a rule or regulation of the Board, the

Debtor, or the Reorganized Debtor, as applicable. The approval of the Plan by two-thirds (2/3) of the members of the Board shall be deemed to be the affirmative vote by two-thirds (2/3) of the members of the Board to expel a Defaulting Member from the Debtor or the Reorganized Debtor, as applicable, pursuant to section 1.6 of the Bylaws effective upon the date that is 30 days after such Defaulting Member's failure to timely pay its TAA Balance on the Effective Date in accordance with the Plan; provided, however, that, notwithstanding the foregoing, nothing in this Plan shall prohibit the Reorganized Debtor's Board from reinstating such Defaulting Member as a member of the Reorganized Debtor upon a two-thirds (2/3) vote of the members of the Reorganized Debtor's Board. Any such Defaulting Member's then-existing Patronage Capital shall be retired in the ordinary course and in accordance with the applicable provisions of the Bylaws, the Plan, and the Confirmation Order. Following the expulsion of the Defaulting Member, the Defaulting Member shall no longer accrue and be allocated additional Patronage Capital. The expulsion of the Defaulting Member shall not affect the Defaulting Member's rights and obligations (including an obligation to pay its TAA Balance and its allocated share of Transition Charges) under its All Requirements Contract, as assumed pursuant to the Plan, and the Member shall continue to deemed to be in breach of its All Requirements Contract, as assumed pursuant to the Plan.

3.  Transition to Member-Directed Power Supply

Before, on, or after the Effective Date, the Consenting Members and the Debtor or the Reorganized Debtor, as applicable, shall cooperate to negotiate and otherwise facilitate such Consenting Members' transition to alternative sources of power supply, and each Consenting Member may interact directly with ACES and other potential counterparties in connection with such Consenting Member's power supply. Before, on, or after the Effective Date, at a Consenting Member's reasonable written request, the Reorganized Debtor shall use commercially reasonable efforts to amend its agreements with ACES, as necessary, to accomplish the foregoing, and will use commercially reasonable efforts to support any such Consenting Member's membership in ACES and such Consenting Member may negotiate, execute, and enter into its own power-supply arrangements and agreements with counterparties; provided, however, that the foregoing is subject in all respects to the terms of the All Requirements Contracts until the Amended ARC Effective Date; provided, further, however, that no power supply related agreements entered into by a Consenting Member shall be effective or otherwise permit transactions to occur before the Amended ARC Effective Date.

4.  Generation Sale

Before the Effective Date, the Debtor's Board authorized the Debtor to conduct the Generation Sale and, pursuant to this Plan, before, on and immediately after the Effective Date, the Debtor and the Reorganized Debtor, as applicable, shall continue such efforts, conduct a marketing process, and promptly consummate the Generation Sale in accordance with applicable law. On the Effective Date, and pursuant to Article V, the Debtor or the Reorganized Debtor, as applicable, shall assume the engagement agreement entered into with Moelis & Company LLC for the Generation Sale.

The final tranche or transaction of the Generation Sale must close, and all Generation Assets must have been sold, transferred, or otherwise abandoned (with any such abandonment to be subject to Bankruptcy Court approval), on or before the Generation Sale Outside Date, which may be extended solely by the unanimous consent of (i) the Consenting Members and (ii) the Generation Oversight Committee; provided, however, that the Consenting Members and the Generation Oversight Committee must provide the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with written notice of any such extension at least 30 days before the Generation Sale Outside Date then in effect, and such notice shall contain reasonable detail setting forth the need for the extension and a good faith estimate of the anticipated length of the extension.

Notwithstanding any order of the Bankruptcy Court extending the Generation Sale Outside Date, if the Generation Sale Outside Date is extended, the Reorganized Debtor shall retain a Third-Party QSE to schedule the Reorganized Debtor's generation for the Generation Assets on or before the Generation QSE Termination Date. The Reorganized Debtor's failure to retain such Third-Party QSE on or before the Generation QSE Termination Date shall result in ERCOT having the absolute right to prohibit the Reorganized Debtor from selling generation into the ERCOT wholesale market until such time as the Reorganized Debtor has retained a Third-Party QSE.

For the avoidance of doubt, the sale or other disposition or abandonment of any Generation Assets shall be conducted in accordance with the applicable provisions of the Amended and Restated RUS Secured Notes Documents.

a.    *Generation Oversight Committee*

The Generation Oversight Committee shall make recommendations to the Board regarding the Generation Sale, but shall not have the authority to approve any transaction or otherwise bind the Board, the Debtor, or the Reorganized Debtor. The Generation Oversight Committee may, subject to the consent and approval of the Reorganized Debtor's Board (such consent and approval not to be unreasonably withheld), retain professionals and other staff to, among other things, oversee and make recommendations to the Board in respect of the Generation Sale.

The Reorganized Debtor shall provide the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with reasonable access to nonprivileged documents and information concerning the status of the Generation Sale, including by providing copies of any written reports created by the Generation Oversight Committee (with appropriate redactions for privileged information) promptly after such reports are delivered to the Board or the Reorganized Debtor, as applicable. Any such documents and information provided to the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, or the GUC Notice Parties, as applicable, shall be subject to the terms of the Protective Order and be treated by ERCOT as Protected Information (as defined in the Protocols). At the reasonable written request of the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, the GUC Notice Parties, or their respective attorneys and advisors, the Reorganized Debtor shall provide a reasonably detailed update, which may be written or by telephonic or video conference, on the status of the Generation Sale. For the avoidance of doubt, any documents or information belonging to the Members shall be subject to the Protective Order, and no document or information of the Reorganized Debtor or the Members shall be shared with any Entity (including any principal of such Entity) that is a competitor of the Reorganized Debtor or a potential purchaser of any Generation Assets or T&D Assets.

b.    *Generation Employee Retention Plan*

The Generation Employee Retention Plan shall be implemented by the Reorganized Debtor on the Effective Date without any further action by the Reorganized Debtor's Board or the Bankruptcy Court.

5.    Substations

Upon the occurrence of the effective date under the Amended ARCs, and in accordance with the terms thereof, a Consenting Member shall have the ability by providing written notice to the Reorganized Debtor, but not the obligation, to construct, own, and maintain new substations in such Consenting Member's service area.

6.    The Ratepayer Hardship Fund

The Debtor's mission historically has been to provide valued service to the Members and through them, their respective Ratepayers, by generating, procuring, and transmitting reliable power at the lowest

cost.  Although the Reorganized Debtor, in accordance with the Plan, will soon exit the power-supply and power-generation businesses, the Reorganized Debtor remains committed to reducing the financial impact of Winter Storm Uri and this Chapter 11 Case on the applicable Members' Ratepayers, while continuing to provide reliable electricity transmission and distributions service after the Effective Date and the consummation of the Generation Sale.  To continue those efforts, the Debtor or the Reorganized Debtor, as applicable, shall establish and fund the Ratepayer Hardship Fund to help mitigate Winter Storm Uri's impact on Ratepayer electric bills.

a.      <em>The Establishment of the Ratepayer Hardship Fund</em>

Before, on, or promptly after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall take all necessary steps to establish the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents.  The Ratepayer Hardship Fund shall not be a source of distributions to Holders of Claims under the Plan or otherwise against the Debtor or the Reorganized Debtor.  The Ratepayer Hardship Fund shall be established for the purposes described in this Plan and, as applicable, the Plan Supplement, and any other purposes more fully described in the Ratepayer Hardship Fund Documents.   The Hardship Fund Administrator and the Hardship Fund Custodian, as applicable, shall, in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents:

i.     make Hardship Distributions to Qualified Hardship Recipients;

ii.    hold, manage, invest, and administer the Hardship Fund Contribution and all other funds and other assets received by the Ratepayer Hardship Fund for the benefit of the beneficiaries of the Ratepayer Hardship Fund;

iii.   hold and maintain required reserves for the Ratepayer Hardship Fund in accordance with the Ratepayer Hardship Fund Documents; and

iv.    pay all applicable Hardship Fund Expenses.

On the Effective Date, the Reorganized Debtor shall fund the Ratepayer Hardship Fund with the Hardship Fund Contribution and neither the Debtor, the Reorganized Debtor, the Consenting Members, nor any other party shall be obligated to make any other or further contribution to the Ratepayer Hardship Fund.  The Hardship Fund Contribution shall vest in the Ratepayer Hardship Fund free and clear of all Liens, Claims, interests, encumbrances, and liabilities of any kind, and shall be subject to and governed by the applicable provisions of the Plan and the Ratepayer Hardship Fund Documents.

b.      <em>Appointment and Role of the Hardship Fund Administrator, the Hardship Fund Custodian, and the Hardship Fund Oversight Board</em>

Upon the entry of the Confirmation Order, the Debtor shall be authorized to engage and retain Solix, Inc., on and subject to the terms set forth in the Plan Supplement, to serve as the initial Hardship Fund Administrator.  In furtherance of and consistent with the purposes of the Ratepayer Hardship Fund and the Plan, the Hardship Fund Administrator and the Hardship Fund Custodian, as applicable, shall have the power and authority to perform their respective functions on behalf of the Ratepayer Hardship Fund in accordance with the Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents.  In all circumstances, the Hardship Fund Administrator and the Hardship Fund Custodian shall be independent and disinterested and shall act in the best interests of the beneficiaries of the Ratepayer Hardship Fund, in furtherance of the purposes of the Ratepayer Hardship Fund, and in accordance with this Plan, the Confirmation Order, and the Ratepayer Hardship Fund Documents.  All determinations regarding the eligibility of any person or entity for any service, payment, or other relief or accommodation from the Ratepayer Hardship Fund will be made pursuant to the Ratepayer Hardship Fund Documents.

The affairs of the Ratepayer Hardship Fund shall be managed by the Hardship Fund Administrator and the Hardship Fund Custodian, as applicable, under the direction of the Hardship Fund Oversight Board.

c.      *Monitoring and Reporting Obligations*

The Hardship Fund Administrator and the Hardship Fund Custodian, as applicable, shall, among other things and subject to the Ratepayer Hardship Fund Documents, (i) monitor the use of funds received by Ratepayer Hardship Fund and (ii) prepare and deliver to the Reorganized Debtor, the Consenting Members, and the PUCT quarterly reports on the disbursements and other Hardship Distributions from the Ratepayer Hardship Fund, the use and management of the Hardship Fund Contribution, and compliance with the Ratepayer Hardship Fund Documents.  A copy of any such quarterly reports shall be Filed with the Bankruptcy Court.  In addition, the Hardship Fund Administrator shall use commercially reasonable efforts to provide the Reorganized Debtor, the Consenting Members, and the PUCT with reasonable access to nonprivileged documents and information concerning the administration of the Ratepayer Hardship Fund and any Hardship Distributions made to Qualified Hardship Recipients.

d.      *Residual Cash in Ratepayer Hardship Fund*

To the extent any portion of the Hardship Fund Contribution (including any proceeds thereof) remains in the Ratepayer Hardship Fund as of the 10th anniversary of the Effective Date, such remaining Cash shall be deemed to have irrevocably re-vested in, and the Hardship Fund Administrator shall promptly transfer such property to, the Reorganized Debtor for distribution to the Members (other than Defaulting Members and Members that did not have a TAA Balance) to be used by such Members in a manner materially consistent with the Ratepayer Hardship Fund purposes and the written recommendations of the Hardship Fund Oversight Board (a copy of which shall be given to each Member) made in accordance with the Ratepayer Hardship Fund Documents.

7.      <u>Releases; Proofs of Claim; CoServ/Tri-County Claim Litigation</u>

The Consenting Members shall be (i) Released Parties hereunder and shall receive the releases set forth in <u>Article VIII.C</u> and (ii) Releasing Parties hereunder and shall grant the releases set forth in <u>Article VIII.D</u>.  On the Effective Date, each Proof of Claim Filed by or on behalf of any of the Consenting Members shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court, and except as otherwise set forth herein, all Claims and Causes of Action between the Debtor and the Estate, on the one hand, and the Consenting Members, on the other hand, shall be deemed to be fully and finally resolved, waived, discharged, and released.

On the Effective Date or promptly thereafter, CoServ, Tri-County, the Reorganized Debtor, and the Committee shall take reasonable steps to facilitate the dismissal with prejudice, of the CoServ/Tri-County Claim Litigation, and the CoServ/Tri-County Claim Litigation shall be deemed fully resolved; <u>provided</u>, <u>however</u>, that the CoServ/Tri-County Claim Litigation shall not be withdrawn or dismissed as to any Defaulting Member.

8.      <u>Consenting Member Recourse</u>

The Consenting Members shall have all rights available under applicable law to enforce the terms of the Plan, the Confirmation Order, and any other applicable Plan Document, and nothing in this Plan shall be construed to limit or compromise any such rights.

G.      *The ERCOT Settlement*

The treatment of the ERCOT Claim under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth herein and in the

Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the ERCOT Adversary Proceeding, the ERCOT Claim Appeals, and all Claims, Causes of Action, controversies, and disputes related thereto.  The ERCOT Settlement includes the following material terms, conditions, and Restructuring Transactions:

       1.     <u>Eligible Market Participant Election Notice</u>

ERCOT shall send the Eligible Market Participant Election Notice to the Eligible Market Participants.

       2.     <u>ERCOT's Payments to Eligible Market Participants; Releases; Binding Effect</u>

The Eligible Market Participant Election Notice sets forth the Market Participant Settlement Procedures.  The Market Participant Settlement Procedures provide, among other things, that all Eligible Market Participants will be bound by the release and injunction provisions as set forth therein unless any such Eligible Market Participant opts out in accordance with the Market Participant Settlement Procedures. The Market Participant Settlement Procedures further provide that any Eligible Market Participants that do not elect to receive the Market Participant Accelerated Cash Recovery or the Market Participant Convenience Cash Recovery will receive the Market Participant Deferred Cash Recovery.  Pursuant to the Market Participant Settlement Procedures, ERCOT will pay the ERCOT Market Participant Consideration received under <u>Article III.B.4</u> to Eligible Market Participants in accordance with the ERCOT Recovery Appendix.  The Market Participant Settlement Procedures provide that any payment obligation of ERCOT to Eligible Market Participants on account of the Brazos Short Pay Claim shall be governed solely by the Plan and the ERCOT Recovery Appendix, and that ERCOT's payment of the ERCOT Market Participant Consideration to Eligible Market Participants pursuant to the Market Participant Settlement Procedures constitutes the full and final satisfaction of the amount each are owed by ERCOT on account of their allocable portion of the Brazos Short Pay Claim.

**Except as otherwise set forth in the Confirmation Order or the Market Participant Settlement Procedures, effective immediately upon the occurrence of the Effective Date, each of the ERCOT Settlement Release Parties shall be deemed to release, remise and forever discharge each other ERCOT Settlement Release Party of and from any and all debts, losses, demands, actions, Claims, Causes of Action, suits, accounts, covenants, contracts, agreements, claims, counterclaims, controversies, disputes, obligations, judgments, rights, damages, costs, losses, expenses, liens, or liabilities of any and every nature or description whatsoever, both at law or in equity, whether asserted or unasserted, express or implied, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, that arose at any time before the Effective Date and arise out of or directly related to the ERCOT Adversary Proceeding, the ERCOT Claim, the Brazos Short Pay Claim (including ERCOT's efforts to collect the Brazos Short Pay Claim), or the Debtor's purchase or procurement of any electricity or ancillary services from ERCOT during Winter Storm Uri.**

**Upon the occurrence of the Effective Date, except as otherwise set forth in the Market Participant Settlement Procedures, or to the extent that the Bankruptcy Court orders otherwise, the Eligible Market Participants and their respective affiliates (for purposes of this paragraph, the term "affiliate" shall have the meaning ascribed to it in the Protocols) and Representatives shall be forever barred and enjoined from interfering with the implementation of this Plan or the ERCOT Settlement or taking any action against ERCOT or its property solely with respect to the ERCOT Settlement, any Claim or Cause of Action in any way related to the ERCOT Claim (including the Brazos Short Pay Claim), or the specific transactions underlying, or that otherwise gave rise to, the ERCOT Claim or any portion thereof (including the Brazos Short Pay Claim); _provided_, _however_, that nothing herein releases or waives the Debtor's, the Reorganized Debtor's, or ERCOT's obligations under the ERCOT Settlement.  Notwithstanding anything contained in this <u>Article IV.G</u> to the contrary,**

**Eligible Market Participants may cooperate with the efforts of their QSE Customers that are not ERCOT Settlement Release Parties before the PUCT, a court, or other Governmental Unit, at the request of such QSE Customer and to the extent that such cooperation is required by the terms of the contract between the Eligible Market Participant and the QSE Customer.**

For the avoidance of doubt, (i) no party is releasing any right or interest in any Unaffected Proceeding pursuant to this Article IV.G or the Market Participant Settlement Procedures; (ii) if all transactions in the ERCOT wholesale market during Winter Storm Uri are resettled or repriced (*i.e.*, a market-wide repricing) by either ERCOT decision, an act of the Texas Legislature, or an order issued by the PUCT or any other Governmental Unit or court with authority (including as a result of invalidation or vacatur of the PUCT orders entered on February 15, and 16, 2021 or ERCOT's implementation of those orders during any time period) neither the Debtor nor the Reorganized Debtor nor any Member shall be required to pay, or entitled to receive payment in connection with, any invoices (including Default Uplift Invoices) related to such ERCOT market-wide wholesale market resettlement or repricing; (iii) the Debtor or the Reorganized Debtor, as applicable, shall be required to pay the ERCOT Unaffected Invoices as set forth below; (iv) neither the Debtor nor the Members are releasing any rights or Claims against each other related to the All Requirements Contract, the TAA, or the TAA Balance pursuant to this Article IV.G.2; and (v) nothing in the ERCOT Settlement, Article IV.G of the Plan, or the Market Participant Settlement Procedures shall in any way except any Claim from or otherwise compromise or abrogate the Debtor's discharge under section 1141 of the Bankruptcy Code or the applicable provisions of Article VIII of the Plan.

On the Effective Date, each Proof of Claim Filed by or on behalf of any Eligible Market Participants shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court solely to the extent that such Claim relates to the Brazos Short Pay Claim or any related Default Uplift; provided, however, that any timely Filed Proofs of Claim or applications for payment in respect of Bilateral Power Claims or Bilateral Gas Claims held by any Eligible Market Participants shall remain subject to any rights and defenses held by the Debtor, the Estate, the Reorganized Debtor, and the Holders of such Claims and shall, if Allowed, receive the treatment applicable to such Claims under the Plan.

3.    No Default Uplift

The Debtor's and Reorganized Debtor's timely payment of the Initial ERCOT Cash Payment and the ERCOT Market Participant Consideration to ERCOT, and ERCOT's subsequent payments of such Cash to Eligible Market Participants as set forth in the ERCOT Recovery Appendix, shall constitute a payment plan designed to enable ERCOT to pay the Eligible Market Participants all amounts such Eligible Market Participants are owed by ERCOT on account of the Brazos Short Pay Claim.  If the Debtor or Reorganized Debtor fails to comply with this payment plan, ERCOT (i) shall not collect unpaid amounts through the Default Uplift process described in Protocols §§ 9.19.1 and 9.19.2 in connection with or arising from the Brazos Short Pay Claim and (ii) may only seek relief from the Bankruptcy Court as provided herein.  For the avoidance of doubt, the foregoing does not apply to any Default Uplift process arising from a default by a Market Participant other than Brazos.

4.    ERCOT Prepetition Transfers

As partial consideration to ERCOT in exchange for the settlement and compromises set forth in the ERCOT Settlement (including the compromise and settlement of the ERCOT Claim), as of the Effective Date, all claims and Causes of Action related to the ERCOT Prepetition Transfers are waived and released by the Debtor and the Estate, and ERCOT shall retain the ERCOT Prepetition Transfers.

5.      Dismissal of Proceedings

On the Effective Date, ERCOT and the Reorganized Debtor (and, to the extent required under any applicable rules, the Member Intervenors, the Defendant Intervenors, and the Committee) shall file one or more joint stipulations, motions, or other appropriate filings with, as applicable, the Bankruptcy Court, the U.S. District Court for the Southern District of Texas, or the U.S. Court of Appeals for the Fifth Circuit to dismiss with prejudice the ERCOT Adversary Proceeding and dismiss the ERCOT Claim Appeals.  ERCOT and the Reorganized Debtor acknowledge and agree that the *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss and for Abstention* [Adv. Dkt. No. 137], the *Order Denying Electric Reliability Council of Texas, Inc.'s Emergency Motion to Dismiss* [Adv. Dkt. No. 243], and the *Order on Motions for Summary Judgment* [Adv. Dkt. No. 377] are each subject to an ongoing and pending appeal, each of which will be dismissed by agreement under the ERCOT Settlement agreement; thus, no court of final appellate jurisdiction has reviewed or considered whether the Bankruptcy Court made any factual or legal errors in such rulings.

6.      Certain Remaining Obligations

On the Effective Date (or in the ordinary course if any of the following amounts are not due and owing as of the Effective Date), the Debtor or the Reorganized Debtor, as applicable, shall pay in full the ERCOT Unaffected Invoices.

To secure the payment obligations of the Debtor and the Reorganized Debtor in respect of an ERCOT Unaffected Invoice, ERCOT may hold the ERCOT Unaffected Invoice Collateral, which ERCOT may apply to satisfy the Debtor's or the Reorganized Debtor's obligations to ERCOT under any ERCOT Unaffected Invoice in the event that the Debtor or the Reorganized Debtor fails to timely pay such invoice as required by the Plan.  In the event that ERCOT uses any portion of the ERCOT Unaffected Invoice Collateral to satisfy payment obligations arising from an ERCOT Unaffected Invoice, ERCOT may request that the Reorganized Debtor replenish the ERCOT Unaffected Invoice Collateral.  After the Reorganized Debtor's potential liability for any ERCOT Unaffected Invoice has ended, ERCOT shall return to the Reorganized Debtor any then-unused ERCOT Unaffected Collateral.

7.      Reorganized Debtor's Market Participant Status

The treatment provided under Article III.B.4 in respect of the Allowed ERCOT Claim, constitutes the full, final, and prompt satisfaction, settlement, release, and discharge of the ERCOT Claim, including under sections 39.159, 39.160, and 41.151(b) of PURA.  Subject to the Reorganized Debtor's performance of its obligations under the Plan and the Confirmation Order, (i) the Reorganized Debtor shall be deemed to be in compliance with the applicable requirements of, and no action shall be taken against the Reorganized Debtor in respect of the Brazos Short Pay Claim under, sections 39.159, 39.160, and 41.151 of PURA as they relate to any obligations arising from or related to the ERCOT Claim; (ii) ERCOT shall be deemed to have taken all steps necessary to pursue collection in full; (iii) ERCOT shall not report to the PUCT that the Reorganized Debtor is in default under sections 39.159 or 39.160 of PURA or otherwise in connection with any obligations arising from or related to the ERCOT Claim; and (iv) except as otherwise provided in the Plan in respect of ERCOT, no Entity shall pursue collection of the ERCOT Claim from the Reorganized Debtor or any other Entity under sections 39.159 or 39.160 of PURA or otherwise.

On and after the Effective Date, subject to the Reorganized Debtor's continued compliance with the Brazos SFA and any other applicable SFA, (i) the Brazos SFA shall be deemed to be in full force and effect and binding on the Reorganized Debtor, and any alleged breach or default occurring before the Petition Date shall be deemed to be cured as of the Effective Date; (ii) the Reorganized Debtor may remain a LSE pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor shall terminate its status as a LSE; (iii) the Reorganized Debtor may remain a QSE

pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor shall no longer schedule load and may remain as a QSE solely to schedule generation for the Generation Assets through the Generation QSE Termination Date; (iv) the Reorganized Debtor may remain a CRR Account Holder pursuant to the Brazos SFA only until the Amended ARC Effective Date, at which time the Reorganized Debtor shall remain as a CRR Account Holder solely to fully liquidate or transfer, subject to the Protocols, its PCRRs and CRRs pursuant to a written "liquidation plan" submitted on or before the Effective Date to ERCOT, and the Reorganized Debtor shall terminate its status as a CRR Account Holder for all purposes within 30 days after such PCRRs and CRRs are fully liquidated or transferred; and (v) the Reorganized Debtor shall remain a Transmission Service Provider and a Distribution Service Provider, and perform any other Market Participant functions reasonably necessary under the Amended ARCs (other than serving as a QSE, LSE, or CRR Account Holder and subject to the limitations specified herein) pursuant to the Brazos SFA or any other applicable SFA.  If the Reorganized Debtor or ERCOT determines that it would be necessary or advisable for the Reorganized Debtor or its Affiliates to execute a new SFA or other agreement under the Protocols in connection with the Plan and the Restructuring Transactions, ERCOT and the Reorganized Debtor shall, subject to the Protocols, cooperate to negotiate any such SFA or other agreement in good faith.

Notwithstanding anything to the contrary herein, subject to the Reorganized Debtor's compliance with the Protocols, nothing in the Plan shall be deemed to limit or in any way hinder the Reorganized Debtor's engagement of or arrangements with a Third-Party QSE in connection with the Power Supply Exceptions, if any, on the Reorganized Debtor's behalf; provided, however, that (i) after the Generation Sale Closing Date and subject to the Power Supply Exceptions, the Reorganized Debtor shall not own or operate electricity-generation assets or electric-energy storage facilities for the purpose of offering power for sale into the ERCOT wholesale market; (ii) the T&D Resources shall be prohibited from being offered as a sale or a purchase of any associated capacity or energy into the ERCOT wholesale energy market, including, but not limited to, any current or future ancillary service products; and (iii) for any period of time after the Amended ARC Effective Date for which the Reorganized Debtor is procuring power for one or more Defaulting Members, the Reorganized Debtor shall, in consultation with ERCOT, retain an independent third-party monitor appointed by the Bankruptcy Court (the "Monitor"), which Monitor shall (a) evaluate the measures undertaken by the Reorganized Debtor to provide power supply for each Defaulting Member's load, including, without limitation, any physical or financial power supply or hedges, any fuel-supply arrangements associated with the power supply or hedges, and efforts undertaken to weatherize any power and fuel-supply resources on which the Reorganized Debtor intends to rely; (b) submit a report to the Bankruptcy Court and ERCOT, commencing on April 1, 2023 and continuing every April 1 thereafter, for the period from June 1 through May 31 and, commencing on October 1, 2023 and continuing every October 1 thereafter, for the period from December 1 through November 30 (each such period, a "Reporting Period"); and (c) provide in each such report the Monitor's independent assessment of the adequacy of the measures undertaken by the Reorganized Debtor to provide power supply to meet each Defaulting Member's forecasted load for the Reporting Period, taking into account industry standards and good utility practice, the inherent risks of the relevant markets, and the available tools and resources; provided, further, that, if the Monitor reports that the Reorganized Debtor is failing to meet relevant industry standards and good utility practice for the applicable Reporting Period, (x) the Reorganized Debtor shall have 30 days from the date of the Monitor's report to undertake additional measures, after which the Monitor will submit a supplemental report; and (y) if such supplemental report indicates that the Reorganized Debtor's actions continue to fail to meet relevant industry standards and good utility practice, the applicable Defaulting Member(s) and the Reorganized Debtor shall be obligated to pay to the Ratepayer Hardship Fund an amount equal to $200,000 per day commencing on the 31st day after the date of the Monitor's initial report finding that the Reorganized Debtor is failing to meet relevant industry standards and good utility practice and the payment obligation shall continue until such date that the Reorganized Debtor has, in the Monitor's reasonable professional judgment, taken sufficient measures to satisfy relevant industry standards and good utility practice (such amount, the "Defaulting Member

Power Supply Charge") , which conclusion shall be set forth in a report to the Bankruptcy Court and ERCOT; provided, however, that the Defaulting Member Power Supply Charge shall be paid solely out of Cash collected by the Reorganized Debtor from the applicable Defaulting Member(s) (including any Cash received from such Defaulting Member(s) through direct payments to the Reorganized Debtor or through the exercise of any right of setoff or recoupment against amounts otherwise payable by the Reorganized Debtor to such Defaulting Member(s) under the All Requirements Contract(s), the declared retirement of any Patronage Capital of such Defaulting Member(s), or otherwise), which shall then be immediately paid to the Ratepayer Hardship Fund until the Defaulting Member Power Supply Charge is paid in full.  The Reorganized Debtor shall use commercially reasonable efforts to promptly collect the Defaulting Member Power Supply Charge (including through the exercise of any right of setoff or recoupment) from such Defaulting Member(s) and remit such amounts to the Ratepayer Hardship Fund in accordance with this Article IV.G.7.

