**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC., | § | Chapter 11 |
| | § | |
| Debtor.[1] | § | |

**DECLARATION OF CHRISTOPHER J. KEARNS
IN SUPPORT OF CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN OF
REORGANIZATION OF BRAZOS ELECTRIC POWER COOPERATIVE, INC.**

I, Christopher J. Kearns, pursuant to section 1746 of title 28 of the United States Code, state as follows:

**Background and Qualifications**

1.      I was asked by Norton Rose Fulbright US LLP and O'Melveny & Myers LLP (collectively, "Counsel") to provide analysis regarding the "best interests of creditors" test and the Liquidation Analysis attached as Exhibit D (the "Liquidation Analysis") to the Disclosure Statement for the Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc. [Dkt. No. 2262] (the "Disclosure Statement") and in further support of the confirmation of the Amended Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc. [Dkt. No. 2440-1] (as amended, modified, or supplemented from time to time, the "Plan"). I provide this Declaration describing that analysis and in support of the confirmation of the Plan.[2]

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, Texas 76712.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or Plan and related exhibits, as applicable.

2.      I am a Managing Director and co-head of the corporate finance practice of Berkeley Research Group ("BRG"). I am a Certified Public Accountant, a Certified Turnaround Professional, a Certified Insolvency and Restructuring Advisor, and a Certified Fraud Examiner. I have over 40 years of broad-based financial experience as an auditor, corporate officer and, for approximately the past 30 years, as an advisor or crisis manager in bankruptcy and turnaround matters.

3.      I have served as the principal advisor to various parties-in-interest in numerous complex bankruptcy and restructuring matters, including but not limited to Peabody Energy Corp., Nortel Networks, Hertz Global Holdings Inc., Chemtura Corporation, MPM Silicones, Schwinn, Southern Foods Group (Dean Foods), Molycorp, Inc., Starter Corporation, Eastman Kodak, Mirant Corporation, 21st Century Oncology Holdings, Caesars Entertainment Operating Company Inc., McClatchy Co., SunGard Availability Services, Calpine, Energy Future Holdings, Dynegy Holdings LLC, Speedcast International, and Lyondell Chemical Company. I have served as a testifying expert witness in matters concerning solvency, valuation, capital adequacy, credit analysis, contract breach, lost profits, and various financial and business issues in bankruptcy and restructuring. A copy of my curriculum vitae is attached as Exhibit 2.

4.      BRG's corporate finance practice focuses on the areas of business turnaround and restructuring situations, out-of-court workouts, bankruptcy matters, crisis management, valuation, transaction advisory, due diligence services, and litigation support.

5.      Prior to joining BRG in June 2015, I was one of the founding members of Capstone Advisory Group, LLC ("Capstone"), a financial services consulting firm, founded in January 2004, which provided similar services as BRG. Prior to co-founding Capstone, from 1991 to 2004, I was a Senior Managing Director of FTI Consulting, Inc. ("FTI") (and predecessor firms) and the co-

leader of FTI's New York office. My experience and client assignments during that period were substantially similar to the assignments I performed at Capstone. Prior to 1991, I was employed by Bristol-Myers Squibb Company for approximately three years (including serving as Assistant Corporate Controller), and a major international public accounting firm for ten years in the mergers and acquisitions group and in the audit practice.

6.      In February 2021, Brazos retained BRG as its financial advisor to assist the Debtor in various Chapter 11, prepetition, and post-petition activities, including but not limited to analyzing the financial condition, balance sheet, liquidity, and financing needs of the Debtor. BRG also ran the process to raise the DIP financing for this case. I have been directly involved with all aspects of the Debtor's restructuring efforts, and I am personally familiar with the Debtor's operations and finances. Others at BRG, who worked at my direction and under my supervision, assisted me with this assignment.

7.      Except as otherwise indicated, all facts set forth in this Declaration are either based on my personal knowledge, information obtained from Brazos's management team and other advisors, or my opinions based on my experience and personal knowledge. In developing the opinions set forth herein, I have relied upon and/or considered the following: (a) my experiences in complex chapter 11 cases, including matters related to the "best interests of creditors test" and liquidation analyses; (b) my knowledge of the operations and financial condition of the Debtor and Members; (c) discussions with the Debtor's management and advisors concerning a hypothetical liquidation of the Debtor; (d) certain of the Debtor's and Member's financial and operational information; (e) the Valuation Analysis prepared by Collet & Associates, LLP and attached as Exhibit C to the Disclosure Statement (the "Valuation Analysis"); and (f) the Plan and Disclosure Statement.

8.      My current billing rate for this assignment is $1,195 per hour. Neither my nor BRG's compensation for this matter is in any way contingent upon the outcome of these proceedings.

9.      I am duly authorized to submit this Declaration, and if called upon to testify, I could and would testify competently to the facts set forth herein.

## Liquidation Analysis – Overview

10.     I understand that section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim against the Debtor either (i) has accepted the Plan, or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests of creditors" test.

11.     To satisfy the best interests of creditors test, I was asked to prepare, with the assistance of the Brazos management team, the Liquidation Analysis, which was attached to the Disclosure Statement.

12.     The Liquidation Analysis assumes that the hypothetical liquidation begins on or about October 31, 2022 (the "Liquidation Date") and was developed from the Debtor's projected balance sheet as of that date. A chapter 7 Trustee (the "Trustee") would oversee the liquidation of all the Debtor's assets and wind-down of the Estate. There are three general asset categories that would generate recoveries in a liquidation: (i) estimated proceeds from claims and other receivables against the Members; (ii) net proceeds from the sale of the Debtor's fixed assets (the "Brazos Fixed Assets"); and (iii) current assets and post-conversion cash flows.

13.     Distributable proceeds in a liquidation at the Brazos level are impacted by its ability to realize recoveries on receivables from and claims against Brazos's Members, consisting of TAA

Claims, Accounts Receivable, and Other Member Claims. Because of the loss of the cooperative structure, the absence of the Hardship Fund, and magnitude of the claims against the Members in a liquidation scenario (including the substantial claims that would result from the absences of the reductions and settlements embodied in the Plan), the Liquidation Analysis estimates recoveries on these claims by assuming a standalone liquidation of each Member. The estimated recoveries in respect of the TAA Claims, Accounts Receivable, and Other Member Claims are estimated on a Member-by-Member basis.

