**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC., | § | Chapter 11 |
| | § | |
| Debtor.[1] | § | |

**DECLARATION OF CLIFTON KARNEI IN SUPPORT OF (I) APPROVAL
OF THE DISCLOSURE STATEMENT ON A FINAL BASIS, AND (II)
CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN OF
REORGANIZATION OF BRAZOS ELECTRIC POWER COOPERATIVE, INC.**

I, Clifton Karnei, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief.

**Background and Qualifications**

1.      I am the Executive Vice President and General Manager of Brazos Electric Power Cooperative, Inc. ("Brazos" or the "Debtor") and have served in this role since September 1997. Brazos is a non-profit electric cooperative corporation organized under the laws of the state of Texas pursuant to section 161.059 of the Texas Utilities Code and is the debtor and debtor in possession in this case.

2.      I submit this declaration (the "Declaration") in support of final approval of the *Disclosure Statement for Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.*, dated September 13, 2022 [Dkt. No. 2294-2] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and confirmation of the *Amended Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.*, dated October 27,

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, Texas 76712.

2022 [Dkt. No. 2440-1] (as may be amended, modified, or supplemented in accordance with the terms thereof, the "Plan"), including the agreements and other documents set forth in the *Notice of Filing of Plan Supplement* [Dkt. No. 2420] (as may be amended, modified, or supplemented in accordance with the Plan, the "Plan Supplement"), pursuant to the applicable provisions of sections 1125 and 1129 of the Bankruptcy Code.[2]

3.      I have over 35 years of experience in the energy industry, including extensive experience in the public-power sector since joining Brazos in 1997.  I am a former member of the Board of Directors of Electric Reliability Council of Texas ("ERCOT") and previously served as the Chair and Vice Chair of the ERCOT Finance & Audit Committee for over 20 years.   In addition, I serve on the boards of directors for ACES Power, an energy-management company that helps electric cooperatives manage energy-market risks, and National Renewable Cooperative Organization, an organization that helps its members develop and use renewable energy sources. Before joining Brazos, I worked as the General Manager at the San Miguel Electric Cooperative, a 440-megawatt lignite-fired electric generation facility in Jourdanton, Texas, and as a Senior Auditor at the accounting firm Deloitte.  I earned a Bachelor of Business Administration in Accounting, *summa cum laude*, from the University of Texas at San Antonio and am a Certified Public Accountant in the State of Texas.

4.      As a result of my time with Brazos, my review of relevant documents, and my discussions with other members of Brazos's management team and professional advisors, I am familiar with Brazos's day-to-day operations, business, financial affairs, books and records, and restructuring efforts.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

5.      Except as otherwise indicated, all facts set forth in this Declaration are either based on my personal knowledge, information obtained from Brazos's management team and advisors, my review of documents and information concerning Brazos's operations, financial affairs, and restructuring initiatives, or my experience and knowledge. I have relied in part on information and materials that Brazos's personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, or for my benefit in preparing this Declaration.

6.      Together with counsel, I have reviewed the applicable requirements for approval of the Disclosure Statement under section 1125 of the Bankruptcy Code and for confirmation of the Plan under section 1129 of the Bankruptcy Code.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this Declaration.

**Development of the Plan and Related Plan Settlements**

7.      The Plan, the Disclosure Statement, the *Declaration of Clifton Karnei in Support of Chapter 11 Petition and Emergency First-Day Motions*, dated March 1, 2021 [Dkt. No. 3] (the "First-Day Declaration"), and the record of this Chapter 11 Case provide an overview of Brazos's business and other facts that are relevant to approval of the Disclosure Statement on a final basis and confirmation of the Plan.

8.      The Plan is the result of extensive good faith negotiations between Brazos and the majority of its key economic stakeholders, including ERCOT, certain Market Participants, Brazos's 16 member distribution electric cooperatives (the "Members"), the Official Committee of Unsecured Creditors (the "Committee"), and other significant creditors, almost all of which were reached through (or directly resulted from) the various mediations conducted by The Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas

("Judge Isgur"), which spanned several months during the course of this Chapter 11 Case.  Indeed, the Plan incorporates and describes a collection of key, interdependent settlements and compromises:  the ERCOT Settlement, the Member Settlement, the Committee Settlement, the BSCEC Claims Settlement, the SCEA Claims Settlement, and the Tenaska Power Claim Settlement.