Nothing herein shall prohibit the applicable Defaulting Member(s) or the Reorganized Debtor from filing an emergency motion with the Bankruptcy Court (and the parties agree that any such emergency motion will be heard on an expedited basis but not on fewer than seven days' notice to ERCOT) disputing any findings of the Monitor in any report submitted to the Bankruptcy Court and ERCOT, including, without limitation, any finding that the Reorganized Debtor is failing to meet relevant industry standards and good utility practice for the applicable Reporting Period.  Upon the filing of such emergency motion, any obligation to pay the Defaulting Member Power Supply Charge to the Ratepayer Hardship Fund shall be suspended (but not waived) until the Bankruptcy Court enters its ruling on the emergency motion.  In the event the Bankruptcy Court denies the emergency motion, the applicable Defaulting Member(s) and the Reorganized Debtor shall promptly pay the full amount of the Defaulting Member Power Supply Charge in the manner set forth in the preceding paragraph (including any amount that accrues during the pendency of the emergency motion) to the Ratepayer Hardship Fund.  In the event the Bankruptcy Court grants the emergency motion, any obligation to pay the Defaulting Member Power Supply Charge in respect of the disputed period shall be waived.

8.      Changes in Management

As part of the ERCOT Settlement, and at ERCOT's request, the Board and the Debtor have agreed to, and the Reorganized Debtor shall, implement the management changes set forth in Article IV.M.2.

9.      No Consents Required

ERCOT represents and warrants that it has full power and authority to enter into the ERCOT Settlement as set forth in the Plan and otherwise perform all of its obligations under the ERCOT Settlement, the Plan, and the Confirmation Order, and that no other or further authority, approval, or consent of or from the PUCT or any other Entity is required for ERCOT to enter into the ERCOT Settlement.

10.     Retained Agreements

After the Effective Date, with respect to each of the Retained Agreements, the Reorganized Debtor shall not materially increase the amount of power and energy available under any such agreement. Additionally, the Lapetus 2 PPA shall not be extended beyond December 31, 2034 and the SWPA PPA shall not be extended beyond September 30, 2023; provided, however, that the Reorganized Debtor may further extend the maturity date of the SWPA PPA to March 30, 2024 (and, in no event, shall the term be extended beyond that date) in order to allow the parties to the SWPA PPA and the applicable Consenting Members to negotiate the terms of a potential assignment or other transition of the SWPA PPA to one or more Consenting Members, to the extent practical and permitted by applicable law and the Federal government; provided, further, however, that the Reorganized Debtor's entry into the foregoing six-month

extension shall be subject to ERCOT's consent, which consent shall not be unreasonably withheld upon showing of good cause for the extension by the Reorganized Debtor.

      11.    <u>T&D Asset Proceeds</u>

The Reorganized Debtor shall be prohibited from distributing the proceeds of any sale of T&D Assets to any Entity (other than the RUS Secured Parties or any other Entity with a valid Lien on such T&D Assets) before the Reorganized Debtor has made all distributions required under the Plan to Holders of Allowed General Unsecured Claims and to ERCOT; <u>provided</u>, <u>however</u>, that, following the payment of all distributions required under the Plan to all Holders of Allowed General Unsecured Claims and the payment in full of the Additional Market Participant Cash Payment, the Reorganized Debtor may distribute the proceeds of a T&D Asset sale to any Entity if, and only if, (i)(a) the Installment Market Participant Cash Payments have been paid in full and (b) as of the date of any proposed distribution of such sale proceeds, there are funds on deposit in the ERCOT Escrow Account and invested in Permitted Investments that yield future annual Cash balances sufficient to timely pay the remaining unpaid annual amounts of the Market Participant Deferred Cash Recovery in accordance with the ERCOT Recovery Appendix, or (ii) ERCOT otherwise agrees to the proposed distribution in its sole discretion. For the avoidance of doubt, nothing in this <u>Article IV.G.11</u> shall obviate the obligation to pay all of the ERCOT Market Participant Consideration and the Deferred GUC Obligations in full in accordance with the Plan, or prohibit the Reorganized Debtor from distributing the proceeds of any sale of T&D Assets to the RUS Secured Parties or any other Entity with a valid Lien existing now or hereinafter acquired on such T&D Assets.

H.    *SCEA Claims Settlement*

The treatment of the SCEA Claims (including the SCEA Allowed GUC Claim and the SCEA Allowed Administrative Claim) under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and SCEA, on the other hand. The SCEA Claims Settlement includes the following material terms and conditions:

As of the Effective Date, the SCEA Allowed Administrative Claim shall be deemed Allowed in full and shall be paid in full, in Cash, in accordance with <u>Article IIA</u>.

As of the Effective Date, the SCEA Allowed GUC Claim shall be a Class 5 General Unsecured Claim and deemed Allowed, unless the Bankruptcy Court determines that it must be separately classified, in which case the SCEA Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5A Claim with the same treatment as provided for in this <u>Article IV.H</u>. The SCEA Allowed GUC Claim shall receive treatment as an Allowed Class 5 General Unsecured Claim; <u>provided</u>, <u>however</u>, that SCEA shall receive the following payments on account of the SCEA Allowed GUC Claim: (i) on the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the aggregate amount of $105,440,252.88 in Cash with respect to the first $124,047,356.33 tranche of the SCEA Allowed GUC Claim, which payment shall be in full and final satisfaction of such portion of the SCEA Allowed GUC Claim, and (ii) the second $130,000,000 tranche of the SCEA Allowed GUC Claim shall be paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the SCEA Allowed GUC Claim is classified as a Class 5 or Class 5A General Unsecured Claim (*i.e.*, the Debtor or the Reorganized Debtor, as applicable, shall pay to SCEA the GUC Cash Recovery in the amount of the GUC Distribution Percentage with respect to the $130,000,000 tranche of the SCEA Allowed GUC Claim in full and final satisfaction thereof). To the extent the recoveries received by Holders of Allowed Class 5 General Unsecured Claims increase consistent with the terms of the Committee

Settlement and the Plan, the recovery to SCEA on account of the $130,000,000 tranche of the SCEA Allowed GUC Claim shall increase commensurately to the extent set forth in the Plan.  There shall be no interest, charge, or accrual of any kind payable in respect of the SCEA Allowed GUC Claim other than solely in respect of the second tranche of the SCEA Allowed GUC Claim as set forth in <u>Article IV.L.1.a</u>, if any.

On the Effective Date, except to the extent of the Allowed SCEA Claims in this <u>Article IV.H</u>, each Proof of Claim Filed by or on behalf of any of SCEA shall be deemed withdrawn and expunged, and the Debtor's objection to the SCEA Claims, all related filings by the Debtor and SCEA in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

I.      *BSCEC Claims Settlement*

The treatment of the BSCEC Claims (including the BSCEC Allowed GUC Claim) under the Plan and the BSCEC Claims Settlement, together with the other terms and conditions set forth in the Plan and the Confirmation Order, reflects the compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and each of the BSCEC Trustee and the BSCEC Collateral Trustee, on behalf of itself and the BSCEC Noteholders, on the other hand.  The BSCEC Claims Settlement includes the following material terms and conditions:

Pursuant to the BSCEC Claims Settlement, the BSCEC Allowed GUC Claim shall receive the agreed treatment pursuant to the Plan and the Confirmation Order in accordance with the terms and conditions of the BSCEC Claims Settlement Agreement, which terms and conditions are incorporated into the Plan as if fully set forth herein.  The BSCEC Allowed GUC Claim shall be classified as a Class 5 General Unsecured Claim, unless the Bankruptcy Court determines that it must be separately classified, in which case the BSCEC Allowed GUC Claim shall be deemed separately classified as an Allowed Class 5B Claim, with the same treatment pursuant to the Plan and the Confirmation Order as provided for in the BSCEC Claims Settlement Agreement, and paid out consistent with, and in the same manner as, the Allowed Class 5 General Unsecured Claims regardless of whether the BSCEC Allowed GUC Claim is classified as a Class 5 or Class 5B General Unsecured Claim (*i.e.*, the Debtor or the Reorganized Debtor, as applicable, shall pay the GUC Cash Recovery in the amount of the GUC Distribution Percentage on account of the BSCEC Allowed GUC Claim).  There shall be no interest, charge, or accrual of any kind payable in respect of the BSCEC Allowed GUC Claim other than as set forth in <u>Article IV.L.1.a</u>, if any.

On the Effective Date, except in respect of and to the extent of the BSCEC Allowed GUC Claim in the BSCEC Claims Settlement Agreement and this <u>Article IV.I</u>, each Proof of Claim Filed by or on behalf of any of the BSCEC Trustee or the BSCEC Collateral Trustee, on behalf of itself or the BSCEC Noteholders, shall be deemed withdrawn and expunged, and the Debtor's objections to the applicable BSCEC Claims, all related filings by the Debtor, the BSCEC Trustee, or the BSCEC Collateral Trustee in connection therewith, and the related contested matters shall be deemed withdrawn or otherwise dismissed, in each case, without further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything in the Plan or the Confirmation Order, the BSCEC Claims Settlement Agreement provides for releases to be granted and received by parties (which includes third-party beneficiaries for all purposes in this paragraph and the next paragraph) as set forth therein, and the releases thereunder shall exclusively govern the terms and conditions of the releases (including the timing of such releases) and the scope of any stay, injunction, and exculpation in the Plan between such parties; <u>provided</u>, <u>however</u>, that a party may affirmatively elect to opt into the broader releases, stays, injunctions, and

exculpations as provided for in the Plan as to itself. There shall be no retained Causes of Action in respect of any releasee referenced in Section 5 of the BSCEC Claims Settlement Agreement.

Notwithstanding anything in the Plan Documents, this Article IV.I does not impair or limit the BSCEC Claims Settlement Agreement, which shall remain in full force and effect and shall control in the event of an inconsistency with the Plan Documents. This Article IV.I and any other provision of this Plan may not be amended or modified to adversely affect any rights of the parties under the BSCEC Claims Settlement Agreement without the prior written consent the affected party, which consent may not be unreasonably withheld.

J.    *Tenaska Power Claim Settlement*

The treatment of the Tenaska Power Claim under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Estate, on the one hand, and Tenaska Power, on the other hand. The Tenaska Power Claim Settlement includes the following material terms and conditions:

As of the Effective Date, the Tenaska Power Claim shall be deemed an Allowed Administrative Claim in the aggregate amount of $84,090,140.38, and, notwithstanding anything to the contrary in Article II.A, Tenaska Power shall be paid an amount in Cash equal to 93.6 Cents of such Allowed Claim (*i.e.*, $78,708,371.40) on the Effective Date in full and final satisfaction of such Allowed Claim.

On the Effective Date, each Proof of Claim Filed by or on behalf of any of Tenaska Power shall be deemed withdrawn and expunged without further notice to or action, order, or approval of the Bankruptcy Court.

K.    *Committee Settlement*

The treatment of General Unsecured Claims under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims, Causes of Action, controversies, and disputes between the Debtor and the Committee. The Committee Settlement includes the following material terms and conditions:

1.    Minimum Recovery

Each Holder of an Allowed General Unsecured Claim will be paid by the Reorganized Debtor through the GUC Cash Recovery an aggregate amount in Cash that is sufficient to yield a recovery of no less than 89.5 Cents on account of such Holder's Allowed General Unsecured Claim (without interest, charge, or accrual of any kind, other than pursuant to Article IV.L.1.a), including the BSCEC Allowed GUC Claim and the second tranche of the SCEA Allowed GUC Claim (*i.e.*, the remaining $130,000,000), unless any such Holder agrees to less favorable treatment (including, as to the BSCEC Allowed GUC Claim, pursuant to the BSCEC Claims Settlement Agreement, if any, and as to the SCEA Allowed GUC Claim pursuant to the SCEA Claims Settlement). Holders of Allowed General Unsecured Claims will be the sole beneficiaries of any reduction in the amount of the Debtor's Estimated GUC Pool (*i.e.*, if the amount of Allowed General Unsecured Claims falls below the August 2022 Estimated GUC Pool, including on account of any reduction in the BSCEC Claims as set forth in the BSCEC Claims Settlement Agreement, each Holder of an Allowed General Unsecured Claim will receive a proportionate increase in its recovery under the Plan), unless any such Holder agrees to less favorable treatment. The GUC Distribution

Percentage shall not increase on account of the portion of any Claim held by MUFG that is secured by the MUFG Account, any General Unsecured Claim that is reclassified as a Secured Claim or Administrative Claim or Other Priority Claim, any Cure Claims, Claims for obligations assumed by the Reorganized Debtor under the Plan, any Claims to the extent paid (in full or in part) during the Chapter 11 Case pursuant to a Bankruptcy Court order, and Claims that are expressly deemed withdrawn, expunged, or otherwise disallowed as of the Effective Date under the Plan.  For the avoidance of doubt, no portion of the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payments, shall be reduced to fund the GUC Cash Recovery and, similarly, no portion of the GUC Cash Recovery shall be reduced to fund the ERCOT Market Participant Consideration, including any payments to be made to the ERCOT Escrow Account in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payment.

2.    Tort Claims Treatment

Holders of Class 7 Tort Claims will receive the treatment set forth in Article III.B.7.  To the extent that any Holder of an Allowed Class 7 Tort Claim is entitled to receive payment on account of such Allowed Claim under the applicable General Liability Insurance Policies, the Reorganized Debtor shall pay the amount of the deductible, if any, required under the applicable General Liability Insurance Policies.  As set forth in Articles III.B.7 and III.B.8, each Holder of an Allowed Tort Claim shall have the option to elect Tort Convenience Claim treatment and receive the Tort Convenience Recovery in accordance with the Plan. Each Holder of an Allowed Tort Claim that votes to accept the Plan and affirmatively elects on its Ballot to receive the Tort Convenience Recovery as a Class 8 Tort Convenience Claim shall be deemed to be a Releasing Party under the Plan and to have granted a full release and waiver in respect of the Debtor, the Reorganized Debtor, each of the Members, and each of the foregoing party's respective Representatives on account of such Holder's Claim.

3.    Waiver of Certain Preference Claims

On the Effective Date, the Debtor, on behalf of itself and its Estate, and all of its successors or assigns, and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall release and be deemed to have waived the right to pursue any and all Claims and Causes of Action under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable nonbankruptcy law (including, without limitation, any such Claims and Causes of Action against Holders of Allowed General Unsecured Claims, Allowed General Unsecured Convenience Claims, Allowed Tort Claims, and Allowed Tort Convenience Claims).

4.    Committee Consent, Consultation, and Reporting Rights

The following Plan Documents (or applicable provisions thereof) shall be in form and substance reasonably satisfactory to the Committee; provided that any such consent shall not be unreasonably withheld:  (i) the Plan; (ii) the provisions of the Confirmation Order that implement the terms of the Committee Settlement; and (iii) any amendment, modification, or supplement to the foregoing that is materially adverse to the Committee or Holders of Allowed Claims in Classes 5 through 8.  The Debtor or the Reorganized Debtor, as applicable, shall consult the Committee in respect of the following:  (i) the Debtor's selection of the Effective Date, (ii) the form of the Exit Facility Credit Agreement, and (iii) whether to include in the Plan Supplement any other document or agreement that the Debtor determines may be necessary or advisable to effectuate the Restructuring Transactions or that are otherwise contemplated by this Plan, but solely to the extent that such document or agreement affects the treatment of Allowed Claims in Classes 5 through 8.  The Committee and the Prepetition Revolving Agent shall also receive any reporting provided pursuant to the Exit Facility Credit Agreement until final distributions are made on all Allowed General Unsecured Claims, which reporting shall be subject to the Protective Order.

For the avoidance of doubt, any documents or information belonging to the Members and provided to the Committee pursuant to this paragraph shall be subject to the Protective Order.

      5.    <u>Plan Support</u>

The Committee will recommend that all creditors, including, without limitation, the Holders of Claims under the Prepetition Revolving Loan Documents and Holders of Tort Claims, support the Committee Settlement and vote to accept the Plan (including by providing a letter or other insert to be included in the Disclosure Statement and solicitation materials).  The Committee will not change its recommendation, and will not, directly or indirectly, oppose, join in opposition, or otherwise assist with any objection or other challenge to the Plan or to Confirmation unless the Bankruptcy Court finds that the Disclosure Statement contained material omissions or misstatements sufficient to require a re-solicitation of the Plan.  In addition, neither the Committee, its members, nor its professionals will share any "work product," analysis, or other confidential information with any other party that does not support the Committee Settlement or the Plan; <u>provided</u>, <u>however</u>, that the Committee and its professionals will not be prohibited or otherwise prevented from requesting that information already known to the Committee and its professionals be included in the Disclosure Statement to the extent that the Committee or its professionals reasonably believe that the inclusion of such information is necessary to ensure that the Disclosure Statement provides "adequate information" as defined in section 1125 of the Bankruptcy Code.

L.    *Plan Defaults*

      1.    <u>Reorganized Debtor Defaults</u>

The Reorganized Debtor's failure to timely pay any portion of the ERCOT Market Participant Consideration to ERCOT or the Deferred GUC Obligations to the applicable Holders shall constitute a "Plan Default."  If the Reorganized Debtor determines that it will be unable to timely pay any portion of the ERCOT Market Participant Consideration or the Deferred GUC Obligations on or before the date that any such Plan payment is due, the Reorganized Debtor shall, no later than seven (7) days before any such Plan payment is due, File a notice (and serve a copy of such notice on the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties) with the Bankruptcy Court (i) stating that the Reorganized Debtor's Board, in its sole discretion, has authorized the Reorganized Debtor to, as applicable, promptly sell a portion of its T&D Assets or obtain other financing and, in either case, (ii) confirming (a) that such sale transaction or financing is reasonably likely to result in net-sale proceeds or financing proceeds sufficient to enable the Reorganized Debtor to cure the applicable Plan Default and (b) the anticipated timing of any such transaction (any such notice, a "<u>Plan Default Cure Notice</u>").  After Filing a Plan Default Cure Notice, the Reorganized Debtor shall use commercially reasonable efforts to promptly market and sell the applicable T&D Assets or otherwise obtain such financing, as the case may be.

After the Reorganized Debtor Files a Plan Default Cure Notice, the Reorganized Debtor shall provide the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, and the GUC Notice Parties with reasonable access to nonprivileged documents and information concerning the status of any proposed sale of T&D Assets or efforts to obtain other financing.  Any such documents and information provided to the Consenting Members, the RUS Secured Parties, ERCOT, the Committee, or the GUC Notice Parties, as applicable, shall remain subject to the Protective Order and be treated by ERCOT as Protected Information.  For the avoidance of doubt, any documents or information belonging to the Members shall be subject to the Protective Order, and no document or information of the Reorganized Debtor or the Members shall be shared with any Entity (including any principal of such Entity) that is a competitor of the Reorganized Debtor or a potential purchaser of any Generation Assets or T&D Assets.

a.    *Post-Effective Date and Default Interest*

The unpaid portion of the Interim Distribution Obligations shall bear interest at a rate of 6.0% *per annum* from and including the Effective Date through the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date; provided, however, that, if such Interim Distribution Obligations are paid in full on or before the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, any accrued interest shall be deemed to have been irrevocably waived and forgiven.  If the Interim Distribution Obligations are not paid in full on or before the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, any accrued interest shall become immediately due and payable as of the Interim Distribution Deadline or, if earlier, ten days following the Generation Sale Closing Date, subject to subsection (b) below.  If a Plan Default occurs in respect of the Interim Distribution Obligations, the unpaid portion of such Interim Distribution Obligations shall bear interest due and payable on a monthly basis, subject to subsection (b) below, at a rate of 8% *per annum* from and after the date of such Plan Default until the defaulted portion of such Interim Distribution Obligations are paid in full.

If a Plan Default occurs in respect of an Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment (other than the Market Participant Deferred Cash Recovery payments contemplated to be made in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payments), the amount of such defaulted Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment, as applicable, shall bear interest due and payable on a monthly basis, subject to subsection (b) below, at a rate of 8% *per annum* from and after the date of such Plan Default until the defaulted portion of such Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment, as applicable, is paid in full; provided, however, that if such defaulted Installment Market Participant Cash Payment or Market Participant Deferred Cash Recovery payment is paid in full within 30 days of the occurrence of the applicable Plan Default, any accrued interest shall be deemed to have been irrevocably waived and forgiven.

b.    *Stay of Enforcement Actions and Standstill Periods*

(i)     ERCOT, the Committee, the GUC Notice Parties, and Holders of General Unsecured Claims are entitled, and the Reorganized Debtor shall not dispute that they are entitled, to exercise any remedies available under applicable law following the occurrence of a Plan Default, subject to the provisions of this subsection (b), including, first obtaining an order of the Bankruptcy Court in accordance with the procedures of this subsection (b) that finds that a Plan Default has occurred and is continuing.

(ii)     With respect to a Plan Default on account of any of the Additional Market Participant Cash Payment, the Deferred GUC Obligations, and the *first* installment of the Installment Market Participant Cash Payments, if the Reorganized Debtor has timely delivered a Plan Default Cure Notice then (x) all Entities and all Holders of General Unsecured Claims (other than ERCOT, the Committee, and the GUC Notice Parties) shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the 12 months following such Plan Default, and (y) each of ERCOT, the Committee, and the GUC Notice Parties shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the first 90 days following such Plan Default other than filing a motion with the Bankruptcy Court seeking entry of an order, upon notice and a hearing, that a Plan Default has occurred and enforcing the terms of the Plan and Confirmation Order and authorizing the exercise of any remedies (including specific performance) available under applicable law (an "Enforcement Motion") and taking any action or exercising any remedy permitted by law after entry of an order by the Bankruptcy Court granting such Enforcement Motion; provided, however, that, no hearing on any such Enforcement Motion shall be scheduled to occur before the 90th day following the occurrence of the applicable Plan Default described in

this paragraph; provided, further, however, that such 12-month prohibition in (x) above shall terminate and all other Holders of General Unsecured Claims and other Entities with standing shall be entitled to file an Enforcement Motion if the Reorganized Debtor has not, on or before the 90th day following the occurrence of the applicable Plan Default, paid interest accrued in accordance with subsection (a) above from the Effective Date to the date of the Plan Default at the rate of 6% *per annum* and interest accrued from the date of the Plan Default to the date of payment at 8% *per annum*.

       (iii)      With respect to a Plan Default on account of any *subsequent* Installment Market Participant Cash Payment or *subsequent* Market Participant Deferred Cash Recovery payment (other than the Market Participant Deferred Cash Recovery payments contemplated to be made in connection with the Additional Market Participant Cash Payment and the Installment Market Participant Cash Payments), if the Reorganized Debtor has timely delivered a Plan Default Cure Notice, then ERCOT and all other Entities shall be prohibited from taking any action or enforcing any remedy against the Reorganized Debtor or its property in respect of such Plan Default during the 60 days following such Plan Default except that, after such Plan Default, ERCOT may File an Enforcement Motion with the Bankruptcy Court; provided, however, that no hearing on any such Enforcement Motion shall be scheduled to occur before the 30th day following the occurrence of the applicable Plan Default described in this paragraph.

       (iv)      Notwithstanding anything to the contrary in this <u>Article IV.L</u>, and for the avoidance of doubt, no Entity may enforce any remedy against the Reorganized Debtor or its property in respect of a Plan Default without first obtaining an order from the Bankruptcy Court that a Plan Default has occurred and is continuing. Nothing herein shall prohibit the Reorganized Debtor from disputing that a Plan Default has occurred or is continuing, the amount of any such Plan Default, or the calculation of any interest owed on account of any such Plan Default.

       c.     *Pro Rata Sharing*

In the event that the proceeds of the sale of T&D Assets or other financing obtained pursuant to <u>Article IV.L</u> are insufficient to pay the unpaid portion of the Additional Market Participant Cash Payment and the Deferred GUC Obligations, such proceeds shall be applied to the payment of the Additional Market Participant Cash Payment and the Deferred GUC Obligations pro rata, without preference or priority as to timing or amount. The foregoing does not obviate the obligation to pay all ERCOT Market Participant Consideration and the Deferred GUC Obligations in full.

       d.     *No Default Uplift*

In no event shall any amount be assessed to or collected from Market Participants through the Default Uplift process described in Protocols §§ 9.19.1 and 9.19.2 in connection with any Plan Default.

       2.     <u>Creditor Defaults</u>

An act or omission by a Holder of a Claim in contravention of the provisions of this Plan shall be an event of default under this Plan. Upon an event of default, the Reorganized Debtor may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtor in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (i) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (ii) enforce the Plan by order of specific performance; (iii) award judgment against such defaulting creditor in favor of the Reorganized Debtor in an amount, including interest, to compensate the Reorganized Debtor for the damages caused by such default; and (iv) make such other order as may be equitable that does not materially alter the terms of the Plan.

Nothing in the preceding paragraph (i) authorizes the Reorganized Debtor to appear, sign, and/or accept the documents required under the Plan on behalf of the United States or any of its agencies; (ii) permits a remedy against the United States or its agencies that would be unavailable under applicable law; (iii) require the RUS Secured Parties to perform any obligation not contained in the Amended and Restated RUS Secured Documents, RUS Contingency Exit Note, or the AU8 FFB Note; or (iv) permits the Reorganized Debtor to collect attorney's fees in contravention of the Anti-Deficiency Act, 31 U.S.C. §§ 1341 *et seq*.

Nothing herein shall prohibit the applicable creditor from disputing that such an event of default has occurred or is continuing.

M.     *New Organizational Documents and Senior Management*

    1.     <u>New Organizational Documents</u>

From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the New Organizational Documents, if any, and the Reorganized Debtor (subject to any approvals required under the Bylaws) shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. The Bylaws shall contain such provisions as are necessary to satisfy the provisions and ensure the implementation of the Plan, subject to further amendment and revision thereof after the Effective Date as permitted by applicable law. Under the Debtor's existing organizational documents and, as applicable, the New Organizational Documents, the Debtor has no power to issue certificates of stock, its principal purpose being to generate (through the Generation Sale Closing Date), procure (through March 1, 2023), and transmit wholesale electricity at the lowest cost to the Members and, under applicable law, the Debtor shall operate as a nonprofit electric cooperative pursuant to the ECCA. Accordingly, the requirement of section 1123(a)(6) of the Bankruptcy Code does not apply to the Debtor or this Plan.