14.     The Brazos Fixed Assets are comprised of generation, transmission, distribution, and general assets, which are assumed to be sold. The assumed sale period is three months for the generation assets and nine to twelve months for the transmission and distribution assets, which are appropriate time frames based on each asset class. The Liquidation Analysis includes net operating cash flows prior to sale closings as a source of proceeds. Estimated recoveries are derived from the Valuation Analysis Prepared by Collet & Associates, LLP, attached to the Disclosure Statement as Exhibit C (the "Valuation Analysis") with liquidation discounts applied by asset class.

15.     The Liquidation Analysis assumes that trustee costs, exclusive of professional fees, are 4% of total proceeds. Professional fees would further reduce recoveries in a hypothetical chapter 7.

16.     The Liquidation Analysis contains both a "Low Case" and a "High Case" of the amounts recovered from the Members and the proceeds generated from the sale of the Brazos Fixed Assets to establish a range of the estimated recoveries for Claims against Brazos. The "Midpoint Case" is the average of the Low and High Cases.

17.     In a hypothetical chapter 7, the settlements contained in the Plan—including the ERCOT Settlement and the SCEA Settlement—would no longer be in place. Each of those settling parties would likely pursue the full asserted value of their respective Claims. Additionally, the Liquidation Analysis adjusts Claims to reflect the termination of Brazos's retirement plans, and the inclusion of other Claims.

18.     Cash on hand and amounts held in the Cushion of Credit account are assumed to be recovered in full. Materials and inventory are included in net proceeds from the sale(s) of the fixed assets. All other current assets, including prepaid expenses, are immaterial and assumed not to be recoverable in a liquidation.

19.     The Liquidation Analysis allocates the proceeds to holders of Claims in accordance with section 726 of the Bankruptcy code, satisfying administrative and secured Claims first, with the remainder used to pay general unsecured Claims. The Liquidation Analysis shows no recovery in respect of any Member's Claim including, but not limited to, Patronage Capital.

20.     In my opinion, the Liquidation Analysis represents the best estimate under the circumstances of the range of recoveries for unsecured Claims in a hypothetical liquidation of the Debtor. Attached as Exhibit 1 is the recovery waterfall included in Exhibit D to the Disclosure Statement, which I incorporate into this Declaration for all purposes. As summarized in the chart below, the estimated range of recoveries for unsecured Claims in the Liquidation Analysis is 50.4% in the Low Case, 65.8% at the Midpoint, and 82.6% in the High Case, compared to a floor for unsecured creditor recoveries under the Plan of at least 89.5%:

| $ in millions | Low | Midpoint | High |
|---|---|---|---|
| Total Distributable Value | $ 3,942.5 | $ 4,316.5 | $ 4,690.5 |
| Total Secured Claims | (1,766.9) | (1,766.9) | (1,766.9) |
| Total Administrative Priority Claims | (679.5) | (679.5) | (679.5) |
| Secured & Administrative Priority Claims Recovery | 100% | 100% | 100% |
| Funds Available for Unsecured Claims | 1,496.1 | 1,870.1 | 2,244.1 |
| Total Unsecured Claims | (2,968.3) | (2,843.3) | (2,718.3) |
| Shortfall/Surplus | (1,472.1) | (973.1) | (474.1) |
| Unsecured Claims Recovery | 50.4% | 65.8% | 82.6% |

21.     In order to achieve an unsecured Claims recovery comparable to the Plan (a floor of 89.5%), the chapter 7 Trustee would need to realize an additional $188 million (in the High Case) to $1.16 billion (in the Low Case) in value from Brazos's assets ($674 million in the Midpoint Case), which is both significant and lacks the certainty of recovery that results from the distributions under the heavily negotiated Plan. Additionally, in preparing the Liquidation Analysis, I have taken a conservative approach, and assumed relatively high recoveries in respect of (i) the sale of the Brazos Fixed Assets (the midpoint of the estimated liquidation value of the Brazos Fixed Assets is approximately 89% of the corresponding estimated midpoint of the fair market value range in the Valuation Analysis) and (ii) recoveries related to fixed assets in respect of claims against the Members. Further, the Liquidation Analysis does not account for the time value of money, and for the reasons described more fully herein, recoveries in a liquidation scenario could occur over a prolonged period of time due to the risk and complication of the sale of the Brazos Fixed Assets and the recovery of the TAA Claims, Accounts Receivable, and Other Member Claims from the Members. As a result, and as described herein, in my opinion the Plan meets the "best interest of creditors test" pursuant to Section 1129 of the Bankruptcy Code.

## Summary of the Liquidation Process

22.     The Debtor's liquidation would be conducted in a chapter 7 environment, with the Trustee managing the estate to maximize recovery in an expedited process. The first component

of the liquidation process would be to collect from Brazos's members amounts owed to the Debtor upon the Debtor's liquidation consisting of (a) costs and expenses incurred during Winter Storm Uri calculated pursuant to the WPSDS Tariff and the TRRM Protocols and invoiced to the Members (the "TAA Claims"), (b) ordinary course accounts receivable ("Accounts Receivable") projected as of the Liquidation Date, and (c) all other costs and expenses of the Debtor (the "Other Member Claims"), to the extent that each Member is able to pay unsecured claims following their respective hypothetical liquidations.

23.     The Trustee would also sell the Brazos Fixed Assets to one or more buyers, which the Liquidation Analysis assumes could include (a) sales of logical asset groups, (b) sales of facilities with associated assets, (c) sales on a going-concern basis (where possible), or (d) other sales of assets on a piecemeal basis. The Trustee would also sell or monetize the Debtor's other assets and would have access to the Debtor's cash.

24.     During a liquidation, the Trustee would determine the amount of net proceeds generated during the period from conversion to chapter 7 and would reconcile each class of Claims asserted against the Debtor to determine the amount of Allowed Claims per Class. The Trustee would also need to estimate any Claims that have not been asserted in the chapter 11 case, but would be asserted and allowed in a liquidation, such as Claims arising from the termination of the Debtor's retirement plans and the rejection of various executory contracts which will be assumed pursuant to the Plan. The net cash proceeds would be distributed in accordance with the priority structure contained in the bankruptcy code.

25.     The gross amount of cash available in a liquidation would be the sum of proceeds from the collection of the Claims and other receivables against the Members, the disposition of the Brazos Fixed Assets, and the cash and other assets held by Brazos at the commencement of the

liquidation process. That gross amount would be adjusted to account for (i) net cash flow from the Brazos Fixed Assets during the sale process for each respective asset class, (ii) interest paid on Brazos's secured debt during the sale process for each respective asset class, (iii) transaction fees on asset sales, (iv) costs related to the retention of personnel during the liquidation, and (v) Trustee and other administrative and professional fees.