## A.   The ERCOT Settlement

9.   Under the ERCOT Settlement, Brazos will make two Effective Date payments to ERCOT: first, a $599.7 million payment to replenish ERCOT's "CRR Reserve Account," and second, a $553.8 million initial payment to ERCOT, to be paid by ERCOT to certain Eligible Market Participants. Brazos will also make certain installment payments ($13.8 million per year over 12 years) and contribute a portion of the proceeds from the Generation Sale (approx. $116.6 million) to fund payments to ERCOT, who will then pay Eligible Market Participants in accordance with the Market Participant Settlement Procedures, the ERCOT Election Notice, and the ERCOT Recovery Appendix. The ERCOT Settlement includes a mutual release and related injunction provisions, precluding ERCOT from collecting any default uplift from other Market Participants for prepetition amounts owed by Brazos under the Protocols.  I understand that those provisions were critical to achieving the ERCOT Settlement.  The parties to the ERCOT Adversary Proceeding also agreed to dismiss the litigation over the ERCOT Claim, the ERCOT Adversary Proceeding, and related appeals. The ERCOT Settlement further includes non-economic provisions required by ERCOT and the PUCT, including certain post-Effective Date changes in Brazos's management team and its general counsel.

**B.      The Member Settlement and Ratepayer Hardship Fund**

10.      The Member Settlement will allow Brazos to obtain critical Plan funding, consummate an operational restructuring, and finally resolve all claims and disputes between Brazos and its Members. The key terms of the Member Settlement are as follows:

- Members will pay their respective TAA Balances (into an escrow account) prior to the Effective Date to fund most of the Plan's Effective Date distributions;

- Brazos will wind down its power-supply business and Brazos and the Members will execute the Amended ARCs for wholesale transmission and distribution services;

- Members Patronage Capital Claims will be reinstated and retired in accordance with Brazos's bylaws;

- Members will retain their membership in Brazos in order to preserve the Brazos cooperative structure; and

- Brazos and the Committee will dismiss the pending claims litigation against CoServ and Tri-County, and Brazos and the Members will—through the Plan's releases— agree to a mutual release of claims.

11.      As part of the Member Settlement, Reorganized Brazos will transition from a "Generation & Transmission" electric cooperative to a "Transmission & Distribution" electric cooperative. Accordingly, the Plan provides that Brazos and the Consenting Members will execute the Amended ARCs, which will become effective on March 1, 2023.  Under the Amended ARCs:

- Brazos will no longer sell power and energy to the Members and Members will no longer receive power supply from Brazos;

- Members will have the right to build substations in the future;

- The term of the Amended ARC will be extended to 2060, with 5-year extensions triggered every 5 years allowing debt to match the useful lives of financed assets;

- Brazos will be prohibited from owning power-supply resources or making power sales, with certain exceptions; and

- "Transition Cost" allocations will be locked in, i.e., net costs of generation assets pending disposition, and retention of certain Power Purchase Agreements (or PPAs).

12.      Also as part of the Member Settlement, Brazos will establish and fund a Ratepayer Hardship Fund. The fund is designed to mitigate the impact of Winter Storm Uri-related

securitization charges on the Members' low-income retail customers. Eligible customers will receive a credit of 100% of the securitization charge, or comparable proxy amount, on their monthly bills. Initial eligibility will be based on that used for the Low Income Home Energy Assistance Program ("LIHEAP"), which is less than 150% of the poverty line for a household.  An estimated 134,000 potentially eligible households will qualify. Qualification will typically be for 12 months, with retroactive benefits possible for the first six months after implementation of the securitization charges. At the start of the program, Brazos will contribute $140,000,000 in funds to be invested/managed in trust for the benefit of the program and to cover program expenses. The goal of the program will be to achieve optimal distribution of funds for the benefit of the beneficiaries of the fund. Solix, Inc. will serve as the Hardship Fund Administrator and U.S. Bank N.A. will serve as the Hardship Fund Custodian. Solix is the Low Income Program Administrator in Texas for similar programs. A Trust Oversight Board has been established and is comprised of 7 individuals nominated by the Members and appointed by the Brazos Board. The Trust Oversight Board will provide oversight and direction to the Hardship Fund Custodian and Hardship Fund Administrator. The Trust Oversight Board may modify the "Fund Plan" to optimize use of the Ratepayer Hardship Fund over its 10-year life.

## C.     The Committee Settlement

13.     The Committee Settlement is also the product of numerous mediation sessions before Judge Isgur and extensive negotiations spanning several months.  The key terms of the Committee Settlement are as follows:

- The Committee and most of the Prepetition Revolving Lenders agreed to support the Plan in exchange for a "minimum distribution" equal to no less than 89.5% of the Allowed General Unsecured Claims;

- Holders will receive the benefit of any reduction in the amount of Brazos's Estimated GUC Pool (i.e., if the amount of Allowed General Unsecured Claims falls below the

estimated GUC pool, each holder of an Allowed General Unsecured Claim will receive a proportionate increase in its recovery under the Plan);

- Brazos agreed to the waiver and release of "preference" claims under section 547 of the Bankruptcy Code (and any similar laws) in respect of general unsecured creditors; and

- The Committee also agreed to the inclusion of a letter recommending that holders of General Unsecured Claims and Tort Claims vote to accept the Plan in the Solicitation Package.