    2.     <u>Senior Management</u>

On the Effective Date, the current directors and officers of the Debtor shall remain in their respective roles and capacities as directors and officers of the Reorganized Debtor, as applicable, except that:

        a.     Clifton Karnei (the Debtor's Executive Vice President & General Manager) shall exit his existing roles and cease his employment with, or otherwise retire from, the Reorganized Debtor on or before the earlier of (i) March 31, 2023 or (ii) the date that is 30 days after the Generation Sale Closing Date ("<u>Karnei Resignation Date</u>"). On the Karnei Resignation Date, Mr. Karnei's employment by the Reorganized Debtor and his position as an officer of the Reorganized Debtor shall cease and end for all purposes; <u>provided</u>, <u>however</u>, that, if the Generation Sale Closing Date has not occurred on or before March 31, 2023, the Reorganized Debtor may, in its sole discretion, retain Mr. Karnei as a consultant pursuant to a commercially reasonable consulting agreement through the date that is 30 days after the Generation Sale Closing Date. Other than as expressly permitted above, from and after the Karnei Resignation Date: Mr. Karnei: (i) shall not be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor including while acting as a consultant to the Reorganized Debtor; and (ii) shall completely disassociate himself, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest in, either now or hereafter. The foregoing prohibitions include, but are not limited

to, Mr. Karnei being further retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

b.   Josh Clevenger (the Debtor's Vice President of Power Supply) and Travis "Dean" Thrall (the Debtor's Vice President of Generation) shall exit their existing roles and cease their employment with, or otherwise retire from, the Reorganized Debtor on or before the date that is 30 days after the Generation Sale Closing Date ("Clevenger/Thrall Resignation Date"). On the Clevenger/Thrall Resignation Date, Mr. Clevenger's and Mr. Thrall's employment by the Reorganized Debtor and their positions as officers of the Reorganized Debtor shall cease and end for all purposes. From and after the Clevenger/Thrall Resignation Date: (i) neither Mr. Clevenger nor Mr. Thrall shall be or otherwise act as a "Principal" (as that term is defined in Protocols § 16.1.2) of the Reorganized Debtor; and (ii) Mr. Clevenger and Mr. Thrall shall both completely disassociate themselves, both directly and indirectly, from the Reorganized Debtor and any entity the Reorganized Debtor may have an interest in, either now or hereafter. The foregoing prohibitions include, but are not limited to, either Mr. Clevenger or Mr. Thrall being retained as a consultant by the Reorganized Debtor, serving on the Board, or being a Principal of ACES.

c.   Philip Segrest (the Debtor's General Counsel) shall exit his existing role as General Counsel of the Reorganized Debtor on the date that is 30 days after the Effective Date ("Segrest Resignation Date"). Effective as of the Segrest Resignation Date and thereafter, neither Mr. Segrest nor any other lawyer at Segrest & Segrest PC shall hold the title of "General Counsel" (or any equivalent title) or be employed by the Reorganized Debtor in any in-house legal capacity; provided, however, that the Reorganized Debtor may, in its sole discretion, obtain any legal services from Mr. Segrest and Segrest & Segrest PC at any time before, on, and after the Effective Date.

In addition to the above, no employee of the Debtor currently or formerly in its power supply or generation functions may become a Principal of the Debtor or the Reorganized Debtor. To the extent that there are any other anticipated changes in the Reorganized Debtor's directors and officers, the Debtor shall, pursuant to section 1129(a)(5) of the Bankruptcy Code, identify such changes (including any new directors and officers) in the Plan Supplement at or before the Confirmation Hearing.

3.   Management Severance Plan

The Management Severance Plan shall be implemented by the Reorganized Debtor on the Effective Date without any further action by the Reorganized Debtor's Board or the Bankruptcy Court.

N.   *Corporate Action*

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects and, to the extent taken before the Effective Date, ratified in all respects without any requirement for further action by Holders of Claims, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including, as applicable (i) the selection and appointment of the directors and officers for the Reorganized Debtor; (ii) the implementation of the Restructuring Transactions; and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtor, and any corporate action required by the Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action

by the Members, directors, or officers of the Debtor or the Reorganized Debtor.  On or before the Effective Date, as applicable, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Reorganized Debtor, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under nonbankruptcy law.

O.      *Employee Obligations*

Except as (i) otherwise provided in the Plan; (ii) identified on the Rejected Contracts Schedule; (iii) was rejected by the Debtor pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the Effective Date, the Reorganized Debtor shall honor the Debtor's Employee Obligations and, to the extent not already satisfied, the Debtor's Employee Obligations shall become obligations of the Reorganized Debtor in accordance with their terms.  To the extent the Employee Obligations are Executory Contracts and (i) such Executory Contracts are not identified on the Rejected Contracts Schedule, (ii) were not previously rejected pursuant to sections 365 or 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the Effective Date, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided that the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-referenced written contracts, agreements, policies, programs and plans.  Notwithstanding anything set forth in this paragraph to the contrary, the cure provisions of Article V hereof shall apply to any Employee Obligation arising from an Executory Contract assumed in accordance with the provisions of Article V.

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtor shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the bonus, retention, or severance programs approved by the Bankruptcy Court in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein, if any, in accordance with the terms thereof.

On the Effective Date, the Reorganized Debtor shall continue and assume the Pension Plan in accordance with and subject to the terms of the Pension Plan and applicable law, including, to the extent applicable, the timely payment of any (i) unfunded benefit liabilities of the Pension Plan under 29 U.S.C. § 1362(a); (ii) due and unpaid minimum funding contributions owed to the Pension Plan under 26 U.S.C. §§ 412 and 430, and 29 U.S.C. §§ 1082 and 1083; and (iii) flat-rate, variable-rate, and termination premiums owed to the PBGC under 29 U.S.C. §§ 1306(a)(7) and 1307.  The Pension Plan is and shall remain subject to such applicable requirements under Title IV of ERISA and the Internal Revenue Code of 1986, as amended.

On the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall provide to the PBGC a Pension Plan account statement or other document evidencing that the above minimum funding obligations, if any, have been timely paid, and if all Pension Plan obligations owed as of the Effective Date have been paid timely—*i.e.*, variable-rate and flat-rate premiums owed to PBGC and minimum funding obligations owed to the Pension Plan, then all Proofs of Claim filed by the PBGC with respect to the Pension Plan shall be deemed withdrawn automatically on the Effective Date and without any further notice to or action, order, or approval of the Bankruptcy Court.  No provision of the Disclosure Statement, Plan, Confirmation Order, section 1141 of the Bankruptcy Code, or any other document filed in the Debtor's Chapter 11 Case shall be construed to discharge, release, or relieve the Reorganized Debtor, its successors, individuals, or any "parties in interest" (as defined in 29 U.S.C. § 1002(14)) from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plan or from claims of the PBGC

with respect to the Pension Plan.  The PBGC and the Pension Plan will not be enjoined or precluded from enforcing such liability with respect to the Pension Plan as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, section 1141 of the Bankruptcy Code, or any other document filed in the Debtor's Chapter 11 Case.

Notwithstanding anything to the contrary in this Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtor shall continue to honor all retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), if any, as and to the extent required by the agreements giving rise to such obligations.

P.      *Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtor shall continue to honor its obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtor operates or the Debtor previously operated and (ii) the Debtor's (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation; (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation; and (c) workers' compensation insurance policies and programs.  All Proofs of Claim filed by the Debtor's current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's claims, defenses, Causes of Action, or other rights under applicable law with respect to any such contracts, agreements, policies, programs, and plans.

Q.      *Ordinary Course Professionals*

Any Ordinary Course Professional is authorized to set off any undisputed Claim for prepetition fees and expenses against any amount held on retainer for such Ordinary Course Professional.

R.      *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan, on the Effective Date:  (i) the obligations of the Debtor under the Prepetition Revolving Loan Documents and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor or giving rise to any Claim shall be cancelled or extinguished and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against the Debtor shall be released and discharged; provided that notwithstanding the releases set forth in Article VIII of the Plan, Confirmation, or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions or other applicable treatment under the Plan as provided herein; provided, further, that nothing in this section shall effectuate a cancellation of any Indemnification Obligation.  For the avoidance of doubt, the Reorganized Debtor shall retain the interests in any other Entity in which the Debtor or the Reorganized Debtor has an interest as of the Effective Date, and, except as otherwise set forth herein, the Membership Certificates shall not be cancelled.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor or its interests, as a result of the cancellations, terminations,

satisfaction, releases, or discharges provided for in this Article IV.R shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

Nothing in this Article IV.R shall cancel or otherwise operate upon any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor held by the RUS Secured Parties.

S.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments, or documents; (ii) the creation of any Lien, mortgage, deed of trust or other security interest; (iii) any transfers, directly or indirectly, of property (including the Generation Assets) pursuant to the Plan or Plan Documents; (iv) any assumption, assignment, or sale by the Debtor of its interests in Unexpired Leases of nonresidential real property or Executory Contracts pursuant to section 365(a) of the Bankruptcy Code; (v) the grant of collateral, if any, under the Exit Facility Documents and the RUS Exit Financing; and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, or the Restructuring Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

T.      *Preservation of Causes of Action*

Except as otherwise set forth in the Plan and on the Retained Causes of Action Schedule, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtor's Causes of Action, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **The Debtor and the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action that have not been released by the Plan or are on the Retained Causes of Action Schedule.**

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor, as applicable, shall not pursue any and all available Causes of Action against it.  Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtor and the Reorganized Debtor, as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtor reserves and shall retain such Causes of Action of the Debtor notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

**Notwithstanding anything to the contrary contained in this <u>Article IV.T</u>, on the Effective Date, all Avoidance Actions that are not specifically identified in the Retained Causes of Action Schedule shall be released by the Debtor.**

U.       *Insurance Policies and Surety Bonds*

     1.       <u>Director and Officer Liability Insurance</u>

On the Effective Date, the Reorganized Debtor shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtor's and its Affiliates' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or before the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of each of the D&O Liability Insurance Policies.

After the Effective Date, neither the Debtor nor the Reorganized Debtor shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on the Effective Date with respect to conduct occurring before the Effective Date, and all officers, directors, managers, and employees of the Debtor and its Affiliates who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date; <u>provided</u> that nothing in this paragraph shall preclude a reduction in the amount of available policy proceeds under the D&O Liability Insurance Policies through payment of claims under any D&O Liability Insurance Policies to or on behalf of the Debtor or the Reorganized Debtor.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan and no Proof of Claim need be Filed with respect thereto.

     2.       <u>Assumption of Insurance Policies</u>

On the Effective Date, each Insurance Policy shall be assumed by the Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was identified on the Rejected Contracts Schedule, (ii) was rejected by the Debtor pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending on the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of such Insurance Policies.

     3.       <u>Insurance Neutrality</u>

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) the rights or obligations of any Insurer or (ii) any rights or obligations of the Debtor or the Reorganized Debtor arising

out of or under any Insurance Policy.  The Insurers, the Debtor, and Reorganized Debtor, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable to the Debtor, as existed before the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.  Nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

4.   Surety Bonds

On the Effective Date, (i) all of the Debtor's obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtor; (ii) surety bonds and related indemnification and collateral agreements entered into by the Debtor will be vested and performed by the Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order; and (iii) the Reorganized Debtor shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business.  Nothing in the Plan or Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of the Debtor or any surety bond provider with respect to any unexpired surety bond agreement or related indemnification or collateral agreement.

V.   *Notice of Effective Date*

On the Effective Date, the Debtor shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Contracts Schedule; (ii) have been previously rejected, assumed, or assumed and assigned by a Final Order; (iii) previously expired or terminated pursuant to their own terms; (iv) are the subject of a motion that is pending on the Effective Date; or (v) have an ordered or requested effective date of rejection that is after the Effective Date; provided that nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan, document, or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; provided, further, that the Debtor reserves the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including, but not limited to, seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assignments, and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan and the Assumed and Rejected Contracts Schedules pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, the Confirmation Order, or in the Assumed and Rejected Contracts Schedules, assumptions, assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be deemed to be effective as of the Effective Date.  The Debtor is authorized to abandon any of the Debtor's personal property at or on the leased

premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtor, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

The Debtor reserves the right to alter, amend, modify, or supplement the Assumed and Rejected Contract Schedules, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including the Effective Date. As such, the Assumed and Rejected Contract Schedules are not final, and are subject to ongoing review.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The Consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which the Debtor or Reorganized Debtor, as applicable, is a party.

The provisions of the Plan relating to the Member Settlement set forth in Article IV.F shall control to the extent that any provision of this Article V relating to the All Requirements Contracts and the Amended ARCs is inconsistent with the provisions of Article IV.F.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of 30 days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be deemed disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or any property of the foregoing, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Except as otherwise set forth herein, Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as

General Unsecured Claims and shall be treated in accordance with <u>Article III.B.5</u> of the Plan, and such Claims may be objected to in accordance with this Plan.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtor or the Reorganized Debtor, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event any Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan are not listed in the Assumed Contracts Schedule, the Cure Claim for such Executory Contracts and Unexpired Leases shall be deemed to be zero dollars ($0.00).  On and after the Effective Date, the Reorganized Debtor may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Contracts Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtor or the Reorganized Debtor, as applicable, may otherwise agree, or as determined by the Bankruptcy Court by a Final Order.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor, as applicable, of such Cure Claim.

**Any party that fails to timely object to the assumption or assumption and assignment of its Executory Contract or Unexpired Lease (including the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Contracts Schedule, shall be (i) deemed to have consented to the assumption or assumption and assignment of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Contracts Schedule (including a cure amount of $0.00) and from asserting any Claim against the Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor or the Reorganized Debtor assumes such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

D.    *Assumption Dispute Resolution*

Any counterparty to any Executory Contract and Unexpired Lease shall have the time prescribed by the Disclosure Statement Order, or other applicable order of the Bankruptcy Court, to object to the proposed assumption, assumption and assignment, or related Cure Claim listed on the Assumed Contracts Schedule or other applicable cure notice.  In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, assignment,

or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "Assumption Dispute") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtor may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before the resolution of such Assumption Dispute; provided that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease.  To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtor, the Debtor may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

If the Debtor is unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim before the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing.

E.      *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or the Reorganized Debtor, as applicable, under any such Executory Contract or Unexpired Lease.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtor pursuant to rejected Executory Contracts or Unexpired Leases.

F.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, and not assigned to a non-Debtor Entity, will be performed by the Debtor or the Reorganized Debtor in the ordinary course of its operations.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the inclusion nor exclusion of any Executory Contract or Unexpired Lease on the Debtor's Schedules, the Assumed and Rejected Contracts Schedules, nor anything contained in the Plan or the Confirmation Order, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. Each of the Debtor and the Reorganized Debtor reserves all rights with respect to any Causes of Action or other rights, claims, and defenses in respect of any Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions Generally*

Except as otherwise provided herein, the Debtor or the Reorganized Debtor, as applicable, in its capacity as Disbursing Agent, shall make all distributions under this Plan to the Holders of Allowed Claims in accordance with the terms of this Plan. Such distributions shall be made to Holders of Allowed Claims on behalf of the Debtor. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

B.      *Distribution Record Date*

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred 20 or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

C.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are Disputed, shall receive the amount of the distributions that the Plan provides for the applicable Holders of Allowed Claims in each applicable Class as set forth herein beginning on the Effective Date, and such initial and subsequent distributions shall be made in the manner provided in this Plan; provided, however, that Allowed Administrative Claims and Allowed Priority Tax Claims shall be paid in accordance with Article II.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as

otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or other charges or accruals of any kind on any such Claims or the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

If any distribution is made after the Effective Date in respect of any Interim Distribution Obligation (other than a regularly scheduled payment to ERCOT due on a date before the Generation Sale Closing Date or, if the Generation Sale Closing Date has not occurred, due before the Interim Distribution Deadline), the Reorganized Debtor shall contemporaneously make a like payment (equivalent on a pro rata basis) on all other Interim Distribution Obligations so that all Interim Distribution Obligations are paid *pari passu*.

D.     *Rights and Powers of Disbursing Agent*

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, Holders of Claims against the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by this Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of this Plan, or applicable law, except for actions or omissions to act arising solely out of the willful misconduct, gross negligence, malpractice, actual fraud, criminal conduct, or *ultra vires* acts of such Disbursing Agent as determined by a Final Order of a court of competent jurisdiction.  No Holder of a Claim or other party in interest shall have or pursue any Claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with this Plan or for implementing provisions of this Plan, except for actions or omissions to act arising solely out of the willful misconduct, gross negligence, actual fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent as determined by a Final Order of a court of competent jurisdiction.  Except as otherwise agreed by the Reorganized Debtor, the Disbursing Agent shall be empowered to, in its capacity as Disbursing Agent and at its sole expense, (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

The Reorganized Debtor shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtor) with the amounts of Claims and the identities and addresses of Holders of Claims as of the Distribution Record Date, in each case, as set forth in the Debtor's books and records.

1.     Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtor's books and records as of the Distribution Record Date.  Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute Securities, property (including Cash), notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date.

2.     Expenses Incurred On or After the Effective Date

To the extent the Disbursing Agent is an Entity other than the Reorganized Debtor, except as otherwise agreed in writing by the Reorganized Debtor, any compensation, reimbursements, fees, expenses,

and other amounts (including any professionals' fees and expenses) incurred by such Disbursing Agent on or after the Effective Date (including any taxes) shall be the sole responsibility of such Disbursing Agent.

E.   *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.   <u>Delivery of Distributions</u>

        a.   *Delivery of Distributions in General*

Except as otherwise provided in the Plan, distributions to Holders of an Allowed Claim shall be made as follows:  (i) at the address set forth in the Debtor's books and records (unless such Holder listed a different address on the Proof of Claim, if any, Filed in respect of such Allowed Claim); (ii) at the address set forth in any written notice of address changes actually received by the Reorganized Debtor after the Effective Date; or (iii) to any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. Subject to this <u>Article VI</u>, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Disbursing Agent shall not incur any liability whatsoever on account of any distributions under the Plan except solely to the extent of its willful misconduct, gross negligence, actual fraud, malpractice, criminal conduct, or *ultra vires* acts as determined by a Final Order of a court of competent jurisdiction.

        b.   *Delivery of Distributions on Account of the Allowed ERCOT Claim*

ERCOT shall be deemed to be the sole Holder of the Allowed ERCOT Claim and shall receive all distributions in respect of the Allowed ERCOT Claim under the Plan.

        c.   *Delivery of Distributions on Account of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims*

The Reorganized Debtor (or other applicable Disbursing Agent designated by the Reorganized Debtor), in its capacity as the Disbursing Agent under the Plan, shall make all distributions to Holders of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims in Cash. Distributions to Holders of Allowed General Unsecured Claims shall be made as follows:  the Initial GUC Cash Payment shall be made to Holders of Allowed General Unsecured Claims on the Effective Date, the Additional GUC Cash Payment shall be made to Holders of Allowed General Unsecured Claims on the Generation Sale Closing Date (or within ten days thereafter, but, in any case, such payment must be paid on or before the Interim Distribution Deadline), and the Residual GUC Cash Payment, if any, shall be made on the date when all General Unsecured Claims have either been Allowed or expunged.

        d.   *Distributions on Account of Allowed Tort Claims*

As of the Effective Date, Holders of Allowed Tort Claims will be permitted to pursue such Allowed Claims to final judgment or settlement and attempt to recover any liquidated final judgment or settlement on account of such Allowed Claims solely from the Available Coverage and in no event will the Debtor, its Estate, or the Reorganized Debtor be liable to such Holder in any way whatsoever with respect to such Holder's Claim except that, to the extent that a Holder of an Allowed Tort Claim is entitled to payment under the applicable General Liability Insurance Policies, the Reorganized Debtor shall pay the amount of the deductible, if any, required thereunder.

e.      *Delivery of Distributions on Account of Allowed Tort Convenience Claims*

The Reorganized Debtor (or other applicable Disbursing Agent designated by the Reorganized Debtor), in its capacity as the Disbursing Agent under the Plan, shall make all distributions to Holders of Allowed Tort Convenience Claims.

2.      <u>Minimum Distribution</u>

Holders of Allowed Claims entitled to distributions of $100 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to <u>Article VIII</u>, and its Holder shall be forever barred pursuant to <u>Article VIII</u> from asserting that Claim against the Reorganized Debtor or its property.

3.      <u>Distributions after Effective Date</u>

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

4.      <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon thereafter as is reasonably practicable without interest or other charge or accrual of any kind; <u>provided</u> that nothing herein shall require the Disbursing Agent to attempt to locate Holders of undeliverable distributions; <u>provided</u>, <u>further</u>, that any such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. Subject to the last sentence of this paragraph (solely with respect to General Unsecured Claims), after such date, all unclaimed property or interests in property shall automatically revert to and shall be property of the Reorganized Debtor without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.  Any unclaimed property or interests in property with respect to General Unsecured Claims shall be returned to the applicable Disbursing Agent for inclusion in the Residual GUC Cash Payment, if any, or, if Allowed General Unsecured Claims are paid in full, the Reorganized Debtor.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Disbursing Agent of an intent to accept a particular distribution and has not actually accepted such distribution within 180 days; (iii) responded to the Disbursing Agent's request for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

F.      *Satisfaction of Claims*

Any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

G.      *Securities Registration Exemption*

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the offering, issuance, and distribution of any Securities under the Plan, whether on the Effective Date or any other date of distribution thereafter, pursuant to the terms of the Plan or the

Confirmation Order, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (i) the Securities Act and all rules and regulations promulgated thereunder and (ii) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities.  Except as otherwise set forth herein, pursuant to section 1145 of the Bankruptcy Code, any issuance of Securities contemplated by the Plan will be freely transferable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments; and (c) any other applicable regulatory approval.

H.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Taxing Authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Disbursing Agent may require, as a condition to receipt of a distribution, that the Holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Reorganized Debtor, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its property.

I.    *Cancellation of Liens and Surrender of Cancelled Instruments or Securities*

Except to the extent otherwise provided in the Plan, upon the payment or other satisfaction of an Allowed Secured Claim (including an Allowed Other Secured Claim), the Holder of such Allowed Secured Claim shall deliver to the Debtor or Reorganized Debtor, as applicable, any collateral or other property of the Debtor or the Reorganized Debtor held by such Holder, and any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Secured Claim that may be required in order to terminate any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents.

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to this Article VI.I, except to the extent otherwise provided in the Plan.

J.    *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to

the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

K.      *No Postpetition or Default Interest on Claims*

Except to the extent set forth in Article IV.L or as otherwise required by an order of the Bankruptcy Court or applicable bankruptcy law, neither postpetition nor default interest shall accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest of any kind accruing on or after the Petition Date on any such Claim.

L.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Reorganized Debtor may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Reorganized Debtor may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claim they may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless (i) the Reorganized Debtor has consented and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable nonbankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

M.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be deemed disallowed or otherwise satisfied and shall be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any party.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Disbursing Agent on account of such Claim, such Holder shall, within two weeks thereof, repay or return any distribution held by or transferred to the Holder to the applicable Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Insurers

Distributions under the Plan to each holder of an Allowed Insured Claim against the Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; provided that there shall be deducted from any distribution under the Plan on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such Holder in respect of such Allowed Insured Claim.  To the extent that one or more of the Debtor's Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy

Court; _provided_ that the Debtor or the Reorganized Debtor, as applicable, shall provide 21 days' advance written notice to the Holder of such Claim before any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

        3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions under the Plan to Holders of Allowed Claims and/or payments by Insurers of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers, under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses (including the applicable Causes of Action retained pursuant to the Plan) that the Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order. All settled Claims approved before the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties and parties in interest. The Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

B.      *Claims Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the authority to (i) File, withdraw, or litigate to judgment objections to Claims; (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court shall, with respect to all Claims, vest in the Reorganized Debtor; _provided_ that the Reorganized Debtor shall consult with the Committee with respect to the settlement or compromise of any Disputed General Unsecured Claim above $1,000,000 and the Reorganized Debtor shall consult with the Committee on a quarterly basis after the Effective Date on the claims-reconciliation process of Class 5 General Unsecured Claims; _provided_, _further_, that, if after the initial Claims Objection Deadline, the Debtor has not objected to other Filed (but not yet Allowed) General Unsecured Claims above $1,000,000 and has not informed the Committee that it intends to object to such Claims by the subsequent Claims Objection Deadline, the Committee shall, subject to advance notice and consultation with the Reorganized Debtor, have the right to file or litigate to judgment objections to such General Unsecured Claims above $1,000,000 and the Reorganized Debtor shall provide reasonable assistance in such litigation. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately before the Effective Date with respect to any Disputed Claim.

C.    *Reservation of Rights to Object to Claims*

The failure of the Debtor or the Reorganized Debtor, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtor or the Reorganized Debtor, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or nonbankruptcy forum.

D.    *Disputed and Contingent Claims Reserve*

On or before the Effective Date, the Debtor shall establish one or more Disputed Claim reserves (including a reserve for Disputed General Unsecured Claims as set forth herein), which reserves shall be funded in respect of Disputed Claims with amounts that, based on the face amounts of the underlying Proofs of Claim, would be sufficient to pay the Holders of such Disputed Claims their respective pro rata recoveries in accordance with the Plan as if such Claims were Allowed at the time when such distributions are made (*e.g.*, with respect to Disputed General Unsecured Claims, the Debtor shall only reserve such amounts as sufficient to make the Initial GUC Cash Payment that would otherwise be made to Allowed General Unsecured Claims on the Effective Date, with the balance reserved at the time the Additional GUC Cash Payment is made to Holders of Allowed General Unsecured Claims to the extent such General Unsecured Claims remain Disputed).  On or after the Effective Date, the Reorganized Debtor may establish any other reserves, in its sole discretion, for Claims that are contingent, unliquidated, or have not yet been Allowed, in an amount or amounts as reasonably determined by the Reorganized Debtor, consistent with the Proof of Claim Filed by the applicable Holder.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. § 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Debtor or the Reorganized Debtor, as applicable, shall be required to comply with the relevant rules.

E.    *Estimation of Claims*

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and may be used as evidence in any supplemental proceedings, and the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 7 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Adjustment to Claims Register Without Objection*

Any duplicate Claim, any Claim (Filed or scheduled) that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtor upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Time to File Objections to Claims*

Any objections to a Claim shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.  For the avoidance of doubt, the Committee may object to a General Unsecured Claim to the extent set forth in Article VII.B.

H.      *Disallowance of Claims*

Subject to the waivers and releases of Causes of Action contemplated in Articles IV.K.3 and T above, any Claims held by any Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor, as applicable.