### Estimated Proceeds from Members from Brazos's Pursuit of TAA Claims, Accounts Receivable, and Other Member Claims

26.     The first category of proceeds available to the Trustee would come from the Trustee's pursuit of TAA Claims, Accounts Receivable, and Other Member Claims against each of Brazos's sixteen Members. These claims would be as follows:

      a.     TAA Claims totaling approximately $2.5 billion, arising from costs incurred during Winter Storm Uri;

      b.     Accounts Receivable, projected to be approximately $139 million as of the Liquidation Date; and

      c.     Allocated portions of Other Member Claims of up to $956 million, comprised of Sandy Creek Rejection Damages, Swap Claims, and employee-related and other related claims.

27.     Under a liquidation scenario, there would be no Plan settlements or reductions of Claims (more than $550 million). Additionally, in the absence of the Plan, the Members would not have access to the Hardship Fund and its accompanying benefits to the Members' ratepayers. Moreover, (i) the absence of exit financing included in the Plan (the Exit Facility of $350 million and the RUS Exit Financing of as much as $300 million), (ii) the inability in a liquidation to fund a portion of the ERCOT settlement payments over twelve years ($166.6 million), and (iii) the loss

of the Brazos cooperative structure, would cause the Members to lose their ongoing financial benefits by virtue of their membership in Brazos.

28.     In my opinion, because of the amount of these claims, the lack of ongoing benefit to the Members, and the other factors described herein, the liquidation of Brazos would lead to a standalone liquidation of each Member. Additionally, because of the magnitude of the claims and their enforceability against each Member, a liquidation of each Member represents the best estimate of the Trustee's ability to collect, and the Members' ability to pay, the TAA Claims, Accounts Receivable, and Other Member Claims in the absence of the negotiated Plan and liquidation of the cooperative structure.

29.     The Plan is the product of countless hours of negotiations following protracted litigation with ERCOT and certain Market Participants, including two weeks of trial. In a liquidation scenario, the settlements and other concessions contained in the Plan would cease to exist, and each of Brazos's creditors would assert the full amount of their Claim as immediately due and payable without any mitigation. Without the settlements and other concessions contained in the Plan, I would expect ERCOT to litigate and pursue the immediate payment of its Claim in full. ERCOT would likely also continue to litigate the priority of its entire Claim.

30.     Each Member would be responsible for the full amount of its respective TAA Claim, which exceeds what each Member is currently responsible for paying pursuant to the Plan. In addition to the Plan's reduction of the amount that the Members are required to pay in respect of the TAA Claims, the Hardship Fund, which would not exist in a liquidation scenario, also addresses affordability issues faced by the Members. Under the Plan, the Hardship Fund mitigates the impact of securitization charges by providing $140 million to be invested and managed in trust for the benefit of the Members' ratepayers. There are an estimated 134,000 households potentially

eligible to benefit from the Hardship Fund, which will cover 100% of securitization charges for qualified ratepayers.

31.     There would be affordability issues for certain Members if the settlements and concessions in the Plan were to evaporate, and the Members no longer had access to the Hardship Fund. For example, residential customers of seven of Brazos's Members have poverty rates in excess of 15%, compared to a national average of 11.3%.

32.     Further, in a liquidation scenario, the cooperative structure between Brazos and its Members would cease to exist, and the Members and their ratepayers would no longer benefit from the margins projected to be generated by Brazos's transmission and distribution operations in the Reorganized Debtor. Both the loss of ongoing margins and the elimination of each Members' interest in Brazos would, in turn, have a material negative impact on the ability of any individual Member to access capital. And, as demonstrated by the proofs of claims filed by certain of the Members, the resulting litigation that culminated in the settlements and concessions contained in the Plan, there would be significant litigation risk to the Trustee regarding potential claim offsets.

33.     All told there would be an additional $1.4 billion of claims due and owing from the Members to Brazos immediately upon liquidation as compared to funding pursuant to the Plan, with no source of margin coming from the Brazos cooperative structure, no exit financing pursuant to the Plan, and no relief from the Hardship Fund to mitigate those costs. I understand that no outside party could force a Member to securitize these costs, and it is unclear whether the non-TAA Claims could be securitized pursuant to SB 1580. Even if those claims could be securitized, the amount each Member would be forced to securitize would raise the affordability issues described above.

34.     Thus, in a liquidation scenario, given the magnitude of Brazos's claims against the Members, the lack of ongoing benefits to the Members due to the loss of the cooperative structure, the lack of affordability for their ratepayers, and the other material negative impacts to the Members described herein, the Members would be unable or unwilling to securitize the unmitigated claims and would instead seek protection under the Bankruptcy Code.

35.     In the Liquidation Analysis, based in part on information obtained from Collet & Associates as well as the latest financial information from the Members, I have calculated the anticipated net proceeds from the liquidation of the Members' utility fixed assets using an equally weighted average of two methods at fair value: (i) the estimated range of the fair value from sale of residential customers, discounted in a hypothetical liquidation by 10%; and (ii) the estimated range of fair value based on a multiple of the Net Utility Plant to book value for each Member, discounted in a hypothetical liquidation by 5% to 10%, summarized in the table below:

| Member Liquidation Assumptions | | | | |
|---|---|---|---|---|
| Sale of Customers - Revenue per Customer | | Low Case | | High Case |
| High Density | $ | 3,848 | $ | 4,050 |
| Low Density | $ | 3,420 | $ | 3,600 |
| Net Utility Plant Multiple | | 1.21x | | 1.27x |

36.     For the sale of customers calculation, I have assumed each residential customer is sold for $3,600 in low density areas and $4,050 in high density areas in the High Case, and then discounted those numbers by 5% to arrive at the numbers in the Low Case. These figures are calculated based on comparable market transactions depending on area density ($4,000 for low density and $4,500 for high density) and include an appropriate liquidation discount of 10% in the high case. Four of Brazos's Members—CoServ, Tri-County, United, and Mid-South—are in high density areas based on their financial and customer information. The remaining Members serve low density areas.

12

37. For the net utility plant multiple calculation, a multiple of 1.27X is applied in the High Case to each Member's net utility plant in service, reduced by 5% in the Low Case. I calculated this by utilizing a 1.34X multiple from comparable market transactions, with a 5% discount to the High Case to account for the liquidation. I have valued construction work in progress at a 1.0X at net book value in both cases.