**D.     The SCEA Claims Settlement**

14.     SCEA, pursuant to a Power Purchase Agreement with Brazos, asserted an $8.5 million priority claim and an unsecured claim for rejection damages of between approximately $640 million and $740 million. After initiating litigation and following several mediation sessions with Judge Isgur, Brazos agreed to pay in full the SCEA Allowed Priority Claim and to treat the SCEA Allowed GUC Claim in the amount of $254,047,356.33 as a Class 5 General Unsecured Claim.  The SCEA Allowed GUC Claim is divided into two tranches for distribution purposes. The first tranche, in the claim amount of $124,047,356.33, will be paid $105,440,252.88 on the Effective Date, or an 85% recovery. The remainder, in the claim amount of $130,000,000, will be paid SCEA's pro rata share of the Initial GUC Cash Payment (distributed on or about the Effective Date) and the Additional GUC Cash Payment (distributed on or before, but not more than ten days following, the sale of Debtor's Generation Assets). Although SCEA will receive the full amount of the first tranche payment on the Effective Date (versus 60% for GUCs), total payment on its claim ($221,790,252.88 assuming an 89.5% GUC Distribution Percentage) results in an 87.3% recovery, which is slightly less favorable than other General Unsecured Claims (albeit, SCEA will receive payment slightly sooner).

**E.     The Tenaska Power Claim Settlement**

15.     Tenaska Power asserted a priority claim against Brazos in excess of $84 million for ancillary services purchased during Winter Storm Uri. To avoid complex, costly claims litigation regarding the priority of Tenaska Power's Claims, the parties ultimately agreed that Tenaska Power's Claim would be treated as an Administrative Claim, but that such Administrative Claim would be fully satisfied through a cash payment on the Effective Date equal to 93.6% of the Allowed Tenaska Power Claim.

**F.     The BSCEC Claims Settlement**

16.     The BSCEC Claims Settlement was previously submitted to the Bankruptcy Court pursuant to a joint motion [Dkt. No. 2156], and on September 14, 2022, the Bankruptcy Court entered an order approving the BSCEC Claims Settlement Agreement [Dkt. No. 2276].  The Plan simply incorporates that previously approved settlement, which allows the BSCEC Claim at $165,000,000.

**G.     Plan Settlements**

17.     The above described Plan settlements and compromises are the results of extensive, good-faith, arm's-length negotiations with ERCOT, the Members, the Committee, and Brazos's other creditor and stakeholder constituencies, including through numerous mediation sessions with Judge Isgur.  These negotiations resulted in, among other things, the following benefits to Brazos and its estate: (i) the assumption of all existing All Requirements Contracts and entry into Amended ARCs with Consenting Members, (ii) the marketing and sale of the Generation Assets to fund payment obligations to creditors under the Plan, (iii) the Members' respective payments of their TAA Balances to Brazos, (iv) the establishment of the Ratepayer Hardship Fund, (v) the resolution of each Consenting Members' claims against Brazos, (vi) the dismissal of pending litigation between Brazos and ERCOT (and Brazos and CoServ/Tri-County), (vii) an agreed upon

minimum recovery for holders of Allowed General Unsecured Claims, and (viii) the agreement by the Committee to support the Plan and recommend to creditors that they vote in favor of the Plan. Each of the foregoing settlements also resolves complex disputes between Brazos and one or more of its stakeholders, avoids protracted, costly and uncertain litigation, results in universal support for the Plan among the Voting Classes, and provides certainty for Brazos's business upon emergence from Chapter 11.

18.     I believe that each of the Plan Settlements discussed above is fair, reasonable, and in the best interests of Brazos, its estate, its creditors, and other stakeholders.

## The Disclosure Statement Should be Approved on a Final Basis

19.     For the reasons explained below (except where such satisfaction is apparent on the face of the Disclosure Statement), I believe the Disclosure Statement and its exhibits satisfy the applicable requirements of the Bankruptcy Code, including the provisions regarding the provision of notice of the Objection Deadline, the Voting Deadline, and the Combined Hearing, and should be approved on a final basis.

20.     I understand that the primary purpose of a disclosure statement is to provide "adequate information" to allow parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  Here, the Disclosure Statement contains descriptions and summaries of, among other things: (a) the Plan, including the classification and treatment of Claims against Brazos and which holders are entitled to vote and how to vote on the Plan; (b) Brazos's corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness; (c) events leading to this Chapter 11 Case and material developments during the Chapter 11 Case; (d) certain important effects of confirmation of the Plan; (e) the releases, exculpations, and injunctions contemplated by the Plan; (f) certain financial

information about Brazos, including financial projections and liquidation and valuation analyses; (g) the statutory requirements for confirming the Plan; (h) certain risk factors that holders of Claims should consider before voting to accept or reject the Plan; (i) information regarding alternatives to confirmation of the Plan; and (j) certain United States federal income tax consequences of the Plan.  Based on my experience in the industry and my knowledge of the types of Claims asserted against Brazos, I believe the Disclosure Statement, which includes the foregoing information, provides the holders of Claims against Brazos with sufficient information to make an informed judgment about whether to support the Plan.  Accordingly, I believe the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code as I understand it.