All Proofs of Claim Filed on account of an Indemnification Obligation or Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation or Employee Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or otherwise agreed by the Debtor or the Reorganized Debtor, as applicable, any and all Claims, or any portion thereof, shall be deemed disallowed and any related Proofs of Claim, if any, shall be expunged as of the Effective Date without any further notice, action, order, or approval of the Bankruptcy Court to the extent that (i) such Claim has been disallowed by Final Order, settlement, or other agreement; (ii) the related Proofs of Claim were Filed after the applicable Claims Bar Date; (iii) such Claim is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely Filed; or (iv) such Claim is not listed on the Schedules and as to which no Proof of Claim has been timely Filed, and, in each case, Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the applicable Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

I.      *Amendments to Proofs of Claim*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.  Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

J.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

K.      *No Distributions Pending Allowance*

Except as otherwise set forth herein, no payment or distribution provided under the Plan shall be made on account of the Disputed portion of any Claim unless and until such Disputed portion of such Claim becomes an Allowed Claim.  Any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed.

L.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  Except as otherwise set forth in the Plan, as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing a Disputed Claim becomes a Final Order, the distributions (if any) to which such Holder is entitled under the Plan as of the Effective Date or thereafter, without any interest, dividends, or other charges or accruals of any kind other than as set forth in Article IV.L.1.a, shall be paid to the Holder of such Allowed Claim on account of such Allowed Claim.

M.      *Single Satisfaction of Claims*

In no case shall the aggregate value of all property received or retained under the Plan or otherwise on account of any Allowed Claim exceed 100 Cents of such Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good faith compromise and settlement in full and final satisfaction, discharge, and release of all Claims and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein (including the Plan Settlements) shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and the Estate and Causes of Action against other Entities.

B.      *Discharge and Satisfaction of Claims*

Pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has voted to accept or reject the Plan.  Any default or "*event of default*" by the Debtor or its Affiliates with respect to any Claim that existed immediately before or on account of the Filing of the Chapter 11 Case shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.

C.      *Releases by the Debtor*

**Notwithstanding anything contained herein to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and each of the RUS Secured Parties is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally and forever released and discharged by the Debtor, the Reorganized Debtor, and the Estate, including any successors to the Debtor or the Estate's representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Cause of Action against the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the Debtor's capital structure, management, assets or operation thereof, including any draws under or any Claims or Causes of Action related to the Prepetition Revolving Loan Documents), the assertion or enforcement of rights and remedies against the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Plan, the business or contractual relationship between the Debtor and any Released Party or RUS Secured Parties, the Debtor's in- or out-of-court restructuring efforts, the Debtor's purchase or procurement of products and services from ERCOT or any other Entity during Winter Storm Uri, any Avoidance Actions (including any Avoidance Actions in respect of the ERCOT Prepetition Transfers), intercompany transactions between or among the Debtor and its Affiliates, the Chapter 11 Case, the Plan Settlements, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility and**

the DIP Facility Documents, the Exit Facility or the Exit Facility Documents, the RUS Exit Financing or the Amended and Restated RUS Secured Notes Documents, the Participating Member Securitization or the Participating Member Securitization Documents, the Amended ARCs, or this Plan (including, for the avoidance of doubt, the Plan Supplement and the Plan Documents), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Transactions, the Plan, the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility or the Exit Facility Documents, the RUS Exit Financing or the Amended and Restated RUS Secured Notes Documents, the Participating Member Securitization or the Participating Member Securitization Documents, the Amended ARCs, the Chapter 11 Case, the Filing of the Chapter 11 Case, the Plan Settlements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of securities of any kind pursuant to or in connection with this Plan, or the distribution of property of any kind under or in connection with this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under this Plan or any document, instrument, or agreement executed to implement this Plan (including the Plan Supplement); (ii) the rights of Holders of Allowed Claims to receive distributions under this Plan; or (iii) any retained Causes of Action set forth in the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (iv) a good-faith settlement and compromise of the Claims or Causes of Action released by the Debtor release; (v) in the best interest of the Debtor and the Estate and all Holders of Claims; (vi) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (vii) a bar to the Debtor, the Reorganized Debtor, the Estate, or any other Entity asserting any Claim or Cause of Action released pursuant to the Debtor release.

D.      *Releases by Holders of Claims*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the Debtor's capital structure, management, assets, or operation thereof, including any draws under or any Claims or Causes of Action related to the Prepetition Revolving Loan Documents), the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Plan (including the ERCOT

Claim), the business or contractual relationship between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, the Debtor's purchase or procurement of products and services from ERCOT or any other Entity during Winter Storm Uri, any Avoidance Actions (including any Avoidance Actions in respect of the ERCOT Prepetition Transfers), intercompany transactions between or among the Debtor and its Affiliates, the Chapter 11 Case, the Plan Settlements, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility, the Participating Member Securitization Documents, the Amended ARCs, or this Plan (including, for the avoidance of doubt, the Plan Supplement and the Plan Documents), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the DIP Facility and the DIP Facility Documents, the Exit Facility, the Participating Member Securitization, the Amended ARCs, or the Confirmation Order, the Chapter 11 Case, the Filing of the Chapter 11 Case, the Plan Settlements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of securities of any kind pursuant to or in connection with this Plan, or the distribution of property of any kind under or in connection with this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any Claim or Cause of Action against a non-Debtor Market Participant in respect of the Unaffected Proceedings; (ii) any Claims related to any act or omission that is determined in a final order to have constituted willful misconduct, gross negligence, or actual fraud, solely to the extent as determined by a final order of a court of competent jurisdiction; (iii) any obligations of any party under this Plan or any document, instrument, or agreement executed to implement this Plan (including the Plan Supplement); (iv) the rights of Holders of Allowed Claims to receive distributions under this Plan; (v) the rights of any current employee of the Debtor under any applicable employment agreement or plan; or (vi) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party releases, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (iv) a good-faith settlement and compromise of the Claims or Causes of Action released by the third party releases; (v) in the best interest of the Debtor and the Estate and all Holders of Claims; (vi) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (vii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third party releases.

E.     *Exculpation*

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, including, without limitation, the formulation, preparation, dissemination, negotiation, or Filing of the Plan and any related prepetition transactions (including any draws under or Claims or Causes of Action related to the Prepetition Revolving Loan

Documents), the Disclosure Statement, the DIP Facility, the Exit Facility, the RUS Exit Financing, the Participating Member Securitization, the Amended ARCs, the Plan Settlements, the Plan Supplement and the Plan Documents, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case, any preference, fraudulent transfer, or other Avoidance Actions, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of securities pursuant to or in connection with this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date to the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the exculpations set forth in this **Article VIII.E.**

F.  *Injunction*

Upon entry of the Confirmation Order, all Holders of Claims and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, Representatives, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim that is extinguished, discharged, or released in connection with this Plan.  Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to **Article VIII** or otherwise under the Plan or Confirmation Order, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, the Exculpated Parties, and/or the Released Parties:

    i.    commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action;

    ii.    enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Causes of Action;

    iii.    creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action;

    iv.    asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a Claim or

otherwise that such party asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

v.    commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Causes of Action released, settled, or enjoined in connection with this Plan or the Confirmation Order.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order or under any other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.  The injunction in this Plan shall extend to any successors and assigns of the Debtor and the Reorganized Debtor and their respective property and interests in property.

G.    *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that the Releasing Party does not know of or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses, Claims, or Causes of Action.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party, including the provisions of California Civil Code section 1542.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

H.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, and applicable law, all Governmental Units and any other Entity subject to section 525 of the Bankruptcy Code under applicable law shall be prohibited from discriminating against the Debtor and the Reorganized Debtor or denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to (including, for the avoidance of doubt, the Reorganized Debtor's or its Affiliates' registration as a Transmission Service Provider or a Distribution Service Provider), conditioning such a grant to, discriminating with respect to such a grant against, denying, or restricting employment to, terminating the employment of, or discriminating with respect to employment against, the Debtor or the Reorganized Debtor, or another Entity with whom the Debtor or the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

I.      *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

K.      *Release of Liens*

Except (i) with respect to the Liens, if any, securing (a) the Exit Facility; (b) the Amended and Restated RUS Secured Notes Documents; and (c) to the extent elected by the Debtor with respect to an Allowed Other Secured Claim in accordance with Article III.B.2, or (ii) as otherwise provided in the Plan or the Confirmation Order or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Reorganized Debtor to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor or the Reorganized Debtor.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (before or in conjunction with the occurrence of the Effective Date) or waived pursuant to Article IX.B):

1.      the Plan and the Plan Documents shall be in form and substance reasonably satisfactory to the Debtor;

2.      the final version of the Plan Supplement (including all schedules, exhibits, and other documents contained therein) shall have been Filed and all documents contained therein shall be consistent in all material respects with the Plan and otherwise in form and substance reasonably satisfactory to the Debtor;

3.      the Plan, the Confirmation Order, and the applicable Plan Documents, shall be in form and substance reasonably satisfactory to the Consenting Members as set forth in Article I.H, and each of the Consenting Members and the Debtor shall have executed the Amended ARCs;

4.      the Plan and the provisions of the Confirmation Order that implement the ERCOT Settlement shall be in form and substance reasonably satisfactory to ERCOT;

5.      the Plan and the provisions of the Confirmation Order that implement the Committee Settlement shall be in form and substance reasonably satisfactory to the Committee as set forth in Article IV.K.4;

6.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance satisfactory to the Debtor, and the Confirmation Order shall approve the Disclosure Statement on a final basis and the Confirmation of the Plan (including the Member Settlement, the ERCOT Settlement, the SCEA Claims Settlement, the Committee Settlement, any other Plan Settlements not already approved by the Bankruptcy Court, the Tenaska Power Claim Settlement, the Participating Member Securitization, the Plan Supplement, and the releases, exculpation, and other provisions in Article VIII) and such Confirmation Order shall not have been stayed, modified, or vacated;

7.      the Exit Facility Documents, the Amended and Restated RUS Secured Notes Documents, and the applicable Participating Member Securitization Documents shall have been executed by the parties thereto and shall be effective in accordance with their respective terms (except for any conditions that will be satisfied in conjunction with, or are otherwise related to, the occurrence of the Effective Date);

8.      each Member shall have deposited an amount equal to its TAA Balance, if any, with the TAA Escrow Agent in accordance with Article IV.E.1;

9.      the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

10.     the Administrative and Priority Claims Reserve shall have been established and funded in accordance with Article II.A;

11.     the ERCOT Escrow Account shall have been established and funded in accordance with the Plan;

12.     the United States shall have funded the AU8 FFB Note in full;

13.     the Professional Fee Reserve shall have been established and funded in accordance with Article II.C.3; and

14.     subject to and in accordance with the DIP Credit Agreement and the DIP Orders, the reasonable and documented unpaid fees and expenses of the attorneys of the DIP Agent and the DIP Lenders shall have been paid in Cash.

B.      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article IX.A may be waived only if waived in writing by the Debtor and, as applicable, (i) in respect of the condition precedent in Article IX.A.2, (a) solely to the extent of the Amended ARCs, the Exit Facility Documents, and the RUS Exit Financing, the Debtor and the RUS Secured Parties, and (b) solely to the extent of the Exit Facility Documents, the Exit Facility Agent; (ii) in respect of the condition precedent in Article IX.A.3, the Debtor and the applicable Consenting Members; (iii) in respect of the condition precedent in Article IX.A.4, the Debtor and ERCOT; (iv) in respect of the condition precedent in Article IX.A.5, the Debtor and the Committee; (v) in respect of the condition precedent in Article IX.A.7, the Debtor, the Committee, the RUS Secured Parties, and the Consenting Members; (vi) in respect of the condition precedent in Article IX.A.8, the Debtor, the RUS Secured Parties, and the Members; provided, however, that a Member shall not have

the right to withhold or otherwise condition its consent to the waiver of Article IX.A.8 in respect of its own TAA Balance; (vii) in respect of the condition precedent in Article IX.A.11, the Debtor and ERCOT; and (viii) in respect of the condition precedent in Article IX.A.12, the Debtor and the RUS Secured Parties.  For the avoidance of doubt, the Committee, the Members, ERCOT, and the RUS Secured Parties shall not unreasonably withhold their respective consent to the waiver of the applicable conditions precedent in Article IX.A.

C.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the Plan Supplement, or any other Plan Document shall (i) constitute a waiver or release of any Claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders of Claims, or any other Entity in any respect.

D.      *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to ERCOT's, the Consenting Members', and the Committee's rights set forth herein, the Debtor reserves the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to any applicable restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Subject to ERCOT's, the Consenting Members', and the Committee's rights set forth herein, the Debtor has the right to amend the treatment of any Class under the Plan as permitted by the Bankruptcy Code and Bankruptcy Rules.  For the avoidance of doubt, the Debtor is prohibited from seeking amendments or modifications that would directly or indirectly cause any particular Holder of an Allowed General Unsecured Claim to receive more than any other Holder of an Allowed General Unsecured Claim on more favorable terms.

B.      *Effect of Confirmation*

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact, even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if stated as findings of fact.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the Member Settlement, the ERCOT Settlement, the SCEA Claims Settlement, the Committee Settlement, or the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims; (b) prejudice in any manner the rights of the Debtor or any other Entity, including the Holders of Claims; (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity; or (d) be used by the Debtor or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.  For the avoidance of doubt, to the extent that the Debtor has entered into any Participating Member Securitization Documents after the entry of the Confirmation Order, the Debtor shall continue to perform its obligations thereunder notwithstanding the revocation or withdrawal of the Plan or the non-occurrence of the Effective Date.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of, or related to, the Chapter 11 Case, the Plan, the Confirmation Order, or the Restructuring to the fullest extent permitted under applicable law, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims; provided that the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtor or the Reorganized Debtor, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Debtor or the Reorganized Debtor, as applicable, amending, modifying, or supplementing, after the Confirmation Date, the schedule of Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to Article V; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any motions or applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all settlements (including the Plan Settlements), contracts, instruments, releases, indentures, and other agreements or documents created in connection with or otherwise relating to the Plan or any of the Plan Documents;

9.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan or the Confirmation Order (including with respect to the Plan Settlements);

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, the Plan Documents, or the Confirmation Order, including, without limitation, any order to enforce sections 525, 1123, 1141, or 1142 of the Bankruptcy Code and the provisions for discharge, satisfaction, release, and injunctive relief with respect to Claims provided for or otherwise addressed under the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Plan Documents, the Confirmation Order, or the Plan Supplement;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein (including, without limitation, the Restructuring Transactions);

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20.    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, or scope of the release or exculpation provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.    enforce all orders entered by the Bankruptcy Court;

23.    hear any other matter not inconsistent with the Bankruptcy Code;

24.    enter an order concluding or closing the Chapter 11 Case; and

25.    enforce the compromise, settlement, injunction, release, and exculpation provisions set forth in Article VIII or the Confirmation Order.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement or other Plan Documents that have a jurisdictional, forum selection, or dispute resolution clause that requires actions to be brought in a court other than the Bankruptcy Court and any disputes concerning documents contained in the Plan Supplement or any Plan Document that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A and the applicable provisions of the Bankruptcy Code, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, any and all Holders of Claims (irrespective of whether such Holders of Claims have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements (including the Plan Settlements), compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address below or by downloading such exhibits and documents from the Debtor's restructuring website at https://cases.stretto.com/Brazos or the Bankruptcy Court's website at www.txs.uscourts.gov.

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor with respect to the Holders of Claims before the Effective Date.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, Representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtor or Reorganized Debtor shall be served on:

| | |
|---|---|
| Debtor & Reorganized Debtor | Brazos Electric Power Cooperative, Inc. |
| | 7616 Bagby Avenue |
| | Waco, Texas  76712 |
| | Attn.: Clifton Karnei; Johnny York; Khaki Bordovsky |
| | ckarnei@brazoselectric.com |
| | jyork@brazoselectric.com |
| | kbordovsky@brazoselectric.com |
| | |
| | - and - |
| | |
| | Segrest & Segrest P.C. |
| | 28015 US-84 |
| | McGregor, Texas  76657 |
| | Attn.: Philip R. Segrest; JaNelle Cobb |
| | philip.segrest@segrestfirm.com |
| | janelle.cobb@segrestfirm.com |
| | |
| | with copies to: |
| | |
| Counsel to Debtor & Reorganized Debtor | Norton Rose Fulbright US LLP |
| | 1301 McKinney Street, Suite 5100 |
| | Houston, Texas  77010 |
| | Attn: Jason L. Boland; Julie Goodrich Harrison; Maria Mokrzycka |

jason.boland@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York  10019
Attn: James A. Copeland
james.copeland@nortonrosefulbright.com

- and -

O'Melveny & Myers LLP
2501 North Harwood Street, Suite 1700
Dallas, Texas  75201
Attn: Louis R. Strubeck; Laura Smith;
Nick Hendrix
lstrubeck@omm.com
lsmith@omm.com
nhendrix@omm.com

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

The Plan, Plan Supplement, and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

I.      *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided that, at the request of the Debtor or the Reorganized Debtor, as applicable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, further, that any such alteration or interpretation shall be satisfactory to the Debtor in all respects.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtor or the Reorganized Debtor (as applicable) and, to the extent set forth herein, any affected Plan Settlement party, ERCOT, the Consenting Members, or the Committee; and (iii) nonseverable and mutually dependent.

J.      *Dissolution of Committee and Bankruptcy Advisory Committee*

On the Effective Date, the Committee and the Bankruptcy Advisory Committee shall be deemed to have automatically dissolved; underlined provided that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) prosecuting fee applications, and any relief related thereto, for compensation by the Committee's Professionals; (ii) in connection with any pending litigation or contested matter, including appeals, to which the Committee is a party; (iii) in connection with any appeals of the Confirmation Order to which the Committee is a party; and (iv) in connection with the Committee's post-Effective Date rights and actions as set forth in the Plan; provided, however, that, on and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall not be liable for or otherwise required to pay any fees or expenses incurred by the Committee or its professionals except for the reasonable and necessary fees or expenses incurred with respect to the matters identified in clauses (i) through (iv) above; provided, that any reasonable and necessary fees or expenses incurred in clauses (ii) through (iv) above are subject to the Committee Post-Effective Date Budget; provided, however, that, notwithstanding anything to the contrary herein, if a Plan Default has occurred and is continuing with respect to the Deferred GUC Obligations, reasonable and necessary fees and expenses incurred by the Committee or its professionals with respect to such Plan Default shall not be subject to the Committee Post-Effective Date Budget, but to the extent that the Reorganized Debtor disputes any such fees and expenses (including with respect to the reasonableness or necessity thereof), the Reorganized Debtor shall pay the undisputed portion of such fees and expenses and, if the parties are unable to consensually resolve any such dispute, the Bankruptcy Court shall retain jurisdiction to determine such disputed fees and expenses.  Unless otherwise provided in the Plan, fees and expenses incurred pursuant to this Article XII.J shall be paid in the ordinary course by the Reorganized Debtor.  On and after the Effective Date, the Committee's professionals shall include (i) one counsel and (ii) one financial advisor (other than with respect to final fee applications).  The Committee's professionals shall at all times use reasonable best efforts to use minimal staffing and efficient resources in connection with any such matters the Committee survives for post-Effective Date work (*i.e.*, items (i) through (iv) above and any applicable Plan Default) until the Committee's final dissolution.  The Committee will dissolve automatically upon the earlier of (i) the entry of an order by the Bankruptcy Court closing the Chapter 11 Case and (ii) the completion of the Committee's post-Effective Date work.

Upon the dissolution of the Committee and the Bankruptcy Advisory Committee, the members of such committees and their respective Professionals will cease to have any duty, obligation, or role arising from or related to the Chapter 11 Case and shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

Notwithstanding the dissolution of the Committee and the Bankruptcy Advisory Committee and release of their respective members from further duties and responsibilities, all such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or any Bankruptcy Court-appointed mediator, which shall remain in full force and effect according to their terms.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its Representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under or in connection with the Plan and any previous plan, if any, and, therefore, neither any of such parties or individuals nor the Reorganized Debtor will have any liability for the violation of any applicable

law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under or in connection with the Plan and any previous plan.

L.      *Expedited Tax Determination*

The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtor for all taxable periods through the Effective Date.

M.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

N.      *Waiver or Estoppel*

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement or the Debtor's or Reorganized Debtor's right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Claims and Noticing Agent before the Confirmation Date.

O.      *Closing of Chapter 11 Case*

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

[*Signature on following page*]

Respectfully submitted, as of October 27, 2022

BRAZOS ELECTRIC POWER COOPERATIVE, INC.
The Debtor and Debtor-in-Possession


By:     _/s/ Clifton Karnei_____
Name:  Clifton Karnei
Title:    Executive Vice President & General Manager

**Exhibit A**

BSCEC Claims Settlement Agreement

## SETTLEMENT AGREEMENT (AMENDED)

This Settlement Agreement, as amended, (the "Agreement") is made and entered into as of September 14,  2022 (the "Agreement Date") by and between: (i) Brazos Electric,[1] the debtor in the chapter 11 case currently pending before the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") as *In re Brazos Electric Power Cooperative, Inc.*, No. 21-30725 (the "Chapter 11 Case"); and (ii)(a) Janet S. Northrup, not individually, but solely as the chapter 7 trustee (the "Chapter 7 Trustee") for the bankruptcy estate (the "BSCEC Estate") of Brazos Sandy Creek Electric Cooperative, Inc. ("BSCEC") in the chapter 7 case currently pending before the Bankruptcy Court as *In re Brazos Sandy Creek Electric Cooperative, Inc.*, No. 22-30682 (the "Chapter 7 Case"), and (b) Computershare Trust Company, N.A., the collateral trustee (the "Collateral Trustee") for the Secured Parties (as defined in the Collateral Indenture, Security and Assignment Agreement by and between BSCEC and the Collateral Trustee concerning the Notes (as defined below) dated November 4, 2009 (the "Collateral Indenture")) with respect to the 6.54% Series 2009A Senior Secured Notes due June 30, 2024 issued by BSCEC (the "Notes").  Brazos Electric, the Chapter 7 Trustee, and the Collateral Trustee shall herein be collectively referred to as the "Parties" in the plural and as a "Party" in the singular.

## RECITALS

**WHEREAS**, on March 1, 2021 (the "Chapter 11 Petition Date"), Brazos Electric filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") initiating the Chapter 11 Case before the Bankruptcy Court;

**WHEREAS**, on March 16, 2022, Brazos Electric filed its *Emergency Motion for an Order (I) Authorizing the Debtor to Reject Certain Power Purchase Agreements and (II) Granting Related Relief* [Chapter 11 Case, Dkt. No. 1622], which sought the approval of the proposed rejection of the Power Purchase Agreement dated September 1, 2008, between Brazos Electric and BSCEC (the "BSCEC PPA");

**WHEREAS,** on March 18, 2022 (the "Chapter 7 Petition Date"), BSCEC filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court initiating the Chapter 7 Case before the Bankruptcy Court;

**WHEREAS**, the Bankruptcy Court, on April 12, 2022, entered the *Amended Stipulation and Agreed Order Regarding Rejection of Certain Power Purchase Agreement* [Chapter 11 Case, Dkt. No. 1692], which provided for the rejection of the BSCEC PPA but reserved certain rights, including as to the effective date of rejection;

**WHEREAS**, on April 8, 2022 and May 23, 2022, respectively, the Collateral Trustee filed in the Chapter 11 Case Claim No. 758 asserting prepetition claims relating to the BSCEC PPA and Claim No. 772 asserting a general unsecured claim of at least $434,967,371 based on, *inter alia*,

---

[1]    "Brazos Electric" means Brazos Electric Power Cooperative, Inc. or its bankruptcy estate, as currently existing, and as reorganized under any Chapter 11 Plan, including any successors and assigns to any of the foregoing.

the Consent and Agreement dated November 4, 2009 (the "Consent and Agreement") and the rejection of the BSCEC PPA (collectively, the "Collateral Trustee's Claims");

**WHEREAS**, on April 14, 2022 and May 23, 2022, respectively, the Chapter 7 Trustee filed in the Chapter 11 Case Claim No. 761 asserting prepetition claims, including, without limitation, a general unsecured claim in the amount of $11,497,185.45, and Claim No. 773 asserting a general unsecured rejection damages claim in the amount of at least $438,296,721.00 based the rejection of the BSCEC PPA (collectively, the "Chapter 7 Trustee's Claims" and together with the Collateral Trustee's Claims, the "Claims");

**WHEREAS**, on June 25, 2022, Brazos Electric filed the *Debtor's Objection to Proof of Claim Nos. 761 and 773 Filed by Janet Northrup, Solely in Her Capacity as Chapter 7 Trustee for Brazos Sandy Creek Electric Cooperative, Inc.* [Chapter 11 Case, Dkt. No. 1917] and *Debtor's Objection to Proof of Claim Nos. 758 and 772 Filed by Computershare Trust Company, N.A.* [Chapter 11 Case, Dkt. No. 1920] (collectively, the "Objections"), initiating a contested matter (the "Contested Matter") to determine the allowance of the Claims filed by the Chapter 7 Trustee and the Collateral Trustee;

**WHEREAS**, on July 11, 2022, the Bankruptcy Court entered the *Amended Agreed Scheduling Order Regarding Debtor's Objections to Brazos Sandy Creek Electric Cooperative, Inc.'s Proofs of Claim Nos. 761 and 773 [Docket No. 1917] and Computershare Trust Company, N.A.'s Proofs of Claim Nos. 758 and 772 [Docket No. 1920]* [Chapter 11 Case, Dkt. No. 1989] (the "Scheduling Order"), which provided for an expedited schedule for the Contested Matter, including, among other things, pre-discovery summary judgment motions on certain agreed threshold legal issues, and on July 15, 2022, in accordance with the Scheduling Order, the Parties filed the *Notice of Joint Statement of Issues for Summary Judgment* [Chapter 11 Case, Dkt. No. 2037] (the "Statement of Issues");

**WHEREAS**, in accordance with the Scheduling Order, on July 27, 2022, Brazos Electric filed the *Debtor's Motion for Partial Summary Judgment Regarding the BSCEC Trustee and Computershare Claims* [Chapter 11 Case, Dkt. No. 2062], the Chapter 7 Trustee filed the *Chapter 7 Trustee's Motion for Summary Judgment* [Chapter 11 Case, Dkt. No. 2063] and the *Memorandum of Law in Support of Chapter 7 Trustee's Motion for Summary Judgment* [Chapter 11 Case, Dkt. No. 2064], and the Collateral Trustee filed the *Joinder of Computershare Trust Company, N.A. to Chapter 7 Trustee's Motion for Summary Judgment and Memorandum in Support* [Chapter 11 Case, Dkt. No. 2067], and on August 10, 2022, the Chapter 7 Trustee filed the *Chapter 7 Trustee's Response to Debtor's Motion for Partial Summary Judgment Regarding the BSCEC Trustee and Computershare Claims* [Chapter 11 Case, Dkt. No. 2102], the Collateral Trustee filed the *Joinder of Computershare Trust Company, N.A. to Chapter 7 Trustee's Response to Debtor's Motion for Partial Summary Judgment Regarding the BSCEC Trustee and Computershare Claims* [Chapter 11 Case, Dkt. No. 2103], and Brazos Electric filed the *Debtor's Response to Chapter 7 Trustee's Motion for Summary Judgment* [Chapter 11 Case, Dkt. No. 2104], and the respective positions of the Parties having been set forth in such pleadings;

**WHEREAS**, since the filing of the Objections, the Parties engaged in good faith discussions with the assistance of the court-appointed mediator in the Chapter 11 Case regarding a potential resolution of the Claims;

**WHEREAS**, pursuant to the Note Purchase Agreement dated November 4, 2009 (the "<u>NPA</u>") and the Collateral Indenture, the Collateral Trustee has been authorized and directed by the required Noteholders to enter into this Agreement, which is binding on the Noteholders;

**WHEREAS**, the Parties, at arms' length, have negotiated this settlement to provide for a comprehensive and consensual resolution of the various issues related to the rejection of the BSCEC PPA as between Brazos Electric, on the one hand, and the Chapter 7 Trustee and the Collateral Trustee, on the other hand; and

**WHEREAS**, after consideration of the merits of the Claims and the Objections, the Parties have each determined in their business judgment that this Agreement is in each of their respective best interests because continued litigation will be expensive, may involve further discovery and expert opinions on various issues and matters, and the results of the litigation are uncertain.