38. The proceeds from non-utility fixed assets other than broadband assume a 1.25X multiple to net book value less a 20% liquidation discount. I have discounted broadband assets to 50% of net book value. I also have assumed a recovery of current assets at book value.

39. The claims asserted by the Trustee against each Member would be asserted as general unsecured claims. The Liquidation Analysis utilizes the latest Member financial information (including customer data) available to Brazos as of June 30, 2022, or March 31, 2022 depending on the individual member, with adjustments made to reflect ordinary course payables to Brazos as of the Liquidation Date.

40. As with the Brazos liquidation, the liquidation of each Member would first use net proceeds to pay down each individual Member's secured and administrative claims, with the remaining balance (if any) available to pay the unsecured claims. Brazos's claims against each Member would be paid on a pro-rata basis with other general unsecured claims. I have assumed 1.5% of gross proceeds would be allocated to Trustee costs and assumed 3% of gross proceeds in transaction costs.[3]

41. The chart below contains a summary of the calculations of the estimated recoveries from the Members:

---

[3] I utilized the foregoing assumptions for each Member except South Plains Electric Cooperative, Inc. ("South Plains"), which has a $14.4 million credit as its TAA Balance. I have projected Brazos's Accounts Receivable from South Plans at $25.1 million. I have assumed a 70% overall recovery in the High Case and a 60% overall recovery in the Low Case for the claims against South Plains due to the lack of recent financial information available.

| Member Liquidation Summary - Consolidated 16 Members | | | | |
|---|---|---|---|---|
| | Adjusted | | | |
| $ in millions | Book Value | Low | Midpoint | High |
| Current Assets | $ 286.8 | $ 286.8 | $ 286.8 | $ 286.8 |
| Fixed Assets | 3,397.0 | 3,022.2 | 3,096.4 | 3,170.5 |
| Other Assets | 354.9 | 197.2 | 197.2 | 197.2 |
| **Gross Liquidation Proceeds** | | **3,506.2** | **3,580.3** | **3,654.5** |
| Less: Bankruptcy Costs | | 157.8 | 161.1 | 164.5 |
| Less: Secured Debt | | 1,929.2 | 1,929.2 | 1,929.2 |
| **Funds Available for Unsecured Claims** | | **1,419.2** | **1,490.0** | **1,560.9** |
| Non-Brazos Claims | | 366.4 | 366.4 | 366.4 |
| Brazos AR Claims | | 139.3 | 139.3 | 139.3 |
| Brazos Other Claims | | 956.4 | 918.9 | 881.4 |
| Brazos TAA | | 2,492.6 | 2,492.6 | 2,492.6 |
| TAA Recovery | | 909.8 | 960.7 | 1,011.6 |
| AR Recovery | | 58.7 | 62.2 | 65.7 |
| Other Claims Recovery | | 407.9 | 414.0 | 420.2 |

### **Estimated Proceeds from the Sale of the Brazos Fixed Assets**

42.    In the Liquidation Analysis, I have assumed that the Trustee would sell the Brazos Fixed Assets. As a starting point, the Liquidation Analysis Low Case utilizes the base case values in the Valuation Analysis. The High case utilizes the high case values in the Valuation Analysis for Brazos's Generation Assets and Distribution Assets and assumes a potential premium of 40% on the base case value in the Valuation Analysis for Brazos's Transmission Assets. I have applied this premium to account for the potential of an over-valued bid on the Debtor's Transmission Assets by a strategic buyer to present the highest possible estimate of the value of the Transmission Assets in a liquidation scenario. Consistent with the Valuation Analysis, I did not apply a premium to the Distribution Assets in the High Case as any increase in value would presumably be captured in the increase in the Transmission Assets.

43.    In the Liquidation Analysis, the values in both the Low Case and High Case are then discounted by 20% for the Generation Assets and Distribution Assets, and 10% for the Transmission Assets, while Brazos's other fixed assets—primarily Brazos's corporate headquarters—are assumed to be realized at 60% of book value.

44.     These discounts are appropriate considering the following factors:

a.      In a liquidation, the ability and timeframe for potential buyers to conduct due diligence would be impacted. Major diligence tasks likely would include completion of environmental assessments, assignment of interconnection and other legal agreements, and real estate and engineering issues for buyers intending to separate the Transmission Assets and Distribution Assets;

b.      Any required regulatory approvals likely would take months and could be contested. The sale of Transmission and Distribution Assets would require at least six months (and comparable sales have taken up to two years) for PUCT approval;

c.      The potential for a liquidating Brazos to have its status as a market participant terminated, and a lack of credit availability from counterparties and/or ERCOT during the pendency of a liquidation, would result in a relatively short period for a sale process for the Generation Assets, which would depress realized value;

d.      Due to the integrated nature of Brazos's Transmission and Distribution Assets, both at the Brazos level and in connection with the ERCOT grid, which includes more than 300 points of interconnection, any separation would be time consuming and costly, imposing additional risk on the buyer(s) and likely rendering any separation impossible;

e.      Because the vast majority of the Debtor's Transmission and Distribution Assets are located within ERCOT, potential buyers who do not already own

transmission assets within ERCOT would be restricted from acquiring most of the Debtor's Transmission and Distribution Assets, limiting the pool of potential buyers;

f.    There would be employee and staffing concerns for a new buyer to run approximately 3,000 miles of transmission lines and operate roughly 350 substations;

g.    Certain buyers of the Distribution Assets would need to file a new rate case, which would be time consuming and could be contested; and

h.    Certain buyers may not desire a service territory where the substations are owned by another party, as substation capacity, expansion, maintenance, and operating issues would result in reliability to the customer being heavily influenced by a third party.

45.    The chart below shows the overall estimated range of proceeds from the liquidation of the Brazos Fixed Assets:

| Brazos Fixed Assets | | | |
|---|---|---|---|
| $ in millions | Low | Midpoint | High |
| Total Liquidation Proceeds | $    2,486.8 | $    2,808.4 | $    3,129.9 |
| Collet Valuation | | 3,170.0 | |
| Liquidation Proceeds as % of Collet Valuation | | 89% | |

**Amounts Available from Brazos's Current Assets and Post-Conversion Cash Flows**

46.    In the Liquidation Analysis, I have assumed 100% recovery of the cash and cash equivalents available to Brazos as of the Liquidation Date. I have assumed the following with respect to Brazos's current assets:

a.    The RUS would release to the Trustee the $99.5 million held in the Cushion of Credit account;

16

b. The Trustee would have access to projected cash and equivalents as of the Liquidation Date of $99 million;

c. Materials and inventory balances are included in the sale(s) of Brazos Fixed Assets; and

d. Prepaid expenses and other current assets are not material and are not recoverable in a liquidation.