21.     Additionally, for the reasons set forth in the *Certification of Stretto Regarding Tabulation of Votes in Connection with the Amended Chapter 11 Plan of Reorganization of Brazos Electric Power Cooperative, Inc.* [Dkt. No. 2486] (the "Voting Report"), I believe the Plan was solicited in good faith and in compliance with the provisions of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, and the Disclosure Statement Order.

**The Plan Satisfies the Applicable Confirmation Requirements**

22.     Based on my involvement in the Chapter 11 Case and understanding of the Plan (including the Restructuring Transactions contemplated therein), I believe the following: (a) the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code, all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable nonbankruptcy law; (b) the Plan was proposed in good faith; and (c) Brazos, acting through its officers, directors, and professionals, has conducted itself in a manner that complies with applicable law in relation to the formulation, negotiation, and solicitation of votes on the Plan.  Therefore, I believe the Plan

should be confirmed. I have set forth the reasons for my belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents, or where it will be the subject of other evidence introduced at the Combined Hearing.

**A.     Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code**

23.     I understand that section 1129(a)(1) of the Bankruptcy Code requires the Plan to comply with the applicable provisions of the Bankruptcy Code, which I understand to encompass compliance with sections 1122 and 1123 of the Bankruptcy Code. Based on my understanding of the Bankruptcy Code, I believe the Plan complies with section 1129(a)(1) of the Bankruptcy Code as set forth below.

### *1.     Section 1122: Proper Classification of Claims*

24.     In my view, and based on my familiarity with Brazos's business and review of the Plan and related documents, the classification structure of the Plan satisfies the requirements of section 1122 of the Bankruptcy Code because each Class consists solely of "substantially similar" Claims that share common priority or rights against Brazos's Estate. All Claims within a Class have the same or similar rights against Brazos. Moreover, I understand the Plan's classification scheme generally tracks Brazos's prepetition capital structure and divides the Claims into Classes based on the underlying instruments or facts giving rise to those Claims or other economic, legal, or factual reasons. For example, the Plan separately classifies Class 3 (RUS Secured Notes Claims), Class 4 (ERCOT Claim), Class 5 (General Unsecured Claims), and Class 7 (Tort Claims) because of the different circumstances and legal rights of holders in each Class. The Plan's classifications serve the purpose of facilitating distributions on the Effective Date and administrative convenience, but also acknowledge the fundamental differences between those types of Claims. Accordingly, I believe the Plan satisfies section 1122 of the Bankruptcy Code.

### 2. Section 1123(a): The Plan Contains Appropriate Mandatory Content

25.     Based on my understanding of section 1123(a) of the Bankruptcy Code, and as set forth below, I believe the Plan complies with each of the applicable requirements of section 1123(a).

- Sections 1123(a)(1), (a)(2), and (a)(3) (specification of classes, impairment, and treatment): Article II of the Plan designates Administrative Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims, and other unclassified Claims. Article III of the Plan designates 10 Classes of Claims and specifies whether each Class is Impaired or Unimpaired under the Plan and the treatment of each such Impaired Class.

- Section 1123(a)(4) (equal treatment required of claims in particular class): Article III of the Plan provides that, except to the extent that a holder of a Claim agrees to less favorable treatment, the treatment of each Claim in a particular Class is the same as the treatment of each other Claim in that Class. Each of the 10 Classes of Claims differs from the Claims in each other Class in a legal or factual way, or are separated based upon other applicable criteria, including priority, Brazos's economic or business rationale, or other special circumstances. Accordingly, it is my view, based on my involvement in the Chapter 11 Case and my knowledge of Brazos's business, that the Plan's classification structure satisfies section 1123(a)(4) of the Bankruptcy Code.

- Section 1123(a)(5) (adequate means for implementation): I believe the Plan provides adequate means for implementing the Plan. Article IV of the Plan, in particular, sets forth the means for implementation of the Plan. Among other things, the Plan describes (a) the sources of consideration for Plan distributions; (b) the approval of the terms and conditions of the Plan Settlements; (c) the Consenting Member's continued membership in the Reorganized Debtor in accordance with applicable law; and (d) the procedures governing distributions under the Plan and the resolution of Disputed Claims.

- Section 1123(a)(6) (prohibiting issuance of non-voting equity securities): Brazos has no power to issue certificates of stock under its existing organizational documents, the Plan, the New Organizational Documents, or applicable law. Accordingly, it is my understanding that section 1123(a)(6) of the Bankruptcy Code is not applicable to the Plan.