## <u>AGREEMENT</u>

**NOW, THEREFORE**, in consideration of the mutual undertakings set forth below, the Parties agree as follows:

1.      The recitals set forth in the "WHEREAS" clauses above are incorporated herein fully by this reference.

2.      Except for the downward adjustment set forth in Section 4 below, the BSCEC Estate and the Collateral Trustee have a single allowed general unsecured claim (the "<u>BSCEC Allowed Claim</u>") in the amount of one-hundred sixty-five million dollars ($165,000,000) (the "<u>Claim Amount</u>") against Brazos Electric in the Chapter 11 Case.  The BSCEC Allowed Claim is not subject to setoff, recoupment, withholding, avoidance, recharacterization, subordination, or any other defense, claim, or cause of action by any party in interest.

3.      Any chapter 11 plan filed in the Chapter 11 Case (any "<u>Chapter 11 Plan</u>") shall provide the following:

        a.      Subject to Sections 3(c)–(d) and 4 below, the BSCEC Allowed Claim and the Chapter 7 Trustee and the Collateral Trustee (collectively, including any successor or assignee, the "<u>Holder</u>"), shall receive the same treatment as all other allowed general unsecured claims and all holders of any such allowed general unsecured claims (collectively, the "<u>GUCs</u>") under any Chapter 11 Plan; *provided*, *however*, that, at a minimum, the Holder shall receive, on account of the BSCEC Allowed Claim, indefeasible cash distributions equal in the aggregate to not less than eighty-seven percent (87%) of the Claim Amount, *i.e.*, one-hundred forty-three million five-hundred fifty thousand dollars ($143,550,000) (the "<u>Minimum Distribution Amount</u>"), payable in

*ACTIVE 681833782v8*

cash as follows: (x) approximately sixty percent (60%) of the Minimum Distribution Amount, *i.e.*, approximately eighty-six million one-hundred thirty thousand dollars ($86,130,000), on the effective date (the "<u>Effective Date</u>") of a confirmed Chapter 11 Plan (such distribution, as modified by Section 3(c) below, the "<u>Effective Date Distribution</u>"); and (y) the remaining approximately forty percent (40%) of the Minimum Distribution Amount, *i.e.*, approximately fifty-seven million four-hundred twenty thousand dollars ($57,420,000) as promptly as is practicable after the Effective Date (including partial distributions when available pursuant to any Chapter 11 Plan) (such distribution(s), as modified by Section 3(c) below, the "<u>Post-Effective Date Distribution(s)</u>" and together with the Effective Date Distribution, the "<u>Distributions</u>").  Except as otherwise set forth in Section 24 of this Agreement or as otherwise agreed by the Chapter 7 Trustee and the Collateral Trustee (notice of which shall be provided to Brazos Electric), the Distributions shall be made to the BSCEC Estate.  For the avoidance of doubt, the Post-Effective Date Distribution(s) contemplated in this Section 3(a) would be subject to Article IV(L)(1)(a, b, and c) of the Chapter 11 Plan filed at Docket No. 2294-1 in the Chapter 11 Case if such provisions remain unchanged, the Effective Date of such Chapter 11 Plan occurs, and Brazos Electric either complies with this Agreement or any noncompliance is waived.

b.      Brazos Electric shall sell its generation or other assets, obtain financing, or take such other steps as are necessary to make the Distributions.  The Chapter 7 Trustee and the Collateral Trustee shall be entitled to reasonable information and updates regarding such efforts and distributions, subject to the execution of a customary non-disclosure agreement acceptable to the Parties.  Brazos Electric shall also provide the Chapter 7 Trustee, the Collateral Trustee, and their respective advisors and counsel, periodic reports by teleconference or televideo with Brazos Electric's advisors and counsel and an opportunity to ask questions and receive answers in respect of Brazos Electric's progress regarding such efforts and distributions, including, without limitation, the Chapter 11 Case and any Chapter 11 Plan.  For the avoidance of doubt, notwithstanding anything set forth herein, neither the Chapter 7 Trustee nor the Collateral Trustee shall be entitled to receive any confidential information belonging solely to the members of Brazos Electric (the "<u>Members</u>") that is in the possession of Brazos Electric.

c.      To the extent the terms of any Chapter 11 Plan concerning the treatment of or recovery to or for GUCs are improved or otherwise increased as compared to Section 3(a)–(b) above (for example, without limitation, distributions in excess of the Minimum Distribution Amount on the BSCEC Allowed Claim, faster payment or other assurances of payment, or enhanced information or reporting rights), this Agreement shall be deemed amended to provide for and any such Chapter 11 Plan shall likewise provide for such improved or increased treatment or recovery for the Holder with respect to

4

the BSCEC Allowed Claim (but under any circumstances the Minimum Distribution Amount shall be payable to the Holder in cash).

d.    The following timeline of post-Effective Date payment and related enforcement rights:

(i)    all distributions to GUCs to be made after the Effective Date (including the Post-Effective Date Distribution(s)) must be paid in full in cash on or before the earlier of the date that is (1) 10 days after the Generation Sale Closing Date (as defined in the Chapter 11 Plan at Docket No. 2294-1 in the Chapter 11 Case) or (2) the one-year anniversary of the occurrence of the Effective Date (such earlier date, the "Post-Effective Date Deadline"), and that post-Effective Date Brazos Electric may make partial distributions to GUCs (including the Holder) when available (for the avoidance of doubt, the distributions contemplated in this Section 3(d)(i) would be subject to Article IV(L)(1)(a, b, and c) of the Chapter 11 Plan filed at Docket No. 2294-1 in the Chapter 11 Case if such provisions remain unchanged, the Effective Date of such Chapter 11 Plan occurs, and Brazos Electric either complies with this Agreement or any noncompliance is waived),

(ii)    certain parties, including the Chapter 7 Trustee and Collateral Trustee, have certain information rights and, subject to subsection (d)(iii) below, may enforce any failure to make all GUC distributions (including the Post-Effective Date Distribution(s)) pursuant to subsection (d)(i) above in full in cash on or before the Post-Effective Date Deadline, and

(iii)    although certain parties, including the Chapter 7 Trustee and Collateral Trustee, may enforce such payment obligations, (x) a hearing on such relief shall not occur any earlier than 90 days after Post-Effective Date Deadline and (y) no other collection or enforcement action can be taken by any party in interest during such 90-day period.

4.    Notwithstanding anything to the contrary herein, the BSCEC Allowed Claim amount shall be subject to a downward adjustment if the Net Sales Proceeds (as defined below) from a sale in the Chapter 7 Case under section 363 of the Bankruptcy Code of the BSCEC Estate's interest in the assets related to the Sandy Creek Energy Station (collectively, a "Sale") exceed the amount of one-hundred fifty million dollars ($150,000,000) (the "Sale Floor").  Such downward adjustment shall be equal to 114.94% of the amount by which the Net Sale Proceeds exceed the Sale Floor.  (For example, without limitation, if the Net Sales Proceeds are one-hundred fifty-five million dollars ($155,000,000), the BSCEC Allowed Claim amount shall be reduced from one-hundred sixty-five million dollars ($165,000,000) to one-hundred fifty-nine million two-hundred fifty-three thousand dollars ($159,253,000).)  Under no circumstance, however, can the adjustment

5

in this Section 4 cause any amount to be owed or payable to Brazos Electric or the amount of the BSCEC Allowed Claim to decrease below $0.00.  The Holder shall provide Brazos Electric, and its respective advisors and counsel, periodic reports by teleconference or televideo with the Holder's advisors and counsel and an opportunity to ask questions and receive answers regarding the status of the sale process to the extent the provision of such reports or answers would not chill bidding or otherwise adversely impact the sale process.  Brazos Electric and its advisors and counsel, shall be bound by the mediation confidentiality agreement in respect of such reports or answers.  Any such downward adjustment occurring after the Effective Date, regardless of the timing of the Effective Date Distribution, shall be applied first to reduce the Post-Effective Date Distribution(s) payable by Brazos Electric under Section 3 above.  For purposes of this Section 4, "Net Sale Proceeds" means the proceeds of a Sale paid to the Chapter 7 Trustee on behalf of the BSCEC Estate (regardless of whether those proceeds are redirected to pay BSCEC Estate creditors directly) net of (i) the following specifically associated with such Sale: professional fees, expenses, Transfer Taxes,[2] recording charges, and other like customary closing costs; and (ii) the Chapter 7 Trustee's commission for distribution of Sale proceeds from the BSCEC Estate.

5.      Subject to the rights and obligations arising under this Agreement and subject to the approval of this Agreement by a final order of the Bankruptcy Court, and effective as of the Effective Date and the receipt of any Effective Date Distribution due, Brazos Electric irrevocably releases (i) BSCEC, the BSCEC Estate, the Chapter 7 Trustee, their current or former officers, directors, agents, professionals, attorneys, and employees, and each of their predecessors in interest, successors, and assigns, as to each of the foregoing solely in such capacities, of and from any and all obligations, causes of action, claims, liabilities, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, from the beginning of time to the Effective Date, arising out of, by reason of, or related to Brazos Electric, BSCEC, the BSCEC Estate, the Chapter 7 Trustee, the Collateral Trustee, the Noteholders, the BSCEC PPA, the Consent and Agreement, the Collateral Indenture, the NPA, and the Notes; (ii) the Collateral Trustee, its predecessors, successors, assigns, and co-trustees, and their current or former officers, directors, agents, members, managers, professionals, attorneys, and employees, as to each of the foregoing solely in such capacities, of and from any and all obligations, causes of action, claims, liabilities, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, from the beginning of time to the Effective Date, arising out of, by reason of, or related to Brazos Electric, BSCEC, the BSCEC Estate, the Chapter 7 Trustee, the Collateral Trustee, the Noteholders, the BSCEC PPA, the Consent and Agreement, the Collateral Indenture, the NPA and the Notes; and (iii) the current or prior holders of (or managers or investment managers of current or prior holders of) the Notes and each of their respective agents, members, managers, officers, directors, professionals, attorneys, and employees, and each of their predecessors in interest, successors, and assigns (the "Noteholders"), as to each of the foregoing solely in such capacities, of and from any and all obligations, causes of action, claims, liabilities, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, from the beginning of time to the Effective Date, arising out of, by reason of, or related to Brazos Electric, BSCEC, the

---

[2]   "Transfer Taxes" means any stamp, documentary, registration, transfer, real estate, use, sales, ad valorem, added-value, or similar tax imposed under any applicable law.

ACTIVE 681833782v8

BSCEC Estate, the Chapter 7 Trustee, the Collateral Trustee, the Noteholders, the BSCEC PPA, the Consent and Agreement, the Collateral Indenture, the NPA, and the Notes.

6.     Subject to the rights and obligations arising under this Agreement and subject to the approval of this Agreement by a final order of the Bankruptcy Court, and effective as of the Effective Date and the receipt of any Effective Date Distribution due, the Chapter 7 Trustee, on behalf of the BSCEC Estate and any party claiming by or through it, irrevocably releases Brazos Electric, its current or former officers, directors (as well as the current or former officers and directors, agents, attorneys or professionals of BSCEC not (a) currently retained or employed by the Chapter 7 Trustee and not (b) currently or formerly providing goods or services for the operation or maintenance of the Sandy Creek Energy Station), agents, Members, managers, professionals, attorneys, and employees, and each of their predecessors in interest, successors, and assigns, as to each of the foregoing solely in such capacities (collectively, the "Brazos Electric/BSCEC Released Parties"), of and from any and all obligations, causes of action, claims, liabilities, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, from the beginning of time to the Effective Date, arising out of, by reason of, or related to Brazos Electric, BSCEC, the BSCEC Estate, the Chapter 7 Trustee, the Collateral Trustee, the Noteholders, the BSCEC PPA, the Consent and Agreement, the Collateral Indenture, the NPA, and the Notes; *provided, however*, for the avoidance of doubt, this Section 6 shall effect a release only with respect to the Brazos Electric/BSCEC Released Parties and shall not affect or impair any obligations, causes of action, claims, liabilities, or demands, whether pursuant to this Agreement or otherwise, arising or otherwise existing solely between or among the Chapter 7 Trustee, BSCEC, the BSCEC Estate, the Collateral Trustee, or the Noteholders (none of whom are released parties under this Section 6).

7.     Subject to the rights and obligations arising under this Agreement and subject to the approval of this Agreement by a final order of the Bankruptcy Court, and effective as of the Effective Date and the receipt of any Effective Date Distribution due, the Collateral Trustee, on behalf of itself and the Noteholders irrevocably releases the Brazos Electric/BSCEC Released Parties of and from any and all obligations, causes of action, claims, liabilities, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, from the beginning of time to the Effective Date, arising out of, by reason of, or related to Brazos Electric, BSCEC, the BSCEC Estate, the Chapter 7 Trustee, the Collateral Trustee, the Noteholders, the BSCEC PPA, the Consent and Agreement, the Collateral Indenture, the NPA, and the Notes; *provided, however*, for the avoidance of doubt, this Section 7 shall effect a release only with respect to the Brazos Electric/BSCEC Released Parties and shall not affect or impair any obligations, causes of action, claims, liabilities, or demands, whether pursuant to this Agreement or otherwise, arising or otherwise existing solely between or among the Chapter 7 Trustee, BSCEC, the BSCEC Estate, the Collateral Trustee, or the Noteholders (none of whom are released parties under this Section 7).

8.     The terms of this Agreement shall be incorporated into and made a part of any Chapter 11 Plan in form and substance reasonably acceptable to the Parties.

9.      The Parties shall jointly request that all pending hearings, motions, and filing and discovery deadlines pertaining to any dispute between them in the contested matter arising from the Objections be abated by the Bankruptcy Court pending approval of this Agreement.

10.     It is a material term of this Agreement that the BSCEC Allowed Claim receive the treatment and distributions under a Chapter 11 Plan as provided for herein.

a.   In the event that (i) the Effective Date of any Chapter 11 Plan consistent with each provision of this Agreement has not occurred by March 31, 2023, unless otherwise extended by written agreement of the Parties, which agreement shall not be unreasonably withheld so long as Brazos Electric continues to engage in good faith efforts to confirm and consummate a Chapter 11 Plan consistent with each provision of this Agreement, or (ii) Brazos Electric does not continue to pursue or prosecute, or is no longer able to continue to pursue or prosecute, confirmation and consummation of a Chapter 11 Plan consistent with each provision of this Agreement, then, at the option of the Holder, this Agreement may be terminated and as a result shall be null and void *ab initio*, and the Parties shall return to the status quo as if this Agreement had not existed, and shall terminate the abatement of and resume expedited litigation in the Chapter 11 Case arising from the Objections, including, without limitation, resetting the pending hearing on the summary judgment motions of the Parties therein, for the earliest date the Bankruptcy Court is available, and resetting the other discovery deadlines.

b.   In the event of the occurrence of the Plan Failure Condition (which shall not impact this Agreement or the Approval Orders other than as expressly set forth in this Section 10(b) and Section 10(c)),[3] then (1) any proponent of a Chapter 11 Plan shall within 15 business days notify the Holder of the maximum percentage distribution that Brazos Electric can afford to pay on account of the BSCEC Allowed Claim, which shall be provided in a new Chapter 11 Plan (each, a "Successor Plan") and shall not be inconsistent with the percentage distribution for GUC claims in the applicable Successor Plan (each, a "New Percentage"), and (2) upon receipt of such notice, the Holder shall no longer be assured an eighty-seven percent (87%) distribution on the BSCEC Allowed Claim. Within 10 business days after receiving the latest notice of a New Percentage, the Holder may choose to:

(i)   Continue to have all terms and provisions of this Agreement remain in full force and effect other than the assurance of an eighty-seven percent (87%) distribution (the "Remaining Provisions"), and have all rights to seek agreement (through mediation or otherwise) and/or litigate to maximize recovery for the BSCEC Allowed Claim in excess

---

[3]   "Plan Failure Condition" means that (1) the Effective Date of the proposed Chapter 11 Plan providing for not less than an 89.5% distribution on allowed GUC claims (including the BSCEC Allowed Claim) cannot or does not occur notwithstanding good faith efforts to do so, such that the proposed Chapter 11 Plan shall be null and void in all respects and deemed withdrawn and revoked, and (2) the Effective Date of a Chapter 11 Plan providing for not less than an 87% distribution on allowed GUC claims (including the BSCEC Allowed Claim) cannot or does not occur notwithstanding good faith efforts to do so.

of a New Percentage, provided that all Remaining Provisions (including Sections 2 and 4 of this Agreement) shall remain in effect notwithstanding any outcome of such agreement or litigation unless the Holder agrees otherwise in writing; or

(ii) Terminate this Agreement, as a result of which the Agreement shall be null and void *ab initio*, and the Parties shall return to the status quo as if this Agreement had not existed, and shall terminate the abatement of and resume the expedited litigation of the Claims in the Chapter 11 Case.

The Approval Orders shall provide that if the Holder exercises either option in subsection (b)(i) or (b)(ii) above, any Successor Plan shall provide for payment of the Holder's Claims, regardless of when they are allowed by final, non-appealable order, as if they had been allowed by final, non-appealable order prior to the Effective Date of any Successor Plan, and any plan proponent shall show at confirmation of any Successor Plan that payment of the applicable New Percentage on account of the Holder's Claims (in whatever amount as is ultimately allowed) is feasible and that Brazos Electric has the financial wherewithal to make such payment in the same form of consideration as other GUC claims.

c. In the event the Holder does not timely exercise an option in subsection (b)(i) or (b)(ii), the assurance of the eighty-seven percent (87%) distribution in Section 3(a) shall be replaced with an assurance of any New Percentage distribution accepted by the Holder, and all other terms and provisions of this Agreement shall remain in full force and effect.

d. The provisions of Section 10(a) and Section 10(b) (including the options contained therein) are independent and distinct.

11. As of the Agreement Date, the Chapter 7 Trustee and the Collateral Trustee, on behalf of itself and for the benefit of the individual Noteholders, confirm that they have not assigned or otherwise transferred their respective Claims.

12. Brazos Electric and the Chapter 7 Trustee shall promptly seek approval of this Agreement via a joint motion under Bankruptcy Rule 9019 in both Cases on an emergency basis and at a hearing on the earliest date that the Bankruptcy Court is available. The Parties shall agree on the form and substance of the motion and orders under Bankruptcy Rule 9019 authorizing and approving the settlement set forth in this Agreement. The effectiveness of this Agreement is subject to the entry of orders in both Cases by the Bankruptcy Court, in form and substance acceptable to the Parties, authorizing and approving the settlement set forth in this Agreement (the "Approval Orders"). Brazos Electric and the Chapter 7 Trustee shall file joint motions (the "Approval Motions") in both of the Cases on or before August 24, 2022 to obtain the entry of the Approval Orders, which pleadings must be mutually acceptable to the Parties. In the event that the Bankruptcy Court does not enter the Approval Orders, this Agreement shall be null and void *ab initio*, and the Parties shall return to the status quo as if this Agreement had not existed, and

9

shall terminate the abatement of and resume expedited litigation in the Chapter 11 Case arising from the Objections, including, without limitation, resetting the pending hearing on the summary judgment motions of the Parties therein, for the earliest date the Bankruptcy Court is available, and resetting the other discovery deadlines.

13.     In the event that any party seeks relief from or otherwise challenges the Approval Orders or any order confirming any Chapter 11 Plan (which order shall be consistent with this Agreement) (the "Confirmation Order"), including, without limitation, appealing or seeking in any way to modify, stay, reverse, or vacate the Approval Orders, in whole or in part, or the Confirmation Order as it may apply to the Agreement,  the Parties shall cooperate in good faith to oppose any such challenge(s) or relief and preserve the full force and effect of the Approval Orders and the Confirmation Order (such as by appeal if any such challenge or request for relief is granted), including, without limitation, by requesting a court order requiring the appealing party to post a bond in the full amount of the Claims or such lesser amount as agreed to by the Holder. This Section 13 shall survive any modification, stay, reversal, or vacatur of the Approval Orders or the Confirmation Order.

14.     Any notices provided for in this Agreement shall be given by e-mail (and shall be confirmed by the recipient upon receipt) and by overnight mail with delivery confirmation, postage prepaid, to the Parties at the notice addresses set forth below.  Any such notice shall be deemed to have been given at the time any such e-mail was sent (according to the records contained in the software or other platform or program from which such email was sent) and shall not be determined based on the time of the mailing of any such notice.

**IF TO BRAZOS ELECTRIC:**

FOLEY & LARDNER LLP
Holland N. O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: 214-999-4961
Email: honeil@foley.com

Timothy C. Mohan
1400 16th Street, Suite 200
Denver, CO 80202
Telephone: 720.437.2000
Email: tmohan@foley.com

**IF TO THE CHAPTER 7 TRUSTEE:**

HUGHES WATTERS ASKANASE, LLP
Jan Northrup
Wayne Kitchens
Heather Heath McIntyre
1201 Louisiana St., 28th Floor

10

*ACTIVE 681833782v8*

Execution Version

Houston, Texas 77002
Telephone: (713) 759-0818
Email: jnorthrup@hwa.com; wkitchens@hwa.com; hmcintyre@hwa.com

**IF TO THE COLLATERAL TRUSTEE:**

GREENBERG TRAURIG, LLP
Shari L. Heyen
1000 Louisiana Street, Suite 6700
Houston, Texas 70002
Telephone: (713) 374-3535
Email: heyens@gtlaw.com

Oscar N. Pinkas
Nathan A. Haynes
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 801-9200
Email: pinkaso@gtlaw.com; haynesn@gtlaw.com

Joseph P. Davis III
One International Place, Suite 2000
Boston, Massachusetts 02110
Telephone: (617) 310-6204
Email: davisjo@gtlaw.com

15.     The Parties agree to return to the mediation discussed herein to resolve disputes, if any, arising from or regarding the terms of this Agreement, the settlement set forth herein, or any other final settlement documents; *provided, however*, that if the mediation process does not resolve any such dispute, any of the Parties may seek relief from the Bankruptcy Court to resolve such dispute or enforce the terms of this Agreement.

16.     This Agreement or any provisions hereof may not be amended, waived, delayed, or otherwise altered or modified unless set forth in a further written agreement executed by all of the Parties, and any such purported amendment, waiver, or delay in the enforcement of this Agreement not memorialized in a writing signed by all of the Parties shall have no force or effect.

17.     This Agreement shall not be treated as or deemed to be evidence of or an admission of any fact or liability by any Party, or of the merit or lack of merit of any claim or defense of any Party.

18.     The Parties acknowledge that this Agreement is a compromise of disputed claims and that no Party admits, and each expressly denies, any liability on its part.

19.     Except as otherwise set forth in this Agreement, the Parties represent and acknowledge that, in executing this Agreement, they do not rely and have not relied upon any

11

representation or statement made by any Party or any of their agents, shareholders, representatives, or attorneys, with regard to the subject matter, basis, or effect of this Agreement.

20.     The Parties further declare that, in making this Agreement, they have relied entirely upon their own judgment, beliefs, and the advice of their counsel and other advisors, if any, and that they have had a reasonable period of time to consider this Agreement, and if so desired, to consult with counsel.

21.     The terms of this Agreement are non-severable and mutually dependent.  If any provision(s) of this Agreement be declared or be determined by any court of competent jurisdiction to be illegal, invalid, or unenforceable, then the Parties shall amend this Agreement in such a manner as to effectuate the benefit of their bargain.  If such amendment is not possible, the entire Agreement will be null and void *ab initio*, and the Parties shall return to the status quo as if this Agreement had not existed, and shall terminate the abatement of and resume expedited litigation in the Chapter 11 Case arising from the Objections, including, without limitation, resetting the pending hearing on the summary judgment motions of the Parties therein, for the earliest date the Bankruptcy Court is available, and resetting the other discovery deadlines.

22.     This Agreement sets forth the entire agreement among the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof.  The Parties agree that no rule of construction shall apply to this Agreement construing its provisions in favor of or against any of the Parties.

23.     This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, administrators, and assigns.  Any releasees under Sections 5, 6, or 7 above that are not a signatory to this Agreement are intended third-party beneficiaries of this Agreement and are entitled to enforce such releases.

24.     Neither this Agreement nor any of the rights and benefits arising under it may be assigned without the prior written consent of all of the Parties; *provided*, *however*, that upon the closing or dismissal of the Chapter 7 Case, all of the Chapter 7 Trustee and the BSCEC Estate's rights and defenses under this Agreement (including any rights to payment and as a Holder of the BSCEC Allowed Claim) shall be assigned by the Chapter 7 Trustee to the Collateral Trustee without any further notice, order, or action, and without the prior written consent of the Parties.

25.     The Parties shall cooperate fully and execute all supplementary documents and take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

26.     This Agreement shall be interpreted and construed in accordance with the provisions of the Bankruptcy Code, and, where not inconsistent, the laws of the State of Texas, without regard to the conflict of laws principles of the State of Texas.  Each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Agreement and expressly waives any right to commence any such action in any other forum.

Execution Version

27.     This Agreement may be executed (electronically or manually) in one or more counterparts, including by e-mail, PDF, or facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

28.     Each person signing this Agreement represents and warrants that he or she has been duly authorized and has the requisite authority to execute and deliver this Agreement on behalf of such Party and to bind his or her respective clients or entities to the terms and conditions of this Agreement.

[*Signature Page Follows.*]

13

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed by themselves, or their respective authorized agent, as of the date first written above.

Brazos Electric Power Cooperative, Inc.

By:_____

Name: Clifton Karnei_____

Position: Executive Vice President & General Manager____


Janet S. Northrup, not individually but solely in her capacity as the chapter 7 trustee of the bankruptcy estate of Brazos Sandy Creek Electric Cooperative, Inc.

_____


Computershare Trust Company, N.A., as Collateral Trustee

By: David Diaz_____

Name: David Diaz_____

Position: Vice President_____

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed by themselves, or their respective authorized agent, as of the date first written above.

Brazos Electric Power Cooperative, Inc.

By _____

Name: Clifton Karnei

Position: Executive Vice President & General Manager

Janet S. Northrup, not individually but solely in her capacity as the chapter 7 trustee of the bankruptcy estate of Brazos Sandy Creek Electric Cooperative, Inc.