47. I have included net cash flows from the Transmission, Distribution, and Generation Assets through the assumed sales dates of each asset class, which I have estimated to be $45 million in the Low Case and $60 million in the High Case.

## Claims Against Brazos

48. In the Liquidation Analysis, I have assumed the following claims would be unchanged in a liquidation scenario:

a. Secured Claims of $1.64 billion related to the RUS Secured Notes and $124 million of pre-petition revolver setoff;

b. Administrative Claims including post-petition accounts payable, professional fees and trade Claims;

c. Section 503(b)(9) Claims for bilateral gas and power; and

d. General Unsecured Claims for the unsecured portion of the Prepetition Revolving Loan, letters of credit, interest rate swaps, and other trade Claims;

49. I have adjusted the following Claims in the Liquidation Analysis as compared to the Plan:

a.     Sandy Creek Claims are assumed to be $625 million in the Low Case and $425 million in the High Case, assuming no Plan related settlements, e.g., the rejection damages claim asserted by SCEA (one of the two Sandy Creek Claims) was for a range of $640 - $770 million.

b.     No settlement or reduction of the ERCOT Claim, with ERCOT asserting $258 million of Section 503(b)(9) Claims (as calculated by Brazos), and a $1.63 billion unsecured claim. This assumes the Trustee would set off a projected ERCOT receivable balance of $44 million against ERCOT's unsecured claim. If ERCOT were to successfully appeal or otherwise challenge the priority status of the $1.63 billion portion of its Claim, recoveries to unsecured creditors would be correspondingly reduced;

c.     Pension and Post-Retirement Health Care Plans claims at the asserted amount of $63 million due to plan terminations;

d.     Employee Claims in a liquidation scenario are included, consisting of retention, severance, vacation, and sick pay;

e.     Other potential contract rejection damages are to be determined, and would further reduce recoveries to unsecured creditors;

f.     The High and Midpoint Cases assume potential claims reduction(s) for ongoing claims objections by Brazos; and

g.     No settlement is reached in relation to Claims filed by the Members. Should these Claims be litigated, any additional costs would further reduce creditor recoveries.

## **Conclusion**

50.     Based on this Liquidation Analysis versus the implied reorganization value under the Plan, the Plan satisfies the requirements of 1129(a)(7) of the bankruptcy code.

## **Right to Supplement**

51.     I reserve the right to supplement or amend my Declaration, including any exhibits or appendices thereto, based on any new information that may come to my attention that is relevant to the opinions contained herein.

*[Signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 10, 2022

*/s/ Christopher J. Kearns*
Christopher J. Kearns
Managing Director & Co-Head of Corporate
Finance
Berkeley Research Group, LLC

## EXHIBIT 1 – RECOVERY WATERFALL

| $ in millions | Projected Book Value 10/31/22 | Low | Midpoint | High |
|---|---|---|---|---|
| TAA Claims | $ 2,492.6 | $ 909.8 | $ 960.7 | $ 1,011.6 |
| Asserted Member Offsets | - | - | - | - |
| Accounts Receivable from Members | 139.3 | 58.7 | 62.2 | 65.7 |
| Other Member Claims | 831.5 | 407.9 | 414.0 | 420.2 |
| RUS Cushion of Credit | 99.5 | 99.5 | 99.5 | 99.5 |
| Cash on Hand | 99.0 | 99.0 | 99.0 | 99.0 |
| Prepaid Expenses and Other | 5.0 | - | - | - |
| Fuel and Materials | 91.2 | | | |
| Fixed Assets | 2,090.4 | 2,486.8 | 2,808.4 | 3,129.9 |
| Post-Conversion Cash Flows from T&D, Gen O&M | | 45.0 | 52.5 | 60.0 |
| Trustee and Other Administrative Costs | | (164.3) | (179.9) | (195.4) |
| Total Distributable Value | | $ 3,942.5 | $ 4,316.5 | $ 4,690.5 |
| Secured Claims | | | | |
| RUS Secured Notes | | (1,643.0) | (1,643.0) | (1,643.0) |
| BofA Prepetition Revolver Setoff | | (123.9) | (123.9) | (123.9) |
| Total Secured Claims | | $ (1,766.9) | $ (1,766.9) | $ (1,766.9) |
| Administrative Priority Claims | | | | |
| 503(b)(9): ERCOT | | (258.3) | (258.3) | (258.3) |
| 503(b)(9): Power and Gas | | (344.3) | (344.3) | (344.3) |
| Post-Petition Accounts Payable | (65.0) | (65.0) | (65.0) | (65.0) |
| Other | | (11.9) | (11.9) | (11.9) |
| Total Administrative Priority Claims | | $ (679.5) | $ (679.5) | $ (679.5) |
| Total Secured & Administrative Priority Claims | | $ (2,446.3) | $ (2,446.3) | $ (2,446.3) |
| Secured & Administrative Priority Claims Recovery | | 100% | 100% | 100% |
| Funds Available for Unsecured Claims | | $ 1,496.1 | $ 1,870.1 | $ 2,244.1 |
| Unsecured Claims | | | | |
| Sandy Creek Related Claims | | $ (625.0) | $ (525.0) | $ (425.0) |
| Other Contract Rejection Damages | | TBD | TBD | TBD |
| Unsecured Portion of Prepetition Revolving Loan | | (356.6) | (356.6) | (356.6) |
| Interest Rate Swaps | | (246.9) | (246.9) | (246.9) |
| Letters of Credit | | (20.0) | (20.0) | (20.0) |
| Pension and Post-Retirement Health Care Plans | | (62.9) | (62.9) | (62.9) |
| Other Claims | | (50.8) | (50.8) | (50.8) |
| Employee Related | | (21.6) | (21.6) | (21.6) |
| ERCOT | | (1,584.3) | (1,584.3) | (1,584.3) |
| Potential Claims Reduction | | - | 25.0 | 50.0 |
| Total Unsecured Claims | | $ (2,968.3) | $ (2,843.3) | $ (2,718.3) |
| Shortfall/Surplus | | $ (1,472.1) | $ (973.1) | $ (474.1) |
| Unsecured Claims Recovery | | 50.4% | 65.8% | 82.6% |

## EXHIBIT 2 – KEARNS CV

**Christopher J. Kearns**

**Managing Director**
**Berkeley Research Group**
**810 Seventh Ave, Suite 4100**
**New York, NY 10019**
212-782-1409
CKearns@thinkbrg.com

### SUMMARY

Mr. Kearns is a Managing Director and co-head of the corporate finance practice of Berkeley Research Group ("BRG"). Prior to joining BRG in June 2015, he was a Member of the Firm and co-founder of Capstone Advisory Group, LLC ("Capstone" or the "Firm"). He is a CPA, a Certified Turnaround Professional, a Certified Insolvency and Restructuring Advisor, and a Certified Fraud Examiner. He specializes in providing financial restructuring advisory services, crisis management services, and expert testimony in the troubled company and corporate finance environment. He has represented all parties-in-interest in various complex matters and has rendered expert testimony on various issues.