- Section 1123(a)(7) (selection of officers and directors must be consistent with interests of creditors, equity security holders and public policy): Article IV.M of the Plan and Exhibit M of the Plan Supplement set forth the

provisions regarding the Reorganized Debtor's governance under the New Organizational Documents and discloses the identities of the Reorganized Debtor's initial senior management team and the initial directors of the Reorganized Debtor's Board. As a result, I understand that the Plan provisions governing the manner of selection of any officer, director, or manager of the Reorganized Debtor are consistent with the interests of creditors and public policy. Accordingly, I believe the Plan satisfies the requirements of section 1123(a)(7).

- <u>Section 1123(a)(8) (requirements for individual debtors)</u>:  Brazos is not an individual and, as a result, I understand that section 1123(a)(8) of the Bankruptcy Code does not apply to the Plan.

26.     For these reasons, I believe the Plan satisfies the requirements of section 1123(a) of the Bankruptcy Code.

### 3.     *Section 1123(b)(1)–(5): The Plan's Permissive Content is Appropriate*

27.     Based on my understanding of section 1123(b) of the Bankruptcy Code, and as discussed below, I believe each provision of the Plan is permissible under section 1123(b).

- <u>Section 1123(b)(1) (plan may impair or leave unimpaired any class of claims or interests)</u>:  Article III specifies which Classes of Claims are Impaired and which Classes of Claims are Unimpaired under the Plan.

- <u>Section 1123(b)(2) (plan may provide for assumption, rejection, or assignment of any executory contract or unexpired lease)</u>:  Article V of the Plan provides for the assumption of all Brazos's Executory Contracts and Unexpired Leases, except for those that (a) are identified on the Rejected Contracts Schedule; (b) have been previously rejected, assumed, or assumed and assigned by a Final Order; (c) previously expired or terminated pursuant to their own terms; (d) are the subject of a motion that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date. Moreover, the Assumed Contracts Schedule, annexed as Exhibit A to the Plan Supplement, identifies those Executory Contracts and Unexpired Leases that are being assumed or assumed and assigned pursuant to the Plan and the applicable Cure Claims, if any, as well as procedures to address disputes as to Cure Claims and other matters in respect of the proposed treatment of such Executory Contracts and Unexpired Leases under the Plan. The Rejected Contracts Schedule, annexed as Exhibit B to the Plan Supplement, identifies those Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan.

- <u>Section 1123(b)(3)(A) (plan may provide for settlement or adjustment of any claim or interest)</u>:  The Plan Settlements and compromises incorporated

into the Plan and described in Article IV of the Plan and in this Declaration, represent good-faith compromises of Claims and controversies relating to the contractual, legal, and other rights that such creditors may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  In addition, Article VIII.C of the Plan provides for Brazos's release of certain Claims and Causes of Action against the Released Parties. In connection with the confirmation of the Plan, I believe the Bankruptcy Court should approve those Plan Settlements that have not been the subject of a separate motion for approval (*i.e.*, the BSCEC Claims Settlement), as set forth above.

- <u>Section 1123(b)(3)(B) (plan may provide for retention and enforcement of any claim or interest)</u>:  Article IV.T of the Plan and the Retained Causes of Action Schedule, annexed as Exhibit C to the Plan Supplement, preserve for the Reorganized Debtor certain Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable rights and defenses that Brazos had immediately before the Effective Date, except as otherwise expressly set forth in the Plan.

### 4. Section 1123(b)(6) (plan may include other appropriate provisions): The Plan's Discretionary Content is Permitted

28.    I understand that Article VIII of the Plan includes several discretionary provisions, including release, exculpation, and injunction provisions that are integral to Brazos's reorganization and are a key component in respect of the global resolution of Claims and controversies in this Chapter 11 Case, including several of the Plan Settlements.  These discretionary provisions are the result of extensive good faith and arm's-length negotiations, are supported by Brazos, its largest creditors, and other key stakeholders.

**B.    The Plan Releases are Appropriate and Constitute a Sound Exercise of Brazos's Business Judgment**

29.    Article VIII.C of the Plan provides for the release of Claims and Causes of Action by Brazos, its Estate, and the Reorganized Debtor that Brazos could assert against the Released Parties (the "<u>Debtor Release</u>").  Article VIII.D of the Plan provides for the release of claims and Causes of Action by certain non-Debtor third parties—the Releasing Parties—against the Released Parties (the "<u>Third Party Releases</u>," together with the Debtor Release, the "<u>Plan Releases</u>").