_____

Computershare Trust Company, N.A., as Collateral Trustee

By: _____

Name: _____

Position: _____

ACTIVE 68783378268

**<u>Exhibit B</u>**

Form of Eligible Market Participant Election Notice

## ELIGIBLE MARKET PARTICIPANT ELECTION NOTICE

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS ELECTION NOTICE.**

**THIS ELECTION NOTICE MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY ERCOT BY NO LATER THAN 5:00 P.M. (CT) ON OCTOBER [14], 2022 (THE "ELECTION DEADLINE").**

---

| (Name of Entity) | (Account ID: DUNS + 4) | (Share of Brazos Short Pay Claim) |
| --- | --- | --- |

You are receiving this Eligible Market Participant Election Notice (the "Election Notice") because you are owed an allocable portion of the Brazos Short Pay Claim[1] resulting from the failure of Brazos Electric Power Cooperative, Inc. ("Brazos") to pay Settlement Statements and Resettlement Statements issued by ERCOT to Brazos.

On March 1, 2021, Brazos commenced its bankruptcy case under Chapter 11 of the Bankruptcy Code, which is assigned Case No. 21-30725 (the "Bankruptcy Case") and is pending before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). ERCOT filed a claim in the Bankruptcy Case in the amount of $1,886,595,737.08 (the "Brazos Short Pay Claim"). Of this amount, ERCOT is owed $599,709,609.22 to replenish the CRR account funds used to reduce amounts short-paid to Market Participants and to pay down amounts owed under the Subchapter M securitization. The remaining $1,286,886,127.86 is owed to Eligible Market Participants.

On September __, 2022, the Bankruptcy Court entered an order conditionally approving the *Disclosure Statement for Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (the "Disclosure Statement"). A hearing to consider confirmation of the *Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* (the "Plan") has been set on November ___, 2022. The Plan, if confirmed, will govern the treatment and payment of the Brazos Short Pay Claim following the Effective Date of the Plan. The Disclosure Statement and Plan may be reviewed by visiting Brazos's Bankruptcy Case website at https://cases.stretto.com/Brazos. If you have any questions on how to properly complete this Election Notice, please email MPElectionNotice@ercot.com. ERCOT will not, however, provide legal advice. ERCOT encourages all Eligible Market Participants to review the Disclosure Statement and Plan for additional information regarding the below election and the impact of confirmation of the Plan, and the occurrence of the Plan's Effective Date, on the Brazos Short Pay Claim.

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

Under the Plan, Brazos will make payments to ERCOT, which ERCOT will subsequently distribute to the Eligible Market Participants.  Your response to this Election Notice will indicate to ERCOT the payment option you elect.

If more than one timely, properly completed Election Notice is received by ERCOT with respect to the account entity noted above, then the last properly executed Election Notice received will be deemed to reflect the Eligible Market Participant's intent and will supersede and revoke any prior Election Notice.

The Disclosure Statement and Plan contain information regarding a proposed settlement between Brazos and ERCOT, including the Brazos Short Pay Claim.  Eligible Market Participants may elect between the following four options with regard to treatment of their allocable portion of the Brazos Short Pay Claim.  **Failure to elect any of the following four options, or selecting more than one option, will result in an Eligible Market Participant automatically being deemed to have elected Option 2**.

The four available options are:
- Option 1: Market Participant Accelerated Cash Recovery
- Option 2: Market Participant Deferred Cash Recovery
- Option 3: Market Participant Convenience Cash Recovery
- Option 4: Allocation of the Eligible Market Participants share between Option 1 and Option 2

If an Eligible Market Participant elects Option 4, such Eligible Market Participant shall maintain and provide to ERCOT at its request all documentation it has supporting the direction delivered to it by a QSE Customer.

Under each of the above options, Eligible Market Participants will be bound by the release in Article IV.G.2 of the Plan, the terms of which are set forth below and are fully incorporated into this Election Notice as set forth herein (the "Settlement Release"); however, as detailed below:

- Eligible Market Participants who elect or are deemed to have elected Option 2 may opt-out of the Settlement Release as provided below.
- As provided further below, Eligible Market Participants who elect Option 4 may opt-out of the Settlement Release in respect of any amount of its allocable portion of the Brazos Short Pay Claim for which the Eligible Market Participant elects, at the direction or otherwise on behalf of a QSE Customer, to receive the Market Participant Deferred Cash Recovery.

**The Settlement Release in Article IV.G.2 of the Plan**

Except as otherwise set forth in the Confirmation Order or the Market Participant Settlement Procedures, effective immediately upon the occurrence of the Effective Date, each of the ERCOT Settlement Release Parties shall be deemed to release, remise and forever discharge each other ERCOT Settlement Release Party of and from any and all debts, losses, demands, actions, Claims, Causes of Action, suits, accounts, covenants, contracts, agreements, claims, counterclaims, controversies, disputes, obligations, judgments, rights, damages, costs, losses, expenses, liens, or liabilities of any and every nature or description whatsoever, both at law or in equity, whether asserted or unasserted, express or implied, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, which arose at any time before the Effective Date, arising out of or directly related to the ERCOT Adversary Proceeding, the ERCOT Claim, the Brazos Short Pay Claim (including ERCOT's efforts to collect the Brazos Short Pay Claim), or the Debtor's purchase or procurement of any electricity or ancillary service from ERCOT during Winter Storm Uri.

Upon the occurrence of the Effective Date, except as otherwise set forth in the Confirmation Order or the Market Participant Settlement Procedures, or to the extent that the Bankruptcy Court orders otherwise, the Eligible Market Participants and their respective affiliates (for purposes of this paragraph, the term "affiliate" shall have the meaning ascribed in the Protocols) and Representatives shall be forever barred and enjoined from taking any action against ERCOT or its property or to otherwise interfere with the implementation of this Plan or the ERCOT Settlement in respect of any Claim or Cause of Action in any way related to the ERCOT Claim (including the Brazos Short Pay Claim), or the specific transactions underlying or that otherwise gave rise to the ERCOT Claim or any portion thereof (including the Brazos Short Pay Claim); provided, however, that nothing herein releases or waives the Debtor's, the Reorganized Debtor's, or ERCOT's obligations under the ERCOT Settlement.  Notwithstanding anything contain in this Article IV.G to the contrary, Eligible Market Participants may cooperate with the efforts of their QSE Customers that are not ERCOT Settlement Release Parties before the PUCT, a court, or other Governmental Unit, at the request of such QSE Customer and to the extent that such cooperation is required by the terms of the contract between the Eligible Market Participant and the QSE Customer.

For the avoidance of doubt, (i) no party is releasing any right or interest in any Unaffected Proceeding pursuant to Article IV.G of the Plan; (ii) if all transactions in the ERCOT wholesale market during Winter Storm Uri are resettled or repriced (*i.e.*, a market-wide repricing) by either ERCOT decision, an act of the Texas Legislature, or an order issued by the PUCT or any other Governmental Unit or court with authority (including as a result of invalidation or vacatur of the PUCT orders entered on February 15, and 16, 2021 or ERCOT's implementation of those orders during any time period) neither the Debtor nor the Reorganized Debtor nor any Member shall be required to pay, or entitled to receive payment in connection with, any invoices (including Default Uplift Invoices) related to such ERCOT market-wide wholesale market resettlement or repricing; (iii) the Debtor or the Reorganized Debtor, as applicable, shall be required to pay the ERCOT

Unaffected Invoices as set forth below; and (iv) nothing in the ERCOT Settlement or Article IV.G of the Plan shall in any way except any Claim from or otherwise compromise or abrogate the Debtor's discharge under section 1141 of the Bankruptcy Code or the applicable provisions of Article VIII of the Plan.

"ERCOT Settlement Release Parties" and "ERCOT Settlement Release Party" means, each of and collectively, (i) the Debtor and the Reorganized Debtor, (ii) ERCOT, (iii) the Committee, (iv) the Members, (v) the Electing Market Participants, (vi) the Eligible Market Participants receiving only the Market Participant Deferred Cash Recovery and that did not opt out of the release set forth in the Market Participant Settlement Procedures in accordance therewith, (vii) any QSE Customer that does not opt out of the release set forth in the Market Participant Settlement Procedures in accordance therewith, and (viii) each of the Representatives of the foregoing parties; provided, however, that: (a) an Electing Market Participant shall not be an ERCOT Settlement Release Party in respect of any portion of its Brazos Short Pay Claim for which it elects, at the direction or otherwise on behalf of a QSE Customer to (1) receive the Market Participant Deferred Cash Recovery and (2) opt out of the release set forth in the Market Participant Settlement Procedures in accordance therewith; and (b) an Eligible Market Participant that is an Affiliate of another Eligible Market Participant shall not be an ERCOT Settlement Release Party solely by operation of clause (viii) of this definition.

**Notwithstanding the foregoing, an entity may opt out of the Settlement Release if it:** (a) elects or is deemed to have elected Option 2 (the Market Participant Deferred Cash Recovery) and it opts out of the Settlement Release in accordance with this Election Notice, in which case it will not be an ERCOT Settlement Release Party in any respect; or (b) elects Option 4 (a combination of the Market Participant Deferred Cash Recovery and Market Participant Accelerated Recovery) and opts out of the Settlement Release in accordance with this Election Notice in respect of the amount of its allocable portion of the Brazos Short Pay Claim for which the Eligible Market Participant elects, at the direction or otherwise on behalf of a QSE Customer, the Market Participant Deferred Cash Recovery, in which case the Eligible Market Participant will not be an ERCOT Settlement Release Party with respect to such amount of its allocable portion of the Brazos Short Pay Claim.

As set forth in Article IV.G.3 of the Plan, which is incorporated herein, Brazos's timely payment to ERCOT of the obligations set forth in the Plan (including the timely payment of the ERCOT Market Participant Consideration ), and ERCOT's subsequent payments of such cash to Eligible Market Participants as set forth in the ERCOT Recovery Appendix, constitutes a payment plan designed to enable ERCOT to pay the Eligible Market Participants all amounts such Eligible Market Participants are owed by ERCOT on account of the Brazos Short Pay Claim. If Brazos fails to comply with this payment plan, the Plan provides that ERCOT (i) will not collect unpaid amounts through the Default Uplift process described in Protocols §§ 9.19.1 and 9.19.2 in connection with or arising from the Brazos Short Pay Claim and (ii) may only seek relief from the Bankruptcy Court as provided in the Plan. The foregoing, however, does not apply to any Default Uplift process arising from a default by a Market Participant other than Brazos.

**Option 1:  Market Participant Accelerated Cash Recovery**

By checking the box below for this Option, the undersigned Eligible Market Participant elects to receive the Market Participant Accelerated Cash Recovery on the full amount of its allocable portion of the Brazos Short Pay Claim and be bound by the Settlement Release set forth in Article IV.G.2 of the Plan and incorporated into this Election Notice.

Generally speaking, the Market Participant Accelerated Cash Recovery is an approximate 65% nominal recovery on an Eligible Market Participant's allocable portion of the Brazos Short Pay Claim with an approximate 43% nominal recovery on the Effective Date of the Plan.  Payment details are shown below.

| Payment Description | Payment Timing | Approximate Percent Recovery |
|---|---|---|
| **Initial Market Participant Cash Payment** | Paid to ERCOT on Effective Date of the Plan | 43% |
| **Additional Market Participant Cash Payment** | Paid to ERCOT on the Generation Sale Closing Date (maximum of 1 year after Effective Date of the Plan) | 9% |
| **Installment Market Participant Cash Payments** | Paid to ERCOT in 12 annual installments beginning on first anniversary of Effective Date of the Plan | 13% |
| **Total** | | **65%** |

☐        Accept Option 1

**Option 2**:  **Market Participant Deferred Cash Recovery**

By checking the box below for this Option, the undersigned Eligible Market Participant elects to receive the Market Participant Deferred Cash Recovery on the full amount of its allocable portion of the Brazos Short Pay Claim.

Generally speaking, the Market Participant Deferred Cash Recovery is a 100% nominal recovery on an Eligible Market Participant's allocable portion of the Brazos Short Pay Claim paid in 30 annual cash payments to be paid by ERCOT in accordance with the fixed-payment schedule (created by the Debtor).  The first payment is paid to ERCOT on the first anniversary of the Effective Date of the Plan. The approximate amount of the annual payments is shown below.

| Payment Numbers | Approximate Percent Recovery per Payment | Approximate Percent Recovery for all Payments |
|---|---|---|
| **1-5** | [2.27]% | [11.36]% |
| **6-25** | [3.33]% | [66.67]% |
| **26-30** | [4.39]% | [21.97]% |
| **Total** | | **100.00%** |

☐          Accept Option 2

By accepting Option 2, you will under the Plan and bound by the Settlement Release set forth in Article IV.G.2 of the Plan and incorporated herein, as set forth above unless you check the opt-out box below.  It is your decision whether to participate in the Settlement Release or to opt out and not be bound by the Settlement Release.  By opting out of the Settlement Release, you will forgo the benefit of obtaining the Settlement Release and will not be an ERCOT Settlement Release Party as defined in the Plan and this Election Notice.

**<u>OPTIONAL RELEASE ELECTION</u>.  YOU MAY ELECT TO OPT OUT OF THE SETTLEMENT RELEASE CONTAINED IN <u>ARTICLE IV.G.2</u> OF THE PLAN AND INCORPORATED HEREIN IF YOU CHECK THE BOX BELOW:**

☐          The undersigned elects to OPT OUT of the Settlement Release.

6

**Option 3**:  **Market Participant Convenience Cash Recovery**

By checking the box below for this Option, the undersigned Eligible Market Participant elects to receive the Market Participant Convenience Cash Recovery and be bound by the Settlement Release set forth in <u>Article IV.G.2</u> of the Plan and incorporated herein.

This Option may only be elected by Eligible Market Participants whose allocable portion of the Brazos Short Pay Claim (at an account level with ERCOT) is (i) less than $10,000.00 or (ii) greater than $10,000.00 and irrevocably elects to reduce such claim to $10,000.00.

Market Participant Convenience Cash Recovery means with respect to the applicable Eligible Market Participants, the right to receive a one-time Cash payment from ERCOT on the Effective Date of the Plan in an amount equal to 63% of the lesser of (i) such Eligible Market Participant's allocable share of the Brazos Short Pay Claim, and (ii) $10,000.00.

☐        Accept Option 3

**Option 4**:   **Market Participant Accelerated Cash Recovery & Market Participant Deferred Cash Recovery**

By completing the dollar amount boxes below for this Option 4, the undersigned Eligible Market Participant elects to receive part of its allocable share of Brazos Short Pay Claim as Option 4.1—Market Participant Accelerated Cash Recovery and the remainder as Option 4.2—Market Participant Deferred Cash Recovery. To the extent and in respect of its allocable portion of the Brazos Short Pay Claim for which the Eligible Market Participant elects the Market Participant Accelerated Cash Recovery, whether on its own behalf or on behalf of any QSE Customer, both it and its associated QSE Customer shall be bound by the Settlement Release set forth in <u>Article IV.G.2</u> of the Plan and incorporated herein.  To the extent and in respect of its allocable portion of the Brazos Short Pay Claim for which the Eligible Market Participant elects the Market Participant Deferred Cash Recovery, whether on its own behalf or on behalf of any QSE Customer(s), both it and any associated QSE Customer(s) shall be bound by the Settlement Release **unless** the undersigned Eligible Market Participant elects to opt out of the Settlement Release by checking the opt out box below and specifies the amount of its allocable share of the Brazos Short Pay Claim associated with such opt out.  **Any QSE Customer that does not respond, indicate or otherwise instruct the Eligible Market Participant in writing (i) how to allocate that portion of the Brazos Short Pay Claim applicable to the QSE Customer between Option 4.1 or Option 4.2, or (ii) whether to opt out of the Settlement Release set forth in <u>Article IV.G.2</u> of the Plan and incorporated herein, shall be deemed to have instructed the Eligible Market Participant to elect the Market Participant Deferred Cash Recovery and not opt out of the Settlement Release in respect of such portion of the Brazos Short Pay Claim applicable to the QSE Customer.**

If the amounts below are less than the Eligible Market Participant's allocable share of the Brazos Short Pay Claim, the difference will be added to Option 4.2: Market Participant Deferred Cash Recovery.  If the amounts below are greater than the Eligible Market Participant's allocable share of the Brazos Short Pay Claim, the difference will be deducted from Option 4.1: Market Participant Accelerated Cash Recovery.

$ [                    ]   Option 4.1—Market Participant Accelerated Cash Recovery

$ [                    ]   Option 4.2—Market Participant Deferred Cash Recovery

(Continued on next page)

**OPTIONAL SETTLEMENT RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE SETTLEMENT RELEASE CONTAINED IN <u>ARTICLE IV.G.2</u> OF THE PLAN AND INCORPORATED HEREIN IF YOU CHECK THE BOX BELOW <u>AND</u> PROVIDE THE DOLLAR AMOUNT OF MARKET PARTICIPANT DEFERRED CASH RECOVERY OPTING OUT OF THE RELEASE:**

☐  The undersigned elects to OPT OUT of the Settlement Release solely in respect of the portion of the allocable share of the Brazos Short Pay Claim electing Option 4.2—Market Participant Deferred Cash Recovery Accept Option 3

$ _____  Allocable share of the Brazos Short Pay Claim that elected Option 4.2 above that elects to OPT OUT of the Settlement Release.  The allocable share of the Brazos Short Pay Claim opting out of the Settlement Release may not exceed the amount the Eligible Market Participant elects to receive Option 4.2—Market Participant Deferred Cash Recovery above.

9

By signing this Election Notice, the undersigned Eligible Market Participant certifies that: (a) it is the holder of the allocable portion of the Brazos Short Pay Claim described above to which this Election Notice pertains (or an authorized signatory for such holder); (b) it has full power and authority to execute this Election Notice; (c) it has reviewed a copy of the Plan and Disclosure Statement (and all attachments and supplements thereto); (d) it has consented to be an "ERCOT Settlement Release Party" as defined in the Plan and this Election Notice and shall be bound by the Settlement Release set forth in <u>Article IV.G.2</u> of the Plan and incorporated herein unless opting out of the Settlement Release in accordance with the terms of this Election Notice; and (e) all authority conferred or agreed to be conferred pursuant to this Election Notice, and every obligation of the undersigned hereunder, shall be binding upon its transferees, successors, and assigns.  The undersigned understands that an otherwise properly completed, executed and timely returned Election Notice that does not indicate an election of any of the Options will be treated as an election of Option 2.

Name of Eligible Market Participant: _____

Signature: _____

Print Name: _____

Title: _____

Telephone Number: _____

Date Completed: _____


**PLEASE PROMPTLY SUBMIT YOUR ELECTION NOTICE.**

**ELECTION NOTICES MUST BE SUBMITTED VIA EMAIL DIRECTED TO <u>MPELECTIONNOTICE@ERCOT.COM</u>.**

**IN ORDER FOR YOUR ELECTION TO BE CONSIDERED, YOUR ELECTION NOTICE MUST BE <u>ACTUALLY RECEIVED</u> BY NO LATER THAN 5:00 P.M. (PREVAILING CENTRAL TIME) ON OCTOBER [14], 2022.**

**<u>Exhibit C</u>**

Eligible Market Participants

| | |
|---|---|
| Amount owed to Market Participants (detail below) | $ 1,286,886,127.86 |
| Amount owed to ERCOT CRRs (Initial ERCOT Cash Payment) | 599,709,609.22 |
| Brazos Short Pay Claim (defined in Plan) | $ 1,886,595,737.08 |

| Name | Amount |
|---|---|
| 3000 ENERGY CORP (QSE) | $ 309.47 |
| ACCENT ENERGY TEXAS LP (QSE) | 1,235.80 |
| AKUO TRADING SAS (QSE) | 17.85 |
| ALLIANCE POWER COMPANY LLC (CRRAH) | 340.71 |
| ALLIANCE POWER COMPANY LLC (QSE) | 215,167.60 |
| ALTOP ENERGY TRADING TEXAS LLC (CRRAH) | 43.43 |
| ALTOP ENERGY TRADING TEXAS LLC (QSE) | 0.19 |
| ALTOP ENERGY TRADING TEXAS LLC (SQ1) | 0.17 |
| ALTUS POWER LLC (CRRAH) | 184,668.83 |
| ALTUS POWER LLC (QSE) | 4,425.70 |
| ALTUS POWER LLC (SQ2) | 26,914.90 |
| ALTUS POWER LLC (SQ4) | 6,770.24 |
| ALTUS POWER LLC (SQ5) | 25,276.14 |
| ALTUS POWER LLC 1 (CRRAH) | 1,564.12 |
| ALTUS POWER LLC 2 (CRRAH) | 1,407.64 |
| AM TRADING SOLUTIONS LLC (QSE) | 13,791.26 |
| AMERICAN ELECTRIC POWER SERVICE CORP (SQ2) | 4.34 |
| AMERICAN ELECTRIC POWER SERVICE CORP (SQ3) | 24,511.16 |
| AMERICAN ELECTRIC POWER SERVICE CORP EPMTM (CRRAH) | 664.97 |
| AMES ENERGY LLC (CRRAH) | 2,836.64 |
| APN MANAGEMENT LP (SQ1) | 19,601.38 |
| APOLLO ENERGY CORP (QSE) | 980.82 |
| APPIAN WAY ENERGY PARTNERS SOUTHCENTRAL LP (CRRAH) | 69,188.73 |
| APPIAN WAY ENERGY PARTNERS SOUTHCENTRAL LP (QSE) | 2,199.41 |
| APPIAN WAY ENERGY PARTNERS SOUTHCENTRAL LP 1 (CRRAH) | 9.88 |
| APPIAN WAY ENERGY PARTNERS SOUTHCENTRAL LP 2 (CRRAH) | 1,304.34 |
| ARCTURUS POWER TRADING LLC (CRRAH) | 1,202.91 |
| ARCTURUS POWER TRADING LLC 1 (CRRAH) | 2,929.52 |
| ARCTURUS POWER TRADING LLC 2 (CRRAH) | 1,606.85 |
| ARDOR ENERGY LLC (CRRAH) | 51.44 |
| ARDOR ENERGY LLC (QSE) | 3,048.75 |
| ASPIRE POWER VENTURES LP (CRRAH) | 5,865.66 |
| ASPIRE POWER VENTURES LP (QSE) | 52,489.15 |
| ASPIRE POWER VENTURES LP (SQ2) | 23,270.07 |
| ASPIRE POWER VENTURES LP (SQ3) | 3,822.60 |
| ASPIRE POWER VENTURES LP (SQ4) | 476.83 |
| ATNV ENERGY LP (CRRAH) | 17,885.81 |
| ATNV ENERGY LP (QSE) | 139,496.74 |
| ATNV ENERGY LP 1 (CRRAH) | 6,105.64 |

| | |
|---|---:|
| ATNV ENERGY LP 2 (CRRAH) | 5,754.16 |
| AVANGRID RENEWABLES LLC (QSE) | 3,183,051.59 |
| AVANGRID RENEWABLES LLC (SQ1) | 7,438,392.63 |
| AVANGRID RENEWABLES LLC (SQ2) | 8,972.69 |
| AVANGRID RENEWABLES LLC (SQ3) | 2,762,737.04 |
| AXPO US LLC (QSE) | 2,215.31 |
| BARTON FUND LLC (QSE) | 8,768.77 |
| BIG BEND TRADING LLC (CRRAH) | 177.20 |
| BJ ENERGY LLC (CRRAH) | 3,009.89 |
| BJ ENERGY LLC 2 (CRRAH) | 62.99 |
| BLLD LLC 1 (QSE) | 1,198.50 |
| BLUE LANTERN CAPITAL LLC (SQ1) | 0.40 |
| BOSTON ENERGY TRADING AND MARKETING LLC (CRRAH) | 27,138.82 |
| BOSTON ENERGY TRADING AND MARKETING LLC (QSE) | 28.13 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ1) | 2,780.32 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ3) | 1,901.96 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ4) | 1,546,754.59 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ5) | 3,426.39 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ6) | 6,824.74 |
| BOSTON ENERGY TRADING AND MARKETING LLC (SQ7) | 1,143.50 |
| BOSTON ENERGY TRADING AND MARKETING LLC 1 (CRRAH) | 76,820.76 |
| BOSTON ENERGY TRADING AND MARKETING LLC 2 (CRRAH) | 53,659.82 |
| BP ENERGY COMPANY (CRRAH) | 62,336.07 |
| BP ENERGY COMPANY (QSE) | 38,475,456.05 |
| BP ENERGY COMPANY 1 (CRRAH) | 15,424.71 |
| BP ENERGY COMPANY 2 (CRRAH) | 584.02 |
| BPTX (SQ3) | 2,463.36 |
| BPTX (SQ4) LPT LLC | 108.27 |
| BPTX (SQ5) HUDSON | 7,151.75 |
| BPTX (SQ6) | 6,094.45 |
| BPTX (SQ7) | 2,954,577.53 |
| BPTX (SQ9) | 363,673.12 |
| BRAZOS ELECTRIC POWER CO OP INC (CRRAH) | 13,394.28 |
| BRAZOS ELECTRIC POWER CO OP INC (QSE) | 64.48 |
| BRAZOS ELECTRIC POWER CO OP INC POST (QSE) | 34,537.63 |
| BROAD REACH POWER LLC (CRRAH) | 49.95 |
| BROAD REACH POWER LLC (QSE) | 5,165,945.35 |
| BROWNSVILLE PUBLIC UTILITIES BOARD (CRRAH) | 54,465.50 |
| BRYAN TEXAS UTILITIES (CRRAH) | 3,118.18 |
| BTU QSE SERVICES INC (QSE) | 2,043,707.18 |
| BULB US LLC (QSE) | 1,521.05 |
| BULL CREEK WIND LLC (QSE) | 22,987.22 |
| CALPINE ENERGY SOLUTIONS LLC (CRRAH) | 310.11 |
| CALPINE ENERGY SOLUTIONS LLC (QSE) | 58,848,459.16 |
| CALPINE POWER MANAGEMENT LLC (CRRAH) | 4,589.89 |
| CALPINE POWER MANAGEMENT LLC (QSE) | 79,344,096.23 |
| CALPINE POWER MANAGEMENT LLC (SQ13) | 1,282.21 |