### PROFESSIONAL EXPERIENCE

**Berkeley Research Group – June 2015 - Present**

Managing Director

**Capstone Advisory Group, LLC – January 2004 – May 2015**

Managing Member of the Firm

**FTI Consulting, Inc. (and predecessor firms) – 1991 – January 2004**

Senior Managing Director

At BRG, Capstone, FTI, and predecessor firms, he has provided financial advisory and crisis management services in the troubled company environment. Assignments have included service as Chief Executive Officer, Chief Restructuring Officer, Responsible Officer, Lead Independent Director, Receiver and Trustee. Also, he has rendered expert testimony in various jurisdictions on matters involving solvency, valuation, lost profits, credit analysis, liquidation and recovery analysis, and other issues regarding distressed situations. Sample assignments include:

- *The Hertz Corporation (2020 – 2021)* – Financial advisor to the Unsecured Creditors Committee in a Chapter 11 proceeding for a major multinational rental car company
- *Southern Foods Group (Dean Foods) (2019 – 2021)* – Financial advisor to the Unsecured Creditors Committee in a Chapter 11 proceeding for a leading dairy company
- *Commonwealth of Puerto Rico (2017 – 2019)* – Financial advisor to a monoline insurer in various tranches of bonds
- *Peabody Energy Corp. (2016 – 2017)* – Financial advisor to the Official Committee of Unsecured Creditors in a Chapter 11 proceeding for the world's largest private sector coal company

**Christopher J. Kearns**
**(continued)**

- *Molycorp, Inc. (2015 – 2016)* – Financial advisor to the Official Committee of Unsecured Creditors in a Chapter 11 proceeding for a global rare earths and rare metals producer

- *Gleacher & Company, Inc. (2013 – 2018)* – Chief Executive and Chief Restructuring Officer for a publicly traded financial services business and broker dealer

- *Extended Stay Hotels (2009 – 2010)* – Financial advisor to the Operating Advisor in a $7 billion CMBS structure in a Chapter 11 proceeding for a hotel chain, including sale of the assets

- *Archstone (2009 – 2010)* – Financial advisor to major stakeholders for a large multi-family dwelling platform in major markets in connection with a debt for equity swap and related valuation

- *Nortel (2009 – 2017)* – Financial advisor to the Unsecured Creditors Committee in a Chapter 11 proceeding for a multinational telecommunications company

- *MF Global (2011 – 2013)* – Financial advisor to the Statutory Creditors' Committee in a Chapter 11 proceeding for a failed multinational broker dealer

- *Dynegy Holdings LLC (2011 – 2013)* – Financial advisor to the Indenture Trustee, Roseton and Danskammer operating facilities

- *Eastman Kodak (2012 – 2013)* – Financial advisor to ad hoc noteholders on intellectual property matters

- *Centro Group (2007 – 2009)* – Financial advisor to US lenders (debt of approximately $2.2 billion) in connection with the restructuring of a multinational commercial real estate company

- *Energy Future Intermediate Holdings (2013 – 2016)* – Financial advisor to the ad hoc group of First Lien lenders to a holdco with a significant interest in a regulated electric transmission company

- *Mirant Corporation (2004 – 2006)* – Financial advisor to Unsecured Creditors Committee in Chapter 11 proceeding for a multinational energy company with generation capacity of 18,000 megawatts. Reorganization value upon emergence $11.5 to $12.0 billion

- *SEMGroup (2008 – 2009)* – Financial advisor to Secured Lenders (aggregate indebtedness of nearly $3 billion) in a Chapter 11 proceeding for a company engaged in the transport, storage and distribution of petroleum products in the North American energy corridor

- *NRG Energy (2002 – 2003)* – Financial advisor to Global Lenders (aggregate indebtedness of over $3 billion) in a Chapter 11 proceeding for a multinational energy company

- *Calpine entities (2005 – 2007)* – Financial advisor to various ad hoc groups, including Calgen noteholders, CCFC noteholders, and Broad River/ Southpoint / Rockgen stakeholders

- *Xerox (2002)* – Financial advisor to the Lenders in connection with the successful restructuring of a $7 billion credit facility for this multinational company

- *Superior Essex Communications LLC (f/k/a Superior Telecommunications) (2001 – 2002)* – Financial advisor to the Lenders (debt of approximately $1 billion) in a Chapter 11 proceeding for a manufacturer of wire and cable

- *Schwinn/GT (2001)* – Financial advisor to the Debtors in a Chapter 11 proceeding for a manufacturer and distributor of bicycle and fitness products

23

**Christopher J. Kearns**
**(continued)**

- *Heilig-Meyers and The RoomStore* (*2001 – 2005*) – Financial advisor to the Debtors in a Chapter 11 proceeding for a furniture retailer
- *Starter Corporation (1999*) – Financial advisor to the Debtors in a Chapter 11 proceeding for an apparel and retail company