30.     In consideration of the Plan Releases and the other components of the Restructuring Transactions set forth in the Plan, the Released Parties have, among other things (and as applicable), (a) voted to accept the Plan; (b) provided consensual postpetition cash collateral usage to Brazos; (c) provided the DIP Facility and a committed Exit Facility on the best terms available to Brazos; (d) negotiated in good faith with Brazos regarding a broad range of disputed issues, including those settled through the Plan Settlements (in particular, the Member Settlement, the SCEA Claims Settlement, the Committee Settlement, and the Tenaska Power Claim Settlement); (e) provided postpetition services to Brazos in their capacity as officers or directors; and (f) guided Brazos through its restructuring, including the Chapter 11 Case.  I believe that Brazos's officers and directors and Bankruptcy Advisory Committee were instrumental to the Debtor's efforts to negotiate with the stakeholders (in particular, with the Members) and evaluate alternatives.  Thus, they played an important role in Plan negotiations, including by devoting substantial time and resources to exploring various restructuring options, working with Brazos's stakeholders to negotiate the Plan Settlements and proposed Restructuring Transactions, and generally providing support and guidance to Brazos's advisors throughout the Chapter 11 Case.  Due to the Released Parties' efforts, the Plan provides for, among other things, agreed-upon recoveries to several of Brazos's key stakeholders and preserves Brazos as a going concern.

31.     By expending significant time and effort negotiating the terms of the Plan and the Restructuring contemplated therein and, after confirmation and the Effective Date, implementing and facilitating the Restructuring Transactions, the Released Parties have made (and will continue to make) significant contributions to the success of the Chapter 11 Case and have helped to ensure the Plan maximizes value for all stakeholders.  I believe the Plan Releases facilitated participation by the Released Parties in the chapter 11 process, including the mediation of numerous critical

issues and the negotiation of the Plan Settlements.  As a result, Brazos and all Releasing Parties benefit from the Restructuring contemplated by the Plan and the significant contributions of the Released Parties in furtherance of that Restructuring.

32.     I understand that parties in interest were provided extensive notice of the Plan, the proposed Plan Releases, and the Objection Deadline.  Indeed, I understand that many of Brazos's largest creditors and other stakeholders either participated in nearly six months of mediation with Judge Isgur or were otherwise included in negotiations concerning the drafting of the Plan.  I further understand the Third Party Releases are fully consensual as each of the Releasing Parties, including creditors and counterparties that were not entitled to vote to accept or reject the Plan, were afforded the opportunity to "opt out" of the Third Party Releases by filling out an opt out form or objecting to the Plan in accordance with the Disclosure Statement Order, but chose not to do so.  Consequently, I believe the Plan Releases represent a consensual settlement of claims and Causes of Action by the Releasing Parties in exchange for the consideration provided by the Released Parties under and in connection with the Plan.

33.     I believe the Plan Releases are a critical component of the various settlements that form the Plan's foundation and recognize the extensive efforts and contributions of the Released Parties to Brazos's Restructuring, which efforts were needed in order to ensure a successful resolution of numerous ongoing disputes and challenges among Brazos and other stakeholder groups and pave the way for Brazos's emergence from bankruptcy.

34.     Moreover, I am not aware of any colorable Claims or Causes of Action that Brazos has or may have against any of the Released Parties that would provide a material benefit to creditor recoveries beyond what the Plan already provides.  Further, the Plan explicitly preserves and does not release certain Causes of Action that Brazos believes may be valuable as identified

in the Retained Causes of Action Schedule.  As such, I do not believe Brazos has any material Claims or Causes of Action against any of the Released Parties that would justify the risk, expense, and delay attendant to pursuing such Claims or Causes of Action.

35.     Accordingly, I believe the Plan Releases are appropriate and constitute a sound exercise of Brazos's business judgment.

**C.    The Exculpation and Injunction Provisions Satisfy the Requirements of the Bankruptcy Code**

36.     Article VIII.E of the Plan provides for a release and exculpation of the Exculpated Parties (the "Exculpation"), for claims arising out of or relating to, among other things, the Chapter 11 Case and the administration thereof.  The Exculpation carves out acts or omissions that are determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  The Exculpation is, in my view, fair and appropriate, given for valuable consideration, and in the best interests of Brazos and all parties in interest.  In addition, I believe the Exculpation is appropriate to protect the Exculpated Parties, each of whom has made a substantial contributions to Brazos's Restructuring, from collateral attacks related to good faith acts or omissions related to Brazos's Plan.

37.     Article VIII.F of the Plan contains an injunction (the "Injunction") that I believe is a necessary part of the Plan because it provides certainty to Brazos and Reorganized Debtor that the Plan will be enforceable according to its terms.  The Injunction enforces the Debtor Releases, Third Party Releases, and Exculpation, each of which is centrally important to the Plan and the global settlement of disputes among Brazos, its Estate, and numerous stakeholders by permanently enjoining all Persons and Entities from commencing or continuing in any manner any Claim or Cause of Action that was released or exculpated under those provisions.  The Injunction is

narrowly tailored to achieve that purpose. Accordingly, I believe the Injunction Provision complies with applicable law and satisfies the requirements of the Bankruptcy Code.