| | |
|---|---:|
| CALPINE POWER MANAGEMENT LLC CHAMPION (SQ3) | 21,873.90 |
| CALPINE POWER MANAGEMENT LLC CHAMPION II (SQ5) | 221.32 |
| CALPINE POWER MANAGEMENT LLC CHAMPION III (SQ6) | 8,206,969.52 |
| CALPINE POWER MANAGEMENT LLC CHAMPION IV (SQ7) | 31,195.72 |
| CALPINE POWER MANAGEMENT LLC CHAMPION V (SQ11) | 50,575.17 |
| CALPINE POWER MANAGEMENT LLC QCALP2 (SQ2) | 5,710.97 |
| CANADIAN BREAKS LLC (QSE) | 3,931,899.35 |
| CASSIAN ENERGY LLC (CRRAH) | 6,617.24 |
| CASSIAN ENERGY LLC (SQ2) | 0.30 |
| CASSIAN ENERGY LLC (SQ3) | 3,265.32 |
| CASSIAN ENERGY LLC (SQ4) | 2,219.75 |
| CASSIAN ENERGY LLC (SQ5) | 22,026.75 |
| CASSIAN ENERGY LLC 2 (CRRAH) | 9,456.44 |
| CASSIAN ENERGY LLC 3 (CRRAH) | 11.73 |
| CASTLETON COMMODITIES MERCHANT TRADING LP (CRRAH) | 25,331.37 |
| CASTLETON COMMODITIES PARTNERS LLC (CRRAH) | 1,137.67 |
| CC8 LLC (CRRAH) | 4,022.82 |
| CC8 LLC (SQ1) | 279.15 |
| CC8 LLC (SQ10) | 5,762.87 |
| CC8 LLC (SQ11) | 279.15 |
| CC8 LLC (SQ14) | 1,155.57 |
| CC8 LLC (SQ15) | 2,075.61 |
| CC8 LLC (SQ16) | 0.01 |
| CC8 LLC (SQ18) | 533.68 |
| CC8 LLC (SQ2) | 670.60 |
| CC8 LLC (SQ3) | 15,682.23 |
| CC8 LLC (SQ9) | 2.12 |
| CC8 LLC 1 (CRRAH) | 881.64 |
| CC8 LLC 2 (CRRAH) | 917.53 |
| CEI HOLDCO SPV LP (CRRAH) | 295.17 |
| CENTRAL TEXAS ELECTRIC COOPERATIVE INC (CRRAH) | 1,609.03 |
| CIRRO GROUP INC (CRRAH) | 876.29 |
| CITIGROUP ENERGY INC (CRRAH) | 57,935.22 |
| CITIGROUP ENERGY INC (QSE) | 7,029.55 |
| CITY OF AUSTIN DBA AUSTIN ENERGY (CRRAH) | 225,876.18 |
| CITY OF AUSTIN DBA AUSTIN ENERGY (QSE) | 42,183,968.14 |
| CITY OF BOERNE (CRRAH) | 31.73 |
| CITY OF COLLEGE STATION (CRRAH) | 2,052.69 |
| CITY OF GARLAND (CRRAH) | 3,334.88 |
| CITY OF GARLAND (QSE) | 1,960,214.84 |
| CITY OF GARLAND (SQ1) | 408,040.64 |
| CITY OF GARLAND (SQ10) | 10,044.43 |
| CITY OF GARLAND (SQ11) | 69,552.63 |
| CITY OF GARLAND (SQ12) | 242,266.82 |
| CITY OF GARLAND (SQ13) | 326,415.67 |
| CITY OF GARLAND (SQ14) | 346,116.36 |
| CITY OF GARLAND (SQ15) | 4.43 |

| | |
|---|---:|
| CITY OF GARLAND (SQ16) | 113,572.58 |
| CITY OF GARLAND (SQ17) | 31,421.76 |
| CITY OF GARLAND (SQ2) | 9,032.47 |
| CITY OF GARLAND (SQ3) | 18,036.22 |
| CITY OF GARLAND (SQ4) | 4,785.19 |
| CITY OF GARLAND (SQ5) | 7,355.57 |
| CITY OF GARLAND (SQ6) | 26,868.72 |
| CITY OF GARLAND (SQ7) | 14,522.50 |
| CITY OF GARLAND (SQ8) | 328.30 |
| CITY OF GARLAND (SQ9) | 521.33 |
| CITY OF GEORGETOWN (CRRAH) | 10,479.12 |
| CONOCOPHILLIPS COMPANY (QSE) | 314.27 |
| CONOCOPHILLIPS COMPANY (SQ1) | 113,947.78 |
| CONOCOPHILLIPS COMPANY (SQ2) | 2,093.69 |
| CONSTELLATION ENERGY GENERATION LLC (CRRAH) | 100,923.06 |
| CONSTELLATION ENERGY GENERATION LLC (QSE) | 12,565,905.19 |
| CONSTELLATION ENERGY GENERATION LLC (SQ1) | 1,934,606.24 |
| CONSTELLATION ENERGY GENERATION LLC (SQ2) | 1,969.31 |
| CONSTELLATION ENERGY GENERATION LLC 2 (CRRAH) | 49,821.32 |
| CONTINUUM ENERGY FUND LP (QSE) | 537.36 |
| CORIOLIS FORCE LLC (QSE) | 1,086.63 |
| CORSAIR LLC (CRRAH) | 5,561.45 |
| CORSAIR LLC (QSE) | 17,280.76 |
| CORSAIR LLC 2 (CRRAH) | 29,154.11 |
| CORSAIR LLC 3 (CRRAH) | 1,754.14 |
| CPS ENERGY (CRRAH) | 26,505.88 |
| CPS ENERGY (QSE) | 231,310.29 |
| CPS ENERGY (SQ3) | 1,994.07 |
| CPS ENERGY (SQ4) | 64,363.62 |
| CPS ENERGY (SQ5) | 5,911.11 |
| CPS ENERGY (SQ6) | 417.74 |
| CPS ENERGY 2 (CRRAH) | 20,074.40 |
| CPS ENERGY RIO NOGALES (SQ2) | 7,891,861.84 |
| CPS ENERGY WIND (SQ1) | 1,798,224.25 |
| CRIMSON ENERGY LLC (CRRAH) | 54.32 |
| CWP ENERGY INC (CRRAH) | 311.92 |
| CWP ENERGY INC (QSE) | 402,128.48 |
| CWP ENERGY INC (SQ1) | 7,834.22 |
| CWP ENERGY INC (SQ2) | 8,009.61 |
| CWP ENERGY INC 1 (CRRAH) | 3,380.61 |
| CWP ENERGY INC 2 (CRRAH) | 3,619.48 |
| DANSKE COMMODITIES US LLC (CRRAH) | 3,622.74 |
| DANSKE COMMODITIES US LLC (QSE) | 10,579.19 |
| DANSKE COMMODITIES US LLC 1 (CRRAH) | 1.78 |
| DARBY ENERGY LLC (CRRAH) | 22,321.71 |
| DARBY ENERGY LLC (QSE) | 159,910.60 |
| DARBY ENERGY LLC 2 (CRRAH) | 5,781.92 |

| | |
|---|---:|
| DC ENERGY TEXAS LLC (CRRAH) | 45,161.39 |
| DC ENERGY TEXAS LLC (QSE) | 177,276.00 |
| DC ENERGY TEXAS LLC (SQ1) | 4,721.40 |
| DC ENERGY TEXAS LLC 2 (CRRAH) | 25,938.65 |
| DC ENERGY TEXAS LLC 3 (CRRAH) | 95,766.80 |
| DENTON MUNICIPAL ELECTRIC (CRRAH) | 12,381.27 |
| DENTON MUNICIPAL ELECTRIC (QSE) | 9,360.87 |
| DENTON MUNICIPAL ELECTRIC (SQ1) | 11,101.61 |
| DENTON MUNICIPAL ELECTRIC (SQ2) | 7,890,296.61 |
| DIRECT ENERGY LP (CRRAH) | 4,217.19 |
| DIRECT ENERGY LP (QSE) | 143,801.50 |
| DIRECT ENERGY LP (SQ10) | 1,004.58 |
| DIRECT ENERGY LP (SQ11) | 5,099,477.22 |
| DIRECT ENERGY LP (SQ12) | 676.32 |
| DIRECT ENERGY LP (SQ13) | 22,489.77 |
| DIRECT ENERGY LP (SQ16) | 1,607,077.96 |
| DIRECT ENERGY LP (SQ3) | 7,026,322.02 |
| DIRECT ENERGY LP 1 (CRRAH) | 16,211.69 |
| DIRECT ENERGY LP WTU (SQ2) | 257,169.77 |
| DRW COMMODITIES LLC (CRRAH) | 0.24 |
| DRW COMMODITIES LLC (QSE) | 264.06 |
| DRW COMMODITIES LLC (SQ1) | 16.63 |
| DRW COMMODITIES LLC 1 (CRRAH) | 12.06 |
| DRW COMMODITIES LLC 2 (CRRAH) | 61.29 |
| DTE ENERGY TRADING INC (CRRAH) | 72.06 |
| DTE ENERGY TRADING INC (SQ1) | 130,353.18 |
| DUKE ENERGY RENEWABLE SERVICES LLC (CRRAH) | 9,511.64 |
| DUKE ENERGY RENEWABLE SERVICES LLC (QSE) | 570,080.76 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ1) | 17,031.81 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ2) | 1,352.19 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ3) | 5,484.35 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ4) | 32,600.70 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ5) | 269.92 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ6) | 75,010.87 |
| DUKE ENERGY RENEWABLE SERVICES LLC (SQ7) | 1,839.91 |
| DYFL POWER LLC (QSE) | 61,711.57 |
| DYNASTY ENERGY CALIFORNIA INC (QSE) | 4,150.39 |
| DYNASTY ENERGY CALIFORNIA INC (SQ1) | 4,338.19 |
| DYNASTY ENERGY CALIFORNIA INC (SQ2) | 1,399.54 |
| DYNASTY ENERGY CALIFORNIA INC (SQ3) | 811.16 |
| DYNASTY ENERGY CALIFORNIA INC (SQ4) | 9.31 |
| DYNASTY ENERGY CALIFORNIA INC 2 (CRRAH) | 152.07 |
| DYNASTY ENERGY CALIFORNIA INC 3 (CRRAH) | 240.10 |
| DYNASTY POWER INC (QSE) | 1,332,540.06 |
| DYNASTY POWER INC (SQ1) | 6,114.73 |
| DYNASTY POWER INC (SQ2) | 15,032.56 |
| DYNASTY POWER INC (SQ3) | 100,580.05 |

| | |
|---|---|
| EAGLES VIEW PARTNERS LTD (QSE) | 0.29 |
| EAST TEXAS ELECTRIC COOPERATIVE INC (CRRAH) | 784.46 |
| ECTOR COUNTY ENERGY CENTER LLC (CRRAH) | 1.39 |
| ECTOR COUNTY ENERGY CENTER LLC (QSE) | 33,019.24 |
| EDF ENERGY SERVICES LLC (QSE) | 1,727,010.48 |
| EDF ENERGY SERVICES LLC (SQ1) | 12,597,902.79 |
| EDF ENERGY SERVICES LLC (SQ10) | 10,000,993.00 |
| EDF ENERGY SERVICES LLC (SQ12) | 3,066,746.25 |
| EDF ENERGY SERVICES LLC (SQ15) | 1,600.13 |
| EDF ENERGY SERVICES LLC (SQ2) | 2,358,124.33 |
| EDF ENERGY SERVICES LLC (SQ20) | 38,328.43 |
| EDF ENERGY SERVICES LLC (SQ21) | 26,699,384.93 |
| EDF ENERGY SERVICES LLC (SQ3) | 1,277,600.56 |
| EDF ENERGY SERVICES LLC (SQ34) | 2,938,133.96 |
| EDF ENERGY SERVICES LLC (SQ36) | 75,167.37 |
| EDF ENERGY SERVICES LLC (SQ4) | 1,900,970.42 |
| EDF ENERGY SERVICES LLC (SQ5) | 5,526,012.46 |
| EDF ENERGY SERVICES LLC (SQ6) | 767,042.39 |
| EDF ENERGY SERVICES LLC (SQ8) | 1,528,715.80 |
| EDF ENERGY SERVICES LLC 1 (CRRAH) | 4,600.03 |
| EDF NORTH AMERICA (SQ20) | 5,025.02 |
| EDF NORTH AMERICA (SQ22) | 38,840.39 |
| EDF NORTH AMERICA (SQ23) | 9,661.02 |
| EDF NORTH AMERICA (SQ24) | 4,990.98 |
| EDF NORTH AMERICA (SQ25) | 24,520.03 |
| EDF NORTH AMERICA (SQ26) | 20,566,023.95 |
| EDF NORTH AMERICA (SQ27) | 39,709.47 |
| EDF NORTH AMERICA (SQ28) | 11,640,620.09 |
| EDF NORTH AMERICA (SQ29) | 1,443,835.14 |
| EDF NORTH AMERICA (SQ30) | 846.34 |
| EDF NORTH AMERICA (SQ31) | 1,923,821.67 |
| EDF NORTH AMERICA (SQ32) | 4,486.66 |
| EDF NORTH AMERICA (SQ33) | 489,043.13 |
| EDF NORTH AMERICA (SQ35) | 3,552.10 |
| EDF NORTH AMERICA (SQ38) | 7,446.01 |
| EDF NORTH AMERICA (SQ39) | 16,615,718.44 |
| EDF NORTH AMERICA (SQ40) | 5,028,801.73 |
| EDF NORTH AMERICA (SQ41) | 2,609,616.04 |
| EDF NORTH AMERICA (SQ42) | 673,068.20 |
| EDF TRADING (SQ10) | 473.04 |
| EDF TRADING (SQ17) | 2,456,399.19 |
| EDF TRADING (SQ19) | 4,109.33 |
| EDF TRADING (SQ5) | 6,819,077.17 |
| EDF TRADING (SQ7) | 1,622,038.08 |
| EDF TRADING (SQ9) | 8.58 |
| EDF TRADING NORTH AMERICA LLC (QSE) | 21,406,402.31 |
| EDF TRADING NORTH AMERICA LLC 3 (CRRAH) | 36,410.37 |

| | |
|---|---|
| EDF TRADING NORTH AMERICA LLC I (CRRAH) | 23,434.61 |
| EDP RENEWABLES NORTH AMERICA LLC (CRRAH) | 46,413.34 |
| EDP RENEWABLES NORTH AMERICA LLC (QSE) | 3,523.13 |
| EKAPITAL INVESTMENTS LLC (QSE) | 32.29 |
| ELECTRANET QSE I LLC (QSE) | 2,860,185.55 |
| ELECTRANET QSE I LLC (SQ1) | 73,654.69 |
| ELECTRANET QSE I LLC (SQ2) | 1,082,590.55 |
| ENEL TRADING NORTH AMERICA LLC (CRRAH) | 2,199.31 |
| ENEL TRADING NORTH AMERICA LLC (QSE) | 0.91 |
| ENEL TRADING NORTH AMERICA LLC (SQ1) | 716,871.82 |
| ENEL TRADING NORTH AMERICA LLC (SQ2) | 3,089,330.27 |
| ENEL TRADING NORTH AMERICA LLC (SQ4) | 1,492.00 |
| ENEL TRADING NORTH AMERICA LLC (SQ5) | 2,298.03 |
| ENEL TRADING NORTH AMERICA LLC (SQ6) | 3,197.30 |
| ENEL TRADING NORTH AMERICA LLC 1 (CRRAH) | 258.83 |
| ENEL X NORTH AMERICA INC (QSE) | 23,972.23 |
| ENERGY MONGER LLC (QSE) | 628.26 |
| ENERWISE GLOBAL TECHNOLOGIES LLC (QSE) | 176,212.00 |
| ENGELHART CTP (US) LLC (CRRAH) | 7,811.30 |
| ENGELHART CTP (US) LLC 1 (CRRAH) | 5,610.11 |
| ENGELHART CTP (US) LLC 2 (CRRAH) | 19,042.94 |
| ENGIE ENERGY MARKETING NA INC (CRRAH) | 2,466.34 |
| ENGIE ENERGY MARKETING NA INC (SQ1) | 2,690,650.26 |
| ENGIE ENERGY MARKETING NA INC (SQ10) | 96.64 |
| ENGIE ENERGY MARKETING NA INC (SQ11) | 468,040.49 |
| ENGIE ENERGY MARKETING NA INC (SQ12) | 1,026.27 |
| ENGIE ENERGY MARKETING NA INC (SQ13) | 11,225.72 |
| ENGIE ENERGY MARKETING NA INC (SQ16) | 220,992.49 |
| ENGIE ENERGY MARKETING NA INC (SQ17) | 1,299,403.06 |
| ENGIE ENERGY MARKETING NA INC (SQ18) | 3,222,904.21 |
| ENGIE ENERGY MARKETING NA INC (SQ19) | 1,824,289.06 |
| ENGIE ENERGY MARKETING NA INC (SQ2) | 2,852.37 |
| ENGIE ENERGY MARKETING NA INC (SQ20) | 2,053,909.04 |
| ENGIE ENERGY MARKETING NA INC (SQ21) | 5,198.40 |
| ENGIE ENERGY MARKETING NA INC (SQ22) | 10,719.59 |
| ENGIE ENERGY MARKETING NA INC (SQ23) | 9,324.24 |
| ENGIE ENERGY MARKETING NA INC (SQ25) | 267.47 |
| ENGIE ENERGY MARKETING NA INC (SQ26) | 13,458.07 |
| ENGIE ENERGY MARKETING NA INC (SQ28) | 6,863.26 |
| ENGIE ENERGY MARKETING NA INC (SQ30) | 2,225.04 |
| ENGIE ENERGY MARKETING NA INC (SQ5) | 0.07 |
| ENGIE ENERGY MARKETING NA INC (SQ6) | 7,206.67 |
| ENGIE ENERGY MARKETING NA INC (SQ8) | 6.44 |
| ENGIE ENERGY MARKETING NA INC 2 (CRRAH) | 25,710.51 |
| ENGIE ENERGY MARKETING NA INC 3 (CRRAH) | 7,953.46 |
| ENGIE RESOURCES LLC (CRRAH) | 11,305.57 |
| ENTRUST ENERGY INC (CRRAH) | 1.85 |

| | |
|---|---|
| ENTRUST ENERGY INC (QSE) | 15,033.63 |
| ENTRUST ENERGY INC (SQ1) | 1,042.25 |
| ETC ENDURE ENERGY LLC (CRRAH) | 7,150.56 |
| ETC ENDURE ENERGY LLC (QSE) | 374,469.29 |
| ETC ENDURE ENERGY LLC (SQ1) | 1,063.28 |
| ETC ENDURE ENERGY LLC (SQ3) | 510.98 |
| ETC ENDURE ENERGY LLC (SQ5) | 0.17 |
| ETC ENDURE ENERGY LLC LAAR (SQ2) | 15,154.67 |
| EVERGY KANSAS CENTRAL INC (QSE) | 5,012,717.46 |
| EVERGY METRO INC (QSE) | 864.60 |
| FAYETTE ELECTRIC COOPERATIVE INC (CRRAH) | 2,575.72 |
| FORMOSA UTILITY VENTURE LTD (QSE) | 3,778,262.41 |
| FP SOUTH CAPITAL PARTNERS LLC (CRRAH) | 96,838.86 |
| FP SOUTH CAPITAL PARTNERS LLC (QSE) | 105,188.75 |
| FPL ENERGY TEXAS LLC (SQ1) | 424,089.74 |
| FR MARIAH CLASS B HOLDCO LLC (CRRAH) | 0.13 |
| FREEPOINT COMMODITIES LLC (CRRAH) | 6,712.45 |
| FREEPOINT COMMODITIES LLC SOLUTIONS (SQ1) | 495,389.42 |
| FRONTIER UTILITIES LLC (CRRAH) | 4,167.93 |
| FRONTIER UTILITIES LLC (QSE) | 1,494,740.81 |
| GALT POWER INC (QSE) | 0.10 |
| GALT POWER INC (SQ1) | 1,088.73 |
| GBPOWER LLC (QSE) | 1,006.85 |
| GEODESIC 1 LLC (CRRAH) | 1,631.47 |
| GEODESIC 1 LLC (QSE) | 8,808.84 |
| GEODESIC 1 LLC (SQ2) | 6,714.05 |
| GERDAU AMERISTEEL ENERGY INC (QSE) | 1,632,837.16 |
| GESTERNOVA SA CORPORATION (QSE) | 5,496.58 |
| GEUS (CRRAH) | 858.24 |
| GEXA ENERGY LP (CRRAH) | 9,195.46 |
| GEXA ENERGY LP (QSE) | 32,591.15 |
| GEXA ENERGY LP (SQ1) | 1.68 |
| GEXA ENERGY LP (SQ2) | 3,958.05 |
| GEXA ENERGY LP (SQ6) | 330,412.38 |
| GEXA ENERGY LP (SQ7) | 15,757.73 |
| GOLDEN SPREAD ELECTRIC COOPERATIVE INC (CRRAH) | 31,620.52 |
| GOLDEN SPREAD ELECTRIC COOPERATIVE INC (QSE) | 2,076,664.57 |
| GOLDTHWAITE WIND ENERGY LLC (CRRAH) | 94.27 |
| GOLDTHWAITE WIND ENERGY LLC (QSE) | 208,223.78 |
| GRAND OAK CAPITAL PARTNERS LP (SQ3) | 2,511.04 |
| GRANTHAM ENERGY CORPORATION (QSE) | 1,293.43 |
| GREENE ENERGY CAPITAL SW LLC (QSE) | 109.08 |
| GREENE ENERGY CAPITAL SW LLC (SUB A) (SQ1) | 3,428.74 |
| GREENE ENERGY CAPITAL SW LLC (SUB B) (SQ2) | 12,280.62 |
| GREENE ENERGY CAPITAL SW LLC (SUB C) (SQ3) | 21,650.06 |
| GREENE ENERGY CAPITAL SW LLC (SUB E) (SQ5) | 913.44 |
| GREENE ENERGY CAPITAL SW LLC (SUB F) (SQ6) | 537.67 |

| | |
|---|---|
| GRIDDY ENERGY LLC 1 (QSE) | 2,825.70 |
| GRIDMATIC EQUISETUM LLC (QSE) | 1,407.25 |
| GRIDMATIC EQUISETUM LLC (SQ1) | 554.87 |
| GRIDMATIC INC (CRRAH) | 967.70 |
| GRIDMATIC INC (QSE) | 32,652.30 |
| GRIDMATIC INC (SQ1) | 17,493.73 |
| GRIDPLUS TEXAS INC (QSE) | 3,141.41 |
| GUADALUPE VALLEY ELECTRIC CO OP INC (CRRAH) | 7,499.96 |
| GUNSIGHT MOUNTAIN WIND ENERGY LLC (CRRAH) | 128.44 |
| GUNSIGHT MOUNTAIN WIND ENERGY LLC (QSE) | 846,665.59 |
| GUZMAN ENERGY LLC (QSE) | 69,136.48 |
| GUZMAN ENERGY LLC (SQ2) | 0.01 |
| HANWHA ENERGY USA HOLDINGS CORP DBA 174 POWER GLOBAL (SQ1) | 8,808.72 |
| HANWHA ENERGY USA HOLDINGS CORP DBA 174 POWER GLOBAL (SQ2) | 32,475.21 |
| HANWHA ENERGY USA HOLDINGS CORP DBA 174 POWER GLOBAL (SQ3) | 6,100.75 |
| HARTREE PARTNERS LP (CRRAH) | 18,141.13 |
| HARTREE PARTNERS LP (QSE) | 115.55 |
| HARTREE PARTNERS LP 1 (CRRAH) | 9,184.42 |
| HARTREE PARTNERS LP 2 (CRRAH) | 794.25 |
| HEBER ENERGY LLC (CRRAH) | 33.12 |
| HEBER ENERGY LLC (QSE) | 77,147.35 |
| HEN POWER MARKETING LLC (QSE) | 210.97 |
| HERITAGE POWER LLC (QSE) | 1,540.36 |
| HERMIT ENERGY TRADING LLC (CRRAH) | 57,385.99 |
| HERMIT ENERGY TRADING LLC (QSE) | 36,372.22 |
| HERMIT ENERGY TRADING LLC 1 (CRRAH) | 25.31 |
| HERMIT ENERGY TRADING LLC 2 (CRRAH) | 2,476.03 |
| HQ ENERGY SERVICES (US) INC (QSE) | 9,288.37 |
| ILUMINAR ENERGY LLC (QSE) | 3,404.85 |
| IN COMMODITIES US LLC (QSE) | 20,408.31 |
| INERTIA POWER III LP (CRRAH) | 1.91 |
| INERTIA POWER III LP (SQ2) | 43.83 |
| INERTIA POWER III LP (SQ3) | 0.19 |
| INERTIA POWER III LP (SQ5) | 2,470.93 |
| INITUS INVESTMENTS LLC (QSE) | 6,855.52 |
| INTERGRID POWER LLC (CRRAH) | 2,799.51 |
| INTERGRID POWER LLC (QSE) | 19.85 |
| ISO 2 LLC (QSE) | 4,689.80 |
| J ARON AND COMPANY LLC (QSE) | 3,233,393.11 |
| JACINTO ENERGY LLC (QSE) | 4,104.67 |
| JP ENERGY RESOURCES LLC (QSE) | 94.03 |
| JP MORGAN CHASE BANK NA (QSE) | 15,977.97 |
| JUST ENERGY TEXAS LP (QSE) | 3,808,667.35 |
| JUST ENERGY TEXAS LP (SQ1) | 3,715,997.70 |
| KERRVILLE PUBLIC UTILITY BOARD (CRRAH) | 1,307.59 |
| KWANTIX TRADING FUND I LP (CRRAH) | 48,143.94 |
| KWANTIX TRADING FUND I LP (QSE) | 4,953.26 |

| | |
|---|---|
| KWANTIX TRADING FUND I LP (SQ1) | 5,880.87 |
| KWANTIX TRADING FUND I LP (SQ3) | 29,989.06 |
| LAFAYETTE POWER LLC (CRRAH) | 793.64 |
| LANEY ANALYTICS LLC (QSE) | 2.41 |
| LANEY POWER LLC (CRRAH) | 30,106.85 |
| LANEY POWER LLC (SQ1) | 14,626.10 |
| LANEY POWER LLC (SQ2) | 11,108.63 |
| LANEY POWER LLC (SQ4) | 24,629.55 |
| LANEY POWER LLC 1 (CRRAH) | 324.74 |
| LANEY POWER LLC 2 (CRRAH) | 2,720.82 |
| LINKS EP LLC (SQ1) | 10,854.32 |
| LNE POWER LLC (CRRAH) | 6,653.67 |
| LNE POWER LLC 2 (CRRAH) | 5,468.12 |
| LNE POWER LLC 3 (CRRAH) | 8,404.13 |
| LOWER COLORADO RIVER AUTHORITY (CRRAH) | 2,288,615.95 |
| LOWER COLORADO RIVER AUTHORITY (QSE) | 3,202,354.00 |
| LOWER COLORADO RIVER AUTHORITY LCRA WSC ENERGY (CRRAH) | 237.93 |
| LOWER COLORADO RIVER AUTHORITY LCRA WSC ENERGY (SQ1) | 1,926,041.37 |
| LQA LLC (CRRAH) | 4,541.68 |
| LQA LLC 2 (CRRAH) | 12,912.09 |
| LQA LLC 3 (CRRAH) | 1,360.87 |
| LTSTE INVESTMENTS LLC (QSE) | 2,331.60 |
| LUMINANT ENERGY COMPANY LLC (CRRAH) | 68,740.68 |
| LUMINANT ENERGY COMPANY LLC (QSE) | 452,432.35 |
| LUMINANT ENERGY COMPANY LLC (SQ1) | 5,055,455.42 |
| LUMINANT ENERGY COMPANY LLC (SQ2) | 12,765.42 |
| LUMINANT ENERGY COMPANY LLC (SQ6) | 92,067.89 |
| LUMINANT ENERGY COMPANY LLC REPS (CRRAH) | 92,421.77 |
| LUMINANT ENERGY COMPANY LLC TRADING (CRRAH) | 21,079.24 |
| MACQUARIE ENERGY LLC (QSE) | 14,669,692.49 |
| MACQUARIE ENERGY LLC 1 (CRRAH) | 6,720.08 |
| MACQUARIE ENERGY TRADING LLC (QSE) | 21,363.58 |
| MACQUARIE ENERGY TRADING LLC (SQ1) | 22,302.74 |
| MACQUARIE ENERGY TRADING LLC (SQ2) | 46,830.27 |
| MAG ENERGY SOLUTIONS INC (CRRAH) | 11,651.10 |
| MAG ENERGY SOLUTIONS INC (QSE) | 16,829.83 |
| MAG ENERGY SOLUTIONS INC (SQ1) | 6,066.64 |
| MAGNOLIA ENERGY CAPITAL LLC (QSE) | 5,370.95 |
| MAVERICK CREEK WIND LLC (CRRAH) | 5,947.63 |
| MCADOO WIND ENERGY LLC (QSE) | 1,645,792.15 |
| MERCURIA ENERGY AMERICA LLC (CRRAH) | 4,250.18 |
| MERCURIA ENERGY AMERICA LLC (QSE) | 1,819.94 |
| MERCURIA ENERGY AMERICA LLC (SQ2) | 167,407.32 |
| MERCURIA ENERGY AMERICA LLC 1 (CRRAH) | 36,798.16 |
| MERCURIA ENERGY AMERICA LLC 2 (CRRAH) | 8,468.27 |
| MERRILL LYNCH COMMODITIES INC (CRRAH) | 19,282.43 |
| MERRILL LYNCH COMMODITIES INC (QSE) | 39.20 |