**Other restructuring and bankruptcy assignments include:**

- 21st Century Oncology Holdings – Advisor to the Unsecured Creditors Committee
- aaiPharmaceutical – Advisor to the Lenders
- Aerospace contractor – Advisor to the Lenders
- Advanced Glassfiber Yarns – Advisor to the Lenders
- Aircraft parts and maintenance company – Advisor to the Lenders
- Allied Holdings – Advisor to the Company and Lenders (separate matters)
- Altegrity Inc. – Advisor to Unsecured Creditors Committee
- American Asphalt – Advisor to the Lenders
- American Capital – Advisor to the Lenders
- APA Trucking – Advisor to the Company
- Aralez Pharmaceuticals – Advisor to the Unsecured Creditors Committee
- Astria Health – Advisor to the Unsecured Creditors Committee
- Avaya, Inc. – Advisor to the Second Lien Indenture Trustee
- Biofuel company – Advisor to the Lenders
- Biotech company – Advisor to the independent members of the Board of Directors
- Blackjewel LLC – Advisor to the Unsecured Creditors Committee
- Boscov's – Advisor to the Debtor
- Bouchard – Advisor to the Unsecured Creditors Committee
- Brazos Electric Power Cooperative, Inc. – Advisor to the Debtor
- Breitburn Energy Partner LP – Advisor to the Unsecured Creditors Committee
- Bridge and tunnel construction company – Advisor to the Lenders
- Briggs & Stratton – Advisor to the Unsecured Creditors Committee
- Buddy L, Inc. – Advisor to the Debtor and Trustee
- Bumble Bee Foods – Advisor to the Unsecured Creditors Committee
- Building products company – Advisor to the Company
- Caesars Entertainment Operating Company Inc. – Advisor to ad hoc secured noteholders
- Center City Health – Advisor to the Unsecured Creditors Committee
- Countrywide – Litigation consultant re mortgage put backs
- Channel Master – Advisor to the Debtor
- Chemtura Corporation – Advisor to the Lenders

**Christopher J. Kearns**
**(continued)**

- Commonwealth of Puerto Rico – Advisor to monoline insurer, various tranches of bonds
- Credit card company and private bank – Advisor to the Company
- Diamond Offshore Drilling, Inc. – Advisor to the Unsecured Creditors Committee
- Direct marketing company – Advisor to the Lenders
- Doral Financial Corporation – Advisor to the Unsecured Creditors Committee
- Downey – Litigation consultant and advisor to the Trustee
- Endo Pharmaceuticals – Advisor to the Unsecured Creditors Committee
- Exide Holdings Inc. – Advisor to the Lenders
- Foresight Energy LP – Advisor to the Unsecured Creditors Committee
- G3K Display, LLC – Receiver
- Gas importer/retailer – Advisor to the Lenders
- GST AutoLeather – Advisor to the Unsecured Creditors Committee
- Hovensa, Inc. – Advisor to the Unsecured Creditors Committee
- Kasper A.S.L. – Advisor to the Lenders
- Privately owned hotel chain – Advisor to the Lenders
- KPNQwest – Advisor to the Lenders
- Life Science – Advisor to the Company
- Magnum Hunter Resources Corporation – Advisor to the Unsecured Creditors Committee
- Maxus Energy Corporation – Advisor to the Unsecured Creditors Committee
- Maxxim Medical – Advisor to the Lenders
- Marvel Avoidance Litigation Trust – Trustee
- The McClatchy Company – Advisor to the Unsecured Creditors Committee
- M&G Chemicals – Advisor to the Unsecured Creditors Committee
- Midstates Petroleum Company, Inc. – Advisor to the Unsecured Creditors Committee
- Mid-stream oil and gas company – Advisor to the Lenders
- Mid-stream oil and gas company – Advisor to the Lenders
- Mid-stream gas company – Advisor to the Company
- Monet Group – Advisor to the Debtor
- Multinational manufacturer – Advisor to the Company
- New York Waterways – Advisor to the Company
- Non-public business development company – Advisor to the Lenders
- Non-public Specialty Chemicals company – Advisor to the Lenders
- Non-public multinational bulk shipping company – Adviser to the Lenders
- Non-public coal company – Adviser to the Lenders
- Nutritionals manufacturer – Advisor to the Company
- Over the counter pharma manufacturer – Advisor to the Company

**Christopher J. Kearns**
**(continued)**

- PCB manufacturer – Advisor to the Lenders
- Pathnet – Advisor to the Debtor
- Peabody Energy Corporation – Advisor to the Unsecured Creditors Committee
- Pharmaceutical company – Advisor to the Company
- Pharmaceutical company – Advisor to the Lenders
- Privately owned pharmaceutical and contract research company – Advisor to the Lenders
- Puerto Rico Electric Power Authority – Advisor to the Lenders
- Quicksilver Resources Inc. – Advisor to the Unsecured Creditors Committee
- Real estate / hotel company – Advisor to the Noteholders
- Real estate / hotel company – Advisor to the CMBS Mezzanine Lender
- Real estate development company – Advisor to the Lenders
- Rhodia Inc. – Advisor to the Lenders
- Sabine Oil & Gas Corporation – Advisor to the Unsecured Creditors Committee
- Schein Pharmaceutical – Advisor to the Lenders
- Seadrill Partners – Advisor to the Unsecured Creditors Committee
- Sharp International – Responsible Officer
- Singer Company – Advisor to the Unsecured Creditors Committee
- Sirius XM – Advisor to the Lenders
- Spanish Broadcasting System, Inc. – Advisor to the Company
- SpeedCast International Limited – Advisor to the Unsecured Creditors Committee
- SLM International – Advisor to the Company
- Specialty chemical company – Advisor to the Lenders
- Spiegel – Advisor to the Lenders
- Sub-prime auto lender – Responsible Officer
- Sub-prime mortgage lender – Advisor to the Company
- SunGard Availability Services – Advisor to the Special Committee of the Board of Directors
- Technology services company (non-public) – Advisor to the Special Committee of the Board
- Theatre operator – Advisor to the Lenders
- Tidewater Inc. – Advisor to the Unsecured Creditors Committee
- Transportation company – Advisor to the Company
- Transportation company – Advisor to the Lenders
- Triangle Petroleum Corp. – Advisor to the Parent Company
- Valaris plc – Advisor to the Shipbuilder Creditor
- Verity Health Systems – Advisor to the Debtors
- Westmoreland Coal Company – Advisor to the Unsecured Creditors Committee

**Christopher J. Kearns**
**(continued)**

- Winter Group – Chief Restructuring Officer
- Women's apparel manufacturer – Advisor to the Company

**Litigation related assignments / Expert testimony:**

− Arbitrator, American Arbitration Association

− Testimony (dates are approximate)