**D.      Section 1123(d): The Plan's Cure Process is Appropriate**

38.      Article V of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan. Specifically, I understand that Brazos or the Reorganized Debtor, or the party to which any Executory Contract or Unexpired Lease is assigned, as applicable, shall pay Cure Claims, if any, not subject to an Assumption Dispute on the Effective Date (or within three Business Days thereafter), or on such other terms as the parties may agree. Each Executory Contract or Unexpired Lease to be assumed and any related Cure Claims have been or will be identified either in connection with the Disclosure Statement Order or otherwise on the Assumed Contracts Schedule filed with the Plan Supplement. I also understand that any disputed Cure Claims will be determined in accordance with the procedures set forth in Article V.D of the Plan and applicable law.

39.      Accordingly, I believe the Plan complies with section 1123(d) of the Bankruptcy Code.

**E.      The Plan Satisfies the Remaining Requirements in Section 1129(a)(2)-(16)**

40.      I believe the Plan complies with the remaining applicable requirements for confirmation of the Plan set forth in section 1129(a) of the Bankruptcy Code, for the following reasons:

- Section 1129(a)(2) (compliance with applicable provisions of Bankruptcy Code): I understand that section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code and, in that regard, is specifically intended to ensure compliance with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code. Based on my review of information provided by Brazos and its advisors, along with the Voting

Report, I believe that Brazos has complied with sections 1125 and 1126 of the Bankruptcy Code.

- <u>Section 1129(a)(3) (plan proposed in good faith and not by any means forbidden by law)</u>:  For the reasons described in this Declaration, I believe the Plan and all settlements and other agreements contemplated therein—including the Plan Settlements—have been proposed by Brazos in good faith and not by any means forbidden by law.

  I believe the Plan has been proposed by Brazos for the legitimate and honest purposes of reorganizing Brazos's ongoing business and enhancing Brazos's long-term financial viability while maximizing recoveries to Brazos's stakeholders. The Plan is the culmination and direct result of extensive good-faith arm's-length negotiations between Brazos and its key stakeholders, including the Members, ERCOT, the Defendant-Intervenors and other Market Participants, the RUS Secured Parties, the Committee, and various other parties in interest. Brazos actively participated in numerous mediation sessions with ERCOT, the Defendant-Intervenors, SCEA, the BSCEC Trustee and the BSCEC Collateral Trustee, and the Committee to seek a consensual resolution of their concerns.  As a result of these negotiations, Brazos reached the Plan Settlements that will allow Brazos to implement value-maximizing transactions for the benefit of Brazos's stakeholders and emerge from chapter 11 with enhanced long-term financial viability.  Therefore, I believe the Plan has been proposed in good faith and complies with section 1129(a)(3) of the Bankruptcy Code.

- <u>Section 1129(a)(4) (payment for certain services subject to court approval)</u>: Articles II and XI of the Plan provide that all Professional Fee Claims must be approved by the Bankruptcy Court as reasonable pursuant to final fee applications and that the Bankruptcy Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan."  Therefore, I believe the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

- <u>Section 1129(a)(5) (disclosures concerning certain individuals)</u>:  Article IV.M.2 of the Plan discloses that the current directors and officers of Brazos shall remain in their respective roles and capacities as officers of the Reorganized Debtor, except that myself, Josh Clevenger (Brazos's Vice President of Power Supply), Travis "Dean" Thrall (Brazos's Vice President of Generation), and Philip Segrest (Brazos's General Counsel) shall exit our existing roles and cease our employment or otherwise retire from the Reorganized Debtor in accordance with the terms described in the Plan. Exhibit M to the Plan Supplement provides additional information concerning the Reorganized Debtor's initial senior management team and

board of directors.  Therefore, I believe the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

- Section 1129(a)(6) (approval of certain rate changes):  Brazos's Board establishes the rates charged for power and distribution services provided by Brazos to its Members, while the wholesale transmission rates for wholesale transmission services over transmission facilities charged by Brazos are established and regulated by the Public Utility Commission of Texas.  The Plan does not provide for any rate changes.  Thus, I believe section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

- Section 1129(a)(8) (each class of claims accepts or is unimpaired):  It is my understanding, based on the Voting Report, that each Class of Claims has either accepted the Plan or is unimpaired by the Plan.  Further, it is my understanding that no Classes of Claims have voted to reject the Plan or are deemed to reject the Plan.