| | |
|---|---|
| MERRILL LYNCH COMMODITIES INC 2 (CRRAH) | 2,519.25 |
| MERRILL LYNCH COMMODITIES INC 3 (CRRAH) | 7,088.46 |
| MESQUITE GENERATION HOLDINGS LLC (QSE) | 46,824,170.83 |
| MET TEXAS TRADING LP (CRRAH) | 2,184.68 |
| MET TEXAS TRADING LP 2 (CRRAH) | 944.18 |
| MET TEXAS TRADING LP 3 (CRRAH) | 89,000.72 |
| MFT ENERGY US 1 LLC (QSE) | 9,820.77 |
| MIAMI WIND I LLC (CRRAH) | 763.69 |
| MIAMI WIND I LLC (QSE) | 958,731.03 |
| MIDAMERICAN ENERGY SERVICES LLC (CRRAH) | 3,805.77 |
| MIDAMERICAN ENERGY SERVICES LLC (QSE) | 255,141.00 |
| MIDWEST ENERGY TRADING EAST LLC (CRRAH) | 47,747.45 |
| MITSUI AND CO ENERGY MARKETING AND SERVICES (USA) INC (CRRAH) | 106.50 |
| MITSUI AND CO ENERGY MARKETING AND SERVICES (USA) INC (QSE) | 87.81 |
| MITSUI AND CO ENERGY MARKETING AND SERVICES (USA) INC (SQ2) | 311,380.82 |
| MONTEREY TX LLC (QSE) | 11,421.34 |
| MORGAN STANLEY CAPITAL GROUP INC (CRRAH) | 8,855.98 |
| MORGAN STANLEY CAPITAL GROUP INC (QSE) | 11,672.79 |
| MORGAN STANLEY CAPITAL GROUP INC B (CRRAH) | 18,125.16 |
| MORGAN STANLEY CAPITAL GROUP INC C (CRRAH) | 1,250.84 |
| MP2 ENERGY LLC (QSE) | 394,167.70 |
| MP2 ENERGY LLC (SQ1) | 594,363.00 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (QSE) | 12,539,687.55 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (SQ1) | 6,779.92 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (SQ2) | 575.58 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (SQ3) | 43,372.29 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (SQ4) | 1,848.57 |
| MP2 ENERGY TEXAS LLC DBA SHELL ENERGY SOLUTIONS (SQ5) | 366.70 |
| MQE LLC (QSE) | 1,324.01 |
| MUDD ENERGY LLC (CRRAH) | 61.03 |
| NDC PARTNERS LLC (QSE) | 11,567.33 |
| NEW BRAUNFELS UTILITIES (CRRAH) | 13,462.21 |
| NEW MEXICO ELECTRIC MARKETING LLC (CRRAH) | 256.06 |
| NEW MEXICO ELECTRIC MARKETING LLC 2 (CRRAH) | 1,046.57 |
| NEXTERA ENERGY MARKETING LLC (CRRAH) | 1,461.47 |
| NEXTERA ENERGY MARKETING LLC (QSE) | 99,432.63 |
| NEXTERA ENERGY MARKETING LLC (SQ1) | 10,885.61 |
| NEXTERA ENERGY MARKETING LLC (SQ10) | 7,741.20 |
| NEXTERA ENERGY MARKETING LLC (SQ11) | 506,546.85 |
| NEXTERA ENERGY MARKETING LLC (SQ12) | 2,549,975.70 |
| NEXTERA ENERGY MARKETING LLC (SQ14) | 40,194.12 |
| NEXTERA ENERGY MARKETING LLC (SQ15) | 17,057,784.04 |
| NEXTERA ENERGY MARKETING LLC (SQ16) | 146,695.16 |
| NEXTERA ENERGY MARKETING LLC (SQ17) | 16,052.91 |
| NEXTERA ENERGY MARKETING LLC (SQ18) | 5,835,868.80 |
| NEXTERA ENERGY MARKETING LLC (SQ2) | 153,160.39 |
| NEXTERA ENERGY MARKETING LLC (SQ20) | 3,902,239.95 |

| | |
|---|---:|
| NEXTERA ENERGY MARKETING LLC (SQ22) | 40,876,469.27 |
| NEXTERA ENERGY MARKETING LLC (SQ24) | 96,038.96 |
| NEXTERA ENERGY MARKETING LLC (SQ26) | 3,202.19 |
| NEXTERA ENERGY MARKETING LLC (SQ3) | 9,924.91 |
| NEXTERA ENERGY MARKETING LLC (SQ4) | 429,886.96 |
| NEXTERA ENERGY MARKETING LLC (SQ6) | 4,062,623.61 |
| NEXTERA ENERGY MARKETING LLC (SQ7) | 3,854.01 |
| NEXTERA ENERGY MARKETING LLC (SQ8) | 14,286.90 |
| NEXTERA ENERGY MARKETING LLC (SQ9) | 10,950.15 |
| NEXTERA ENERGY MARKETING LLC A (CRRAH) | 49,295.51 |
| NORTHERN STATES POWER COMPANY (QSE) | 3,041,778.07 |
| NOVATUS ENERGY MANAGEMENT LLC (CRRAH) | 1,671.62 |
| NRG CURTAILMENT SOLUTIONS INC (QSE) | 7,132.84 |
| NRG POWER MARKETING LLC (CRRAH) | 47,760.86 |
| NRG POWER MARKETING LLC 2 (CRRAH) | 3,205.11 |
| NRG POWER MARKETING LLC 3 (CRRAH) | 1,837.06 |
| NRG TEXAS BUSINESS SOLAR (SQ3) | 362,833.54 |
| NRG TEXAS CEDAR BAYOU (SQ4) | 41,506,305.36 |
| NRG TEXAS LOAD (SQ2) | 561,670.16 |
| NRG TEXAS POWER LLC (CRRAH) | 965.23 |
| NRG TEXAS POWER LLC (GME) (CRRAH) | 909.87 |
| NRG TEXAS POWER LLC (LOAD) (CRRAH) | 85,091.62 |
| NRG TEXAS POWER LLC (QSE) | 46,297,319.86 |
| NUECES ELECTRIC COOPERATIVE INC RETAIL DIVISION (SQ1) | 480,957.67 |
| OCCIDENTAL POWER SERVICES INC (QSE) | 5,142,039.16 |
| OCCIDENTAL POWER SERVICES INC (SQ1) | 2,773,752.97 |
| ONE VENTURES TX LLC (QSE) | 36,747.36 |
| ORSTED ONSHORE NORTH AMERICA LLC (CRRAH) | 62.37 |
| ORSTED US TRADING LLC (QSE) | 420,353.00 |
| PACIFIC SUMMIT ENERGY LLC (CRRAH) | 1,539.42 |
| PACIFIC SUMMIT ENERGY LLC (QSE) | 1,609,847.31 |
| PATTERN ENERGY MANAGEMENT SERVICES LLC (CRRAH) | 7,235.22 |
| PATTERN ENERGY MANAGEMENT SERVICES LLC (QSE) | 3,942.54 |
| PCS TRADING LLC (CRRAH) | 10,227.98 |
| PEAK ENERGY CAPITAL LP (CRRAH) | 8,528.68 |
| PEAK ENERGY CAPITAL LP (QSE) | 597.86 |
| PEAK ENERGY CAPITAL LP 1 (CRRAH) | 12,613.08 |
| PEAK ENERGY CAPITAL LP 2 (CRRAH) | 4,392.57 |
| PEARL STREET MERCHANT ENERGY LLC (CRRAH) | 3,780.59 |
| PEARL STREET MERCHANT ENERGY LLC (QSE) | 30,792.87 |
| PEBBLESTONE ENERGY LLC (QSE) | 13,903.09 |
| PENINSULA POWER LLC (QSE) | 13,845.73 |
| PENINSULA POWER LLC (SQ1) | 2,139.50 |
| PERFECT POWER SOLUTIONS TEXAS LLC (QSE) | 6.91 |
| PHARETRAM ENERGY SERVICES LTD (QSE) | 3,529.16 |
| PHYSICAL SYSTEMS INTEGRATION LLC (QSE) | 2,757.20 |
| PNT FINANCIAL LLC (SQ2) | 0.03 |

| | |
|---|---:|
| PRECEPT POWER LLC (CRRAH) | 32,790.86 |
| PRECEPT POWER LLC (SQ1) | 90,787.95 |
| PRECEPT POWER LLC (SQ2) | 913.89 |
| PRECEPT POWER LLC (SQ3) | 0.04 |
| PRECEPT POWER LLC (SQ4) | 6,807.50 |
| PRIORITY POWER MANAGEMENT LLC (QSE) | 3,236,511.48 |
| PRIORITY POWER MANAGEMENT LLC (SQ1) | 115,161.73 |
| PURE ENERGY INC (QSE) | 339.51 |
| QDT TRADING LLC (CRRAH) | 4,292.76 |
| QUATTRO ENERGY LP (CRRAH) | 11.56 |
| R SQUARE ENERGY CORP (QSE) | 652.34 |
| RAINBOW ENERGY MARKETING CORPORATION (QSE) | 2,200,736.41 |
| RAINBOW ENERGY MARKETING CORPORATION (SQ1) | 298,680.93 |
| RAINBOW ENERGY MARKETING CORPORATION (SQ2) | 2,481,501.07 |
| RAINBOW ENERGY MARKETING CORPORATION (SQ3) | 175.47 |
| RAINBOW ENERGY MARKETING CORPORATION (SQ4) | 111,120.33 |
| RAINBOW ENERGY MARKETING CORPORATION (SQ5) | 102.93 |
| RATTLESNAKE WIND I LLC (QSE) | 1,846.17 |
| RAYBURN COUNTRY ELECTRIC COOPERATIVE INC (CRRAH) | 3,213.79 |
| RAYBURN COUNTRY ELECTRIC COOPERATIVE INC (QSE) | 3,735.09 |
| RED OAK ENERGY CAPITAL LLC (QSE) | 201.98 |
| RED WOLF TX2 LLC (QSE) | 2,657.12 |
| REDEMPTIVE POWER INC (QSE) | 24,858.12 |
| REUEL ENERGY LLC (QSE) | 94,945.70 |
| RHYTHM OPS LLC (QSE) | 237.81 |
| RIVERCREST POWER SOUTH 1 LLC (CRRAH) | 2,544.57 |
| RIVERCREST POWER SOUTH LLC (CRRAH) | 85,784.15 |
| RIVERCREST POWER SOUTH LLC (QSE) | 73,756.17 |
| ROCTOP INVESTMENTS INC (CRRAH) | 647.82 |
| ROCTOP INVESTMENTS INC (QSE) | 218.77 |
| RWE RENEWABLES QSE LLC (CRRAH) | 143,970.92 |
| RWE RENEWABLES QSE LLC (QSE) | 18,602.84 |
| RWE RENEWABLES QSE LLC (SQ2) | 4,106,724.97 |
| RWE RENEWABLES QSE LLC (SQ4) | 1,570,373.15 |
| RWE RENEWABLES QSE LLC (SQ5) | 724,129.65 |
| RWE RENEWABLES QSE LLC (SQ6) | 1,055,645.04 |
| RWE RENEWABLES QSE LLC (SQ7) | 770,107.28 |
| SAN BERNARD ELECTRIC COOPERATIVE INC (CRRAH) | 2,981.56 |
| SANDALWOOD POWER LLC (CRRAH) | 6,434.27 |
| SANDALWOOD POWER LLC (QSE) | 13,847.65 |
| SANDALWOOD POWER LLC (SQ1) | 303.60 |
| SANDALWOOD POWER LLC 1 (CRRAH) | 7,621.67 |
| SANDALWOOD POWER LLC 2 (CRRAH) | 211.78 |
| SANDY CREEK ENERGY ASSOCIATES LP (QSE) | 54,347.23 |
| SANTA RITA EAST WIND ENERGY LLC (QSE) | 23,799.32 |
| SANTA RITA WIND ENERGY LLC (QSE) | 10,839.59 |
| SARACEN ENERGY WEST LP (CRRAH) | 36,507.96 |

| | |
|---|---:|
| SARACEN ENERGY WEST LP 2 (CRRAH) | 23,203.65 |
| SARACEN ENERGY WEST LP 3 (CRRAH) | 6,874.23 |
| SARACEN POWER LP (CRRAH) | 50,598.43 |
| SARACEN POWER LP 1 (CRRAH) | 3,229.73 |
| SCURRY COUNTY WIND II LLC (QSE) | 212,275.49 |
| SCURRY COUNTY WIND LP (QSE) | 41,565.07 |
| SEMPRA GAS AND POWER MARKETING LLC (CRRAH) | 388.29 |
| SEMPRA GAS AND POWER MARKETING LLC (QSE) | 2,616.53 |
| SENATE WIND LLC (CRRAH) | 5,269.20 |
| SESCO SOUTHWEST TRADING LLC - CAISO (SQ1) | 30,269.28 |
| SESCO SOUTHWEST TRADING LLC - FTR (SQ5) | 115,994.77 |
| SESCO SOUTHWEST TRADING LLC - SYSTRADE (SQ3) | 62,497.26 |
| SESCO SOUTHWEST TRADING LLC - Y (SQ4) | 9,317.43 |
| SESCO SOUTHWEST TRADING LLC (CRRAH) | 21,024.77 |
| SESCO SOUTHWEST TRADING LLC (QSE) | 214,414.33 |
| SESCO SOUTHWEST TRADING LLC KP (CRRAH) | 4,542.56 |
| SESCO SOUTHWEST TRADING LLC KP (SQ2) | 125,204.97 |
| SHELL ENERGY NORTH AMERICA (US) LP (CRRAH) | 524.70 |
| SHELL ENERGY NORTH AMERICA (US) LP (QSE) | 121,044,600.42 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ1) | 1,135,869.42 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ11) | 21,797.24 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ12) | 3,951.65 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ14) | 509,603.07 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ15) | 4,441.97 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ2) | 15,060,363.73 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ3) | 23,052.44 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ4) | 0.21 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ5) | 6.71 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ7) | 170,012.76 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ8) | 20,739.38 |
| SHELL ENERGY NORTH AMERICA (US) LP (SQ9) | 34,712.27 |
| SHELL ENERGY NORTH AMERICA (US) LP 2 (CRRAH) | 115,876.08 |
| SHELL ENERGY NORTH AMERICA (US) LP 3 (CRRAH) | 71,096.20 |
| SIX ONE COMMODITIES LLC (QSE) | 1,664.72 |
| SOUTH PLAINS WIND ENERGY LLC (CRRAH) | 261.45 |
| SOUTH TEXAS ELECTRIC CO OP INC (QSE) | 13,680,452.17 |
| SOUTH TEXAS ELECTRIC CO OP INC (SQ3) | 58,663.69 |
| SOUTH TEXAS ELECTRIC COOPERATIVE INC (CRRAH) | 240,658.14 |
| SP ENERGY TRADING LLC (CRRAH) | 266.41 |
| SP ENERGY TRADING LLC (QSE) | 4,356.82 |
| SPARK ENERGY LLC (QSE) | 6,467.92 |
| STANDARD NORMAL ENERGY LLC (SQ2) | 3,295.27 |
| STANDARD NORMAL ENERGY LLC (SQ3) | 6,403.23 |
| STANDARD NORMAL ENERGY LLC (SQ4) | 5,324.73 |
| STANTON WIND ENERGY LLC (QSE) | 228,575.45 |
| SUSTAINING POWER SOLUTIONS LLC (QSE) | 7,591.06 |
| SW POWER TRADING LLC (CRRAH) | 28,629.95 |

| | |
|---|---:|
| TALEN ENERGY MARKETING LLC (CRRAH) | 7,207.65 |
| TALLER CUBE LLC (CRRAH) | 294.27 |
| TALLER CUBE LLC (QSE) | 3,370.97 |
| TEC ENERGY INC (QSE) | 508,470.63 |
| TENASKA POWER SERVICES CO (CRRAH) | 6,703.52 |
| TENASKA POWER SERVICES CO (QSE) | 112,901,211.12 |
| TENASKA POWER SERVICES CO 2 (CRRAH) | 425.03 |
| TENASKA POWER SERVICES CO 3 (CRRAH) | 1,100.39 |
| TEXAS ELECTRIC MARKETING LLC (2) (CRRAH) | 115.71 |
| TEXAS ELECTRIC MARKETING LLC (3) (CRRAH) | 1,017.21 |
| TEXAS ENERGY TRANSFER POWER LLC (QSE) | 2,071,213.29 |
| TEXAS ENERGY TRANSFER POWER LLC LONE STAR (SQ2) | 1,183,353.80 |
| TEXAS ENERGY TRANSFER POWER LLC REED (SQ3) | 554,784.43 |
| TEXAS ENERGY TRANSFER POWER LLC SXL (SQ4) | 7,608.33 |
| TEXAS RETAIL ENERGY LLC (CRRAH) | 1,879.96 |
| TEXAS RETAIL ENERGY LLC (QSE) | 50,829.03 |
| TEXAS RETAIL ENERGY LLC (SQ1) | 196,805.07 |
| TEXPO POWER LP DBA TEXPO ENERGY (QSE) | 1,940,896.95 |
| THE ENERGY AUTHORITY INC (CRRAH) | 52.32 |
| THE ENERGY AUTHORITY INC (SQ2) | 17,426,890.86 |
| THORDIN LLC (QSE) | 6,876.71 |
| TIDAL ENERGY MARKETING (US) LLC (CRRAH) | 13,536.90 |
| TIOS CAPITAL LLC (QSE) | 10,338.04 |
| TOTALENERGIES GAS AND POWER NORTH AMERICA INC (QSE) | 10,255,284.01 |
| TRAILSTONE ENERGY MARKETING LLC (CRRAH) | 880.05 |
| TRAILSTONE ENERGY MARKETING LLC (QSE) | 24,743,151.14 |
| TRAILSTONE ENERGY MARKETING LLC (SQ2) | 25,507.41 |
| TRANE GRID SERVICES LLC (QSE) | 5,459.06 |
| TRANSALTA ENERGY MARKETING (US) INC 3 (CRRAH) | 973.74 |
| TRANSALTA ENERGY MARKETING (US) INC 3 (QSE) | 3,278.84 |
| TRIOLITH ENERGY FUND LP (QSE) | 13,371.25 |
| TRQ11 (SQ11) | 2,783.54 |
| TRQ12 (SQ12) | 3,374.44 |
| TRQ13 (SQ13) | 908.90 |
| TRQ14 (SQ14) | 19,710,163.72 |
| TRQ15 (SQ15) | 6,019.32 |
| TRQ16 (SQ16) | 75.29 |
| TRQ17 (SQ17) | 3,774,474.67 |
| TRQ18 (SQ18) | 41,082,045.74 |
| TRQ20 (SQ20) | 15,977,252.96 |
| TRQ21 (SQ21) | 37,779.49 |
| TRQ4 (SQ4) | 8,646,055.05 |
| TRQ7 (SQ7) | 35,989,607.54 |
| TRUE COMMODITIES LLC (QSE) | 0.11 |
| TRUELIGHT ENERGY FUND LP (QSE) | 524.62 |
| TTPA LLC (CRRAH) | 231.34 |
| TTPA LLC (QSE) | 5,376.79 |

| | |
|---|---:|
| TURKEY TRACK WIND ENERGY LLC (QSE) | 258,730.21 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (QSE) | 26.75 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ1) | 16.26 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ10) | 0.26 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ11) | 12.28 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ4) | 3,292,377.12 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ6) | 650.45 |
| TWIN EAGLE RESOURCE MANAGEMENT LLC (SQ9) | 7,939,290.22 |
| TX ACTIVE POWER INVESTMENTS LLC (CRRAH) | 58,639.03 |
| TX ACTIVE POWER INVESTMENTS LLC (QSE) | 1,658.07 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ1) | 150,661.78 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ2) | 38,864.55 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ3) | 155,887.64 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ4) | 68,434.29 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ5) | 65,656.57 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ6) | 2,441.64 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ7) | 10,991.07 |
| TX ACTIVE POWER INVESTMENTS LLC (SQ8) | 110,280.03 |
| TX ACTIVE POWER INVESTMENTS LLC 2 (CRRAH) | 5,553.48 |
| TX ACTIVE POWER INVESTMENTS LLC 3 (CRRAH) | 317.70 |
| UNCIA ENERGY LP SERIES E (QSE) | 174.28 |
| UNIPER GLOBAL COMMODITIES NORTH AMERICA LLC (CRRAH) | 11,789.53 |
| UNIPER GLOBAL COMMODITIES NORTH AMERICA LLC (QSE) | 5,805,542.54 |
| VARSITY ENERGY LLC (QSE) | 181.45 |
| VBE INVESTMENTS LLC (CRRAH) | 40,572.68 |
| VBE INVESTMENTS LLC (QSE) | 14,424.46 |
| VBE INVESTMENTS LLC 1 (CRRAH) | 1,792.19 |
| VELOCITY AMERICAN ENERGY MASTER I LP (CRRAH) | 3,429.99 |
| VELOCITY AMERICAN ENERGY MASTER I LP (SQ3) | 91,764.10 |
| VELOCITY AMERICAN ENERGY MASTER I LP (SQ5) | 104,985.44 |
| VELOCITY AMERICAN ENERGY MASTER I LP (SQ6) | 14,292.33 |
| VELOCITY AMERICAN ENERGY MASTER I LP 2 (CRRAH) | 222,652.65 |
| VELOCITY AMERICAN ENERGY MASTER I LP 3 (CRRAH) | 170,165.34 |
| VERANO ENERGY TRADING LP (QSE) | 5,325.62 |
| VIRIBUS FUND LP (CRRAH) | 1,393.66 |
| VIRIDITY ENERGY SOLUTIONS INC (QSE) | 12,544.35 |
| VITOL INC (CRRAH) | 9,679.31 |
| VITOL INC (QSE) | 826.03 |
| VITOL INC (SQ1) | 13,466.23 |
| VITOL INC 2 (CRRAH) | 34,655.39 |
| VITOL INC I (CRRAH) | 13,634.82 |
| VOLT ELECTRICITY PROVIDER LP (QSE) | 435,651.99 |
| VOLTUS INC (QSE) | 20,318.91 |
| WAKE WIND ENERGY LLC (QSE) | 2,011,925.41 |
| WAKE WIND ENERGY LLC 2 (SQ1) | 1,900,408.31 |
| WEATHERFORD MUNICIPAL UTILITY SYSTEM (CRRAH) | 3,049.55 |
| WOLFRAMIUM POWER LP (CRRAH) | 33,462.50 |

| | |
|---|---:|
| WOLFRAMIUM POWER LP (QSE) | 21,112.80 |
| WOLFRAMIUM POWER LP 1 (CRRAH) | 48,049.29 |
| WOLFRAMIUM POWER LP 2 (CRRAH) | 3,420.93 |
| WOLVERINE TRADING LLC (QSE) | 90.85 |
| WORLD POWER AND GAS LP (QSE) | 0.08 |
| XO ENERGY TX LP (QSE) | 296,268.40 |
| XO ENERGY TX2 LP (CRRAH) | 25,329.16 |
| XO ENERGY TX2 LP 1 (CRRAH) | 784.06 |
| XO ENERGY TX2 LP 2 (CRRAH) | 9,710.86 |
| XO ENERGY TX3 LP (QSE) | 95,233.17 |
| Z AND Y ENERGY TRADING LLC (QSE) | 0.08 |
| | $ 1,286,886,127.86 |

**<u>Exhibit D</u>**

Retained Agreements

1. Hydro Power Sales Contract for 5.2 MW, dated as of January 4, 2012, by and between Brazos Electric Power Cooperative, Inc., as buyer, and the United States of America, acting by and through the Southwestern Power Administration within the Department of Energy, as seller, currently expiring on June 30, 2027.

2. Hydro Power Sales Contract for 36 MW, dated as of July 18, 2003, by and between Brazos Electric Power Cooperative, Inc., as buyer, and the United States of America, acting by and through the Southwestern Power Administration within the Department of Energy, as seller, originally set to expire on September 30, 2018, but having been extended annually and currently expiring on September 30, 2022.

3. Solar Power Sales Contract for 42.5 MW, dated as of February 1, 2019, by and between Brazos Electric Power Cooperative, Inc., as buyer, and Lapetus Energy Project, LLC, acting by and through Duke Energy Renewables Solar, LLC, as seller, currently expiring on December 31, 2034.

**<u>Exhibit E</u>**

TAA Balances

| Member | | TAA Balances [1] |
|---|---|---|
| Bartlett Electric Cooperative, Inc. | $ | 46,593,994 |
| Comanche County Electric Cooperative Association | | 28,982,671 |
| Denton County Electric Cooperative, Inc.; d/b/a CoServ Electric | | 450,910,027 |
| Fort Belknap Electric Cooperative | | 12,324,673 |
| Hamilton County Electric Cooperative Association | | 49,810,057 |
| HILCO Electric Cooperative, Inc. | | 121,098,932 |
| Heart of Texas Electric Cooperative, Inc. | | 83,740,581 |
| J-A-C Electric Cooperative, Inc. | | 13,176,209 |
| Mid-South Electric Cooperative Association | | 98,146,890 |
| Navarro County Electric Cooperative | | 60,676,472 |
| Navasota Valley Electric Cooperative, Inc. | | 51,828,502 |
| Cooke County Electric Cooperative, Inc., d/b/a PenTex Energy | | 65,324,775 |
| Tri-County Electric Cooperative, Inc. | | 476,747,686 |
| United Electric Cooperative Services, Inc., d/b/a United Cooperative Services | | 430,781,177 |
| Wise Electric Cooperative, Inc. | | 94,823,843 |
| Total TAA Balances | $ | 2,084,966,488 |

[1] For the avoidance of doubt, the TAA Balances do not include the Participating Member Securitization Reimbursements and, therefore, do not necessarily reflect the total amount that a given Member is obligated to deposit with the TAA Escrow Agent under the Plan.