- 2022 In re: Brazos Electric (Southern District of Texas) – Solvency Analysis
- 2020 In re: Diamond Offshore Drilling, Inc. (Southern District of Texas) – KEIP program
- 2019 In re: Health Diagnostic Laboratory Inc. (Eastern District of Virginia) – solvency analysis and determination of "reasonably equivalent value"
- 2018 In re: Verity Health Systems (Central District of California) – KEIP and KERP programs
- 2018 In re: MPM Silicones et al ("Momentive") (Southern District of New York) – credit analysis, valuation of secured notes and credit market efficiency
- 2018 In re: Green Field Energy Services – solvency analysis and determination of "reasonably equivalent value" regarding the transfer of assets
- 2017 In re: Capital Royalty Partners v. Navidea Pharmaceuticals (Texas State Court) – reasonableness and necessity of certain actions taken by a secured lender and related fees and expenses
- 2016 and 2011: In re: Lyondell Litigation Trust vs. Lydonell directors and officers, Blavatnik et al (Southern District of NY) – solvency and valuation analysis, including issues related to alleged fraudulent transfer
- 2016 In re: Midstates Petroleum Company, Inc. – evaluation of value allocation between encumbered and unencumbered assets and potential diminution in value
- 2016 In re: Sabine Oil & Gas Corporation (Southern District of NY) – evaluation of potential claims and proposed settlement pursuant to the Debtors' proposed plan of reorganization
- 2015 In re: Quicksilver Resources, Inc. – evaluation of potential 506(c) claims
- 2015 In re: Energy Future Intermediate Holding Company LLC (Delaware) – make whole determination and analysis of reinvestment risk for senior secured noteholders
- 2014 Marblegate Asset Management, LLC et al vs. Education Management Corp et al (District Court – Southern District of NY) – analysis of available liquidity under various restructuring scenarios as directed by counsel
- 2014 In re: MPM Silicones et al ("Momentive") (Southern District of NY) – market efficiency, credit analysis and valuation in connection with a cram down of secured notes pursuant to a plan of reorganization; make whole determination and analysis for senior noteholders
- 2013 In re: Getty Marketing, Inc. v. Lukoil Americas Corporation et al – valuation analysis and determination of "reasonably equivalent value" in a fraudulent transfer matter
- 2013 In re: School Specialty, Inc. (Delaware) – make whole determination for the senior secured lender

**Christopher J. Kearns**
**(continued)**

- 2010 In re: Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) (Southern District of MS) – make whole / no call determination for noteholders including analysis of reinvestment risk

- 2009 In re: Lyondell Chemical Company, et al; Official Committee of Unsecured Creditors v. Citibank N.A., et al – solvency and valuation analysis, including issues related to alleged fraudulent transfer

- 2007 Phar-Mor vs. McKesson – solvency and valuation analysis

- 2007 Northwestern Corporation – rebuttal on structured finance and restructuring related matters

- 2007 In re: Calpine Corporation (Southern District of NY) – solvency analysis and make whole / no call determination for certain noteholders

- 2006 and 2007 In re: Enron Securities Litigation – rebuttal on solvency and valuation matters

- 2005 Maxxim Medical, Inc. vs. Professional Hospital Supply (Middle District of Florida) – lost profits and business valuation

- 2001 and 2005 Heilig-Meyers and The RoomStore (Virginia) – KERP program, asset sales, business valuation and for plan proponent

- 2001 Schwinn/GT (Colorado) – KERP program, liquidation analysis and creditor recoveries, sale of assets, and for plan proponent

- 2000 Monet Group (Delaware) – Sale of assets and for plan proponent

- 2000 Nature's Best Group Inc. v. Best Foods et al (Nassau County, NY State) – Deposition testimony for defendant; lost profits and business valuation

- 1999 Starter Corp. (Delaware) – KERP program, liquidation and creditor recoveries analysis, and for plan proponent

- 1998 Fletcher et al v. Liggett Group Inc. (Alabama) – business valuation, bankruptcy and restructuring recoveries, and intellectual property analysis

- 1995 Buddy L, Inc. (Delaware) – for Chapter 11 plan proponent

**Recent Speaking Engagements**

- 2021 – Valcon – Valuation Challenges in the Current Environment

- 2021 – American Bankruptcy Institute – Liquidating Plans: Standing and Preservation of Claims for Creditors

- 2020 – GLG and Burford Capital Webcast – Bankruptcy in the COVID Downturn

- 2018 – Valcon – When is Adequate Protection Not Adequate?

- 2018 – Debtwire Distressed Investors Conference – Recent Developments in Bankruptcy

- 2016 – Beard Distressed Investors Conference, panelist

- 2016 – Managing Distress in the Energy Sector: Strategies and Alternatives (Diamond McCarthy webinar)

- 2012 – American Bankruptcy Institute – mid-level professionals conference, panelist

- 2012 – Distressed Investors Conference – Schulte Roth & Zabel LLP, panelist

**Christopher J. Kearns**
**(continued)**

- 2011 – Energy Industry Conference – Cadwalader Wickersham & Taft, panelist

## BOARDS OF DIRECTORS

**Bristol-Myers Company – 1988-1991**

**Assistant Controller: 1990-1991**

- Responsible for SEC reporting for the corporation and internal reporting and analysis for senior management
- Principal corporate financial interface with accounting and finance function for major divisions /subsidiaries
- Managed all corporate disbursements

**Director – Internal Audit: 1988-1990**

- Managed audits and special projects at corporate and multinational subsidiary levels for the Company's pharmaceutical, healthcare and consumer products businesses

**Arthur Andersen & Company – 1978-1988**

**Manager: 1983-1988**

- Managed numerous audit engagements, including overall engagement responsibility for ITT Corporation, Grumman Corporation and Signal Companies
- Advised major investment banks in connection with merger and acquisition structure and techniques

**Corporate**

- aaiPharmaceutical, Inc. 2006-2009
- Outsourcing Solutions, Inc. 2003-2005
- Supradur Company 1992-1993

**Non-profit**

Leukemia and Lymphoma Society

- National Board of Representatives 2005 – 2010
- NY Chapter - Chairman Emeritus, past President and Trustee 1995 – 2010
- Long Island Chapter Board of Trustees 2014 – 2019

Catholic Health Services of Long Island – Mercy Medical Center (ex officio) – 2012 – 2013

Make-A-Wish Foundation of Metro New York – 1992 – 1994

Turnaround Management Association – NY Chapter past President

Friends of Mercy Medical Center, Long Island NY – Past President and Executive Committee 2008 – 2014

## MEMBERSHIPS

- Turnaround Management Association, past President NY chapter
- Association of Certified Insolvency and Restructuring Advisors
- American Institute of Certified Public Accountants

**Christopher J. Kearns**
**(continued)**

- NY State Society of CPA's
- National Association of Certified Fraud Examiners

### EDUCATION AND PROFESSIONAL CERTIFICATIONS

- Iona College – BBA Accounting with honors 1978
- Certified Public Accountant
- Certified Turnaround Professional
- Certified Insolvency and Restructuring Advisor
- Certified Fraud Examiner