- Section 1129(a)(9) (payment in full of allowed administrative and priority claims):  Article II.A of the Plan provides that Allowed Administrative Claims will be paid in full in Cash on the Effective Date (or in the ordinary course if an Allowed Administrative Claim is not yet due and owing), or if not Allowed on the Effective Date, upon Allowance of any such Administrative Claim.  Article II.B of the Plan provides that Allowed DIP Facility Claims will receive on the Effective Date, at each holder's election, a Pro Rata share of a participation in the Exit Facility, or payment in full in Cash.  In addition, Article II.D of the Plan provides that Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

- Section 1129(a)(10) (acceptance by at least one impaired class of claims):  I understand, based on the Voting Report, that Classes 4, 5, 6, 7, and 10 are Impaired, do not include any insiders, and have voted to accept the Plan.  Accordingly, I believe the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

- Section 1129(a)(12) (plan must provide for fully payment of statutory fees):  Article II.E of the Plan provides that on the Effective Date or as soon as practicable thereafter, such fees shall be paid by Brazos or the Reorganized Debtor, as applicable.  The proposed Confirmation Order also provides for the payment of all such statutory fees.  Therefore, I believe the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

- Section 1129(a)(13) (plan must provide for continuation of retiree benefits):  Article IV.O of the Plan provides that, "[n]otwithstanding anything to the contrary in this Plan, in accordance with section 1129(a)(13) of the

Bankruptcy Code, the Reorganized Debtor shall continue to honor all retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), if any, as and to the extent required by the agreements giving rise to such obligations." Therefore, I believe the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

- <u>Section 1129(a)(14) (concerning domestic support obligations)</u>: I understand that section 1129(a)(14) does not apply to the Plan because Brazos does not have domestic support obligations.

- <u>Section 1129(a)(15) (concerning individuals)</u>: I understand that section 1129(a)(15) does not apply to the Plan because Brazos is not an "individual" as that term is used in the Bankruptcy Code.

- <u>Section 1129(a)(16) (property transfers must comply with nonbankruptcy law)</u>: The Plan expressly provides that all transactions contemplated by the Plan will be made in accordance with applicable nonbankruptcy law. *See, e.g.*, Plan Art. IV. Importantly, I understand that no state or regulatory authority with jurisdiction over Brazos has filed an objection to the Plan or proposed Restructuring on this ground. To the contrary, the PUCT, through the Office of the Attorney General of the State of Texas, has participated in negotiations concerning the formulation of certain aspects of the Plan, including the terms of the ERCOT Settlement, and has expressly supported confirmation and implementation of the Plan. Therefore, I believe the Plan satisfies section 1129(a)(16) of the Bankruptcy Code.

**F.  Section 1129(c):  The Plan is the Only Plan Currently on File**

41.     The Plan is the only plan currently on file in the Chapter 11 Case.  Accordingly, I believe section 1129(c) of the Bankruptcy Code is satisfied.

**G.  Section 1129(d):  The Purpose of the Plan is Not Tax or Securities Law Avoidance**

42.     The principal purpose of the Plan is not the avoidance of taxes or section 5 of the Securities Act of 1933 and understand that no Governmental Unit has objected to Confirmation of the Plan on such grounds.  Therefore, I believe the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**H.      Section 1129(e):  Inapplicable Provisions**

43.     I understand the Chapter 11 Case is not a "small business case" as that term is defined in the Bankruptcy Code.  Accordingly, I believe that section 1129(e) of the Bankruptcy Code does not apply to the Plan.

**I.      Good Cause Exists to Waive the Stay of the Confirmation Order**

44.     Under the circumstances, I believe that it is appropriate for the Bankruptcy Court to permit Brazos to consummate and implement the Plan without delay and immediately upon entry of the Confirmation Order.  The Restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties and is premised on preserving value of Brazos as a going concern for the benefit of all stakeholders, including the Members and their respective Ratepayers. The Restructuring contemplates a series of complex and time-consuming corporate reorganizational steps that must be taken in advance of the Effective Date.  I believe that, under the circumstances, time is of the essence.  Accordingly, I believe that the immediate effectiveness of the Confirmation Order would facilitate Brazos's efforts to emerge from bankruptcy and provide the authorization it needs to take the steps necessary to consummate the Plan.

45.     Finally, I believe that, as set forth above, given Brazos's extensive efforts to provide each of the Voting Classes and other stakeholders a full measure of adequate notice, staying the Confirmation Order will not serve any due process-related ends.

<u>**Conclusion**</u>

46.     For the reasons set forth in this Declaration, it is my belief that confirmation of the Plan is appropriate and in the best interests of Brazos and its Estate and satisfies the applicable confirmation requirements of the Bankruptcy Code.  Thus, on behalf of Brazos, I respectfully submit that the Plan should be approved.

Dated: November 10, 2022
       Houston, Texas

                                     */s/ Clifton Karnei*
                                       Clifton Karnei
                                       Executive Vice President and General Manager
                                       Brazos Electric Power Cooperative, Inc.